# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# DIVISION

*Ms. Sabrina Adkins and Ms. Jennifer Hill v Ben Fields, Mickey Stines, Letcher County Sheriff, and Eastern Kentucky Corrections Services*

CIVIL ACTION NO. 7:22-cv-00007-REW-EBA

\* \* \*

Report of Expert, Scott J. Hilden

January 25, 2025

\* \* \*

## INTRODUCTION

I, Scott J. Hilden, have been retained by Attorney Bethany Baxter of Childers and Baxter PLLC and Attorney Ned Pillersdorf of Pillersdorf Law Offices to provide expert analysis in the case involving Deputy Ben Fields and Sheriff Mickey Stines.

In conducting this analysis, I have drawn upon my 32 years of law enforcement experience, including my specialized knowledge in policies, procedures, supervision, management, training, and risk management. My conclusions are based on a thorough review of the available evidence, including deposition transcripts, social media posts, text messages, and relevant departmental policies. The following report details my findings, grounded in recognized law enforcement protocols and practices.

## SUMMARY OF QUALIFICATIONS

Education:

I am a seasoned law enforcement professional with a strong educational foundation. I hold a bachelor's degree in criminal justice from Michigan State University and a master's degree in liberal studies from Eastern Michigan University. Additionally, I completed the Police Staff and Command School program at Eastern Michigan University, further advancing my expertise in law enforcement practices and administration.

Professional Experience:

Throughout my 32-year career, I have consistently held leadership positions with significant responsibilities. Over the past decade, I have served as Deputy Chief of Police, Chief of Police/Emergency Management, and, currently, as Chief of Police for a municipality with a population of 33,000. In this role, I oversee all police department operations. Under my leadership, the department has earned accreditation from three respected organizations: the Commission on Accreditation for Law Enforcement Agencies (CALEA) and the Michigan Law Enforcement.

Accreditation Commission (MLEAC), and a CALEA-accredited communications center. These achievements reflect my commitment to adopting nationwide best practices in law enforcement.

As Police Chief, I regularly review and approve policies and procedures related to all aspects of police operations, including criminal investigations, case development, report writing, records management, handling officer complaints, training, supervision, and employee discipline. I remain committed to staying current with professional police practices, as demonstrated by my active membership in the following organizations:

- International Association of Chiefs of Police (IACP)
- Police Executive Research Forum (PERF)
- Michigan Association of Chiefs of Police (MACP)
- Wayne County Chiefs of Police
- Southeastern Michigan Chiefs of Police
- Western Wayne County Chiefs of Police
- Member of the Michigan Municipal Risk Management Association (MMRMA).

Over the course of my career, I have supervised numerous divisions, including patrol, staff operations, selective enforcement, records bureau, department training, professional standards, and hiring. In addition to these leadership roles, I have served as an instructor and trainer in several high-liability areas, such as defensive tactics and use of force, emergency vehicle operations, high-risk traffic stops, and as a field training officer. Through these positions, I have imparted my knowledge and expertise to hundreds of officers, enhancing their effectiveness in police operations, tactics, and decision-making.

I want to emphasize further my expertise in the following relevant areas:

Training:

- Leadership in Training
  - Over 20 years of experience developing and overseeing use-of-force policies and procedures.
  - Served as a department training instructor in high-liability areas such as defensive tactics, emergency vehicle operation, and high-risk traffic stops.
  - Led the implementation of training programs across the department.
- Supervisory Role
  - Nearly four years as the department's training unit supervisor, responsible for all in-service training for nearly 100 sworn officers.

My background enables me to explain training protocols, standards, and best practices, providing essential context for understanding the actions of law enforcement officers in specific situations.

Policy and Procedures:

- Development and Implementation
  - Actively involved in developing department policies and procedures for over two decades.
  - Ensured proper implementation of these policies across the department.
- Compliance Review

- Conducted reviews of misconduct incidents to ensure compliance with department policies and legal standards.
- Accreditation in Policy and Procedures
  - 20 years of experience working in CALEA-accredited agencies, recognized for implementing "best practices" in law enforcement.
  - Played a key role in creating and implementing policies to meet the highest industry standards. CALEA and the Michigan Law Enforcement Accreditation Commission accredit my current agency.

This expertise allows me to provide informed opinions on whether officers adhered to established protocols and best practices during their actions, particularly in use-of-force incidents. These insights are crucial for assessing compliance with legal and departmental guidelines.

Management and Supervision:

- Leadership Experience
  - Over 23 years of supervisory roles, progressing from instructor to supervisor, Deputy Chief, Chief of Police, and now Director of Public Safety/Chief of Police.
  - Proven leadership in managing training units, enforcing departmental policies, and overseeing all aspects of police department operations.
- Complaint and Misconduct Investigations
  - Throughout my 32-year career, I have reviewed and investigated hundreds of internal allegations of police misconduct.
  - As Chief of Police, I am responsible for assessing the validity of these complaints, applying corrective actions when necessary, and maintaining public trust. My experience ensures a thorough understanding of internal investigations and the critical importance of adhering to policies, procedures, and the rule of law.

This background allows me to provide authoritative insights into leadership, supervision, and organizational culture within law enforcement agencies. These perspectives are essential for evaluating the actions of officers involved in use-of-force incidents.

This background allows me to provide authoritative insights into leadership, supervision, and organizational culture within law enforcement agencies. These perspectives are essential for evaluating officers' actions.

This expertise allows me to provide informed opinions on whether officers adhered to established protocols and best practices during their actions. These insights are crucial for assessing compliance with legal and departmental guidelines.

My extensive experience in supervision, leadership, and team management includes a thorough understanding of legal requirements, agency protocols, and best practices in law enforcement. I have consistently focused on ensuring accountability and guiding my teams to uphold professional standards while serving the community effectively and ethically. Throughout my career—as an officer, trainer, supervisor, and Chief of Police—I have collaborated closely with my teams to

address complex situations and make sound decisions. I have trained and mentored hundreds of officers, providing them with the skills and knowledge to perform their duties responsibly. As a supervisor and Chief, I have reviewed numerous incidents and operations to ensure they comply with policies, legal standards, and the community's expectations.

My leadership, strategic thinking, and dedication to public safety have earned me many awards, including the Director's Recognition Award and more than 30 departmental awards for exemplary conduct and meritorious actions. Organizations such as the Michigan Association of Chiefs of Police and the Governor's Traffic Safety Advisory Commission have recognized my efforts to enhance traffic safety and reduce crime.

Expert testimony in the last four years:

| Type of Case: | Location: | Date | Case Number: |
|---|---|---|---|
| Deposition Testimony Use of Force | United States District Court Eastern District of Wisconsin | June 2024 | 2:23-cv-153 |
| Deposition Testimony Use of Force | United States District Court Eastern District of Kentucky | December 2024 | 6:23-cv-152-REW-HAI |

With over 32 years of experience managing and supervising every aspect of police department operations, my expertise is well-documented. For further details on my training, qualifications, and background, please refer to my Curriculum Vitae, attached to this report as **Exhibit A**.

Retainer & Fee Schedule:

Retainer - $3,900.00
Case Review and Expert Report - $300.00/hr.
Deposition Testimony - $400.00/hr.
Trial Testimony - $4,000.00/day

**Methodology:**

The purpose of this report is to provide expert analysis and testimony to assist the trier of fact in understanding whether the actions of Deputy Fields, Sheriff Stines, and the Letcher County Sheriff's Department were consistent with accepted law enforcement practices. All opinions expressed in this report are based on a reasonable degree of professional certainty and are derived from materials typically relied upon by experts in my field.

My opinions and conclusions are derived from analyzing the case materials provided. I have relied on my extensive expertise and knowledge as a law enforcement officer and Director of Public Safety/Chief of Police, which spans over 32 years. To arrive at my conclusions, I have examined and evaluated the facts and information presented, utilizing a methodology I have used for many

years as a police executive when scrutinizing and assessing the actions and conduct of police officers under my command and/or supervision.

My approach involves assessing law enforcement officers' actions against widely accepted police practices, policies, and legal standards, such as those established by organizations like the International Association of Chiefs of Police (IACP), the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA), and the Police Executive Research Forum (PERF).

The IACP is a renowned professional law enforcement association with over 120 years of experience. It is recognized for launching internationally acclaimed programs, conducting groundbreaking research, and providing exemplary services to members worldwide. For over thirty years, its Law Enforcement Policy Center has been instrumental in addressing innovative issues in law enforcement through advocacy, research, and training services.

The IACP Law Enforcement Policy Center (Center) has published Concepts and Issues Papers and Model Policies, which serve as guidelines for law enforcement agencies and officers. These documents provide essential background information and supporting materials, ensuring that the most current information and professional judgment are incorporated into these policies.

CALEA was created in 1979 as a joint effort by significant executive leadership associations in law enforcement: the IACP, the National Organization of Black Law Enforcement Executives, the National Sheriff's Association, and the Police Executive Research Forum. Its purpose is to establish a set of professional standards and an accreditation process known as Law Enforcement Accreditation. This program ensures accountability and transparency within the agency and its community by defining apparent authority, performance, and responsibilities.

PERF, founded in 1976, is a police research and policy organization that provides police management services, technical assistance, and executive-level education to support law enforcement agencies. It helps improve the delivery of police services through strong national leadership, public debate on police and criminal justice issues, research, and policy development.

A vast body of knowledge and literature is available about the practices and standards that well-managed and administered police agencies across the United States should follow and implement in their operations. These generally accepted practices have been developed over time to encourage and assist police agencies in providing professional, reasonable, practical, and legal police services to the communities they serve. Most of these generally accepted practices have been derived from law enforcement's critical analysis of field incidents and reviews of incidents that have led to police liability, deficiencies, and employee misconduct.

Materials Reviewed:

In forming my opinions, I reviewed the following documents and materials:

1. Amended Complaint
2. Adkins Deposition
3. Adkins Exhibits
4. Fields Deposition

5. Fields Exhibits
6. Stines Deposition
7. Stines Exhibits
8. Chris Triplett Affidavit
9. Criminal Plea agreement Deputy Fields

Approach and Expertise:

My analysis is grounded in over 32 years of experience in law enforcement. My approach involves assessing the actions of law enforcement officers against widely accepted practices, policies, and legal standards, such as those established by organizations like the International Association of Chiefs of Police (IACP), the Commission on Accreditation for Law Enforcement Agencies (CALEA), and the Police Executive Research Forum (PERF). These organizations provide model policies and guidelines that reflect best practices in law enforcement.

In this case, I scrutinized the facts and materials using the same methodology I have applied for years when evaluating officers' conduct under my supervision. This includes analyzing the law enforcement officers' decision-making and actions against department policies and procedures, rules and regulations, training, and accepted law enforcement practices.

Professional Standards Referenced:

My assessment is also informed by guidelines and model policies from respected law enforcement organizations, including:

- **International Association of Chiefs of Police**
    - *"Best Practices Guide for Developing a Police Department Policy-Procedures Manual"* (Chief W. Dwayne Orrick- International Association of Chiefs of Police, n.d.) Attached as Exhibit B.
    - *"Sexual Harassment &Misconduct"* Model Policy and Concepts and Issues Paper. (International Association of Chiefs of Police, February 2022) Attached as Exhibit C.
    - *"Standards of Conduct"* Model Policy and Concepts and Issues Paper (International Association of Chiefs of Police, July 2019) Attached as Exhibit D.

Use of Terminology:

While my report may use terms such as "reasonable," "reckless," "negligent," or "unreasonable." these terms are not intended to convey legal conclusions but are used in the context of law enforcement standards. Such terminology is common in my field and reflects my assessment of the officers' actions relative to accepted police practices. Any legal determination remains the responsibility of the court and factfinders.

<u>Reservation of Rights:</u>

This report is based on the information provided to me at the time of writing. Should new evidence or information become available, I reserve the right to amend or supplement my opinions and conclusions.

In my analysis and report, I have refrained from judging the credibility of the different parties and witnesses or taking sides in the disputed accounts. This is because it is not within the scope of my work and should be left to the factfinder.

## SUMMARY OF THE INCIDENT

Taken from the criminal plea agreement Letcher County Circuit Court dated September 28, 2023, of Ben Fields, who pleaded guilty to multiple charges, including Rape 3rd, degree, Sodomy 3rd, degree, Tampering with a Prisoner monitoring device, and Perjury.

*Ben Fields was employed as a deputy for the Letcher Co. Sheriff (bailiff), and also worked for East Kentucky Corrections Services, monitoring inmates placed on home incarceration with ankle bracelets. Those on HIC are required to pay a weekly fee. While assigned to monitor Sabrina Adkins after she was released from Letcher Co. jail and placed on home incarceration, Fields advised her he would not require her to pay the fee, and would allow her to go without the ankle monitor in exchange for sexual favors. Adkins would meet Fields the night before a court appearance to put the ankle monitor on, then Fields would remove it after court.*
*On one occasion, Circuit Judge learned that Adkins was involved in a domestic violence case, and asked Fields for her coordinates which Fields could not provide. Fields then obtained a sworn false criminal complaint against Adkins for Escape. Fields used a similar approach with inmate Brianna Cornett when she was released from the Letcher County jail on Home Incarceration. He gave her a "dummy" monitor to wear. Fields admitted that he deactivated the ankle monitor and had sexual relations with Adkins and had inappropriate communications with Cornett. He also admitted he obtained the criminal complaint against Adkins for Escape to cover up the fact he allowed her to not wear the ankle monitor.*

Chris Triplett, a 59-year-old resident of Whitesburg, Kentucky, and the fiancé of Jennifer Hill, provided sworn testimony detailing serious allegations against Deputy Ben Fields of the Letcher County Sheriff's Department. A summary of his affidavit dated 3/14/22 is below:

*Triplett stated that in December 2019, he became aware that Deputy Fields coerced Ms. Hill into providing sexual favors under threat of imprisonment. As part of Ms. Hill's bond conditions, she was under house arrest, which Deputy Fields supervised. Triplett recounted that Deputy Fields parked his cruiser behind their home and told Ms. Hill, "If you don't do what I say, I will put you back in jail," before forcing her to perform oral sex in his cruiser. Days later, Deputy Fields returned and coerced Ms. Hill into sexual intercourse, again under the same threat. Triplett reported these incidents to the Letcher County Sheriff's Department in December 2021 via phone and in person. However, an unidentified employee at the department reportedly laughed at him and refused to document the complaint. After reporting the misconduct, Triplett experienced targeted harassment from other deputies, including being pulled over three times within 12 hours without*

*cause. During one stop, a deputy followed him to a remote area, conducted a warrantless search of his car, and forced him to strip to his underwear, leaving him humiliated and fearing for his life. Triplett believes these actions were retaliatory. Through media reports, Triplett became aware of similar allegations against Deputy Fields by another woman, Sabrina Adkins. He stated that neither he nor Ms. Hill had prior knowledge of Ms. Adkins before the publicity surrounding her lawsuit.*

## Analysis

### Policy Review

In my 32 years of law enforcement experience and 23 years in supervision and management, I have written and reviewed thousands of policies and procedures. When beginning my review of the Letcher County Sheriff's Department's policies, it is essential to understand why policies and procedures exist and their importance in law enforcement agencies nationwide. Agencies establish policies and procedures as foundational frameworks that guide the agency's conduct, operations, and decision-making processes. These three areas below are of particular importance:

**1. Provide Guidance to Law Enforcement Officers-** Policies and procedures guide law enforcement officers in performing their duties lawfully and effectively. By adhering to these standards, officers are protected from:

- Legal Liability: Policies help officers understand their responsibilities and the limits of their authority, reducing the risk of civil lawsuits or criminal charges stemming from misconduct or procedural errors.
- Decision-Making: Policies clarify managing complex or high-stress situations, such as using force, arrests, or searches, ensuring consistency and fairness.
- Safety and Well-Being: Operational guidelines, such as those for managing hazardous materials, vehicle pursuits, or interactions with armed suspects, prioritize officer safety while maintaining public trust.
- Accountability: Officers working within the boundaries of established policies are more likely to be supported by their agency and municipal government in the face of scrutiny.

**2. Protection of the Municipal Government-** Municipalities and county governments bear significant liability for their agencies' actions. Policies and procedures help mitigate this risk by:

- Reducing Legal Exposure: Clear, enforceable policies reduce the likelihood of successful litigation against the municipality for claims such as excessive force, discrimination, or failure to protect civil rights.
- Establishing Accountability: By documenting expectations and practices, agencies demonstrate a commitment to ethical and professional conduct, protecting the municipality from accusations of negligence or mismanagement.
- Promoting Fiscal Responsibility: Effective policies minimize incidents that could lead to costly settlements, judgments, or damage to the agency's reputation.

**3. Protect the community-** Ensuring a high level of service and the lawful delivery of services to the community. The overarching purpose of law enforcement is to serve and protect the community while upholding the law.

- <u>Consistency and Fairness:</u> Written standards promote uniformity in how officers interact with the public, investigate crimes, and enforce laws, ensuring all community members are treated equitably.
- <u>Alignment with Legal Standards:</u> Policies ensure compliance with federal, state, and local laws, reducing the risk of constitutional violations and enhancing the community's trust in law enforcement.
- <u>Transparency and Accountability:</u> Documented policies assure the community that the agency operates ethically and responsibly, enhancing trust and cooperation.
- Adaptability to Change: Procedures allow agencies to evolve with societal expectations, legal precedents, and advancements in technology or training.


Department policies and procedures play a crucial role in guiding the behavior of law enforcement officers, promoting accountability and professionalism, and ultimately contributing to the safety and well-being of communities. Policies establish protocols and guidelines for supervisors and guide departmental training. <u>Failure to enforce and follow policies directly connects to a failure to train and supervise.</u>

In my initial review of the policy, I noted that Letcher County policies are approximately 14 years old from the last revision date, which is entirely unacceptable by standard law enforcement practices. Policies are typically reviewed annually to ensure they are updated and compliant with current laws and police practices. They also indicate compliance with CALEA (Counsel on Accreditation of Law Enforcement Agencies). See the example below:

**Letcher County Sheriff's Department**

| Policy # | Related Policies: |
|---|---|
| **Ethics** | |

*This policy is for internal use only and does not enlarge an employee's civil liability in any way. The policy should not be construed as creating a higher duty of care, in an evidentiary sense, with respect to third party civil claims against employees. A violation of this policy, if proven, can only form the basis of a complaint by this department for non-judicial administrative action in accordance with the laws governing employee discipline.*

| Applicable State Statutes: K.R.S. 522.030 | |
|---|---|
| CALEA Standard: 1.1.1; 1.1.2; KACP 1.1 | |
| Date Implemented: | Review Date: |

I.  **Purpose:** Law enforcement employees, representing government, bear the heavy responsibility of maintaining their own conduct, and the honor and integrity of the government entity that they represent. It is the purpose of this policy to provide additional guidance to the standards of conduct embodied in the law enforcement officer's code of ethics, this agency's mission statement and core values so that employees of this agency will better understand prohibitions and limitations pertaining to their conduct and activities while on and off duty.

II. **Policy:** This Department will maintain the highest standard of integrity by never violating the community's trust. All departmental employees must recognize that they are held to a higher standard than the private citizen because, in addition to representing the Department, they also represent the law enforcement profession. Conduct, on and off duty, must be beyond reproach. Agency employees must avoid any conduct that might compromise the integrity, morale, operations or efficiency of the Department.

III. **Definitions:**

   A. Ethical Conduct: In the context of this policy, ethical conduct means the duty of all employees to conduct themselves at all times in a manner that reflects the ethical standards consistent with the rules and values published by this agency.

IV. **Personal Conduct:**

   A. Oath of Office: All sworn employees will take and abide by an oath of office before assuming sworn status. The oath of office is administered by the agency head or his representative.

   B. Ethical Conduct: The Department will maintain the highest standard of integrity by never violating the community's trust. All departmental employees must recognize that they are held to a higher standard than the private citizen because, in addition to representing the Department, they also represent the law enforcement profession and their local government. Conduct, on and off duty, must be ethical conduct.

   C. All sworn officers shall abide by the Law Enforcement Code of Ethics.

©2007 Legal & Liability Risk Management Institute. Reprinting of this document is prohibited without license from LLRMI. http://www.llrmi.com

1

It is important to note that although they reference CALEA standards, they do not comply with or are accredited by CALEA. In his deposition testimony (September 16, 2004, page 81), Sheriff Stines states he does not know what CALEA is.  See below:

```
MR. DOTSON: CALEA Standard, is that what you are
talking about?
MS. BAXTER: Yeah, that is what I am wondering.
MR. DOTSON: KACP 1.1, okay.
Q     What is CALEA, if you know?
A     I don't recall.
Q     Is the Letcher County Sheriff's Department
      do you have any kind of accreditation?
A     I don't recall.
Q     Okay. I guess not to your knowledge?
A     Yeah, not to my knowledge.
Q     At any time since you have been sheriff,
      have you made any revisions or changes to
      this policy?
A     I don't recall.
```

Exacta Court Reporting, Inc.
(606) 789-3034                                    81

In my review, I found that the Letcher County Sheriff's Department implemented these policies 14 years ago. They appear to have aligned with best practice standards when created but have never been revised. Based on my analysis of the provided information and deposition testimonies of Sheriff Stines and Deputy Fields, none of these policies were followed, trained on, or ever enforced—a significant failure in law enforcement practices.

Law enforcement professionals nationwide rely on professional organizations like the International Association of Police to guide best practice standards in Law Enforcement. Below is their guidance on developing policy and procedures.

The International Association of Chiefs of Police produced a ***"Best Practices Guide for Developing a Police Department Policy-Procedures Manual."*** (Chief W. Dwayne Orrick- International Association of Chiefs of Police, n.d.) This provides nationally recognized best practice guidance on developing and revising policy-procedure manuals.



On page 7 of this guide, it states:

*"When distributing a new policy, some agencies inappropriately require officers to sign a form indicating they have received, read, understand and agree to follow a new policy. This forces staff to indicate they understand and will abide by a policy before they have been provided an opportunity to read and resolve any questions. The preferred approach to follow when a new policy is issued is to give staff ample time to read the policy to identify expectations of performance, note legitimate questions, and detect any issues that need to be resolved.*
*Next, officers must be trained on the policies to ensure that they fully understand their requirements before they are implemented. This training should cover administrative and operational topics, with particular emphasis being placed on high-liability issues. This process may include both classroom as well as practical exercises.*

In his deposition testimony on September 11, 2024, Deputy Fields states that he was given and told to read the policies, which is precisely what best practice guidelines above state is "inappropriate." see his statement below:



Deputy Fields states he was told to read the policies, but I found no evidence to support that he was ever trained on them. Sheriff Stine's deposition testimony confirms this failure to train and follow policies.

In his deposition testimony on September 16, 2024, Sheriff Stine clearly states that his department failed to train on policy. Below is an excerpt from pages 82-83, where he states, "I don't recall," when asked about what training he provides on Letcher County Policies.

Q       I guess that I am asking specifically about
        training at the Letcher County Sheriff's

Exacta Court Reporting, Inc.
(606) 789-3034

        Department provides on these policies?
A       The state does most of the training
        material.
Q       But I wouldn't think that the state would
        train deputies on the Letcher County
        Sheriff's Department policies; correct? I
        am asking about annual training from the
        Letcher County Sheriff's Department on the
        Letcher County Sheriff's Department
        policies, is there any such annual
        training?
    MR. DOTSON: And you are saying in the personal
    office of the sheriff's office, not state
    training or whatever?
Q       I am talking about training of Letcher
        County Sheriff's Department policies
A       I don't recall.
Q       Okay. That is fine.

13

Furthermore, on page 91 of his testimony, he states, "Not that I recall," when asked whether he, as required by policy, approved secondary employment for Ben Fields or anyone else in his agency.

```
Q       Did ou ever receive such a statement from
        Ben Fields related to his work with EKCS?
A       Not that I recall.
Q       It looks like according to this policy
        approval of outside employment has to be
        submitted an ultimately approved by the
        agency head. Would you be the agency head
        in this instance?
A       Yes, ma'am.
Q       And it looks like there is also a
        requirement for officers who obtained
        written approval that they then resubmit
        their applications for reapproval on an
        annual basis.  Did that happen consistent
        with this policy as to Ben Fields work with
        EKCS?
A       Not that I recall.
Q       Have you ever had anybody submit any kind
        written form for approval of outside
        employment?
A       Not that I recall.
```

Exacta Court Reporting, Inc.
(606) 789-3034                                    91

Sheriff Stines states in his testimony ( September 16, 2024, pages 92-93) that he again indicates failures in training and compliance with the sexual misconduct policy and admits Deputy Fields violated this policy. See below:



A       Okay.

Q       Shall not engage in sexual conduct with another person who is in the custody of law as such officer has supervisory or disciplinary authority over such other person. Do you see that?

A       Yes.

Q       Do you agree with me that Sabrina Adkins and Jennifer Hill, while they were on home incarceration, were they in the custody of law according to this policy?

A       Yes.

Q       And did Ben Fields have supervisory or disciplinary authority over Sabrina Adkins and Jennifer Hill while they were on home incarceration?

A       Yes.

Q       So on sub section E right below the one that I was just reading. It talks about sworn officers receiving specific training about sexual misconduct. Do you see that?

A       Yes.

Q       So what kind of specific training did the Letcher County Sheriff's Department provide in the time that you been sheriff regarding

```
          this policy?
A         None that I recall.
Q         Do you believe that Ben Fields violated
          this policy based on his actions that are
          subject in this litigation?
A         Yes, absolutely.
Q         There is some information in here about
          reporting requirements.  Do you see that
          under Sub Section F?
A         Yes.
Q         And there is some reference to, and I am
          reading from the third line, immediately
          contacting the internal affairs section.  I
          am just wondering what is the internal
          affairs section for the Letcher County
          Sheriff's Department?
A         We don't have one.
Q         Is there some other person or you know,
          group of persons that is handing out to an
          internal affairs section?  Let me ask it
          this way.  Is there anybody else with
          internal affairs responsibility within the
          Letcher County Sheriff's Department?
A         Not that I recall.
Q         Okay.
```

No supporting evidence shows that Letcher County has trained or held staff accountable to any policies. This is highly relevant because an agency's failure to train and ensure adherence to policy is critical. Failure to train and failure to ensure compliance is the same as having no policies; in fact, it is worse as it demonstrates a complete disregard for the staff, as management is not setting them up to be successful in their mission. This sends a message to the organization that there are no controls to monitor or check employee behavior or performance. This creates a de-facto policy or custom that allows staff to go unsupervised, untrained, with no fear of consequence.

Below, I have reviewed and summarized Deputy Fields's failure to comply with policy and the Letcher County Sheriff's Department's failure to supervise, train, and enforce department policy, particularly Sheriff Stine.

This analysis reviews the Letcher County Sheriff's Department policies on sexual misconduct, internal affairs/citizen complaints, training directives, secondary employment, and ethics. It evaluates specific failures by Deputy Ben Fields to adhere to these policies and the systemic failure of management and supervision under Sheriff Mickey Stines to enforce compliance. These deficiencies reflect a lack of training, supervision, and accountability, which created the conditions for misconduct to thrive unchecked.

**Sexual Misconduct Policy-Exhibit 5**

Policy Requirements
- Establish explicit prohibitions against sexual harassment, coercion, or exploitation.
- Provide training on recognizing and preventing sexual misconduct.
- Investigate complaints promptly and impose appropriate disciplinary measures.

Failure by Deputy Fields
- Fields abused his position of authority to coerce Ms. Adkins and Ms. Hill into engaging in sexual activities by leveraging his control over her tether conditions. This represents a direct violation of sexual misconduct policies.
- He tampered with tether equipment and created a coercive environment, violating ethical and professional standards.
- Communications, including explicit text messages, demonstrate his blatant disregard for policies prohibiting inappropriate relationships with individuals under his supervision.

The International Association of Chiefs of Police published a "Standards of Conduct" Policy and Concepts & Issues document in July 2019, widely accepted as best practice standards. On page 4 of the model policy, it states:

**Standards of Conduct**          Model Policy

    i. Officers involved with any civil action that arises from acts performed under color of authority shall inform their supervisor.

10. Prohibited associations and establishments:

    a. Officers shall not knowingly commence or maintain a relationship with any person who is under criminal investigation, indictment, arrest, or incarceration by this or another law enforcement or criminal justice agency or who has an open and notorious criminal reputation in the community (for example, persons whom they know, should know, or have reason to believe are involved in criminal activity), except as necessary to the performance of official duties or where unavoidable or impractical because of pre-existing familial or marital relationships. In such cases where regular household, physical, or telephone contact is unavoidable, the officer shall inform their supervisor of the relationship.

    b. Officers shall not knowingly engage in social or romantic relationships with confidential informants, victims, or witnesses involved with active investigations.

    c. Officers shall not participate or interfere in investigations involving family members or persons with whom they have a close personal or business relationship.

    d. Except in the performance of official duties, officers shall not enter any establishment in which the law is knowingly violated.

    e. Officers shall not knowingly join or participate in any organization that advocates, incites, or supports criminal acts or criminal conspiracies or that promotes hatred or discrimination toward racial, religious, ethnic, or other groups or classes of individuals protected by law.

Failure by Management/Supervision
- The department failed to provide deputies adequate training in preventing sexual misconduct and maintaining ethical boundaries despite a policy that clearly instructs this training.

proven, can only for the basis of a complaint by this department for non-judicial administrative action in accordance with the laws governing employee discipline.

| | |
|---|---|
| Applicable State Statutes: K.R.S. 522.030; K.R.S. 510.010 | |
| CALEA Standard: 26.1.3 | |
| Date Implemented: | Review Date: |

I. **Purpose:** Law enforcement officers are empowered with authority by their government to protect the public from criminal activity. When an officer abuses this authority for sexual purposes, and violates another person, the officer not only commits a crime against the victim, but damages the credibility and trust of the entire law enforcement community with the public. The purpose of this policy is caution all officers that any violation of the public trust involving sexual misconduct will result in severe consequences including prosecution to the fullest extent possible.

II. **Policy:** It is the policy of this Department to train all of their officers concerning the potential for criminal sexual misconduct within law enforcement, how to recognize it, and the requirements for reporting any violation to the appropriate authorities.

III. **Definitions:**

   A. Criminal Sexual Misconduct: The abuse of authority by a law enforcement officer for sexual purposes that violate the law.

   B. Sexual Misconduct: Any sexual activity while on-duty or stemming from official duty. Sexual misconduct includes but is not limited to use of official position and official resources to obtain information for purposes of pursuing sexual conduct.

   C. Intimate Part: Genital area, inner thigh, groin, buttocks or breasts of a person.

   D. Actor: The person accused of sexual assault

   E. Sexual Contact: Any contact for the purpose of sexual gratification of the actor with the intimate parts of a person not married to the actor.

- Sheriff Stines admitted in his deposition that the department had no formalized sexual misconduct training or policies, leaving deputies without guidance on appropriate behavior.

Sheriff Stines had a duty to foster an environment of ethical behavior. Below is an excerpt from the International Association of Chiefs of Police document *"Addressing Sexual Offenses and Misconduct by Law Enforcement Executive Guide."*

## The Culture of Law Enforcement

Within the policing profession some conditions of the job may inadvertently create opportunities for sexual misconduct. Law enforcement officers (1) have power and authority over others; (2) work independently; (3) sometimes function without direct supervision; (4) often work late into the night when their conduct is less in the public eye[3]; and (5) engage with vulnerable populations who lack power and are often perceived as less credible (*e.g.*, juveniles, crime victims,

> "It is the agency executive's responsibility to foster an environment in which ethical behavior is expected and each member of the department is held accountable for meeting those standards."
>
> —Chief Russ Martin, Delaware Police Department, OH

undocumented people, and those with addictions and mental illness). Furthermore, some people are so impressed by and attracted to the authority the uniform and badge represent that they will seek to engage officers in sexual relations in order to have a vicarious connection to the power of the profession.[4]

[3]  Lettner, Kimberly S., "Developing Policies to Address Police Sexual Misconduct," Richmond, VA, University of Richmond, 2004, pp. 12-13; and Maher, Timothy M., "Police Sexual Misconduct: Female Police Officers' Views Regarding its Nature and Extent," *Woman and Criminal Justice*, Vol. 20, Issue 3, 2010, pp. 263-282.

[4]  Discussion at IACP Focus Group, Alexandria, VA, March 15, 2010.

- Allegations of misconduct were ignored and not investigated, allowing Fields' actions to continue without consequence.

**Internal Affairs/Citizen Complaints Policy-Exhibit 7**

Policy Requirements
- Require a structured process for receiving, documenting, and investigating complaints against personnel.
- Establish an internal affairs unit or designate personnel to manage complaints impartially and confidentially.
- Mandate timely and thorough investigations, with clear accountability for addressing violations.

Failure by Deputy Fields
- By engaging in misconduct without fear of repercussions, Fields exploited the department's weak enforcement of complaint procedures.

Failure by Management/Supervision
- The department lacked a functioning internal affairs unit or equivalent mechanism to investigate complaints.
- Complaints from Mr. Chris Triplett and others were not treated seriously, with no evidence of thorough investigations or corrective actions.
- This failure to investigate reinforced a culture where deputies could violate policies without accountability.

Below is an affidavit from Chris Triplett, the fiancée of Ms. Hill. He clearly states he reported the misconduct of Deputy Fields to the Letcher County Sheriff's Department, and they took no action. See below.

## AFFIDAVIT OF CHRIS TRIPLETT

Comes the Affiant, Chris Triplett, under oath and for his affidavit states as follows:

1. The Affiant states that he is 59 years old and resides at 490 Sergent Road, Whitesburg, KY 41858.

2. The Affiant states that he is the fiancée of Jennifer Hill, who resides with Affiant.

3. The Affiant states that in or around December 2019 he became aware that Ben Fields, a deputy with the Letcher County (Ky.) Sheriff's Department, was forcing Ms. Hill to provide sexual favors to Deputy Fields, who oversaw enforcement of Ms. Hill's house arrest as part of her bond on pending criminal matters.

4. The Affiant states that, sometime during Ms. Hill's period of home incarceration, Affiant became aware that Deputy Fields parked his cruiser behind the home of Affiant and Ms. Hill, told her "If you don't do what I say, I will put you back in jail," and commanded her to perform oral sex on him in his cruiser, which she did. The Affiant further states that Deputy Fields returned several days later and commanded Ms. Hill to submit to sexual intercourse with him under the same threat.

5. The Affiant states that, on or around December 15, 2021, he reported the sexual abuse of Ms. Hill by Deputy Fields to the Letcher County Sheriff's Department by telephone and in-person at the sheriff's department headquarters in downtown Whitesburg.

6. The Affiant states that, after reporting Deputy Fields's misconduct to an unknown employee of the Letcher County Sheriff's Department, the unknown employee laughed at him and refused to file a report regarding the misconduct.

7. The Affiant states that, in response to him reporting Deputy Fields's misconduct, other Letcher County deputies began harassing him. This harassment included pulling over

Affiant's car three separate times for no legitimate reason within an approximately-12-hour period immediately following Affiant reporting the misconduct of Deputy Fields. On one of these pullovers, Affiant states that a deputy followed his car into an extremely remote area at dusk, made him get out of the car and strip down to his underwear, performed a warrantless search of the car without Affiant's consent, and made Affiant fear for his life. Affiant believes these tactics by the deputies were meant to humiliate and harass him in retaliation for reporting Deputy Fields's misconduct.

8. The Affiant states that he became aware of similar sexual allegations against Deputy Fields by another woman, Sabrina Adkins, through media publicity. The Affiant states that neither he nor Jennifer Hill know Ms. Adkins and had never heard of her before the publicity of Ms. Adkins's lawsuit.

Further the Affiant sayeth not.

_Chris Triplett_
CHRIS TRIPLETT

STATE OF KENTUCKY

COUNTY OF _Floyd_

The foregoing document was subscribed and sworn before me by Chris Triplett to be the truth to the best of his knowledge, this the 14th day of March, 2022.

MY COMMISSION EXPIRES:

_12-7-24_      _Deborah Steinbe Woods_
NOTARY PUBLIC, STATE AT LARGE

A failure to investigate an accusation of this severity would represent a significant breach of police practices, oversight, and management protocols.

**Training Directives Policy-Exhibit 9**

Policy Requirements
- Provide training on high-liability areas such as ethical standards, sexual misconduct prevention, and proper handling of citizen complaints.
- Require ongoing training to reinforce compliance with departmental policies and professional standards.

Failure by Deputy Fields
- Fields' lack of training in ethical conduct and sexual misconduct prevention contributed to his repeated violations of departmental policies.
- His misuse of departmental resources and abuse of authority reflects a clear gap in knowledge and understanding of professional standards.

Failure by Management/Supervision
- Sheriff Stines failed to implement comprehensive training programs on critical areas, including sexual misconduct, complaint handling, and ethical behavior.
- Deputies were not provided with ongoing or scenario-based training to reinforce proper conduct, leaving them ill-prepared to adhere to policies.
- The absence of documented training on these topics represents a systemic failure in leadership and a lack of commitment to professional development.

The failures again are violations of widely accepted police practice standards and protocols in supervision and training as noted in The International Association of Chiefs of Police "Standards of Conduct" Policy and Concepts & Issues document in July 2019, page3 of the concepts and issues document below:

*Training, Supervision, and Policy Guidance.* The law enforcement agency is responsible for providing each officer with sufficient and proper training, supervision, and policy guidance to ensure that they are fully aware of standards of conduct, policies, rules, and procedures. In this respect, policy and procedure development is not static, but a dynamic function subject to continued refinement as the agency's environment and circumstances change. As modifications are made, steps must be taken to ensure that each officer has actual notice of such matters and fully understands what is required. In addition, it is imperative for the agency to continuously promote ethics, integrity, individual and organizational pride, public trust, transparency, and enhanced partnership with the community throughout the agency's mission statement, policy and procedure, and all training.

*Responsibility of Supervisors.* Supervisors are a law enforcement agency's most important asset for continually reinforcing evolving policies, procedures, goals, and objectives and ensuring that they are carried out properly. The primary responsibility for maintaining and reinforcing officer conformance with the agency's standards of conduct and operational procedures is lodged with first-line supervisors. Supervisors must closely monitor and evaluate the general conduct and performance of all officers in their unit. Evaluations of officers must be the product of daily observation and close working relationships. Supervisors should remain alert to any indications of behavioral, physical, or other

[3] Certain qualifications have been shown to result in more positive outcomes. These include requiring at least a two-year college degree before hiring; conducting a thorough background investigation that tracks the disciplinary history of candidates; and requiring that candidates go through a competent psychological screening regimen. For more information regarding identifying appropriate pre-employment screening mechanisms and pre-hiring qualifications for law enforcement personnel, see Michael G. Aamodt, *Research in Law Enforcement Selection* (Boca Raton, FL: Brown Walker Press, 2004); and James F. Albrecht, *Police Brutality, Misconduct and Corruption: Criminological Explanations and Policy Implications,* Springer Briefs in Criminology (New York, NY: Springer Publications, 2017).

[4] See the IACP Policy Center documents on Retaliatory Conduct by Employees available at https://www.theiacp.org/resources/policy-center-re- source/retaliatory-conduct.

**IACP Law Enforcement Policy Center**      3

**Secondary Employment Policy-Exhibit 4**

Policy Requirements
- Written approval is required for secondary employment, and such work must not conflict with official duties.
- Prohibit the use of departmental resources for secondary employment activities.
- Conduct regular reviews to monitor compliance.

Failure by Deputy Fields
- Fields engaged in secondary employment without seeking or obtaining approval, violating departmental policies.
- He used departmental equipment, including vehicles and communication tools, for personal gain, further violating policy.
- His actions blurred the boundaries between official duties and personal interests, creating conflicts of interest.

Failure by Management/Supervision
- The department did not enforce the requirement for deputies to seek approval for secondary employment or conduct routine reviews to ensure compliance.
- Leadership failed to monitor the use of departmental resources, enabling Fields to misuse equipment for his secondary employment activities.
- The lack of oversight reflects a broader failure to implement and enforce accountability measures.

Based on the facts and evidence in this case, Deputy Fields' conduct, which involved trading sex for preferential treatment, was facilitated by the overlap between his role as a deputy sheriff and his position with the Eastern Kentucky Corrections Services. This overlap is demonstrated by the following actions, which highlight his misuse of law enforcement authority and resources:

1. **Use of Department-Issued Uniform**: Deputy Fields wore his official sheriff's department uniform while performing his tether unit duties, which projected the authority of the sheriff's office. This created a perception of law enforcement power that he exploited to gain compliance and cooperation from individuals under his supervision. Further evidence of this misuse is in Deputy Fields' deposition testimony on (September 11, 2024, pages 63-64). See below.



```
Q        You had a sheriff's department uniform;
         correct?
A        Yes.
Q        Okay. Did you have a badge?
A        Yes.
Q        Did you carry a gun?
A        Yes.
Q        Okay. And did you wear that uniform badge
         and did you carry that gun during time
         periods when you were performing services
         for East Kentucky Correctional Solutions?

              Exacta Court Reporting, Inc.
                 (606) 789-3034                    63


A        Yes.
Q        And were you aware of any policies with the
         sheriff's department about when you were or
         were not suppose to use that sheriff's
         department property that I just identified?
A        Not that I know of.
```

In his deposition testimony on (September 16, 2024, page 69), Sheriff Stines acknowledges that Fields had permission to wear his uniform while working for Eastern Kentucky Corrections Services Services.  See his testimony below:



Further evidence that this was permitted, and the norm comes from Ms. Adkins's deposition testimony on (April 9, 2024, pages 108-109) where she states that Deputy Fields was always in uniform and driving his patrol cars.  See below:



2. **Operation of a Police Vehicle**: Deputy Fields regularly utilized his department-issued patrol car while performing tether unit duties. By doing so, he reinforced his authority and blurred the lines between his tether unit responsibilities and his role as a deputy sheriff. This misuse of department resources violated departmental policies and directly facilitated his misconduct.

3. **Leverage of Law Enforcement Authority**: Deputy Fields' interactions with Ms. Adkins and Ms. Hill under his supervision were framed by his position as a law enforcement officer. He used the implicit threat of legal consequences, such as stricter monitoring, punitive reports, or possible incarceration, to coerce vulnerable individuals into providing sexual favors in exchange for leniency or preferential treatment.

These examples of overlap demonstrate that Deputy Fields' misconduct was directly tied to his role as a deputy sheriff and his use of departmental resources and authority. The sheriff's office failed to ensure that deputies maintained clear boundaries between their official duties and external assignments. The lack of oversight, enforcement of ethical guidelines, and accountability mechanisms allowed this overlap to persist, enabling Deputy Fields to exploit his position.

In conclusion, the sheriff's department and Sheriff Stines share responsibility for Deputy Fields' actions due to their failure to prevent the misuse of their resources and authority. These failures directly contributed to the constitutional violations against Ms. Adkins and Ms. Hill.


**Ethics Policy-Exhibit 3**

Policy Requirements
- Require deputies to act with integrity, uphold public trust, and avoid conflicts of interest.
- Mandate disciplinary action for behavior that undermines professional standards or public confidence.

Failure by Deputy Fields
- Fields' actions, including coercion, equipment tampering, and resource misuse, violated the ethical principles of integrity and professionalism.
- By exploiting Ms. Adkins and Ms. Hill, Fields demonstrated a blatant disregard for the ethical standards required of law enforcement personnel.

Failure by Management/Supervision
- The department failed to enforce ethical standards by neglecting to address or discipline Fields' misconduct.
- Leadership tolerated a permissive culture where ethical violations were ignored, further eroding public trust.

Sheriff Stines contributed significantly to the department's culture. In his testimony (September 16, 2004, page 136), he was asked about his Facebook communications with his staff and the content of those communications; he stated the following:

(The document was marked Exhibit 16)

> Q    What kind of example do you think that you
>      were setting for the folks working under
>      you by engaging in this kind of
>      conversation with your sheriff's deputies?
>
> A    Horrible.
>
> Q    Did those communications that we just
>      looked through did those violate any of the
>      Letcher County sheriff's department's
>      policies that we reviewed earlier?
>
> A    Yes.
>
> Q    Which ones?
>
> A    Conduct.
>
> Q    Conduct unbecoming?

Exacta Court Reporting, Inc.
(606) 789-3034                                    136

Exhibit 15 below exemplifies the conduct he regularly engaged in with his staff. His communications with staff were crude, vulgar, and sexist and had no place in workplace conversations. It is a shocking example of routine inappropriate conduct with his deputies.



26

**Author** Mickey Stines (Facebook: 100001762381827)
**Sent** 2021-08-19 00:55:06 UTC
**Body** That is great @Ben Fields

**Author** Jason Eckels (Facebook: 100000500589247)
**Sent** 2021-08-19 00:57:45 UTC
**Body** I'm gettin real sick and tired of this shit. I got feelings too ya know.

**Author** Mickey Stines (Facebook: 100001762381827)
**Sent** 2021-08-19 01:02:06 UTC
**Body** What you mad about @James Norris should be the one mad

**Author** Mickey Stines (Facebook: 100001762381827)
**Sent** 2021-08-19 01:02:09 UTC
**Body** 🤣🤣🤣🤣

**Author** Jason Eckels (Facebook: 100000500589247)
**Sent** 2021-08-19 01:02:31 UTC
**Body** I guess your right. Hes the little prick. 🤣🤣🤣

**Author** Mickey Stines (Facebook: 100001762381827)
**Sent** 2021-08-19 01:08:54 UTC
**Body** @James Norris how you and your wife feeling?? You all need anything??

**Author** James Norris (Facebook: 100002199635456)
**Sent** 2021-08-19 01:55:18 UTC
**Body** I was feel pretty good until I opened this chat..

**Author** Jason Eckels (Facebook: 100000500589247)
**Sent** 2021-08-19 01:56:02 UTC
**Body** See @Mickey you hurt poor James feelings.

Sheriff Stines's conduct violates widely accepted law enforcement practices in leadership, supervision, and management. He created a toxic culture that allowed deputies and staff to go unchecked, disregard rules of conduct, and engage in criminal conduct in Deputy Fields's case.

- The absence of clear guidance and enforcement mechanisms on ethical behavior allowed Fields to act with impunity.
- Failure to train in ethics per their department policy. See below:



**XII. Attention to duty:** As most police work is performed without close supervision, responsibility for proper performance of duty lies primarily with the officer. An officer has a responsibility for the safety of the community and his or her fellow officers, and discharges that responsibility by faithful and diligent performance of duty.

**XIII. Financial Obligations:** Employees should avoid incurring financial obligations which are beyond their ability to satisfy.

**Note:** Training-The department will strive to include a component of ethics in all in-service training. The department shall conduct annual in-service training on ethics.

# Opinions

My opinions below are predicated upon 32 years of experience in the law enforcement profession, 23 years of experience in leadership and supervisory positions, and 11 years of experience as a deputy chief, chief, and public safety director. I have had decades of training, and my education has resulted in a postgraduate degree and completing a law enforcement staff and command executive development program.

## Failure to Train

The Letcher County Sheriff's Department systematically failed to provide critical training on key issues such as sexual misconduct prevention, ethical behavior, complaint handling, and professional standards. These failures were not mere oversight; they reflect a culture of failure to train that was the norm, a severe failure by Sheriff Mickey Stines and the department's leadership. No evidence exists of attempts to implement training on policy, supervise staff, or investigate misconduct. This lack of commitment to foundational law enforcement practices created a permissive environment where deputies operated without clear boundaries or accountability. This failure to train is a glaring breach of accepted law enforcement practices and a significant factor enabling Deputy Fields' misconduct.

## Failure to Supervise

The leadership of the Letcher County Sheriff's Department, particularly Sheriff Stines, failed to supervise its deputies adequately. Deputy Fields was allowed to misuse departmental resources, engage in unauthorized secondary employment, and exploit individuals under his supervision without consequence. This absence of meaningful supervision demonstrates a breakdown in the department's chain of command and a failure to meet professional law enforcement standards. It is my professional opinion that this lack of supervision directly contributed to Fields' abusive conduct.

## Failure to Follow Policies

Although the department had written policies, they were meaningless because they were not enforced. Fields repeatedly violated established rules related to professional conduct, complaint handling, and secondary employment. Yet, the department's leadership failed to hold him accountable or take corrective action. This failure to adhere to established protocols represents a severe leadership deficiency and a departure from the standards expected of a competent and responsible law enforcement agency.

## Culture Enabling Misconduct

The culture within the Letcher County Sheriff's Department normalized misconduct and created a permissive environment. Prior incidents of unprofessional conduct were ignored, signaling to staff that violations would be tolerated. This toxic organizational culture emboldened Deputy Fields and allowed him to exploit his position without fear of reprisal. Based on my experience, I conclude that this culture of indifference, inappropriate behavior, and no ethical standards facilitated Fields' misconduct. The Stines and Fields exhibits have further examples of the unacceptable behavior

shared by Sheriff Stines, Deputy Fields, and other deputies. This behavior was permitted and became part of the department's culture.

**Department Responsibility**

Deputy Fields' misconduct was directly facilitated by the overlap between his role as a deputy sheriff and his duties with the Eastern Kentucky Corrections Services. He wore his department-issued uniform, used his police vehicle, and leveraged his law enforcement authority to coerce individuals under his supervision. This misuse of departmental resources and authority highlights a lack of oversight and accountability by the sheriff's office, contributing to the misconduct. This lack of oversight, enforcement of ethical guidelines, and accountability mechanisms allowed this overlap to persist, enabling Deputy Fields to exploit his position.

## Conclusion

The Letcher County Sheriff's Department's failure to train, supervise, and enforce policies—combined with a culture that tolerated misconduct—created an environment where Deputy Fields' abusive behavior could flourish. These systemic failures, rooted in poor leadership, failure to train, and no supervision, represent a significant departure from accepted law enforcement practices and contribute directly to the harm suffered by Ms. Adkins and Ms. Hill.

My opinions are rendered to a reasonable degree of professional certainty based on my education, training, 32 years of experience, and review of the evidence. Should additional information or materials become available, I reserve the right to amend or expand my opinions.

*Scott J. Hilden*

Scott J. Hilden
*S. J. Hilden Consulting LLC*
South Lyon, Michigan
sjhildenconsulting@gmail.com

January 25, 2025



# SCOTT J. HILDEN

South Lyon, MI | sjhildenconsulting@gmail.com | (248) 880-3521

## PROFESSIONAL SUMMARY

With over 32 years of dedicated service in law enforcement, I offer a wealth of knowledge and experience. As an expert witness/consultant, I specialize in providing comprehensive insights into police operations, procedures, and best practices. My career has been shaped by a commitment to leadership, operational excellence, and community safety, making me uniquely qualified to understand the complexities of law enforcement matters.

As chief of Police and Director of Public Safety for a community of 33,000 residents, I oversee all police and fire department operations. My focus has always been on maintaining the highest standards and implementing best practices in public safety. This extensive experience positions me well to provide clear, informed opinions on various police-related issues in litigation.

I possess in-depth expertise in all facets of police operations, including defensive tactics, the use of force, police procedures, and officer training programs. Throughout my career, I have been actively involved in policy development, internal investigations, and risk management. I have also successfully guided departments in achieving and maintaining accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), ensuring strict adherence to national standards.

As an expert witness/consultant, I take my role seriously and approach each case with impartiality and objectivity. My assessments and recommendations are always grounded in facts, evidence, and established best practices. I am dedicated to supporting fair and just outcomes, regardless of the parties involved, and I provide clear communication to understand the nuances of police conduct and operations.

I firmly believe in a culture of accountability, integrity, and professionalism within law enforcement. My experience extends to areas such as school safety and community relations, where I have worked diligently to promote secure environments for students and residents alike.

My expertise extends into all facets of the law enforcement profession, as my experience is grounded in my years as a police officer, school resource officer, instructor/trainer, sergeant, lieutenant, special services lieutenant, deputy chief, chief, and director of public safety.

## EDUCATION

**Master of Liberal Studies | Police Supervision and Management | 2005**
Eastern Michigan University | Ypsilanti, MI

**School of Police Staff and Command | 2002**
Eastern Michigan University | Ypsilanti, MI

**Bachelor of Arts | Criminal Justice | 1989**
Michigan State University | East Lansing, MI

## AREAS OF EXPERTISE

POLICE PRACTICES/OPERATIONS | POLICE TRAINING | SUPERVISION & MANAGEMENT | USE OF FORCE | BEST PRACTICE STANDARDS | POLICY/PROCEDURES | SCHOOL POLICING | PREMISE LIABILITY | RISK MANAGMENT | EMERGENCY VEHICLE OPERATIONS

**Police Practices/Operations**

With extensive leadership experience as Chief of Police and Director of Public Safety, I have implemented and supervised all aspects of law enforcement operations. I specialize in evaluating whether police practices meet professional standards and legal requirements. My ability to assess operational conduct in critical incidents is supported by my experience as an instructor, where I taught officers how to apply proper techniques and strategies in the field.

**Police Training**

I have developed and delivered comprehensive training programs on critical topics such as using force, defensive tactics, and crisis intervention. As an experienced instructor, I design training programs that incorporate real-world scenarios and emphasize best practices, ethical decision-making, and compliance with legal standards. I am qualified to assess whether inadequate training contributed to the actions under review.

**Supervision & Management**

As a law enforcement executive, I have supervised and managed personnel, operations, and high-stakes incidents. My experience includes mentoring supervisors and ensuring accountability at all levels. As a leadership instructor, I have trained supervisors in effective management practices, decision-making, and personnel development. I can evaluate whether proper supervision and management practices were in place and adhered to during the incidents.

**Use of Force**

I have over three decades of experience analyzing and managing use-of-force incidents. I am highly knowledgeable in constitutional standards, case law, and accepted police practices, allowing me to evaluate the appropriateness and proportionality of force in any given situation. Over a decade as a use-of-force instructor and having achieved the rank of black belt in a Korean style of martial arts called Tang Soo Do. I have trained officers in tactics, decision-making under stress, and de-escalation techniques, ensuring they operate within legal and professional boundaries. I am an ICAT instructor (Integrating Communications, Assessment, and Tactics) developed by the Police Executive Research Forum. This program teaches officers de-escalation and tactics to reduce the need to use force in critical incidents.

**Best Practice Standards**

As a law enforcement executive, I have consistently applied nationally recognized best practices to improve department policies, training, and operations. My experience includes leading my department through accreditation processes, which require a thorough review and implementation of best practice standards. My agency is accredited through the gold standard in law enforcement accreditation, CALEA (Commission on Accreditation for Law Enforcement Agencies), and the Michigan Law Enforcement Accreditation Commission. I integrate these best practices into training programs to ensure officers are fully equipped to meet professional and legal expectations. My expertise enables me to identify deviations from accepted standards.

**Policy/Procedures**

I have developed and implemented comprehensive policies and procedures, ensuring alignment with constitutional standards, legal mandates, and industry best practices. I have also led departments through accreditation processes, which required the development of policies that meet or exceed national standards. My experience includes assessing whether policies adequately guide officer conduct in high-pressure situations. As a trainer and policy advisor, I have educated officers on the practical application of departmental procedures, enhancing their understanding of navigating complex situations.

**School Policing**

My experience in school policing includes serving as a School Resource Officer (SRO) in the K-12 system and as Chief of Police/ Emergency Manager at a community college of 12,000 students. I have firsthand knowledge of the unique challenges involved in policing educational environments, including the need for specialized training in youth development, de-escalation, and conflict resolution. I have trained SROs to build positive relationships with students and staff while maintaining a safe learning environment. This dual perspective allows me to evaluate whether officers' actions in school settings were appropriate and in line with best practices.

**Premise Liability**

My experience includes evaluating the adequacy of safety and security measures in public and private settings. I served three years as my department's crime prevention expert and have been trained in basic and advanced crime prevention

techniques. I can assess whether actions or inactions contributed to premise liability incidents, offering expert insights on best practices for ensuring safety on the property. I also have experience advising on implementing security measures, such as surveillance systems and physical barriers, to minimize liability risks.

**Risk Management**

I have a proven track record of identifying and mitigating risks in law enforcement operations to reduce liability and enhance public safety. My expertise includes conducting risk assessments, reviewing high-liability incidents, and providing actionable recommendations to minimize future exposure. I have trained officers and supervisors in risk management strategies, emphasizing proactive approaches to reduce operational and legal risks.

**Emergency Vehicle Operations**

My extensive experience included overseeing and training officers in emergency vehicle operations. As an instructor, I have provided officers with critical training in pursuit policies, high-speed response techniques, and safe driving practices. I can evaluate whether emergency vehicle operations were conducted safely and within accepted practices, ensuring compliance with legal and professional standards.

# WORK EXPERIENCE

**DIRECTOR OF PUBLIC SAFETY/CHIEF OF POLICE**                    2021 - CURRENT
Northville Township Department of Public Safety | Northville, MI

- Chief of Police for a community of 33,000 residents.
- Lead an agency accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA), Michigan Law Enforcement Accreditation Commission (MLEAC), and (CALEA-accredited communications center.
- Responsibilities include all aspects of police and fire department operations.

**CRIMINAL JUSTICE CONSULTANT**                    2022 – CURRENT
The Police Chief Risk Management Group, LLC | Ann Arbor, MI

- Consultant and expert witness specializing in litigation cases related to police conduct.

**CHIEF OF PUBLIC SAFETY/POLICE AND EMERGENCY MGMT**                    2016 - 2021
Washtenaw Community College | Ann Arbor, MI

- Chief of Police for a public safety department with a team of 7 sworn officers, 34 non-sworn officers, and support staff.
- Served as Emergency Manager, primarily responsible for the college emergency operations planning and overseeing the crisis management team leader.
- Responsible for all school safety for the student population of approximately 12,000
- ALICE active threat instructor

**DEPUTY CHIEF OF POLICE**                    2013 - 2016
Canton Township Public Safety | Canton, MI

- I worked at a department of 95 sworn officers, leading the patrol division comprising 60 patrol officers, 16 dispatcher personnel, three school resource officers, five selective enforcement officers, two canine officers, eight sergeants, and four lieutenants. **Responsibilities included:**
- **CompStat:** Overseeing department statistics and performance metrics preparation and analysis.
- **CALEA Compliance:** Ensuring patrol personnel adhere to CALEA accreditation requirements, collaborating closely with the department's accreditation manager.
- **Internal Affairs Investigations:** I oversaw approximately 65 internal affairs investigations conducted by the department annually. I also reviewed all use of force reports, averaging 50-60 incidents annually.

## LIEUTENANT, PATROL DIVISION – SHIFT COMMANDER                    2011 - 2013
Canton Township Public Safety Special Services | Canton, MI

- Led shift supervisors, patrol officers, and dispatch personnel, providing guidance, development, and direction.
- Served as a Community Policing Team Leader, collaborating with schools, community leaders, and groups to address local issues.
- Supervised our department's school resource officers and K9 units.

## LIEUTENANT, STAFF OPERATIONS DIVISION                    2008 - 2011
Canton Township Public Safety Special Services | Canton, MI

- Direct supervision over the following areas and units:
- **Records Bureau:** Managed the Records Bureau, overseeing a team of 9 clerks responsible for handling Freedom of Information requests, firearm permits and registration, and property room management.
- **Selective Enforcement Unit:** Supervise a team comprising four traffic officers and one motor carrier officer.
- **Training Unit:** I supervised the department's training unit, in-service training, and a group of 20 field training officers and dispatcher training officers, focusing on recruit training and program management.
- **Liaison:** I have established constructive relationships with various groups and organizations, including houses of worship, businesses, schools, homeowners' associations, leisure, and municipal services.
- **Accreditation:** Worked with the accreditation manager to formulate policies and procedures aligned with CALEA requirements.

## LIEUTENANT, PATROL DIVISION SHIFT COMMANDER                    2006 - 2008
Canton Township Public Safety | Canton, MI

- Served as a night shift commander and managed the on-duty patrol staff and a community policing team.
- Supervised the bicycle unit and accident investigation team.

## SERGEANT, STAFF OPERATIONS                    2003 - 2006
Canton Township Public Safety | Canton, MI

- Managed the following units:
- **Crime Prevention:** Presented crime prevention seminars in Canton, focusing on identity theft, personal safety, and construction site theft prevention for residents and businesses.
- **Crime Analysis:** Analyzed crime data to uncover trends and patterns, effectively relaying insights to investigators and patrol units.
- **Community Relations:** Responsible for establishing relationships with community stakeholders.

## POLICE OFFICER | SCHOOL RESOURCE OFFICER                    1999 - 2001
Northville Township Department of Public Safety, Northville, MI

- Dedicated full-time to Plymouth Canton Educational Park, serving over 6,000 students from Plymouth, Canton, and Salem High Schools, focusing on enhancing school safety and building police-community relations.
- Focused on the National Association of School Resource Officers approach to school policing called the Triad approach. This emphasized the officer's responsibilities as a public safety educator, mentor/informal counselor, and law enforcement officer.
- Department Instructor in the following areas: defensive tactics/use of force, emergency vehicle operations, and high-risk traffic stops.
- Field Training Officer- responsible for the training and assimilation of new officers into the organization.

# LEADERSHIP AND AWARDS

SCOTT J HILDEN

## LEADERSHIP:

- **2025- Michigan Commission on Law Enforcement Standards Subject Control Focus Group as a Subject Matter Expert to review the basic training curriculum and training objectives for subject control.**
- **2023- Current Advisory Board Member to Wayne County Police Academy**
- **2023- Current member of Michigan Association of Chiefs of Police Traffic Safety Committee.**
- **2018 Governor's Task Force on School Safety**: Contributed subject matter expert establishing 29 recommendations for school safety.
- **2006 -2013 President, Canton Command Officers Association.**

## AWARDS:

- **2015 Director's Recognition Award:** Recognized for exceptional service in police department operations.
- **2011 Governor's Traffic Safety Advisory Commission**: Effectively reducing traffic crashes and crime rates through the Innovative data-driven approach to crime and traffic safety (DDACTS).
- **2009 Michigan Association of Chiefs of Police:** Traffic safety award for outstanding efforts in traffic enforcement and crash reduction.
- **30 additional awards** for meritorious actions.

# PROFESSIONAL ASSOCIATIONS

## CURRENT AFFILIATIONS:

- International Association of Chiefs of Police
- Police Executive Research Forum
- Michigan Association of Chiefs of Police
- Wayne County Association of Chiefs of Police
- Southeast Michigan Association of Chiefs of Police
- Western Wayne County Association of Chiefs of Police

## PAST AFFILIATIONS:

- Washtenaw County Criminal Justice Association- 2021 served as President.
- Michigan Association of Campus Law Enforcement Administrators
- International Association of Campus Law Enforcement Administrators
- National Association of CLERY Compliance Officers
- Campus Public Safety Administrators Group-Michigan Association of Chiefs of Police

# TEACHING HIGHLIGHTS

- Wayne County Regional Police Academy- Instructed as a defensive tactics instructor.
- Washtenaw County Regional Police Academy- Instructed a course on the 21st Century Police Officer.
- Eastern Michigan Staff and Command School- Instructed on leadership, mentoring, and development of new officers.
- Throughout my 32-year career, I have taught hundreds of officers in police-related tactics, topics, and procedures.
- I have taught and presented to hundreds of community members, including students, business leaders, and houses of worship, on topics such as active shooter protocols, school safety, theft prevention, cybercrime, fraud, and more.

# Best Practices Guide



International Association of Chiefs of Police

Smaller Police Departments
Technical Assistance Program

## Developing a Police Department Policy-Procedure Manual

*by W. Dwayne Orrick*

This project supported by a grant from:



Bureau of Justice Assistance
U.S. Department of Justice

# Developing a Police Department Policy-Procedure Manual

*W. Dwayne Orrick*

## Introduction

This guide has been designed to assist police agencies in smaller communities with the development and revision of their policy-procedure manuals. The policy and procedures manual is the foundation for all of the department's operations. When properly developed and implemented, a policy-procedure manual provides staff with the information to act decisively, consistently, and legally. It also promotes confidence and professional conduct among staff.

Service delivery by agencies in smaller communities is often more responsive than departments in larger communities due to knowledge of partnerships within the community. Officers working in smaller agencies must be prepared for the same challenges and situations as their colleagues in larger organizations. In addition, their response to these situations are held to the same legal and professional standards as larger communities. The only real difference between large and small is the degree of specialization in job assignments in smaller departments. Officers in smaller agencies are generalists, often seeing cases through from start to finish. Because of this, they are provided more latitude to perform their jobs and are not locked into the same routine every day, allowing for more growth, job enhancement, and satisfaction. Therefore, policies and procedures for smaller agencies must be as thorough and complete as in their larger counterparts.

The remainder of this guide will focus on the process of developing a manual in smaller departments. It will explore the general rules for developing policies, forming a policy committee, accessing information, organizing the manual, writing a policy, implementing a new policy, and conducting compliance inspections.

## Definitions

Organizations call their policy and procedures manual different names – policy and procedures, operations manual, or standard operating procedures. Regardless of the name, the document provides staff with the guidance necessary to perform department operations. Before outlining the process for developing an operations manual, it is necessary to provide a baseline of terminology. Several terms will be used during the development of a manual. It is necessary to distinguish between each:

- Standard – Professional or legal guidelines or performance requirements that establish benchmarks for agencies to use in developing the organizational structure and measuring its service delivery system.

- Policy - A course or line of action adopted and pursued by an agency that provides general guidance on the department's philosophy on identified issues.

- Procedure - A detailed description of how a policy is to be accomplished. It describes the steps to be taken, the frequency of the task, and the persons responsible for completing the tasks.

- General Orders - Written directives related to policy, procedures, rules and regulations involving more than one organizational unit. General orders typically have a broad statement of policy as well as the procedures for implementing the policy.

- Special Orders - Directives regulating one segment of the department or a statement of policy and procedure regarding a specific circumstance or event that is temporary in nature.

- Personnel Orders - Announcements of changes in status of personnel such as transfers or promotions.

- Rules and Regulations - Procedures that apply each and every time a situation occurs with specific guidelines for staff to follow. Rules and regulations usually proscribe specific behavior that will result in employees being disciplined for failing to follow the guidelines provided.[1]

- Post Orders – Specific processes and duties to be performed at assigned locations or posts (i.e. front desk, security positions)

- Employee Handbook - Manual provided by the governing authority that introduces employees to the organization, its benefits/compensation package, and an abbreviated listing of policies.

# Rules for Effective Manual Development and Implementation

When developing operational policy and procedures, several general principles should be remembered.

- First, the operations manual should be comprehensive, providing staff with direction and guidance for all aspects of the department's operations.

- Second, the manual should be clearly written and easy to use.

- Third, the manual should be consistent with and mirror the organizational philosophy, legal requirements, and applicable standards.

- Fourth, staff should be involved in the development of the manual and kept informed of any changes.

- Fifth, staff should receive adequate training and participate in open, frank discussions about the policy and the reasons for its requirements.

- Sixth, the operations manual should be considered a living document. Routine inspections and reviews should be completed to ensure compliance with its directives so that the manual remains current.[2]

- Seventh, the manual should reflect and incorporate accepted state and national best practices. For example, model policies like those developed by the IACP's National Law Enforcement Policy Center or other law enforcement organization's general guidelines for policy-procedure manuals as developed by CALEA (Commission on Accreditation for Law Enforcement) or state law enforcement associations.

# Formation of the Policy Committee

Developing a policy manual is a substantial undertaking. One of the first tasks to be completed is the selection of a policy project coordinator. The selection of the proper person for this position is critical to the success of the development and implementation of the operations manual. The individual must have the written communication skills to compose and edit the document in a grammatically correct manner that flows

in an easy-to-understand manner. This requires patience and attention to detail. In most agencies, this appointment is not a full-time assignment. Instead, the person must complete these responsibilities in addition to their current duties. In very small agencies the police chief may serve as the coordinator. Regardless of who is selected, the person serving as the policy project coordinator must have the authority, knowledge, and motivation to make assignments, draft policies, coordinate meetings, and complete the process. In addition, the coordinator must have sufficient administrative or clerical support to expedite the development process.

While one person can write the manual, the final product will likely be more complete, comprehensive, and accepted by staff, if it is developed with contributions from both sworn and civilian representatives of the agency. Diverse, heterogeneous groups tend to be more effective with complex problems and assignments than a homogeneous group or an individual.[3] Therefore, it is strongly suggested that as many staff as practical be involved in the manual's development and implementation. To accomplish this, many departments have organized policy committees to assist with development of the manual.

Involving staff in the development process provides a vehicle for employees' abilities to be both challenged and recognized. It is recommended the chief post a memorandum or intra-office e-mail explaining the development/revision process of the operations manual. Supervisors should ask for persons who are interested in assisting with the effort. In addition to volunteers, the policy committee should involve employees who may be critical of the department's operations. Many times, these staff members provide information that can improve operations within the department. Inclusion of individuals with vocal opposition provides a safe avenue to discuss contentious issues and promote the resolution of conflicts. Alternatively, alienation of critics only fuels their cynicism and undermines the agency's cohesion and morale. Finally, there may also be a need to involve legal counsel and persons from other agencies, particularly those with special knowledge areas.

## Sources of Information

When preparing to develop each area of the manual, a variety of sources should be reviewed for information to be included in the policy.

The local government's charter usually outlines the department's authority. Similarly, local, state, and federal laws and applicable court decisions proscribe standards of performance for department compliance.

Collective bargaining agreements, consent orders, and court decrees often:

- List requirements for the employment process;

- Describe individual duties and responsibilities;

- Outline discipline and grievance procedures, compensation and benefits programs.

The governing authority's procedures are binding upon the department's operations in many areas, particularly employment procedures and compensation benefits. The department's procedures may be more strict or detailed but, cannot conflict with policies of the governing authority or they will automatically be considered null and void.

Intergovernmental agreements and contracts for services, such as detention of inmates or dispatch operations, may include requirements that should be considered and included in the operational procedures.

Mutual aid agreements, emergency operation plans and previously agreed upon protocols (i.e. child abuse/molestation investigations) often outline binding procedures for officers to follow while working with other agencies. Because these documents are often updated on a schedule different than the review of the

manual, it is good to place the latest copy of the agreements in the appendices and refer to them in the body of the policy.

Standards such as the **Standards for Law Enforcement Agencies** by the Commission on Accreditation for Law Enforcement Agencies (CALEA) or standards promulgated for state certification programs provide the benchmarks for professional conduct and are an excellent cornerstone for department operations.

Existing departmental policies, procedures, and general orders, provide ample direction for officers and should not be arbitrarily abandoned. With a little modification to ensure consistency in structure with the new manual, these procedures can be easily included in the manual. In many cases, the department's informal operating processes simply need to be recorded.

Since police operations are similar throughout the United States, there is no need to reinvent the wheel. Model policies provide a baseline to begin the development of a manual. There are a number of sources for model operating policies including the IACP National Law Enforcement Model Policy Center and state police chiefs' associations. Because of the diversity in the size of communities, state laws, and operational philosophies between agencies, it is difficult to develop a policy that is applicable in all departments. Consequently, model policies should be thought of as general guidelines to be used in the development of the department's manual.

Policies from other departments are also an excellent resource for expediting the development process. Copies of manuals may be acquired from neighboring departments that have completed state certification or national accreditation. In addition, manuals can be obtained or requested on internet sites such as IACP Net. In many cases, these policies can be downloaded in an electronic format, which simplifies the editorial process. The tendency is for departments to copy manuals from other communities verbatim. This process is completely acceptable if the manual represents the department's philosophy and procedures and is consistent with legal guidelines. However, this is usually not the case and considerable editing is usually required.

**Tips:**

- Academic research journals, trade magazines, and training lesson plans are a good source for policy and procedure background information and address areas that may be overlooked in particular subjects. Examples: **Journal of Criminal Justice**, **International Journal of Police Strategies and Management**, and **The Police Chief**.

- Interview subject matter experts (i.e. records clerks, evidence custodians, and narcotic agents), and persons such as law enforcement leaders and legal counsel whose contributions are critical to the manual's success.

# Organization of the Manual

Before beginning to write the manual, several issues relating to formatting must be discussed and decided including scope, headers, pagination, key phrases, and index.

The scope of the manual must be identified. Smaller agencies typically have one comprehensive manual that regulates all of the department's administration and operations. Larger agencies have found it necessary to have more than one manual for functional areas such as administration, patrol, investigations, and detention.[4]

The beginning of each new section of the manual should be divided with a tab that readily identifies the chapter's subject or number. Each policy must have a header that includes the Agency's Name, Chapter/Policy Number, Title, Effective Date (originally implemented), Revised Date (Current Revision),

Number of Pages in the section, and to whom the policy is distributed. Before the policies can be finalized, the format for the header must be designed and approved.

Because manuals tend to be rather voluminous, it is necessary to develop a pagination system to ensure the reader can easily identify and locate specific areas. This system should identify the exact policy and page. For example, 5-1.3 indicates the location is Chapter 5.1, page 3. There are several derivations of this format.

To ensure consistency, key phrases such as detention facility vs. jail, investigator vs. detective, and shift vs. watch must be identified, discussed, and decided upon for consistency throughout the entire manual.

As the policy manual is being developed, broad topic areas to be covered must be identified. Reviewing model manuals or other departments' policies may provide insight into developing these categories and the specific policies to be included in each area. Each policy should be organized in the sequential order they are to appear in the manual. Some policies may not be finalized until issues are addressed and resolved in other policies. Therefore, it may be necessary for the coordinator to prioritize the order in which the policies must be composed.

Finally, some departments have found it useful to provide an index in the appendices of the manual to assist in readily locating relevant policies. The index cannot be compiled until the manual is completed. If the document is accessed electronically, staff can use 'key words' to search for relative policies/directives.

## Committee Review

After the topics to be included in the manual have been identified and finalized, the drafting of policies can begin. To ensure the manual is developed in a timely manner, a schedule should be developed to outline the tasks to be completed, time expected to complete the tasks, persons responsible, and deadlines for completing each task. This schedule helps the committee to prioritize their work activity and focus their attention on the manual's development. For these same reasons, an agenda should be developed and distributed at every committee meeting. Otherwise, the meetings will likely get off track and fail to accomplish anything. There are a number of ways to compose an operations manual. The process of policy development typically includes the following steps:

## Policy Development Steps

1. The policy committee meets and members reach a consensus regarding what should be included in each section. Any discussion points, questions, and concerns identified during meetings should be noted by the coordinator and addressed at the next meeting.
2. Using the information provided by the committee, the project coordinator (or the designated committee member) develops all draft policies (see "Steps for Writing Operating Procedures" below). The policy development committee should not be used to write the manual. If members were expected to compose the manual as a collective group, it would never get done.
3. Copies of the draft policy are sent to committee members for review and comment.
4. Committee members may individually return their draft copies with comments to the coordinator or meet as a group to discuss their concerns. As the manual is reviewed, committee members should be primarily concerned with the validity of the policies. That is, does the policy regulate or direct department operations and employee conduct in the manner in which it was intended. Any contradictions, gaps, or inconsistencies should be identified and corrected. This review should also ensure each policy is grammatically correct, correctly spelled, and easily understood.
5. The coordinator reviews the comments by the committee and makes the necessary changes to the drafts.
6. Copies of the subsequent draft are sent to the committee members for review. In some cases, it may be necessary to repeat Steps 4 and 5 several times.
7. The coordinator submits the final draft to the department's legal counsel to ensure the proposed policy is in compliance with current local, state, and federal laws. There are differing opinions about the decision to

have legal counsel review each policy or restricting the review to areas of high liability and where legal questions exist. This is a decision that should be made by leaders in each community.

8. When the legal review is complete, any comments or changes may be sent to the committee for final review. In some communities, it may be necessary to send the approved policy to the City Manager or governing authority for review.

9. Upon final review and approval by the chief, the coordinator places the policy in final form and prepares it for distribution to department staff.

# Procedure Development Steps

Before embarking upon the procedure development, it is recommended the committee take the time to identify and articulate the department's core values, mission statement and vision statement. While the manual can be developed without these documents, it can prove invaluable to developing the organization and its culture. Embedding the organizational values throughout the manual will encourage desired behaviors by officers as well as a strong and consistent value system throughout the department. In many cases departments have found it necessary to contract with a facilitator to assist with the development of these statements.

When writing the procedures, the use of scenarios can be helpful tools in the development process, clarifying each component of the procedure and the supporting agency values and mission. Completing the scenario helps to identify the duties and functions that must be completed with each task.

# Steps for Writing Operating Procedures

1. Start with the end in mind. Assuming an officer completes the scenario successfully, identify the desired outcome. (Goal)

2. Review the literature/research material for issues that should be addressed in the policy being developed. Also review the committee's notes of discussion points, questions, and concerns.

3. Outline the actions/steps to be completed to achieve the goal or complete the function successfully. (What)

4. Place the outlined steps in sequential order. (When)

5. Identify the person/positions to be involved in completing the tasks in Steps 2 and 3. (Who)

6. Be sure to identify and include any special equipment, supplies, and materials to be used with the procedure.

7. Compose the draft directive and submit it to the policy committee for review.[5]

It should be noted the tone of the language used in the manual subtly impacts the organizational culture. Unreasonable restrictions in operational policy have oftentimes been the source of dissension between line and supervisory staff. The purpose of the manual is to empower the staff. So it is important to recognize every possible scenario cannot be identified and officers should be allowed the latitude they need for making decisions in unusual circumstances. If a negative tone is used in the manual (e.g., shall not, will not, are not, forbidden) it can permeate the ranks and promote cynical attitudes in staff. Consequently, the text of the manual should avoid focusing on prohibited acts, but rather emphasize conduct the department expects and supports of officers. Finally, there are very few absolutes in law enforcement. The courts have ruled that terms such as should, are to, and directed to, are not absolute. The use of "shall" is an absolute, and means under all circumstances and conditions officers will act in the manner described or directed. In addition, some courts have held the use of the term 'will' is very close to an absolute. Because it is difficult to identify

circumstances when officers are to always act in the same exact manner, the use of absolute language should be avoided whenever possible.

# Implementation

After the manual has received final approval, it is ready to be implemented. Traditionally, this has been accomplished by first printing copies with a high capacity printer or photocopy machine. If a commercial printer is used, the agency should have an agreement with the printer to ensure extra or discarded copies are destroyed or returned to the department.

If a paper copy of the operations manual is used, it is best to issue them in a three ring binder. This allows easy modification and addition to existing policy. As each manual is issued it should be stamped with a sequential serial number that is recorded as being assigned to the officer. As with most department equipment, officers may be required to sign for the manual when it is issued to them.

Today most agencies post their manual on the department's computer server to ensure the policies are accessible and easy to search at all times. Regardless of the format, having the entire manual distributed at one time will likely overwhelm officers. It is highly recommended to distribute new policies incrementally as they are developed and approved. This incremental process provides staff a better opportunity to digest its requirements.

When distributing a new policy, some agencies inappropriately require officers to sign a form indicating they have received, read, understand and agree to follow a new policy. This forces staff to indicate they understand and will abide by a policy before they have been provided an opportunity to read and resolve any questions. The preferred approach to follow when a new policy is issued is to give staff ample time to read the policy to identify expectations of performance, note legitimate questions, and detect any issues that need to be resolved.

Next, officers must be trained on the policies to ensure that they fully understand their requirements before they are implemented. This training should cover administrative and operational topics, with particular emphasis being placed on high-liability issues. This process may include both classroom as well as practical exercises.

Once a policy is implemented, officers can usually refer to the manual for clarification. However, for high liability and critical policies, officers must have a comprehensive and detailed understanding of the policy. For example, every employee must be able to immediately recall specific details of policy requirements for topics such as use of force and vehicle pursuit directives. To ensure officers understand and comprehend the policy and its expectations, each should be tested on critical topics. After the testing is complete, incorrect responses should be reviewed with the officer. If an officer fails a test or several officers miss the same question, additional training should be provided.

In addition to introductory training, time may be designated during in-service training to review the department's operational procedures relating to the topic of instruction. This is a convenient way to ensure training is relevant and staff remain current on the department's standards of performance.

When the training is complete, documentation should be maintained that officers have been issued the policy, trained on the content, and understand its requirements. This documentation may include a copy of the policy, lesson plan, power point slides, handouts, sign-in attendance sheets, tests given to measure comprehension, and officers' test scores. Manually tracking and maintaining records of distribution can be cumbersome and time consuming. To simplify the documentation process, agencies should consider using a digital format to track testing, record issuance, and understanding of policy content.

Finally, 'master' copies of previous policies must be maintained to answer questions of why specific actions may have been taken or if litigation is filed against the agency. These records will be critical for resolving questions regarding department practices during that time.

## Inspection and Review

Once the new manual has been implemented, only half of the work is completed. Department officials must ensure the policies are being followed. If work is not done in accordance with the policy, the manual is meaningless because the custom is the policy. This situation is more problematic than not having a policy. Informal customs attack the credibility of the department's operational procedures and administration. It also increases the department's exposure to potential liability.

What gets inspected is what gets done. There are several ways to ensure compliance with the manual. One way is to form a check sheet that lists various inspections that are to be conducted, by staff and the frequency of the inspections. It is a simple process of checking off when the inspection is complete. In some cases, policy may require internal and external inspections.

In the event officers are not in compliance with the department policy, a decision must be made as to the appropriate corrective action, ranging from remedial training to counseling to punishment. In some cases, a change in policy may be required.

Finally, the entire manual should be reviewed on at least an annual basis. This review helps to ensure the manual is in compliance with current management, operational, and legal standards. Instead of trying to eat the elephant in one bite, it is best to coordinate this review with key personnel over several weeks. As the review is conducted, listen to the staff closest to the service delivery. They know the problems and often have the best ideas for addressing them. If modifications are necessary, the same procedures outlined in this guide should be followed for updating, distributing, and training staff of the changes.

## Conclusion

Developing, maintaining, and revising a police department's operations manual is a monumental undertaking. If completed properly, the community, its governing authority, chief executive, and department's staff can be assured their operations are in compliance with current standards. It will ensure staff act in a consistent, professional and legal manner. It will also ensure department staff are prepared for unusual circumstances and the correct course of action is identified.

**About the Author**

*W. Dwayne Orrick has more than 34 years law enforcement experience including 22 years as a police chief and public safety director. He holds a Bachelors of Arts in Criminal Justice and Masters of Public Administration from the University of Georgia. Orrick is a graduate of the 186th Session of the FBI National Academy.*

# Bibliography

[1]  Carpenter, Michael, "Put it in Writing: The Police Policy Manual", <u>FBI Law Enforcement Bulletin</u>, October 2000.

[2]  Orrick, Dwayne, <u>Model Jail Operations Manual for Georgia Detention Facilities</u>, Georgia Department of Community Affairs, 1987

[3]  Prince, Dr. Howard, John Halstead, and Larry Hesser, <u>Leadership in Police Organizations</u>, International Association of Chiefs of Police, 2002, p.208

[4]  Kinnaird, Brian A., "Policy and Procedure Manual: A Didactic Model for Law Enforcement Administrators", <u>Sheriff</u>, February 2002.

[5]  Martin, Mark D., <u>Developing and Revising Detention Facility Policies and Procedures</u>, National Institute of Corrections, U. S. Department of Justice, April 2002

# Sample Organization of Department Operations Manual

| | | |
|---|---|---|
| **Chapter 1** | | **Introduction** |
| **Chapter 2** | | **Agency Jurisdiction and Mutual Aid** |
| | 2-1 | Law Enforcement Role and Authority |
| | 2-2 | Contract Services |
| **Chapter 3** | | **Organization and Direction** |
| | 3-1 | Management of Information |
| | 3-2 | Goals and Objectives |
| | 3-3 | Fiscal Management |
| | 3-4 | Hiring Standards |
| | 3-5 | Promotion/Appointment Procedures |
| | 3-6 | Performance Evaluations |
| | 3-7 | Career Development |
| | 3-8 | Job Analysis and Classification |
| | 3-9 | Planning and Research |
| **Chapter 4** | | **Training** |
| | 4-1 | Fitness Standards |
| **Chapter 5** | | **Conduct** |
| | 5-1 | Discipline |
| | 5-2 | Internal Investigations |
| | 5-3 | Conduct Review Board |
| | 5-4 | Outside Employment |
| | 5-5 | Sexual Harassment |
| | 5-6 | Receiving Civil Process Served Department/Employees |
| | 5-7 | Polygraph |
| **Chapter 6** | | **Uniform and Dress Code** |
| **Chapter 7** | | **Arrest** |
| | 7-1 | Taking Suspects into Custody |
| | 7-2 | Processing of Juvenile Offenders |
| | 7-3 | Family Violence |
| **Chapter 8** | | **Search and Seizure** |
| **Chapter 9** | | **Firearms** |
| **Chapter 10** | | **Use of Force** |
| | 10-1 | Use of Force Reports |
| | 10-2 | Investigation of Use of Deadly Force |
| | 10-3 | Critical Incident/Post Critical Incident |
| | 10-4 | Line of Duty Seriously Injured/Death of Officer |
| **Chapter 11** | | **Vehicle Operations** |
| | 11-1 | Vehicle Pursuits |
| | 11-2 | Interjurisdictional Pursuits |
| | 11-3 | Vehicle Inspections and Maintenance |
| | 11-4 | Personally Assigned Patrol Vehicles |
| | 11-5 | In-Car Video Camera Film Procedures |
| **Chapter 12** | | **Property and Evidence** |
| | 12-1 | Departmental Property Control |
| | 12-2 | Vehicle Inventory/Impound |
| | 12-3 | Blood and Urine Test Kits |
| **Chapter 13** | | **Records Division Operations** |
| | 13-1 | Release of Information |

**Chapter 14**          **Traffic and Parking Enforcement**
        14-1            Traffic Citations (Special Processing)
        14-2            Traffic Accident Investigation
        14-3            Traffic Direction and Control
        14-4            Use of Radar
**Chapter 15**          **Patrol Functions**
        15-1            Investigating Suspicious Activity
        15-2            Foot Pursuits
        15-3            Racial Profiling
        15-4            Blood Borne Pathogens
        15-5            Courtroom Building Security
        15-6            Taxicab Inspections
        15-7            Administrative Notification
        15-8            Hazardous Materials
        15-9            On-Call Procedures
        15-10           Citizen Ride-Along Program
        15-11           Handling Mentally Ill Persons
        15-12           Unusual Occurrences
        15-13           Missing Persons
        15-14           Rights of Victims and Witnesses
**Chapter 16**          **Criminal Investigation Division**
        16-1            Covert and Raid Operations
        16-2            Crime Analysis
        16-3            Arson Protocol
        16-4            Crime Scene Processing
        16-5            Civil Condemnation Actions
        16-6            Informants
**Chapter 17**          **Animal Control**
**Chapter 18**          **Communications**
        18-1            Tactical Dispatch Plans

# Sexual Harassment & Misconduct

February 2022





IACP®

International Association of
Chiefs of Police

The IACP Law Enforcement Policy Center creates four types of documents: Model Policies, Considerations Documents, Concepts & Issues Papers, and Need to Know one-page summaries. Typically, for each topic, either a Model Policy or a Considerations Document is created, supplemented with a Concepts & Issues Paper. This file contains the following documents:

- ***Model Policy***: Provides police agencies with concrete guidance and directives by describing in sequential format the manner in which actions, tasks, and operations are to be performed. Legal criteria draw a distinction between sexual harassment and sexual misconduct, but, in reality, this distinction is not always clear. Thus, separate model policies for **Sexual Harassment** and for **Sexual Misconduct** are both presented here, with a combined Concepts & Issues paper that discusses both sexual harassment and sexual misconduct and the similarities and differences between the two concepts.

- ***Concepts & Issues Paper***: Designed to provide context and background information to support a Model Policy for a deeper understanding of the topic.

## Model Policy

Updated: February 2022

# Sexual Harassment in the Workplace

## I.   PURPOSE

The purpose of this policy is to define, identify, and prohibit sexual harassment in the workplace.[1]

## II.   POLICY

It is the policy of this law enforcement agency that employees shall not engage in any acts of sexual harassment.[2]

## III.   DEFINITIONS

*Complainant:* The person reported to be the victim of sexual harassment.

*Office of Professional Standards (OPS)*: The designated employee(s) or unit, which may be external to the agency, with primary responsibility for monitoring adherence of employees to agency policy, procedures, and rules for investigating reports of employee misconduct, including sexual harassment.

*Retaliatory Conduct:* Harmful conduct or action designed to serve as retribution against an employee for engaging in legally protected activity, such as reporting or otherwise providing information regarding misconduct against another employee or testifying on behalf of another employee.[3]

*Interference:* Using intimidation, threat, or coercion to prevent or discourage an individual's right to make a complaint of sexual harassment.

*Sexual Harassment:* A form of gender discrimination, sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical offensive conduct of a sexual nature that explicitly or implicitly affects employment; unreasonably interferes with work performance; or creates an intimidating, hostile, or offensive working environment.

---

[1] Sexual harassment of victims, witnesses, or others not employed by the agency will be covered under the Sexual Misconduct by Police policy and/or Standards of Conduct.

[2] Individuals covered under this policy are referred to as "employees" and include agency members defined as employees; applicants for employment with the agency, whether sworn, regular, reserve, or professional staff; all volunteers; interns; cadets; Police Explorers; contractors; or any individual engaged in agency-sponsored activities.

[3] U.S. Equal Employment Opportunity Commission, *Enforcement Guidance on Retaliation and Related Issues* (2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#II.  ELEMENTS**.

**Publications of the IACP Law Enforcement Policy Center
44 Canal Center Plaza, Suite 200, Alexandria, VA 22314**

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

*Workplace:* Anywhere the employee is performing job-related responsibilities, is in uniform, is acting as a representative of the agency, or is acting in such a way that leverages the power and privilege of their status as a law enforcement officer and the power the position affords them.[4]

## IV.  PROCEDURES

### A.  Prohibited Behavior

No employee shall:

1.  Engage in sexual harassment. This includes prohibitions against

    a.  Unwelcome physical contact of a sexual nature, such as intentional touching, grabbing, pinching, brushing against another's body, and/or impeding or blocking movement;

    b.  Verbal or written comments that are perceived as sexually offensive;

    c.  Sexually offensive conduct that is severe or pervasive;

    d.  Explicit or implicit suggestions of sexual activity by a supervisor or manager in return for a favorable employment action;

    e.  Placing the complainant in an objectively disadvantageous work environment;

    f.  Creation of an environment that is

        i.  Objectively offensive such that a reasonable person would find it hostile, humiliating, or demeaning; and/or

        ii. Subjectively offensive as perceived by the complainant.

2.  Use blogs, social networking sites, telephone, text message, or other communication devices to sexually harass another employee. This prohibition includes the employee's use of communication methods or devices to sexually harass another individual or engage in sexual misconduct outside the workplace.

3.  Interfere with reporting and investigating reports of sexual harassment.

4.  Retaliate against any individual for engaging in any legally protected activities, such as reporting or supporting an individual who has reported sexual harassment or sexual misconduct.

### B.  Supervisory Responsibilities

1.  Although all employees shall be responsible for preventing sexual harassment, supervisors are expected to be aware of subtle as well as overt aspects of internal agency culture and take proactive affirmative action to intervene. In addition, supervisors' responsibilities include:

    a.  Advising employees on the types of behavior prohibited and the agency procedures for reporting and resolving complaints of sexual harassment;

    b.  Monitoring the work environment on a daily basis for warning signs and patterns or indicators that sexual harassment may be occurring;

    c.  Using all reasonable means to prevent a prohibited act from occurring when they suspect that an employee will or may perform such an activity.

2.  Supervisors shall immediately notify the appropriate authority, such as OPS, any supervisor higher in the chain of command, or the agency's human resources function, of any actual or potential sexual harassment that is observed or brought to their attention.[5]

---

[4] The definition of workplace will vary by jurisdiction.

[5] Agencies should determine the exact timeframe for supervisors to complete these notifications.

3.  Once a supervisor observes or receives information regarding conduct that may violate this policy, they are responsible for taking immediate action to prevent further sexual harassment or misconduct, regardless of whether the complainant wants any action taken on the complainant's behalf. This includes reporting to and working with the human resources function to eliminate the hostile, humiliating, demeaning, or sexually offensive environment where there has been a complaint of sexual harassment.

4.  Circumstances in which the victim is underage require immediate notification of the parents or legal guardian and, where necessary, the appropriate child protective services agency.

5.  Supervisors shall take immediate action to prevent retaliatory conduct or interference toward the complainant and witnesses.

6.  Any proscribed conduct covered by this policy that comes to the attention of a supervisor shall result in an investigation.

7.  Each supervisor has the responsibility to assist any employee or member of the public in documenting and filing a complaint of sexual harassment with the appropriate authority, such as OPS.

8.  If a situation requires separation of the parties, care should be taken to avoid action that punishes either party.

9.  Any sexual harassment of a criminal nature or of a potential criminal nature shall be reported according to the agency policy on criminal behavior.

## C.  Employee Responsibilities

1.  Each employee of this agency shall be responsible for assisting in the prevention of sexual harassment by:

    a.  Refraining from participation in or encouragement of action that could be perceived as sexual harassment;

    b.  Reporting observed acts of sexual harassment to a supervisor, OPS, or the human resources function;[6]

    c.  Encouraging any employee who confides that they are being sexually harassed to report these acts to a supervisor, OPS, or the human resources function;

    d.  Encouraging any employee who is aware of sexual harassment to report these acts to a supervisor, OPS, or the human resources function;

    e.  Undergoing training to identify when another employee is engaging in sexually harassing behavior and learn the skills necessary to intervene (see Section F).

2.  Failure of any employee to carry out their responsibilities in good faith as defined in this policy may be considered in any performance evaluation or promotional decision and may be grounds for discipline.[7]

## D.  Agency Responsibilities

1.  This agency shall thoroughly investigate all reports of sexual harassment, whether internally and/or by an outside agency.

2.  Investigations shall be completed even if the accused employee leaves the agency or if a settlement is reached between the agency and the complainant.

3.  Upon a finding of "founded," appropriate corrective action shall be taken.[8]

---

[6] This does not apply to victims who do not report sexual harassment.

[7] In some instances, collective bargaining agreements may dictate the actions to be taken in these circumstances.

[8] Corrective action may include counseling, additional training, and/or disciplinary action.

4.  Any transfer or reassignment of any of the parties involved should be voluntary, if possible, and should not be taken against the wishes of the complainant.

5.  Any retaliatory or interfering conduct shall result in discipline.[9]

6.  The chief executive officer or their designee should be provided with an annual summary of complaints related to sexual harassment. This summary should be reviewed to determine if any changes are necessary to agency policy, procedures, and/or training.

## E.  Complaint Procedures

If any employee believes that they have been subjected to sexual harassment, the employee has the right to file a complaint with the agency. This may be done in writing or orally. Further, this policy does not preclude any employee from filing a complaint or grievance with an appropriate outside agency or other authority.

1.  Complaint procedures shall be made available to agency employees.

2.  Any employee encountering sexual harassment is encouraged to:

    a.  Inform the person that their actions are unwelcome and offensive; and

    b.  Immediately document all incidents in order to provide the fullest basis for investigation.

3.  Any employee who believes that they are being sexually harassed is encouraged to report the incident(s) as soon as possible so that steps may be taken to protect the employee from further actions that may be in violation of this policy and so that appropriate investigative and disciplinary measures may be initiated. Where the immediate supervisor is involved in the prohibited action, the employee may waive filing a complaint with that supervisor and may report to another entity, which may include a supervisor higher in the chain of command; an equal employment opportunity officer, if available; the agency's human resources function; or OPS.

4.  Once a complaint is received, agency policy regarding reports of employee misconduct shall be followed, to include thorough documentation and follow-up investigation.[10]

5.  Confidentiality shall be maintained throughout the investigatory process to the extent practical and appropriate under the circumstances and controlling law.

6.  Agencies shall follow recommended practices for trauma-informed investigations focusing on sexual harassment.[11]

7.  After the receipt of a complaint of sexual harassment, agencies should make every reasonable effort to prevent retaliation and interference.[12]

---

[9] See the IACP Law Enforcement Policy Center documents on Retaliatory Conduct by Employees available at https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

[10] See the IACP Law Enforcement Policy Center documents on Investigations of Allegations of Employee Misconduct available at https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

[11] For more information, see the IACP Trauma Informed Sexual Assault Investigation Training resources at https://www.theiacp.org/projects/trauma-informed-sexual-assault-investigation-training.

[12] For more information, see the accompanying Concepts & Issues Paper and the IACP Law Enforcement Policy Center documents on Retaliatory Conduct by Employees available at https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

### F.  Training

Preventing sexual harassment, and reporting sexual harassment when it does occur, is everyone's responsibility. This agency shall provide regular and refresher training concerning:

- The nature of sexual harassment in the workplace;
- Prohibitions on such actions defined in the policy;
- How to intervene when witnessing sexual harassment amongst peers;
- How to support victims of sexual harassment (such as trauma-informed response);
- How, when, and where to report such behavior;
- The agency's definitions of retaliation and interference and the consequences of each.

All employees shall receive training on the agency's sexual harassment policy. However, additional training should be provided to supervisors and others in a leadership role, recognizing that middle- and first-line supervisors are of particular importance in preventing, identifying, and responding effectively to sexual harassment.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their agency's legal advisor before implementing any policy.

© Copyright 2022. Departments are encouraged to use this document to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

| Model Policy | Updated: February 2022 |

# Sexual Misconduct

## I.   PURPOSE

The purpose of this policy is to define, identify, and prohibit sexual misconduct. Consent shall not be an affirmative defense for violations of this policy. While on duty; no sex acts are considered consensual.

## II.   POLICY

It is the policy of this law enforcement agency that employees shall not engage in sexual misconduct.[1]

## III.   DEFINITIONS

*Complainant:* The person reported to be the victim of sexual misconduct.

*Office of Professional Standards (OPS):* The designated employee(s) or unit, which may be external to the agency, with primary responsibility for monitoring adherence of employees to agency policy, procedures, and rules and for investigating reports of employee misconduct.

*Retaliatory Conduct:* Harmful conduct or action designed to serve as retribution against an individual for engaging in legally protected activity, such as reporting or otherwise providing information regarding misconduct against an individual or testifying on behalf of another individual.

*Sexual Misconduct:* Any behavior by an employee that takes advantage of the employee's position in law enforcement to misuse authority and power (including force) in order to commit a sexual act, initiate sexual contact or conduct with another person, or respond to a perceived sexually motivated cue (from a subtle suggestion to an overt action) from another person. It also includes any communication or behavior by an employee that would likely be construed as lewd, lascivious, inappropriate, or conduct unbecoming an employee and violates general principles of acceptable conduct common to law enforcement.[2]  Sexual misconduct includes a broad scope of behaviors and may include sexual harassment or criminal conduct such as sexual assault.

---

[1] Individuals covered under this policy include agency members defined as employees and applicants for employment with the agency, whether sworn, regular, reserve, or professional staff; all volunteers; interns; cadets; Police Explorers; or any individual engaged in agency-sponsored mentoring activities.

[2] International Association of Chiefs of Police, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide* (June 2011), https://www.theiacp.org/sites/default/files/all/a/ AddressingSexualOffensesandMisconductbyLawEnforcementExecutiveGuide.pdf.

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

*Workplace*: Anywhere the employee is performing job-related responsibilities, is in uniform, is acting as a representative of the agency, or is acting in such a way that leverages the power and privilege of their status as a law enforcement officer and the power the position affords them.[3]

## IV.   PROCEDURES

### A.  Prohibited Behavior

No employee shall:

1. Engage in sexual misconduct. This includes prohibitions against:

   a. Any sexual behavior or acts while on duty, consensual or otherwise (e.g., masturbation, viewing and/or distributing pornographic images, sexting while 'on break');

   b. Sexual contact by force (e.g., sexual assault, rape);

   c. Sexual contact with individuals in handcuffs or individuals who have been detained or arrested;

   d. Sexual coercion or exploitation (e.g., extorting sexual favors in exchange for not ticketing or arresting a community member);

   e. Gratuitous physical contact with suspects (e.g., inappropriate or unnecessary bodily searches, frisks, or pat-downs);

   f. Unwanted employee-initiated sexual contacts directed toward community members, family members, peers, or any individual the employee encounters;

   g. Engaging in community member-initiated sexual contact while on duty;

   h. Voyeuristic actions that are sexually motivated (e.g., looking in windows of residences for sexually motivated reasons);

   i. Unnecessary contacts/actions taken by employees for personally and/or sexually motivated reasons, including failing to respect classified information or client confidentiality (e.g., unwarranted call backs to crime victims, making a traffic stop to get a closer look at the driver for non-criminal justice purposes);

   j. Inappropriate and unauthorized use of agency resources and/or information systems for other than legitimate law enforcement purposes.

2. Use blogs, social networking sites, telephone, text message, or other communication devices to engage in sexual misconduct. This prohibition includes the employee's use of communication methods or devices to engage in sexual misconduct outside the workplace.

3. Retaliate against any individual for engaging in any legally protected activities, such as reporting or supporting an individual who has reported sexual misconduct.

### B.  Supervisory Responsibilities

1. Although all employees shall be responsible for preventing sexual misconduct, supervisors are expected to take proactive affirmative action. In addition, supervisors' responsibilities include:

   a. Advising employees on the types of behavior prohibited and the agency procedures for reporting and resolving complaints of sexual misconduct;

   b. Monitoring the work environment on a daily basis for warning signs and patterns or indicators that sexual misconduct may be occurring, to include but not limited to traffic stops, arrests, activity

---

[3] The definition of workplace will vary by jurisdiction.

    reports, radio logs, body-worn cameras, narrative reports, case dispositions, locations of activities, and categories of subjects;

    c.  Utilizing all reasonable means to prevent a prohibited act from occurring when they know or should know that an employee will or may perform such an activity;

    d.  Taking immediate action to prevent retaliatory conduct toward the complainant and witnesses and to eliminate the hostile, humiliating, demeaning, or sexually offensive environment where there has been a complaint of sexual misconduct.

2. Supervisors shall immediately notify the appropriate authority, such as OPS, any supervisor higher in the chain of command, or the agency's human resources function, of any actual or potential sexual misconduct that is observed or brought to their attention.[4]

3. Once a supervisor observes or receives information regarding conduct that may violate this policy, they are responsible for taking immediate action to prevent further sexual misconduct, regardless of whether the complainant wants any action taken on the complainant's behalf.

4. Circumstances in which the victim is underage require immediate notification of the parents or legal guardian and, where necessary, the appropriate child protective services agency.

5. Each supervisor has the responsibility to assist any employee or member of the public in documenting and filing a complaint of sexual misconduct with appropriate authority, such as OPS.

6. Any violation of proscribed conduct covered by this policy – whether criminal or administrative – that comes to the attention of a supervisor shall result in an investigation.

7. Any sexual misconduct of a criminal nature or of a potential criminal nature shall be reported according to agency policy on criminal behavior.

## C. Employee Responsibilities

1. Each employee of this agency shall be responsible for assisting in the prevention of sexual misconduct by:

    a.  Refraining from participation in or encouragement of action that could be perceived as sexual misconduct;

    b.  Reporting observed acts of sexual misconduct to a supervisor, OPS, or the human resources function;[5]

    c.  Encouraging any employee who confides that they are a victim of sexual misconduct to report these acts to a supervisor, OPS, or the human resources function;

    d.  Encouraging any employee who is aware of someone else involved in sexual misconduct to report these acts to a supervisor, OPS, or the human resources function;

    e.  Undergoing peer intervention training to learn the skills necessary to intervene when another employee is engaging in sexual misconduct.

2. Failure of any employee to carry out their responsibilities in good faith as defined in this policy may be considered in any performance evaluation or promotional decision and may be grounds for discipline.[6]

---

[4] Agencies should determine the exact timeframe for supervisors to complete these notifications.

[5] This does not apply to victims who do not report sexual harassment or sexual misconduct.

[6] In some instances, collective bargaining agreements may dictate the actions to be taken in these circumstances.

### D.  Agency Responsibilities

1.  This agency shall thoroughly investigate all reports of sexual misconduct (criminal or non-criminal), whether internally and/or by an outside agency.

2.  If there are both criminal and administrative violations, the investigations should be conducted concurrently, while ensuring due process rights of employees reported to have committed an offense are upheld during the separate administrative and criminal investigations. Concurrent investigations ensure any necessary administrative actions are taken in accordance with the investigation findings as soon as practically possible and independent of any potentially lengthy criminal proceedings.

3.  Investigations shall be completed even if the accused employee leaves the agency or if a settlement is reached between the agency and the complainant.

4.  Upon a finding of "founded," appropriate corrective action shall be taken, up to and including termination and state decertification.[7]

5.  Any transfer or reassignment of any of the parties involved should be voluntary, if possible and should not be taken against the wishes of the complainant.

6.  Any retaliatory conduct shall result in discipline, up to and including termination and state decertification.[8]

7.  All victims shall be provided with the opportunity to connect with victim services.

8.  The chief executive officer or their designee should be provided with an annual summary of complaints related to sexual misconduct. This summary should be reviewed to determine if any changes are necessary to agency policy, procedures, and/or training.

9.  Train all employees, especially supervisors, on early warning signs and patterns or indicators of possible sexual misconduct.

### E.  Complaint Procedures

Agency complaint procedures shall apply and be made available to members of the community as well as agency employees. Complaints of sexual misconduct may be made to the agency and/or to an appropriate outside agency or authority.[9]

1.  Any individual encountering sexual misconduct is encouraged to:

    a.  Inform the person that their actions are inappropriate, in violation of policy.

    b.  Immediately document all incidents in order to provide the fullest basis for investigation.

2.  Any individual who is a victim of sexual misconduct is encouraged to report the incident(s) as soon as possible so that steps may be taken to protect the individual from further actions that may be in violation of this policy and so that appropriate investigative and disciplinary measures may be initiated.

3.  Once a complaint is received, agency policy regarding reports of misconduct shall be followed, to include thorough documentation and follow-up investigation.[10]

---

[7] Corrective action may include counseling, additional training, and/or disciplinary action.

[8] See the IACP Policy Center documents on Retaliatory Conduct by Employees, https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

[9] This may include the city/local government that governs the department or federal resources. For more information on reporting police misconduct in the United States, see U.S. Department of Justice, "Addressing Police Misconduct Laws Enforced by the Department of Justice," https://www.justice.gov/crt/addressing-police-misconduct-laws-enforced-department-justice.

[10] See the IACP Law Enforcement Policy Center documents on Investigation of Allegations of Employee Misconduct, https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

4. Confidentiality shall be maintained throughout the investigatory process to the extent practicable and appropriate under the circumstances and controlling law.

5. This policy does not preclude any employee from filing a complaint or grievance with an appropriate outside agency.

6. Agencies shall follow recommended practices for and train all officers on how to conduct trauma-informed investigations focusing on sexual misconduct.[11]

7. After the receipt of a complaint of sexual misconduct, agencies should make every reasonable effort to prevent retaliation and interference.[12]

## F.  Training

Preventing sexual misconduct and/or reporting sexual misconduct when it does occur, is everyone's responsibility. This agency shall provide regular and refresher training concerning:

- The nature of sexual misconduct in the workplace, to include warning signs and patterns or indicators that sexual misconduct may be occurring;
- Prohibitions on such actions defined in the policy;
- How to intervene when witnessing sexual misconduct;
- How to support victims of sexual misconduct (such as trauma-informed response);
- How and where to report such behavior;
- The agency's definitions of retaliation and interference, and the consequences of each.

All employees shall receive training on the agency's sexual misconduct policy. However, additional training should be provided to supervisors and others in a leadership role, recognizing that middle- and first-line supervisors are of particular importance in preventing, identifying, and responding effectively to sexual misconduct.

---

[11] For more information, see the IACP Trauma Informed Sexual Assault Investigation Training resources at https://www.theiacp.org/projects/trauma-informed-sexual-assault-investigation-training.

[12] For more information, see the accompanying Concepts & Issues Paper and the IACP Law Enforcement Policy Center documents on Retaliatory Conduct by Employees, https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their agency's legal advisor before implementing any policy.

© Copyright 2022. Departments are encouraged to use this document to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

## Concepts & Issues Paper

Updated: July 2021

# Sexual Harassment & Misconduct

## I.  INTRODUCTION

### A.  Purpose of Document

This document addresses illegal and unwanted sexual behavior. This paper is designed to accompany the Model Policies on Sexual Harassment and Sexual Misconduct established by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policies. This material will be of value to law enforcement executives in their efforts to tailor the models to the requirements and circumstances of their community and their law enforcement agency.

### B.  Definitions

While sexual harassment and sexual misconduct are related concepts, they are not synonymous. *Sexual harassment* is a legal term with a specific definition (see Appendix A for further explanation of the legal basis of sexual harassment), whereas *sexual misconduct* is a broader term that does not necessarily have the same legal criteria as sexual harassment (although sexual misconduct may include sexual harassment). Sexual harassment involves an employee, while sexual misconduct can be directed toward anyone; this may include victims of crime, arrestees, community members, or any individuals an officer encounters through the course of their duties on the job or while off-duty by virtue of their status as a police officer. In the United States, sexual harassment is a civil offense, whereas certain types of sexual misconduct can be criminal offenses. Nonetheless, both should be prohibited and treated seriously when they do occur. Because of the legal distinctions between the two topics, a separate policy is warranted for each. However, it is also possible that certain behavior may constitute both sexual harassment and sexual misconduct; the distinction is not always clear.

*Sexual harassment* is a form of gender discrimination defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical offensive conduct of a sexual nature that explicitly or implicitly affects employment; unreasonably interferes with work performance; or creates an intimidating, hostile, or offensive working environment. For the purposes of this discussion, sexual harassment is distinguished from general employment-related harassment, discrimination, and otherwise unprofessional conduct.[1]

---

[1] For an in-depth discussion of these topics, please see the IACP Law Enforcement Policy Center documents on Harassment, Discrimination, and Unprofessional Conduct, https://www.theiacp.org/resources/policy-center-resource/harassment-discrimination-and-unprofessional-conduct.

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, or other verbal or physical offensive conduct of a sexual nature when:

1. Submission to or rejection of such advances, requests, or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; or

2. Such advances, requests, or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating, or sexually offensive work environment.

Under these definitions, direct or implied requests by a supervisor or co-worker for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment constitutes sexual harassment. The legal definition of sexual harassment[2] is broad, and, in addition to the above examples, other sexually oriented conduct, whether it is intended as such or not, that is unwelcome and has the effect of creating a workplace environment that is hostile, offensive, intimidating, or humiliating to employees of any gender identity may also constitute sexual harassment.

*Sexual misconduct* includes any behavior by an agency employee that takes advantage of the employee's position in law enforcement to misuse authority and power (including force) in order to commit a sexual act, initiate sexual contact with another person, or respond to a perceived sexually motivated cue (from a subtle suggestion to an overt action) from another person. It also includes any communication or behavior by an employee that would likely be construed as lewd, inappropriate, or conduct unbecoming an employee that violates general principles of acceptable conduct common to law enforcement.[3] Sexual misconduct includes a broad scope of behaviors and may include sexual harassment or more severe criminal conduct such as sexual assault.[4]

It is also recognized that the law enforcement profession is unique in that employees perform work-related duties in a variety of settings outside the traditional office environment. For law enforcement, *workplace* is defined as anywhere the employee, whether sworn or civilian, is performing job-related responsibilities, is in uniform, is acting as a representative of the agency, or holds a position of implied authority because of their law enforcement status. This applies to both on-duty and off-duty conduct.[5]

Agency leaders are encouraged to consult a legal advisor regarding this distinction and the applicable laws and statutes within their jurisdictions.

## II.  BACKGROUND

Members of law enforcement are in a unique and visible position in the communities they serve. They are entrusted with the authority to enforce laws and protect the civil rights of community members. Sexual offenses and misconduct implicating law enforcement represent abuse of this authority. It is imperative that executives proactively address and work to prevent such incidents, establishing and maintaining a healthy culture through agency mission, policy, and training.

---

[2] Sexual harassment is considered discrimination in violation of the Civil Rights Act of 1964. For more information, see U.S. Equal Employment Opportunity Commission, *Facts About Sexual Harassment*, https://www.eeoc.gov/publications/facts-about-sexual-harassment#:~:text=Sexual%20harassment%20is%20a%20form,as%20to%20the%20federal%20government.

[3] International Association of Chiefs of Police (IACP), *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide* (2011), https://www.theiacp.org/sites/default/files/all/a/AddressingSexualOffensesandMisconductbyLawEnforcementExecutiveGuide.pdf.

[4] IACP, *Addressing Sexual Offenses and Misconduct by Law Enforcement*, https://www.theiacp.org/sites/default/files/all/a/AddressingSexualOffensesandMisconductbyLawEnforcementExecutiveGuide.pdf.

[5] The definition of workplace will vary by jurisdiction.

For ethical, liability, and economic reasons, law enforcement executives have a vested interest in prohibiting sexual harassment and misconduct. The following statistics reveal the widespread nature of these behaviors.

*Sexual Harassment:*

- Twenty-seven percent of respondents in a study who reported gender discrimination within the last five years identified sexual harassment as the most recent type of discrimination they experienced.[6]
- In a survey of 23 countries, a reported 15–30 percent of women worldwide experience sexual harassment in the workplace.[7]
- In 2018, the Human Rights Tribunal of Ontario awarded $200,000 to an employee who endured sexual harassment for injury to her dignity, feelings, and self-respect.[8]
- Monetary benefits of sexual harassment claims to the U.S. Equal Employment Opportunity Commission (EEOC) in 2019 were $139.6 million.[9] In some cases, these costs fall to the employer. In addition to monetary costs of a claim, the employer in a sexual harassment case can also suffer from decreased employee productivity, increased turnover, and damage to the agency's reputation.[10]

*Sexual Misconduct:*

- After excessive use of force complaints, sexual misconduct was the second most reported type of police complaint.[11]
- Officers who commit sexual violence are likely to have done so before; 41 percent of police sexual violence cases are committed by 'recidivist officers' who averaged four victims over a three-year span of offending.[12]

Sexual harassment and misconduct, in addition to being morally objectionable administrative violations, may be criminal. Law enforcement employees who engage in these behaviors invite public scrutiny and potential legal repercussions and threaten the integrity, community trust, legitimacy, and professionalism of the agency and its members. Failure to effectively address sexual harassment and misconduct enables further toxic behavior. Additional impacts to agencies that do not create and enforce sexual misconduct policies may include:

- Lack of trust among employees, decreased morale, and reduced productivity.
- Erosion of public trust of the agency, reinforced by negative media coverage.
- Difficulty recruiting and retaining employees.
- Impact to the health of harassed employees to include physical illnesses, mental health degradation, and symptoms of post-traumatic stress disorder,[13] leading to increased medical care costs and work absences.
- Lawsuits and corresponding legal fees.

---

[6] Department of Justice Office of the Inspector General, *Review of Gender Equity in the Department's Law Enforcement Components* (June 2018), https://oig.justice.gov/reports/2018/e1803.pdf.

[7] Trishala Singh, "Prevention of Sexual Harassment of Women in the Workplace: Seeking Gender Equality at Work in India," *Journal of International Women's Studies* 18, no. 1 (2016): 104–113.

[8] A.B. v. Joe Singer Shoes Ltd., 2018 HRTO 107.

[9] U.S. Equal Employment Opportunity Commission (EEOC), "All Charges Alleging Harassment (Charges filed with EEOC) FY 2010–FY 2019," https://www.eeoc.gov/statistics/all-charges-alleging-harassment-charges-filed-eeoc-fy-2010-fy-2019.

[10] Chai R. Feldblum and Victoria A. Lipnic, *Select Task Force on the Study of Harassment in the Workplace* (Washington, DC: U.S. EEOC, 2016), https://www.eeoc.gov/select-task-force-study-harassment-workplace.

[11] Cato Institute, *The Cato Institute's National Police Misconduct Reporting Project: 2010 Annual Report,* 1, https://ftp.leg.state.nv.us/App/NELIS/REL/77th2013/ExhibitDocument/OpenExhibitDocument?exhibitId=1240&fileDownloadName=o0220ab146_reejb.pdf.

[12] Cara E. Rabe-Hemp and Jeremy Braithwaite, "An Exploration of Recidivism and the Officer Shuffle in Police Sexual Violence," *Police Quarterly* 16, no. 2 (June 2012): 127–147, https://journals.sagepub.com/doi/abs/10.1177/1098611112464964.

[13] Robin N. Haarr Robin N. and Merry Morash, "The Effect of Rank on Police Women Coping With Discrimination and Harassment," *Police Quarterly* (Vol 14, Issue 4) (2013), 396.

- Reinforcement of implicit and explicit biases.
- Increased city/government oversight.

Law enforcement executives may also be directly impacted by sexual misconduct occurring within their agencies. For instance, they may face individual lawsuits or be named in a larger lawsuit, have reduced time for normal duties, experience a degradation in their ability to effectively lead the agency due to decreased trust from staff and community leadership to enforce standards, and confront direct negative impacts related to future job prospects.

## A. Sexual Harassment

Individuals of all sexual orientations and gender identities can be the victims or perpetrators of sexual harassment. While the majority of sexual harassment reports are brought forth by women,[14] all individuals should be encouraged to report instances of sexual harassment.     Women have a greater risk of sexual harassment in work situations where men outnumber women, which often includes law enforcement.[15] Globally, the representation of women in policing varies from as high as 29.8 percent[16] in England and Wales to as low as 11.8 percent in the United States.[17] Transgender individuals may also be at an elevated risk of victimization.[18]

Victims of harassment may experience negative job-related, physical health, and psychological effects. The negative outcomes may also impact the organization in costs, lower morale, reduced output, increased absenteeism, turnover, and legal costs. Sexual harassment may also impact the future of the policing profession by creating barriers to expanding gender diversity.[19] Studies have shown that women in law enforcement feel that they must work harder and better to prove their ability to do the job.[20] When individuals in law enforcement experience sexual harassment, they may feel that their hard work and efforts are being undermined and devalued.

## B. Sexual Misconduct

Sexual misconduct by law enforcement personnel, both sworn and professional staff, is under-reported, most likely due in part to the reluctance of victims to report to authorities.[21] In addition to experiencing the trauma of the violation, victims may struggle with feelings of humiliation and fear of retaliation, of not being believed, or they may

---

[14] United States Equal Employment Opportunity Commission (EEOC), *Charges Alleging Sex-Based Harassment (Charges filed with EEOC) FY 2010 – FY 2018*, Enforcement & Litigation Statistics, https://www.eeoc.gov/eeoc/statistics/enforcement/sexual_harassment_new.cfm.

[15] Stans de Haas and Greetje Timmerman, "Sexual Harassment in the Context of Double Male Dominance," *European Journal of Work and Organizational Psychology* 19, no. 6 (2010): 717–734, https://www.tandfonline.com/doi/abs/10.1080/09541440903160492.

[16] Jodie Hargreaves, Hannah Husband, and Chris Linehan, *Police Workforce, England and Wales, 31 March 2018* (London, UK: Home Office National Statistics, July 2018), 33, https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/726401/hosb1118-police-workforce.pdf.

[17] Federal Bureau of Investigation, *Crime in the United States 2014*, table 74, Full-time Law Enforcement Employees by Population Group (2015), https://ucr.fbi.gov/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/table-74.

[18] Annelise Mennicke et al., "Workplace Experiences of Gay and Lesbian Criminal Justice Officers in the United States: A Qualitative investigation of Officers Attending a LGBT Law Enforcement Conference," *Policing and Society*, 28:6, 712–729, https://doi.org/10.1080/10439463.2016.1238918.

[19] Mennicke et al., "Workplace Experiences of Gay and Lesbian Criminal Justice Officers in the United States."

[20] Paula McDonald and Michael G Flood, *Encourage. Support. Act! Bystander Approaches to Sexual Harassment in the Workplace* (Sydney, NSW: Human Rights Commission, 2012), https://humanrights.gov.au/sites/default/files/content/sexualharassment/bystander/bystander_june2012.pdf.

[21] Linda B. Cottler et al., "Breaking the Blue Wall of Silence: Risk Factors for Experiencing Police Sexual Misconduct Among Female Offenders," *American Journal of Public Health* 104, no. 2 (February 2014): 338–344; Philip Matthew Stinson Sr. et al., "Police Sexual Misconduct: Arrested Officers and Their Victims," *Victims & Offenders* 2, no. 2 (2015): 117–151.

be unsure as to whether their experience qualifies as sexual misconduct. It is also difficult to gauge the extent of the problem because accused employees may resign, expecting to avoid a complete administrative investigation.

Agency policy should be comprehensive enough to include protection for all populations. For example, studies indicate that most reported victims of sexual misconduct are minors.[22] One study found almost 40 percent of cases of sexual abuse by officers over a 12-year period involved teenagers. The same study found that more than 40 percent of the cases with teenage victims involved Police Explorers programs. Five of the thirty-two Explorer-related cases involved sexual molestation of boys.[23] Risk of victimization may also be elevated based on real or perceived gender identity or sexual orientation.[24]

By maintaining an awareness of populations that are statistically more likely to be victims of sexual misconduct, agencies are aided in their attempts to prevent and respond to instances of misconduct.

## C. Sexual Harassment and Misconduct in the Age of Technology

Technology may be used to commit sexual misconduct. Employees might use technology to view or distribute pornography, send inappropriate and/or unsolicited texts and images to community members or colleagues, or create and publish sexually harassing web content to be viewed by community members or colleagues. Technology and agency resources may also be inappropriately used to learn more, stalk, or come in closer contact with a victim. Agencies should establish and keep current policies related to technology and social media use.[25]

Agency executives must be aware of and understand how technology and electronic media, including social media sites, can be used to commit sexual misconduct against individuals, including other agency employees as well as members of the public. These technologies provide individuals with an opportunity for misconduct without the need for face-to-face interactions.

Sexual harassment and misconduct can be committed on a blog, webpage, social media site, or through various messaging apps—and agencies may be held liable. In addition, the exact definition of what legally constitutes the workplace is now expanded. This means that if a sufficient connection between the sexually harassing conduct and the employment relationship can be made, the agency may be liable. In fact, sexually harassing blog or web entries regarding co-workers may be considered as if those comments were made verbally as if in the workplace. Even with personal webpages, blogs, and social media sites, although employers might not face liability, the employee may face personal liability. However, if it is shown that the employer was aware of the sexual harassment and did nothing to stop it, a court may find the employer should have done more to stop the behavior.

Conversely, agencies can utilize technology to combat sexual misconduct, enhance community-police relations, and promote strong leadership messages and transparency. Press releases, social media, and agency websites may be used to inform the public and employees of complaint procedures and the results of investigations.[26]

---

[22] Cato Institute, *The Cato Institute's National Police Misconduct Reporting Project: 2010 Annual Report,* 1; A.B. v. Joe Singer Shoes Ltd., 2018 HRTO 107; see also Philip Matthew Stinson Sr. et al., "Police Sexual Misconduct: A National Scale Study of Arrested Officers," *Criminal Justice Policy Review* 26, no. 7 (2014): 665–690.

[23] Walker, Samuel and Dawn Irlbeck, *Police Sexual Abuse of Teenage Girls: A 2003 Update on "Driving While Female"* (Omaha, NE: Police Professionalism Initiative, 2003), 4–5, https://samuelwalker.net/wp-content/uploads/2010/06/dwf2003.pdf.

[24] Amnesty International, USA, *Stonewalled: Police Abuse and Misconduct against Lesbian, Gay, Bisexual, and Transgender People in the U.S.* (New York, NY: Amnesty International, 2005), https://www.amnesty.org/en/documents/AMR51/122/2005/en.

[25] For more information, see IACP Policy Center documents on Social Media, https://www.theiacp.org/resources/policy-center-resource/social-media.

[26] For more information, see IACP Policy Center documents on Police-Media Relations, https://www.theiacp.org/resources/policy-center-resource/police-media-relations.

## III.  Policy Recommendations

Law enforcement executives should review all laws and regulations regarding sexual harassment and misconduct and ensure they are reflected in agency policies, procedures, and training. However, agencies should not limit restricted behavior to those actions that are addressed by law but should instead be proactive in identifying and prohibiting any behavior regarding sexual misconduct that could negatively impact the agency, its employees, or members of the community.

Agencies should develop policies that clearly define and prohibit sexual harassment and sexual misconduct and should be clear that consent shall not be an affirmative defense for violations of policy. Law enforcement authority provides opportunities for employees to engage in improper conduct. By developing comprehensive policies, law enforcement executives take a critical step in displaying the necessary leadership and holding the agency and its employees accountable. Similarly, agencies should establish clear technology use policies to prevent, detect, and mitigate sexual misconduct. The technology use policy should describe the employee's rights and obligations when related to both the professional and personal use of technology and include a clear statement regarding sexual misconduct. Agency policies must be clearly and consistently communicated and enforced.[27]

In addition to policy implementation, law enforcement executives must review their hiring selection process, training, and procedures related to reporting, investigating complaints, and providing services to victims[28] of sexual misconduct to ensure the safety and comfort of employees and the community. Agencies should also take preventive measures (such as proactive training or monitoring the use of internal technology systems), react to occurrences swiftly to protect victims, and hold perpetrators accountable in order to restore internal and external trust.

### A.  Training and Accountability

Agencies should provide regular and ongoing training, at least annually, concerning the nature of sexual misconduct as well as prohibitions on such actions as defined in agency policy. The training should recognize that even actions that are not necessarily criminal may still be violations of agency policy and, thereby, subject to disciplinary action. A successful training program should instill and reinforce the agency's philosophy against sexual misconduct; for this purpose, training should be conducted via a top-down approach. Whenever possible, training should be conducted in person (as opposed to virtual videos) and allow participants the opportunity to ask questions and discuss issues surrounding sexual misconduct; this will help foster an organizational culture of accountability and responsibility.

Agencies should ensure that employees are aware of behaviors that constitute sexual misconduct, how to recognize indications that sexual misconduct may be occurring, and how to respond to complaints of sexual misconduct. It should also be made clear that any sex acts on duty are prohibited. Additionally, employees should receive guidance regarding the importance of responding to sexual misconduct for community-police relations, positive police-media relations, and for employee and leadership retention.

---

[27] Research from other disciplines indicates that policies are only effective at changing behavior when those policies are communicated, enforced, and monitored through consistent data collection. See Billie-Jo Grant and Walter Heinecke, "K–12 School Employee Sexual Abuse and Misconduct: An Examination of Policy Effectiveness," *Journal of Child Sexual Abuse* 28, no. 2 (2019): 200–221.

[28] See the IACP Policy Center documents on Response to Victims of Crime, https://www.theiacp.org/resources/policy-center-resource/victims.

## B. Prohibited Behavior

*1. Sexual Harassment*

Agencies should ensure no employee engages in sexual harassment of fellow employees. Agencies have a duty to protect all employees and applicants for employment, whether they are sworn, regular, reserve, or civilian; all volunteers; interns; cadets; Police Explorers; or any individual engaged in agency-sponsored mentoring activities.

Many courts and anti-discrimination agencies refer to two categories of unlawful sexual harassment—*quid pro quo* and hostile work environment. The term *quid pro quo* means "something for something." Situations that fall under the category of *quid pro quo* occur when submission to, or rejection of, unwelcome sexual conduct is used as the basis for employment decisions affecting the individual or when some term of employment is either expressly or implicitly conditioned on participation in unwelcome sexual conduct. This action generally arises when employers use their position of authority to force an employee to submit to sexual harassment in return for tangible job benefits. It is also applicable when an employment decision is made based on whether or not the employee agreed to submit to such actions. Examples of employment decisions are promotions, demotions, pay raises, performance evaluations, and disciplinary measures.

Employer liability results when the *quid pro quo* exchange is suggested by the main employer or any agents or supervisors who have the authority to make employment decisions that affect the employee. The *quid pro quo* suggestion may be either explicit or implicit to be actionable. Employer liability that is based on a supervisor's acts includes those supervisors with the actual authority to make such decisions. Employer liability may be based on single or multiple acts of pressured submission.

In a sexual harassment claim, inquiries often lead to the issue of the credibility of the parties and whether the victim consented to sexual advances. The harasser may assert that the reported acts were misunderstood, actions were consensual, or that a romantic relationship existed between the parties. Because victims of sexual harassment may submit to sexual advances out of fear of losing their jobs or other job benefits, the mere fact that an employee permitted the behavior is not by itself considered voluntary consent. Even if the parties had a romantic relationship at one time, a viable claim of sexual harassment can be made if one party no longer welcomes the interaction and/or advances. It is essential for agency employees to receive training that includes discussion of consent, including factors that affect or negate it, such as power imbalances.

The other category of sexual harassment is the creation of a *hostile work environment*.[29] This is when harassing conduct is "severe or pervasive enough to create an environment that a reasonable person would consider intimidating, hostile, abusive,"[30] or offensive. If the harassment creates an environment a reasonable person would find offensive and that the victim perceived as offensive, then that environment is hostile.

Unwelcome touching that goes beyond socially acceptable boundaries can be considered sexual harassment. A key factor is whether the touching was unwelcome or unsolicited. Touching includes not only placing of the hands on the body of another, but also brushing up against the individual, especially when done in a suggestive manner. The measure is whether a reasonable person would have found the touching offensive. While touching genitals or caressing a person is considered inappropriate workplace touching, other acts that are less overt can also be considered sexual harassment. For example, where a supervisor does not normally touch employees, but one day rests his hand on the employee's shoulder to emphasize a point, it may be considered an act within the

---

[29] For additional information regarding hostile work environment in the United States, see the IACP Policy Center Concepts & Issues Paper on Harassment, Discrimination, and Unprofessional Conduct available at https://www.theiacp.org/resources/policy-center-resource/harassment-discrimination-and-unprofessional-conduct.
[30] EEOC, https://www.eeoc.gov/laws/types/harassment.cfm.

normal bounds of what a reasonable person would consider inoffensive, depending on the context and totality of the circumstances.

Sexual harassment can also include sexually suggestive jokes, gestures, and innuendoes. The display of sexual devices or material or other items that are sexually suggestive may also be considered harassment.

Sexual harassment does not have to be expressly directed at the intended target in order to be actionable. Moreover, there need not be any identifiable target present for the behavior to be punishable.[31] A common example of this is where the sexual harasser is talking to one person but makes offensive comments loud enough that the target knows it was meant for them. Sexually harassing content may also include displaying pictures, cartoons, posters, or other picture material that offends, intimidates, or degrades the viewer, such as materials containing sexual content.

Overall, agencies should ensure that employees are not engaging in sexually harassing behaviors. For example, they should expressly forbid behaviors such as:

- Physical contact of a sexual nature, including intentional touching, grabbing, pinching, massaging, brushing against another's body, and/or impeding or blocking movement;
- Verbal or written comments that are perceived as sexually offensive;
- Sexually offensive conduct that is severe or pervasive;
- Explicit or implicit suggestions of sex:
  - By a supervisor or manager in return for a favorable employment action;
  - By a peer equivalent or other colleague;
- Creation of an environment that is objectively offensive such that a reasonable person would find it hostile, humiliating, or demeaning;
- Creation of an environment that is subjectively offensive such that the accuser perceived it to be so.

*2. Sexual Misconduct*

Agencies should prohibit employees from engaging in actions defined as sexual misconduct. Sexual misconduct may be directed at members of the community, detainees, youth, and crime victims or witnesses and may take place on- or off-duty.[32] Prohibitions on sexual misconduct also apply to officers in undercover roles. Forms may include, but are not limited to:

- Sexual contact by force (e.g., sexual assault, rape);
- Sexual contact with individuals in handcuffs or individuals who have been detained or arrested;
- Sexual coercion or exploitation (e.g., extorting sexual favors in exchange for not ticketing or arresting a community member);
- Sexual contact with a victim or witness;
- Gratuitous physical contact with suspects (e.g., inappropriate or unnecessary searches, frisks, or pat-downs);
- Employee-initiated sexual contacts with the public while on duty;
- Engaging in community member-initiated sexual contact while on duty;

---

[31] Battaglia v. United Parcel Service, Inc., 214 N.J. 518 (N.J. 2013) 70 A.3d 602.

[32] In 1994, researcher Allen Sapp developed seven individual categories of police sexual offenses (Allen D. Sapp, "Sexual Misconduct by Police Officers," in *Police Deviance,* eds. Thomas Barker and David L. Carter (Cincinnati, OH: Anderson Publishing, 1994), and Timothy Maher added an eighth based on his research (Timothy M. Maher, "Police Sexual Misconduct," in *Contemporary Policing: Controversies, Challenges and Solutions,* eds. Quint C. Thurman and Jihong Zhao (Los Angeles, CA: Roxbury Publishing Company, 2004) 327–338.

- Voyeuristic actions that are sexually motivated (e.g., looking in windows of residences for sexually motivated reasons);
- Unnecessary contacts/actions taken by employees for conduct unbecoming policy and/or sexually motivated reasons, including failing to respect classified information or client confidentiality (e.g., unwarranted call backs to crime victims, making a traffic stop to get a closer look at the driver for non-professional reasons);
- Inappropriate and unauthorized use of department resources and/or information systems for other than legitimate law enforcement purposes;
- Any sexual behavior or acts while on duty, consensual or otherwise (e.g., masturbation, viewing and/or distributing pornographic images, sexting, while "on break").

Additionally, certain behaviors or patterns of behavior may indicate security concerns.[33] These may include:

- Sexual behavior of a criminal nature, whether or not the individual has been prosecuted;
- A pattern of compulsive, self-destructive, or high-risk sexual behavior that the person is unable to stop or that may be symptomatic of a personality disorder;
- Sexual behavior that causes an individual to be vulnerable to coercion, exploitation, or duress;
- Sexual behavior of a public nature and/or that reflects lack of discretion or judgment;[34]
- A history of intimate partner violence and/or stalking, whether or not the individual has been prosecuted;
- Violations of protective orders.[35]

*3. Retaliation and Interference*

In some cases, accused parties or other employees may discourage individuals from reporting sexual misconduct – known as interference – or may retaliate against individuals who do. Reporting or otherwise providing information regarding misconduct as well as testifying on behalf of another employee are legally protected activities. While interference does not carry the same legal protections, agencies should prohibit and strive to prevent both interference and retaliatory behavior and should intervene if such behavior occurs.[36]

Employees should receive specific guidance on identifying the types of behavior that constitute retaliation and interference, avenues for reporting such behavior, and potential consequences for participating. A particularly important issue to address is that of caring for the victim. Preventing additional harm to the victim can go a long way toward reducing retaliation. In cases of sexual harassment, holding the accused accountable and showing employee victims that the organization is concerned about their welfare may help improve victim healing and provide them with a sense of justice, prevent lawsuits, and limit potential liability.

Agencies may consider implementing protective measures for victims who are particularly vulnerable to retaliation. Such measures may include developing a network with local social service providers to alert them to the fact that the agency is implementing a new sexual misconduct policy and will consistently pursue reports of sexual harassment and misconduct, including incidents perpetrated of sexual misconduct by employees against members of the public. The development of this type of network and communication may help ensure that social service providers can work with the law enforcement agency to provide extra protections for reported victims.

---

[33] See also the IACP Policy Center documents on Early Identification Systems, https://www.theiacp.org/resources/policy-center-resource/early-identification-system.

[34] Army Publishing Directorate, "Personnel Security Program," Army Regulation 380-67 (January 24, 2014), 63-64, https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/r380_67.pdf.

[35] See IACP Policy Center documents on Stalking, https://www.theiacp.org/resources/policy-center-resource/stalking.

[36] For more information, see the IACP Policy Center documents on Retaliatory Conduct by Employees, https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

## C. Roles and Responsibilities

Although all employees are responsible for preventing sexual misconduct, agencies should make efforts to prevent, identify, and respond to these behaviors by clearly defining staff roles and responsibilities.

*1. Agency Responsibilities*

Agencies should establish policies prohibiting sexual harassment and misconduct. These policies should be clearly communicated to employees and monitored and enforced through data collection and regular training. Appropriate safeguards such as establishing and communicating a policy prohibiting sexual harassment and misconduct can reduce agency liability in any such claims.[37]

Agencies should be aware they have the legal and moral duty to thoroughly investigate claims of sexual misconduct.[38] Where there are both criminal and administrative violations, the investigations should be conducted concurrently, while ensuring due process rights of employees reported to have committed an offense are upheld during the separate administrative and criminal investigations. Concurrent investigations ensure any necessary administrative actions are taken in accordance with the investigation findings as soon as practically possible and independent of any potentially lengthy criminal proceedings. Even if the accused employee leaves the agency or a settlement is reached between the agency and the reporting party, the investigation should still be completed. Sometimes, employees facing accusations might then be hired by another agency where they may continue to commit offenses against others. Therefore, it is imperative that a complete investigation is carried out whether or not the accused employee resigns.[39]

If a complaint is made anonymously, the agency should investigate to whatever degree possible as patterns of behavior may be established should more complaints occur. Upon a finding of "founded," appropriate corrective action should be taken. This action may include counseling, additional training, and/or disciplinary action as appropriate.

In order to ensure that sexual misconduct is appropriately addressed, the chief executive officer or their designee should receive annual summaries of complaints related to sexual misconduct. These summaries should be reviewed to determine if any changes are necessary to agency policy, procedures, and/or training.

In cases involving sexual harassment, any employee transfers or reassignments should be voluntary, if possible. The victim's desire to transfer or reassign should take priority over the accused whenever feasible. Agencies should also ensure that retaliatory conduct results in discipline.[40]

Law enforcement agencies should also explore programs that have been shown to help victims of sexual harassment to overcome resulting workplace challenges. One example of a program is an optional mentorship

---

[37] See Pennsylvania State Police v. Suders, 542 U.S. 129 (2004); Burlington Industries Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

[38] For example, in the United States case *Malik v. Carrier Corp.*, 202 F.3d 97 (2d Cir. 2000), the plaintiff reported his employer was negligent in its decision to investigate retracted allegations of sexual harassment that had been brought against him by a female colleague. The court held that the employer's decision to pursue the investigation was warranted, given that an employer's investigation of a sexual harassment complaint was not a "gratuitous or optional undertaking." The court stated that under federal law, an employer's failure to investigate "may allow a jury to impose liability on the employer."

[39] International Association of Chiefs of Police, *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*, (June 2011), https://www.theiacp.org/resources/document/addressing-sexual-offenses-and-misconduct-by-law-enforcement-executive-guide.

[40] See the IACP Policy Center documents on Retaliatory Conduct by Employees, https://www.theiacp.org/resources/policy-center-resource/retaliatory-conduct.

program. Mentors may be a good programmatic tool to help victims overcome challenges resulting from sexual harassment in the workplace.[41]

*2.  Supervisory Responsibilities*

No law enforcement agency can fulfill its duty to maintain a workplace free of sexual misconduct without the assistance and support of its supervisors – especially first-line supervisors. Apathetic or hostile supervisors can quickly undermine an otherwise effective and meaningful policy against sexual misconduct through their actions or inaction in implementing the policy. By contrast, through their daily supervision of employees, supervisors can assist the agency in identifying, stopping, and preventing prohibited behavior.[42] Monitoring the work environment on a daily basis for warning signs and patterns or indicators that sexual misconduct may be occurring is a critical responsibility for supervisors. The work environment may include but is not limited to traffic stops, arrests, activity reports, radio logs, body-worn camera footage, narrative reports, case dispositions, locations of activities, and subject demographics.

*3.  Employee Responsibilities*

Employees should abstain from engaging in any prohibited behaviors and should also refrain from participating in or encouraging any action that could be perceived as sexual misconduct. If any employee sees such actions, they should report the misconduct to a supervisor, OPS, or the human resources function.[43] Peer intervention training can be helpful in advocating for and fostering this behavior. Members of the public who experience sexual misconduct by agency employees should be encouraged to file an official complaint. It is the responsibility of every employee to promote a safe work environment, and failure to carry out these responsibilities may be considered in a performance evaluation or promotional decision and may be grounds for discipline. In some instances, collective bargaining agreements may dictate the actions to be taken in these circumstances.

## D.  Complaint Procedures

Development of effective, accessible, and timely complaint procedures, both for internal and external complaints, is an important action that an agency can take to stop sexual misconduct and minimize liability. All employees should be aware of the agency complaint procedures to be followed in the event of sexual misconduct. If any employee encounters prohibited behavior, they should know the appropriate actions to take. In cases of sexual harassment, action should include informing the perpetrator that those actions are unwelcome and offensive and immediately documenting all incidents in order to provide the fullest basis for investigation. For sexual misconduct toward community members, agencies should review agency procedures and ensure potential victims are provided with easily understood instructions for filing a complaint, and employees and the public are updated regarding the results of investigations.[44]

When the agency receives a complaint, internally or externally, the reported event should be investigated in a fair and expeditious manner. The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances and will include private interviews with the person filing the complaint and

---

[41] Paula McDonald and Michael G Flood, *Encourage. Support. Act! Bystander Approaches to Sexual Harassment in the Workplace* (Sydney, NSW: Human Rights Commission, 2012).

[42] For more detailed information regarding supervisor responsibilities in preventing and responding to harassment, including sexual harassment, see the Policy Center documents on Investigation of Allegations of Employee Misconduct, https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

[43] This does not apply to victims who do not report sexual harassment or sexual misconduct.

[44] For detailed information regarding suggested complaint procedures for sexual misconduct, please see the Policy Center documents on Investigations of Allegations of Employee Misconduct, https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

separately with any witnesses. An interview will also be conducted with the person reported to have committed misconduct. If it is determined that inappropriate conduct has occurred, the agency will act promptly to eliminate the offending conduct, and, where appropriate, impose disciplinary action.

When the investigation is complete, the agency should, to the extent appropriate, inform the person filing the complaint and the person reported to have committed the conduct of the results of that investigation.

In addition to filing a complaint with the agency, formal reports can also be filed with the appropriate government agencies. For reports of criminal misconduct, criminal charges should be filed.[45]

---

[45] See the IACP Policy Center Concepts & Issues paper on Investigation of Allegations of Employee Misconduct, https://www.theiacp.org/resources/policy-center-resource/employee-misconduct.

# APPENDIX A: UNITED STATES LEGAL PRECEDENT

Police agencies in the United States must maneuver around local, state, and federal rules and regulations that are constantly evolving. The following information is intended to provide readers with an overview of the evolution of the current topic in the United States.

## A.1 Sexual Harassment

The Civil Rights Act of 1964 makes it unlawful to discriminate against others because of race, color, sex, religion, or national origin. The applicable employment portion of the law is commonly referred to as Title VII, because this is the section of the Act that addresses employment discrimination. Title VII provides federal protection to employees from employment discrimination practices. It provides protection to women from workplace and employment discriminatory practices. The title also establishes the Equal Employment Opportunity Commission (EEOC). Law Enforcement executives should be familiar with the content of Title VII of the Federal Civil Rights Act of 1964.[46]

In 1980, the EEOC provided guidelines that further define the types of acts that are deemed to be workplace sexual harassment and discrimination. The guidelines followedcame after U.S. Supreme Court case holdings against employers who were sexually discriminating against female employees. Law enforcement executives should be familiar with all types of sex-based discriminations, as defined by EEOC.[47] In 1986, a U.S. Supreme Court decision recognized sexual harassment as an act that violates Title VII of the Civil Rights Act of 1964.[48] In 1991, Congress passed the Civil Rights Act of 1991. The new federal law strengthened the 1964 act, by making employers liable for workplace discrimination and allowing federal juries to hear such cases.[49] Further, the Violence Against Women Act, part of the Violent Crime Control and Law Enforcement Act of 1994,[50] recognizes sexual assaults at the federal level and provides remedies for intentional discrimination and unlawful harassment in the workplace. In 1995, Congress passed the Government Accountability Act, which applies all of the previous workplace harassment laws to Congress's own workplace.[51]

## A.2 Sexual Misconduct

The public trusts that when they are in the custody of law enforcement officials, they will be kept physically and psychologically safe from harm. When the very person entrusted with that care is the person who commits a harmful act, trust in law enforcement fades. Law enforcement sexual misconduct is an extremely serious act against victims whose trust in law enforcement was betrayed. There are federal, state, and local laws that prohibit an employee from sexually assaulting a person in their care. The United States Department of Justice's Civil Rights Division can investigate and prosecute law enforcement officials for coercion or violence carried out against a victim's right to bodily integrity.[52]

---

[46] Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, https://www.eeoc.gov/laws/statutes/titlevii.cfm.

[47] U.S. Equal Opportunity Employment Commission, "Sex-Based Discrimination," https://www.eeoc.gov/laws/types/sex.cfm.

[48] Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986).

[49] The Civil Rights Act of 1991, Pub. L. No. 102-166, https://www.eeoc.gov/statutes/civil-rights-act-1991.

[50] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, https://www.congress.gov/bill/103rd-congress/house-bill/3355/text.

[51] Congressional Accountability Act of 1995, Pub. L. No.104-1, https://www.ocwr.gov/sites/default/files/CAA_508v2.pdf.

[52] United States Department of Justice, "Law Enforcement Misconduct," *s.v.* "Sexual Misconduct," https://www.justice.gov/crt/law-enforcement-misconduct#sex.

## APPENDIX B: ADDITIONAL RESOURCES

- End Violence Against Women International. (2020). Law Enforcement Sexual Misconduct: Introducing a Model Policy Resource for Prevention and Accountability (recorded webinar). Available at https://evawintl.org/courses/law-enforcement-sexual-misconduct-introducing-a-model-policy-resource-for-prevention-and-accountability/.

- IACP. (2011). *Addressing Sexual Offenses and Misconduct by Law Enforcement: Executive Guide*. Available at https://www.theiacp.org/resources/document/addressing-sexual-offenses-and-misconduct-by-law-enforcement-executive-guide.

- Lonsway, K.A., Patrick, W., (2018). *Sexual Harassment and Sexual Assault: Understanding the Distinctions and Intersections*. End Violence Against Women International. Available at https://evawintl.org/wp-content/uploads/2018-05_TB-Sexual-Harassment-and-Sexual-Assault.pdf.

- Tremblay, T., Archambault, J., & Lonsway, K. (2020). *Model Policy Resource: Law Enforcement Sexual Misconduct Prevention and Accountability*. End Violence Against Women International. Available at https://evawintl.org/wp-content/uploads/2020-02_TB-Model-Policy-Resource-LESM-Prevention-and-Accountability.pdf.

- U.S. Equal Employment Opportunity Commission (EEOC) website. Available at https://www.eeoc.gov/.

- Virtual Knowledge Centre to End Violence against Women and Girls. (2011). Sources of International Law Related to Sexual Harassment. Available at https://www.endvawnow.org/en/articles/492-sources-of-international-law-related-to-sexual-harassment.html.

© Copyright 2022. Departments are encouraged to use this document to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.



**International Association of Chiefs of Police**
44 Canal Center Plaza, Suite 200
Alexandria, VA 22314
703.836.6767 | FAX 703.836.4743
**www.theIACP.org**

International Association of
Chiefs of Police

# Standards of Conduct

July 2019





The IACP Law Enforcement Policy Center creates four types of documents: Model Policies, Considerations Documents, Concepts & Issues Papers, and Need to Know one-page summaries. Typically, for each topic, either a Model Policy or a Considerations Document is created, supplemented with a Concepts & Issues Paper. This file contains the following documents:

- ***Model Policy***: Provides police agencies with concrete guidance and directives by describing in sequential format the manner in which actions, tasks, and operations are to be performed.

- ***Concepts & Issues Paper***: Designed to provide context and background information to support a Model Policy or Considerations Document for a deeper understanding of the topic.

## Model Policy

Updated: July 2019

# Standards of Conduct

## I.   PURPOSE

It is the purpose of this policy to provide specificity to the standards of conduct embodied in the law enforcement officer's code of ethics[1] and this agency's statement of values and mission, so that officers[2] have a clear understanding of agency expectations pertaining to conduct and activities while on and off duty.[3]

## II.   POLICY

It is the policy of this law enforcement agency that officers shall conduct themselves both on and off duty in a manner that reflects high ethical standards consistent with the values and mission established by this agency and the expectations of the community it serves.

## III.   PROCEDURES

### A.  General

The following items shall be reviewed and/or developed.

1. A statement that explicitly states the agency's mission, goals, and values;
2. Code of ethics;
3. Oath of honor.

---

[1] See the IACP Ethics Toolkit available at https://www.theiacp.org/ projects/iacp-ethics-toolkit.

[2] The term "officer" is used throughout this document. However, agencies should consider whether sworn, civilian, or reserve officers; volunteers; interns; cadets; explorers; or any individual engaged in agency-sponsored mentoring activities should be cognizant of and adhere to the directives set forth herein.

[3] For additional guidance regarding officer conduct, please refer to the IACP Law Enforcement Policy Center documents on Harassment and Discrimination, Employee Drug Policy, Investigation of Employee Misconduct, Firearms, Family and Medical Leave, Grievance Procedures, Grooming and Appearance, Nepotism and Employee Fraternization, Off-Duty Arrests, Secondary Employment, Retaliatory Conduct by Employees, and Social Media available at https://www.theiacp.org/policycenter.

**Publications of the IACP Law Enforcement Policy Center**
**44 Canal Center Plaza, Suite 200, Alexandria, VA 22314**

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

## B. Conduct

General conduct includes the following:

1. Officers shall follow this agency's mission and values statement, oath of honor, and code of ethics. If an officer experiences an ethical conflict with these items, they should consult a supervisor for further clarification.

2. Officers shall be truthful in all matters and shall not lie, falsify, conceal, purposely distort, diminish, embellish, or fail to fully disclose facts associated with any law enforcement business.[4]

3. Adherence to laws, regulations, and orders:

   a. Officers shall abide by all laws, regulations, agency policies, rules, and procedures.

   b. Officers shall obey all lawful orders.

   c. Officers who are arrested or come under investigation for any offense in any jurisdiction shall immediately report this fact to their supervisor.

   d. A court conviction for a crime that carries a possible sentence of incarceration shall be prima facie evidence of a violation of this policy.

4. Unbecoming conduct – Officers shall not conduct themselves in a manner, on or off duty, that:

   a. Casts doubt on their integrity, honesty, moral judgment, or character;

   b. Brings discredit to this agency; or

   c. Impairs the agency's efficient and effective operation.

5. Neglect of duty:

   a. All officers shall perform their duties faithfully and diligently and shall take responsibility for and exhibit attentiveness, care, and thoroughness in the conduct of assignments and responsibilities.

   b. Officers shall conduct themselves in an expeditious manner to avoid any unreasonable delays to the public in the performance of law enforcement duties and activities.

6. Accountability and responsibility:

   a. Officers are directly accountable for their actions, through the chain of command, to this agency's chief executive officer.

   b. Officers shall report for duty, including court and off-duty assignments, at the time and place required.

   c. Officers have a duty to intervene to prevent or stop wrongdoing by another officer when it is safe and reasonable to do so.

   d. Officers have a duty to report any misconduct of which they become aware and shall notify a supervisor as soon as possible when another member of the agency is violating law or policy.

   e. Officers shall cooperate fully in any internal administrative investigation conducted by this or any other authorized agency and shall not attempt to conceal, divert, or mitigate any culpability of theirs or others by falsehoods or omissions.

   f. Officers shall utilize agency supplies, property, and equipment only for their official purpose and in accordance with established agency rules, policies, and procedures and shall not intentionally abuse, destroy, dispose of, or damage these items.

---

[4] This policy recognizes the fact that there are legitimate needs for deception and/or non-disclosure of information in furtherance of the law enforcement purpose.

7. Conduct toward fellow officers:

   a. Officers shall conduct themselves in a manner that fosters cooperation among members of this agency, showing respect, courtesy, and professionalism in their dealings with one another.

   b. Officers shall not use language or engage in acts that demean, harass, or intimidate other officers.[5]

8. Conduct toward the public – Officers shall interact with the public in a civil and professional manner that conveys a service orientation to foster public trust and cooperation and adheres to the concepts associated with procedural justice.

   a. Officers shall treat individuals with courtesy, respect, and dignity.

   b. Officers shall not employ an officious or overbearing attitude or use language that might belittle, ridicule, or intimidate individuals.

   c. Officers shall perform their duties equitably in both the enforcement of laws and the delivery of law enforcement services within the community and shall strive to maintain public trust by conducting all law enforcement business in an unbiased, fair, and impartial manner.[6]

9. Abuse of law enforcement authority or position:

   a. Officers may not accept goods, services, or discounts of value not available to the general public and shall report any unsolicited goods or services they receive and the circumstances of the receipt to a supervisor.[7]

   b. Officers shall not use their authority or position:

      • for financial gain;

      • to obtain or grant privileges or favors;

      • to avoid the consequences of illegal acts for themselves or others; or

      • to barter, solicit, or accept any goods or services, such as gratuities, gifts, discounts, rewards, loans, or fees, whether for themselves or others.

   c. Officers shall not purchase, convert to their own use, or have any claim to found, impounded, abandoned, or recovered property or any property held or released as evidence.

   d. Officers shall not permit the use of any agency-issued identification card, badge, or official document by unauthorized persons.

   e. Officers are prohibited from using law enforcement sensitive information gained through their position to advance financial or other private interests of theirs or others.

   f. Officers shall not steal, forge, or tamper with any official law enforcement document. Documents shall not be altered or duplicated unless such actions are approved by a supervisor.

   g. Officers shall not take or release photographs capturing sensitive information or images unless authorized to do so.

   h. Officers shall not undertake any investigation or other official action that is not part of their regular duties without first obtaining permission from their supervisor, unless the exigency of the situation requires immediate law enforcement action.

---

[5] Please refer to the IACP Policy Center documents on Harassment and Discrimination available at https://www.theiacp.org/resources/ policy-center-resource/harassment-and-discrimination and Retaliatory Conduct by Officers available at https://www.theiacp.org/resources/poli- cy-center-resource/retaliatory-conduct.

[6] See the IACP Policy Center documents on Unbiased Policing available at https://www.theiacp.org/resources/policy-center-resource/ unbiased-policing.

[7] Agencies should determine whether de minimis items, defined as those that are "so minor as to merit disregard," are included in these prohibitions.

       i. Officers involved with any civil action that arises from acts performed under color of authority shall inform their supervisor.

10. Prohibited associations and establishments:

       a. Officers shall not knowingly commence or maintain a relationship with any person who is under criminal investigation, indictment, arrest, or incarceration by this or another law enforcement or criminal justice agency or who has an open and notorious criminal reputation in the community (for example, persons whom they know, should know, or have reason to believe are involved in criminal activity), except as necessary to the performance of official duties or where unavoidable or impractical because of pre-existing familial or marital relationships. In such cases where regular household, physical, or telephone contact is unavoidable, the officer shall inform their supervisor of the relationship.

       b. Officers shall not knowingly engage in social or romantic relationships with confidential informants, victims, or witnesses involved with active investigations.

       c. Officers shall not participate or interfere in investigations involving family members or persons with whom they have a close personal or business relationship.

       d. Except in the performance of official duties, officers shall not enter any establishment in which the law is knowingly violated.

       e. Officers shall not knowingly join or participate in any organization that advocates, incites, or supports criminal acts or criminal conspiracies or that promotes hatred or discrimination toward racial, religious, ethnic, or other groups or classes of individuals protected by law.

## C. Public Statements, Appearances, and Endorsements

1. Officers shall follow this agency's policy on social media.[8]

2. Officers shall not, when officially acting as a representative of this agency:[9]

       a. make any public statement that could be reasonably interpreted as having an adverse effect upon agency morale, discipline, operations, or public perception;

       b. divulge or willfully permit to have divulged any information gained by reason of their position, for anything other than its official, authorized purpose; or

       c. unless expressly authorized, make any statements, speeches, or public appearances that could reasonably be considered to represent the views of this agency.

3. Officers shall not solicit or accept contributions for this agency or, as a law enforcement officer of this agency, for any other agency, organization, event, or cause without the express consent of the agency chief executive or their designee.

4. Officers may not, as an agent of this agency, endorse, recommend, or facilitate the sale of commercial products or services without the approval of the agency's chief executive officer or their designee. This includes but is not limited to the use of tow services, vehicle repair shops, attorneys, bail bondsmen, or other technical or professional services. It does not pertain to referrals to appropriate governmental, community, or social services.

---

[8] See the IACP Policy Center documents on Social Media available at https://www.theiacp.org/resources/policy-center-resource/social-media.

[9] For issues concerning limitations on speech while off-duty, please refer to the accompanying Concepts & Issues Paper.

## D.  Political Activity

Officers shall follow applicable laws regarding their participation and involvement in political activities. Where legal mandates are silent on this issue, officers shall be guided by the following examples of prohibited political activities while on duty, in uniform, or otherwise serving as a representative of this agency. Officers shall not:

1.  Place, affix, or display any campaign literature or other paraphernalia in or on government-owned or controlled property, to include offices and vehicles;

2.  Solicit political funds from any member of this agency or another governmental agency of this jurisdiction;

3.  Solicit contributions, signatures, or other forms of support for political candidates, parties, or ballot measures;

4.  Use official authority to interfere with any election or with the political actions of other officers or the general public; or

5.  Favor or discriminate against any person seeking employment because of political opinions or affiliations.

Every effort has been made by the IACP Law Enforcement Policy Center staff and advisory board to ensure that this document incorporates the most current information and contemporary professional judgment on this issue. However, law enforcement administrators should be cautioned that no model policy can meet all the needs of any given law enforcement agency. In addition, the formulation of specific agency policies must take into account local political and community perspectives and customs, prerogatives, and demands; often divergent law enforcement strategies and philosophies; and the impact of varied agency resource capabilities, among other factors. Readers outside of the United States should note that, while this document promotes procedures reflective of a democratic society, its legal basis follows United States Supreme Court rulings and other federal laws and statutes. Law enforcement administrators should be cautioned that each law enforcement agency operates in a unique environment of court rulings, state laws, local ordinances, regulations, judicial and administrative decisions, and collective bargaining agreements that must be considered and should therefore consult their legal advisor before implementing any policy.

© Copyright 2020. Agencies are encouraged to use this document to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.

## Concepts & Issues Paper

Updated: July 2019

# Standards of Conduct

## I. INTRODUCTION

### A. Purpose of Document

    This document was designed to accompany the Model Policy on Standards of Conduct developed by the IACP Law Enforcement Policy Center. This paper provides essential background material and supporting documentation to provide greater understanding of the developmental philosophy and implementation requirements for the model policy. This material will be of value to law enforcement executives in their efforts to tailor the model to the requirements and circumstances of their communities and their law enforcement agencies.

    The term "officer" is used throughout this document. However, agencies should consider whether sworn, civilian, or reserve employees; volunteers; interns; cadets; explorers; or any individual engaged in agency-sponsored mentoring activities should be cognizant of and adhere to the directives set forth herein.

### B. Background

    Law enforcement officers confront many difficult decisions that may involve conflicting notions of what is right and wrong and what is expected from them. From the seemingly benign offer of a free cup of coffee to a substantial financial inducement for an officer to ignore wrongdoing, law enforcement authority can be a source of many temptations that can strain the limits of personal and professional integrity.

    Therefore, law enforcement agencies must clearly define what is and is not acceptable conduct. To do their job properly, law enforcement officers must accept and abide by a high ethical and moral standard that is consistent with the rule of law they are sworn to uphold. They must also uphold those beliefs and demonstrate their adherence to those values by consistently employing propriety and discretion in their personal lives that reflect favorably on themselves as professionals and the law enforcement agency that they represent. Without this high standard, agencies cannot expect to gain the trust, respect, and cooperation of community members that are essential to the success of policing.

    Personal integrity—a conscious decision to do the right thing even in the face of overwhelming pressure—and acceptance of responsibility for one's actions are indispensable in achieving high levels of professional conduct. Values, codes of conduct, and ethical standards are important guides; however, it is also critical that agencies make clear what is acceptable behavior in specific situations. This is particularly the case in highly sensitive areas of law enforcement operations.

**Publications of the IACP Law Enforcement Policy Center**
**44 Canal Center Plaza, Suite 200, Alexandria, VA 22314**

These documents are the result of work performed by the IACP Law Enforcement Policy Center. The views and opinions expressed in these documents are sanctioned by the center's advisory group and do not necessarily represent the official position or policies of the International Association of Chiefs of Police.

The rules of conduct set forth in this document are not intended to serve as an exhaustive list of requirements, limitations, or prohibitions on officer conduct and activities. Rather, they are intended to inform officers about some of the more sensitive and often problematic matters involved in law enforcement conduct and ethics; specify, where possible, actions and inactions that are contrary to and conflict with the duties and responsibilities of law enforcement officers; and guide officers in conducting themselves and their affairs in a manner that reflects the high standards of professionalism required of law enforcement officers. Additional guidance on matters of conduct may also be found in specific policies, procedures, and directives disseminated by the agency and in direction provided by officers' immediate supervisors and commanders.[1]

## C.  Promoting Ethical Policing

Agencies must promote ethical conduct by all officers at all times. While a policy outlining acceptable and unacceptable conduct for employees is necessary, not every situation can or will be covered explicitly. If one does not already exist, agencies should begin by establishing a statement that outlines their mission, goals, and values. In addition, a code of ethics and oath of honor should be utilized.[2] These broad statements should reflect a general underlying principle requiring ethical conduct that will guide the use of discretion in incidents where no specific rule applies.

Officers should be required to follow each of these items in all situations and use these principles as the basis for all decision-making. In cases where officers are asked or directed to behave in a manner or are faced with a situation that is contradictory to these items, they should consult a supervisor for further clarification.

The focus on ethics should begin with the selection and hiring process. A variety of screening tools, such as psychological and polygraph examinations may be utilized to determine if an individual has the behavioral characteristics suited to law enforcement work. Once hired, a training and probationary period may be used to further evaluate how the potential officer demonstrates the ethical standards set forth by the agency. In addition, in an effort to develop independent, rational, ethical decision-making skills, agencies may elect to utilize role-playing exercises designed to simulate possible situations where an officer is confronted with an opportunity to act in a corrupt or unethical manner.

## D.  Policy Rationale

Standards of conduct often involve personal liberties, including freedom of association and freedom of speech, that are among the more closely guarded individual rights. In virtually all work environments, there are limitations upon an employer's ability to dictate the terms of employment with regard to personal conduct of employees. It is reasonable for employers to require that their personnel conduct themselves with decorum and good taste. However, in matters of a more personal nature, employers must be confident that the restrictions or limitations they wish to impose are legally grounded, reasonable, and justifiable as job-related.

The courts have, in many cases, upheld the notion that law enforcement work has distinctive features that distinguish it from other types of employment. As such, certain types of conduct and employee activities are deemed harmful to the efficient and effective operation of law enforcement agencies and can be limited, curtailed, or modified in some manner.

---

[1] For additional guidance regarding employee conduct, please refer to the IACP Law Enforcement Policy Center documents on Harassment and Discrimination, Employee Drug Policy, Investigation of Employee Misconduct, Firearms, Family and Medical Leave, Grievance Procedures, Grooming and Appearance, Nepotism and Employee Fraternization, Off-Duty Arrests, Secondary Employment, Retaliatory Conduct by Employees, and Social Media available at https://www.theiacp.org/policycenter.

[2] See the IACP Ethics Toolkit available at https://www.theiacp.org/projects/iacp-ethics-toolkit.

Law enforcement policies generally, and particularly those that have bearing on liberty interests of personnel, must be based on rational, justifiable grounds that can be articulated and relate to the promotion of legitimate law enforcement agency and/or public interests.

## E. Prevention of Employee Misconduct – Proactive Measures

As with any other aspect of law enforcement, the best way to solve a problem is to prevent the problem from arising. For this reason, agencies should incorporate proactive, preventive measures for detecting and responding to indications of potential ethical or conduct violations prior to their occurrence.

*Pre-Employment Screening and Qualifications.* The pre-employment screening stage is an opportune time to ensure that candidates initially selected for a career in law enforcement are the most suitable and most likely to perform in an ethical manner. Agencies should develop and publish pre-employment qualifications and guidelines that specifically outline the desired recruit attributes.[3]

*Individual Responsibility and Accountability.* Line officers are key stakeholders in efforts to preserve and enhance the reputation of their agency and their personal pride. These officers are on the front line with the community they serve, and their conduct reflects upon the agency as a whole. It is imperative that organizational pride, self-respect, and respect for the law enforcement profession and agency ethics are continuously emphasized. These concepts must be prioritized in agency mission statements, throughout policy and procedure, and in any training.

Therefore, if an agency is to maintain a professional image, officers must ensure that their behavior complies with professional standards of conduct. Every employee of the agency has a responsibility to adhere to agency standards of conduct, policies, rules, and procedures. Employees should be made fully aware of the fact that they will be held strictly accountable for such adherence. Officers should also be required to report actions or patterns of behavior of fellow officers that breach agency standards of conduct, especially when acts or patterns of behavior by fellow officers threaten the rights of community members and/or the well-being and reputation of other officers and the agency as a whole. The agency should also take a strong stance against retaliatory conduct.[4] Again, the emphasis must be on individual and organizational pride and respect for the law enforcement field.

*Training, Supervision, and Policy Guidance.* The law enforcement agency is responsible for providing each officer with sufficient and proper training, supervision, and policy guidance to ensure that they are fully aware of standards of conduct, policies, rules, and procedures. In this respect, policy and procedure development is not static, but a dynamic function subject to continued refinement as the agency's environment and circumstances change. As modifications are made, steps must be taken to ensure that each officer has actual notice of such matters and fully understands what is required. In addition, it is imperative for the agency to continuously promote ethics, integrity, individual and organizational pride, public trust, transparency, and enhanced partnership with the community throughout the agency's mission statement, policy and procedure, and all training.

*Responsibility of Supervisors.* Supervisors are a law enforcement agency's most important asset for continually reinforcing evolving policies, procedures, goals, and objectives and ensuring that they are carried out properly. The primary responsibility for maintaining and reinforcing officer conformance with the agency's standards of conduct and operational procedures is lodged with first-line supervisors. Supervisors must closely monitor and evaluate the general conduct and performance of all officers in their unit. Evaluations of officers must be the product of daily observation and close working relationships. Supervisors should remain alert to any indications of behavioral, physical, or other

---

[3] Certain qualifications have been shown to result in more positive outcomes. These include requiring at least a two-year college degree before hiring; conducting a thorough background investigation that tracks the disciplinary history of candidates; and requiring that candidates go through a competent psychological screening regimen. For more information regarding identifying appropriate pre-employment screening mechanisms and pre-hiring qualifications for law enforcement personnel, see Michael G. Aamodt, *Research in Law Enforcement Selection* (Boca Raton, FL: Brown Walker Press, 2004); and James F. Albrecht, *Police Brutality, Misconduct and Corruption: Criminological Explanations and Policy Implications,* Springer Briefs in Criminology (New York, NY: Springer Publications, 2017).

[4] See the IACP Policy Center documents on Retaliatory Conduct by Employees available at https://www.theiacp.org/resources/policy-center-re- source/retaliatory-conduct.

problems that may affect an officer's job performance as well as any behaviors that may suggest conduct that is inconsistent with agency policy, procedures, and rules. Where observed, any information of this type that is deemed relevant should be documented immediately. When problems are detected, a supervisor may recommend additional training, counseling, or other corrective action.

However, the agency cannot assume that an officer who is promoted to supervisory status necessarily possesses the requisite supervisory or leadership abilities. All supervisory personnel require training in first-line supervision skills if they are to be effective and serve the interests of the agency and the community. This training should encourage supervisors to act as role models for both subordinates and peers, with an emphasis on ethics and professionalism.

***Early Identification Systems.*** Effective early identification systems (EIS) assist supervisors and managers in identifying employees whose performance warrants review and, where appropriate, outlining intervention procedures in circumstances where the employee's behavior may have negative consequences for the employee, coworkers, the agency, and/or the general public.[5] An EIS allows for identified officers to receive enhanced supervisory attention and more frequent performance evaluation. Mentoring and guidance at this preemptive stage may lead to improved performance and prevention of misconduct.

## II.   PROCEDURES

### A. General Conduct

***Obedience to Laws.*** Officers are responsible for observance of all laws, regulations, and orders. Law enforcement officers are as subject to the law as any other person. This element of the policy is intended to stress the importance of the rule of law for all officers and to hold each officer accountable for any legal wrongdoing.

It is imperative that officers also abide by agency policies, rules, and procedures and obey all lawful orders. The term lawful is included to acknowledge the potential situation in which an order may be given that is unlawful or is in violation of agency policy. In situations where an unlawful order is given, officers should inform the individual giving the order that it cannot be followed because it would violate a law or agency policy.

Truthfulness is also a key component of officer integrity. Failure to be truthful in all situations, to include when conducting law enforcement business and in the course of filing reports or making statements, can render an officer unfit for duty and provide the grounds for termination of employment.[6] However, agencies should recognize that there are legitimate needs for deception and/or nondisclosure of information in furtherance of the law enforcement purpose.

Finally, officers should be required to immediately notify their supervisor whenever they are arrested or come under investigation for any offense in any jurisdiction. Agencies may also elect to include a requirement for notification if the officer is charged with a misdemeanor or felony. This information—either as a single incident or in the context of repeated problems—can have a bearing upon an officer's ability to serve as a law enforcement officer generally or in specific assignments within the agency. Additionally, a court conviction for a crime that carries a possible sentence of incarceration shall be prima facie evidence of a violation of this policy.

***Conduct Unbecoming an Officer.*** Officers, whether on- or off-duty, should act in a manner that is above reproach. This includes avoiding behavior that may cast doubt on their integrity, honesty, moral judgment, or character; tends to bring discredit to the agency; or impairs the agency's efficient and effective operation. These actions are sometimes referred to as conduct unbecoming an officer (CUBO). Unbecoming conduct incorporates those acts that might not be specifically identified by policy but that could reasonably be regarded as so improper or inappropriate by their nature and in their context that they are harmful to the agency's and officers' reputations.

---

[5] See the IACP Policy Center documents on Early Identification Systems available at https://www.theiacp.org/resources/policy-center-resource/early-identification-system.

[6] See the IACP Policy Center documents on *Brady* Disclosure Requirements available at https://www.theiacp.org/resources/policy-center-resource/brady-disclosure-requirements.

One of the problems in defining prohibited conduct is that it is impossible to reasonably itemize all forms of conduct that may be considered damaging to officers or their agency. Attempts by an agency to list all prohibited acts become excessively tedious and invariably overlook certain types of behavior that would be considered unacceptable. Under these circumstances, it is more difficult to hold an officer accountable for improper behavior if it is not included in the defined list of prohibited actions. Therefore, CUBO incorporates the array of improper acts not specifically identified in a standards of conduct policy. But, to do this effectively, CUBO should show a nexus between the conduct and the efficiency of service and be linked effectively to an agency's code of conduct and values.

Some agency executives may hesitate to incorporate CUBO into their standards of conduct because it does not identify specific prohibited acts and presents the possibility that charges brought under this umbrella could more easily be challenged as being arbitrary. While this possibility exists, it is also true that most disciplinary measures relating to conduct violations are subject to similar challenges based on the alleged transgression's relevance to the officer's job and the efficient and effective operation of the agency. In all cases of conduct violations, the agency must be prepared to defend its position based on the connection of the behavior to negative outcomes on the agency's officers and mission. Charges of CUBO should be brought only when there is an articulable reason and rational justification for enforcing the standard.

Additionally, agencies should be particularly cognizant of the need to enforce CUBO on a consistent and equitable basis.

The agency should recognize that it may be setting precedent in some cases when disciplining officers for conduct that is not specified in the agency's policy and procedure manual. To avoid charges of disparate treatment, the agency should make every effort to ensure that similar acts of offending conduct by officers are dealt with through similar disciplinary measures. Also, to provide officers with the information necessary to make informed decisions on such matters, the agency should provide in-service training on an initial basis upon introduction of the policy and on a periodic basis thereafter.

***Neglect of Duty.*** Officers must not neglect their duties. This includes the willful failure to perform such actions as required of a law enforcement officer. Failure to act, outside the strict legal context, can also involve failure to take law enforcement action; failure to perform a law enforcement function due to inattentiveness or lack of diligence; or failure to perform a function fully and responsibly as prescribed by the duty assignment, operation, or expectations of the agency.

Officers must remain alert and ready to quickly respond to any situation requiring action. Therefore, agencies should prohibit employees from sleeping, conducting personal business, or engaging in any other activities that would cause them to neglect or be inattentive to their duties.

In addition, officers should work efficiently and effectively. They should perform their duties in such a way that avoids any unnecessary delays, whether this be when responding to a call or completing a traffic stop. This policy statement also aids in the prevention of claims of unlawful detentions.

***Accountability and Responsibility.*** Officers should be reminded that they are directly accountable for their actions through the chain of command to the agency's chief executive officer. They are expected to report for duty, including any court or off-duty assignments, at the time and place required. Should an officer be unable to meet this requirement, they should notify their supervisor as soon as possible.

While officers have a duty to follow all laws and policies themselves, they also have a duty to intervene, to prevent, or to stop wrongdoing by another employee when it is safe and reasonable to do so. This should include notification of a supervisor as soon as possible when another member of the agency is violating law or policy.

Further, officers must cooperate fully in any administrative investigation conducted by the agency, or another authorized agency, and must not attempt to conceal, divert, or mitigate any culpability by falsehoods or omissions.

Officers are also responsible for maintaining agency- or government-owned or controlled property and equipment in a manner consistent with policy and training. Any intentional abuse, destruction, disposal, or damage of such items should be considered a violation of policy.

***Conduct Toward Fellow Officers.*** Establishment of a working environment that is respectful, constructive, and supportive develops a fellowship among officers and motivates them toward maximum personal and agency achievement. All working environments experience some degree of discord and friction between personalities can be expected. However, an officer can reasonably expect, and indeed should require, a workplace free from harassment and discrimination.[7]

Workplace harassment and discrimination not only expose the organization and offending personnel to civil liability, as well as possible prosecution under the law, but also have other destructive effects. Harassment has serious debilitating effects on its victims and creates disruptions to productivity. Agencies should address these issues in a separate comprehensive policy on this matter and remain cognizant of the broader applicability of workplace harassment and discrimination law.

Therefore, officers are expected to conduct themselves in a respectful, courteous, and professional manner at all times, especially when interacting with other members of the agency. Any language or acts that demean, harass, or intimidate another officer should not be tolerated.

***Conduct Toward the Public.*** A positive community-police relationship is essential for gaining the public's confidence and securing their support in crime prevention and criminal apprehension. Public support and cooperation are built primarily upon a relationship that is the result of fair treatment by law enforcement. The law enforcement image among members of the public is generally the product of a single or a few brief personal encounters with law enforcement or is based on what are perceived as reliable stories passed on by friends or acquaintances who have had such experiences. As highlighted by social media, even a single negative public encounter can have a ripple effect. These incidents can often undo or seriously damage long-standing positive law enforcement–community relationships.[8]

There are several general rules of conduct that, if followed by officers on a consistent basis, should assist in building and maintaining public support. Specifically, officers should always have a civil and professional manner when interacting with the public. In addition, officers should treat all individuals with courtesy, respect, and dignity. Overbearing attitudes and language that can belittle, ridicule, or intimidate individuals should be avoided.

Treating persons in an unbiased, fair, and impartial manner is also key to gaining public trust, support, and cooperation. This is the case when dealing with the public in enforcement encounters as well as in providing services to the community, such as preventive patrol and crime prevention initiatives.[9]

Officers should also uphold the tenets of procedural justice, which refers to the idea that individuals judge the fairness of the justice system on how fair they perceive the process, as opposed to how fair they perceive the outcome. Therefore, the framework surrounding procedural justice in law enforcement consists of several approaches that aim to foster trust and confidence in law enforcement. These include providing the public with (1) voice: that their side of the story has been heard; (2) respect: that law enforcement treats them with dignity and respect; (3) neutrality: that an officer's decision-making is unbiased and trustworthy; (4) understanding: provision of basic information on why and how officers made decisions in a given matter; and (5) helpfulness: that an officer is interested in the individual's personal situation to the extent reasonable and allowable.[10] By incorporating these items into their daily interactions with the public, officers can help establish the legitimacy necessary to build community trust and confidence in law enforcement.

[7] See the IACP Policy Center documents on Harassment, Discrimination, and Unprofessional Conduct available at https://www.theiacp.org/resourc- es/policy-center-resource/harassment-and-discrimination.
[8] See the IACP National Policy Summit on Community-Police Relations: Advancing a Culture of Cohesion and Community Trust report, https://www.theiacp.org/resources/iacp-national-policy-summit-on-community-police-relations-advancing-a-culture-of-cohesion.
[9] See the IACP Policy Center documents on Unbiased Policing available at https://www.theiacp.org/resources/policy-center-resource/unbiased-po- licing.
[10] President's Task Force on 21st Century Policing. *Final Report of the President's Task Force on 21st Century Policing* (Washington, DC: Office of Community Oriented Policing Services, 2015), 10.

## B. Abuse of Law Enforcement Authority and Position

The fact that law enforcement officers hold an elevated position within the criminal justice hierarchy confers upon them a greater responsibility of office. A law enforcement officer is entrusted to protect the safety and rights of the public. Abuse of authority by law enforcement officers can take many forms, including the use of excessive force and violation of civil rights. However, the present discussion deals primarily with those acts or inactions committed by officers for purposes of personal or financial gain, privilege, or advantage not otherwise available to them as private citizens. This may also be referred to as corruption. Personal gain may take the form of services rendered, status, political influence, or prestige. Such violations range in severity from acceptance of nominal tokens of appreciation to the systematic exploitation of persons or organizations for gain. Small, seemingly benign acts that take advantage of law enforcement authority or position may foster an environment of tolerance within agencies, sometimes leading to more frequent and egregious transgressions. Agencies should, therefore, assume a position of zero tolerance on this matter.

In particular, officers should not be allowed to accept goods, services, or discounts of value that are not available to the general public. Even though officers are prohibited from receiving gifts, gratuities, and similar items, such items might nevertheless be received through the mail or by other means on an unsolicited basis. Reporting these items helps to ensure that their receipt receives official notice, thus protecting the officer from allegations of misconduct and providing the agency with oversight ability. In their policies, agencies should consider prohibiting officers from using their authority or position (1) for financial gain; (2) to obtain or grant privileges or favors; (3) to avoid the consequences of illegal acts for themselves or others; or (4) to barter, solicit, or accept any goods or services, whether for themselves or others. The latter includes gratuities, gifts, discounts, rewards, loans, and fees.

This restriction addresses the majority of concerns law enforcement executives have regarding an officer's use of authority for financial gain. It prohibits situations such as accepting special access to and treatment at public events or gatherings; negotiating with officers from the same or another jurisdiction to overlook violations of the law for themselves, their friends, or members of their family; or asking for, bartering for, or accepting outright any goods, services, or similar gains. These are only examples of possible scenarios covered by this directive, which is designed to address a broad spectrum of situations in which officers could willfully or inadvertently benefit from their position or authority.

Some will argue that a complete ban on the acceptance of goods, services, and favors is too far reaching and fails to recognize that gestures, such as providing items of de minimis value, are sometimes made by community members as tokens of appreciation without any expectation of special treatment. Each agency must make its own decision regarding what it will tolerate in this area. But as a matter of principle, it should be made clear to officers that they are in a high-profile position within the community as a representative of local government and are given a special level of trust and authority not available to others. As such, they may be faced with situations in which persons or groups may, intentionally or unintentionally, attempt to abuse their authority and influence them for unauthorized purposes. The simple cup of coffee or a discounted meal from a friendly restaurateur might be nothing more than a courteous gesture or token of appreciation. However, it might also incorporate subtle manipulation intended to extract favors from officers, such as spending more time in and around the establishment than would normally be necessary or permitted. Some agencies may wish to impose additional restrictions to address this issue, such as limits on the number of officers who are allowed to congregate at locations such as businesses when there is no legitimate law enforcement need for their presence.

Members of the public who witness or learn of officers receiving special treatment or gratuities may feel a degree of resentment toward not only the officers involved but the law enforcement agency as a whole. They may question the degree to which favoritism influences the decision-making process of officers in general, whether law enforcement resources are provided equitably and fairly within the community, and even whether the apparently simple gesture reflects a more pervasive degree of corruption within the agency.

Officers should also be prohibited from taking ownership of found, impounded, abandoned, or recovered property—or any property held or released as evidence by the agency. Here again, the issue is one primarily of appearances. In these

situations, charges could be made that officers are engaged in subterfuge by procuring property unnecessarily or inappropriately with personal intentions for its use or acquisition. However, this does not preclude the agency from selling at public auction or in other acceptable ways dispensing of abandoned, recovered, or related property after a reasonable amount of time and following legitimate and earnest attempts to locate owners. Agencies should have established policies dictating these practices.

Officers should also be limited in the manner in which they can solicit funds as part of, or on behalf of, the law enforcement organization without the express consent of the agency chief executive or their designee. This directive is intended to impose controls over all fundraising activities so that legitimate activities can be sanctioned and managed by the agency.

Another issue regarding abuse of authority concerns the unauthorized use of law enforcement sensitive information to advance an officer's or someone else's financial or private interests. For example, officers or other employees working in sensitive areas of the agency might sell criminal history records or other restricted information to commercial operations as part of background investigations. Officers working in part-time jobs for security firms, process servers, or others might use confidential or other sensitive information developed by the agency to promote their interests and those of unauthorized outside parties. Similarly, officers should be prohibited from stealing, forging, or tampering with any official law enforcement document or record. Any changes and duplications of these documents or records must be approved by a supervisor. Officers should also be instructed not to take or release photographs capturing sensitive information or images unless authorized to do so. Express prohibitions on the unauthorized use of agency-issued identification cards, badges, or official documents should also be included in policies governing officer conduct.

Officers are often involved in several cases at any given time. While adding an additional case to their workload might not seem like a cause for concern, these officers should obtain permission from their supervisors before undertaking any investigation or other official action that is outside their regular duties. The goal of this directive is to prevent any possible accusations of impropriety that might result from officers becoming involved in cases outside their normal purview. However, this does not apply to exigent situations that require immediate law enforcement action.

Finally, officers should immediately notify their commanding officer whenever they are involved in a civil action directly linked to their job-related duties. Officers may initiate civil lawsuits or otherwise become party to civil actions against persons with whom they have had dealings in the course of their employment and from which they could receive monetary compensation. This will allow the agency to become aware of cases in which officers appear to be abusing this right or conspiring to use this legal avenue solely for personal gain or punishment of others.

## C. Prohibited Associations and Establishments

Many agencies seek to prevent employees from knowingly associating with "undesirable" persons, other than in official capacities—that is, those who have a notorious criminal reputation or history that could present a potential threat to the agency's reputation and effectiveness or that could compromise the officer. Where restrictions or prohibitions on such relationships exist within law enforcement organizations, questions often arise as to whether the rule serves a legitimate governmental interest, whether it impinges upon an employee's right to freedom of association, and where the balance falls between the two competing interests.

First, restrictions of this nature should not be overly broad. A policy that fails to provide specific guidance as to the types of associations that are prohibited may be held void for reason of vagueness. The agency should be prepared to give specific, articulable reasons why association with a named class of individuals will damage the agency's reputation or otherwise interfere with the agency's mission. Second, the policy should provide an exception for family relationships or other associations that are similarly unavoidable. Most courts would not uphold a policy, for example, that prevents an officer from associating with his or her spouse or parents. Finally, the policy should provide an exception for contacts legitimately made in the line of duty.

Policies may address these issues by outlining precisely when officers may not enter into a social or romantic

relationship with different individuals. Specifically, knowingly commencing or maintaining such relationships with individuals who are under criminal investigation, indictment, arrest, or incarceration by the agency or another law enforcement or criminal justice agency, or who have an open and notorious criminal reputation in the community should be avoided whenever possible. This directive is designed to remove the appearance of impropriety involving officers involved in such cases. Such associations might also give rise to other speculation to include the pre-arrest relationship of the officer to the person in question and the possible interplay of the relationship to the arrest. In cases where regular household, physical, or telephone contact is unavoidable, the officer should inform their supervisor of the relationship.

Additional prohibitions in a policy should not necessarily preclude officers from associating with individuals in their private lives solely because they have a criminal record. However, as this is not advisable for law enforcement officers, many agencies may wish to discourage it. But association with persons who have served their sentence, reentered society, and are otherwise pursuing legitimate occupations may be considered acceptable. On the other hand, should the individual's past criminal history be so notorious and infamous as to cast doubt on that person's reputation after having reentered society, or there is question concerning the individual's continued connection to criminal enterprises, there would be legitimate grounds for the agency to prohibit such association. In short, whenever questions arise concerning the reputation of persons with whom officers associate, officers are well advised to restrict or eliminate their interactions with such individuals and to discuss the matter with an appropriate supervisor.

Agencies should also consider restrictions regarding officers' knowingly engaging in social or romantic relationships with confidential informants, victims, or witnesses. In cases where these individuals are involved in active investigations, the relationship should be prohibited. However, once the investigation has concluded, agencies must decide whether officers should be allowed to engage in such relationships. When making this decision, agencies must weigh the infringement upon an officer's personal affairs against the possible perception of impropriety.

Officers should also not participate in any investigations involving family members or individuals with whom they have a close personal or business relationship. If an officer is actively investigating a case and information develops indicating that such person or persons are involved, the officer should advise their supervisor of the involvement and the details of the case so that the supervisor can determine if the case needs to be reassigned.

In regard to associations involving business establishments, officers should not enter any establishment in which the law is knowingly violated except when conducting a legitimate law enforcement purpose. Again, the issue involved here is the protection of the image and reputation of officers and their agencies. Some agencies choose to establish a list of "off-limits" locations officers are not allowed to visit unless for a legitimate law enforcement purpose. This list may include locations where illegal activity is known to occur but can also extend to locations where there is suspected wrongdoing that has not yet been proven.

Finally, officers should be prohibited from knowingly joining or participating in any organization that advocates, incites, or supports criminal acts or criminal conspiracies or that promotes hatred or discrimination. This includes not only organizations that support criminal acts or conspiracies, but also any that advocate such acts. Affiliation with so-called "hate groups" that espouse or support criminal acts or criminal conspiracies are among those that run counter to the core values of law enforcement. Any affiliation of officers with such groups has a significant debilitating effect on the reputation of officers and their law enforcement agency.

## D. Public Statements, Appearances, and Endorsements

Agency policy should address several concerns with respect to public statements made by officers. This may include prohibiting officers, when acting as a representative of the agency, from making any public statement that could be reasonably interpreted as having an adverse effect upon agency morale, discipline, operations, or public perception.[11]

---

[11] See the Appendix for a discussion of public employees' rights related to free speech in the United States.

Another aspect of this issue relates to the release or sharing of law enforcement sensitive information for anything other than an official, authorized purpose. Prohibitions on such behavior are clearly intended to protect confidential information from being released without authorization or to be used by officers for any purposes other than those for which they were intended.

Officers should also be prohibited from making unauthorized statements, speeches, or appearances that might be considered to represent the views of the agency. Normally, all policy and position statements are provided to the media and others through the chief executive officer, the public information officer, or another designated spokesperson. Other officers who may appear in public either in uniform or as clearly designated members of the law enforcement agency must ensure that their comments regarding their work and the agency are within the parameters of policy established by the agency for the release of information.[12]

The promotion of products or services by any personnel who are clearly identified as a law enforcement officer without the approval of the agency's chief executive officer or their designee should be prohibited. It is inappropriate for a governmental agent to do so in most roles as it can imply governmental sanctioning of and support for specific products and services. This is both misleading and might provide an unfair trade advantage to competing product manufacturers or service providers. It can also give the impression that the officer or the agency is receiving compensation for such endorsements or that they vouch for and stand behind product or service quality and customer satisfaction. Finally, it could be argued by some that recommendation of products and services directly to individual consumers by a law enforcement officer carries a degree of coercion that is improper even if unintended.

This prohibition does not apply to recommendations concerning governmental services when authorized by the law enforcement agency. For example, this can include recommendations regarding the use of family counseling or crisis intervention services, health clinics, social welfare or housing assistance services, or similar municipal, county or state services.

## E.  Political Activity

Political activity may be regarded as a matter of free speech. As such, there are limitations on what law enforcement executives can do to restrict their officers' political activity. The demarcation line in limiting such activity is based generally upon whether the activity in question is being performed by the officer during working hours, while in uniform, or while otherwise serving as a representative of the law enforcement agency. However, agencies should be familiar with applicable law in their jurisdictions when crafting their policies on this topic.[13]

Thus, during working hours, while officers are in uniform or otherwise serving as representatives of their law enforcement agency, agencies should consider prohibitions against engaging in certain political activities, including, but not limited to the following:

- Placing, affixing, or displaying any campaign literature or other paraphernalia on government-owned or controlled property, to include offices and vehicles.
- Soliciting political funds from any member of the law enforcement agency or another governmental agency of the employing jurisdiction.
- Soliciting contributions, signatures, or other forms of support for political candidates, parties, or ballot measures.

---

[12] For more information on this and guidelines on media relations by officers and others see, for example, the IACP Policy Center documents on Police-Media Relations available at https://www.theiacp.org/resources/policy-center-resource/police-media-relations.

[13] In the United States, the First Amendment prohibits officials from discharging or threatening to discharge public employees solely for not sup- porting the political party in power, unless the party affiliation is an appropriate requirement for the position involved. See *Elrod* v. *Burns*, 427 U.S. 347 (1976); and *Branti* v. *Finkel*, 445 U.S. 507 (1980). While such patronage has been considered appropriate for high-level, policy-making personnel within agencies, it has been considered inappropriate for actions against lower-level, non-policy-making personnel. See *Rutan* v. *Republican Par- ty of Illinois*, 497 U.S. 62 (1990). Note that this does not apply to policy-making employees, nor does it apply to employees who hold "confidential" positions. See, for example, *Soderstrum* v. *Town of Grand Isle*, 925 F.2nd 135 (5th Cir. 1991) where a new chief discharged the confidential secretary of the old chief.

- Using agency email or phones for political purposes.
- Using official authority to interfere with any election or interfere with the political actions of other employees or the general public.
- Favoring or discriminating against any person seeking employment because of political opinions or affiliations.

## III.   CONCLUSION

The preceding discussion is designed to address the overarching topics that must be considered when an agency drafts its policy related to ethical policing and the standards of conduct upon which the actions of its officers will be based. As previously noted, no policy on the topic of appropriate conduct can specifically identify every action, or inaction, that is a violation. Rather, broad statements must be included outlining the ethical ideal to which officers must strive, to include an agency mission and values statement and code of ethics. Once stated, this ideal must be upheld and promoted every day through the actions of supervisors and the chief executive. In those instances when officers do not meet these standards, discipline must follow. However, this discipline must be fairly and equitably distributed. Through this consistent treatment, an agency can help to ensure that its vision and mission are reflected in the daily actions of its officers.

## APPENDIX A: UNITED STATES PUBLIC EMPLOYEE FIRST AMENDMENT RIGHTS

With the increased popularity of social media, law enforcement personnel have more opportunities to make public statements regarding their agencies.[14] While law enforcement agencies may wish to limit or control such statements, they must also uphold the constitutionally guaranteed right to free speech.[15] Public employees do not forfeit First Amendment rights simply because they are employed by the government. The First Amendment protection afforded to public employee speech depends on a careful balancing of the interests of the employee as a citizen and the interests of the government employer in promoting efficient and effective operation.

The extent to which an agency may regulate speech by its personnel depends on many factors and is a complex point of law to which only limited guidance has been given by the courts. In general, however, the basis for any discussion of the subject must distinguish between speech of a "personal" versus a "public" nature. For example, if an employee makes statements detrimental to the agency, including those made on social media platforms, the agency may be able to take disciplinary action as long as the statements are of "personal interest" only. If, however, the statements deal with matters of "public concern," then the agency may take action against the employee only if the public concern is outweighed by the interest of the public employer "in promoting the efficiency of the public services it performs."[16]

Something is a matter of public concern if it relates to "any matter of political, social, or other concern to the community."[17] Unfortunately, the deciding line between that which is of only "personal interest" and that which is a matter of "public concern" is very vague, and, as with other free-speech issues, the outcome depends largely on the court considering the question. In general, however, personal insults directed at superiors and complaints regarding the individual treatment of the complaining employee are often considered matters of "personal interest" for which action may be taken[18]—whereas complaints about, for example, the alleged misuse of public funds or similar acts of official misconduct by superiors are likely to be regarded as matters of "public concern." Ultimately, whether the matter is one of "personal interest" or "public concern" is a question of law to be decided in the courtroom.[19]

---

[14] See IACP Policy Center documents on Social Media available at https://www.theiacp.org/resources/policy-center-resource/social-media.

[15] For the purposes of this discussion, speech is defined as statements or conduct intended to communicate or convey a message, belief, or idea.

[16] *Pickering* v. *Board of Education*, 391 U.S. 563, 568 (1968). Also see *Garcetti* v. *Ceballos*, 547 U.S. 410 (2006); *Connick* v. *Myers*, 461 U.S. 138, 146 (1984).

[17] *Connick* v. *Myers*, 461 U.S. 138, 146 (1984).

[18] See, e.g., *Pickering* v. *Board of Education*, 391 U.S. 563 (1968); *Ohse* v. *Hughes*, 816 F.2d. 1144 (7th Cir. 1987).

[19] For a more detailed discussion of this topic, see, for example, IACP Policy Center documents on Social Media at https://www.theiacp.org/resources/policy-center-resource/social-media.

© Copyright 2020. Agencies are encouraged to use this policy to establish one customized to their agency and jurisdiction. However, copyright is held by the International Association of Chiefs of Police, Alexandria, Virginia, U.S.A. All rights reserved under both international and Pan-American copyright conventions. Further dissemination of this material is prohibited without prior written consent of the copyright holder.



**International Association of Chiefs of Police**
44 Canal Center Plaza, Suite 200
Alexandria, VA 22314
703.836.6767 | FAX 703.836.4743
**www.theIACP.org**

International Association of
Chiefs of Police