UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION
CIVIL ACTION NO. 7:22-CV-00007-REW-EBA

SABRINA ADKINS, ET AL                 PLAINTIFFS


VS:       DEPOSITION OF BEN FIELDS

BEN FIELDS, ET ALL                    DEFENDANTS



            *  *  *  *  *  *  *  *  *  *  *

        The Deposition of BEN FIELDS was taken on

behalf of Plaintiff on September 11, 2024, at the

Pillersdorf Law Offices, 124 West Court Street,

Prestonsburg, Kentucky.

        Said deposition was taken pursuant to

notice, previously filed, and is to be used for

purposes of discovery and all other purposes

permitted by the Rules of Civil Procedure.

APPEARANCES



ON BEHALF OF PLAINTIFF:

                        HON. BETHANY BAXTER
                        201 WEST SHORT STRRET, STE 300
                        LEXINGTON, KY 40507
                        bethany @jchilderslaw.com



ON BEHALF OF DEFENDANTS:

                        HON. JOHN KELLY
                        303 SOUTH MAIN STREET
                        LONDON, KY 41743
                        john@wftlaw.com


                        HON. JONATHAN SHAW
                        P.O. DRAWER 1767
                        PAINTSVILLE, KY 41240
                        jshaw@psbb-law.com


                        VIA ZOOM
                        HON. DON JONES
                        P.O. BOX 276
                        PAINTSVILLE, KY 41240
                        don@djoneslawoffice.com


                        VIA ZOOM
ALSO PRESENT:           MICKY STINES
                        SABRINA ADKINS

INDEX

CAPTION PAGE . . . . . . . . . . . . . 1

APPEARANCES. . . . . . . . . . . . . 2

INDEX. . . . . . . . . . . . . . . . 3

DIRECT EXAMINATION BY:

    HON. BETHANY BAXTER . . . . . . . 4-210

CROSS-EXAMINATION BY:

    HON. JONATHAN SHAW . . . . . . . 211-213

REPORTER'S CERTIFICATE . . . . . . . . 214

EXHIBITS

1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15,
16, 17, 18, 19, 20 and 21

1      WHEREUPON, BEN FIELDS, THE WITNESS, HAVING BEEN

| | |
|---|---|
| 1 | DULY SWORN BY THE COURT REPORTER, WAS EXAMINED AND |
| 2 | TESTIFIED AS FOLLOWS: |

**DIRECT EXAMINATION**

**MS. BAXTER:**

| | | |
|---|---|---|
| 5 | Q | Mr. Fields, my name is Bethany Baxter, and |
| 6 | | I represent the plaintiffs in this Federal |
| 7 | | Civil litigation.  My first question for |
| 8 | | you is have you ever given a deposition |
| 9 | | before? |
| 10 | A | Yes. |
| 11 | Q | Okay. And how many times? |
| 12 | A | Once. |
| 13 | Q | Okay. What was the situation that prompted |
| 14 | | you to give that deposition testimony? |
| 15 | A | It was a - - due to a inmate at the Letcher |
| 16 | | County jail passing away while in custody, |
| 17 | | and they took depositions from everybody |
| 18 | | that was working. |
| 19 | Q | Okay. Were you named as a defendant in that |
| 20 | | lawsuit? |
| 21 | A | No. |
| 22 | Q | Okay. How long ago was that? |
| 23 | A | I would say over 10 years. |
| 24 | Q | Do you remember the name of the plaintiff, |

|     |   |                                             |
| --- | - | ------------------------------------------- |
| 1   |   | the individual who died?                    |
| 2   | A | I believe his name was Christian Cantrell.  |
| 3   | Q | Okay. Well, I don't know if you remember    |
| 4   |   | since it has been 10 years, but I am going  |
| 5   |   | to give you a little sense of how today is  |
| 6   |   | going to work.  As you can see, it is       |
| 7   |   | somewhat of an informal process.  Mr.       |
| 8   |   | VanHoose is going to be taking down         |
| 9   |   | everything that is said today. You are      |
| 10  |   | under oath. I am going to be asking you     |
| 11  |   | some questions, other attorneys may have    |
| 12  |   | some questions as well. I would just ask if |
| 13  |   | I have I ask you a question, and you don't  |
| 14  |   | understand it or it didn't make sense or I  |
| 15  |   | talk too fast, all of which may well        |
| 16  |   | happened, feel free to ask me to rephrase   |
| 17  |   | it, or repeat it.  I am happy to do that    |
| 18  |   | especially as the day wears on.  So if you  |
| 19  |   | don't ask me to rephrase or repeat a        |
| 20  |   | question, I am going to assume that you     |
| 21  |   | understood my question, and I am going to   |
| 22  |   | assume that you response or your answer is  |
| 23  |   | responsive to my question; is that fair?    |
| 24  | A | Yes.                                        |

```
 1   Q        The other thing that I asked is please give
 2            affirmative responses instead of shaking
 3            your head for example or a uh-huh, or uh-
 4            uh.  I will try to prompt you to be more
 5            clear if that happens.  The court reporter
 6            may as well.  That is just so that we have
 7            a clear record.  Okay. I want to make sure
 8            that I understand what your answers were
 9            based on the transcript that we are going
10            to get from today's deposition. If you want
11            to take a break at some point, you know,
12            stand up stretch your legs, smoke a
13            cigarette, or whatever break that you might
14            need, I am happy to do that. But if I have
15            asked you a question, I ask that you answer
16            that question before we take a break; okay?
17   A        Okay.
18   Q        What did you do to prepare for today's
19            deposition?
20        MR. KELLY: You do have an attorney client
21        privilege. The conversations that we had and the
22        conversations that you had with Jason are
23        privileged and you do not talk about that.
24   Q        Yes. Aside from any conversations that you
```

| | | |
|---|---|---|
| 1 | | had with attorney, did you talk to anyone |
| 2 | | else about your deposition today? |
| 3 | A | No. |
| 4 | Q | You didn't talk to Mickey Stines about your |
| 5 | | deposition? |
| 6 | A | No. |
| 7 | Q | When was the last time that you talked to |
| 8 | | Mickey Stines? |
| 9 | A | It was sometime last year. |
| 10 | Q | Okay. So in 2023? |
| 11 | A | Yes. |
| 12 | Q | Okay. Did you talk to anybody at the |
| 13 | | courthouse, any of the Judges, or court |
| 14 | | staff? |
| 15 | A | No. |
| 16 | Q | Did you review any documents before your |
| 17 | | deposition today? |
| 18 | A | Yes. |
| 19 | Q | What documents did you review? |
| 20 | A | The depositions of the other parties. |
| 21 | Q | Would that have been Sabrina Adkins's |
| 22 | | deposition? |
| 23 | A | Yes. |
| 24 | Q | And would that have been Patty Stockham's |

| | | |
|---|---|---|
| 1 | | deposition? |
| 2 | A | No. |
| 3 | Q | Just Sabrina's deposition? |
| 4 | A | Yes. |
| 5 | Q | Okay. Did you read it in full? |
| 6 | A | Yes. |
| 7 | Q | Okay. Anything else aside from her |
| 8 | | deposition? |
| 9 | A | Some court documents. |
| 10 | Q | Which court documents? |
| 11 | A | Onm my criminal case. |
| 12 | Q | Okay. The case where you were identified as |
| 13 | | a Defendant? |
| 14 | A | Yes. |
| 15 | Q | What documents did you review from that |
| 16 | | case? |
| 17 | A | My Plea Agreement. |
| 18 | Q | Okay. Did you review any of the Discovery |
| 19 | | from that case? |
| 20 | A | No. |
| 21 | Q | Okay. Do you have the Discovery from that |
| 22 | | case, the documents that were produced by |
| 23 | | the Attorney General Special Prosecutor? |
| 24 | A | I don't have them with me. |

| | | |
|---|---|---|
| 1 | | **MR. KELLY:** Nor does the attorney. |
| 2 | | **MS. BAXTER:** Well, now he can answer for himself. |
| 3 | | **MR. KELLY:** Okay. |
| 4 | Q | Do you have those documents?  You said not |
| 5 | | with you. Do you have them somewhere else? |
| 6 | A | I believe that I have a copy in my |
| 7 | | residence. |
| 8 | Q | Okay. Is that a physical copy of is it on a |
| 9 | | hard drive or something? |
| 10 | A | I believe it is a physical copy. |
| 11 | Q | Okay. How many pages, approximately? |
| 12 | A | Several. |
| 13 | Q | Thousands? |
| 14 | A | I don't know if it was thousands, but it is |
| 15 | | several hundred. |
| 16 | Q | Okay. Do you know that we have requested |
| 17 | | those documents from you through counsel? |
| 18 | A | I did not. |
| 19 | Q | Well, we have, and there has actually been |
| 20 | | a lot of discussion about that in this |
| 21 | | case, and burned a lot of oil trying to get |
| 22 | | ahold of those, so I ask that those get |
| 23 | | produced as soon as possible. And I am also |
| 24 | | going to say if once we get ahold of those, |

| | | |
|---|---|---|
| 1 | | if there is things that we need to address |
| 2 | | that we don't have access to today, I might |
| 3 | | have to ask you to come back on a separate |
| 4 | | day; okay? |
| 5 | A | Okay. |
| 6 | Q | Who is paying for your attorney in this |
| 7 | | case, if you know? |
| 8 | A | I am not entirely sure. I believe KACO, |
| 9 | | maybe. |
| 10 | Q | Okay. Have you paid anything out of your |
| 11 | | pocket? |
| 12 | | **MR. KELLY:** Objection as to any kind of |
| 13 | | relationship that he has with the attorneys. |
| 14 | | **MS. BAXTER:** I think whether or not that you have |
| 15 | | paid directly your attorneys is fair game. |
| 16 | | **MR. KELLY:** I disagree. |
| 17 | | **MS. BAXTER:** So are you instructing him not to |
| 18 | | answer? |
| 19 | | **MR. KELLY:** That is correct. |
| 20 | Q | Okay. Have you received any kind of |
| 21 | | reservation of rights letter from KATO? |
| 22 | | **MR. KELLY:** Note an objection. You can ask him if |
| 23 | | he got a letter? |
| 24 | | **MS. BAXTER:** That is what I asked him. |

| 1 | A | I am not sure. |
| 2 | Q | Okay. As you sit here today, you are not |
| 3 | | sure whether KACO might be representing you |
| 4 | | pursuant to a reservation of rights; is |
| 5 | | that what I understand? |
| 6 | | **MR. KELLY:** Note an objection. If you want to |
| 7 | | hear from me, I will gladly tell you. |
| 8 | | **MS. BAXTER:** No, I am interested in hearing from |
| 9 | | Mr. Fields. |
| 10 | Q | If you know, is KACO representing you |
| 11 | | pursuant to any reservation of rights? |
| 12 | | **MR. KELLY:** And likewise, if you don't know, you |
| 13 | | can answer accordingly. |
| 14 | A | I don't know. |
| 15 | Q | Have you gotten any letters or any |
| 16 | | documents from KACO related to this |
| 17 | | litigation? |
| 18 | A | Could you - - |
| 19 | Q | Have you gotten any documents, letters or |
| 20 | | anything else from KACO related to this |
| 21 | | litigation? |
| 22 | A | The deposition here? |
| 23 | Q | No, just the case in general? |
| 24 | | **MR. KELLY:** He may be misunderstanding, but |

| | | |
|---|---|---|
| 1 | | things that come from us come from KACO. They |
| 2 | | don't, they come from us and we are your |
| 3 | | attorney and you are not to talk about it. |
| 4 | Q | I am only talking about KACO. I am not |
| 5 | | interested in hearing what information or |
| 6 | | what communications that you have gotten |
| 7 | | from your attorney, if you know? |
| 8 | A | I don't know. |
| 9 | Q | Okay. Could you state your full name for |
| 10 | | the record? |
| 11 | A | Benjamin Charles Fields. |
| 12 | Q | Mr. Fields, I am interested to know about |
| 13 | | your family in Letcher County who is over |
| 14 | | the age of 18. I know you have a spouse |
| 15 | | named Angie Fields. Your mother is Nell |
| 16 | | Fields. I have seen in some of the |
| 17 | | documents you have a number of siblings, I |
| 18 | | have got their names.  What about  - - I am |
| 19 | | interested in sir names and first cousins |
| 20 | | in Letcher County? |
| 21 | A | I don't know all of their names.  My mother |
| 22 | | is one of 18 kids.  I have a lot of uncles |
| 23 | | and aunts. |
| 24 | Q | I will tell you what I will send a letter |

|    |    |                                                        |
|----|----|--------------------------------------------------------|
| 1  |    | to your attorney and ask them to provide               |
| 2  |    | that information at a later date to save us            |
| 3  |    | some time today. But I would like to know              |
| 4  |    | sort of all of your relatives through first            |
| 5  |    | cousin which sounds like it might be a lot             |
| 6  |    | of people who are in Letcher County, but I             |
| 7  |    | would also like to know generally in                   |
| 8  |    | Eastern Kentucky and I can list those                  |
| 9  |    | counties out and let your attorney know.               |
| 10 |    | Can you do that for me?                                |
| 11 |    | **MR. KELLY:** Are you talking about the Pikeville     |
| 12 |    | Division?                                              |
| 13 |    | **MS. BAXTER:** Correct.                               |
| 14 | Q  | You have a couple of children, one child?              |
| 15 | A  | I have a stepdaughter, and a biological                |
| 16 |    | daughter.                                              |
| 17 | Q  | I am only interested in your children who              |
| 18 |    | are over the age of 18, so what are the                |
| 19 |    | names of your children over the age of 18?             |
| 20 | A  | My stepdaughter.                                       |
| 21 | Q  | Is that Sky Napier?                                    |
| 22 | A  | Yes.                                                   |
| 23 | Q  | Who is Sky's mother?                                   |
| 24 | A  | My wife.                                               |

| | | |
|---|---|---|
| 1 | Q | Your current wife, Angie? |
| 2 | A | Yes. |
| 3 | Q | Have you been married before? |
| 4 | A | No. |
| 5 | Q | When did you and Angie get married? |
| 6 | A | In 2011. |
| 7 | Q | And you have an uncle named Bill Meade; |
| 8 | | correct? |
| 9 | A | Yes. |
| 10 | Q | Has Mr. Meade ever ridden in your Sheriff's |
| 11 | | Department vehicle with you? |
| 12 | A | No. |
| 13 | Q | You have a sister named Holly Fields; |
| 14 | | correct? |
| 15 | A | Yes. |
| 16 | Q | And does she have a married name? |
| 17 | A | Boggs. |
| 18 | Q | And what is her position at the courthouse? |
| 19 | A | She works with Drug Court. |
| 20 | Q | Angie used to work in the jail; correct? |
| 21 | A | Yes. |
| 22 | Q | Is that how that you met her? |
| 23 | A | Yes. |
| 24 | Q | When did you start working for the jail? |

| | | |
|---|---|---|
| 1 | A | In 2008. |
| 2 | Q | And so does Angie still work with the jail? |
| 3 | A | No. |
| 4 | Q | Where does she work now? |
| 5 | A | She is the court designated worker. |
| 6 | Q | Did she get terminated from the jail? |
| 7 | A | No. |
| 8 | Q | When did she start working as a CDW? |
| 9 | A | I believe in November of - - She applied |
| 10 | | and started the interview process in |
| 11 | | November of 2021. I think officially she |
| 12 | | started in January of 2022. |
| 13 | Q | Okay. Walk me through your educational |
| 14 | | background. So did you go to Cowan |
| 15 | | Elementary? |
| 16 | A | Yes. |
| 17 | Q | Did you go to Whitesburg Middle? |
| 18 | A | No. |
| 19 | Q | Okay. What middle school did you go to? |
| 20 | A | Cowan, it was all in one. |
| 21 | Q | Okay. And then, did you graduate from |
| 22 | | Letcher County High School? |
| 23 | A | No. It was Whitesburg High School. |
| 24 | Q | Okay. So from there, did you get any |

| | | |
|---|---|---|
| 1 | | additional education? |
| 2 | A | I took two years at Southeast Community |
| 3 | | College. |
| 4 | Q | Is that there in Whitesburg? |
| 5 | A | Yes. |
| 6 | Q | And did you get a degree from Southeast? |
| 7 | A | No. |
| 8 | Q | Okay. Did you get any sort of law |
| 9 | | enforcement education though Southeast |
| 10 | | Community College? |
| 11 | A | No. |
| 12 | Q | Okay. Do you have any other family in law |
| 13 | | enforcement? |
| 14 | A | Not that I know of. |
| 15 | Q | Okay. So Angie and your sister, Holly, both |
| 16 | | work at the courthouse. Do you have any |
| 17 | | other family that works at the courthouse? |
| 18 | A | No. |
| 19 | Q | Any other family that works for the jail? |
| 20 | A | No. |
| 21 | Q | Any other relatives who works for the |
| 22 | | Sheriff's Department within the last 10 |
| 23 | | year period? |
| 24 | A | No. |

|    |   |                                              |
|----|---|----------------------------------------------|
| 1  | Q | Where do you own property in Letcher         |
| 2  |   | County?                                      |
| 3  | A | I don't.                                      |
| 4  | Q | Okay. Do you have family property? Do you     |
| 5  |   | have family members who own property in       |
| 6  |   | Letcher County?                              |
| 7  | A | Yes.                                         |
| 8  | Q | What area of the county is that property      |
| 9  |   | located in?                                  |
| 10 | A | Cowan.                                       |
| 11 | Q | Does your family own any property around      |
| 12 |   | Premium?                                     |

**MR. KELLY:** What is the purpose of this line of questioning? Does it have to do with obtaining a judgement against him; is that what you are doing?

**MS. BAXTER:** I just seen reference to different of the counties in Discovery, and I am just trying to figure out what area of the county he has got property in?

|    |   |                                              |
|----|---|----------------------------------------------|
| 21 | A | Not that I know of, not at Premium.          |
| 22 | Q | Okay. Around Premium?                        |
| 23 | A | I mother lives on Kings Creek, and I have    |
| 24 |   | an uncle that lives on Roxanna.              |

| | | |
|---|---|---|
| 1 | Q | Is that Bill Meade? |
| 2 | A | He lives - - I don't know if it would be |
| 3 | | considered Kings Creek or Roxanna.  I don't |
| 4 | | know where that line is. He lives between |
| 5 | | there.  I have another uncle that lives at |
| 6 | | Roxanna. |
| 7 | Q | Okay. What is his name? |
| 8 | A | Rondell Meade. |
| 9 | Q | Rondell.  Okay. Specifically from 2020 |
| 10 | | through 2022, I am going to ask you about |
| 11 | | social media use.  So you had a facebook |
| 12 | | account; correct? |
| 13 | A | Yes. |
| 14 | Q | Did you have more than one facebook |
| 15 | | account? |
| 16 | A | No. |
| 17 | Q | So the only account that you had was the |
| 18 | | one with your name on it; is that correct? |
| 19 | A | Yes. |
| 20 | Q | And what about snapchat, did you use |
| 21 | | snapchat? |
| 22 | A | No. |
| 23 | Q | Did you use any other social media |
| 24 | | platforms? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Only facebook? |
| 3 | A | Yes. |
| 4 | Q | What e-mails addresses did you use between |
| 5 | | 2020 and 2022? |
| 6 | A | I use got one. hacksaw151@gmail.com |
| 7 | Q | I think that I saw somewhere that Hacksaw |
| 8 | | was your nickname? |
| 9 | A | Not really. |
| 10 | Q | I thought that I saw somewhere in your |
| 11 | | application for your job at the Letcher |
| 12 | | County Sherriff that you had identified |
| 13 | | that as one of your nicknames? |
| 14 | A | I can't remember. |
| 15 | Q | But you are saying that is not a nickname? |
| 16 | A | That is not one that I would go by. |
| 17 | Q | Do you have any other nicknames that you |
| 18 | | would go by? |
| 19 | A | Just Ben, Big Ben. |
| 20 | Q | Okay. So you worked as a deputy jailer with |
| 21 | | the Letcher County Jail from 2008 until |
| 22 | | what date? |
| 23 | A | 2019, January of 2019. |
| 24 | Q | Is that because you got the job with the |

```
 1              Sheriff's Department?

 2    A         Yes.

 3    Q         What was your job title at the Letcher

 4              County Jail?

 5    A         Deputy jailer up until the last, maybe two

 6              years, then, I was the assistant chief

 7              deputy.

 8    Q         Okay.  Let's start with deputy jailer, and

 9              explain to me what you job duties as a

10              deputy jailer?

11    A         Just to oversee the every day operations of

12              the jail, supervise prisoners.

13    Q         Okay. And the jail in Letcher County is in

14              the same building as the courthouse;

15              correct?

16    A         Yes.

17    Q         So when you say oversee inmates, would that

18              include taking them into the courthouse or

19              was that limited just in to the jail

20              portion of that building?

21    A         What do you mean by taking them into the

22              courthouse?

23    Q         Yeah.  I am just trying to figure out did

24              your job include only overseeing those
```

| | | |
|---|---|---|
| 1 | | inmates within the jail area of the |
| 2 | | building or would you also oversee them in |
| 3 | | other parts of the building? |
| 4 | A | Occasionally, we would have to take |
| 5 | | prisoners up to court to assist the |
| 6 | | bailiffs. |
| 7 | Q | And who were the bailiffs at that time? |
| 8 | A | Sheriff Stines was, and my brother-in-law |
| 9 | | was at the time. |
| 10 | Q | You didn't mention him before.  What is his |
| 11 | | name? |
| 12 | A | Jason Boggs. |
| 13 | Q | B-O-G-G-S? |
| 14 | A | Yes. |
| 15 | Q | And that is Holly's husband? |
| 16 | A | Yes. |
| 17 | Q | Does Jason still work in the Courthouse? |
| 18 | A | No. |
| 19 | Q | Where does he work now? |
| 20 | A | He is a nurse. |
| 21 | Q | Okay. But he used to work as a bailiff? |
| 22 | A | Yes. |
| 23 | Q | Okay. You said oversee inmates, sometimes |
| 24 | | you take them up to court.  What else would |

| | | |
|---|---|---|
| 1 | | you do to oversee inmates at the jail? |
| 2 | A | Dispense medication, serve them dinners, |
| 3 | | bring them from their cell to visitation. |
| 4 | Q | Okay. And think that you said earlier that |
| 5 | | is where that you met Angie Fields; |
| 6 | | correct? |
| 7 | A | Yes. |
| 8 | Q | Okay. And what part of the county is she |
| 9 | | from? |
| 10 | A | When I met her? |
| 11 | Q | Yeah. |
| 12 | A | She was living in the Mayking area. |
| 13 | Q | Do you recall when she started working at |
| 14 | | the jail? |
| 15 | A | I believe it was in 2009. |
| 16 | Q | Okay. So soon after that you started? |
| 17 | A | Yeah. |
| 18 | Q | And I saw in the records that you had |
| 19 | | acknowledged that you have had sexual |
| 20 | | contact with Angie Fields at the Letcher |
| 21 | | County Jail; do you recall that response to |
| 22 | | a polygraph report? |
| 23 | A | It was in the courthouse. |
| 24 | Q | So you had sexual contact with Angie |

| | | |
|---|---|---|
| 1 | | Mullins, who is now your wife, in the |
| 2 | | courthouse? |
| 3 | A | Not Angie Mullins. |
| 4 | Q | I am sorry, Angie Fields? |
| 5 | A | Yes. |
| 6 | Q | I don't know where I got Angie Mullins |
| 7 | | from. Okay. Explain to me where that sexual |
| 8 | | contact took place? |
| 9 | A | In the - - I guess it would be the first |
| 10 | | floor bathroom. |
| 11 | Q | First floor of the jail? |
| 12 | A | Of the courthouse. |
| 13 | Q | Okay. Is that like the public bathroom? |
| 14 | A | Yes. |
| 15 | Q | And when would that have been, like what |
| 16 | | year? |
| 17 | A | 2011, maybe the end of 2010. |
| 18 | Q | How many times did that occur? |
| 19 | A | Just a couple. |
| 20 | Q | So two? |
| 21 | A | Yes. |
| 22 | Q | And was that while you guys were on duty? |
| 23 | A | No. |
| 24 | Q | Okay. So what would have been doing in the |

| | | |
|---|---|---|
| 1 | | public bathroom of the courthouse when you |
| 2 | | weren't on duty? |
| 3 | A | It was between shifts, getting off duty. |
| 4 | | We worked the same shift. |
| 5 | Q | So was it before your shift or after your |
| 6 | | shift? |
| 7 | A | I can't remember. |
| 8 | Q | And so would that have been before you two |
| 9 | | got married or after you were married? |
| 10 | A | Before. |
| 11 | Q | Would that have been during normal business |
| 12 | | hours for the courthouse or would it have |
| 13 | | been after hours? |
| 14 | A | After hours. |
| 15 | Q | Okay. Did you ever have any sexual contact |
| 16 | | with Angie in the judge's chambers? |
| 17 | A | No. |
| 18 | Q | I think that I heard you say earlier that |
| 19 | | part of your job as a deputy jailer was to |
| 20 | | take inmates from the jail up into the |
| 21 | | courthouse, and I guess, that was for court |
| 22 | | hearings? |
| 23 | A | Yes. |
| 24 | Q | Did you ever take any female detainees at |

| | | |
|---|---|---|
| 1 | | the Letcher County Jail into the courthouse |
| 2 | | after hours? |
| 3 | A | No. |
| 4 | Q | You never took any females detainees from |
| 5 | | the Letcher County Jail into this public |
| 6 | | bathroom; is that your testimony? |
| 7 | A | Correct. |
| 8 | Q | What about into the judge's chambers, same |
| 9 | | question, but judge's chambers? |
| 10 | | **MR. KELLY:** Please realize that she is going |
| 11 | | pretty far field in her questioning, and |
| 12 | | remember our conversation concerning the |
| 13 | | possibility of criminal charges arising from it, |
| 14 | | and you rights to invoke the Fifth Amendment. I |
| 15 | | will leave it to your discretion. |
| 16 | A | Could you repeat the question? |
| 17 | Q | Have you ever taken any female detainees |
| 18 | | from the Letcher County Jail up into the |
| 19 | | judge's chambers at the courthouse? |
| 20 | A | During hours or after hours? |
| 21 | Q | At any time? |
| 22 | A | No. |
| 23 | Q | Okay. Have you ever been alone with any |
| 24 | | female detainee from the Letcher County |

| | | |
|---|---|---|
| 1 | | Jail inside the courthouse portion of the |
| 2 | | building? |
| 3 | A | Could you be more specific? |
| 4 | Q | Have you ever been alone with a female |
| 5 | | detainee from the Letcher County Jail in |
| 6 | | the courthouse, you know, during a time |
| 7 | | period when no one else was present? |
| 8 | A | No. |
| 9 | Q | Okay. You have an understanding of where |
| 10 | | there are and where there are not cameras |
| 11 | | within the courthouse; is that correct? |
| 12 | | **MR. KELLY:** Are you including the jail and the |
| 13 | | courthouse? |
| 14 | Q | I am talking about the courthouse portion |
| 15 | | of the building. |
| 16 | A | At one time, I would know. |
| 17 | Q | Okay. And what would that time period have |
| 18 | | been? |
| 19 | A | While I worked there. |
| 20 | Q | And when you say while you worked there, |
| 21 | | are you referencing the time when you were |
| 22 | | working as a deputy sheriff? |
| 23 | A | Yes. |
| 24 | Q | Okay. So based on that time period, and |

| | | |
|---|---|---|
| 1 | | your understanding, what were the places |
| 2 | | where there were no cameras within the |
| 3 | | courthouse? |
| 4 | A | Where there was no cameras? |
| 5 | Q | Uh-huh. |
| 6 | A | Let's see, it would the jury room, the |
| 7 | | judge's chambers, the secretary's office. |
| 8 | Q | Okay. |
| 9 | A | Do you want - - |
| 10 | Q | If you are aware of other places, I would |
| 11 | | like for you to include those in your |
| 12 | | response? |
| 13 | A | The bathrooms. |
| 14 | Q | Makes sense. |
| 15 | A | Private offices. |
| 16 | Q | While you working for the Letcher County |
| 17 | | Jail, at any time during that period from |
| 18 | | 2008 to 2018, was there ever any complaints |
| 19 | | against you that you were aware of from |
| 20 | | inmates? |
| 21 | A | Can you specify complaints? |
| 22 | Q | Any complaints about mistreatment? |
| 23 | **MR. KELLY:** For ones that are made? | |
| 24 | Q | Just any complaints whatsoever? |

| | | |
|---|---|---|
| 1 | | **MR. KELLY:** Inmates complain all of the time. |
| 2 | | **MS. BAXTER:** He can answer for his self and if he |
| 3 | | wants clarification, he can get it. |
| 4 | | **MR. KELLY:** Well, I have a right to have |
| 5 | | clarification. I want to make sure that we are |
| 6 | | all both talking about the same thing.  I would |
| 7 | | like to know what you mean by complaints? |
| 8 | | **MS. BAXTER:** You can object to form. |
| 9 | | **MR. KELLY:** I just did. |
| 10 | A | I would like clarification. |
| 11 | Q | Any complaints? |
| 12 | A | Any complaints at all? |
| 13 | Q | Any complaints from inmates at the Letcher |
| 14 | | County Jail that you were mistreating them? |
| 15 | A | Yes. |
| 16 | Q | Okay. Explain to me what those complaints |
| 17 | | would have been? |
| 18 | A | Didn't give them extra time during visits, |
| 19 | | wouldn't go against the jail's policy to |
| 20 | | favor them to give them extra stuff or |
| 21 | | special treatment. |
| 22 | Q | Okay. I guess the jail has some policies |
| 23 | | about inmates getting preferable treatment? |
| 24 | A | Well, it is just - - Just like the |

| | | |
|---|---|---|
| 1 | | visitation, if the inmate wants to have a |
| 2 | | longer visitation it is not fair to other |
| 3 | | inmates. |
| 4 | Q | Right, that makes sense. What about |
| 5 | | complaints regarding sexual misconduct by |
| 6 | | you lodged by Letcher County Jail inmates? |
| 7 | | **MR. KELLY:** Again, this is an area where she is |
| 8 | | questioning relevance and perhaps whether is it |
| 9 | | designed to discover as admissible evidence, but |
| 10 | | it is also where your rights are affected in |
| 11 | | particular the Fifth Amendment, your right take |
| 12 | | the Fifth Amendment. I Will leave it to your |
| 13 | | discretion. |
| 14 | A | None that I know of. |
| 15 | Q | Were there ever any complaints about sexual |
| 16 | | misconduct lodged by Letcher County Jail |
| 17 | | inmates against other deputy jailer while |
| 18 | | you were there? |
| 19 | A | None that I can think of. |
| 20 | Q | Okay. You referenced earlier that you had |
| 21 | | been an assistant chief deputy. Would that |
| 22 | | have been a promotion? |
| 23 | A | Yes. |
| 24 | Q | Okay. And when were you promoted to that |

| | | |
|---|---|---|
| 1 | | position? |
| 2 | A | I am not sure if it was 2017 or 2018. |
| 3 | Q | And how did your job duties change when you |
| 4 | | were promoted to assistant chief deputy? |
| 5 | A | Not much really changed. |
| 6 | Q | Did you get a pay increase? |
| 7 | A | Slightly. |
| 8 | Q | Did you have any supervisory duties? |
| 9 | A | Yes. |
| 10 | Q | What were those? |
| 11 | A | To be the supervisor of the shift. |
| 12 | Q | Okay. How many shift were there? |
| 13 | A | How many shifts that I supervised or just |
| 14 | | on a day-to-day basis, shifts? |
| 15 | Q | I am sorry I interupted you. On any given |
| 16 | | day, are there two shifts a day or three |
| 17 | | shifts a day that is what I am trying to |
| 18 | | figure out. |
| 19 | A | At the time, it was three shifts through |
| 20 | | the week, and then, two shifts on the |
| 21 | | weekend. |
| 22 | Q | So were there three different Assistant |
| 23 | | Chief Deputies or how many persons held |
| 24 | | that position? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Were you the only one? |
| 3 | A | Yes. |
| 4 | Q | And who was the jailer who promoted you to |
| 5 | | that position? |
| 6 | A | Don Mcall. |
| 7 | Q | Who was the jailer who followed Mr. McCall? |
| 8 | A | Bert Slone. |
| 9 | Q | Okay. Did you work under Bert Slone at all? |
| 10 | A | No. |
| 11 | Q | When you got promoted to shift supervisor, |
| 12 | | did you oversee Angie? |
| 13 | A | Yes. |
| 14 | Q | Okay. Was there any policy about, you know, |
| 15 | | conflict of interest or managing persons |
| 16 | | who you are directly related to to you |
| 17 | | knowledge? |
| 18 | A | Not that I know of. |
| 19 | Q | Did you have like any investigative |
| 20 | | responsibilities as assistant chief deputy? |
| 21 | A | Yes. |
| 22 | Q | And what sort of things would you |
| 23 | | investigate? |
| 24 | A | Just if they was like a fight, I would |

| | | |
|---|---|---|
| 1 | | watch the cameras and try to review them, |
| 2 | | find out what went on. |
| 3 | Q | Okay. What other things would you |
| 4 | | investigate? |
| 5 | A | Just about any criminal offense that |
| 6 | | occurred inside of the jail. |
| 7 | Q | Okay. Would that include criminal offenses |
| 8 | | perpetrated by staff at the jail? |
| 9 | A | I believe the Jailer usually oversaw those. |
| 10 | | If anything ever arose that seemed |
| 11 | | criminal, the Jailer would investigate it. |
| 12 | Q | Okay. I think that you referenced earlier |
| 13 | | amount of fairness amongst, and sometimes |
| 14 | | inmates would want special privileges. |
| 15 | | Were some of those privileges related to |
| 16 | | visitation; is that what I understood? |
| 17 | A | Yes. |
| 18 | Q | Did other privileges relate to food, |
| 19 | | getting food brought in from outside or |
| 20 | | something? |
| 21 | A | Mainly from wanting extra trays, about food |
| 22 | | related stuff. |
| 23 | Q | Okay. And you were an inmate at the Letcher |
| 24 | | County Jail for six months; is that |

|     |   |                                                        |
| --- | - | ------------------------------------------------------ |
| 1   |   | correct?                                               |
| 2   | A | Yes.                                                   |
| 3   | Q | Did you get any special privileges while               |
| 4   |   | you were an inmate there?                              |
| 5   | A | I was a trustee.                                        |
| 6   | Q | What does that mean?                                    |
| 7   | A | I was allowed to come and go in my cell as             |
| 8   |   | all other trustee are.                                 |
| 9   | Q | How many trustee are there?                            |
| 10  | A | At the time, counting myself, there was                |
| 11  |   | eight.                                                  |
| 12  | Q | Eight trustees. And how many inmates were              |
| 13  |   | there total during that six month time                 |
| 14  |   | period, approximately?                                 |
| 15  | A | I would say between 50 and 70.                         |
| 16  | Q | Okay. So how does one earn the position of             |
| 17  |   | trustee?                                                |
| 18  | A | Being trusted.                                          |
| 19  | Q | Intrusted in whose eyes?                                |
| 20  | A | I guess, whoever is working, jailers.                  |
| 21  | Q | Okay. So whoever the deputy is. Does it                |
| 22  |   | change from shift to shift who the trustees            |
| 23  |   | are?                                                    |
| 24  | A | No. Each shift, I guess, can pick if they              |

| | | |
|---|---|---|
| 1 | | need a trustee they can bring one out. |
| 2 | Q | and what do those trustees get to do? |
| 3 | A | Work, sweep, mop, do the laundry, cook. |
| 4 | Q | Do you get food brought in, fastfood |
| 5 | | brought in for you? |
| 6 | A | Churches would bring food, the guards would |
| 7 | | buy pizza and bring in. |
| 8 | Q | Would only the trustees get to share in |
| 9 | | that pizza? |
| 10 | A | Most often.  Sometimes the jail bought |
| 11 | | pizza or food for the whole jail. |
| 12 | Q | But other times, only the trustees got to |
| 13 | | have that catered food; correct? |
| 14 | A | If there was extra that the guards bought. |
| 15 | Q | And did you know any of those guards from |
| 16 | | having worked as deputy jailer previously? |
| 17 | A | Few, three or four. |
| 18 | Q | What were their names? |
| 19 | A | Michael Billiter. |
| 20 | Q | Who else? |
| 21 | A | Alena Hensley, Bryan Slone, Amanda Sexton. |
| 22 | Q | Anybody else? |
| 23 | A | Justin Collier. I believe that is the only |
| 24 | | ones that I knew when that I worked there. |

| | | |
|---|---|---|
| 1 | Q | And would have been the assistant chief |
| 2 | | deputy and supervisor of those five people |
| 3 | | you just named? |
| 4 | A | Not all five of them. |
| 5 | Q | Which ones of those did you previously |
| 6 | | supervise? |
| 7 | A | I believe Justin Collier, and Mikey |
| 8 | | Billiter, and Amanda Sexton. |
| 9 | Q | Did Angie Fields ever have a supervisory |
| 10 | | role within the Letcher County Jail? |
| 11 | A | Yes. |
| 12 | Q | Did she have the title of assistant chief |
| 13 | | deputy? |
| 14 | A | I don't think that was her title. I think |
| 15 | | she was a Lieutenant. |
| 16 | Q | Was that even higher than assistant chief |
| 17 | | deputy? |
| 18 | A | I don't know. |
| 19 | Q | Do you know at the time when Angie Fields |
| 20 | | was working as a Lieutenant for the jail, |
| 21 | | did she supervise any of those people that |
| 22 | | you just named? |
| 23 | A | Possibly. |
| 24 | Q | Any other special privileges that you had |

```
 1              by virtue of being a trustee?
 2   A    If there was leftover food after we served,
 3        we could get a little extra.
 4   Q    Anything else?
 5   A    No.
 6   Q    Were you ever allowed to leave the jail?
 7   A    We would take the trash out to the sally
 8        port.
 9   Q    Where is the sally port?
10   A    It is connected to the jail.
11   Q    Okay. Did you ever go past the sally port?
12   A    Yes.
13   Q    What occasion did you go past the sally
14        port while you were in jail?
15   A    Whenever they would bring the food delivery
16        for the jail, we would have to go out in
17        front of the lobby, load it in the carts
18        and bring it back in.
19   Q    And who is they?
20   A    The trustees.
21   Q    But who would be bringing the food?  You
22        said when they bring the food, who is they?
23   A    The company that they order the food off of
24        to be cooked and served.
```

| | | |
|---|---|---|
| 1 | Q | Okay. So the trustees have the privileges |
| 2 | | of going outside beyond the sally port to |
| 3 | | get that food? |
| 4 | A | Yes. |
| 5 | Q | Were you made a trustee on the first day |
| 6 | | that you checked in at the jail, or did it |
| 7 | | take some time to become a trustee? |
| 8 | A | It was probably about a week. |
| 9 | Q | Okay. Had any of the other folks, who were |
| 10 | | trustees, had any of them previously worked |
| 11 | | at the jail also, like you? |
| 12 | A | Not that I know of. |
| 13 | Q | Okay. I understand you, for a period of |
| 14 | | time, were a Letcher County Constable; is |
| 15 | | that correct? |
| 16 | A | Yes. |
| 17 | Q | And so that is an elected position; |
| 18 | | correct? |
| 19 | A | Yes. |
| 20 | Q | As I understand it, at least in Lexington, |
| 21 | | it is for a specific geographic area within |
| 22 | | the county; is that correct? |
| 23 | A | Yes. |
| 24 | Q | Just generally speaking, what was your |

| | | |
|---|---|---|
| 1 | | region, if that is the proper term, for |
| 2 | | acting as a Constable? |
| 3 | A | It would District 1. |
| 4 | Q | What does that include? |
| 5 | A | Most of Whitesburg, maybe all of |
| 6 | | Whitesburg, Cowan, Little Cowan, Dry Fork. |
| 7 | | That is the places that I can think of. |
| 8 | Q | And when were you elected to that position |
| 9 | | of Constable? |
| 10 | A | I am not sure. Maybe 2010. |
| 11 | Q | Based on some of the notes that I saw, it |
| 12 | | looked like you might have started that |
| 13 | | position in 2011 and I think that I saw |
| 14 | | somewhere that you actually resigned in |
| 15 | | December of 2014; does that sound accurate? |
| 16 | A | I ran in 2010, so yeah, I would have took |
| 17 | | office in 2011. And I just never filed to |
| 18 | | run again. |
| 19 | Q | Okay. So it is not that you actually left |
| 20 | | that position? |
| 21 | A | No. |
| 22 | Q | And I saw somewhere, I guess, you decided |
| 23 | | not to run for personal reasons? |
| 24 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | What were those reasons? |
| 2 | A | It didn't pay nothing and wasn't worth the |
| 3 | | headache. |
| 4 | Q | Did you have an office when you worked as |
| 5 | | Constable? |
| 6 | A | No. |
| 7 | Q | You just worked out of your home? |
| 8 | A | Yeah. |
| 9 | Q | Was there any relationship with the |
| 10 | | Sheriff's office by virtue of you holding |
| 11 | | that position of Constable? |
| 12 | A | I don't know. I don't know if it - - I |
| 13 | | guess it wouldn't be Constable is separate. |
| 14 | Q | Yeah, I guess I will ask it a different |
| 15 | | way. When you were serving as a Constable |
| 16 | | for District 1, did you have any |
| 17 | | interaction in that role with Letcher |
| 18 | | County Sheriff's office? |
| 19 | A | Not that I can think of, not directly. |
| 20 | | Maybe, if I pulled up on a wreck assisting |
| 21 | | the sheriff's deputy who was working the |
| 22 | | wreck, I might assist with the traffic, but |
| 23 | | I can't really think of any time that I |
| 24 | | affiliated with them. |

| | | |
|---|---|---|
| 1 | Q | Okay. So in 2019, you went to work for the |
| 2 | | Letcher County Sheriff's Department; is |
| 3 | | that correct? |
| 4 | A | Yes. |
| 5 | Q | Am I correct that you were hired as court |
| 6 | | security officer? |
| 7 | A | Yes. |
| 8 | Q | So how did the role of court security |
| 9 | | officer differ from persons who did not |
| 10 | | hold that title but who were also deputy |
| 11 | | sheriffs? |
| 12 | A | I was restricted to the courthouse. |
| 13 | Q | What do you mean by that? |
| 14 | A | That is where that I worked. I didn't |
| 15 | | patrol the streets and stuff. |
| 16 | Q | Okay. Did you also serve warrants? |
| 17 | A | Yes. |
| 18 | Q | So that would be outside of the courthouse; |
| 19 | | correct? |
| 20 | A | No. People that came to the courthouse. |
| 21 | Q | Okay. So you would only sere a warrant if |
| 22 | | it was somebody that stepped foot in the |
| 23 | | courthouse? |
| 24 | A | As far as I remember, yes. |

| | | |
|---|---|---|
| 1 | Q | Okay. But you did have a patrol car; |
| 2 | | correct?  You had a Letcher County |
| 3 | | Sheriff's Department vehicle? |
| 4 | A | Yes. |
| 5 | Q | Why did you need a vehicle if your role was |
| 6 | | restricted to the courthouse? |
| 7 | A | I guess, to go from home to work. |
| 8 | Q | So you were allowed to use that vehicle to |
| 9 | | go from home to work? |
| 10 | A | Yes. |
| 11 | Q | Did you use that vehicle to go places other |
| 12 | | than home and work? |
| 13 | A | Training. |
| 14 | Q | Did you also use that vehicle in your role |
| 15 | | as a, you know, the ankle monitor for East |
| 16 | | Kentucky Correctional Solutions? |
| 17 | A | Yes. |
| 18 | Q | Okay. And you were hired by Sheriff Danny |
| 19 | | Webb? |
| 20 | A | I started the interview and training |
| 21 | | process, I think while Danny was Sheriff. |
| 22 | Q | Right. But Mickey Stines has already been |
| 23 | | elected back in November to become the next |
| 24 | | Sheriff; is that correct? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did you campaign or do any election work |
| 3 | | for Mickey Stines? |
| 4 | A | No, not really. |
| 5 | Q | Did you participate in his campaign in any |
| 6 | | way? |
| 7 | A | Not that I can think of. |
| 8 | Q | Did you know Mickey Stines before 2018? |
| 9 | A | Yes. |
| 10 | Q | How did you first meet Mickey Stines? |
| 11 | A | At the courthouse. |
| 12 | Q | Was that while you were working as a deputy |
| 13 | | jailer? |
| 14 | A | Yes. |
| 15 | Q | Help me understand how you guys would have |
| 16 | | met and the kind of relationship you had |
| 17 | | during that time period when you were |
| 18 | | working for the jail? |
| 19 | A | He was the bailiff for District Court, and |
| 20 | | would come down to get prisoners. |
| 21 | Q | So he would come down to get prisoners and |
| 22 | | sometimes you would take prisoners up to |
| 23 | | him; is that how that I understood it |
| 24 | | earlier? |

| | | |
|---|---|---|
| 1 | A | Sometimes, I think. Usually if the jail |
| 2 | | would take prisoners up, it would be for |
| 3 | | Drug Court after 4:00 o'clock and stuff |
| 4 | | like that. |
| 5 | Q | Okay. So Drug Court happened later on in |
| 6 | | the day? |
| 7 | A | Yes, it happens after regular court is over |
| 8 | | with, I guess. |
| 9 | Q | And did you develop a friendship with |
| 10 | | Mickey Stines during that time period when |
| 11 | | you were working for the jail? |
| 12 | A | You could say that. |
| 13 | Q | Okay. How did that friendship evolve? |
| 14 | A | Just we both worked at the same place |
| 15 | | basically. |
| 16 | Q | I mean, did he invite you over to his house |
| 17 | | did you invite him over to your house? |
| 18 | A | He came to my house once and worked on my |
| 19 | | heat pump for me, cleaned the coils on it, |
| 20 | | and then, he has invited me to his house. |
| 21 | Q | And where does he live? |
| 22 | A | McRoberts. |
| 23 | Q | And that is the opposite end of the county |
| 24 | | from Cowan? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did he invite you over for any particular |
| 3 | | purpose? |
| 4 | A | Hang out, play cards, eat. |
| 5 | Q | Okay. And that was to play poker? |
| 6 | A | Yeah, we would play poker. |
| 7 | Q | I have seen reference to poke games. Okay. |
| 8 | | You started going to Sheriff Stines's poker |
| 9 | | games when you were a deputy jailer? |
| 10 | A | I can't remember. It would be towards the |
| 11 | | end, maybe of being a deputy jailer, I am |
| 12 | | not sure. |
| 13 | Q | Okay. Would those poker games happen with |
| 14 | | any kind of routine way? Was it like every |
| 15 | | Sunday or something like that? |
| 16 | A | I can't remember for sure. It could have |
| 17 | | been on Sundays. I can't really remember. |
| 18 | Q | Was it like a weekly occurrence, a monthly |
| 19 | | occurrence? |
| 20 | A | Weekly. |
| 21 | Q | Weekly.  And how many people were typically |
| 22 | | be there, and I am talking about |
| 23 | | specifically the time period when you were |
| 24 | | a deputy jailer? |

| | | |
|---|---|---|
| 1 | A | I can't remember if I went up when I was a |
| 2 | | deputy jailer. |
| 3 | Q | Okay. But you did develop a friendship with |
| 4 | | Mickey Stines while you were still a deputy |
| 5 | | jailer.  That is what I understood you to |
| 6 | | say previously; correct? |
| 7 | A | Yes. |
| 8 | Q | Did Mickey Stines promise you a job in |
| 9 | | exchange for your support in his election? |
| 10 | A | No. |
| 11 | Q | When did Mr. Stines - - Did he first |
| 12 | | approach you about working as a deputy |
| 13 | | sheriff or how did that work? |
| 14 | A | He did. |
| 15 | Q | What did he say? |
| 16 | A | I can't remember how it went. If he wins, |
| 17 | | if I would want to work for him something |
| 18 | | along those lines, I can't remember. |
| 19 | Q | Did you understand when he first approached |
| 20 | | you that he was wanting to offer you a job |
| 21 | | as court security officer? |
| 22 | A | Yes. |
| 23 | Q | What did he tell you about being a court |
| 24 | | security officer specifically? |

| | | |
|---|---|---|
| 1 | A | You would be a bailiff, you would get the |
| 2 | | prisoners and take them up to Court. |
| 3 | Q | And did you understand that Mr. Stines was |
| 4 | | also working for East Kentucky Correction |
| 5 | | Solutions during that time period? |
| 6 | A | Yes. |
| 7 | Q | And what did you understand, you know, what |
| 8 | | Mr. Stines did in his role, and I am just |
| 9 | | going to call it EKCS for short. What did |
| 10 | | you understand Mickey Stines job duties in |
| 11 | | his role with EKCS? |
| 12 | A | He overseen the house arrest in Letcher |
| 13 | | County. |
| 14 | Q | Okay. During the time period before you |
| 15 | | started working for the Letcher County |
| 16 | | Sheriff's Department, had you ever met |
| 17 | | Patty Stockham? |
| 18 | A | I don't believe so. |
| 19 | Q | Do you remember when you first met Patty |
| 20 | | Stockham? |
| 21 | A | Whenever that I started at the Sheriff's |
| 22 | | Office. |
| 23 | Q | Was it Mickey Stines who helped you get the |
| 24 | | job with EKCS? |

| | | |
|---|---|---|
| 1 | A | I suppose. |
| 2 | Q | Okay. Did you start working for EKCS before |
| 3 | | you started working for the Sheriff's |
| 4 | | Department? |
| 5 | A | I don't think that I started working for |
| 6 | | them. I believe that I went up and watched |
| 7 | | Mickey, because he done the job to get an |
| 8 | | understanding of it. |
| 9 | Q | And when you say the job, you are talking |
| 10 | | about the job with EKCS? |
| 11 | A | Yes. |
| 12 | Q | And when you say went up, you are saying |
| 13 | | that you went to another place within the |
| 14 | | courthouse to watch him perform that job? |
| 15 | A | Yes. |
| 16 | Q | And where in the courthouse did he perform |
| 17 | | that job? |
| 18 | A | The District Courtroom. |
| 19 | Q | And what time of day would that have been? |
| 20 | A | It was on Wednesdays. |
| 21 | Q | What time? |
| 22 | A | After 4;00 o'clock. |
| 23 | Q | How late? |
| 24 | A | 4:00 or 4:30, I think was when he had |

```
 1              everybody checking in.
 2    Q         Okay. Did that change when you became the
 3              Home Incarceration Officer for EKCS?
 4    A         No.
 5    Q         So you kept that at the same time?
 6    A         Yes.
 7    Q         Did you start working for EKCS about the
 8              same time that you became the Court's
 9              Security Officer for the Letcher County
10              Sheriff's Department?
11    A         Yes.
12    Q         Let's talk specifically about the Letcher
13              Sheriff's Department; okay?
14    A         Could we take a short break?
15    Q         Sure.
16         (A short break was taken).
17    Q         I was asking you before the break what sort
18              of training that you got as a court
19              security officer for the Letcher County
20              Sheriff's Office; explain to me your
21              training upon hire?
22    A         It was two week training in Richmond.
23    Q         Was that the Criminal Justice Information
24              System Security Awareness Training?
```

```
 1   A      I believe so.

 2   Q      Any other training aside from that two

 3          weeks of training?

 4   A      I had a week of research training my second

 5          year.

 6   Q      Any other annual training you would have

 7          received after that initial hire?

 8   A      CPR.

 9   Q      Anything else?

10   A      Not that I can think of.

11   Q      Do you recall being training on any of the

12          Letcher County Sheriff's Department

13          policies?

14   A      Yes.

15   Q      What was that training like?

16   A      We were given the policy to review.

17   Q      Okay. Did you review it?

18   A      Yes.

19   Q      Did you review it a the time that you were

20          hired?

21   A      Yes.

22   Q      Was it a requirement that you review that

23          again on an annual basis that you recall?

24   A      I can't remember.
```

| | | |
|---|---|---|
| 1 | Q | I know that you said you sorta shadowed |
| 2 | | Mickey Stines regarding the work with EKCS. |
| 3 | | Did you shadow Mickey Stines or anyone |
| 4 | | else, you know, at the courthouse, related |
| 5 | | to the court security officer work? |
| 6 | A | Yes. |
| 7 | Q | Who did you shadow? |
| 8 | A | Sheriff Stines. |
| 9 | Q | Okay. How long did you shadow him for? |
| 10 | A | I believe a couple of weeks. |
| 11 | Q | We used the term bailiff, we used the term |
| 12 | | court security officer; is that the same |
| 13 | | thing? |
| 14 | A | It is my understanding it is. |
| 15 | Q | Okay. I will use bailiff, because it is |
| 16 | | fewer words. Were you there for Circuit |
| 17 | | Court, District Court or both? |
| 18 | A | District Court. |
| 19 | Q | And that is Judge Mullins; correct? |
| 20 | A | Yes. |
| 21 | Q | Was there ever any occasion when you would |
| 22 | | have served as a bailiff for the Circuit |
| 23 | | Court also? |
| 24 | A | Yes. |

| 1 | Q | Was there a separate bailiff who was |
| 2 | | working in the Circuit Court during the |
| 3 | | 2020-2021 time period? |
| 4 | A | Yes. |
| 5 | Q | Was that Jason Eckels? |
| 6 | A | I believe so. |
| 7 | Q | Okay. Did you know Judge Mullins before you |
| 8 | | started working for the Sheriff's |
| 9 | | Department? |
| 10 | A | Yes. |
| 11 | Q | Would you call him a friend? Did you have a |
| 12 | | relationship with him? |
| 13 | A | We would talk if we seen each other. |
| 14 | Q | Okay.  Have you ever been to his house? |
| 15 | A | A couple of times to take papers up to get |
| 16 | | him to sign. |
| 17 | Q | Never for a, you know, social visit? |
| 18 | A | No. |
| 19 | Q | What about Judge Craft, did you know him |
| 20 | | prior to starting your work with the |
| 21 | | Letcher County Sheriff's Department? |
| 22 | A | Yes. |
| 23 | Q | And would you call him a friend? |
| 24 | | **MR. KELLY:** You are talking about Junior, James |

```
 1          Wiley.

 2     Q          Correct. Judge Craft, who was Circuit Judge

 3                in 2021, would you consider him a friend?

 4     A          Yes.

 5     Q          Okay. Have you ever been to his house for a

 6                social visit?

 7     A          No.

 8     Q          But you knew him prior to going to work for

 9                the Letcher County Sheriff's Department;

10                correct?

11     A          Yes.

12     Q          How did you know him?

13     A          As the Judge.

14     Q          Okay. You didn't know him in any capacity

15                other than Judge?

16     A          I knowed he was an attorney, but I can't

17                say that I really knew him while he

18                practiced.

19     Q          Okay. So aside from the training you have

20                already described, do you recall there

21                being any other additional training that

22                you received related to your work with

23                Letcher County Sheriff's Department?

24     A          Not that I can think of.
```

| | | |
|---|---|---|
| 1 | Q | Okay. Aside from the training that you |
| 2 | | received from Mickey Stines related to |
| 3 | | EKCS, did you receive any other type of |
| 4 | | training? |
| 5 | A | Not that I can think of. |
| 6 | Q | Do you recall any employment policies or |
| 7 | | handbook or anything of that nature related |
| 8 | | to EKCS? |
| 9 | A | I can't remember. |
| 10 | Q | So all of the training that you received |
| 11 | | was training that you got from Mickey |
| 12 | | Stines; correct? |
| 13 | A | Yes, and after that I met Patty, she showed |
| 14 | | me when we got the new GPS bracelets, she |
| 15 | | showed me how to hook those up. |
| 16 | Q | Okay. And that happened sometime after you |
| 17 | | started working for EKCS; correct? |
| 18 | A | Yes. |
| 19 | Q | Aside from that training related to the GPS |
| 20 | | bracelets, did you receive any other |
| 21 | | training from Patty Stockham? |
| 22 | A | Not that I can think of. |
| 23 | Q | To you knowledge, were there any other |
| 24 | | employees that you worked with at EKCS |

| | | |
|---|---|---|
| 1 | | beyond Patty Stockham? |
| 2 | A | No. |
| 3 | Q | Okay. Did you ever meet any other |
| 4 | | contractors or employees of EKCS besides |
| 5 | | Patty Stockham? |
| 6 | A | No. |
| 7 | Q | Describe to me your relationship with Jason |
| 8 | | Eckels? Am I pronouncing his last name |
| 9 | | correctly? |
| 10 | A | I believe so. |
| 11 | Q | When did you first meet him? |
| 12 | A | At the jail. |
| 13 | Q | Okay. So he worked at the jail also? |
| 14 | A | Yes. |
| 15 | Q | When was he a deputy jailer? |
| 16 | A | I can't remember when he started. |
| 17 | Q | Did he go to work for the sheriff's |
| 18 | | department before or after you? |
| 19 | A | After. |
| 20 | Q | Did you help him get a job with the |
| 21 | | sheriff's department? |
| 22 | A | I told him that he could put me as a |
| 23 | | reference. |
| 24 | Q | Okay. I looked at your job application with |

1          applying for the job with the sheriff's

2          department, and you listed Bert Slone.  He

3          was the jailer; correct?

4     A    He was the jailer, but he wasn't the jailer

5          when that I filled out the application. He

6          was running for office, believe without

7          looking at the dates.

8     Q    Okay. That is fine.  You also listed Kevin

9          Mullins as a reference; do you recall doing

10         that?

11    A    Yes.

12    Q    Did Kevin Mullins have any say so in who

13         served as the court security officer in his

14         courtroom?

15    A    I am not sure.

16    Q    Do you know if he spoke to Sheriff Stines

17         on your behalf about that job?

18    A    I am not sure.

19    Q    Did you ask him if you could list him as a

20         reference before doing so?

21    A    I believe I did.

22    Q    And I guess he said sure?

23    A    I am assuming, yes.

24    Q    Okay. He also listed Terrence Ison; who is

| | | |
|---|---|---|
| 1 | | that? |
| 2 | A | He worked in the circuit clerk's office. |
| 3 | Q | Okay. In what role? |
| 4 | A | He might have a pre-trail officer at the |
| 5 | | time. I can't remember. |
| 6 | Q | What I have in the Discovery Files, you |
| 7 | | noted that he was in pre-trail services. |
| 8 | | So what does that mean? |
| 9 | A | He was the pre-trail services at the jail. |
| 10 | | That would be to interview prisoners when |
| 11 | | they come in to set their bonds. |
| 12 | Q | Okay. Would be have any role in the home |
| 13 | | incarceration decision making? |
| 14 | A | No. |
| 15 | Q | Did you interact with him in any way in |
| 16 | | your role as the home incarceration officer |
| 17 | | with EKCS? |
| 18 | A | Not that I can think of. |
| 19 | Q | Did you interact with anybody else in pre- |
| 20 | | trail services in your role as home |
| 21 | | incarceration officer with EKCS? |
| 22 | A | I am sure did. |
| 23 | Q | Help me understand what that interaction |
| 24 | | would be? |

| | | |
|---|---|---|
| 1 | A | It would be to verify bonds to make sure |
| 2 | | they have a house arrest bond and what are |
| 3 | | the conditions. |
| 4 | Q | Okay. What are the conditions of house |
| 5 | | arrest? |
| 6 | A | Condition of their bond. |
| 7 | Q | What is an example of condition of bond? |
| 8 | A | A monetary amount has to be posted before |
| 9 | | they can be released. |
| 10 | Q | Anything aside form monetary amounts? |
| 11 | A | It is set my the Judge, I guess. |
| 12 | Q | Okay. |
| 13 | A | Drug screens, good and lawful behavior, |
| 14 | | stuff of that nature. |
| 15 | Q | And you would have to check with that pre- |
| 16 | | trail services person because part of your |
| 17 | | job is home incarceration officer was to |
| 18 | | make sure that those things occurred, those |
| 19 | | conditions were satisfied; is that true? |
| 20 | A | If I interacted with pre-trail for a house |
| 21 | | arrest, it was just to verify bond for the |
| 22 | | person who had house arrest. |
| 23 | Q | You also listed Jason Eckels as a |
| 24 | | reference; do you recall doing that? |

| | | |
|---|---|---|
| 1 | A | I suppose. |
| 2 | Q | Okay. Were you his supervisor over at the |
| 3 | | jail prior to going to work at the |
| 4 | | sheriff's department? |
| 5 | A | Yes. |
| 6 | Q | Have you known him since high school?  Have |
| 7 | | you had a long friendship? |
| 8 | A | Yes, when he started at the jail. |
| 9 | Q | Okay. Do you recall when he started at the |
| 10 | | jail? |
| 11 | A | I don't. |
| 12 | Q | Okay. You were a sworn employee with the |
| 13 | | sheriff's department; correct? |
| 14 | A | I guess. |
| 15 | Q | Do you recall swearing an oath? |
| 16 | A | Yes. |
| 17 | Q | I was just wondering do you know what it |
| 18 | | means to be an sworn employee? |
| 19 | A | I don't know if I understood the question. |
| 20 | | **MR. KELLY:** I am not sure that I understand the |
| 21 | | question. Other than taking an oath, I don't |
| 22 | | know. |
| 23 | Q | And if you know, you know, and don't - - I |
| 24 | | saw a reference to a sworn employee so I am |

| | | |
|---|---|---|
| 1 | | asking you.  What does it mean to be a |
| 2 | | sworn employee? |
| 3 | A | I guess you take an oath, I am not sure. |
| 4 | Q | Okay. We talked a little bit about this |
| 5 | | previously, but you were given a Crown |
| 6 | | Victoria vehicle; correct? |
| 7 | A | I was allowed to use it. |
| 8 | Q | Allowed to use it? |
| 9 | A | Yeah. |
| 10 | Q | So was it like shared by you and other |
| 11 | | people or was it solely in your possession |
| 12 | | and control? |
| 13 | A | It was the vehicle that I drove home and to |
| 14 | | work. |
| 15 | Q | Okay. Did anybody else drive it during the |
| 16 | | day while you were at the courthouse? |
| 17 | A | If somebody needed it. |
| 18 | Q | Okay. |
| 19 | A | I can't really think of any of a particular |
| 20 | | time if somebody that needed it they could |
| 21 | | have used it. |
| 22 | Q | Okay. Did every deputy sheriff have a |
| 23 | | vehicle that they could use to drive home |
| 24 | | and back to work? |

| | | |
|---|---|---|
| 1 | A | I can't remember. I know that some did, |
| 2 | | but I can't say all. |
| 3 | Q | What was the policy for using the sheriff's |
| 4 | | department vehicle for non-work related |
| 5 | | travel? |
| 6 | A | I am not sure. |
| 7 | Q | Do you recall being made aware or training |
| 8 | | on any policies on any related you were or |
| 9 | | were not suppose to use that vehicle? |
| 10 | A | I can't remember. |
| 11 | Q | I was going to show you a form. I am not |
| 12 | | going to bother making it an Exhibit. This |
| 13 | | is something that was produced in |
| 14 | | Discovery. I was wondering have you ever |
| 15 | | seen this form? |
| 16 | A | Yes. |
| 17 | Q | Okay. Did you ever fill out a form like |
| 18 | | that? |
| 19 | A | Yes. |
| 20 | Q | And would you fill it out on a monthly |
| 21 | | basis or why would you fill out a form such |
| 22 | | as that? |
| 23 | A | On a monthly basis. It was to turn in the |
| 24 | | fuel usage and mileage on the vehicle. |

| | | |
|---|---|---|
| 1 | Q | So who would pay for the gas that went in |
| 2 | | the car? |
| 3 | A | The sheriff's office I would imagine. |
| 4 | Q | Did you pay for it and then they reimbursed |
| 5 | | you or how did that work? |
| 6 | A | I had a fuel card. Sometimes if we went to |
| 7 | | pick up a prisoner somewheres, some gas |
| 8 | | stations didn't accept it and then, I would |
| 9 | | pay out of pocket and put the receipt with |
| 10 | | it, and they would reimburse me. |
| 11 | Q | So part of your job as the court security |
| 12 | | officer was to transport inmates? |
| 13 | A | Yes. |
| 14 | Q | Okay. How often would you do that? |
| 15 | A | Pretty often, I would say monthly. |
| 16 | Q | Okay. Help me understand sorta what all |
| 17 | | your duties were as court security officer? |
| 18 | A | It was to be the bailiff in the courtroom, |
| 19 | | get prisoners from the jail and bring them |
| 20 | | up to court, and take them down, transport |
| 21 | | prisoners from other jails back to Letcher |
| 22 | | County or serve subpoenas, summons, civil |
| 23 | | papers. |
| 24 | Q | Anything else? |

| | | |
|---|---|---|
| 1 | A | Not that I can think of. |
| 2 | Q | Were you paid by the hour for your work for |
| 3 | | the sheriff's department or salary? |
| 4 | A | By the hour. |
| 5 | Q | Okay. So would you turn in those hours to |
| 6 | | the sheriff's department? |
| 7 | A | Yes. |
| 8 | Q | Were there sorta set hours per day? Did you |
| 9 | | always work 8:00 to 5:00 or how did that |
| 10 | | work? |
| 11 | A | I think it was - - I can't think of the |
| 12 | | actual hours.  It was eight hours a day. |
| 13 | Q | Eight hours a day. |
| 14 | A | 8:00 to 4:00. 8:00 to 4:30, something like |
| 15 | | that. 8:30 to 4:30 maybe, I can't remember. |
| 16 | Q | And would you ever perform services for |
| 17 | | EKCS during that time period when you were |
| 18 | | working for the sheriff's department? |
| 19 | A | If somebody that was on house arrest was in |
| 20 | | court or a hearing and didn't get off house |
| 21 | | arrest, they would go ahead and pay me |
| 22 | | their weekly payment before they left or if |
| 23 | | somebody got off, I would go ahead and cut |
| 24 | | the bracelet off of them before they left. |

| | | |
|---|---|---|
| 1 | Q | Okay. And that would just be in the |
| 2 | | District Court Courtroom? |
| 3 | A | Yes. |
| 4 | Q | Okay. Was it more often Judge Mullins who |
| 5 | | would put people on house arrest or would |
| 6 | | that be more of a Judge Craft decision? |
| 7 | A | Both. It just depended where they had a |
| 8 | | case out of. |
| 9 | Q | Okay. But you would handle the home |
| 10 | | incarceration duties for both District and |
| 11 | | Circuit Court even though you were the |
| 12 | | bailiff for District Court; correct? |
| 13 | A | Yes. |
| 14 | Q | You had a sheriff's department uniform; |
| 15 | | correct? |
| 16 | A | Yes. |
| 17 | Q | Okay. Did you have a badge? |
| 18 | A | Yes. |
| 19 | Q | Did you carry a gun? |
| 20 | A | Yes. |
| 21 | Q | Okay. And did you wear that uniform badge |
| 22 | | and did you carry that gun during time |
| 23 | | periods when you were performing services |
| 24 | | for East Kentucky Correctional Solutions? |

| 1 | A | Yes. |
|---|---|------|

2  Q  And were you aware of any policies with the
3        sheriff's department about when you were or
4        were not suppose to use that sheriff's
5        department property that I just identified?

6  A  Not that I know of.

7  Q  Okay. So let's start when you were working
8        for the jail.  Did you have any special
9        access, and by that, I mean keys or key
10       cards that gave you access to the
11       courthouse portion of the building?

12  A  While I was at the jail?

13  Q  Correct.

14  A  No, not that I know of.

15  Q  Okay. So when you were working for the
16       jail, if you were accessing the courthouse
17       portion of the building, were you able to
18       access that because the door was unlocked?

19  A  Could you rephrase that, maybe?

20  Q  Yeah. While you were working for the jail,
21       if you were going up into the courthouse
22       for any reason, were those doors unlocked
23       is that how that you gained access?

24  A  The jail is inside of the courthouse

| | | |
|---|---|---|
| 1 | | perimeter. |
| 2 | Q | But in my mind, they are sorta separate |
| 3 | | somewhat.  I would think there is some |
| 4 | | locked doors between the jail and the |
| 5 | | District Courtroom for example at least |
| 6 | | during certain periods of the day? |
| 7 | A | Yes. |
| 8 | Q | While you were working for the jail, if you |
| 9 | | were trying to get from the jail to the |
| 10 | | District Court Courtroom, did you have any |
| 11 | | special key or keycard that let you gain |
| 12 | | access to that off hours? |
| 13 | A | Off hours, no. |
| 14 | Q | So you couldn't gain access to that while |
| 15 | | you were working for the jail of hours? |
| 16 | A | Not to the courtrooms. |
| 17 | Q | Right.  But to the general hallway? |
| 18 | A | Yes. |
| 19 | Q | And where the bathrooms were? |
| 20 | A | Yes. |
| 21 | Q | And then, when you became a court security |
| 22 | | officer, were you then given some sort of |
| 23 | | special access, a key, a keycard that |
| 24 | | allowed you to access more portions of the |

| | | |
|---|---|---|
| 1 | | courthouse? |
| 2 | A | Yes. |
| 3 | Q | And who gave you that keycard or key? |
| 4 | A | I guess the sheriff's office did.  The |
| 5 | | keycard came from ALC, I believe from the |
| 6 | | clerk's office. |
| 7 | Q | And what did that key card give you access |
| 8 | | to? |
| 9 | A | The side door into the courtroom - - into |
| 10 | | the courthouse. |
| 11 | Q | So if I am looking at the front of the |
| 12 | | Letcher County Courthouse, the jail is over |
| 13 | | on the left side; correct? |
| 14 | A | It is under the entire building.  It is the |
| 15 | | whole basement. |
| 16 | Q | Okay. But the access door is on the left? |
| 17 | A | Yes.  The lobby would be on the left. |
| 18 | Q | Okay. And when you reference the side door |
| 19 | | into the courthouse, is that on the right |
| 20 | | side of the building or where is that door? |
| 21 | A | On the left. |
| 22 | Q | So it is over on that same jail side? |
| 23 | A | Yes. |
| 24 | Q | But a different door from the jail entrance |

| | | |
|---|---|---|
| 1 | | door? |
| 2 | A | Yes. |
| 3 | Q | Okay. And did that keycard give you access |
| 4 | | to Judge Mullins Chambers? |
| 5 | A | From the side door, if he left his door |
| 6 | | unlocked, I would have access to it, but if |
| 7 | | he had it locked, I would not. |
| 8 | Q | Did he regularly leave his Chamber's door |
| 9 | | unlocked? |
| 10 | A | What would be regular? |
| 11 | Q | I don't know.  Did you ever go into the |
| 12 | | courthouse and find his chamber door |
| 13 | | locked, we will start there? |
| 14 | A | Did I ever find it locked? |
| 15 | Q | Correct. |
| 16 | A | Yes. |
| 17 | Q | Have you ever been in Judge Mullins' |
| 18 | | chambers without Judge Mullins? |
| 19 | A | Yes. |
| 20 | Q | Okay. And on those occasions when you were |
| 21 | | there and he was not there, did he give a |
| 22 | | key to get into his chambers or did you |
| 23 | | happened to find it unlocked? |
| 24 | A | It would have been unlocked. |

| | | |
|---|---|---|
| 1 | Q | Did he leave it unlocked for you? |
| 2 | A | I wouldn't imagine just to be leaving it |
| 3 | | unlocked. |
| 4 | Q | Okay. So he never told you that I am going |
| 5 | | to leave the door unlocked for you? |
| 6 | A | No. |
| 7 | Q | I have got a question about Sheriff's |
| 8 | | Steins poker parties. After you became a |
| 9 | | deputy sheriff, as I understood your |
| 10 | | testimony previously, you weren't sure if |
| 11 | | you ever attended his poker parties before |
| 12 | | becoming a deputy sheriff, but you do |
| 13 | | recall attending them after; correct? |
| 14 | A | Yes. |
| 15 | Q | And they happened once a week to the best |
| 16 | | of your recollection? |
| 17 | A | Yes. |
| 18 | Q | Who else would be at those parties? |
| 19 | A | Five or six people. |
| 20 | Q | Were those five or six people also deputy |
| 21 | | sheriffs? |
| 22 | A | Not usually. Occasionally, maybe somebody |
| 23 | | from the Sheriff's Office would come up, |
| 24 | | but not on a regular basis. |

| | | |
|---|---|---|
| 1 | Q | Did you go on a regular basis? |
| 2 | A | Sometimes. I would go regular for while and |
| 3 | | then, I may miss some days. |
| 4 | Q | Okay. These five or six people who would |
| 5 | | have been there who were not with the |
| 6 | | sheriff's department, what were their |
| 7 | | names? |
| 8 | A | I am not real sure about their last names. |
| 9 | Q | Okay. I will take what I can get. |
| 10 | A | Larry was one of them. |
| 11 | Q | Okay. |
| 12 | A | Beau. |
| 13 | Q | Okay. |
| 14 | A | It has been so long I can't remember. That |
| 15 | | is the ones that I can think of off the top |
| 16 | | of my head. I can't - - |
| 17 | Q | Did Jason Eckels go to those parties as |
| 18 | | well? |
| 19 | A | He come up and played cards before, yes. |
| 20 | Q | Do you recall any other female deputy |
| 21 | | sheriffs attending those parties? |
| 22 | A | No. |
| 23 | Q | Do you recall any women at all attending |
| 24 | | those poker parties? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | So it was always - - It was kinda a men's |
| 3 | | gathering? |
| 4 | A | I guess. |
| 5 | Q | Okay. Did you all drink alcohol at these |
| 6 | | parties? |
| 7 | A | Not usually.  Ever now and again, I would |
| 8 | | have a beer. |
| 9 | Q | And where did they take place? |
| 10 | A | In his garage. |
| 11 | Q | Okay. Did you all play for real money? |
| 12 | A | Pennies, nickels, dimes, and stuff like |
| 13 | | that. |
| 14 | Q | And you always sort of settle the score |
| 15 | | after that game or was there some sort of a |
| 16 | | running tab? |
| 17 | A | I don't understand. |
| 18 | Q | You know, if you won $20.00, did you take |
| 19 | | that $20.00 home that night or was there |
| 20 | | sorta more of a tab going? |
| 21 | A | Everybody would just keep up with their |
| 22 | | change, I guess. |
| 23 | Q | Were there ever any persons who were on |
| 24 | | home incarceration who attended one of |

| | | |
|---|---|---|
| 1 | | these poker parties at Sheriff Stines's |
| 2 | | house? |
| 3 | A | No. |
| 4 | Q | This is something that I got through |
| 5 | | Discovery, actually I will say through an |
| 6 | | open records request to the Attorney |
| 7 | | General's Office. Do you recognize this |
| 8 | | picture? |
| 9 | A | Yes. |
| 10 | Q | Who is that? |
| 11 | A | Sheriff Stines. |
| 12 | Q | Did you take this photo? |
| 13 | A | I can't remember. |
| 14 | Q | Well, I got it through open records request |
| 15 | | from the criminal file from the Attorney |
| 16 | | General's Office. Does that look to be |
| 17 | | Sheriff's Stines garage and his poker |
| 18 | | table? |
| 19 | A | Yes. |
| 20 | Q | You don't recall seeing this photo before? |
| 21 | A | I have seen it. I can't remember if I was |
| 22 | | the one that took it. |
| 23 | Q | Okay. Do you recall, you know, the night |
| 24 | | that this photo was taken? |

| | | |
|---|---|---|
| 1 | A | Not specifically. |
| 2 | Q | Do you know why Sheriff's Stines has his |
| 3 | | shirt pulled up? |
| 4 | A | I would say it was in the middle of the |
| 5 | | summer and they ain't no air conditioning |
| 6 | | in the garage. |
| 7 | Q | Do you remember pulling your shirt up at |
| 8 | | one of his poker parties? |
| 9 | A | No. |
| 10 | Q | Am I correct you would have attended this |
| 11 | | party during the time period when you were |
| 12 | | working for the Sheriff's Department? |
| 13 | A | I would imagine. |
| 14 | | **(Photo was marked as Exhibit 1)** |
| 15 | Q | Let's talk a little bit about East Kentucky |
| 16 | | Correctional Solutions. You testified |
| 17 | | previously that some of the work you might |
| 18 | | have done was during the time period when |
| 19 | | you were working as bailiff and that would |
| 20 | | have been maybe collecting some money from |
| 21 | | a criminal defendant or cutting a bracelet, |
| 22 | | if need be. Help me understand aside from |
| 23 | | those specific duties, what were you other |
| 24 | | duties with East Kentucky Correctional |

| | | |
|---|---|---|
| 1 | | Solutions? |
| 2 | A | To hook people up on house arrest. |
| 3 | Q | Where would that occur? |
| 4 | A | At the courthouse. |
| 5 | Q | At what time? |
| 6 | | **MR. SHAW:** For the record, were these disclosed |
| 7 | | or produced to opposing counsel at any time |
| 8 | | after that you received them by subpoena from |
| 9 | | AG? |
| 10 | | **MS. BAXTER:** Yeah. |
| 11 | Q | So you would hook people up on house arrest |
| 12 | | that was at the courthouse. Would that |
| 13 | | have been during the time period when you |
| 14 | | were working as a bailiff? |
| 15 | A | What do you mean? |
| 16 | Q | Yeah, I want to be more specific. So during |
| 17 | | the time period that eight hours a day that |
| 18 | | you were working as a bailiff, would you |
| 19 | | also have been hooking folks up on house |
| 20 | | arrest during that time period? |
| 21 | A | I did sometime on my lunch. |
| 22 | Q | Any other time? |
| 23 | A | Occasionally, on days there wasn't no |
| 24 | | court. If the judge was done, I would hook |

1    people up during that time.

2    Q    Okay. Did you always hook folks up on house

3         arrest at the courthouse?

4    A    Either at the courthouse or in the lobby at

5         the jail.

6    Q    Okay. And when you were hooking folks up on

7         house arrest, you would be wearing your

8         deputy sheriff's uniform; correct?

9    A    It depends on when it was.

10   Q    Well, the times that you were at the

11        courthouse, would have been wearing your

12        uniform?

13   A    If I hooked them up after that I got off

14        work, I would get done and go straight down

15        and hook them up.

16   Q    So you are saying that you would change,

17        you are saying?

18   A    No, I wouldn't change. I would stop and

19        take my gun belt off and lock it up in my

20        cruiser.

21   Q    Okay. More often than not, you would be

22        wearing your sheriff's department uniform

23        while you were hooking folks up on house

24        arrest; correct?

| | | |
|---|---|---|
| 1 | A | If they got out after that I worked, days |
| 2 | | that - - if it was somebody that came in on |
| 3 | | a weekend and was bonding out over the |
| 4 | | weekend, I would wear my regular clothes |
| 5 | | and drive my truck out to the jail and hook |
| 6 | | them up. |
| 7 | Q | Okay. |
| 8 | A | But if it was somebody that got a bond set |
| 9 | | through the day, a business day, instead of |
| 10 | | making them wait for me to run home, change |
| 11 | | and come back, I would just go ahead and |
| 12 | | hook them up. |
| 13 | Q | Isn't it true that more often than not, the |
| 14 | | hook ups that you did would have been |
| 15 | | through the week day when you were wearing |
| 16 | | your uniform not on the weekends; is that |
| 17 | | accurate? |
| 18 | A | I would say that I hooked more up through |
| 19 | | the week. |
| 20 | Q | Okay. That is what I was trying to ask. And |
| 21 | | so you talked about hook ups. What were the |
| 22 | | other jobs aside from hooking folks up, |
| 23 | | what would happen next? |
| 24 | A | I would collect their fees. |

| | | |
|---|---|---|
| 1 | Q | Okay. Would you go out to the location, the |
| 2 | | house that I would assume, or apartment |
| 3 | | where someone was living, would you |
| 4 | | actually go out and do sort of a house |
| 5 | | visit? |
| 6 | A | If we had an issue. |
| 7 | Q | What would be kind of issue and prompted |
| 8 | | you to go out there? |
| 9 | A | Tampering with their bracelet to go out and |
| 10 | | do a visual check of their bracelet. |
| 11 | Q | Okay. So that would be sometime after they |
| 12 | | had already been hooked up? |
| 13 | A | Yes. |
| 14 | Q | Okay. And when you would go out to do those |
| 15 | | visual checks, would you drive your |
| 16 | | sheriff's department car? |
| 17 | A | If it was through the week and it was |
| 18 | | something that I could swing by their |
| 19 | | residence on my way home or while I was |
| 20 | | out, I would. |
| 21 | Q | Okay. So you talked about hooking, |
| 22 | | collecting fees.  Where and when would you |
| 23 | | collect the fees? |
| 24 | A | When I hooked them up, the initial fee was |

```
 1              paid, and then, ever Wednesday, they would

 2              report in and I would check the bracelet

 3              and collect their fees.

 4    Q         And they would report into the courthouse?

 5    A         Yes.

 6    Q         And to the District Court Room?

 7    A         Yes.

 8    Q         And when you were collecting those weekly,

 9              would you be wearing your deputy sheriff

10              uniform?

11    A         If I had worked that day.

12    Q         Okay. I believe that you said earlier that

13              you worked eight hours a day full-time job;

14              right?

15    A         Uh-huh.

16    Q         So did you work five days a week Monday

17              thru Friday or was there a certain day that

18              you didn't work?

19    A         Monday thru Friday.

20    Q         Did people on home incarceration have

21              different conditions as far as what they

22              were or were not allowed to do?

23    A         Unless it was set forth by the Judge bond

24              decision. They had other conditions that
```

| | | |
|---|---|---|
| 1 | | people on house arrest have a set of |
| 2 | | conditions for the house arrest. |
| 3 | Q | Would that mean like this person is allowed |
| 4 | | to work or this one is allowed to go get |
| 5 | | their dialysis treatment every Tuesday was |
| 6 | | it things like that? |
| 7 | A | Yes, medical was allowed for everybody |
| 8 | | obviously.  Working had to be approved by |
| 9 | | the Judge. |
| 10 | Q | So in those situations where someone had a |
| 11 | | special condition I will call it, was it |
| 12 | | your job at the home incarceration officer |
| 13 | | to make sure they were where they were |
| 14 | | suppose to be when they are suppose to be? |
| 15 | A | I didn't view the monitoring. Patty would |
| 16 | | view that and let me know if somebody was |
| 17 | | out of range and then, I would contact |
| 18 | | them. |
| 19 | Q | Okay. But did Patty rely on you to let her |
| 20 | | know what sort of conditions were or |
| 21 | | weren't allowed from the Judge? |
| 22 | A | Yes. |
| 23 | Q | Do you recall East Kentucky Correctional |
| 24 | | Solutions ever getting any sort of permit |

| | | |
|---|---|---|
| 1 | | or filling out an application with the |
| 2 | | Letcher County Sheriff's Department to get |
| 3 | | your work approved for EKCS? |
| 4 | A | I don't know what that would be. |
| 5 | Q | Okay. So that is a no? |
| 6 | A | No, I don't know. |
| 7 | Q | Did you ever get permission, and |
| 8 | | specifically, did you ever fill out a |
| 9 | | permission form the Letcher County |
| 10 | | Sheriff's Office authorizing you to work |
| 11 | | for East Kentucky Correctional Solutions? |
| 12 | A | No, I don't know what that would be. |
| 13 | Q | Okay. Were you aware that you were suppose |
| 14 | | have a filled out some sort of permission |
| 15 | | to work for EKCS? |
| 16 | A | No. |
| 17 | Q | You were paid from East Kentucky |
| 18 | | Correctional Solutions not on an hourly |
| 19 | | basis, but did you receive some sort of |
| 20 | | percentage of fees collected?  Explain to |
| 21 | | be how you were paid? |
| 22 | A | I was paid half of the hookup fee for |
| 23 | | anybody that I hooked and $2.00 per day per |
| 24 | | person that I had on. |

1    Q        Okay. Did you interact at all with your

2             sister, Holly Fields Boggs in your role as

3             a home incarceration officer?

4    A        What do you mean?

5    Q        Did she have any part in the home

6             incarceration program?

7    A        No.

8    Q        What about Robbie Kinzer, I think that he

9             is someone that works in Drug Court?

10   A        No.

11   Q        Okay. So you would get the bond decision

12            from the Judge that this person is approved

13            for home incarceration. Would that be the

14            only sort of point of contact through the

15            courthouse that you would have to then do

16            your home incarceration work, or was there

17            someone else at the courthouse involved in

18            that process?

19   A        Just me.

20   Q        Just you. Okay. What would you do when

21            someone wasn't behaving consistent with the

22            Court's Orders regarding their home

23            incarceration?

24   A        Can you say that again?

| | | |
|---|---|---|
| 1 | Q | Sure. Someone is violating their terms of |
| 2 | | their home incarceration. They are not |
| 3 | | where they are suppose to be or maybe they |
| 4 | | haven't paid. What do you do in that |
| 5 | | situation? |
| 6 | A | I would inform the Judge. |
| 7 | Q | And would there be a form that you would |
| 8 | | submit with that information or would you |
| 9 | | just verbally tell the Judge? |
| 10 | A | I would just verbally tell them. |
| 11 | Q | And would you tell Judge Mullins or Judge |
| 12 | | Craft or would it depend on based on who |
| 13 | | had put that person on home incarceration? |
| 14 | A | Whoever's Court they was in. |
| 15 | Q | Okay. You wold just verbally tell that |
| 16 | | Judge this person is in violation? |
| 17 | A | Yes. |
| 18 | Q | And what did you understand would be the |
| 19 | | consequence after you notified the Judge of |
| 20 | | that? |
| 21 | A | It was up to the Judge. |
| 22 | Q | Okay. And what were the options that the |
| 23 | | Judge might choose from to go from there? |
| 24 | A | Revoking their bond, taking them off house |

| | | |
|---|---|---|
| 1 | | arrest putting back in jail, stuff of that |
| 2 | | nature. |
| 3 | Q | Okay. What is the difference between |
| 4 | | revoking bond and putting them back in |
| 5 | | jail? |
| 6 | A | They might not be, I am not fore sure. |
| 7 | Q | Okay. So if the Judge made the decision |
| 8 | | that this person is no longer allowed to be |
| 9 | | on home incarceration, would you be the one |
| 10 | | that would then go arrest them? |
| 11 | A | I would go and pick them up. I didn't |
| 12 | | really have to arrest them.  The condition |
| 13 | | of their release, I would transport them |
| 14 | | back. |
| 15 | Q | And was that transporting them back, was |
| 16 | | that part of your duties as East Kentucy |
| 17 | | Correctional Solutions person or was that |
| 18 | | part of your duties as deputy sheriff? |
| 19 | A | I guess, as the bailiff, if the Judge told |
| 20 | | me to go and pick somebody up and bring |
| 21 | | them back to the jail that would be part of |
| 22 | | the court security. |
| 23 | Q | Okay. So that was part of your duties as |
| 24 | | court security officer, okay.  I have a |

| | | |
|---|---|---|
| 1 | | couple of questions for you.  This was |
| 2 | | something that you produced. |
| 3 | | **(The document was marked as Exhibit 2)** |
| 4 | Q | This looks to be a text between you and |
| 5 | | Patty Stockham; correct? |
| 6 | A | Yes. |
| 7 | Q | Okay.  And you are talking about a person |
| 8 | | named Katie Larue; is that correct? |
| 9 | A | Yes. |
| 10 | Q | Okay. And Patty is letting you know - - I |
| 11 | | guess Patty is asking you for your opinion |
| 12 | | about whether Katie Larue can go to a |
| 13 | | candle light memorial for her mother; is |
| 14 | | that accurate? |
| 15 | A | Yes. |
| 16 | Q | And she sends this text during a time |
| 17 | | period when Katie Larue was on home |
| 18 | | incarceration; correct? |
| 19 | A | I would imagine. |
| 20 | Q | And did you let Patty Stockham know that |
| 21 | | Katie Larue was your aunt? |
| 22 | A | I don't know if she was legally my aunt at |
| 23 | | that time. |
| 24 | Q | But at some point she was married to your |

| | | |
|---|---|---|
| 1 | | uncle; correct? |
| 2 | A | Yes, as far as I know. |
| 3 | Q | Okay. Well, if during this time period |
| 4 | | Katie Larue had been your aunt or had been |
| 5 | | in a romantic relationship with you uncle, |
| 6 | | do you think that is something that Patty |
| 7 | | should have been made aware of? |
| 8 | A | Can you say that again? |
| 9 | Q | If Katie Larue was indeed your aunt at the |
| 10 | | time that this text was sent or was in some |
| 11 | | sort of romantic relationship with your |
| 12 | | uncle, do you think that a sort of |
| 13 | | information you should have disclosed to |
| 14 | | Patty? |
| 15 | | **MR. KELLY:** Note an objection. Go ahead and |
| 16 | | answer the best you can. |
| 17 | A | Possibly. |
| 18 | Q | Did you ever tell Patty - - Do you ever |
| 19 | | recall telling Patty that Katie Larue was |
| 20 | | you aunt or in some sort of romantic |
| 21 | | relationship with your uncle? |
| 22 | A | Not that I can remember. |
| 23 | Q | And in this text, you let Patty know that |
| 24 | | Katie Larue was not allowed to go to her |

1          mother's candle light memorial; correct?

2     A    Correct.

3     Q    And was that your decision or whose

4          decision was that?  Let me put it this way.

5          Was that your decision that she could not

6          go or was that some term of her home

7          incarceration?

8     A    I am not sure. I don't know if - - I could

9          have been sitting with the Judge at the

10         time and asked him, and he said, no.  I am

11         not sure.

12    Q    Okay. This text to me evidences that Patty

13         looked to you for guidance in your opinion

14         as far as what persons on home

15         incarceration in Letcher could or could not

16         do; is that fair?

17         **MR. KELLY:** Objection as to form.

18    A    She would ask me often about certain things

19         because I would know the conditions of

20         their bond more so than she would or I

21         would have access to ask the Judge on their

22         behalf.

23    Q    In those situations when you would ask the

24         Judge whether someone could or couldn't do

| | | |
|---|---|---|
| 1 | | something, that was always verbal? |
| 2 | A | Most often. Sometimes, I would maybe text |
| 3 | | him, and ask him, and then, he would reply. |
| 4 | Q | Were there other situations where you just |
| 5 | | made that decision on your own about what |
| 6 | | someone on home incarceration could or |
| 7 | | could not do? |
| 8 | A | I am sure that I did. |
| 9 | Q | Okay. And what authority did you have to |
| 10 | | decide the terms of their house arrest? |
| 11 | | **MR. KELLY:** Objection to form. Go ahead and |
| 12 | | answer. |
| 13 | A | If somebody texted me that is house arrest, |
| 14 | | and say, I need to go to the ER, is that |
| 15 | | all right.  I will just tell them yes. |
| 16 | Q | Okay. And I think medical seems like a |
| 17 | | different situation; would you agree? |
| 18 | A | Yeah. |
| 19 | Q | So let's stick to this specific example. |
| 20 | | If someone wants to go to a candle light |
| 21 | | memorial, did you exercise the discretion |
| 22 | | to decide when someone could or could do |
| 23 | | something like that? |
| 24 | A | In general or in this? |

| | | |
|---|---|---|
| 1 | Q | I am talking about this specific example |
| 2 | | but I am also curious more generally? |
| 3 | | **MR. KELLY:** Object to form. Go ahead. |
| 4 | A | I would say that I have made decisions |
| 5 | | before. |
| 6 | Q | Okay. Did the Judge tell you that you had |
| 7 | | authority to make decisions like that? |
| 8 | A | On some people, he would. |
| 9 | Q | Okay. By he, do you mean Judge Mullins? |
| 10 | A | Either Judge. |
| 11 | Q | Was Katie Larue one of those people that |
| 12 | | you had the discretion to make those |
| 13 | | decisions for? |
| 14 | A | I can't remember. |
| 15 | Q | There were some criminal charges against |
| 16 | | your Uncle Bill Meade; correct? |
| 17 | A | Yes. |
| 18 | Q | And did those involve Katie Larue's |
| 19 | | daughter, if you recall? |
| 20 | A | I don't know who it involved. |
| 21 | Q | Okay. |
| 22 | Q | Let's look at another document.  This is |
| 23 | | another one that you produced. |
| 24 | | **(The document was marked as Exhibit 3)** |

| | | |
|---|---|---|
| 1 | Q | So do you recognize this? |
| 2 | A | Yes. |
| 3 | Q | And this looks to be some text messages |
| 4 | | between yourself and Patty Stockham? |
| 5 | A | Yes. |
| 6 | Q | And you are discussing someone named Scott |
| 7 | | Cornett: do you see that? |
| 8 | A | Yes. |
| 9 | Q | And another person named Mark Caudill; do |
| 10 | | you see that? |
| 11 | A | Give me a second. |
| 12 | Q | Sure. |
| 13 | A | Okay. yes. |
| 14 | Q | Were those two persons who were both on |
| 15 | | house arrest? |
| 16 | A | I would imagine. |
| 17 | Q | It looks like Mr. Cornett was behind on his |
| 18 | | home incarceration payments, and Patty |
| 19 | | Stockham says you are threatening them |
| 20 | | jail.  I couldn't do that, lol. Do you see |
| 21 | | that? |
| 22 | A | Yes. |
| 23 | Q | And that is in response to your text where |
| 24 | | you state I have told him that if he |

|   |   |                                                      |
|---|---|------------------------------------------------------|
| 1 |   | doesn't get us paid, I will get a warrant            |
| 2 |   | on him. Do you see that?                             |
| 3 | A | Yeah.                                                |
| 4 | Q | So did you have the authority to get a               |
| 5 |   | warrant due to your position as a deputy             |
| 6 |   | sheriff?                                             |
| 7 | A | My understanding is anybody can get a                |
| 8 |   | warrant.                                             |
| 9 | Q | Okay. Have you gotten warrants on persons            |
| 10 |  | on home incarceration?                               |
| 11 | A | Yes.                                                |
| 12 | Q | Okay. And earlier I remember you saying             |
| 13 |  | that if someone violates the terms of their         |
| 14 |  | home incarceration, the Judge could just            |
| 15 |  | revoke that home incarceration. Is that the         |
| 16 |  | same thing as getting a warrant on someone?         |
| 17 | A | I am sorry.                                          |
| 18 | Q | I thought that I understood you to say              |
| 19 |  | previously in a situation where someone is          |
| 20 |  | on home incarceration, they violate that            |
| 21 |  | home incarceration, I thought I heard you           |
| 22 |  | say that the Judge could just revoke their          |
| 23 |  | ability to be on home incarceration which           |
| 24 |  | doesn't necessarily mean that there is a            |

1                warrant for their arrest; right, because

2                they are already under the control and

3                supervision of the court system; is that

4                accurate?

5        **MR. KELLY:** Note an objection. Is it an Contemp

6        of Court charge.

7        **MS. BAXTER:** I am trying to explore the

8        distinctions.

9  A      The Judge would quite often issue a Bench

10          Warrant for that particular case of the

11          bond being revoked as the cause, but the

12          jail would have something to house them on.

13  Q      Okay. So the Judge could get a Bench

14          Warrant, I guess, in a situation like this

15          when someone hasn't paid their home

16          incarceration fees?

17  A      No. This is talking about me getting a

18          warrant on referring to pay for service,

19          just like if I ran a septic company and

20          done a job and they didn't pay me, I could

21          get a Theft of Services Warrant from my

22          understanding.

23  Q      Okay. And that is what you are talking

24          about further down in this text chain.

| | | |
|---|---|---|
| 1 | | Were you purposing trying to get a warrant |
| 2 | | for Scott Cornett's arrest based on his |
| 3 | | failure to pay the home incarceration fees? |
| 4 | A | I probably told Scott that he has to come |
| 5 | | back and pay me what he owed or I would |
| 6 | | have to get a warrant on him. |
| 7 | Q | And the warrant would be Theft of Services? |
| 8 | A | That is what it looks like. |
| 9 | Q | Did you end up doing that? |
| 10 | A | No. |
| 11 | Q | Have you ever done that? |
| 12 | A | No. |
| 13 | Q | Patty Stockham certainly believed that you |
| 14 | | had the ability to threaten persons on home |
| 15 | | incarceration with jail that she did not |
| 16 | | have that authority? |
| 17 | | **MR. KELLY:** Objection as to what he believed. |
| 18 | | **MS. BAXTER:** I am just reading the text. It says |
| 19 | | but you are threatening them jail. I couldn't do |
| 20 | | that. |
| 21 | | **MR. KELLY:** LOL. |
| 22 | | **MS. BAXTER:** LOL, yeah. |
| 23 | | **MR. KELLY:** What does that mean? |
| 24 | | **MS. BAXTER:** I think it means laugh out loud. |

1    **MR. KELLY:** My objection remains the same.

2    **MS BAXTER:** You can object to form, but you are

3    going way beyond objecting to form.

4    **MR. KELLY:** I don't think so.

5    **MS. BAXTER:** I think you are trying to instruct

6    this witness.

7    **MR. KELLY:** I am objecting to the way that you

8    are portraying the question as if she believes

9    that based upon this text.

10   **MS. BAXTER:** And that is an objection to form.

11   Q    Patty Stockham states: You are threatening

12        them with jail.  I couldn't do that.  My

13        question to you is. Do you agree with

14        Patty?  Did you have the ability to

15        threaten folks with jail and did she not

16        have that ability?

17   A    I don't know what she believed.

18   Q    That is not what I asked. I am asking do

19        you degree - -

20   **MR. KELLY:** I thought it was, but okay.

21   Q    Do you agree that Patty did not the ability

22        to threaten folks with jail, but you did

23        have that ability; do you agree with that

24        statement?

1      **MR. KELLY:** Asked and answered.

2      **MR. SHAW:** I will object to the form, because you

3      are mischaracterizing the statement made.

4  Q      My question is do you agree with this

5         statement regardless if whether it is on

6         the page that you had the ability to

7         threaten people with jail, but Patty

8         Stockham did not have that ability.  Do you

9         agree or disagree that statement?

10     **MR. KELLY:** Objection to form. That is contrary

11     what he said earlier.

12     **MS. BAXTER:** I didn't hear him answer the

13     question that is what I am trying to get him to

14     answer.

15     **MR. KELLY:** He said that anybody had the right to

16     get a warrant. He told you that.

17 Q      Please answer the question?

18 A      Anybody has the right to get a warrant.

19 Q      So you disagree with the idea that Patty

20         did not have that authority to threaten

21         someone with jail?

22 A      I can't speak for her. I don't know how she

23         felt.

24 Q      Okay. Isn't it true that Angie Fields would

| | | |
|---|---|---|
| 1 | | sometimes do some of your tasks for East |
| 2 | | Kentucky Correctional Solutions for you? |
| 3 | A | When I was gone to In-Service training, she |
| 4 | | collected the money at the lobby of the |
| 5 | | jail. |
| 6 | Q | Did Patty Stockham know that she was doing |
| 7 | | that for you? |
| 8 | A | Yes. |
| 9 | | **MR. KELLY:** Again, Objection to form.  Go ahead. |
| 10 | Q | Did you tell Patty that? |
| 11 | A | I am sure that did. |
| 12 | Q | Did you have anyone else in Letcher County |
| 13 | | perform any of your EKCS duties for you? |
| 14 | A | Some people on house arrest would leave |
| 15 | | their money at the jail with the deputy |
| 16 | | jailers if I was away for some reason. |
| 17 | Q | Anybody in particular, any deputy jailers |
| 18 | | in particular? |
| 19 | A | Just whoever was working. |
| 20 | Q | Do you recall someone on home incarceration |
| 21 | | named Carrie Hall? |
| 22 | A | Yes. |
| 23 | Q | Did you give her permission to go to |
| 24 | | Virginia to deliver a meal for a friend; do |

```
1              you recall that?

2    A         I can't recall.

3         MR. KELLY: Is there a time associated with this?

4         MS. BAXTER: No.

5         MR. KellY: Do the best that you can.

6    A         I can't recall.

7         MS. BAXTER: You have a couple of policies with

8         you. I think this is 4.

9         (The document was marked Exhibit 4)

10   Q         My question for you, and feel free to

11             review, have you ever seen this policy

12             before?

13   A         I am sure that I have.

14   Q         Okay. Do you recall if you obtained this

15             policy and reviewed it at the time that you

16             were hired as a Letcher County Deputy

17             Sheriff?

18   A         I would imagine that I would.

19   Q         Okay. And this policy requires your conduct

20             to be beyond reproach on and off duty;

21             correct?

22        MR. KELLY: Objection to form.

23        MS. BAXTER: Let's go off the record and give him

24        a chance to look it over.
```

1    **(A short break was taken)**

2    Q        We took a break. Did you have a chance to

3             review this Ethics Policy that was marked

4             as Exhibit 4 to your deposition?

5    A        Yes.

6    Q        Do you see under the second paragraph where

7             it says policy it says conduct on and off

8             duty must be beyond reproach; do you see

9             that?

10   A        Yes.

11   Q        Okay. And so did you understand that you

12            had to behave consistent with this policy

13            as a Letcher County Sheriff's Deputy?

14   A        What do you mean?

15   Q        Were you suppose to abide by this policy?

16   A        I am sure that I was.

17   Q        Okay. And this policy covers both your

18            conduct on and off duty; would you agree?

19   A        Yes.

20   Q        Okay. Let's talk about the second page, and

21            it talks about abusive positions; do you

22            see that under D; do you see that?

23   A        Yes.

24   Q        Employees shall not use their departmental

|    |   |                                            |
|----|---|--------------------------------------------|
| 1  |   | position, identification card or badge for |
| 2  |   | personal or financial gain; do you see     |
| 3  |   | that?                                      |
| 4  | A | Yes.                                       |
| 5  | Q | And you violated that policy; did you not? |
| 6  |   | **MR. KELLY:** Note an objection.          |
| 7  | A | I am not sure.                             |
| 8  | Q | Okay.                                      |
| 9  |   | **MR. KELLY:** I would also as to what the sanction |
| 10 |   | is that forms the basis of the complaint that is |
| 11 |   | what it does.  It is not violating any     |
| 12 |   | regulation for which he could be punished. |
| 13 | Q | You were ultimately terminated from the    |
| 14 |   | Letcher County Sheriff's Department;       |
| 15 |   | correct?                                   |
| 16 | A | Yes.                                       |
| 17 | Q | Do you know if you were terminated for     |
| 18 |   | violating this policy?                     |
| 19 | A | I am not sure.                             |
| 20 | Q | Were you ever given any reason for why you |
| 21 |   | were being terminated?                     |
| 22 | A | I was given a termination letter.          |
| 23 | Q | Right.  Were you given any reason for why  |
| 24 |   | you were being terminated?                 |

| | | |
|---|---|---|
| 1 | A | I am sure that is was over the allegations |
| 2 | | of the Civil case. |
| 3 | Q | And by the allegations of the civil case |
| 4 | | that is also the criminal case that you |
| 5 | | plead guilty to; correct? |
| 6 | A | Yes. |
| 7 | Q | Okay. I guess, before today, have you ever |
| 8 | | seen this policy? |
| 9 | A | I am sure that I have. |
| 10 | Q | Okay. At the end of this policy it says |
| 11 | | that the department will strive to include |
| 12 | | a component of ethics in all in-service |
| 13 | | training. Do you know what this policy |
| 14 | | means by in-service training? |
| 15 | A | I do not. |
| 16 | Q | And it references annual in-service |
| 17 | | training on ethics; do you see that? |
| 18 | A | Yes. |
| 19 | Q | Do you recall there being any annual or in- |
| 20 | | service training on ethics through the |
| 21 | | Letcher County Sheriff's Department? |
| 22 | A | I can't remember. |
| 23 | | **MS. BAXTER:** Let's set this to the side. And |
| 24 | | this will be marked Exhibit 5. |

1      **(The document was marked as Exhibit 5)**

2      Q      Have you had a chance to review that?

3      A      Yes.

4      Q      Okay. So this is the Letcher County

5             Sheriff's Department Sexual Misconduct

6             Policy, and I am reading under subsection 2

7             which it says policy. It is the policy of

8             this department to train all of their

9             officers concerning the potential for

10            criminal sexual misconduct within the law

11            enforcement.  How to recognize it, and the

12            requirements for reporting violations.  So

13            I just want to know what training did you

14            receive on this policy?

15     A      I am not sure.

16     Q      Do you recall seeing this policy before

17            today?

18     A      I am sure that I have.

19     Q      But do you have any specific memories of

20            seeing this policy before today?

21     A      No.

22     Q      Do you recall receiving any annual training

23            on this policy?

24     A      It is possible.

| | | |
|---|---|---|
| 1 | Q | Are you aware of what the requirements are |
| 2 | | for reporting violations of this sexual |
| 3 | | misconduct policy to the appropriate |
| 4 | | authorities? |
| 5 | | **MR. KELLY:** Objection as to form. |
| 6 | A | I don't understand the question. |
| 7 | Q | It just references training on requirements |
| 8 | | for reporting sexual misconduct.  I was |
| 9 | | just curious do you remember receiving any |
| 10 | | training about how to report sexual |
| 11 | | misconduct, and if so, what was that |
| 12 | | training? |
| 13 | A | I can't remember. |
| 14 | Q | Okay. And this policy defines sexual |
| 15 | | misconduct as sexual activities stemming |
| 16 | | from official duty; correct? |
| 17 | | **MR. KELLY:** You are talking about paragraph 3A; |
| 18 | | is that correct? |
| 19 | | **MS. BAXTER:** 3B. |
| 20 | Q | So sexual misconduct is defined to include |
| 21 | | sexual activity stemming from official |
| 22 | | duty; correct? |
| 23 | A | While on duty. |
| 24 | Q | And it includes use of unofficial position |

| | | |
|---|---|---|
| 1 | | or official resources to obtain information |
| 2 | | for purposes of pursuing sexual conduct; do |
| 3 | | you see that? |
| 4 | A | Yes. |
| 5 | Q | Do you know if you were terminated for |
| 6 | | violating this policy? |
| 7 | A | I can't remember. |
| 8 | Q | Do you recall any sort of policy violation |
| 9 | | coming up during the conversations about |
| 10 | | your termination? |
| 11 | A | It was a termination letter, and I can't |
| 12 | | remember exactly what it said. |
| 13 | Q | Did you just get that letter in the mail or |
| 14 | | was it hand delivered? |
| 15 | A | The Sheriff Stines handed it to me.  I was |
| 16 | | in the parking lot of the courthouse, and |
| 17 | | he was walking back from the county |
| 18 | | attorney's office at the time. |
| 19 | Q | Did he say anything to you when he handed |
| 20 | | it to you? |
| 21 | A | No. |
| 22 | Q | He didn't say a word he just handed it to |
| 23 | | you? |
| 24 | A | I am sure that he said something, but I |

| | | |
|---|---|---|
| 1 | | can't - - I don't know. |
| 2 | Q | Okay. How long did that conversation last? |
| 3 | A | Seconds, if there was one that would be |
| 4 | | considered a conversation. |
| 5 | Q | Okay. I am looking now on the second page |
| 6 | | subsection D, and I just want to confirm |
| 7 | | your understanding.  Do you understand this |
| 8 | | policy to forbid a sheriff's deputy from |
| 9 | | engaging in sexual conduct with someone in |
| 10 | | the custody of law over whom such officer |
| 11 | | has supervisory or disciplinary authority? |
| 12 | | Do you see that? |
| 13 | A | I see where it says that. |
| 14 | Q | And in your role as a deputy sheriff, did |
| 15 | | you have such authority over persons? |
| 16 | A | I don't understand. |
| 17 | Q | We just looked at subsection D it says a |
| 18 | | deputy sheriff is not to engage in sexual |
| 19 | | conduct with persons who are in the custody |
| 20 | | of law or with persons over whom such |
| 21 | | officer has supervisory or disciplinary |
| 22 | | authority. Do you see that? |
| 23 | A | I see where it says that. |
| 24 | Q | Did you have supervisory or disciplinary |

| | | |
|---|---|---|
| 1 | | authority over persons during the time |
| 2 | | period when you were working with the |
| 3 | | sheriff's department? |
| 4 | | **MR. KELLY:** Note an objection.  Are you saying |
| 5 | | that includes the period when he was working for |
| 6 | | East Kentucky Correctional Solutions as well? |
| 7 | | **MS. BAXTER:** Yeah, it was the same time period. |
| 8 | Q | I was asking when you were wearing your |
| 9 | | deputy sheriff hat, did you have |
| 10 | | supervisory or disciplinary authority over |
| 11 | | people? |
| 12 | | **MR. SHAW:** Object to state was major. |
| 13 | A | I don't think I was a supervisor. |
| 14 | Q | Did you have the authority to discipline |
| 15 | | people? |
| 16 | A | Other members of the Sheriff's Office? |
| 17 | Q | No. Members of the public? |
| 18 | A | Do you mean like to arrest somebody? |
| 19 | Q | That is one example. |
| 20 | A | I had arrest powers inside of the |
| 21 | | courthouse. |
| 22 | Q | Did you ever have sexual contact with |
| 23 | | anyone who you ever arrested? |
| 24 | A | No. |

| | | |
|---|---|---|
| 1 | Q | Did you ever have - - YOU did have sexual |
| 2 | | conduct with persons who are on home |
| 3 | | incarceration; correct? |
| 4 | A | One person. |
| 5 | Q | One person.  Who was that person? |
| 6 | A | Sabrina Adkins. |
| 7 | Q | You are denying that you had any sexual |
| 8 | | contact with Brianna Cornett? |
| 9 | A | Yes. |
| 10 | Q | And you deny that you had any sexual |
| 11 | | contact with Jennifer Hill? |
| 12 | A | Yes. |
| 13 | Q | And you deny that you had any sexual with |
| 14 | | any other person who was on home |
| 15 | | incarceration; is that your testimony |
| 16 | | today? |
| 17 | A | Yes. |
| 18 | Q | Where you aware of anybody else in the |
| 19 | | Sheriff's Department who would have |
| 20 | | violated this policy? |
| 21 | A | Not that I am aware of. |
| 22 | Q | Do you recall receiving any specific |
| 23 | | training on this policy? |
| 24 | A | Can't remember. |

| | | |
|---|---|---|
| 1 | Q | I just want to differentiate so it is |
| 2 | | clear. You don't recall having specific |
| 3 | | training on this policy at the time that |
| 4 | | you were hired or on any kind of annual |
| 5 | | basis; is that correct? |
| 6 | A | I can't remember. |

7  **MS. BAXTER:** Let's move on to the next one.

8  **MR. SHAW:** For clarification, are you talking

9  about academy training as well?

10  **MS. BAXTER:** Any training whatsoever when I said

11  at hiring.

12  **MR. KELLY:** Do you have CJT including**?**

13  **MS. BAXTER:** Any training on this policy.  This

14  was the Letcher County Sheriff's policy.

15  **MR. SHAW:** There are state laws so KRS that

16  covers most of this.

17  **MS. BAXTER:** If you want to ask some questions to

18  clarify later, you can.

19  **MR. SHAW:** I was trying to make the record

20  clearer for you.  Ia m trying to help you out

21  here.

22  **MS. BAXTER:** Thank you.

23  **MS. BAXTER:** We are on 6, I believe.

24  **(The document has been marked as Exhibit 6)**

| | | |
|---|---|---|
| 1 | Q | I want to show you one more policy here. |
| 2 | | This policy is three pages, and if you want |
| 3 | | to go off the record so that you can review |
| 4 | | that. Do you need a minute to look at it? |
| 5 | A | Yeah, I think that I do. |
| 6 | | **(A short break was taken)** |
| 7 | Q | You have in front of you a policy from the |
| 8 | | Letcher County Sheriff's Department related |
| 9 | | to secondary employment. Have you had a |
| 10 | | chance to look that over? |
| 11 | A | Yes. |
| 12 | Q | Okay. So there is two different types of |
| 13 | | secondary employment identified in this |
| 14 | | policy. One is extra duties details; do |
| 15 | | you see that? |
| 16 | A | Yes. |
| 17 | Q | Okay. I guess first question, are you aware |
| 18 | | of any other extra duty details that were |
| 19 | | approved under this policy that were |
| 20 | | happening during the time period that you |
| 21 | | were working for the Letcher County |
| 22 | | Sheriff's Department? |
| 23 | A | Not that I know of. |
| 24 | Q | Did East Kentucky Correctional Solutions |

| | | |
|---|---|---|
| 1 | | have approval from the Sheriff's Department |
| 2 | | for extra duty details under this policy to |
| 3 | | your knowledge? |
| 4 | A | Not that I know of. |
| 5 | Q | What about outside employment rather, were |
| 6 | | you aware of anyone aside from yourself who |
| 7 | | worked for the Letcher County Sheriff's |
| 8 | | Department who was engaged in outside |
| 9 | | employment? |
| 10 | A | Not that I can think of. |
| 11 | Q | So you were the only person with a second |
| 12 | | job working for the Letcher County |
| 13 | | Sheriff's Department during that time |
| 14 | | period to your knowledge; nobody had a |
| 15 | | second job aside from you as the best that |
| 16 | | you can recall? |
| 17 | A | Not that I know of. |
| 18 | Q | The home incarceration officer position |
| 19 | | with East Kentucky Correctional Solutions |
| 20 | | that was performance of law enforcement |
| 21 | | duty; was it not? |
| 22 | | **MR. KELLY:** Objection as to form. |
| 23 | | **MR. SHAW:** Objection. |
| 24 | | **MR. KELLY:** Go ahead and answer. |

| | | |
|---|---|---|
| 1 | A | I don't think it was. |
| 2 | Q | Why not. |
| 3 | A | It was a contract company. |
| 4 | Q | It is not whether it was a contract |
| 5 | | company. It was about the kind of work that |
| 6 | | you performed, and the work that you |
| 7 | | performed was in the nature of law |
| 8 | | enforcement duties; wouldn't you agree? |
| 9 | | **MR. SHAW:** Object to form. |
| 10 | | **MR. KELLY:** Same objection. Go ahead and answer. |
| 11 | A | I don't really understand it. |
| 12 | Q | My question is was the work that you |
| 13 | | performed for East Kentucky Correctional |
| 14 | | Solutions in the nature of law enforcement; |
| 15 | | yes or no? |
| 16 | A | I don't think it was. |
| 17 | Q | And then, what kind of duties were they, if |
| 18 | | not law enforcement? |
| 19 | A | I mean they had to be on house arrest. If |
| 20 | | an inmate condition was to go to rehab, is |
| 21 | | rehab a law enforcement agency? I am just |
| 22 | | confused about the question itself, I |
| 23 | | guess. I don't feel like it is. |
| 24 | Q | Okay. I am just trying to ask you why you |

| | | |
|---|---|---|
| 1 | | don't feel like it is.  And do you want to |
| 2 | | add to your answer or do you want to leave |
| 3 | | it at that? |
| 4 | A | No, just at that. |
| 5 | Q | Do you recall seeing this policy before |
| 6 | | today? |
| 7 | A | Not specifically. |
| 8 | Q | Do you know if the Letcher County Sheriff's |
| 9 | | Department is an accredited Department? |
| 10 | | **MR. KELLY:** I am sorry. |
| 11 | Q | Does it have any kind of accreditation? |
| 12 | | **MR. KELLY:** Accredited by whom? |
| 13 | Q | Well, I think the Commission on accredited |
| 14 | | law agencies is referenced that is standard |
| 15 | | reference the KALEA.  So to you knowledge |
| 16 | | is the Letcher County Sheriff's Office |
| 17 | | accredited? |
| 18 | A | I don't know. |
| 19 | | **MR. SHAW:** What did you say KLEA? |
| 20 | | **MR. KELLY:** I thought there was AJA was the |
| 21 | | only accreditation. |
| 22 | | **MR. SHAW:** The Kentucky Law Enforcement |
| 23 | | Association, maybe. |
| 24 | | **MS. BAXTER:** I don't know what KALEA stood for |

1      and believe it stands for the The Commission on

2      Accredited Law Enforement Agencies.

3      **MR. SHAW:** K OR C?

4      **MS. BAXTER:** I am sorry, C.

5      **MR. SHAW:** All right.

6      **MS. BAXTER:** Good catch. CALEA that is referenced

7      in the policy.

8   Q      Next I have got a number of facebook

9          communications, and I am really just trying

10         to figure out if you recall sending or

11         receiving them, and just to confirm who is

12         a party to these.  I will tell you what I

13         have got is what I was able to get through

14         open records request from the Attorney

15         General's office, and some of it is

16         redacted.  That is all that I have been

17         able to get, and we have worked hard to try

18         problem solve this.  What I think I

19         understood to testify to previously is you

20         have all of these records at your house?

21     **MR. KELLY:** I don't know that knew he that.

22  Q      As part of the Attorney General's

23         production that you were referencing; is

24         that significant portion of it facebook

| | | |
|---|---|---|
| 1 | | communications? |
| 2 | A | No, I don't believe it was. Not that I |
| 3 | | remember. |
| 4 | Q | Okay. So what is it? |
| 5 | | **MR. KELLY:** I don't think he has what you think |
| 6 | | he has. |
| 7 | | **MS. BAXTER:** And he may not. I am trying to |
| 8 | | figure out what he has. |
| 9 | Q | What do you have? |
| 10 | | **MR.. KELLY:** I think it is things that he got |
| 11 | | from his criminal - - |
| 12 | | **MS. BAXTER:** Let him answer for his self. Quit |
| 13 | | trying to answer for him. |
| 14 | | **MR. KELLY:** Okay. Go ahead. |
| 15 | A | What was it - - |
| 16 | Q | What do you have at your house? You |
| 17 | | referenced that you had a bunch of |
| 18 | | documents from your criminal case, and you |
| 19 | | said that you had looked at them. So what |
| 20 | | are these documents that you have? |
| 21 | A | I think they were like a AT&T Report of |
| 22 | | phone numbers. |
| 23 | Q | Okay. |
| 24 | A | That is the bulk of it. |

| | | |
|---|---|---|
| 1 | Q | Okay. Do you recall having a bunch of |
| 2 | | facebook communications? |
| 3 | A | No, I don't remember that at all. |
| 4 | Q | Any audio recordings? |
| 5 | A | No. |
| 6 | Q | And those were documents that you got |
| 7 | | through the criminal case? |
| 8 | A | I believe so. I am thinking so. |
| 9 | Q | Anything aside from phone records? |
| 10 | A | There could be some pictures or some |
| 11 | | records of the house arrest form.  That is |
| 12 | | all that really sticks out. |
| 13 | Q | Whatever you have, I ask that you give it |
| 14 | | to your attorney, because we asked for that |
| 15 | | in Discovery, and I want to be able to look |
| 16 | | at that. Okay. |
| 17 | | **MR. KELLY:** You asked for two things from us, and |
| 18 | | I forgot what the first thing was.    . |
| 19 | | **MS. BAXTER:** A bunch of family members. |
| 20 | | **MR. KELLY:** Will you send me a letter? |
| 21 | | **MS. BAXTER:** Yes, of course. |
| 22 | | **(The document has been marked Exhibit 7)** |
| 23 | Q | So on this first page of this document, do |
| 24 | | you see a woman ankle with an ankle monitor |

| | | |
|---|---|---|
| 1 | | on it? |
| 2 | A | Yes. |
| 3 | Q | Do you know whose ankle that is? |
| 4 | A | I can't make out the face. |
| 5 | Q | Okay. Do you recall Jason Eckels sending |
| 6 | | this image to you in July of 2021? |
| 7 | A | I don't recall it. |
| 8 | Q | Flip over to the second page. Do you see at |
| 9 | | the top of the page Jason Eckels writes to |
| 10 | | you.  Ben band is a fashionable part of any |
| 11 | | wardrobe; do you see that? |
| 12 | A | Yes. |
| 13 | Q | And he was talking about that ankle |
| 14 | | monitor; wasn't he? |
| 15 | A | I would imagine. |
| 16 | Q | Did you refer to ankle monitors as Ben |
| 17 | | bands yourself? |
| 18 | A | I never. |
| 19 | Q | But Jason did? |
| 20 | A | That is what it looks like. |
| 21 | Q | Do you know why he would have been |
| 22 | | referring to an ankle monitor as a Ben |
| 23 | | band? |
| 24 | A | I guess, because it is band, and I am over |

| | | |
|---|---|---|
| 1 | | house arrest, and my name is Ben. I don't |
| 2 | | mean for that to sound rude. |
| 3 | Q | I didn't take that as rude.  You are fine. |
| 4 | | It looks like you responded to Jason |
| 5 | | Eckels, but it is just a bunch of |
| 6 | | rectangles; do you see that? |
| 7 | A | Yes. |
| 8 | Q | Would you still have this facebook message |
| 9 | | correspondence to figure what sort of - - I |
| 10 | | think those are probably emojis that got |
| 11 | | converted into rectangles.  Do you have |
| 12 | | access to this to know what sort of |
| 13 | | response you sent to him on July 17th? |
| 14 | A | I am not sure if I still have it or not. |
| 15 | Q | I will ask you to look and see? |
| 16 | A | All right. |
| 17 | Q | And Jason Eckels, he worked with you as a |
| 18 | | deputy sheriff; correct? |
| 19 | A | Yes. |
| 20 | Q | And also, I guess, as a court security |
| 21 | | officer; correct? |
| 22 | A | It is the same. |
| 23 | Q | But he had that same position within the |
| 24 | | deputy sheriff's Office as you? |

1    A       Yes.

2    Q       Are you aware of anybody else referring to

3            an ankle monitor as a Ben band aside from

4            Jason Eckels?

5    A       Off the top of my head, I can't think of

6            anybody.

7    Q       Okay. And at the time that you two were

8            having this conversation, you were both

9            employed by the Letcher County Sheriff's

10           Department; correct?

11      **MR. KELLY:** What is the date on it?

12      **MS. BAXTER:** July 17, 2021.

13   A       I was.  I am not sure when he started he

14           could have been working at the time.

15   Q       Well, you started in 2019; correct?

16   A       Yes.

17   Q       Does that help refresh your recollection

18           about when he would have started?

19   A       It don't.

20   Q       Okay. Let's put this aside.

21      **(The document has been marked as Exhibit 8)**

22   Q       Okay.  My first question is this looks to

23           be part of a facebook message communication

24           between yourself and Sheriff Stines; is

| | | |
|---|---|---|
| 1 | | that correct? Would you agree with that? |
| 2 | A | Yeah, that is what it looks like. |
| 3 | Q | Okay. And it looks like it is a |
| 4 | | conversation from August 19, 2021; do you |
| 5 | | agree? |
| 6 | A | It starts on the 18th, August 18th on the top |
| 7 | | line. |
| 8 | Q | Okay. So August 18th to 19th, 20 and 21? |
| 9 | A | Okay. |
| 10 | Q | And look at the second page. Did you create |
| 11 | | that image? |
| 12 | A | It is possible. |
| 13 | Q | Okay. Well, whose face it is on the top of |
| 14 | | that image? |
| 15 | A | Sheriff Stine's. |
| 16 | Q | Okay. Whose face is it on the bottom with |
| 17 | | the deputy sheriff hat on? |
| 18 | A | Jason Eckels. |
| 19 | Q | Okay. And did you cut and paste their faces |
| 20 | | on to this statue? |
| 21 | A | Yes, I am pretty sure that I did. |
| 22 | Q | Why did you do that? |
| 23 | A | As a joke. |
| 24 | Q | Why was that a joke or help me understand |

1       why that was funny?

2   A   Just a joke.

3   Q   Did you have any conversation with Sheriff

4       Stines about this before that you did it?

5   A   No.

6   Q   Did he ask you to do it?

7   A   No.

8   Q   Well, you sent this image to him; correct?

9   A   Yes.

10  Q   And then, flip it over to the 4th page of

11      the exhibit, and there is a new face that

12      appears over the penis of this statue.

13      Whose face is that?

14  A   I think maybe James Norris.

15  Q   Was James Norris another deputy sheriff?

16  A   Yes.

17  Q   At least in this picture from August of

18      2021, James Eckels is wearing a deputy

19      sheriff hat; correct?

20  A   Yes.

21  Q   So does that refresh your recollection

22      about whether he was a deputy sheriff at

23      least in August of 2021?

24  A   I suppose so.

| | | |
|---|---|---|
| 1 | Q | Okay. And you sen this to Sheriff Stines as |
| 2 | | well; did you not? |
| 3 | A | Yeah, it says it. |
| 4 | Q | Okay. And then, look at the last page. You |
| 5 | | told Sheriff Stines, I have censored it, |
| 6 | | and his response was is that is great. DO |
| 7 | | you see that? |
| 8 | A | Yes. |
| 9 | Q | Okay. Did you guys discuss this outside of |
| 10 | | the facebook message chain? |
| 11 | A | What do you mean? |
| 12 | Q | Like, was there any other conversations |
| 13 | | about these images that is not represented |
| 14 | | on this exhibit? |
| 15 | A | Not that I can think of. |
| 16 | Q | Did you ever get reprimanded or disciplined |
| 17 | | for creating this image and sending it to |
| 18 | | the Sheriff? |
| 19 | A | Not that I am aware of. |
| 20 | Q | And then, it looks like Sheriff Stines says |
| 21 | | I sent it in the group; do you see that? |
| 22 | A | Yeah. |
| 23 | Q | Do you know what he is referring to when he |
| 24 | | says in the group? |

| | | |
|---|---|---|
| 1 | A | Not off the top of my head. |
| 2 | Q | Okay. Did Sheriff Stines ever give you any |
| 3 | | kind response about these images that you |
| 4 | | created aside stating that is great? |
| 5 | A | Not that I can remember. |
| 6 | Q | Okay. That is all that I have got for that |
| 7 | | one. |
| 8 | | **(The document has been marked Exhibit 9)** |
| 9 | Q | This looks to me to be a facebook message |
| 10 | | thread between yourself, Jason Eckels, Seth |
| 11 | | Whitaker, and James Norris. I am wondering |
| 12 | | if you would agree with that? |
| 13 | A | That is the names that I see. |
| 14 | Q | Those are the names that I saw as well. And |
| 15 | | it looks like the dates on these |
| 16 | | communications were October 3, 2021 through |
| 17 | | October 16, 201; do you agree? |
| 18 | A | Yes. |
| 19 | Q | And during that time period, yourself, |
| 20 | | Jason Eckels, Seth Whitaker, and James |
| 21 | | Norris were all deputy sheriffs with the |
| 22 | | Letcher County Sheriff's Department; |
| 23 | | correct? |
| 24 | A | Yes, I believe so. |

| | | |
|---|---|---|
| 1 | Q | Okay. I was curious about the picture that |
| 2 | | was on the page marked at the bottom 23646; |
| 3 | | do you see that? |
| 4 | A | Yes. |
| 5 | Q | Is that your head that has been |
| 6 | | photoshopped on the body on the far left? |
| 7 | A | Yes. |
| 8 | Q | Who's the person to your - - you know, the |
| 9 | | next person towards the person to the right |
| 10 | | of you? |
| 11 | A | Seth Whitaker. |
| 12 | Q | Okay. And who is the person to the right of |
| 13 | | Seth Whitaker? |
| 14 | A | James Norris. |
| 15 | Q | Okay. And that looks to be the same face |
| 16 | | that I saw previously, so that is Jason |
| 17 | | Eckels; is that correct? |
| 18 | A | Yes. |
| 19 | Q | And then, you have a bunch of KFC on a |
| 20 | | table that you are looking at? |
| 21 | A | Yes. |
| 22 | Q | Why did you create this image? |
| 23 | A | I don't know. |
| 24 | Q | You don't remember any of the context for |

| | | |
|---|---|---|
| 1 | | why - - Did you create it because you |
| 2 | | thought it was funny? |
| 3 | A | Possibly, I am sure it was. |
| 4 | Q | Okay. Those are all of the questions that I |
| 5 | | have on this one. But do you recall this |
| 6 | | exchange I will say? |
| 7 | A | Just one sitting, I don't remember what I |
| 8 | | was doing during this time. |
| 9 | Q | But you remember this facebook and these |
| 10 | | images between you and your fellow |
| 11 | | deputies; correct? |
| 12 | A | Yes. |
| 13 | | **(The document has been marked Exhibit 10)** |
| 14 | Q | This is communications between yourself, |
| 15 | | Jason Eckels and Seth Whitaker dated |
| 16 | | October 16, 2021; would you agree with |
| 17 | | that? |
| 18 | A | Yes. |
| 19 | Q | Okay. And I again, on that date, all of |
| 20 | | three of you were working with the Letcher |
| 21 | | County Sheriff's Department; correct? |
| 22 | A | Yes. |
| 23 | Q | Okay. And it looks to me the way that I |
| 24 | | read this, do you recall sending the image |

| | | |
|---|---|---|
| 1 | | that on the page marked at the bottom 23666 |
| 2 | | to your fellow deputies? |
| 3 | A | I don't recall it. |
| 4 | Q | By your read of this exhibit, does that |
| 5 | | appear to be the case that you sent that |
| 6 | | image? |
| 7 | A | Yes. |
| 8 | Q | Okay. And the same question for the image |
| 9 | | on the page marked 236667; does that appear |
| 10 | | to be an image that you shared with your |
| 11 | | co-workers? |
| 12 | A | That is what it says. |
| 13 | Q | Okay. And then, also the image on the page |
| 14 | | marked 236668. Do you remember sending that |
| 15 | | image? |
| 16 | A | Not specifically. |
| 17 | Q | Based on your review of this exhibit, would |
| 18 | | you agree that you were the one that who |
| 19 | | sent that image to your co-workers? |
| 20 | A | Yes. |
| 21 | Q | Okay. And again, same question with the |
| 22 | | image on the page marked 236669.  Did you |
| 23 | | send that image? |
| 24 | A | That is what it looks like. |

| | | |
|---|---|---|
| 1 | Q | And then, there is an image on the page |
| 2 | | marked 23673. Do you remember sending that |
| 3 | | image? |
| 4 | A | I don't remember it, but that is what it |
| 5 | | says. |
| 6 | Q | It appears to show that you did send that |
| 7 | | image to your co-workers; right? |
| 8 | A | Yes. |
| 9 | Q | Okay. And then, there is a image on 23674, |
| 10 | | and then, on 23675. Do you see those two? |
| 11 | A | Yes. |
| 12 | Q | Okay. Were you the one that photoshopped |
| 13 | | Mr. Ecekls face on to that image? |
| 14 | A | I could have. |
| 15 | Q | Okay. Do you recall doing that? |
| 16 | A | I don't recall doing it, but I sent it, it |
| 17 | | is saying, so. |
| 18 | Q | Okay. Were you ever disciplined or were any |
| 19 | | of your fellow deputies ever disciplined as |
| 20 | | a result of any of these facebook |
| 21 | | communications that we just reviewed? |
| 22 | A | Not that I know of. |
| 23 | Q | Okay. Did you report any of these |
| 24 | | communications to the sheriff or anybody at |

1       any point?

2   A   Not that I know of.

3   Q   Okay. I have another one here.

4       **(The document was marked Exhibit 11)**

5       And this looks to be some communication

6       between yourself and Deputy Eckels dated

7       October 12 to October 13 of 2021; do you

8       see that?

9   A   Yes.

10  Q   Okay. And it looks like Deputy Eckels is

11      asking you to photoshop someone named Kevin

12      head on to an image; do you see that?

13  A   Yes.

14  Q   Is that Judge Kevin Mullins?

15  A   Yes.

16  Q   Do you know why he would have asked you to

17      do that?

18  A   I don't.

19  Q   You never talked about it outside of this

20      document?

21  A   I guess he thought it would be funny.

22  Q   Okay. Do you know if he ever shared to

23      Judge Mullins?

24  A   I am not sure.

| | | |
|---|---|---|
| 1 | Q | Okay. And then, if you flip over another |
| 2 | | page, do you see that image - - it looks to |
| 3 | | be that you sent this image to Mr. Eckels |
| 4 | | and it shows that same picture with Judge |
| 5 | | Mullins head photoshopped on it, and then, |
| 6 | | there two women on either side of him? |
| 7 | A | Yes. |
| 8 | Q | Who are those women? |
| 9 | A | Jason Eckels's wife and his mother. |
| 10 | Q | What are their names? |
| 11 | A | His wife's name is Danielle. |
| 12 | Q | Eckels, I guess? |
| 13 | A | Yes. |
| 14 | Q | And then, that is his mother? |
| 15 | A | Yes. |
| 16 | Q | What is her name? |
| 17 | A | I don't know. |
| 18 | Q | How did you get the picture of his mom? |
| 19 | A | Probably off of facebook. |
| 20 | Q | Is Jason Eckels wife and mother related to |
| 21 | | Judge Mullins? |
| 22 | A | Not that I know of. |
| 23 | Q | Why did you put on top there nothing is |
| 24 | | better than a close family; do you see that |

| | | |
|---|---|---|
| 1 | | written on there? |
| 2 | A | Yes. |
| 3 | Q | Why did you write that? |
| 4 | A | I don't know. |
| 5 | Q | Okay. On that same page towards the top, |
| 6 | | you and Mr. Eckels are talking about taking |
| 7 | | a kid back, and Jason says I let him drive |
| 8 | | so that I can nap.  Do you recall what you |
| 9 | | all were referring to in that conversation? |
| 10 | A | He probably transported a juvenile back to |
| 11 | | Breathitt County. |
| 12 | Q | And he is saying that he let this juvenile |
| 13 | | defendant drive, so he could nap? |
| 14 | A | That is what he said. |
| 15 | Q | Okay. Do you have any idea who that |
| 16 | | juvenile defendant would have been? |
| 17 | A | No. |
| 18 | | **(The document was marked Exhibit 12)** |
| 19 | Q | Who is Joe Scott Ingram? |
| 20 | A | I am not sure. |
| 21 | Q | He writes to you and writes to you and says |
| 22 | | good morning Ben, and you write good |
| 23 | | morning to Joe. Do you see that? |
| 24 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | And then, this Joe Scott Ingram asks, would |
| 2 | | you be willing to come in and do Jennifer |
| 3 | | Potter's house arrest today. Do you see |
| 4 | | that? |
| 5 | A | Yes. |
| 6 | Q | So does that refresh your recollection |
| 7 | | about who Joe Scott Ingram would have been? |
| 8 | A | I guess, it was somebody wanting to get |
| 9 | | Jennifer Potter out on house arrest. |
| 10 | Q | Okay. Is that normal for like third party |
| 11 | | person to try to - - to contact you like |
| 12 | | that through facebook and ask you get |
| 13 | | someone - - or do someone's house arrest? |
| 14 | A | Yes. |
| 15 | Q | Okay. Do you remember if you actually went |
| 16 | | down to - - Where would have gone to put |
| 17 | | her on house arrest when it says come in, |
| 18 | | where would that be? |
| 19 | A | Probably at the jail. |
| 20 | Q | Okay. So to the best of your recollection, |
| 21 | | this person asking you to go down to the |
| 22 | | jail, and put a ankle monitor on her? |
| 23 | A | That it sounds like. |
| 24 | | **MS. BAXTER:** Okay. That was all that I was |

1        curious about on that one.  I think right now

2        might be a good time to take a break.

3        **(A lunch break was taken)**

4   Q      Mr. Fields, we are back from our lunch

5        break.  I want to ask you about some

6        women's names that I have, and see if you

7        know any of these persons.  The first

8        person I am going to ask you about is

9        Chrystal Dishman.  Do you know Chrystal

10        Dishman?

11   A      I know a Chrystal Dishman.

12   Q      From Letcher County?

13   A      Yes.

14   Q      Have you ever told Chrystal Dishman that

15        you could help her with criminal legal

16        issues in exchange for sexual favors?

17   **MR. KELLY:** Hold on right there.  This is an

18        instance we talked about before. I don't think

19        it is relevant, but it also implicates.  The

20        fifth amendment considerations.  You would have

21        to announce to her that you are going to

22        exercise those rights, but it is up to you. Go

23        head.

24   Q      Did you ever tell Chrystal Dishman that you

| | | |
|---|---|---|
| 1 | | could give her help with criminal legal |
| 2 | | issues in exchange for sexual favors? |
| 3 | A | No. |
| 4 | Q | Have you ever had any sexual contact with |
| 5 | | Chrystal Dishman? |
| 6 | A | No. |
| 7 | Q | Okay. Tommie Conley.  Do you remember |
| 8 | | Tommie Conley? |
| 9 | | **MR. KELLY:** Is that a woman? |
| 10 | | **Ms. BAXTER:** It is a woman. |
| 11 | Q | She was on home incarceration for a period |
| 12 | | of time; do you remember her? |
| 13 | A | No. |
| 14 | Q | Have you ever been alone with her in the |
| 15 | | Judge's Chambers at the Letcher County |
| 16 | | Courthouse? |
| 17 | | **MR. KELLY:** The same admonition that I gave you |
| 18 | | earlier. Go ahead. |
| 19 | A | No. |
| 20 | Q | Have you ever had any sexual contact with |
| 21 | | her? |
| 22 | A | No. |
| 23 | Q | What about Amanda Shields? |
| 24 | A | I don't know anybody by that name. |

```
1    Q        So I think that I know your answer, but

2             have you ever had any sexual contact with

3             Amanda Shields?

4    A        No.

5    Q        What about Bobbi Stamper?  Have you ever

6             had any sexual contact with Bobbi Stamper?

7    A        No.

8         MR. KELLY: The same admonition.

9    Q        What about Bobbi Sue Hall? Have you ever

10            had any sexual contact with Bobbi Sue Hall?

11   A        No.

12   Q        What about Chrystal Johnson?  Have youever

13            had any sexual contact with Chrystal

14            Johnson?

15   A        No.

16   Q        What about Jennifer Potter?  Have you had

17            any sexual contact with Jennifer Potter?

18   A        No.

19        MR. KELLY: Same admonition.

20   Q        Do you know anything about a relationship

21            between Judge Mullins and a Virginia

22            Potter?

23   A        No.

24   Q        Never heard anything about that?
```

```
 1   A        No.

 2   Q        Do you know who Virginia Potter is?

 3   A        The name sounds familiar, but I can't place

 4            the person.

 5   Q        What about Kerri Hall?  Have you ever had

 6            any sexual contact with Kerri Hall?

 7        MR. KELLY: That same admonition?

 8   A        No.

 9   Q        What about Rebecca Hall?

10        MR. KELLY: Same admontion.

11            Have you ever had sexual with Rebecca Hall?

12   A        No.

13   Q        Mahalia Sizemore, have you ever had any

14            sexual contact with Mahalia Sizemore?

15        MR. KELLY: The same admonition.

16   A        No.

17   Q        And finally, Misty Smallwood, have you ever

18            had any sexual contact with Misty

19            Smallwood?

20        MR. KELLY: Same admonition.

21   A        No.

22   Q        Of the persons that I just named, have you

23            ever engaged in any sort of flirtatious

24            communications with any of those woman?
```

```
1    A         No.

2    Q         Okay. I want to know about Brianna Cornett.

3              Am I correct that you plea guilty to

4              tampering with a prisoner's monitoring

5              device related to - - I guess was one of

6              those tampering with a prisoner's monitor

7              device charges related to Brianna Cornett?

8         MR. KELLY: She as number 3, am I correct on the

9         Indictment?

10        MS. BAXTER: I am not sure.  That sounds right.

11        MR. KELLY: I think she was number 3.

12   A         What was the question?

13   Q         Did you plea guilty to tampering with a

14             prisoner's monitoring device in relation to

15             Brianna Cornett?

16        MR. KELLY: Hold on a second.

17        MS. BAXTER: Are you looking for a document that

18        you want to show to Mr. Fields?

19        MR. KELLY: Yeah.

20        MS. BAXTER: Okay. Can I see that document?

21        MR. KELLY: Sure. It is my understanding it is

22        public record.

23        MR. SHAW: Can I see that?

24        MS. BAXTER: Sure.
```

| | | |
|---|---|---|
| 1 | Q | This is a page from your Plea Agreement; |
| 2 | | does that sound accurate? |
| 3 | **MR. KELLY:** It is. | |
| 4 | Q | Okay. So does that document help refresh |
| 5 | | your recollection about whether or not |
| 6 | | Brianna Cornett and you interactions with |
| 7 | | her resulted in your pleading guilty to |
| 8 | | tampering with a prisoner's monitoring |
| 9 | | device? |
| 10 | A | Yes. |
| 11 | Q | And did you plea guilty to that charge |
| 12 | | related to Brianna Cornett because you are |
| 13 | | guilty? |
| 14 | A | Yes. |
| 15 | Q | And what did you do to tamper with Brianna |
| 16 | | Cornett's monitoring device? |
| 17 | A | She didn't have a home phone at the time, |
| 18 | | and I deactivated her bracelet for a couple |
| 19 | | of days until that I got a GPS monitor for |
| 20 | | her. |
| 21 | Q | Okay. So why would she have to have a home |
| 22 | | phone to have a working ankle monitor? |
| 23 | A | The old units ran off the landline. |
| 24 | Q | Okay. Would that action have occurred back |

| | | |
|---|---|---|
| 1 | | in 2020? |
| 2 | A | I can't remember when it happened. |
| 3 | Q | But at some point in time, EKCS |
| 4 | | transitioned their ankle monitors from ones |
| 5 | | that you would have to plug into the wall |
| 6 | | to ones that worked off of GPS; correct? |
| 7 | A | Yes. |
| 8 | Q | Okay. And it is your testimony that was |
| 9 | | only for a couple of day sis that what you |
| 10 | | are saying? |
| 11 | A | Yes. |
| 12 | Q | Did you ever exchange snapchat messages |
| 13 | | with Brianna Cornett? |
| 14 | A | No. |
| 15 | Q | Did you ever engage in any flirtatious |
| 16 | | communications with Brianna Cornett? |
| 17 | | **MR. KELLY:** Do you want to go out? |
| 18 | A | Yes. |
| 19 | | **MR. KELLY:** We will take a minute. |
| 20 | Q | I just know that I have asked you a |
| 21 | | question and you are not answering it. But |
| 22 | | in light of the question, I am going to |
| 23 | | agree that is fine if you guys want to take |
| 24 | | a break. |

1      **(A break was taken)**

2    Q      We are back on the record. The question

3           that I have for you is did you ever engage

4           in any flirtation communications with

5           Biranna Cornett and are you ready to answer

6           that question?

7    A      Yes.  Yes.

8    Q      Yes, you did. Okay. What was the time

9           period when you engaged in those

10          flirtatious communications with Brianna?

11   A      I don't know the actual dates.

12   Q      Well, let's start here.  Did it occur when

13          you were a home incarceration officer?

14   A      Yes.

15   Q      Did it occur while you were also a deputy

16          sheriff?

17   A      Yes.

18   Q      Did those flirtatious communications begin

19          prior you taking off her ankle her off home

20          incarceration?  Let me prefix that.  Prior

21          to you tampering with her monitoring

22          device?

23       **MR. KELLY:** I am sorry. What was ultimately the

24          question.

1        **MS. BAXTER:** Let me repeat it.

2    Q        Did the flirtatious communications begin

3             prior to you tampering with her monitoring

4             device?

5    A        Yes.

6    Q        Okay. Did you at any time give Brianna

7             Cornett a fake or dummy ankle monitor?

8    A        I never gave her a fake one.  It was just

9             one that was deactivated.

10   Q        Okay. And at what time period, did you give

11            her the deactivated ankle monitor?

12   A        When I had her deactivated.

13   Q        And that was for a period of how many days?

14   A        I believe just a couple.

15   Q        And what did you tell Patty Stockham, if

16            anything, about why she has been

17            deactivated?

18   A        Just that she was to be took off house

19            arrest.

20   Q        So you told Patty Stockham that she has

21            been taken off house arrest by the Judge?

22   A        Yes.

23   Q        And that was a lie; correct?

24   A        Yes.

| | | |
|---|---|---|
| 1 | Q | And then, I guess a couple of days later, |
| 2 | | you turned around and told Patty Stockham, |
| 3 | | okay, we have to reactivate her now? |
| 4 | A | I believe so. |
| 5 | Q | When you engaged in flirtatious |
| 6 | | communications with Brianna Cornett, did |
| 7 | | she ever send you any photos of herself? |
| 8 | A | Not that I can remember. |
| 9 | Q | Have you ever been alone with Brianna |
| 10 | | Cornett in the Judge's Chambers of the |
| 11 | | Letcher County Courthouse? |
| 12 | A | No. |
| 13 | Q | So do you deny that you have ever kissed |
| 14 | | Biranna Cornett? |
| 15 | A | Yes. |
| 16 | Q | Did Patty Stockham that she wanted to |
| 17 | | revoke Brianna Cornett's home |
| 18 | | incarceration? |
| 19 | A | I can't remember. |
| 20 | Q | Did you ever tell Brianna Cornett that she |
| 21 | | did not have to pay her home incarceration |
| 22 | | fees? |
| 23 | A | No. |
| 24 | Q | Did Brianna Cornett always pay her home |

1       incarceration fee?

2    A      As far as I remember, yes.

3    Q      And she would meet you at the courthouse

4           ever week to do that?

5    A      Yes.

6    Q      Did you ever send any sexual explicit

7           communications to Brinana Cornett?

8    A      Like a message?

9    Q      Yeah.

10      **MR. KELLY:** Do you know the message?

11      **MS. BAXTER:** I don't need to answer your

12      questions. I am asking him questions.

13      **MR. KELLY:** I don't understand what sexually

14      explicit is.  It is confusing.

15   Q      Did you ever talk to her about oral sex?

16   A      I can't remember.

17   Q      Did you understand what I mean when I said

18          sexual explicit?

19   A      Not really a 100 percent.

20   Q      Okay. Well, if you are confused, you can

21          let me know.

22      **MR. KELLY:** Well, I am going to let you know,

23      too.  I will join in the chorus.

24   Q      Were you aware that Christi Fultz contacted

```
1          Mickey Stines at some point about your
2          supervison of Brianna Cornett on home
3          incarceration?
4     A    Not that I can think of.
5     Q    Were you aware of anyone other than Christi
6          Fultz contacting Mickey Stines about your
7          supervison of Brianna Cornett on home
8          incarceration?
9     A    Not that I can think of.
10    Q    Do you know who Christi Fultz is?
11    A    Is that her mother?
12    Q    Yeah, Brianna Cornett's mother. Did you at
13         some point go and pick up Brianna and take
14         her to the jail; do you recall ever doing
15         that?
16    A    Yes.
17    Q    Why did you do that?
18    A    She had violated her house arrest.
19    Q    Okay. Why couldn't she have just turned
20         herself in?
21    A    She was - - I can't remember, but she was
22         at her mother's house, and her mother
23         contacted me to come and get her.
24    Q    Okay. So you went and picked her up, and
```

| | | |
|---|---|---|
| 1 | | you took her to the jail? |
| 2 | A | Yes. |
| 3 | Q | Do you recall having some of her |
| 4 | | belongings? |
| 5 | A | I can't remember. |
| 6 | Q | Did you kiss Biranna Cornett in your |
| 7 | | Sheriff's Department vehicle? |
| 8 | A | No. |
| 9 | Q | You deny that? |
| 10 | A | Yes. |
| 11 | Q | And when you were picking Brianna up to |
| 12 | | take her to jail, was that because she |
| 13 | | violated the terms of her home |
| 14 | | incarceration? |
| 15 | A | Yes. |
| 16 | Q | Okay. How had she violated them? |
| 17 | A | I believe that she left the residence she |
| 18 | | was suppose to stay at, and her mother |
| 19 | | refused to let her stay with her. |
| 20 | Q | Okay. Do you recall what the residence was |
| 21 | | that she was suppose to be staying at? |
| 22 | A | I do not. |
| 23 | Q | Are you aware of any relationship between |
| 24 | | Brianna Cornett and Judge Mullins? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you recall there being any specific |
| 3 | | terms of Brianna Cornett's home |
| 4 | | incarceration that she was suppose to abide |
| 5 | | by? |
| 6 | A | I am not sure. |
| 7 | Q | Where would it be documented if any were? |
| 8 | A | Possibly on her bond decision. |
| 9 | Q | Okay. I have one document that I need to |
| 10 | | ask you about. |
| 11 | | **(The document was marked Exhibit 13)** |
| 12 | | Just wondering about the communication at |
| 13 | | the bottom.  Again, I got these through |
| 14 | | open records. The name that I believe to be |
| 15 | | Brianna Cornett's name is redacted, but she |
| 16 | | is speaking with a woman named Christi |
| 17 | | Fultz, who is her mother, and it states at |
| 18 | | the bottom October 16, 2020.  Hey, I am at |
| 19 | | the courthouse. I am getting locked up |
| 20 | | again but Ben said that he would get me |
| 21 | | straight back out.  Do you see that? |
| 22 | A | Yes. |
| 23 | Q | Do you recall telling Brianna Cornett that |
| 24 | | would get her straight back out? |

| | | |
|---|---|---|
| 1 | | **MR. KELLY:** Note an objection. |
| 2 | A | I don't recall the particular thing. |
| 3 | Q | Okay. But this would have been after you |
| 4 | | had become a sheriff's deputy and home |
| 5 | | incarceration officer; correct? |
| 6 | A | Yes. |
| 7 | Q | And would this have been after you had |
| 8 | | begun engaging in flirtatious |
| 9 | | communications with Brianna Cornett? |
| 10 | A | I am not sure. |
| 11 | Q | That is all that I have on that one. Did |
| 12 | | you know Brianna Cornett before becoming |
| 13 | | her home incarceration officer? |
| 14 | A | Yes. |
| 15 | Q | How did you know her? |
| 16 | A | From the jail and from the street. |
| 17 | Q | What do you mean by the street? |
| 18 | A | Like, seeing somebody out. |
| 19 | Q | Is she similar in age to you? |
| 20 | A | I think she is close. |
| 21 | Q | But did you all go to high school together? |
| 22 | A | I can't remember. |
| 23 | Q | Okay. What do you know about Christi Fultz? |
| 24 | A | Not much. |

```
1    Q        Well, what part of town do they live in or
2             what part of the county rather?
3    A        Currently, I don't know.
4    Q        Okay. Back in 2021?
5    A        When I picked Braannna up from hr house?
6    Q        Sure.
7    A        It was - -
8        MR. KELLY: Now which house are which house are
9             we talking about here, Christi or the one that
10            she was at?
11   Q        Brianna's house or her mother's house,
12            Christi Fultz, either one?
13   A        Her mother's house.
14   Q        Okay. Where did her mother live?
15   A        The night that I picked her up when her
16            mother called me was behind the Taco Bell
17            in Whitesburg.
18   Q        Has there been any other occasion when
19            Brianna Cornett was in your vehicle?
20   A        Not that I know of.
21   Q        Okay. Let's talk about Jennifer Hill for a
22            minute. Do you recall Jennifer Hill being
23            on home incarceration two different times?
24   A        Yes.
```

```
1    Q       And the first time when she was on home
2            incarceration, I guess, it was back during
3            the time period when had the plug into a
4            phone line.  Did you physically have to go
5            to each of these person's homes and install
6            that box?
7    A       No.
8    Q       Okay. So they could do that themselves?
9    A       Yes.
10   Q       Okay. Do you recall going to Jennifer
11           Hill's home to inspect the home and install
12           a box at any point?
13       MR. KELLY: Can you tell me what time period you
14       are talk about?
15       MS. BAXTER: Just any time period.
16   A       No.
17   Q       You don't remember doing that. Do you
18           recall telling Jennifer Hill if she
19           couldn't afford to pay for home
20           incarceration you could work something out?
21       MR. KELLY: During what time period?
22       MS. BAXTER: Ever?
23       MR. KELLY: One of these he has been indicted on,
24       and apparently one - - If you are saying there
```

1    are two occasions, I would like to know when

2    that first or second occasion was, if we are

3    going to be talking about did you ever, because

4    he has been indicted for one that is where a

5    source of charges have since been dismissed, the

6    others may not have been.

7    Q    You were only a home incarceration officer

8         for a period of four or five years;

9         correct?  Actually, no.  It is less than

10        that; isn't it?

11   A    Three.

12   Q    Three or four years. So in that three or

13        four year period, do you recall ever

14        telling Jennifer Hill that if she couldn't

15        afford to pay her home incarceration fees

16        you could work something out?

17   **MR. KELLY:** Note an objection.  Both as to the

18   form of the question, and again, this may be an

19   instance where you want to invoke your Fifth

20   Amendment Rights, because I don't know about two

21   occasions. I know about this one.

22   A    No.

23   Q    Do you recall a time whenever you arrested

24        Jennifer Hill?

| | | |
|---|---|---|
| 1 | A | I recall a time when I had to take her back |
| 2 | | to the jail. |
| 3 | Q | Okay. Explain to me what you recall and why |
| 4 | | you had to take her back to the jail? |
| 5 | A | The sheriff's office received a call from |
| 6 | | her neighbor that stated that they were |
| 7 | | stealing power off of their neighbor's |
| 8 | | house, and myself and another deputy went |
| 9 | | up to the check on it, and they was.  They |
| 10 | | had an extension cord ran from their |
| 11 | | residence to the other residence and the |
| 12 | | owner of the other residence said they did |
| 13 | | not have permission, and because she didn't |
| 14 | | have any source of power, because I had to |
| 15 | | unplug it, she had to return to jail until |
| 16 | | she was able to get a residence to have |
| 17 | | that. |
| 18 | Q | And where was that residence where that |
| 19 | | occurred, where that arrest occurred or |
| 20 | | when you picked her up rather? |
| 21 | A | It was in Letcher County, but I am not sure |
| 22 | | of the exact address. |
| 23 | Q | Okay. When you referenced they, were you |
| 24 | | talking about Jennifer Hill and Chris |

| | | |
|---|---|---|
| 1 | | Triplett? |
| 2 | A | Yes. |
| 3 | Q | Do you recall Jennifer having any roommates |
| 4 | | also? |
| 5 | A | Not that I know of. |
| 6 | Q | Okay. Who was the other deputy that you |
| 7 | | went out there with? |
| 8 | A | I believe it was Mike Enfusse. |
| 9 | Q | Who? |
| 10 | A | Mike Enfusse. |
| 11 | Q | Can you spell that for me? |
| 12 | A | E-N-F-U-S-E. |
| 13 | Q | Was he with the Letcher County Sheriff's |
| 14 | | Department? |
| 15 | A | Yes. |
| 16 | Q | Let me look at this with you. |
| 17 | | **(The document was marked Exhibit 14)** |
| 18 | | So is this one of these Bond Forms that you |
| 19 | | were referencing earlier |
| 20 | A | This is the paperwork where that she posted |
| 21 | | bond. |
| 22 | Q | Okay. I am trying to figure out - - I see |
| 23 | | where it says must abide by HIC rules and |
| 24 | | regulation and make all Court appearances; |

1          do you see that?

2    A     Yes.

3    Q     Are those terms as dictated or determined

4          by the Judge or who has the authority make

5          those conditions?

6    A     The Judge.

7    Q     So Judge Craft, since we are in Circuit

8          Court with this one, Judge Craft would have

9          said these are the terms and she was able

10         to post a bond, so she got released on home

11         incarceration; correct?

12   A     Yes.

13   Q     And then, I see down at the bottom Amanda

14         Sexton.  Who is Amanda Sexton?

15   A     She is a deputy jailer.

16   Q     So would this document get generated at the

17         time that you show up to put her on home

18         incarceration or sometime prior there to?

19   A     This is the bond that gets filled out

20         whenever they get released from the jail.

21   Q     Okay. So this would have been filled out at

22         the time that you showed up to put her on

23         home incarceration?

24   A     It could have been filled out before.

| 1 | Q | Okay. Do you remember whether you put |
| 2 | | Jennifer Hill on home incarceration, |
| 3 | | whether you put the ankle monitor on at the |
| 4 | | jail or somewhere else? |
| 5 | A | It was at the jail. |
| 6 | Q | Okay. Do you have any recollection of doing |
| 7 | | that? |
| 8 | A | I do not. |
| 9 | Q | And it looks like the address that I am |
| 10 | | seeing here, looks like out on Sergent or |
| 11 | | Sergent I am not sure how you pronounce it, |
| 12 | | road in Whitesburg.  Is that the Jackhorn |
| 13 | | community? |
| 14 | A | I am not sure if it is Jackhorn. |
| 15 | Q | Do you recall her living out in Jackhorn? |
| 16 | A | I can't remember. |
| 17 | Q | Do you recall showing up at Jennifer's home |
| 18 | | sometime after September 2 of 2021 in |
| 19 | | response to a report that Jennifer had |
| 20 | | overdosed? |
| 21 | A | I do. |
| 22 | Q | Explain to me why you would have shown up |
| 23 | | for and how that came about? |
| 24 | A | It came across the scanner, the police |

| | | |
|---|---|---|
| 1 | | scanner, that she was out in the street |
| 2 | | passed out in the road, I believe. |
| 3 | Q | Do you recall where? |
| 4 | A | It was at the residence that she was living |
| 5 | | at, but I think of the physical address. |
| 6 | Q | Okay. Do you recall Sheriff Stines showing |
| 7 | | up on that occasion as well? |
| 8 | A | I do not. |
| 9 | Q | And so were you out patrolling, because I |
| 10 | | don't remember you saying that was part of |
| 11 | | your duties? |
| 12 | A | I was not. |
| 13 | Q | Okay. What caused you to want to go to that |
| 14 | | scene? |
| 15 | A | To see if she was impaired. |
| 16 | Q | Okay. Because you were her home |
| 17 | | incarceration officer? |
| 18 | A | Yes. I heard on the scanner, so drove my |
| 19 | | truck up there to see in case there was any |
| 20 | | type of violation. |
| 21 | Q | Okay. And you are saying that you weren't |
| 22 | | in your police car; you were in your truck? |
| 23 | A | Yes. |
| 24 | Q | Do you remember where you were when that |

| | | |
|---|---|---|
| 1 | | call came across your scanner? |
| 2 | A | I do not. |
| 3 | Q | And had Jennifer, indeed, overdosed? Was |
| 4 | | she laying in the road when you got there? |
| 5 | A | She was not. |
| 6 | Q | Okay. She was unloading groceries from her |
| 7 | | car; wasn't she? |
| 8 | A | I am not sure what she was doing. She was |
| 9 | | on the porch with Chris an ambulance was |
| 10 | | there and I believe either a Neon or |
| 11 | | Jenkins police officer was there. |
| 12 | Q | Did that incident, when you showed up on |
| 13 | | that day, was that before or after you took |
| 14 | | her back to jail for stealing power from |
| 15 | | the neighbor? |
| 16 | A | I believe it was after. |
| 17 | Q | So you think that stealing power from the |
| 18 | | neighbor issued happened sometime before |
| 19 | | this incident where she was on home |
| 20 | | incarceration and there was a call about |
| 21 | | her overdosing? |
| 22 | A | I think. |
| 23 | Q | Okay. Did you return to Jennifer Hills' |
| 24 | | house the day after you responded to that |

```
1                report of her having overdosed?
2     A          No.
3     Q          Did you ever command Jennifer Hill to come
4                out and get inside of your vehicle?
5     A          No.
6     Q          Did you ever tell Jennifer Hill that you
7                wanted oral sex from her?
8     A          No.
9     Q          Do you recall Jennifer Hill having a
10               roommate during this time period?
11    A          I do not.
12    Q          I think that I know the answer.  But have
13               you ever had sexual intercourse with
14               Jennifer Hill?
15    A          No.
16    Q          Did you ever give Jennifer Hill permission
17               to go and visit her newborn granddaughter
18               in London, Kentucky; do you recall that?
19    A          I don't recall.
20    Q          Do you recall Jennifer Hill being taken
21               back to jail for violating the conditions
22               of her bond and her home incarceration this
23               would have occurred in October of 2021?
24    A          She violated her house arrest.  She cut her
```

| | | |
|---|---|---|
| 1 | | bracelet off. I don't remember when they |
| 2 | | picked her up and brought her back in. |
| 3 | Q | You are saying that she violated her house |
| 4 | | arrest because she cut off her bracelet? |
| 5 | A | Yes. |
| 6 | Q | Okay. And didn't give her permission to |
| 7 | | remove that ankle monitor before making the |
| 8 | | determination that there had been a |
| 9 | | violation? |
| 10 | A | No. |
| 11 | Q | During this time period, October of 2021, |
| 12 | | was your spouse, Angie Fields, still |
| 13 | | working at the jail? |
| 14 | A | When was the date? |
| 15 | Q | October of 2021? |
| 16 | A | Yes. |
| 17 | Q | She was still working at the jail; correct? |
| 18 | A | Yes. |
| 19 | Q | Did you ever go to the jail and tell |
| 20 | | Jennifer better keep her mouth shut? |
| 21 | A | No. |
| 22 | Q | Do you recall going to the jail with Angie |
| 23 | | Fields and interrogating Jennifer Hill |
| 24 | | about other inmates at the jail? |

```
1    A       No.

2    Q       Were you aware when Jennifer Hill was

3            released from jail, her cell phone was

4            never returned to her?

5    A       I was not.

6    Q       Do you know what happened to her cell

7            phone?

8    A       I do not.

9    Q       Have you ever talked about that with Angie

10           Fields?

11   A       No.

12   Q       Were you aware that Jennifer Hill in

13           December of 2021 was allowed to participate

14           in Drug Court; do you recall that?

15   A       I don't recall.

16   Q       Okay. Your sister, Holly, she works for the

17           Letcher County Drug Court; correct, she did

18           at that time?

19   A       Yes.

20   Q       Does she still?

21   A       Yes.

22   Q       Were you aware that Chris Triplett made

23           some reports to the Letcher County

24           Sheriff's Department your behavior related
```

1            to Jennifer Hill?

2 A       No.

3      **MR. KELLY:** Do you have such report?

4      **MS. BAXTER:** There is an Affidavit from Chris

5      Triplett.

6      **MR. KELLY"** You do have that Affidavit? If you

7      are going to ask him questions about, you know,

8      allegations made by somebody else, and you have

9      an Affidavit, we would like to see it.

10      **MS. BAXTER:** It has been produced in Discovery,

11      and I don't h ave to show it to you.

12      **MR. KELLY:** Yeah, you do. You don't try things by

13      ambush.

14      **MS. BAXTER:** I am not trying to ambush him. I was

15      asking if he was aware of it.

16      **MR. KELLY:** Let's just see the Affidavit. What is

17      the problem?

18      **MS. BAXTER:** I don't have it.

19      **MR. KELLY:** Okay.

20      **MS. BAXTER:** And you have a copy of it.

21 Q      Okay. Do you ever turn in any paperwork

22      related to completion of home incarceration

23      for someone?

24 A      Yes.

| | | |
|---|---|---|
| 1 | Q | And what does that paperwork look like or |
| 2 | | what is the point of that documentation? |
| 3 | A | The show how many days credit that they had |
| 4 | | on house arrest. |
| 5 | Q | What is that credited towards or why is |
| 6 | | that important? |
| 7 | A | I guess, the Judge can credit towards their |
| 8 | | overall sentence if they are found guilty |
| 9 | | or plead. |
| 10 | Q | And do you do that for every person who is |
| 11 | | on home incarceration?  Do you file a form |
| 12 | | regarding completion of home incarceration |
| 13 | | for each person? |
| 14 | A | Yes. |
| 15 | | **MR. SHAW:** You did say Chris Triplett; right? |
| 16 | | **MS. BAXTER:** Uh-huh. |
| 17 | Q | When do you recall meeting Sabrina Adkins |
| 18 | | for the first time? |
| 19 | A | When I got her out on house arrest. |
| 20 | Q | Did you ever meet her at the jail at any |
| 21 | | time prior to that? |
| 22 | A | No. I mean unless that I was at the jail |
| 23 | | and she wanted to talk to whoever was over |
| 24 | | house arrest. I don't remember talking to |

|    |   |                                              |
|----|---|----------------------------------------------|
| 1  |   | her at the jail.                             |
| 2  | Q | Okay. Where were you when you first met      |
| 3  |   | her?                                         |
| 4  | A | At the courthouse.                           |
| 5  | Q | In what room at the courthouse?              |
| 6  | A | It would be in the lobby of the jail or the  |
| 7  |   | District Court Room.                         |
| 8  | Q | Okay. I guess what do you remember about     |
| 9  |   | that initial meeting and conversation you    |
| 10 |   | had with Ms. Adkins?                         |
| 11 | A | Going over paperwork, I believe, putting a   |
| 12 |   | bracelet on her.  I believe her sister came  |
| 13 |   | and got her and posted the bond.             |
| 14 | Q | Okay. And where was she suppose to stay or   |
| 15 |   | purposes of home incarceration?             |
| 16 | A | I can't think of the address.                |
| 17 | Q | Okay. Was it Stacy Yates house?              |
| 18 | A | Yes.                                         |
| 19 | Q | Okay. Is part of the requirements that if    |
| 20 |   | you are on home incarceration in Letcher     |
| 21 |   | County, you are suppose to stay in Letcher   |
| 22 |   | County?                                      |
| 23 | A | Not necessarily.                             |
| 24 | Q | Okay. Help me to understand when you would   |

| | | |
|---|---|---|
| 1 | | have to stay or why that would or wouldn't |
| 2 | | be the case? |
| 3 | A | Well, if it is a person who is from another |
| 4 | | county and gets arrested in Letcher County. |
| 5 | | If they're within a distance that they can |
| 6 | | travel to meet me on Wednesdays to check |
| 7 | | in, and then, we allow them to live outside |
| 8 | | of county. |
| 9 | Q | Okay. And Sabrina Adkins, she was from Pike |
| 10 | | County; correct? |
| 11 | A | I believe so. |
| 12 | Q | So do you know why she wasn't allowed to go |
| 13 | | back to Pike County? |
| 14 | A | I don't know. |
| 15 | Q | Okay. So you put the ankle monitor on |
| 16 | | Sabrina Adkins at the courthouse, and to |
| 17 | | the best of your knowledge, did she go out |
| 18 | | to Stay Yates's house? |
| 19 | A | Yes. |
| 20 | Q | Did you go out to Stay Yates's house |
| 21 | | yourself that evening? |
| 22 | A | Yes. |
| 23 | Q | And why did you do that? |
| 24 | A | I believe he called the Sheriff's Office, |

| | | |
|---|---|---|
| 1 | | saying that she wasn't allowed to stay |
| 2 | | there. I don't think there was any cell |
| 3 | | phone service there.  I think that I tried |
| 4 | | to reach her by phone, but me and another |
| 5 | | deputy went out to that residence to try to |
| 6 | | get up with her. |
| 7 | Q | Okay. You and another deputy.  Who was the |
| 8 | | other deputy? |
| 9 | A | Jason Eckels. |
| 10 | Q | So what happened when you got out there? |
| 11 | A | We made contact with her and told her that |
| 12 | | Stacy called and said that she wasn't |
| 13 | | allowed to live at that residence. She told |
| 14 | | me that she had another residence close by |
| 15 | | that she could stay at, but she didn't have |
| 16 | | a ride to it. |
| 17 | Q | Was she crying? |
| 18 | A | I can't remember. |
| 19 | Q | Do you remember her saying that she was |
| 20 | | worried she didn't have the funds to pay |
| 21 | | for the ankle monitor? |
| 22 | A | I don't remember that. |
| 23 | Q | Was the other house that you were |
| 24 | | referencing was that Dale Martin's house? |

```
 1    A         I believe so.

 2    Q         I have another document here.

 3              (The document was marked Exhibit 15)

 4              This looks like to me like ou reaching out

 5              to Dale Martin. Did you know Dale Martin

 6              before June 18, 2021?

 7    A         Not that I know of.

 8    Q         Okay. But it looks like you reaching out to

 9              him, and I know it is redacted, but you are

10              asking him if someone can stay at place. Do

11              you recall whether this was you reaching

12              out on Sabrina Adkins's behalf about her

13              staying at Dale Martin's house?

14    A         Yes.

15    Q         Okay. Is that a typical thing for you have

16              done as a home incarceration officer to

17              send a facebook message to someone to see

18              if someone on home incarceration can stay

19              at their home?

20    A         Whenever switching residence, it would be.

21              I would always try to verify from the

22              person that whoever it is that they are

23              moving into that it is okay for them to

24              stay there.
```

| | | |
|---|---|---|
| 1 | Q | Okay. Did you often do that via facebook? |
| 2 | A | If didn't have the person's number. |
| 3 | Q | Okay. Did Dale Martin call you back at some |
| 4 | | point? |
| 5 | A | I can't remember. |
| 6 | Q | But was Sabrina ultimately allowed to stay |
| 7 | | at Dale Martin's house? |
| 8 | A | Yes. |
| 9 | Q | Did you make EKCS aware of the fact that |
| 10 | | her address had changed? |
| 11 | A | Yes. |
| 12 | Q | Did you make Judge Craft aware of the fact |
| 13 | | that her address had changed? |
| 14 | A | I can't remember. |
| 15 | Q | So you have never had any run ins with Dale |
| 16 | | Martin prior to this message to the best of |
| 17 | | your recollection? |
| 18 | A | Yes. |
| 19 | Q | Did you get to know better at some later |
| 20 | | date? |
| 21 | A | No, not particularly. |
| 22 | Q | Do you recall approving Sabrina to go and |
| 23 | | see her son in Pike County? |
| 24 | A | I can't remember. It is possible, but I |

1           can't remember.

2    Q      Okay. Would you have had to of gotten

3           approval from the Judge to have let her to

4           do that?

5        **MR. KELLY:** Objection as to form. Go a head.

6    A      More than likely, yes.

7        **MS. BAXTER:**   Okay. Mark this a Exhibit 16.

8        **(The document was marked as Exhibit 16)**

9    Q      So this looks to be some communications

10          between yourself and I believe Sabrina

11          Adkins, but it is redacted; do you see

12          that?

13   A      Yes.

14   Q      Okay. And these are from September of 2021.

15          Do you recall by this time Sabrina Adkins

16          was still wearing an ankle monitor or not?

17   A      I don't think so.

18   Q      Explain to me what circumstances occurred

19          that prompted you to take off her ankle

20          monitor?

21   A      She was asking me about going to rehab,

22          checking herself in, and when I asked the

23          Judge about it, he said that she would have

24          to wear the monitor while she was there,

| | | |
|---|---|---|
| 1 | | and she told me that she couldn't afford |
| 2 | | it, and didn't have no family or friends |
| 3 | | that would help her with it, and so I felt |
| 4 | | bad for her and took the bracelet off to |
| 5 | | let her go to rehab. |
| 6 | Q | Did you let Sabrina Adkins know if she was |
| 7 | | unable to pay for her ankle that there were |
| 8 | | other ways that you guys could work |
| 9 | | something out? |
| 10 | A | No. |
| 11 | Q | You never made a statement like that to |
| 12 | | her? |
| 13 | A | Not that I can remember. |
| 14 | Q | Was Deputy Sheriff Eckels with you the |
| 15 | | entire time that you were at Sabrina |
| 16 | | Adkins' house that first night when you |
| 17 | | went out to Stacy Yates' home? Did you ride |
| 18 | | together? |
| 19 | A | Yes. |
| 20 | Q | What car did you drive out there in? |
| 21 | A | It was a police cruiser. |
| 22 | Q | Do you recall giving Sabrina some |
| 23 | | cigarettes that evening? |
| 24 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | How long were you there for that evening? |
| 2 | A | Not long. |
| 3 | Q | Okay. When you left, did you leave Sabrina |
| 4 | | Adkins there? |
| 5 | A | Yes. |
| 6 | Q | Was anyone there at the house aside from |
| 7 | | you, Eckels, and Sabrina? |
| 8 | A | Not that I am aware of. |
| 9 | Q | Did you give Sabrina your cell phone |
| 10 | | number? |
| 11 | A | My cell phone number, yes. |
| 12 | Q | Okay. And you guys started corresponding |
| 13 | | both via text and via facebook messenger; |
| 14 | | correct? |
| 15 | A | Yes. |
| 16 | Q | And those communication were flirtatious in |
| 17 | | nature; would you agree with me? |
| 18 | A | Some of them. |
| 19 | Q | When was the first or let's back up here. |
| 20 | | At some point you were testifying earlier |
| 21 | | about agreeing to let Sabrina take off her |
| 22 | | ankle monitor; do you recall that? |
| 23 | A | Yes. |
| 24 | Q | Did that occur at the courthouse? |

1    A      Yes.

2    Q      You took her ankle monitor off at the

3           courthouse?

4    A      Yes.

5    Q      Was that after hours? Was there anybody

6           else in the courthouse when you took that

7           off of her?

8    A      I can't remember.

9    Q      Okay. What room, physically, were you in in

10          the courthouse when you took off her ankle

11          monitor?

12   A      I am not sure.  District Court Room. I

13          can't remember really.

14   Q      Did you take Sabrina into Judge Mullins'

15          chambers that night?

16   A      No.

17   Q      Do you recall telling Sabrina that you

18          wanted to meet her in the judge's chambers

19          because there are no cameras back there?

20   A      No.

21   Q      You never at any point told her that?

22   A      No.

23   Q      Is it true that there is no cameras back in

24          the judge's chambers?

| | | |
|---|---|---|
| 1 | A | As far as I knew at the time, I don't |
| 2 | | recall any being back there. |
| 3 | Q | Okay. So when you took Sabrina's ankle |
| 4 | | monitor off, what did you tell EKCS? |
| 5 | A | I told them that she was being took off |
| 6 | | house arrest. |
| 7 | Q | Were you afraid that Patty might check the |
| 8 | | court records and learn that was not |
| 9 | | accurate? |
| 10 | A | No. |
| 11 | Q | Were you aware that Patty Stockham never |
| 12 | | checked the Letcher County court records? |
| 13 | A | I don't know if she did or not. |
| 14 | Q | Did she ever give you any reason to believe |
| 15 | | that she checked the court records? |
| 16 | A | Not that I can think of. |
| 17 | Q | Was that the first time when you told EKCS |
| 18 | | that Sabrina had been taken off of home |
| 19 | | incarceration - - was that the first time |
| 20 | | that you had ever told Patty Stockham that |
| 21 | | someone had been taken off of home |
| 22 | | incarceration when, in fact, they had not |
| 23 | | been taken off home incarceration? |
| 24 | A | I believe so. |

| | | |
|---|---|---|
| 1 | Q | But you did the same thing as to Brianna |
| 2 | | Cornett; correct? |
| 3 | A | Yes. |
| 4 | Q | But it is your recollection that you told |
| 5 | | Patty Stockham that as to Brianna Cornett |
| 6 | | after you first told Patty Stockham that as |
| 7 | | to Sabrina Adkins? |
| 8 | | **MR. KELLY:** I got lost in there. |
| 9 | Q | There has been two occasions when you told |
| 10 | | Patty Stockham that a person on home |
| 11 | | incarceration has been taken off home |
| 12 | | incarceration; correct? |
| 13 | A | Yes. |
| 14 | Q | Are there any other times you ever told her |
| 15 | | that when it was not accurate? |
| 16 | A | No. |
| 17 | Q | Those are the only two times? |
| 18 | A | Yes. |
| 19 | Q | Okay. Which happened first Brianna Cornett |
| 20 | | or Sabrina Adkins? |
| 21 | A | I believe Sabrina. |
| 22 | Q | Okay. |
| 23 | A | I can't remember. |
| 24 | Q | Okay. So the night that you met Sabrina at |

| | | |
|---|---|---|
| 1 | | the courthouse and took her ankle monitor |
| 2 | | off, did you have any sexual contact with |
| 3 | | her on that date? |
| 4 | A | No. |
| 5 | Q | Did you have any sexual contact with her at |
| 6 | | any point there after? |
| 7 | A | Yes. |
| 8 | | **MR. KELLY:** We are talking about Sabrina now; |
| 9 | | right? |
| 10 | | **MS. BAXTER:** Correct. |
| 11 | Q | Did that sexual contact happen at the |
| 12 | | courthouse? |
| 13 | A | Yes. |
| 14 | Q | Did it happen in the Judge's chambers? |
| 15 | A | No. |
| 16 | Q | Where did it occur? |
| 17 | A | In the bathroom, by the secretary's office. |
| 18 | Q | Is that the same bathroom where you had |
| 19 | | sexual contact with Angie Fields or a |
| 20 | | different bathroom? |
| 21 | A | A different bathroom. |
| 22 | Q | Okay. Where is this bathroom? |
| 23 | A | It is next to the Judge's secretary's |
| 24 | | office. |

| | | |
|---|---|---|
| 1 | Q | Okay. How do you access the Judge's |
| 2 | | Secretary's office? |
| 3 | A | Through the hallway behind the courtroom. |
| 4 | Q | Okay. SO there is a hallway behind the |
| 5 | | courtroom. DO you have to go through the |
| 6 | | Judge's secretary's office to get to the |
| 7 | | Judge's Chambers? |
| 8 | A | Yes. |
| 9 | Q | And the bathroom is somewhere between the |
| 10 | | secretary's office and the chambers? |
| 11 | A | No, it is right at the door where that you |
| 12 | | come into the secretary's office? |
| 13 | Q | Did you ask Sabrina to go into that |
| 14 | | bathroom with you? |
| 15 | A | I can't remember. |
| 16 | Q | How many times were you in that bathroom |
| 17 | | with Sabrina Adkins? |
| 18 | A | Once. |
| 19 | Q | One time.  Do you remember when that |
| 20 | | occurred? |
| 21 | A | I do not. |
| 22 | Q | The time that you are referencing that you |
| 23 | | were in that bathroom, did you have sexual |
| 24 | | intercourse with Sabrina Adkins? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. Prior to that occasion, had there |
| 3 | | been any sexual contact, by that I mean, |
| 4 | | touching, kissing, oral sex, anything? Had |
| 5 | | you had any sexual contact with Sabrina |
| 6 | | Adkins prior to that inaction in the |
| 7 | | bathroom? |
| 8 | A | Is a hug a sexual contact? |
| 9 | Q | It can be, yeah. So are you saying that you |
| 10 | | have hugged her? |
| 11 | A | I hugged her. |
| 12 | Q | Where did you hug her? |
| 13 | A | I think either at the doorway of the |
| 14 | | secretary's office or the hallway leading |
| 15 | | to it. |
| 16 | Q | And that was on a different occasion? |
| 17 | A | Yes. |
| 18 | Q | Okay. So why were you guys back in that |
| 19 | | area of courthouse on this different |
| 20 | | occasion when you were hugging her? |
| 21 | A | I can't remember. |
| 22 | Q | How many occasions total were you in the |
| 23 | | area that includes the Judge's Chambers, |
| 24 | | the secretary's office, and the bathroom |

| | | |
|---|---|---|
| 1 | | and the hallway?  How many times were you |
| 2 | | in that area with Sabrina Adkins total? |
| 3 | A | I don't know. |
| 4 | Q | More than two? |
| 5 | A | I believe so. |
| 6 | Q | And on those occasions when you are back in |
| 7 | | that area of the courthouse with Sabrina |
| 8 | | Adkins, was that after hours? |
| 9 | A | Yes. |
| 10 | Q | Okay. And by after hours, to clarify, after |
| 11 | | 5:00 pm? |
| 12 | A | After 4:00. |
| 13 | Q | After 4:00 pm? |
| 14 | A | Or after 4:30 in that area. |
| 15 | Q | So are you saying it was around 4:00, 4:30 |
| 16 | | or was it later? |
| 17 | A | That is the after hours.  Everything shut |
| 18 | | down around 4:30. |
| 19 | Q | And were there a time of day that you would |
| 20 | | typically meet Sabrina Adkins there? |
| 21 | A | No. |
| 22 | Q | Okay. How were you able to access that |
| 23 | | portion of the courthouse? |
| 24 | A | I was the bailiff I had key sto the |

1      courthouse.

2  Q    Okay. Had you not been the bailiff and not

3       had those keys, would you been able to get

4       back there?

5  A    I don't think so.

6  Q    Did Judge Mullins know that you were back

7       there?

8  A    Not that I know of.

9  Q    Let's look at a couple of documents here.

10      Let's look at this one.  We haven't talked

11      about this one, have we?

12  **MR. KELLY:** 16 was what I have as being the last.

13  Q    I am looking at a message towards the

14      bottom it is you communicating with

15      someone. I never got any texts. I have

16      already tried texting you a couple of

17      times. Your Court is in Circuit tomorrow

18      and it is all in person, so are you going

19      to be in Whitesburg this evening? Do you

20      recall sending that message to Sabrina

21      Adkins?

22  A    I don't recall sending it, but I can see

23      that I did.

24  Q    Okay. But do you think that would have been

1          sent to Sabrina Adkins?

2     A    Maybe.

3     Q    Okay. We can read on and see if it

4          refreshes your recollection at all.

5          There is some reference, I am looking at

6          the third page marked at the bottom 12557.

7          There is a reference to putting a dog

8          collar on for Court. Do you see that?

9          Towards the bottom.

10    A    You have to put me back on my doc collar;

11         is that what you are talking about?

12    Q    Yes. And the response is LOL, yeah, for

13         Court.

14    A    Okay. I see it.

15    Q    So does that refresh your recollection of

16         whether you had been talking to Sabrina

17         Adkins or someone else?

18    A    I believe it was Sabrina.

19    Q    Okay. And by dog collar, did you understand

20         her to be referring to the ankle monitor?

21    A    Yes.

22    Q    And did you have to put it back on for

23         Court so the Judge and no one else would

24         know that she wasn't actually - - That

| | | |
|---|---|---|
| 1 | | actually didn't have an ankle monitor on |
| 2 | | any more? |
| 3 | A | Yes. |
| 4 | Q | I am looking at the top of the page marked |
| 5 | | 12559. You say you better be ready for your |
| 6 | | new collar that is. LOL. By new collar, are |
| 7 | | you talking about the ankle monitor? |
| 8 | A | Yes. |
| 9 | Q | Okay. Further down the page you say. LOL, |
| 10 | | you do still owe me.  What does she owe |
| 11 | | you? |
| 12 | A | I can't remember. |
| 13 | Q | Okay. Further down, you say when you get |
| 14 | | here, let me and I will let you know what |
| 15 | | door to come in. So what door did you want |
| 16 | | her to come in? |
| 17 | A | I am not for sure.  Probably the front |
| 18 | | doors. |
| 19 | Q | And then, you write stay in your vehicle |
| 20 | | until I tell you.  The Judge is still |
| 21 | | around.  Do you know which Judge that would |
| 22 | | have been? |
| 23 | A | I don't. |
| 24 | Q | But you didn't want her to come in tot he |

| | | |
|---|---|---|
| 1 | | courthouse until the Judges were already |
| 2 | | gone; correct? |
| 3 | A | Yes. |
| 4 | Q | And then, later, on the last page, it looks |
| 5 | | like you tell her that she is good to come |
| 6 | | in when she gets here. Do you recall which |
| 7 | | evening that - - Did Sabrina Adkins |
| 8 | | actually show up this evening, if you can |
| 9 | | recall? |
| 10 | A | I can't remember that. |
| 11 | Q | Do you recall this exchange with her? |
| 12 | A | Not specifically. |
| 13 | Q | Was there ever anyone else in the |
| 14 | | courthouse that observed you and Sabrina in |
| 15 | | there? |
| 16 | A | Not that I know of. |
| 17 | Q | I saw some reference AOC maybe had pulled |
| 18 | | some video recordings. Did you ever review |
| 19 | | any video recording of the courthouse from |
| 20 | | AOC? |
| 21 | A | I have not seen any of it. |
| 22 | Q | Okay. We will put this aside. |
| 23 | | **MR. SHAW:** Can we take a couple of minutes? |
| 24 | | **MS. BAXTER:** sure. |

1      **(A short break was taken)**

2      **(The document was marked Exhibit 17)**

3    Q        I am going to hand you another document.

4             I believe this is another communication

5             between yourself and Sabrina Adkins, but

6             her name is redacted. I am just looking at

7             the first page.  It looks like you are

8             asking this person, who I believe to be

9             Sabrina Adkins, if she has a pair of

10            scissors.  She ask why are you going to

11            kill me. You say LOL, no, I need your box

12            back.  Do you see that?

13   **MR. KELLY:** It says I need my box back.

14   Q        My box back. Thank you.  Do you see that?

15   A        Yes.

16   Q        Does that refresh your recollection about

17            whether you would have been having this

18            conversation with Sabrina Adkins?

19   A        I believe so.

20   Q        Okay. By your box back, are you talking

21            about the ankle monitor?

22   A        I believe so.

23   Q        And then, it looks like towards the top of

24            the next page you told Ms. Adkins that

| | | |
|---|---|---|
| 1 | | there was a large trailer with an air unit |
| 2 | | on it behind the courthouse, and she could |
| 3 | | leave it back there. Do you recall that? |
| 4 | A | I see it here. |
| 5 | Q | Whose trailer is that back there? |
| 6 | A | I am not sure. |
| 7 | Q | Why did you ask to leave it behind that |
| 8 | | trailer? |
| 9 | A | I might not have been there. |
| 10 | Q | Do you have access to that trailer? |
| 11 | A | I am not sure what kind of trailer. I would |
| 12 | | say it was just a trailer that was parked |
| 13 | | there. |
| 14 | Q | Like, a trailer that someone could live in? |
| 15 | A | No.  I think more of a pull behind trailer. |
| 16 | Q | Like a camping trailer? |
| 17 | A | I don't think so. I would image it was more |
| 18 | | like what you would haul equipment on and |
| 19 | | stuff. |
| 20 | Q | Okay. Do you remember going out to that |
| 21 | | trailer and retrieving the ankle monitor at |
| 22 | | some point? |
| 23 | A | I don't remember. |
| 24 | Q | Okay. Do you recall ever getting permission |

| | | |
|---|---|---|
| 1 | | from Judge Craft for Sabrina to go to Pike |
| 2 | | County? |
| 3 | A | I can't remember. I believe so, but I am |
| 4 | | not sure. |
| 5 | Q | And would there be any documentation to |
| 6 | | evidence that you made that request and it |
| 7 | | had been approved? |
| 8 | A | I don't think so. |
| 9 | Q | Is that because that would have just been a |
| 10 | | verbal - - If it had been a conversation, |
| 11 | | it would a verbal conversation? |
| 12 | A | Possibly. |
| 13 | Q | Does that get noted anywhere within the |
| 14 | | Court Records? |
| 15 | A | I don't know about the Court Records.  I |
| 16 | | would have changed the address on her |
| 17 | | paperwork. |
| 18 | Q | In my mind, I was asking just about a day |
| 19 | | trip to Pike County, but you are talking |
| 20 | | about if you had approved her to move to |
| 21 | | Pike County? |
| 22 | A | Yes. |
| 23 | Q | And at some point, she did move back to |
| 24 | | Pike County; correct? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So just to specify, do you recall ver |
| 3 | | getting permission from either Judge Craft |
| 4 | | or Judge Mullins for Sabrina to move back |
| 5 | | to Pike County? |
| 6 | A | I can't remember. |
| 7 | Q | had you gotten that permission, how would |
| 8 | | you have documented her change of address? |
| 9 | A | I would have changed it on the paperwork. |
| 10 | Q | And what is the paperwork? |
| 11 | A | The house arrest paperwork where took |
| 12 | | address, phone number, information down on. |
| 13 | Q | Okay. Did you keep that kind of paperwork |
| 14 | | amongst your records? |
| 15 | A | I would keep it until they got off house |
| 16 | | arrest. |
| 17 | Q | Where did you physically keep those files? |
| 18 | A | It was like in a three ring binder. |
| 19 | Q | Where did that live? |
| 20 | A | I usually kept that with me. |
| 21 | Q | So you took it home with you every night? |
| 22 | A | Probably not every night. |
| 23 | Q | If you didn't take it home with you, where |
| 24 | | would it be? |

| | | |
|---|---|---|
| 1 | A | Sometimes, I left it in the Jury Room at |
| 2 | | the courthouse. |
| 3 | Q | Did you give Patty Stockham a copy of all |
| 4 | | of the records you had or did you maintain |
| 5 | | the only copy of certain records? |
| 6 | A | I would fill the paperwork out and then, |
| 7 | | take a picture of it and send it to Patty. |
| 8 | Q | So you would just text her a picture? |
| 9 | A | Yes. |
| 10 | Q | And that was okay with her as far as you |
| 11 | | could tell? |
| 12 | A | Uh-huh. |
| 13 | Q | Just so that I am clear.  What would be the |
| 14 | | names of all of the different types of |
| 15 | | forms that you would have kept in that |
| 16 | | binder and texted to Patty? |
| 17 | A | Honey, it was just one set of papers. It |
| 18 | | had their name on it, birthday, address, |
| 19 | | phone numbers, phone numbers for relatives. |
| 20 | Q | Would that be the application form? |
| 21 | A | Yes. |
| 22 | Q | And what other forms might exist for |
| 23 | | someone on home incarceration? |
| 24 | A | The only other form that I would have was |

| | | |
|---|---|---|
| 1 | | the completion forms that I would fill out |
| 2 | | after they got off house arrest. |
| 3 | Q | Okay. SO really just those two forms? |
| 4 | A | Yes. |
| 5 | Q | And then, I know that you kept receipts of |
| 6 | | income that you got in like a little |
| 7 | | receipt book? |
| 8 | A | Yes. |
| 9 | Q | Where did that receipt book live? |
| 10 | A | With that binder. |
| 11 | Q | Where is the Letcher County Sheriff's |
| 12 | | Office? |
| 13 | A | It is behind the courthouse. |
| 14 | Q | Okay. A different building ro the same |
| 15 | | building? |
| 16 | A | Different building. |
| 17 | Q | Okay. How often would you be in and out of |
| 18 | | that building? |
| 19 | A | It depends on the day. If it was a busy |
| 20 | | day, and I needed to  walk over for |
| 21 | | something. |
| 22 | Q | At some point Sabrina met your Uncle Bill |
| 23 | | Meade; do you recall that? |
| 24 | A | She mentioned about knowing him. |

| | | |
|---|---|---|
| 1 | Q | You told Sabrina that your Uncle Bill Meade |
| 2 | | could help her with her charges. Do you |
| 3 | | recall telling her that? |
| 4 | A | I don't. |
| 5 | Q | Does Bill Meade have any connection at the |
| 6 | | courthouse? |
| 7 | A | Not that I am aware of. |
| 8 | Q | Do you recall telling Sabrina on more than |
| 9 | | one occasion that she didn't have anything |
| 10 | | to worry about because you wold speak to |
| 11 | | the Judge for her about her criminal case? |
| 12 | A | I don't remember. |
| 13 | Q | You don't recall saying that? |
| 14 | A | No. |
| 15 | Q | Are you denying saying it or are you saying |
| 16 | | that you don't recall? |
| 17 | A | I don't recall saying that. |
| 18 | Q | Okay. Were you aware that Bill Meade making |
| 19 | | similar statements that Sabrina didn't need |
| 20 | | to worry that he would speak to the Judge |
| 21 | | for her about her criminal case? |
| 22 | A | I am not aware of that. |
| 23 | Q | How often do you see your Uncle Bill Meade? |
| 24 | A | Not much. |

| | | |
|---|---|---|
| 1 | Q | Be more specific, once a month, once a |
| 2 | | year? |
| 3 | A | If I run into him stopping at a gas |
| 4 | | station, he stopped there, and I pull to |
| 5 | | get gas, if he is there, I will say hi, how |
| 6 | | are you doing, but - - |
| 7 | Q | Okay. Do you recall Stacy Yates filing a |
| 8 | | EPO Complaint against Sabrina? |
| 9 | A | I believe so. |
| 10 | Q | Okay. What do you recall about that?  How |
| 11 | | did you become aware of it? |
| 12 | A | I think he filed a EPO against her.  I |
| 13 | | believe the Judge asked if she was still on |
| 14 | | house arrest, and I told him yes, and he |
| 15 | | asked if I would serve it on her. |
| 16 | Q | I have got a copy of the Court Net.  I |
| 17 | | don't think that I am going to make this as |
| 18 | | an Exhibit, but it might just be helpful |
| 19 | | for purposes of dates. It looks like the |
| 20 | | complaint from Stacy Yates that was filed |
| 21 | | against Sabrina Adkins was filed on January |
| 22 | | 11th; is that correct?  Do you is that? |
| 23 | A | Yes. |
| 24 | Q | And it looks like this domestic violence |

| | | |
|---|---|---|
| 1 | | complaint was in Judge Mullins' Court. Is |
| 2 | | that typical that he oversees domestic |
| 3 | | violence issues? |
| 4 | A | I believe all EOPs go through District |
| 5 | | Court unless they are maybe pending a |
| 6 | | divorce Hearing out of it, and then I think |
| 7 | | it goes up to up Circuit because of that. |
| 8 | | Circuit deals with divorces. A couple going |
| 9 | | through a divorce and there is a pending |
| 10 | | case and one of them gets a EPO, it goes to |
| 11 | | Circuit, but I am not sure. |
| 12 | Q | Okay. Were you present for a Hearing some |
| 13 | | sort of Hearing where Stacy Yates was |
| 14 | | requesting this Emergency Protection Order? |
| 15 | A | I can't remember. |
| 16 | Q | Okay.  At the time that this Complaint was |
| 17 | | filed, Sabrina Adkins according to the |
| 18 | | Court Records, was on home incarceration; |
| 19 | | correct? |
| 20 | A | Yes. |
| 21 | Q | And according to the EKCS records, she had |
| 22 | | been taken off home incarceration; correct? |
| 23 | A | Yes. |
| 24 | Q | So when were you first made aware of this |

| | | |
|---|---|---|
| 1 | | EPO? |
| 2 | A | I can't remember the exact date. |
| 3 | Q | Okay. Do you remember discussing with the |
| 4 | | Judge Craft? |
| 5 | A | I think so. |
| 6 | Q | What do you recall discussing with Judge |
| 7 | | Craft? |
| 8 | A | I think he was asking me, and I don't know |
| 9 | | if it was close to this date or a little |
| 10 | | bit afterwards, but asking me about what |
| 11 | | her address was. |
| 12 | Q | Okay. What was her actual address at that |
| 13 | | point? |
| 14 | A | I can't remember, but I believe she was |
| 15 | | staying in - - I am not sure.  I can't |
| 16 | | remember. |
| 17 | Q | According to the court records, did it |
| 18 | | still have Sabrina Adkins living at Stacy |
| 19 | | Yates' place? |
| 20 | | **MR. KELLY:** According to the court records? |
| 21 | Q | Did Judge Craft seem to believe that she |
| 22 | | was still living with Stacy Yates? |
| 23 | | **MR. KELLY:** Note an objection. |
| 24 | A | I don't know. |

| | | |
|---|---|---|
| 1 | Q | Well, why was he asking about her address? |
| 2 | A | I think it was where she was on house |
| 3 | | arrest. |
| 4 | Q | Okay. What did you tell him? |
| 5 | A | I think that I gave him the address that I |
| 6 | | had for her. |
| 7 | Q | Do you know what that was? |
| 8 | A | I don't.  Not off the top of my head, I |
| 9 | | don't. |
| 10 | Q | Did you talk about anything else with Judge |
| 11 | | Craft related to Sabrina Adkins and this |
| 12 | | EPO issue? |
| 13 | A | He told me to check the GPS and if she had |
| 14 | | left her residence and went to Stacy's to |
| 15 | | have her arrested for escape. |
| 16 | Q | And you couldn't check the GSP; could you? |
| 17 | A | No. |
| 18 | Q | Did Jason Eckels know that you had let |
| 19 | | Sabrina Adkins remove her ankle monitor? |
| 20 | A | No. |
| 21 | Q | Did anybody else know that you had allowed |
| 22 | | Sabrina Adkins to take off her ankle |
| 23 | | monitor? |
| 24 | A | Not that I know of. |

| | | |
|---|---|---|
| 1 | Q | You never discussed it with anybody prior |
| 2 | | to on or before January 11 of 2022? |
| 3 | A | No. |
| 4 | Q | Did you ever discuss this EPO and this |
| 5 | | issue with Sarina Adkins with Judge |
| 6 | | Mullins? |
| 7 | A | I don't remember. |
| 8 | Q | Well, it looks like he oversaw this EPO |
| 9 | | issue; do you see that? |
| 10 | A | Yes. |
| 11 | Q | Would you have been the bailiff in the |
| 12 | | courtroom at the time that any Hearing |
| 13 | | related to this took place? |
| 14 | A | If I was working that day, I would have. |
| 15 | Q | If it wasn't you, who would have been |
| 16 | | there? |
| 17 | A | I am not sure. |
| 18 | Q | How many bailiffs were there? |
| 19 | A | Jason Eckles was the bailiff upstairs, but |
| 20 | | now if one of us had miss, and they had to |
| 21 | | get somebody they would use a regular |
| 22 | | deputy for bailiffs also. |
| 23 | Q | Okay. |
| 24 | A | Or sometimes they would get the jail - - if |

| | | they had to bring a prisoner up, the jail |
| --- | --- | --- |
| 1 | | they had to bring a prisoner up, the jail |
| 2 | | guards would bring them up sometimes and |
| 3 | | watch them. |
| 4 | Q | So you don't have any recollection at least |
| 5 | | at being present for any Hearings related |
| 6 | | to this EPO? |
| 7 | A | Not that I can think of. |
| 8 | Q | So what did you report back to Judge Craft |
| 9 | | after he told to check Sabrina Adkins GPS? |
| 10 | A | I believe that I told him that her GPS was |
| 11 | | messed up, and I couldn't get any |
| 12 | | information on it, and I couldn't prove |
| 13 | | that she had left or if she hadn't. |
| 14 | Q | And that was a lie; correct? |
| 15 | A | Yes. |
| 16 | Q | Did you tell anybody else that same thing |
| 17 | | aside from Judge Craft? |
| 18 | A | No, not that I remember. |
| 19 | Q | Okay. I have another document and I think |
| 20 | | you produced this one. |
| 21 | | **(The document was marked Exhibit 18)** |
| 22 | | I think you produced these and these are |
| 23 | | some text messages between yourself and I |
| 24 | | believe Jason Eckels; is that correct? |

```
 1    A        Yes.

 2    Q        Looks like he is asking you what address do

 3             you have for Sabrina Adkins?

 4    A        Yes.

 5    Q        And you just wrote back call me. so did he

 6             call you?

 7    A        I can't remember. I could have been

 8             driving, and I try not to message and drive

 9             at the same time. I would often hit C it

10             pull up call me, and I would just send it

11             without having to type anything out.

12    Q        So this was one day after the Order for

13             Emergency Protection had been issued in the

14             Yates versus Sabrina Adkins case; correct?

15    A        I guess, it was January 12$^{th}$.

16    Q        And you wrote back and gave him an address

17             in Pikeville; correct?

18    A        Yes.

19    Q        Do you recall having any kind of

20             conversation with Jason about Sabrina's

21             address and this EPO issue?

22    A        I am thinking that I was driving and he

23             called me, and I told him that I would text

24             it to him as soon as I got pulled and could
```

| | | |
|---|---|---|
| 1 | | get the adddress. |
| 2 | Q | Okay. And then, he asks did you say you was |
| 3 | | going to serve the EPO on Sabrina? |
| 4 | A | Yes. |
| 5 | Q | Did you serve an EPO on Sabrina or did you |
| 6 | | intend to? |
| 7 | A | I intended to. |
| 8 | Q | Okay. Did you ever do that? |
| 9 | A | I can't remember. |
| 10 | Q | And then, he asks when did she change her |
| 11 | | address?  Was her address ever on Perkins |
| 12 | | Branch?  Is Perkins Branch in Letcher |
| 13 | | County? |
| 14 | A | I believe so. |
| 15 | Q | Is that Stacy Yates address or is that some |
| 16 | | other address? |
| 17 | A | I think that was the original address of |
| 18 | | Stacy Yates. |
| 19 | Q | Okay. And then you write back, yes, it was |
| 20 | | in Perkins Branch. She changed it after the |
| 21 | | incident that brought up the EPO. Do ou see |
| 22 | | that? |
| 23 | A | Yes. |
| 24 | Q | But that is not true; was it? |

| | | |
|---|---|---|
| 1 | A | I guess not. |
| 2 | Q | Because she changed her address within a |
| 3 | | couple of days of being put on home |
| 4 | | incarceration to Dale Martin's house; |
| 5 | | correct? |
| 6 | A | Yes. |
| 7 | Q | So why did you tell him she had only |
| 8 | | changed her address from Perkins Branch |
| 9 | | sometime in January of 2022? |
| 10 | A | I don't know. |
| 11 | Q | As of January 12, did Jason Eckels know |
| 12 | | anything about your relationship with |
| 13 | | Sabrina Adkins? |
| 14 | A | No. |
| 15 | | **MR. KELLY:** Objection. |
| 16 | Q | Did you ever talk to him about your |
| 17 | | relationship with Sabrina sometime after |
| 18 | | January 12th? |
| 19 | A | No. |
| 20 | Q | Were you aware that Stacy Yates had had a |
| 21 | | relationship with Brianna Cornett? |
| 22 | A | I was not. |
| 23 | Q | Did you at any point become aware of the |
| 24 | | fact that Stacy Yates reported your |

| | | |
|---|---|---|
| 1 | | relationship with Sabrina Adkins to Robbie |
| 2 | | Kinzer in the Drug Court? |
| 3 | A | I didn't know about it. |
| 4 | Q | Did you know about it before that I just |
| 5 | | said that today? |
| 6 | A | Yes, I believe that it might have been in |
| 7 | | the Discovery. |
| 8 | Q | Okay. So you became aware of that through |
| 9 | | Discovery in the criminal case; is that |
| 10 | | correct? |
| 11 | A | Do you mean the criminal or the civil case, |
| 12 | | I am not sure. |
| 13 | Q | And based on that discovery, was it your |
| 14 | | understanding that he reported it to Judge |
| 15 | | Craft? |
| 16 | | **MR. KELLY:** Objection. |
| 17 | A | I can't remember exactly what it said. |
| 18 | Q | Okay. At some point, you filed a Criminal |
| 19 | | Complaint against Sabrina Adkins; correct? |
| 20 | A | Yes. |
| 21 | | **(The document was marked Exhibit 19)** |
| 22 | Q | Why did you decide to do that to file that |
| 23 | | Criminal Complaint? |
| 24 | A | I was trying to get Sabrina to come in and |

| | | |
|---|---|---|
| 1 | | put an ankle monitor on her after the EPO |
| 2 | | incident to try to cover everything up, and |
| 3 | | I couldn't ever get her to come in. |
| 4 | Q | Okay. And so you sore out this complaint, |
| 5 | | criminal complaint. Have you ever swore |
| 6 | | out a criminal complaint against a person |
| 7 | | on home incarceration before Sabrina? |
| 8 | A | Yes. |
| 9 | Q | How many times have you done that? |
| 10 | A | I am not sure. |
| 11 | Q | Okay. More than ten? |
| 12 | A | I would say. |
| 13 | Q | Did any of those prior criminal complaints |
| 14 | | that you swore include false information? |
| 15 | A | No. |
| 16 | Q | Did this one include some false information |
| 17 | | though? |
| 18 | | **MR. KELLY:** Sorry. |
| 19 | Q | Did this criminal complaint include some |
| 20 | | false information? |
| 21 | A | Yes. |
| 22 | Q | Yes, it includes some false information? |
| 23 | A | Yes. |
| 24 | Q | And why did you put in her that Sabrina |

| | | |
|---|---|---|
| 1 | | Adkins was suppose to report to Letcher |
| 2 | | County Sheriff's Office? |
| 3 | A | I am not sure why they put that in there. |
| 4 | Q | Who is they? |
| 5 | A | The county attorney that types this up. |
| 6 | Q | But you are the one that signed it as a |
| 7 | | true and accurate statement; correct? |
| 8 | A | Yes. |
| 9 | Q | And I also see under the signature line it |
| 10 | | says Ben Fields LCSO, so were you signing |
| 11 | | this in your capacity as a Letcher County |
| 12 | | Sheriff's Deputy? |
| 13 | | **MR. KELLY:** Where is that at? |
| 14 | Q | Do you see where - - |
| 15 | A | Oh, right up here. |
| 16 | Q | Yeah, I guess it is not signed it has got |
| 17 | | your name typed out.  I am looking above. |
| 18 | A | Just where I had my uniform on when I went |
| 19 | | over to get the complaint. |
| 20 | Q | Okay. What does it mean CW, if you know? |
| 21 | A | Complaining witness, maybe. |
| 22 | Q | That makes sense. Did you ever direct |
| 23 | | Sabrina Adkisn to report to the Letcher |
| 24 | | County Sheriff's Office? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Who is Angela Trent? |
| 3 | A | I believe that she works for the County |
| 4 | | Attorney's office. |
| 5 | Q | And did you work the County Attorney |
| 6 | | related to this complaint? |
| 7 | A | That is where that you go to get or swear |
| 8 | | out warrants. |
| 9 | Q | Okay. I have never done that, so I am just |
| 10 | | curious on how that works. You go over to |
| 11 | | the County Attorney's office. You explain |
| 12 | | the situation,, and then - - |
| 13 | A | They decide what charge and if it justifies |
| 14 | | a warrant. |
| 15 | Q | Okay. And just because it is redacted, was |
| 16 | | this the Criminal Complaint that you swore |
| 17 | | out related to the offender Sabrina Adkins? |
| 18 | A | I believe so. |
| 19 | Q | So once this criminal complaint is signed |
| 20 | | by you, what is your understanding of what |
| 21 | | happens next? |
| 22 | A | it is sent to the Judge for his signature, |
| 23 | | and a warrant is generated. |
| 24 | Q | I you knew there was going to be a warrant |

```
 1              as a result of your criminal complaint;

 2              correct?

 3    A         Yes.

 4    Q         During this time period, do you recall

 5              reaching out to Sabrina and asking her to

 6              come and turn herself in on the EPO?

 7    A         I can't remember.

 8    Q         Do you remember what, if any,

 9              communications you were having with Sabrina

10              in January of 2022?

11    A         I don't.

12    Q         At some point, Sabrina was arrest; correct?

13    A         Yes.

14    Q         And she was arrested for escape; correct?

15    A         Yes.

16    Q         Based on the complaint that you generated?

17    A         Yes.

18    Q         She was arrested in Pike County; were you

19              aware of that?

20    A         I think so.

21    Q         Were you aware that your Uncle Bill Meade

22              reached out to Sabrina after that she got

23              out of jail and told her that she needed to

24              ask her lawyers to back off this case?
```

| | | |
|---|---|---|
| 1 | | **MR. KELLY:** Objection. |
| 2 | | Did you know that he did that? |
| 3 | A | I did not. |
| 4 | Q | Did you ask him to do that? |
| 5 | A | No. |
| 6 | Q | Were you in communication with Bill Meade |
| 7 | | at any point during this time period? |
| 8 | A | No. |
| 9 | Q | So when did you first become aware of the |
| 10 | | fact that Sabrina Adkins had filed this |
| 11 | | lawsuit? |
| 12 | A | I can't remember if it was the end of |
| 13 | | January or the first of February.  I |
| 14 | | believe it came out in the news. |
| 15 | Q | Before you read it in the newspaper, did |
| 16 | | you talk to Mickey Stines about it? |
| 17 | A | I think he is the one that contacted me and |
| 18 | | told me that it was in the news. |
| 19 | Q | Okay. What did he tell you? |
| 20 | A | That a lawsuit had been filed. |
| 21 | Q | Did he tell you anything beyond that? |
| 22 | A | Not initially. |
| 23 | Q | So Mickey Stines was the first person to |
| 24 | | tell you about the lawsuit; correct? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay. Did he first call up on the phone or |
| 3 | | did he tell you that in person? |
| 4 | A | I think that he called me on the phone. |
| 5 | Q | Okay. How long did that conversation last? |
| 6 | A | I don't believe long. |
| 7 | Q | Where were you when you received that phone |
| 8 | | call? |
| 9 | A | I was in Pike County. |
| 10 | Q | Why were you in Pike County? |
| 11 | A | I had my daughter at a dentist appointment. |
| 12 | Q | Okay. Did you go back that same day and |
| 13 | | speak to Sheriff Stines about this issue? |
| 14 | A | I believe by the time that I got done at |
| 15 | | the dentist and made it back to Whitesburg, |
| 16 | | it was all over the news and facebook. He |
| 17 | | wanted to speak to me. |
| 18 | Q | Okay. So did you go speak to him? |
| 19 | A | Yes. |
| 20 | Q | Where were you when you had that |
| 21 | | conversation? |
| 22 | A | I think the Sheriff's Office. |
| 23 | Q | Okay. Does he have his own personal office |
| 24 | | within the Sheriff's Office? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Were you in his office? |
| 3 | A | I think so. |
| 4 | Q | What did he say? |
| 5 | A | He told me what that he had read, and told |
| 6 | | me about what it had said, because I still |
| 7 | | had not read it. |
| 8 | Q | Okay. |
| 9 | A | And that as about it. |
| 10 | Q | Did he ask you whether any of it was true? |
| 11 | A | Yes. |
| 12 | Q | And what did you tell him? |
| 13 | A | I told him no. |
| 14 | Q | You told him that it was not true? |
| 15 | A | Yes. |
| 16 | Q | Is there any more detailed discussion? |
| 17 | A | I don't think there is any detailed |
| 18 | | discussion. |
| 19 | Q | How long of a conversation was that? |
| 20 | A | It wasn't long. |
| 21 | Q | Okay. |
| 22 | A | I would say less than five minutes. |
| 23 | Q | Had Sheriff Stines spoken to Patty Stockham |
| 24 | | before he had spoken to you? |

| | | |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | he didn't give you an indication of whether |
| 3 | | he had or had not to Ms. Stockham? |
| 4 | A | No. |
| 5 | Q | Okay. |
| 6 | | **MS. BAXTER:** I guess we will make this an |
| 7 | | Exhibit. |
| 8 | | **(The document was marked Exhibit 20)** |
| 9 | Q | Do you recognize this document? |
| 10 | A | Yes. |
| 11 | Q | So did he hand you this document during |
| 12 | | that five minute meeting that you were just |
| 13 | | testifying about? |
| 14 | A | I don't think so. |
| 15 | Q | When did you get ahold of this memorandum? |
| 16 | A | I can't remember. |
| 17 | Q | Did he tell you during that first meeting |
| 18 | | that you were be put on leave or suspended |
| 19 | | without pay? |
| 20 | A | I believe so.  I had my gun with me and my |
| 21 | | badge, and I gave that back to him. |
| 22 | Q | Okay. Did Sheriff Stines tell you anything |
| 23 | | else about anyone else that he had spoken |
| 24 | | to that day prior to speaking to you? |

| | | |
|---|---|---|
| 1 | A | Not that I can remember. |
| 2 | Q | Is that Sheriff Stine's signature there? |
| 3 | A | It looks like it. |
| 4 | Q | Sp he called you on the phone.  You went |
| 5 | | and met with him very briefly.  Did you |
| 6 | | have any other communications with him on |
| 7 | | that day? |
| 8 | A | Not that I can remember. |
| 9 | Q | And on that day, were you told that you |
| 10 | | were being suspended with pay or without |
| 11 | | pay? |
| 12 | A | It would have been without pay. |
| 13 | Q | Okay. And then, did he tell you that he had |
| 14 | | spoken to the County Attorney about this |
| 15 | | issue? |
| 16 | A | I can't remember, he might have. |
| 17 | Q | Okay. Did he tell you anything about why |
| 18 | | you are being suspended without pay? |
| 19 | A | I guess he had consulted with the County |
| 20 | | Attorney and that is what he advised. |
| 21 | Q | You know, what about the next day?  Do you |
| 22 | | know whether that initial conversation and |
| 23 | | in person, did that occur on January 31st? |
| 24 | A | It could, if that is the day that it came |

| | | |
|---|---|---|
| 1 | | out. |
| 2 | Q | That is the day that the lawsuit was filed. |
| 3 | A | Okay. |
| 4 | Q | Were given any other documents related to |
| 5 | | your suspension without pay aside from the |
| 6 | | memorandum? |
| 7 | A | I can't remember. |
| 8 | Q | Were you told anything about an |
| 9 | | administrative investigation or was the |
| 10 | | Sheriff's Office intending to do any kind |
| 11 | | of investigation related to all of this? |
| 12 | A | I don't know. |
| 13 | Q | You were told anything about that? |
| 14 | A | No. |
| 15 | Q | Was there anybody present at that meeting |
| 16 | | aside from you and Sheriff Stines? |
| 17 | A | No. |
| 18 | Q | And then, where did you after you left the |
| 19 | | Sheriff's office that day? |
| 20 | A | I can't remember.  I think maybe home. |
| 21 | Q | Okay. Who did you talk to that evening? |
| 22 | A | What do you mean? |
| 23 | Q | Who did you talk to on the evening of the |
| 24 | | 31st, if you can recall? |

| | | |
|---|---|---|
| 1 | A | I don't really recall. |
| 2 | Q | Okay. The letter that you have got in front |
| 3 | | is dated February 2, 2022 terminating your |
| 4 | | employment. I am wondering did yo have any |
| 5 | | communication or interaction with anyone |
| 6 | | from the sheriff's office on February 1st? |
| 7 | A | I don't believe so. I don't remember |
| 8 | | **(The document was marked Exhibit 21)** |
| 9 | | **MR. KELLY:** Do you know the dates of the week? |
| 10 | | **Ms BAXTER:** I don't. |
| 11 | Q | On February 2nd, - - How did you receive a |
| 12 | | copy of this letter? |
| 13 | A | This is the letter that he handed to me |
| 14 | | when I was in the parking lot. |
| 15 | Q | Okay. So what parking lot was that? |
| 16 | A | I think that I was parked in the funeral |
| 17 | | home parking lot which is right - - just a |
| 18 | | road between it and the courthouse parking |
| 19 | | spots. |
| 20 | Q | Okay. Did he ask you to come there? |
| 21 | A | No. |
| 22 | Q | Why were you there? |
| 23 | A | I think I was there waiting on my wife to |
| 24 | | get off work. |

| | | |
|---|---|---|
| 1 | Q | And Sheriff Stines handed you this letter? |
| 2 | A | Yes. |
| 3 | Q | Did he say anything to you about your years |
| 4 | | of service or about these allegations or |
| 5 | | anything? |
| 6 | A | I think that he just made reference that he |
| 7 | | hated about everything, and that as it. |
| 8 | Q | Have you spoken to Patty Stines on or |
| 9 | | before February 2nd about this complaint? |
| 10 | A | Patty Stockham, you mean? |
| 11 | Q | Patty Stockham, yes. |
| 12 | A | I think that I did. I contacted her and |
| 13 | | told her what was going on, and she decided |
| 14 | | that it was - - that I was no longer over |
| 15 | | the house arrest. |
| 16 | Q | By what is going on, did you tell her that |
| 17 | | you had lie to her and let Sabrina Adkins |
| 18 | | off of house arrest back in August? |
| 19 | A | No. |
| 20 | Q | Did you tell her that you had had sexual |
| 21 | | relations with Sabrina Adkins in the |
| 22 | | courthouse? |
| 23 | A | No. |
| 24 | Q | Were you aware that Stines had had a |

| | | |
|---|---|---|
| 1 | | conversation on February with the Jailer, |
| 2 | | Bert Slone? |
| 3 | A | I don't recall that. |
| 4 | Q | I guess your wife was working at the jail |
| 5 | | on February 2nd, because that is why that |
| 6 | | you are waiting for her in the parking lot; |
| 7 | | correct? |
| 8 | A | She was working in the courthouse. |
| 9 | Q | In the courthouse. So she had already |
| 10 | | gotten a new job at the courthouse? |
| 11 | A | Yes. |
| 12 | Q | Okay. Do you know anything any |
| 13 | | investigations or complaints related to |
| 14 | | inmates in the jail, and that would concern |
| 15 | | you? |
| 16 | A | No. |
| 17 | Q | And so to the best of you recollection, |
| 18 | | were you terminated from your employment |
| 19 | | with EKCS on February 2nd also? |
| 20 | A | I would so. If not, maybe the 1st.  I might |
| 21 | | have called Patty the 1st, and told her. I |
| 22 | | can't remember really. I might have called |
| 23 | | her the night of the 31st and told her what |
| 24 | | was going on. I can't - - I can't remember. |

```
 1   Q        Okay. Do you recall being interviewed by
 2            Attorney General Investigator Matt Eastern
 3            and Detective Shannon Blevins?
 4   A        I can't remember their names, but I
 5            remember being interviewed.
 6   Q        Where did that interview occur?
 7   A        In the Taco Bell parking lot.
 8   Q        Why there?
 9   A        I was in Whitesburg, and they called me and
10            they had went to my residence where that I
11            lived at and no vehicles was there, so they
12            contacted me, and told me who they were and
13            said, can we meet somewhere, and I said,
14            well, I am in Whitesburg. I can meet you
15            anywhere that you want, and he said, well,
16            there is a Taco Bell across from a gas
17            station, and I said, I will be there
18            waiting on you.
19   Q        Okay. How long did that conversation last?
20   A        I don't know. I would say over an hour.
21   Q        Okay. You ultimately plea guilty to some
22            charges related to Sabrina Adkins
23            allegations; correct?
24   A        Yes.
```

| | | |
|---|---|---|
| 1 | Q | Let me look at my notes. So am I correct |
| 2 | | that you plea guilty to rape in the third |
| 3 | | degree, sodomy in the third degree, |
| 4 | | tampering with prisoner monitoring device |
| 5 | | and perjury in the second based on charges |
| 6 | | related to Sabrina Adkins? |
| 7 | A | No. |
| 8 | | **MR. KELLY:** This includes Jennifer, too. |
| 9 | Q | It was my understanding that the charges |
| 10 | | related Jennifer Hill were dismissed? |
| 11 | A | Yes. |
| 12 | Q | My question to you is, and we will go one |
| 13 | | by one.  Did you plead guilty to rape in |
| 14 | | the third degree related to claims made by |
| 15 | | Sabrina Adkins? |
| 16 | A | Yes. |
| 17 | Q | Did you plead guilty because you are |
| 18 | | guilty? |
| 19 | | **MR. KELLY:** Well, did you plead guilty because |
| 20 | | you committed the crime? |
| 21 | A | Yes. |
| 22 | Q | Did you plead guilty to a charge of sodomy |
| 23 | | in the third degree related to complaints |
| 24 | | made by Sabrina Adkins? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And did you plead guilty to that charge |
| 3 | | because you are guilty of that charge? |
| 4 | A | Yes. |
| 5 | Q | Did you plead guilty to a charge of |
| 6 | | tampering with prisoner monitoring devices |
| 7 | | related to complaints made by Sabrina |
| 8 | | Adkins? |
| 9 | A | Yes. |
| 10 | Q | Did you plead guilty because you are |
| 11 | | guilty? |
| 12 | A | Yes. |
| 13 | Q | And finally, did you plead guilty to a |
| 14 | | charge of perjury in the 2nd degree? |
| 15 | A | Yes. |
| 16 | Q | Did you plead guilty to that charge, was it |
| 17 | | related to Sabrina Adkins' complaints? |
| 18 | | **MR. KELLY:** That is my problem. One of them was |
| 19 | | for Brianna Freeman. |
| 20 | Q | It is my understanding that the perjury |
| 21 | | related to the filing of the criminal |
| 22 | | complaint? |
| 23 | A | Yes. |
| 24 | Q | And you filed a criminal complaint related |

1           to Sabrina Adkins; correct?

2   A      Yes.

3   Q      And did you plead guilty to that charge or

4           perjury related to that complaint against

5           Sabrina Adkins because you are guilty of

6           perjury in the second degree?

7   A      Yes.

8      **MR. KELLY:** The tampering was the one for

9   Brianna?

10     **MS. BAXTER:** There was one for Brianna, yeah.

11   I may been finished. I would like to take a

12   break. I would like to talk to my client 10

13   minutes.

14      **(A short break was taken)**

15   Q      I just have a couple more questions. Almost

16           finished. You talked to Mickey Stines on

17           February 2nd when he terminated you. Have

18           you ever at any time after February 2nd

19           spoken to Mickey Stines about anything

20           related to this case?

21   A      No.

22   Q      Have you spoken to any of your other former

23           sheriff deputy colleagues at any point

24           after you were terminated about this case?

```
1   A       No.

2   Q       Or any of the facts underlying in this

3           case?

4   A       No.

5       MS. BAXTER: I think that is all that I have.

6       MR. KELLY: You didn't include his wife in that

7       question.

8       MS. BAXTER: You didn't work with your wife as a

9       sheriff deputy officer.  His wife never worked

10      for the Letcher County Sheriff's Department

11      MR. SHAW: Don, do you have anything?

12      MR. JONES: No, Jon, I don't.

13

14

15

16

17

18

19

20

21

22

23

24
```

1    <u>CROSS-EXAMINATION</u>

2    **MR. SHAW:**

3    Q        I just have a couple of quick ones. I

4             didn't see in the messages the exchange

5             Where Ms. Adkins was providing you photos

6             of her cleavage and telling you that she

7             gets what she wants and things of that

8             nature. Do you remember exchanging those

9             messages with her?

10   A        Yes, I remember seeing those.

11   Q        All right. Were you aware at the time that

12            she was sending you those messages that she

13            already had an attorney involved?

14   A        I was not.

15            **MS. BAXTER:** Object to form.

16            **MR. SHAW:** She was represented by counsel, so

17            that was your client's testimony.

18   Q        I think that we covered this.  But the

19            police cruisers, you took a police cruiser

20            home, because as Court Security, you would

21            also serve papers in the evenings

22            occasionally?

23   A        Yes, if we had civil papers or something to

24            serve on people, if it was on my way home,

1          I would u sally stop and serve.

2     Q    You have to transport prisoners at times?

3     A    Yes, I would have to leave early in the

4          morning and go somewhere to get a prisoner

5          and bring them back.

6     Q    And even though you are Court Security,

7          were you also on-call for emergency

8          situations?

9     A    Yes.

10    Q    If it was after hours and you would go out

11         and check on someone, I wasn't sure if you

12         were test running, would you drive our

13         personal vehicle?

14    A    Most often.

15    Q    And were the times that you were stopping

16         on the way home or between work at the

17         courthouse and home, if something came up,

18         then, you would drive the cruiser?

19    A    Yes.

20    Q    And maybe be in uniform?

21    A    Yes.

22    Q    Okay. The work at the courthouse, what time

23         did it generally end your shift as Court's

24         Security?

| | | |
|---|---|---|
| 1 | A | Usually at 4:00. |
| 2 | Q | 4:00? |
| 3 | A | Or a little bit before. |
| 4 | Q | Earlier you testified that you kinda |
| 5 | | shadowed Mickey Stines for a while, the |
| 6 | | home incarceration services? |
| 7 | A | Yeah. |
| 8 | Q | So that was after work hours? |
| 9 | A | Yes. |
| 10 | Q | Or after your work hours with the Sheriff's |
| 11 | | Department? |
| 12 | A | Yes. |

13      **MR. SHAW:** I will pass the witness.

14      **MS. BAXTER:** I don't have any more questions.

15      **MR. KELLY:** Done.

REPORTER'S CERTIFICATE

STATE OF KENTUCKY

COUNTY OF JOHNSON

      I, Joey VanHoose, Stenographer and Notary Public, and for the State of Kentucky at Large, do certify that the foregoing deposition of BEN FIELDS was taken at the place, on the date and for the purposes stated in the Caption and that the appearances were as noted herein.

      FURTHER, I certify that that witness was duly sworn by me before testifying; that the testimony was reported by me in steno notes and electronically recorded; and thereafter, I constitute a true, correct and complete transcript of my said shorthand notes as could be heard and understood by me.

      GIVEN under my hand at Paintsville, Kentucky, this 18th day of September, 2024.

    My Commission Expires August 1, 2026.

                _____

                Joey VanHoose

                KYNP53570