UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION
CIVIL ACTION NO. 7:22-CV-00007-REW-EBA


SABRINA ADKINS, ET AL                    PLAINTIFFS


VS:        DEPOSITION OF MICKEY STINES

BEN FIELDS, ET AL                        DEFENDANTS


            *  *  *  *  *  *  *  *  *  *  *

        The Deposition of MICKEY STINES was taken

on behalf of the Plaintiffs on September 16, 2024 at

the Law Offices of Ned Pillersdorf, 124 West Street,

Prestonsburg, Kentucky.

        Said deposition was taken pursuant to

notice, previously filed, and is to be used for

purposes of discovery and all other purposes

permitted by the Rules of Civil Procedure.

APPEARANCES

ON BEHALF OF PLAINTIFF:

                HON. BETHANY BAXTER
                201 WEST SHORT STREET, STE 300
                LEXINGTON, KY 40507
                bethanybaxter@jchilderslaw.com

                HON. NED PILLERSDORF
                124 WEST STREET
                PRESTONSBURG, KY 41653

ON BEHALF OF DEFENDANTS:

                HON. JONATHAN SHAW
                P.O. DRAWER 1767
                PAINTSVILLE, KY 41240
                jshaw@psbb-law.com

                HON. DANIEL DOTSON
                178 MAIN STREET, STE 1
                WHITESBURG, KY 41858

                VIA ZOOM

                HON. JASON WILLIAMS
                303 SOUTH MAIN STREET
                LONDON, KY 41743
                jason@wftlaw.com

                HON. DON JONES
                P.O. BOX 276
                PAINTSVILLE, KY 41240
                don@djoneslawoffice.com

ALSO PRESENT:        VIA ZOOM

                SABRINA ADKINS

CAPTION PAGE . . . . . . . . . . . . . 1

APPEARANCES  . . . . . . . . . . . . 2

INDEX . . . . . . . . . . . . . . . 3

DIRECT EXAMINATION BY:

    HON. BETHANY BAXTER . . . . . . . 4-191

CROSS- EXAMINATION BY:

    HON. JASON WILLIAMS . . . . . . .192-193


CROSS-EXAMINATION BY:

    HON. JONATHAN SHAW  . . . . . . . 194-195


REPORTER'S CERTIFICATE. . . . . . . . . 196

Plaintiff's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10,
11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,
and 24

Defendant's Exhibits 1, 2 and 3

1   WHEREUPON, MICKEY STINES, THE WITNESS, HAVING

2   BEEN DULY SWORN BY THE COURT REPORTER, WAS EXAMINED

3   AND TESTIFIED AS FOLLOWS:

4                    **DIRECT EXAMINATION**

5   **MS. BAXTER**

6   Q      Sheriff Stines, my name is Bethany Baxter.

7          I represent Sabrina Adkins and the estate

8          of Jennifer Hill in this case, and I am

9          going to be taking your deposition today.

10         So my first question for you, have you ever

11         given a deposition before?

12  A      Years ago in a car wreck case, I believe,

13         20 years ago.

14  Q      Okay. That is the only other occasion?

15  A      Yes, ma'am.

16  Q      Okay. I am just going to talk about some

17         ground rules. As you know, you are under

18         oath.  I am going to be asking you some

19         questions today. As the day goes on,

20         sometimes my questions get longer and maybe

21         a little harder to understand. Don't be shy

22         about asking me to rephrase something or

23         repeat something, I am happy to do that. If

24         you don't ask me to rephrase or repeat a

25         question, I am going to assume that you

1              understood my question, and that your

2              answer is responsive to my question; is

3              that fair?

4    A         Yes.

5    Q         I am happy to take breaks today, and so

6              forth, if you want to talk to your attorney

7              or go to the bathroom or whatever you want

8              to do. My only request is that if I have

9              asked you a question, I would ask that you

10             respond to that question before we take the

11             break; okay?

12   A         Okay.

13   Q         The other thing that I will say is we have

14             got a court reporter here, who is taking

15             down everything that is being said. So I am

16             going to ask you to try to make verbal

17             responses instead of shaking your head or

18             uh-huh or uh-uh, because that gets

19             confusing when we come back to read the

20             record down the line; okay?

21   A         Yes.

22   Q         Okay. What did you do to prepare for your

23             deposition today?

24        **MR. SHAW:** She doesn't want to know about any

25        conversations you have had with me or with your

1          personal attorney.

2     A       Okay. So I looked over Sabrina Adkins'

3             deposition. I attended Ben Fields', Patty

4             Stockham's.

5     Q       You read Patty Stockham's deposition?

6     A       Yes.

7     Q       Any other documents that you reviewed?

8     A       The interrogatories?

9     Q       The interrogatories that you produced in

10            this case?

11            **MR. SHAW:** We are not for sure whose.  He looked

12            at some Discovery, written Discovery in the

13            process.

14    Q       Okay. Anything else that you can recall?

15    A       Don't believe so.

16    Q       Where were you born and raised?

17    A       Born in Whitesburg, Kentucky.

18    Q       In town?

19    A       At the hospital.

20    Q       Okay. Where did you grow up?

21    A       I grew up in Fleming Neon.

22    Q       Okay. I don't think that I asked you.  Will

23            you state your full name for the record,

24            your legal name?

25    A       Yes.  Shawn Mickey Stines.

```
 1    Q       So when your parents brought you home from

 2            the hospital, they took you back to Fleming

 3            Neon?

 4    A       Yes.

 5    Q       And how long did you live in Fleming Neon?

 6    A       19 years.

 7    Q       Then, where did you move after you left

 8            Fleming Neon?

 9    A       McRoberts.

10    Q       Did you move there with your parents or did

11            you move there by yourself?

12    A       My wife.

13    Q       So you got married at 19 years old?

14    A       Actually when we moved there, we wasn't

15            married.

16    Q       Okay. What is your wife's name?

17    A       Caroline Stines.

18    Q       What is her maiden name?

19    A       Gibson.

20    Q       Where is she from?

21    A       She is from McRoberts originally.

22    Q       Okay. How old are you?

23    A       I am 43.

24    Q       So I know you just said your spouse's

25            maiden name.  Any other sir names of folks
```

| 1 | | in your family in Letcher County aside from |
| 2 | | Stines or Gibson? |
| 3 | A | I am not really sure what you are asking |
| 4 | | me. |
| 5 | Q | Last names is what I mean by that? Like, |
| 6 | | what was your mother's maiden name? |
| 7 | A | Stines. |
| 8 | Q | Okay. What was your father's last name? |
| 9 | A | Don't know who my biological dad is. |
| 10 | Q | Okay. Fair. So did you go to college? |
| 11 | A | Southeast Community College. |
| 12 | Q | There in Whitesburg? |
| 13 | A | Yes. |
| 14 | Q | Okay. Did you graduate from Fleming Neon |
| 15 | | High School? |
| 16 | A | Yes. |
| 17 | Q | What did you study at Southeast? |
| 18 | A | Just basics. I only got 26 hours. |
| 19 | Q | Okay. And where you going to school full |
| 20 | | time? |
| 21 | A | Yes, and I had a job. |
| 22 | Q | Okay. What was your job? |
| 23 | A | I worked at Neon BP. |
| 24 | Q | Okay. What was your employment after you |
| 25 | | left Southeast Community College? |

| | | |
|---|---|---|
| 1 | A | Well, it was on BP for a little |
| 2 | | while. |
| 3 | Q | Okay. What about after that? |
| 4 | A | I went to the Fleming Neon Police |
| 5 | | Department. |
| 6 | Q | Okay. What year did you start with the |
| 7 | | Fleming Neon Police Department? |
| 8 | A | 2001, I believe. |
| 9 | Q | How long did you work at the Fleming Neon |
| 10 | | Police Department? |
| 11 | A | Seven months. |
| 12 | Q | Why did you leave that job? |
| 13 | A | Cut backs. |
| 14 | Q | What was your position with the Fleming |
| 15 | | Neon Police Department? |
| 16 | A | I was a Patrol Officer. |
| 17 | Q | Okay. So cut backs, you lost your job. |
| 18 | | What did you do after that? |
| 19 | A | I drew unemployment for some time, I don't |
| 20 | | know exact date. |
| 21 | Q | What after that? |
| 22 | A | I went to work for the sheriff's office. |
| 23 | Q | Okay. Who was the sheriff when you went to |
| 24 | | work for the sheriff's office? |
| 25 | A | Steve Banks. |

| | | |
|---|---|---|
| 1 | Q | Steve Banks. And what year would that have |
| 2 | | been? |
| 3 | A | 2002. |
| 4 | Q | Was the training that you received as a |
| 5 | | deputy sheriff different from the training |
| 6 | | that you received as a patrol officer? |
| 7 | | Do you want me to repeat the question? |
| 8 | A | Yeah. |
| 9 | | **MR. SHAW:** Are you talking about did he go to the |
| 10 | | academy twice? |
| 11 | Q | Do you have to go to the academy as a |
| 12 | | police officer? |
| 13 | A | Yes. |
| 14 | Q | And so that the same academy you would go |
| 15 | | to as a new deputy sheriff? |
| 16 | A | Let's talk? |
| 17 | | **MR. SHAW:** Yeah, let's - - |
| 18 | | **MS. BAXTER:** Okay. We can take a break. |
| 19 | | **(A break was taken)** |
| 20 | Q | I think the last question that I had was |
| 21 | | the academy training that you received as a |
| 22 | | patrol officer the same as the academy |
| 23 | | training that you would have received as |
| 24 | | Letcher County Sheriff's Deputy? |
| 25 | A | When I was policing at Neon, I got laid off |

1          because of money. They couldn't send me to

2          the academy, so I actually never attended.

3    Q    Okay. So did you attend the academy in 2002

4          when you went to work for the Letcher

5          County Sheriff's Office?

6          **MR. SHAW:** That was the point of confusion.

7          There are different types of academy training.

8          **MS. BAXTER:** That is what I am trying to figure

9          out.

10         **MR. SHAW:** He went to the academy, but not  - -

11         Let me explain his academy training.

12   Q    Let's let him testify for himself.

13   A    So the deputy sheriff has an academy that

14         20 weeks long.  Court Security officers

15         have an academy that is two weeks, and you

16         have different types of training for both.

17         So when I was initially hired for Steven

18         Banks, they put me through Pre-POPS, and I

19         was about to work the road and work the

20         court and stuff.

21   Q    Okay. So you did both the deputy training

22         and the CSO training?

23   A    I have never attended the academy that is

24         what you first asked when I first with - -

25         You have got a year to attend.

```
 1    Q        Okay.

 2    A        After that I worked for Steven Banks for

 3             seven months, Danny Webb came in.  I worked

 4             the road and court for Danny. During that

 5             time, Danny comes to me and says you says,

 6             do you want to be a road officer or court

 7             officer, and I said I will be court

 8             security. And he said we can get you

 9             grandfathered in and I had to take all of

10             their steps to be a court security officer.

11    Q        Okay. I just want to make sure that I

12             understand. So 2002 is when you first went

13             to work for the Letcher County's Sheriff's

14             Office?

15    A        Yes.

16    Q        Why don't you just tell me what training

17             you did when you first came on board?

18    A        When I originally went for Neon, I had to

19             take all of the Pre-POPS that is the

20             fitness.

21         MS. BAXTER: Sorry, we didn't turn the audio back

22         on.

23    Q        Pre-POPS. Okay?

24    A        Once you do that, you can take the other

25             training at the academy.  Neon laid me off,
```

1          and I didn't intend go to that one.

2     Q    Okay. That makes sense. So did you end up

3          doing that training after you went to

4          Letcher County Sheriff's Office?

5     A    Not the full 20 week academy, no, ma'am.

6     Q    Why not?

7     A    The position that they put me in the state

8          didn't require me to attend that.

9     Q    And what was that position?

10    A    Court security officer.

11    Q    That is helpful. So then, when Webb came in

12         seven months later, I think that I

13         understood you to say that he asked you

14         what position that you wanted and what was

15         your response to him?

16    A    When he came in, that was 2003, I believe.

17         I worked the road and court security. Years

18         later, he asked me do you want to go to the

19         academy and I said, no, I am going to stay

20         in court, and he said, okay.

21    Q    Okay. Do you have to do the 20 weeks of

22         deputy training to work the road?

23    A    Can we talk?

24    Q    Just if you know?

25         **MR. SHAW:** Just for the record, he, and I don't

1    know how long ago ID #: 1261, he suffers from

2    California Encephalitis.  So when he is under

3    stress, sometimes it causes some issues.

4         **MS. BAXTER:** I have never heard of that.

5         **MR. SHAW:** It is something that you get from tick

6    bites basically.

7    Q        Well, if we need to take more breaks, I

8             will be happy to do that, and if you don't

9             know the answer that's - -

10        **MR. SHAW:** And that is fine to say that you don't

11   know.  Let me talk with him for a second. We

12   will be right back.

13        **MS. BAXTER:** Off the record.

14        **(A break was taken)**

15   Q        Back on the record.  I think that I was

16            asking you if you had to do the 20 weeks of

17            deputy training to work the roads?

18   A        Yes.

19   Q        But you did not do that training under

20            Sheriff Banks; correct?

21   A        No.

22   Q        Did you ever get that training under

23            Sheriff Webb?

24   A        No.

25   Q        Okay. Did you get that training after that

1    you became sheriff?

2    A     No.

3    Q     What was the time period you were working

4          as deputy sheriff?

5        **MR. SHAW:** And you mean court security officer;

6    right?

7    Q     Letcher County Sheriff's Deputy Court

8          Security Officer. You said that you started

9          in 2003; correct?

10   A     No. 2002.

11   Q     2002, okay, correct. Was that until that

12         you became sheriff?

13   A     Yes, that was - - I took over in 2019, the

14         election was in 2018.

15   Q     Okay. And we will come back to some of that

16         in a minute. Any other jobs that you have

17         held prior to 2019?

18   A     Yeah, I worked for East Kentucky

19         Correctional Services.

20   Q     Okay. Aside from that, any other positions?

21   A     I was a security guard at the hospital.

22   Q     Okay. Any other positions besides that?

23   A     At one time, I was a drug sample gatherer

24         for Drug Court.

25   Q     Okay. Anything else?

```
 1    A         To the best of my knowledge, that is it.

 2    Q         Okay. We will talk about some of those

 3              later. Have you ever been named as a

 4              Defendant in litigation?

 5    A         Yes.

 6    Q         Was that the car accident case that you

 7              referenced earlier?

 8    A         I believe that I was just a witness in it.

 9    Q         Okay. What was the litigation where you

10              were named as a Defendant?

11    A         It would have been - -

12         MR. SHAW: Congleton.

13    A         Yes.

14    Q         What was the name?

15    A         Elisha Congleton.

16    Q         And did she work for the sheriff's office?

17    A         Yes.

18    Q         Okay. Aside from that case, any other

19              matters?

20    A         Not that I can think of, no.

21    Q         Have you ever been accused of work place

22              sexual harassment or sex discrimination?

23    A         No.

24    Q         Have you ever been responsible for

25              investigating sexual harassment, sexual
```

1          misconduct or discrimination in any

2          position that you have held?

3     MR. SHAW: Have you?  Or we can talk for a

4     second, if you want to.

5  A       I am not understanding her question.

6  Q       So think of all of the jobs that you have

7          had in your lifetime including your job as

8          sheriff.  Have part of the duties of any of

9          those jobs been to investigate sexual

10         harassment, sexual misconduct, or sex

11         discrimination?

12    MR. SHAW: I think that she is including this

13    case, too.  What happened when you received work

14    about this case?

15 A       Okay.

16    MR. SHAW: Have you had other incidents of

17    allegations?

18 Q       If you have questions, I would rather you

19         direct - - I would rather rephrase the

20         question. I know you are trying to be

21         helpful Jonathan.  Do you understand the

22         question?

23 A       No, not really.

24 Q       Okay. Let's start here. Have you ever in

25         your capacity as sheriff, have you ever

1          investigated a complaint of sexual

2          harassment or sexual misconduct?

3      **MR. SHAW:** Do you mean him individually, has he

4      investigated?

5  Q        Has he, as sheriff, ever investigated

6          sexual harassment or sexual misconduct?

7  A        Can we talk a second.  I am not - -

8      **MR. SHAW:** Yeah.

9      **(A break was taken)**

10     **MR. SHAW:** For clarification, I think that I

11     understand what you are saying. Are you talking

12     about internal allegations within the department

13     or are you talking about somebody from the

14     street coming in and saying my daddy is sexually

15     abusing me?

16 Q        I am talking about in your role as sheriff

17         related to employment, employees sexual

18         harassment, sexual misconduct. Does that

19         make sense now?

20 A        Yes.

21 Q        So have you ever been responsible for

22         conducting such an investigation?

23 A        This is the only one.

24 Q        Okay.

25 A        I immediately reported it, took action,

1              reported it to the State Police, they

2              declined, and I talked to the Commonwealth

3              Attorney, the County Attorney.

4    Q         And I will ask you more questions about

5              that, about this case later.  I was just

6              wondering have you at any other time

7              investigated sexual harassment - -

8         MR. WILLIAMS: Sorry. Could you please turn on

9         the audio for those on Zoom.

10        MS. BAXTER: Sorry about that.

11   Q         I think I heard you say that you have never

12             investigated sexual harassment or sexual

13             misconduct aside from employee Ben Fields;

14             is that correct?

15        MR. SHAW: Objection. He said that he referred

16        that to KSP.

17   Q         Okay. Let's ask it this way. Are the

18             allegations about Ben Fields the only time

19             that you have ever been made aware of an

20             allegation of sexual misconduct by a

21             sheriff's office employee?

22        MR. SHAW: Since he has been sheriff?

23        MS. BAXTER: Correct.

24        MR. DOTSON: I am not sure that I understand the

25        question, and I know why that he is hesitating

1    not to answer.

2    Q       You became aware at some point that Ben

3            Fields had been accused of sexual

4            misconduct while he was a Letcher County

5            sheriff's deputy; correct?

6    A       Yes.

7    Q       Has there ever been some other instance

8            while you were sheriff that you became

9            aware of a similar allegation related to

10           some other employee?

11   MR. SHAW: That is employed by you? I think you

12   prefaced it to the best of your recollection.

13   Q       That is all that I can ask to the best of

14           your recollection.

15   MR. SHAW: If you recall something, tell her, and

16   if you don't, then, you don't recall.

17   A       Yeah, to the best of my knowledge, I don't

18           recall.

19   Q       Okay. Have you ever been terminated by an

20           employer?  I don't mean laid off, I mean

21           terminated for cause?

22   A       No.

23   Q       Okay. Have you ever been disciplined by an

24           employer?

25   A       Yes.

```
1    Q      Who was that employer?

2    A      Sheriff Webb.

3    Q      What was the discipline?

4    A      Shave.

5    Q      You hadn't shaved?

6    A      No.

7    Q      Anything else that you can think of?

8    A      Not to my knowledge.

9    Q      Okay. Have you ever worked for the Letcher

10          County Jail?

11   A      No.

12   Q      I want to get a better feel for your job

13          duties with East Kentucky Correction

14          Solutions.  Am I correct that you worked,

15          and I am going to call it EKCS today for

16          short, you worked for EKCS at the same time

17          that you were a deputy sheriff; correct?

18   A      Yes.

19   Q      Okay. How did you come to get that job?

20   A      Judge Wood and Harold Bolling.

21   Q      Who are they?

22   A      Judge James T. Wood, and County Attorney

23          Harold Bolling.

24   Q      Was Wood District or Circuit?

25   A      District.
```

1    Q       Did they offer you the job?

2    A       They came to me and said we got a job

3            opportunity for you house arrest, if you

4            want it.

5    Q       Okay. Do you know why they were the ones to

6            approach you about that job?

7    A       I guess because they work that court.  They

8            had already worked that court before I even

9            started working there, and they needed

10           somebody.

11   Q       Okay. Did they work for EKCS themselves?

12   A       No, no, ma'am.

13   Q       Okay. So who was the first person with EKCS

14           who you met?

15   A       Was Patty.

16   Q       Okay. And what do you recall about that

17           initial meeting?

18   A       I had to go to Pikeville and take some

19           training.

20   Q       What kind of training?

21   A       She basically brought me in and showed me

22           all of the paperwork and showed me how to

23           hook everything up, showed me how all of

24           the equipment worked, how to put the leg

25           strap together with the clamps. I believe

1        that was it.

2    Q    Okay. And I believe Ms. Stockham, Patty

3         Stockham, testified that you worked for

4         EKCS for about 20 years; does that sound

5         correct?

6    A    No.

7    Q    How long did you work for EKCS?

8    A    14 TO 16 approximately.

9    Q    Years?

10   A    Yes.

11   Q    So would you have started in - - What would

12        that have been, 2005 about?

13   A    Yeah, maybe 2004.

14   Q    Okay. How were you paid for that work?

15   A    Contract labor, I believe once a month I

16        would get a certain amount commission, and

17        then at the end of the year, I would get a

18        1099.

19   Q    So you were paid on commission?

20   A    Yes.

21   Q    Do you recall how that commission was

22        calculated?

23   A    Per person that was on I got $3.00 a day,

24        and $25.00 for a hookup.

25   Q    Do you recall roughly how much you would

1    have made year to year at that job?

2    A    No.

3    Q    For example Ben Fields in 2021 made over

4         $30,000. Did you ever make that much in a

5         single year?

6    A    Yes.

7    Q    You did?

8    A    Yes.

9    Q    Was that about the average that you would

10        make is $30,000?

11   A    No, it would be different.

12   Q    Every year.  But you are saying that there

13        was years that you made $30,000?

14   A    Yes.

15   Q    Okay. So you just described the training

16        that you got up in Pikeville when you first

17        got hired.  Were you trained on any annual

18        basis after that initial training?

19   A    At one time while I was doing house arrest,

20        we got a different type of equipment. She

21        came in and trained me on that equipment,

22        just the hookup, the process and all of

23        that.

24   Q    Aside from that training, was there any

25        additional training you got from EKCS?

```
 1    A      I don't believe so.

 2    Q      Okay. I guess, as far as persons on home

 3           incarceration, was it your responsibility

 4           to make sure that they abided by the court

 5           order relating to the terms of that home

 6           incarceration?

 7    A      What was your question again?  Sorry.

 8    Q      So for the folks on home incarceration, was

 9           it your responsibility as home

10           incarceration officer to make sure they

11           abided by the terms of the home

12           incarceration?

13    A      The terms of the home incarceration, yes.

14    Q      Okay. And the terms of the home

15           incarceration, who sets those?

16    A      The court and the contract.

17    Q      So the judge can say this person is allowed

18           to go here or there; is that what you mean

19           by that might be in the court order?

20    A      Yes, and the statute.

21    Q      Okay. Anything else that kinda would

22           dictate the terms of someone's home

23           incarceration aside from the statute and

24           the judge's order?

25           MR. SHAW: Do you know the answer?
```

1    A        I didn't do all of them, but judges do

2             verbal.

3    Q        What do you mean by judge's do verbal?

4         MR. SHAW: Do you want to give her an example?

5    A        So when I have violation, I would report it

6             to the judge, and at times, they would say

7             put them in jail, and I would call down to

8             the jail.

9    Q        Okay. And would you be the one then to

10            transport that person to the jail?

11   A        A lot of mine was at the courthouse.

12   Q        So the violation was discussed in the

13            presence of the person on home

14            incarceration?

15   A        Yes.

16   Q        So is that what you mean when you said

17            judges did verbal?

18   A        Yes.

19   Q        Do you remember signing any kind of

20            employment contract with EKCS related to

21            your employment with them?

22   A        What was the question again?  Sorry.

23   Q        Did you ever sign any kind of employment

24            contract or agreement with EKCS related to

25            your work for them?

1    A    Not to my knowledge, no.

2    Q    Was it ever the case that  - - During the

3         time that you were working for EKCS, were

4         you also the court security officer?

5    A    Yes.

6    Q    I am going to use the term bailiff because

7         I understand that to be the same thing; is

8         that fair?

9    A    Yes.

10   Q    So were you the bailiff in District Court

11        or Circuit Court?

12   A    Mainly District.

13   Q    Okay. So were there ever times when you

14        would be working as a bailiff in District

15        Court and also put someone's ankle monitor

16        on?

17   A    No, I had them come after my job.

18   Q    Okay. What do you mean after your job?

19   A    After court security.

20   Q    Like time of day, what time of day would

21        that be?

22   A    I always had them to report at 4:30.

23   Q    Okay. So you would have them come back at

24        4:30 to get the ankle monitor; is that what

25        your testimony is?

1    A        If they was them in court and the judge

2             took them off and they had everything, I

3             would go ahead and take the equipment then.

4    Q        Okay. What about collecting fees?  Would

5             you ever collect fees from folks at the

6             same time as you were working as a bailiff

7             in District Court?

8    A        Can I ask you a question?

9    Q        I would rather that you answer my question,

10            and if you don't recall, that is fine too.

11            Was there ever a time that you can recall

12            when you were working as bailiff in

13            District Court and would have collected

14            fees, you know, during that time period

15            when you were working as a bailiff?

16       **MR. DOTSON:** Counsel, do you mean during the day

17       or do you mean the same month?

18   Q        Before 4:30?

19   A        If they was in court and the judge did an

20            arraignment, and they were on house arrest

21            and the judge said pre-trial in a month and

22            that was a Wednesday, and they said, Mickey

23            I have got the money. I would say hand it

24            here, yeah, and I would go ahead and take

25            it.

```
 1    Q        And give them a receipt, I guess?

 2    A        Yes. All monies that was collected was

 3             wrote out in a receipt.

 4    Q        Was all monies collected cash?

 5    A        I am just trying to remember if I took a

 6             check.  I mean I done it a long time.  I am

 7             not sure if I ever took a check.

 8    Q        Mostly money?

 9    A        Mostly.

10    Q        Do you know whether there is any sort of

11             agreement between EKCS and Sheriff Webb or

12             Sheriff Banks related to your work for

13             EKCS?

14    A        No.

15    Q        Do you recall there being any policies

16             about secondary employment for Letcher

17             County sheriff's deputies when you were

18             working there as deputy?

19    A        I had to get permission from Sheriff Webb.

20    Q        Okay. What did that look like getting

21             permission?

22    A        He just give verbal.

23    Q        Verbal permission?

24    A        Yes.

25    Q        And what Sheriff Banks; do you recall or
```

1        was that before you started working

2        for EKCS probably?

3    A   Yes.

4    Q   Okay. Aside from you getting permission

5        from Sheriff Webb, was there any

6        relationship between EKCS and the county or

7        the sheriff's office about deputies

8        performing that work?

9    A   No.

10   Q   So during that time period that you were

11       working for EKCS, what would you do when

12       Ms. Stockham told you that someone on home

13       incarceration was out of range?  Just walk

14       me through an example what that would look

15       like?

16   A   So when she would call me and give me the

17       details out of range what would happened is

18       she would tell me if she called them or

19       not.  I would try to make contact with them

20       or next of kin.

21   Q   Okay. How would you contact them?

22   A   By phone.

23   Q   What would happen next?

24   A   If I made contact with them, I would ask

25       them and see where they was at by phone,

1              what was going to be some kind of answer why

2              they were out of range.

3    Q    And would be a satisfactory response to

4              that question?

5    A    Someone could tell me hey, I am at the

6              doctor's office, and I forgot to tell

7              Patty, and I would be like okay, you have

8              got to bring in a excuse.  Once you get to

9              that office, time in and time out and you

10             bring that to me every Thursday.

11   Q    Okay. What would be an example of a not

12             satisfactory response?

13   A    I am up at Joe's just hanging out having

14             coffee.

15   Q    So what would you do if you got that kind

16             of response?

17   A    I would tell them that they have to go home

18             and then, I would contact the courts.

19   Q    And who would you contact at the courts?

20   A    The judge.

21   Q    What would you tell the judge?

22   A    We have a violation and what the violation

23             was.

24   Q    And then, what would happen next?

25   A    They would sometimes say get a warrant.

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | Sometimes they would say I will issue a |
| 3 | | bench warrant, just give them a break. |
| 4 | Q | That would be the third option to just give |
| 5 | | them a break? |
| 6 | A | Yeah, if they went back home.  If they went |
| 7 | | back home, just give them a break. |
| 8 | Q | Okay. Did you have the description to |
| 9 | | decide when someone should or shouldn't be |
| 10 | | given a break in that scenario? |
| 11 | A | No. |
| 12 | Q | So only the judge can make that decision? |
| 13 | A | Yes. |
| 14 | Q | Was there any documentation of those |
| 15 | | communication and that decision making or |
| 16 | | was that done verbally? |
| 17 | A | Verbally. |
| 18 | | **MR. SHAW:** Just for clarification, do you mean |
| 19 | | did he create documentation?  The court may have |
| 20 | | generated some type of warrant. |
| 21 | Q | Right, yeah. I guess when you were working |
| 22 | | as bailiff, who was the District Court |
| 23 | | Judge before Mullins? |
| 24 | A | Judge Wood. |
| 25 | Q | I think that you referenced earlier that |

1    there was a two week training that you got

2    as part of that CSO position?

3  A    No, there is a two week that you get to

4    that.  I was grandfathered in where that I

5    started so many years.  When you started

6    working as police and CSO, you could get

7    grandfathered in if you started years

8    before the state required that.

9  Q    So you are saying at the time that you

10    became a CSO, the state didn't even have

11    any kind of training for that position?

12  A    No.

13  Q    Do you recall when that training went into

14    affect?

15  A    No.

16  Q    What about Letcher County sheriff's office

17    policies, do you recall any training about

18    policies specific to Letcher County

19    sheriff's department?

20  A    Can I ask you a question?

21    **MR. SHAW:** When, before he was sheriff, after he

22    was sheriff?

23  Q    I mean once you became sheriff, it was your

24    responsibility to enforce those policies?

25  A    Yes.

1    Q       I am talking about before, when you were a

2            deputy, do you recall any training about

3            Letcher County sheriff's department

4            policies?

5    A       Yes, we received a policy manual.

6    Q       What would that training consist of?

7    A       I don't know detail by detail, but I

8            generalized myself with the policy book.

9    Q       Okay. So there is a policy book?

10   A       Yes.

11   Q       Do you remember when you received that

12           policy book at as a deputy sheriff?

13   A       I can't recall.

14   Q       I have got an Exhibit. I think this was

15           produced by you in Discovery, and it

16           references a 2008 Policy Manual for the

17           Letcher County sheriff's department; do you

18           see that?

19   A       Yes.

20   Q       So I guess back in 2008, was this the first

21           time that Letcher County developed a Policy

22           Manual?

23   A       I don't know.

24   Q       Would you have signed a form like this as a

25           deputy sheriff to the best of your

1          recollection?

2     A     I don't know.

3     Q     Okay. You testified earlier that you recall

4           receiving a Policy Manual, but do you

5           remember signing anything related to having

6           read or received that Policy Manual?

7     A     I can't remember.

8     Q     Okay. Since you became sheriff, is it your

9           practice to have deputies sign something

10          acknowledging receipt of the policies of

11          the sheriff's department?

12    A     Yes.

13    Q     Are they required to sign that at the time

14          they are hired or when do they sign that?

15    A     Yes.

16         **(The document was marked Exhibit 1 and Exhibit**

17         **2)**

18    Q     Okay. As part of your work with EKCS, did

19          you actually physically go out to people's

20          homes to get them hooked up on home

21          incarceration?

22    A     No, not to hook them up.

23    Q     Okay. between the time that a person is

24          hooked up and taking off of home

25          incarceration, would you ever be at their

1    physical home address?

2    A    Only if they had a violation and I

3         contacted a family member said hey, they

4         are gone, they ran off, they cut the ankle

5         bank, I might go out sometime and retrieve

6         that.  Most of the time, I have asked the

7         family to come and get it and bring it to

8         me. Sorry.

9    Q    So when you were working as a deputy

10        sheriff, did you have a sheriff's

11        department vehicle?

12   A    On and off, sometimes.

13   Q    Okay. I guess would there ever been an

14        instance that you would have driven the

15        sheriff's department vehicle out to

16        retrieve one of these home incarceration

17        devices?

18   A    Yes.

19   Q    Were there any policies about how you were

20        or were not suppose to use sheriff

21        department property?

22   A    Can ask you a question?

23        **MR. SHAW:** Yeah.

24        **(A break was taken)**

25        **MR. SHAW:** Can we get some clarification on time

1        frames when you are talking about?

2    Q      Yeah. When you were a deputy sheriff, were

3            there any policies on how deputy sheriffs

4            were or were not suppose to use sheriff's

5            department equipment?

6    A      Policy changes all of the time, but at

7            times, yes.

8    Q      Why would that policy change all of the

9            time?

10    A      I just said policies would change all of

11           the time.

12    Q      Well, specifically policies about using

13           sheriff's department equipment and property

14           like car, do you recall that policy ever

15           changing?

16    A      I don't recall.

17    Q      Well, do you remember there being a policy

18           when you were deputy sheriff?

19    A      Yes, I do believe there was a policy.

20    Q      So you recall what that policy was?

21    A      We can't - -

22       **MR. SHAW:** Just tell her.

23    A      Can you ask the question again?

24    Q      The policy regarding sheriff's department

25           equipment and property that you recall,

1          what do you recall that policy being?

2              **MR. SHAW:** At the time that he was deputy, not

3          since he has been the sheriff.

4     Q        Yes, exactly.

5     A        Yeah, you can't use department's stuff to

6              do other jobs.

7     Q        Right, and so you talked a little bit about

8              your work with EKCS, you were also security

9              guard at the hospital?

10    A        Yes.

11    Q        Tell me about that job, when did you start

12             that?

13    A        I don't remember the dates.

14    Q        Okay. It was while you were a deputy

15             sheriff?

16    A        Yes.

17    Q        Would you wear your deputy sheriff uniform

18             when you did that job or would you wear

19             some other uniform?

20    A        Some other uniform.

21    Q        Okay. Did you get any kind of approval from

22             Sheriff Webb to perform that work?

23    A        Yes.

24    Q        Was that approval documented in any where?

25    A        Can I have a break?

1    Q        Sure. It is going to be a long day.

2             **(A break was taken)**

3    Q        Okay. We were talking about your work as a

4             security guard at the hospital, and you

5             testified that there was only a verbal

6             approval from Sheriff Webb for you to

7             perform that service?

8    A        Yes.

9    Q        Okay. Did you use any Letcher County

10            sheriff's department equipment or property

11            in performing that job?

12   A        Yes.

13   Q        What did you use?

14   A        Gun, duty belt, and a cruiser at times.

15   Q        Okay. To be the security guard at the

16            hospital?

17   A        Yes.

18   Q        And was that a position that you were paid

19            directly by the hospital or did you get

20            paid through the sheriff's department?

21   A        No, the hospital paid us.

22   Q        Paid you directly.  Who is us?

23   A        Other workers.

24   Q        Other deputy sheriffs?

25   A        No, other workers at the hospital, the

1              security agency here at the hospital is

2              what I am talking about.

3    Q    Were you the only Letcher County sheriff's

4              deputy who was working as a security guard

5              at the hospital, if you can recall?

6    A    I don't recall.

7    Q    You also mentioned doing drug sample

8              gathering for Drug Court?

9    A    Yes.

10   Q    Same question, did you use any sheriff's

11             department property or equipment to perform

12             that job?

13   A    I can't recall.

14   Q    What was the time period when you were

15             performing that drug sample gather or job?

16   A    That job was kinda unique, because with

17             Drug Court back years ago when Judge Wood

18             was there, they would have me sample people

19             right there in the courthouse.

20   Q    Okay. And were you paid for that job AOC, I

21             guess or did AOC pay the sheriff's

22             department to pay you?

23   A    No, I only did that job for like two weeks.

24   Q    Okay.

25   A    I got one pay and to be honest, I can't

1              remember who it came from, because I didn't

2              enjoy that job.

3    Q         Okay. What about the security guard at the

4              hospital, what was the time period you were

5              performing that job?

6    A         There was multiple shifts.  It was all – –

7    Q         Years, how many years did you that job?

8    A         I can't remember the years.

9    Q         Okay. More than one year?

10   A         Yes.

11   Q         Why did you decide to run for sheriff?

12   A         It has been my lifelong dream even as a kid

13             to the sheriff.

14   Q         To be a sheriff?

15   A         Yeah. My mamaw and mother told me when I

16             was a kid that I talked about being a

17             sheriff.

18   Q         And think that you testified earlier that

19             you won the election in 2018, and you

20             became a sheriff in 2019; correct?

21   A         Yes.

22   Q         So before you became sheriff,  – – I guess

23             after you won the election and before you

24             became sheriff, did you make a decision to

25             hire Ben Fields?

```
 1    A        Ben Fields was hired by Sheriff Webb.

 2    Q        Right.  He was hired right as Webb was

 3             going out and you were coming in. So was it

 4             Webb's decision to hire or was it your

 5             decision?

 6    A        I gave a recommendation.

 7    Q        Okay. And you recommended Fields to Webb, I

 8             guess?

 9    A        Yes.

10    Q        Okay. Did you terminate any other deputy

11             sheriffs to make room for Ben Fields to

12             have that job?

13    A        No, I didn't terminate anybody.

14    Q        Okay. Did any other deputy sheriffs leave

15             the sheriff's department at the same that

16             Sheriff Webb left?

17    A        Restate the question please?

18    Q        I will be a little more specific. I think

19             from some of your Discovery, you said prior

20             to 2019 someone named Keith Smith and

21             someone named Joshua Pease, P-E-A-S-E had

22             worked for the sheriff's department?

23    A        Yes.

24    Q        When did they leave and why, if you know?

25             MR. SHAW: If you know?
```

1    A    I don't know when they left. Josh Pease

2         resigned and Keith Smith, I don't know.

3    Q    Was there anybody else who was hired right

4         about that time that Ben Fields was hired?

5    A    Billy Jones maybe was the SRO.

6    Q    Is that someone that works in the school?

7    A    Yes.

8    Q    Did you recommend Billy Jones?

9    A    You got me kinda.  She has got me kinda

10        confused on you are talking.  I don't know

11        if Sheriff Webb hired Billy Jones.

12   Q    That wasn't my question.  Did you recommend

13        Billy Jones?

14   A    For the SRO job?

15   Q    Correct.

16   A    That is kinda a whole different job

17        situation as far as hiring.

18   Q    Explain that to me?

19   A    The SRO is hired through our office, but

20        the school system does a contract for Mr.

21        Jones, so the school system conducted

22        interviews and everything.

23   Q    Okay. So they did the hiring?

24   A    Yes.

25   Q    I see.  Are you aware of whether there is

1        any kind of agreement between EKCS and the

2        county today related to home incarceration?

3   A     I am not aware.

4   Q     Are you aware of any agreements between

5        EKCS and the jail today related to home

6        incarceration?

7   A     I am not aware.

8   Q     Okay. Did you receive any training when you

9        got elected as sheriff?

10  A     Yes.

11  Q     Okay. What kind of training did you

12       receive?

13  A     It is the state required training.

14  Q     Okay. Explain to me what that looks like?

15  A     Before I took over, I went, I think, it was

16       December of 2018 to the sheriff's

17       conference.

18  Q     Where was that?

19  A     I don't recall that year.  They move it

20       from year to year.

21  Q     So that is an annual training?

22  A     Yes.

23  Q     Have you attended every year?

24  A     Yes, but one.

25  Q     Okay. What year did you not attend?

```
 1    A        Covid.

 2    Q        Makes sense.  What kind of training do you

 3             get at that conference?

 4    A        I mean all different types.

 5    Q        Can you give me some examples?

 6    A        Legal update, they go over PTSD, what signs

 7             to watch for and stuff like that.

 8    Q        What about supervising employees, and

 9             training about supervising employees?

10    A        Yes.

11    Q        Explain that to me?

12    A        They just go over and talk about make sure

13             that, you know, you recognize your policies

14             and stuff like that.

15    Q        What do you mean by recognize your

16             policies?

17    A        Just make sure they are up to date and

18             stuff like that.

19    Q        Do you believe Letcher County sheriff's

20             department's policies to be up to date?

21    A        To the best of my knowledge.

22    Q        Aside from attending that training, did you

23             anything else ready yourself for the

24             sheriff's position as far as training goes?

25    A        Are you asking at the beginning or the
```

1          whole time?

2     Q    You got elected and you are about to become

3          sheriff.  I am wondering what all you did

4          to ready yourself for that position?  You

5          have talked about going to a state required

6          training?

7     A    Yes.

8     Q    Anything else that you did?

9     A    Yeah, I come over and kinda shadowed

10         Sheriff Webb a little bit.

11    Q    Okay. Anything else?

12    A    Not that I can think of.

13    Q    What about any efforts when you became a

14         sheriff to review or revise any of the

15         Letcher County sheriff's department's

16         policies?

17    A    Can you ask that again?

18    Q    Did you review or revise any of the Letcher

19         County sheriff's department's policies at

20         the time that you became sheriff?

21    A    Yeah, I familiarized myself with the

22         policies, yes, all of them, and I have

23         through the years.

24    Q    Do you remember revising any of them?

25    A    Policy changes, so I don't know.  As soon

```
 1              as I took over, is that what you are asking?

 2     Q        So in 2019 when you became sheriff, did you

 3              revise any of the Letcher County sheriff's

 4              department's policies?

 5     A        I can't recall.

 6     Q        Did you know Ben Fields prior to making

 7              that recommendation that he be hired as a

 8              sheriff's deputy?

 9     A        Work, yeah.

10     Q        What do you mean by work?

11     A        He worked at the jail, and I worked as

12              court bailiff.

13     Q        So you knew him through your work at the

14              courthouse?

15     A        Yes.

16     Q        What did you think of him at that time?

17     A        Nice guy, polite, professional, always at

18              work, just an all around good guy from what

19              I know.

20     Q        Were those the reasons why to hire him for

21              the bailiff position?

22     A        Yeah, he was dependable.

23     Q        And was that also the reason why that you

24              recommended him to Patty Stockham to work

25              for EKCS?
```

1    A       Yes.

2    Q       All right. Did you know any of Ben's

3            family?

4    A       His dad, Jerry Fields was a long time

5            constable. He was a well respected man in

6            the community and his mother, Nell Fields.

7            As far as anybody else, I didn't really

8            know his family that well.

9    Q       He had a sister Holly that worked at the

10           courthouse, too; correct?

11   A       Not at that time, I don't - - Yeah, she

12           might have worked at the clerk's office.

13   Q       Okay. Prior to recommending him to Sheriff

14           Webb, had Ben Fields ever been to your

15           house before?

16   A       I don't recall.

17   Q       Okay. I understand that you have maybe a

18           weekly poker party?

19   A       I wouldn't refer to it as a poker party.

20   Q       Well what would you refer to it as?

21   A       It is a gathering of friends and

22           individual, you know.  We played Rook

23           there, we played corn hole there, we have

24           had fish fries there that we fed the whole

25           community.  My neighbor's wives have come

1              up and played poker and we gather outside

2              around the fire pit. It is just not poker

3              all of the time is what I am getting at.

4       Q      Had you invited Ben Fields to any of those

5              gatherings that you just described prior to

6              recommending him for sheriff's department

7              position?

8       A      I don't believe so.

9       Q      Okay. I guess after he became a deputy

10             sheriff, you did invite him to some of

11             those parties; correct?

12      A      Yes.

13      Q      Did you know any of Ben's family who were

14             working at the jail at the time that you

15             recommended him for deputy sheriff?

16      A      His wife, Angie.

17      Q      Were you aware of any disciplinary issues

18             related and his work at the jail?

19      A      No, I spoke to the previous jailer, Don

20             McCall, and Don says he is a great guy, no

21             issues in his employment.

22      Q      And after Ben Fields applied for the

23             position with the sheriff's department,

24             part of that employment process was doing

25             some - - a lie detector test or something

1          of that nature?

2    A          Yes, that is the Pre-POPS.

3    Q          The pre-POPS.  Do you remember whether you

4               ever reviewed his pre-POPS report?

5    A          Yeah, I am sure that I have looked at it.

6         **MR. SHAW:** Just for the record, are you talking

7         about the actual questions and answers or are

8         you talking about the cover letter that says

9         whether or not they passed?

10   Q          I guess, the report is more than one page,

11              what I saw in the records that you

12              produced, so I guess the whole report?  Did

13              you look at that report?

14        **MR. SHAW:** If you didn't, that is fine.

15   A          I don't know. She has asked me a question,

16              and the polygraph is multiple levels.

17   Q          Did you look through the polygraph?

18   A          Yes, the questions.  They give you a big

19              packet before you take it and stuff.

20        **MR. SHAW:** She is not talking about your

21        polygraph.  Did you review Ben's or did you just

22        rely upon the report.

23   A          No, I just relied on the report of the

24              examiner.

25   Q          In Discovery you produced a file of stuff

1          that represented a Fields personnel file;

2          do you recall that?

3     A    Yes.

4     Q    And included in that was a report that

5          included some questions and answers from

6          Ben Fields; do you recall that?

7     A    I would have to look at it.  I can't

8          recall, like you just said it is a lot.  I

9          mean I don't know what you are talking

10         about.

11         **MR. SHAW:** And I don't know that you would have

12         all of that in his personnel file.  They do the

13         review and I think they mark some of it, but go

14         ahead and ask your questions.

15    Q    Do you recall seeing in Mr. Fields's

16         employment history an admission by him that

17         on at least one occasion that he consumed

18         alcoholic beverages while at work at the

19         jail; do you recall seeing that?

20    A    I don't recall.

21    Q    Within those documents that you produced,

22         do you recall seeing an admission by Mr.

23         Fields that while he was employed at the

24         Letcher County Jail, he engaged in sexual

25         contact during work hours at the detention

1          center?

2     A          No, I don't recall that.

3     Q          If you had of seen that, would you have

4                considered those to be red flags?

5     A          That examination, that report that they

6                send in, they recommend suitable.

7     Q          Who is they?

8     A          It is DOCJT, I believe.

9          **MR. SHAW:** That is a state background check, and

10         state examination.

11    Q          Yeah, that is fine. I was just wondering

12               had you seen that information that he had

13               consumed alcoholic beverages, and he had

14               engaged in sexual contact during work hours

15               at the detention center, had you known

16               that, would you consider that as red flags

17               in hiring Ben Fields?

18    A          They send a report saying that they are

19               suitable for the job. I have got reports

20               that says is not suitable for the job, so I

21               took that as the state recommendation that

22               he passed their exam.

23    Q          I understand that, but that is not my

24               question.  My question is had you known

25               that he had consumed alcoholic beverages

1              while at work, engaged in sexual contact

2              during work hours of the detention center,

3              would you have considered those red flags

4              in hiring Ben Fields?  That is my question.

5     A        Yeah, I would not condone that type of

6              activity on the job.

7     Q        But your testimony is that you weren't

8              aware of that; is that correct, until

9              today?

10    A        Ask it again.

11    Q        Have you ever heard anyone say that Ben

12             Fields  - -

13    A        No, no, absolutely not.

14    Q        Before today?

15    A        That wasn't your question to me earlier.

16         **MR. SHAW:** And she is not talking about the other

17        day when you listened to Fields' testimony about

18        he and his wife would engage in sexual activity.

19    A        That wasn't your question. You said when I

20             first hired him earlier I think was the

21             question.

22    Q        Right. Now I am just trying to figure out

23             when you became aware of that.  It sounds

24             like maybe when you listened to Ben Fields'

25             deposition testimony was the first that you

1          heard about it.

2    A     Yeah, that was the first I heard about it.

3    Q     Okay. I have another document here. Do you

4          recognize this document?

5    A     Yes.

6    Q     What is this?

7    A     It looks like he received the office

8          policy.

9    Q     Okay. I was going send you that earlier

10         form that we looked it required someone to

11         verify that they both received and read the

12         policy manual, but this only requires only

13         that they verify that they received a copy.

14         Do you know when or why that changed?

15   **MR. SHAW:** I am not for sure.

16   Q     Okay. And this looks like it was signed by

17         Ben Fields on April 13th of 2020; correct?

18   A     That is what it looks like.

19   Q     But that was some 15 months after he had

20         already started working for the Letcher

21         County Sheriff's Department; correct?

22   A     Yes.

23   Q     So why did you wait so long over a year to

24         give him a copy of this policy manual?

25   A     Can I ask you a question?

1    Q        Just answer my question.

2         MR. SHAW: He wasn't the sheriff that hired him,

3         so it is not his responsibility to give him the

4         policy.  There maybe something else.

5    Q        This is all that I saw in the file.

6    A        I don't know if Sheriff Webb gave him one

7             or not.  He should have.

8    Q        Okay. The only thing that I saw on the file

9             as far as him having him received a copy

10            was dated April 13, 2020?

11        MR. SHAW: Tell her you don't know.

12   A        I don't know. Sorry.

13   Q        Okay. That is a perfectly fine answer. Are

14            deputy sheriffs, are they at-will

15            employees, meaning can they be terminated

16            for any or no reason or do they have to be

17            terminated for cause? I was just asking

18            him.

19        MR. SHAW: I don't know if he knows the answer.

20        Are you talking about an action under the police

21        officer's bill of rights?

22   Q        No, I am just talking about at the Letcher

23            County Sheriff's Department, can deputies

24            be terminated for any reason or no reason

25            or do they have to be terminated for cause,

1              if you know?

2    A     I am not for sure.

3         **MR. SHAW:** The Police Officer Bill of Rights only

4         applies in certain situation, and doesn't apply

5         in others.

6    Q     Okay. I know that you said more things

7         happen than just playing poker.  You

8         invited male deputy sheriffs to some of

9         those parties at your house where you

10        played cards; correct?

11   A     Yes.

12   Q     Okay. And that included Jason Eckels, and

13        Ben Fields; correct?

14   A     Yes.

15   Q     Any other deputy sheriffs that you invited

16        to those gatherings?

17   A     Mike Enfusse.

18   Q     Okay. Was he a deputy sheriff?

19   A     Court security officer. You keep calling

20        them deputies, but court security officers.

21   Q     And I guess impression was were there

22        Letcher County sheriff deputies who has a

23        specific role as a CSO; is that correct to

24        think of it that way?

25   A     That is a true statement, yeah.

1    Q      Anyone else aside from Deputy Enfusse?

2    A      Charles Fernandez.

3    Q      Okay. Anyone else aside from him?

4    A      I don't recall.

5    Q      What kind of role did Charles Fernandez

6           have with the sheriff's department?

7    A      He was a court security officer also and a

8           special deputy at one time.

9    Q      What does a special deputy mean?

10   A      It is a deputy that does not receive

11          payment for their services.  They just

12          volunteer.

13   Q      Okay.

14   A      He did that during the flood.  He done

15          relief and stuff like that.

16   Q      When you are working as a home

17          incarceration officer for EKCS, did you

18          ever invite any women who were on home

19          incarceration to your house during one of

20          those poker games?

21   A      Absolutely not.

22   Q      Okay. Do you recall a girl named Jennifer

23          Fleming?

24          **MR. DOTSON:** Does he remember - -

25   Q      Yeah, does he remember someone named

Jennifer Fleming

```
1
2    A      I know a Jennifer Fleming.
3    Q      Did you ever come to your house for any of
4           these gatherings?
5    A      Not that I am aware of.
6    Q      Okay. How many of the deputy sheriffs aside
7           from Ben Fields has that designation of
8           CSO?  I think I have heard Ben Fields,
9           Jason Eckels, and Mike Enfusse.  Does
10          anybody else aside from them in the time
11          that you have been sheriff?
12   A      Keith Smith. Could I see my employment list
13          that I provided?
14   Q      I don't have a copy of it.
15   A      That would assist me.
16          MR. SHAW: Just answer based on your
17      recollection.
18   A      I don't recall.
19   Q      Does CSOs get paid more or less than other
20          deputy sheriffs?
21   A      It all depends on job performance. I mean I
22          worked with Sheriff Webb for 16 years, and
23          only made $12.00, and they hired a new guy
24          in when I working for them, Mike Enfusse
25          was actually who it was, they paid him
```

1              $12.50.  He had been there none and they

2              paid him more than me so it all depends.

3              Pay rate depends is varied.

4      Q       Okay. So are CSOs paid by the hour?

5      A       Yes.

6      Q       And Ben Fields was a full time employee?

7      A       Yes.

8      Q       And were those other CSOs that you

9              referenced, were they all full time

10             employees?

11     A       I don't recall.

12     Q       Were you a full time employee during the

13             time period when you were a deputy sheriff?

14     A       Yes.

15     Q       And what does that mean?  Are there set

16             hours that you work from 8:00 to 4:30?

17             What does it mean as far as scheduling

18             goes?

19     A       There is different schedules, you know.  I

20             don't know what you are asking.

21     Q       I am talking about CSOs and let be specific

22             to after that you became sheriff let's be

23             specific to Ben Fields?

24     A       Okay.

25     Q       Did he have a time of day that he was

1           suppose to report to work and a hour that

2           he got off work every day?  How did his

3           schedule work?

4      A    8:00 to 4:30.

5      Q    Okay. So those were the hours that he was

6           working for the sheriff's department?

7      A    Yes.

8      Q    Was that true for the other CSOs as well in

9           the time that you were sheriff?

10         **MR. SHAW:** If that you recall?

11     Q    Jason Eckles, did he work 8:00 to 4:30,

12          too?

13     A    Yes.

14     Q    Keith Smith, did he work 8:00 to 4:30?

15     A    No, there were some days that he had to

16          leave early.

17     Q    Okay.

18     A    He was an EMT paramedic.

19     Q    Okay.

20         **MR. SHAW:** You are talking about since that he

21         has been a sheriff?

22     Q    Yeah, for these specific people.

23         **MR. SHAW:** If I recall, I think there was some

24         other testimony at times the courthouse closed

25         at 4:00 opposed to 4:30 at different times?

1    A      Yes.

2    Q      As far as the pay goes, does AOC pay the

3           sheriff's department which then pays BCSOs?

4    A      I don't know if it is AOCs.  I am always do

5           - - I am pretty sure it forms with local

6           fees.

7    Q      What do you mean by that?

8    A      You get a reimbursement for these employees

9           on the hourly so much.

10   Q      And who is doing the reimbursing?

11   A      I don't recall.

12   Q      So you turn in some paperwork to - -

13   A      Actually, Lashauna turns the paperwork in

14          for me.

15   Q      Okay. Who is Lashauna?

16   A      She is the bookkeeper and office manager at

17          the office.

18   Q      For the sheriff's department?

19   A      Yes.

20   Q      So she turns some paperwork in about hours

21          worked and then, the sheriff's department

22          get reimbursed?

23   A      Yes.

24   Q      I want to talk about our involvement in

25          getting Ben Fields the position with East

1        Kentucky Correctional Solutions?

2    A        Yes.

3    Q        So did you recommend Ben Fields for that

4             position?

5    A        Yes.

6    Q        Could you no longer work that job after

7             that you became sheriff?

8    A        Oh, yeah, no way.

9    Q        Why not?

10   A        The job as sheriff is 24/7 hectic. I mean

11            one day my phone only goes back to 2:00 pm

12            and I had had 186 calls from 2:00 pm to

13            10:00 pm, so it is just too hectic. I

14            couldn't juggle. I worked three jobs, you

15            know, I just couldn't juggle all of it.

16   Q        So you decided to recommend Ben Fields for

17            that job.  What do you recall about your

18            decisions with Patty?

19   A        After that I won the election, she was

20            disappointed and she was like I don't know

21            what I am going to do. I need somebody.

22            Can you find somebody? And I told her that

23            I would look around.

24   Q        Okay. What did you do next?

25   A        I found somebody that I thought would be

1               good for the job. I called her and said,

2               hey, he is a great guy all around good guy.

3               He has worked at the jail, and you know, I

4               told her that I had checked with the

5               previous jailer and nothing, no - -

6     Q         I guess did she know that he was planning

7               to become a deputy sheriff by that point?

8     A         Yes.

9     Q         And so I guess she agreed to hire him as

10              far as you know?

11    A         As far as I know.

12    Q         And you actually trained Ben Fields for the

13              EKCS position; correct?

14    A         I let him shadow me.

15    Q         Okay. What do you recall of that?

16    A         Basically, when I do my house arrest on

17              Wednesday at 4:30, have everybody report, I

18              would show him the paperwork, the forms.

19              See, everything is different now, you know,

20              they do GPS now. I don't believe that I was

21              ever part of GPS. My old first house arrest

22              box was almost as big as that TV.  I mean

23              no joke, it was a white box this big.  You

24              had to have a manual key to turn it on and

25              you had to have a phone landline.  They

1                  wasn't none of that tracking people. It

2                  would only let them get 100 feet outside

3                  their residence and it would tell you if

4                  they had a violation, cut the strap,

5                  unplugged the box stuff like that. So I

6                  went over all of that paperwork with him,

7                  and all of that stuff.

8    Q      Okay.

9    A      I showed him how to hookup, how to collect

10               the money, do the receipt, mail it in.

11               When I first took over, I would have to

12               mail in money orders, because Patty didn't

13               have a bank account and I would mail in the

14               money orders to her.

15    Q      Okay. Were you aware of Ben Fields

16               receiving any other training aside from the

17               training that he got from you?

18    A      I am aware.

19    Q      Okay. Were there any EKCS policies or

20               procedures that you reviewed with Mr.

21               Fields?

22    A      No, I didn't.

23    Q      Aside from that initial conversation with

24               Patty Stockham that you already described,

25               were there any other discussion that you

1          had with her about hiring Ben Fields?

2     A    Not that I recall.

3     Q    I guess were you aware as prior to February

4          of 2022, were you aware of Ben Fields

5          performing services for EKCS while he was

6          in the courtroom and during a period of

7          time when he was working as bailiff?

8     A    I don't understand your question.

9     Q    Prior to February of 2022 when you

10         terminated Mr. Fields, were aware that

11         there were times when he would perform

12         services for East Kentucky Correctional

13         Solutions while he was also in the

14         courtroom and working as a bailiff?

15    A    One more time, sorry? I am little confused

16         on your question.  I am not trying to be

17         difficult but - -

18    Q    Prior to February of 2022 when you

19         terminated Fields, were you aware that

20         there were times when he was performing

21         services for EKCS while also in the

22         courtroom and working as a bailiff; were

23         you aware of that?

24    A    I don't recall.

25    Q    Okay.

1      **MR. SHAW:** You are right -- I guess I will just

2            object to form.

3    Q      Were you aware that Fields performed

4            services for EKCS while wearing a Letcher

5            County Sheriff's Deputy uniform?

6      **MR. SHAW:** If you know, I mean.

7    A      Ask your question one more time. Sorry. I

8            am not trying to be difficult. You bounce

9            around a little bit for me. Like I said, a

10           little bit of stress.

11   Q      I understand, I do, and I am happy to

12           repeat any time.  Were you aware that

13           Fields, Ben Fields, was performing services

14           for EKCS while he was wearing a Letcher

15           County Sheriff's Deputy uniform?

16   A      No, I don't recall.

17   Q      You don't recall being aware of that? If

18           Ben Fields was wearing a Letcher County

19           Sheriff's Deputy uniform while performing

20           services for EKCS, would that have been a

21           violation of the Letcher County Sheriff's

22           Department policies?

23   A      I need some clarification.

24   Q      Okay. If Ben Fields was working someone up

25           on an ankle monitor, doing something that

1          was within his duties for EKCS while

2          wearing a Letcher County Sheriff's Deputy

3          uniform, would that have been a violation

4          of the Letcher County Sheriff's Department

5          policies, yes or no?

6     A    I mean when is he doing that? I don't get

7          your question.

8     Q    At any time. If there is some sort of

9          decision - -

10    A    Is at 4:30 when I got off at sheriff's

11         office, my sheriff didn't require me to go

12         all of the way home and come back with e a

13         personal truck and personal clothing, but

14         now if I was out after hours, I was in

15         personal clothing, and my truck at times.

16         If it was something on the way home, my

17         sheriff would give me permission, and hey,

18         yeah, you can do that.  They would let us

19         go to the grocery store.

20    Q    That wasn't quite my question, but that is

21         helpful to know. So you are the sheriff?

22    A    Yes.

23    Q    And Ben Fields is the EKCS home

24         incarceration officer?

25    A    Uh-huh.

1    Q        Is he allowed to perform services for EKCS

2             while wearing a Letcher County Sheriff's

3             Deputy uniform?

4        **MR. SHAW:** She is talking at the courthouse or

5        any time?  I understand what you were saying.

6    A        If somebody is in court, and they say hey.

7    Q        So does it matter, in different situations

8             is it okay, and other situations it is not

9             okay; is that what you are saying?

10       **MR. SHAW:** Did he ever call you and ask you for

11       permission to stop by on the way home to check

12       something out?

13   A        Yes.

14       **MR. SHAW:** Like you did, so it is the same

15       practice that you had?

16   A        Yes. Sorry.

17   Q        So you are saying that if Ben Fields were

18            to be wearing his deputy sheriff's uniform

19            while performing services for EKCS, he did

20            it with your permission?

21       **MR. SHAW:** Objection. Go head, if you know the

22       answer.

23   A        I don't recall.

24   Q        What is the policy of the Letcher County

25            Sheriff's Department about wearing an

1    uniform while performing services for some

2         other business?

3         **MR. SHAW:** I think he has already testified what

4    the practice is.

5    Q         That was not my question. What is the

6              policy? Do you know what the policy is?

7    A         You have got me confused with your line of

8              questioning, you are bouncing around so

9              much I don't know what you are asking.

10   Q         I am trying to figure out how to frame the

11             question in a way that you could answer it

12             and understand it. So was Ben Fields

13             allowed to wear his deputy sheriff's

14             uniform while performing services for EKCS

15             at any place or at any circumstance?

16        **MR. SHAW:** In the courthouse, out of the

17   courthouse?

18   Q         Anywhere? Was there ever a situation where

19             that was okay by you?

20   A         Yes.

21   Q         What is the circumstance where it would

22             have been okay by you, as sheriff, for him

23             to be performing services for EKCS while

24             wearing his deputy sheriff uniform?

25   A         If he was at the courthouse.

1    Q        Okay. So he was allowed to perform those

2             services for EKCS while he was at the

3             courthouse wearing his uniform?

4    A        Yes.

5    Q        Is there any other places that he was

6             allowed to perform services for EKCS while

7             wearing that uniform? Was just at the

8             courthouse or was it at any other places as

9             well?

10   A        I don't recall any other places.

11   Q        Okay. So to your knowledge, the only time

12            that he would have been performing services

13            for EKCS in his deputy sheriff uniform,

14            would be if he was at the courthouse; is

15            that correct?

16       **MR. SHAW:** And after work hours.

17   Q        Well, didn't hear him say that yet.

18       **MR. SHAW:** Yeah, he did.

19   Q        He talked about himself doing that with

20            Sheriff Webb, but I didn't hear him say

21            that he allowed Fields to do that.

22       **MR. SHAW:** You are trying to confuse the witness.

23   Q        I am not, I truly am not. I am trying to

24            get a straight answer.

25   A        Well, you have got me confused, because I

1      don't know what you are asking me.

2    Q        Deputy Sheriff Fields, he is wearing his

3             deputy sheriff uniform. I think I

4             understood you to say that he is allowed to

5             wear that uniform and perform services for

6             EKCS if he is at the courthouse; is that

7             correct?

8         **MR. SHAW:** No.

9         **MS. BAXTER:** You are not testifying.  He is

10        testifying.

11        **MR. SHAW:** Quit trying to confuse the witness.

12        **MS. BAXTER:**   I truly am not.

13        **MR. SHAW:** He told you what the practice was.

14        **MS. BAXTER:**   No, he hasn't.

15        **MR. SHAW:** Yes, he has.

16        **MS. BAXTER:** Well, I am confused now then.

17        **MR. SHAW:** - - what the practice is and did the

18        practice change after you became sheriff?

19   A        You have got me confused.  I don't know

20            what she is asking.

21        **MR. DOTSON:** She is asking you is it okay for Ben

22        to wear that uniform and hook somebody up on an

23        ankle bracelet?

24        **MR. SHAW:** At the courthouse?

25   Q        Is that okay?

```
1    A        When?

2    Q        At the courthouse, any time of day?

3        MR. SHAW: Before work hours or after?

4    A        See, when I come out at midnight or on the

5             weekends, I was in plain clothes, but when

6             I just got out of court.

7    Q        So you are saying it matters what time of

8             day?

9        MR. DOTSON: She is not asking you what that you

10       did. She was asking you what the policy was as

11       to Ben Fields?

12       MR. SHAW: What you would allow Ben to do?

13   A        I can't allow him to wear the uniform when

14            he is out working for house arrest at any

15            time, just going around and stuff. I don't

16            know what you are asking.

17   Q        Okay. So that was not allowed. I think I

18            heard you say earlier that there were some

19            circumstances where it was allowed. What

20            would be the circumstances where it was

21            allowed?  I think I heard you say if he is

22            at the courthouse and it is right after

23            work hours; is that accurate?

24   A        Yeah.

25   Q        Okay. Thank you.  Sorry.
```

1    A        It is okay. I am really not trying to be

2             sneaky. I am just trying to make sure that

3             I understand what you are saying. So aside

4             from those two to make sure that we have

5             got it in black and white, if it is during

6             his deputy sheriff work hours or if it

7             immediately thereafter and he is still at

8             the courthouse, it is okay for him to wear

9             that deputy sheriff uniform; correct?  Does

10            that mean at all other times it was not

11            allowed - - he was not allowed to wear his

12            deputy sheriff uniform and perform services

13            pre-EKCS like hooking someone up and so

14            forth?

15   A        Yes.

16   Q        Thank you.  What about his Letcher County

17            Sheriff Department vehicle, did Ben Fields

18            have a vehicle from the sheriff's

19            department?

20   A        Yes.

21   Q        Did all of the deputy sheriffs have a

22            vehicle?

23   A        Not all.

24   Q        How do you decide who gets a vehicle and

25            who doesn't get a vehicle?

```
1    A          Well, that had really just took place after

2               the flood and stuff and the shortage and

3               stuff. I am getting ready to look to hiring

4               two part time, and they will probably not

5               have a cruiser.

6    Q          Okay. And I will be more specific.  Between

7               2019 and 2021, in that time period before

8               the flood?

9    A          I believe that all of them had one.

10   Q          You think that all of them had one. Okay.

11              Were there any rules about what they were

12              or were not allowed to do with their

13              sheriff's department vehicles?

14   A          Yeah, coming back and forth to work, they

15              would do transports for me, they would

16              serve papers, you know, if they were on

17              their way home and needed to stop at the

18              grocery store or something like that.

19   Q          Could they take the deputy sheriff car on

20              vacation to Florida?

21   A          No, absolutely not.

22   Q          Okay. Could they take the deputy sheriff

23              car out on the weekend on Saturday when

24              they are not working to go to the grocery

25              store and come back home?
```

1    A        Not without asking me.

2    Q        Okay. What about these situations where

3             deputy sheriffs have outside, secondary

4             employment?  Were there any rules about

5             when Ben Fields was or was not allowed to

6             use that deputy sheriff vehicle to perform

7             services for EKCS?

8    A        Ask me one more time?  Sorry.

9    Q        Were any rules or policies about when Ben

10            Fields was or was not allowed to use his

11            deputy sheriff vehicle to perform services

12            for EKCS?

13   A        He should be using it unless that he had

14            approval from me.

15   Q        Okay. Do you recall him reaching out to you

16            to get approval to do something for EKCS

17            with his sheriff department vehicle?

18   A        Maybe on the way home to stop and get ankle

19            out of the creek.

20   Q        Where was that?

21   A        Out of like the creek. The GPS, they know

22            where the ankle band is at, you know, the

23            creek.

24   Q        Did you say out of the creek?

25   A        Yeah, like somebody cuts it off and throws

```
1               it over the hip or something.

2    Q         Are you recalling a specific instance or

3               just is that sort of speculation on your

4               part? Can you recall any specific instances

5               where Ben Fields called you up and asked

6               you?

7    A         No, I can't recall.

8    Q         Was there ever any instance when Ben Fields

9               was working as a sheriff's deputy that you

10              told him that he wasn't allowed to use that

11              vehicle or any sheriff's equipment in

12              relation to his job with EKCS?

13   A         Sorry.

14   Q         Can you recall any time that you told Ben

15              Fields  - -

16   A         Slow down a little bit.

17   Q         Was there ever a time when you told Ben

18              Fields that he wasn't allowed to use

19              sheriff's department equipment or vehicle?

20   A         I don't recall.  I am having a episode.

21              Sorry.

22        MS. BAXTER:   Okay.  Should we take a break?

23        MR. SHAW: Let's take a break.

24        MR. BAXTER: Yeah, let's take a break.

25        (A break was taken)
```

```
 1     Q        I want to go over some policies with you
 2              that you produced in Discovery. Do you
 3              recognize this policy?
 4     A        Yes, ma'am.
 5     Q        Was this policy in affect between 2019 and
 6              2022?
 7     A        Yes.
 8     Q        I guess what did you do to train deputies
 9              sheriffs on this policy?
10     A        I gave them a copy of the policy and told
11              them to read it and be familiar with it.
12     Q        Anything aside from that?
13     A        Not that I recall.
14     Q        There is some reference in her to an oath
15              of office. Do all deputy sheriffs take an
16              oath of office or do only some, and I am
17              looking at the first page under personal
18              conduct (A) Oath of office. Do you see
19              that?
20     A        Yes.
21     Q        Do all deputy sheriffs take an oath of
22              office?
23     A        Yes.
24     Q        I want you to look at the second page under
25              (D) Abuse of position?
```

1   A      Yes.

2   Q      As we sit here today, is it your opinion

3          that Ben Fields violated this provision of

4          the policy related to abuse of position

5          while he was employed as a deputy sheriff?

6   A      What was the question again? Sorry, I was

7          reading.

8   Q      Do you think that Ben Fields violated this

9          provision of the policy when he was a

10         deputy sheriff as we sit here today is that

11         your opinion?

12  A      Yes.

13  Q      And was he terminated for violating this

14         policy?

15  A      I would need to look at the termination

16         letter.

17  Q      Okay.  We will look at it later, and we can

18         come back to this if you want to. There is

19         reference in this Section D to departmental

20         position, identification card or badge.  Do

21         you people have identification cards for

22         deputy sheriffs?

23  A      Yes.

24  Q      Okay. What is an identification card?

25  A      That is it.

| | | |
|---|---|---|
| 1 | Q | Okay. I have not seen one of those before. |
| 2 | | On the second page also under Section 7- |
| 3 | | Violations of Ethical Standards. There is |
| 4 | | some reference to investigating ethical |
| 5 | | conduct violations. Have you ever |
| 6 | | investigated an ethical conduct violation |
| 7 | | as sheriff? |
| 8 | A | Ask me again. Sorry. |
| 9 | Q | Have you ever conducted an investigation of |
| 10 | | a violation of ethical standards since you |
| 11 | | have been sheriff? |
| 12 | A | I don't really get what you are asking me. |
| 13 | Q | Just have you ever investigated an ethical |
| 14 | | violation of an employee under this policy, |
| 15 | | if you can recall? |
| 16 | A | I don't recall. |
| 17 | Q | Okay. There is some reference in here to |
| 18 | | the appropriate authority. Do you know who |
| 19 | | that would be? |
| 20 | | **MR. DOTSON:** What paragraph? |
| 21 | | **MS. BAXTER:** I am in that same one, Violations of |
| 22 | | Ethical Standards that we have been looking at? |
| 23 | | **MR. DOTSON:** Paragraph 7? |
| 24 | | **MS. BAXTER:**  Correct. |
| 25 | A | The appropriate authority. |

1    Q      Yeah, who is the appropriate authority, if

2           you know?

3    A      I would imagine that it would be me.

4    Q      Okay.  That is kinda what I figured, too,

5           but I was curious. On the last page of this

6           policy there is some reference to training

7           and including a component of ethics is all

8           in-service training.  What is in-service

9           training?

10   A      Where are you at now?  Sorry.

11   Q      On the third page under Note: Training.

12   A      Right here?

13   Q      Yeah.

14   A      In-service is the training that the state

15          requires every year and every two years for

16          us.

17   Q      Okay. That is helpful. So that is state.

18          So the second sentence says the department

19          shall conduct annual in-service training on

20          ethics. Do you see that?

21   A      Yes.

22   Q      Does the Letcher County Sheriff Department

23          conduct annual in-service training on

24          ethics?

25   A      No. I give them the policy and tell them to

1       familiarize themself with the policy.

2    Q      On the front page there is some reference

3           to KACP, do you know what that is?

4    A      I don't recall the abbreviations there is

5           so many.

6    Q      Okay.  There is also reference to KALEA, do

7           you know what that is?

8       **MR. DOTSON:** What paragraph again?

9       **MS. BAXTER:** It is just up at the top in those

10          little boxes.

11      **MR. DOTSON:** CALEA Standard, is that what you are

12          talking about?

13      **MS. BAXTER:** Yeah, that is what I am wondering.

14      **MR. DOTSON:** KACP 1.1, okay.

15   Q      What is CALEA, if you know?

16   A      I don't recall.

17   Q      Is the Letcher County Sheriff's Department

18          do you have any kind of accreditation?

19   A      I don't recall.

20   Q      Okay. I guess not to your knowledge?

21   A      Yeah, not to my knowledge.

22   Q      At any time since you have been sheriff,

23          have you made any revisions or changes to

24          this policy?

25   A      I don't recall.

1    Q        Okay.  I think you testified just

2             previously that there is no - - The Letcher

3             County Sheriff's Department does not

4             conduct annual in-service training on

5             ethics?

6        **MR. SHAW:** Object to form.

7    Q        Does the Letcher County Sheriff's

8             Department conduct any annual in-service

9             training whatsoever?

10   A        On what?

11   Q        On anything?  Is there any Letcher County

12            specific Letcher County Sheriff's

13            Department annual training?

14   A        The range training qualification, you know,

15            qualification with fire arms.  We have all

16            kinds of training for different computer

17            systems.  You know, NARCAN, I don't know if

18            that is every year. You know, they have

19            changed that so much you got to do that.

20            There is stuff with the DOCJT that the

21            deputies can be a part of that reviews it

22            every week I think that counts as training.

23            I mean we have all kinds of training.

24   Q        I guess that I am asking specifically about

25            training at the Letcher County Sheriff's

1          Department prints on these policies?

2     A    The state does most of the training

3          material.

4     Q    But I wouldn't think that the state would

5          train deputies on the Letcher County

6          Sheriff's Department policies; correct? I

7          am asking about annual training from the

8          Letcher County Sheriff's Department on the

9          Letcher County Sheriff's Department

10         policies, is there any such annual

11         training?

12        **MR. DOTSON:** And you are saying in the personal

13         office of the sheriff's office, not state

14         training or whatever?

15    Q    I am talking about training of Letcher

16         County Sheriff's Department policies?

17    A    I don't recall.

18    Q    Okay. That is fine.

19        **(Document was marked Exhibit 3)**

20    Q    Let's look at this policy. I only have two

21         copies of this.  This one was attached to

22         Fields' deposition also.  Do you recognize

23         this policy?

24    A    Yes, ma'am.

25    Q    Okay. Was this policy in affect from 2019

1      thru 2022?

2      A       Yes.

3      Q       So this is a policy that governs secondary

4              employment; correct?

5      A       Yes.

6      Q       Okay. And this policy has two different

7              species of secondary employment. One which

8              it calls extra duty details. Do you see

9              that?

10     A       Uh-huh.

11     Q       And the other which is called outside

12             employment. Do you see that?

13     A       Uh-huh.

14     Q       So do you have any example of extra duty

15             detail secondary employment situation in

16             the time that you have been sheriff? Has

17             anyone applied to the sheriff's department

18             seeking approval for a permit for extra

19             duty detail services?

20     A       Not that I recall.

21     Q       Okay. What about outside employment? Have

22             any Letcher County Sheriff's Department

23             employees sought approval for outside

24             employment?

25     A       Not that I recall.

```
 1   Q        Okay. It looks like this policy requires

 2            for extra duty detail that the employer,

 3            the secondary employer themselves have to

 4            submit a permit application for approval

 5            through the sheriff's department. Would you

 6            agree with that?

 7   A        Which one are you reading?

 8   Q        I am reading about extra duty detail and

 9            there is a permit process described at the

10            bottom of the first page.

11   A        Yes, right there.

12   Q        Extra duty detail as I read this definition

13            it states performance of law enforcement

14            duties not within regularly scheduled hours

15            provided to any business person or

16            enterprise.  The services that East

17            Kentucky Correctional Solutions provided

18            included law enforcement duties; do they

19            not?

20   A        No, they did not.

21   Q        What kind of duties did they perform then?

22   A        They are just monitoring the people on

23            house arrest and reporting back to the

24            court.

25   Q        So would you consider that to be police or
```

1       non police name.

2    A      That would be non police.  You don't have

3           to be a police officer to do that job,

4           because they was a lady before me that

5           wasn't a police officer that done it.

6    Q      Who was that lady?

7    A      I think her name was Dottie.  I remember

8           her first name Dottie.

9    Q      She was somebody in Letcher County?

10   A      Yes, I think so.

11   Q      So can you give me some examples of what

12          the Letcher County Sheriffs Department what

13          kind of performance of duties would qualify

14          by its extra duties details?

15   A      It would be like security at the school

16          ball games.

17   Q      Okay. So is that the SRO position what you

18          described previously or is that different?

19   A      It could qualify as that.

20   Q      Okay. Did the folks that wanted to hire

21          Letcher County Sheriff's Department

22          personnel for security at the ball games,

23          did they submit an application for approval

24          of a permit?

25   A      No, no, uh-uh.

1    Q        But under this policy they were suppose to;

2             correct?

3    A        I have verbal.

4    Q        So you gave verbal permission to who?

5    A        It don't happen often. One of the road

6             deputies might help with the ball game and

7             they will pay.

8    Q        Who do they pay?

9    A        They pay the road deputy.

10   Q        But under this policy, they are suppose to

11            pay the sheriff's department who then pays

12            the employee; correct?

13   A        You got me bouncing around.  Where are you

14            talking about?

15   Q        On the second page towards the top under

16            that Roman Numeral III. All fees paid in

17            connection with Extra-Duty Details will be

18            paid directly to this agency and the agency

19            will compensate the officers in accordance

20            with the agreed upon hourly rate. Do you

21            see that?

22   A        This SRO, yes.

23   Q        Well, I am talking about the security at

24            the ball game that you were just referring

25            to. And my question is for that performance

1              of that duty the hired deputy is paid

2              directly. The money is not paid to the

3              Letcher County Sheriff's Department; is

4              that correct?

5    A        That is correct. They don't do that often.

6    Q        What is another example of an law

7              enforcement duty?

8    A        None that I - -

9    Q        You can't think of any other ones?

10   A        Uh-uh.

11   Q        What about employment that is of a non

12             police nature.  Can you give me an example

13             of what that could be?

14   A        Wal-Mart, retail, gas station.

15   Q        Okay. Where in your opinion does EKCS fit

16             between these different definitions for

17             secondary employment?

18   A        The later, the second one.

19   Q        Okay. So is it your testimony that working

20             as a home incarceration officer with EKCS

21             is work that provides no real or implied

22             law enforcement services to the employer

23             and is not performed during assigned hours

24             of duty?

25   A        Yes.

| | | |
|---|---|---|
| 1 | Q | So in a situation where someone has got |
| 2 | | outside employment, this policy requires |
| 3 | | that they submit - - they have some kind of |
| 4 | | permission form. Do you see that on the |
| 5 | | last page? |
| 6 | A | Yes. |
| 7 | Q | Says the department will develop an outside |
| 8 | | employment request form? |
| 9 | A | Yes. |
| 10 | Q | Has the Letcher County Sheriff Department |
| 11 | | got an outside employment request form? |
| 12 | A | We don't.  Sheriff Webb didn't have one. He |
| 13 | | would do a verbal with me. |
| 14 | Q | But you were the sheriff between 2019 and |
| 15 | | 2021; correct? |
| 16 | A | Yes. |
| 17 | Q | And this policy was in affect from 2019 to |
| 18 | | 2021; correct? |
| 19 | A | Yes. |
| 20 | Q | That was one of the things that I was going |
| 21 | | to say earlier let me finish my questions |
| 22 | | before answer because it just makes for a |
| 23 | | more clean record. So you never developed |
| 24 | | an outside employment request form; |
| 25 | | correct? |

1    A        Correct.

2    Q        This policy requires deputy sheriffs who

3             have outside employment to submit a

4             statement indicating that no aspect of the

5             employment could be considered questionable

6             in nature such as placement in compromising

7             situation, use of police powers or have the

8             potential to bring discredit to the

9             department. Do you see that under sub

10            section D.

11   A        You said D, right here.

12   Q        Do you see that?

13   A        Yes.

14   Q        Okay. Did you ever require Ben Fields to

15            provide you with any such statement as

16            provided for on that - -

17   A        Not that I recall.

18   Q        Sub section B, D. Okay. And then, I am

19            looking at the next section here that talks

20            about requiring that someone who works for

21            the Letcher County Sheriff's Department who

22            gets outside employment, they are suppose

23            to provide a statement indicating the

24            services rendered will not be connected

25            with security work, investigations, or

| | | |
|---|---|---|
| 1 | | collection or possession of property and |
| 2 | | will not involve any law enforcement |
| 3 | | duties. Do you see that? |
| 4 | A | Yes. |
| 5 | Q | Did ou ever receive such a statement from |
| 6 | | Ben Fields related to his work with EKCS? |
| 7 | A | Not that I recall. |
| 8 | Q | It looks like according to this policy |
| 9 | | approval of outside employment has to be |
| 10 | | submitted an ultimately approved by the |
| 11 | | agency head. Would you be the agency head |
| 12 | | in this instance? |
| 13 | A | Yes, ma'am. |
| 14 | Q | And it looks like there is also a |
| 15 | | requirement for officers who obtained |
| 16 | | written approval that they then resubmit |
| 17 | | their applications for reapproval on an |
| 18 | | annual basis.  Did that happen consistent |
| 19 | | with this policy as to Ben Fields work with |
| 20 | | EKCS? |
| 21 | A | Not that I recall. |
| 22 | Q | Have you ever had anybody submit any kind |
| 23 | | written form for approval of outside |
| 24 | | employment? |
| 25 | A | Not that I recall. |

```
1    Q        We can sit that one aside for now.

2            (The document was marked Exhibit 4)

3    Q        I have another policy.  This is another one

4             that we looked at with Mr. Fields. This is

5             number 5.

6            (The document was marked Exhibit 5)

7    Q        So do you recognize this policy?

8    A        Yes.

9    Q        Okay. And was this policy in effect between

10            2019 and 2022?

11   A        Yes.

12   Q        This looks to be a sexual misconduct policy

13            and I am looking down under definitions of

14            sexual misconduct.  This includes sexual

15            activity while on duty or stemming from

16            official duty. Do you see that?

17   A        Yes.

18   Q        And it also includes use of official

19            position and official resources to obtain

20            information for purposes of pursuing sexual

21            conduct. Do you see that?

22   A        Yes.

23   Q        I am looking at the second page now. A

24            police officer/sheriff's deputy shall not

25            I am reading from D.
```

1    A          Okay.

2    Q          Shall not engage in sexual conduct with

3               another person who is in the custody of law

4               as such officer has supervisory or

5               disciplinary authority over such other

6               person.  Do you see that?

7    A          Yes.

8    Q          Do you agree with me that Sabrina Adkins

9               and Jennifer Hill, while they were on home

10              incarceration, were they in the custody of

11              law according to this policy?

12   A          Yes.

13   Q          And did Ben Fields have supervisory or

14              disciplinary authority over Sabrina Adkins

15              and Jennifer Hill while they were on home

16              incarceration?

17   A          Yes.

18   Q          So on sub section E right below the one

19              that I was just reading. It talks about

20              sworn officers receiving specific training

21              about sexual misconduct. Do you see that?

22   A          Yes.

23   Q          So what kind of specific training did the

24              Letcher County Sheriff's Department provide

25              in the time that you been sheriff regarding

1          this policy?

2     A     None that I recall.

3     Q     Do you believe that Ben Fields violated

4           this policy based on his actions that are

5           subject in this litigation?

6     A     Yes, absolutely.

7     Q     There is some information in here about

8           reporting requirements.  Do you see that

9           under Sub Section F?

10    A     Yes.

11    Q     And there is some reference to, and I am

12          reading from the third line, immediately

13          contacting the internal affairs section.  I

14          am just wondering what is the internal

15          affairs section for the Letcher County

16          Sheriff's Department?

17    A     We don't have one.

18    Q     Is there some other person or you know,

19          group of persons that is handing out to an

20          internal affairs section?  Let me ask it

21          this way. Is there anybody else with

22          internal affairs responsibility within the

23          Letcher County Sheriff's Department?

24    A     Not that I recall.

25    Q     Okay.

1       **MR. SHAW:** You said in the Letcher County

2       Sheriff's Department?

3       **MS. BAXTER:** Uh-uh.

4  Q     Did you terminate Ben Fields because of his

5       violation of this policy?

6  A     I would need to look at the termination

7       letter.

8  Q     Okay. I have one here, but I will say it is

9       about two sentences, whatever that I have

10      got is about two sentences long, but we can

11      get that out now.

12      **MR. SHAW:** There is two versions.

13      **MS. BAXTER:** There is a suspension, and then

14      there was his termination.

15      **MR. SHAW:** No, there was two versions of

16      termination.  The one that was the draft, and

17      the one from the county attorney had approved,

18      and I am not really sure which is which.

19      **MS. BAXTER:** I think that all I have seen are

20      these two from Ben Fields' deposition. I don't

21      know if I have seen this one. Is this one that

22      was produced from the sheriff?

23      **MR SHAW:** I think that what is in his file is

24      different than what he was actually getting.

25      **MS. BAXTER:** I don't think that I have seen this,

1       but.

2       **MR. SHAW:** And there was some confusion. Like one

3       is a draft and one is a final after the county

4       attorney was involved.

5    A      I can clear it up.

6       **MR. SHAW:** Well, if you can clear it up.

7    Q      Let's just go ahead and make that an

8           exhibit, because I have not seen that

9           before. This will be Exhibit 6.

10      **(The document was marked Exhibit 6)**

11   Q      So this looks to be a letter dated February

12          2. I think this is the most detailed of any

13          of the documents signed by you related to

14          Ben Fields' termination; is that correct?

15   A      Yes.

16   Q      And I guess this does specify that you

17          violated - - or that you terminated Ben

18          Fields due to his violation of certain

19          policies. Was it just the ethic policy that

20          is referenced?

21   A      Yes.

22   Q      Conduct unbecoming?

23   A      Yes.

24   Q      Do you believe that Ben Fields also

25          violated this sexual misconduct policy?

| | | |
|---|---|---|
| 1 | A | Absolutely. |
| 2 | Q | Okay. Why didn't you say that in your |
| 3 | | letter? |
| 4 | A | The county attorney, I got guidance from |
| 5 | | the county attorney. I sent this one down |
| 6 | | to him, he called me back and sent this one |
| 7 | | to use and that is what he wanted. |
| 8 | Q | Okay. Let's go back and look at the |
| 9 | | document that was marked Exhibit 4, the |
| 10 | | ethics policy that is what you referenced |
| 11 | | in your - - I think I see the conduct |
| 12 | | unbecoming an officer of page 2 subsection. |
| 13 | A | No, no, no, you have given me the wrong |
| 14 | | one. It is the Ethic ones. 3, sorry. |
| 15 | Q | So I see that conduct unbecoming section |
| 16 | | there on the document marked Exhibit 3? |
| 17 | A | Yes. |
| 18 | Q | So that section is the basis that you sited |
| 19 | | for terminating Ben Fields; is that |
| 20 | | correct? |
| 21 | A | Which one? |
| 22 | Q | Sub Section 10 conduct of unbecoming. I |
| 23 | | just want to clarify that I am looking at |
| 24 | | the right thing. On the second page of that |
| 25 | | policy under X conduct unbecoming that is |

1           the provision that you terminated Ben

2           Fields pursuant to; is that correct?

3    A      That is the one that the county attorney

4           recommended, yes.

5    Q      Well, did you agree with the county

6           attorney's recommendation?

7    A      That is the one that the county attorney

8           recommended.

9    Q      Okay. Do you always consult the county

10          attorney in employee terminations or

11          disciplinary matters?

12   A      Yes.

13   Q      Why?

14   A      They are the county attorney.  They give

15          legal guidance.  I am not an attorney.

16   Q      Okay.  You don't have to be an attorney to

17          discipline or terminate someone.  Was that

18          unique to the Ben Fields situation since he

19          was facing a criminal investigation or did

20          you do that in all instances is what I am

21          trying to figure out?

22   A      That was unique in Ben Fields' because

23          criminal theft.

24   Q      So in a normal situation, I don't know what

25          normal is, I guess, but in a situation that

1       does not involve criminal activity, would

2       you still consult the county attorney?

3    A  Not always.

4    Q  But sometimes?

5    A  Sometimes, yes.

6    Q  Okay.

7    A  You are bouncing around on me again.  I

8       can't keep up.

9    Q  I am sorry.

10   A  Can I put this one back so I don't get it

11      mixed up with everything?

12   Q  Sure. We can put these other ones aside for

13      now. When did you first become aware of the

14      fact that Ben Fields had engaged in some

15      sort of sexual misconduct?

16   A  I don't remember the exact date.

17   Q  Well, how do you recall becoming aware of

18      it?

19   A  A reporter called the office and I talked

20      to them on the phone.

21   Q  Do you remember who the reporter was?

22   A  No.

23   Q  I guess was that after the civil case had

24      been filed?

25   A  I had not received the civil case. That was

1          the first time I heard of it was the

2          reporter.

3     Q    Do you know who Chris Triplett is?

4     A    Yes, I know Chris.

5     Q    Okay. Were you aware that he had reported

6          sexual misconduct by Ben Fields to the

7          Letcher County Sheriff's Department

8          sometime in mid December?

9     A    No, I was not aware of that.

10    Q    Did you become aware of that at some point

11         in this litigation?

12    A    I have seen it on the reports.

13    Q    Have you ever asked your staff or talked to

14         other deputy sheriffs to inquire whether

15         that complaint had been made?

16    A    Yes.

17    Q    Okay. And what was the response that you

18         got?

19    A    They said that he did not come in and file

20         that complaint.

21    Q    What did they tell you?

22    A    He has been in the office several times. He

23         has been in trouble for years. I have seen

24         him a bunch and he has never mentioned any

25         kind of sexual allegation.

1    Q          Okay. Does your office have any kind of

2               procedure for documenting complaints if

3               someone was to come in or call the office

4               and make a complaint about sexual

5               misconduct against a sheriff's deputy? Is

6               there some sort of process for how that

7               gets documented and investigated?

8    A          Anyone that comes in to file a complaint,

9               they are going to ask them to sit and wait

10              on me and talk to me.

11   Q          Is that written in the policy somewhere?

12   A          Not that I recall.

13   Q          Okay. How did you advise your deputy

14              sheriffs and staff that is what they needed

15              to do?

16   A          I would tell them. I am the boss. If

17              anybody comes in to complain, I want to

18              talk to them.

19   Q          Okay. How often are you physically in the

20              office?

21   A          Every day.

22   Q          So you are usually in the office you are

23              not out, you know, patrolling the street?

24   A          Yeah, I will respond to calls absolutely.

25              Unlocks, wrecks and stuff, but the majority

1          of the time I was in the office pushing

2          paperwork and stuff like that.

3     Q    Okay. So I guess it is your testimony that

4          you are aware that Chris Triplett has been

5          in your office to complain about various

6          things on some occasions but not

7          specifically about Ben Fields?

8     A    I don't complain.

9     Q    Well, tell me why that he would be in your

10         office?

11    A    We serve warrants, we serve EPOs, we take

12         property tax. I mean there is all kinds of

13         things we would be in.  He has been a

14         criminal in the criminal environment for

15         years.  We have always had to deal with him

16         and stuff, so.

17    Q    Okay. I was wondering if he was to show up

18         to your office - - Has he ever showed up to

19         your office to complain about anything to

20         your knowledge?

21    A    I don't recall.

22    Q    Let's look at this policy and this is not

23         one that we looked at.

24         **(The document was marked Exhibit 7)**

25    Q    Do you recognize this policy?

1    A        Yes.

2    Q        Okay. Was this policy in affect between

3             2019 and 2022?

4    A        Yes.

5    Q        And so this looks to be a policy about how

6             you address citizen complaints. My first

7             question is have you ever employed this

8             policy to investigate any kind of citizen

9             complaint to your recollection?

10   A        Not that I recall.

11       **MR. SHAW:** This will be Exhibit 7.

12   Q        Have you ever been made aware aside from

13            the reporter who called you up to notify

14            you about Ben Fields, can you think of any

15            other situation where you were made aware

16            of a complaint alleging employee or

17            department misconduct?

18   A        Ask me that again. Sorry.

19   Q        Aside from Ben Fields, were there any other

20            instance that you can recall when you made

21            aware of a complaint alleging employee or

22            department misconduct since you have been

23            sheriff?

24   A        I have received nothing formal in writing,

25            but the county attorney tells me if

1              somebody wants to file a complaint to put

2              it in writing.

3     Q        Well, this policy doesn't require

4              complaints to be in writing, does it? And I

5              am looking under procedure on the second

6              page, sources of complaint.  That does not

7              require a complaint be made in writing;

8              correct?

9     A        That is correct.

10    Q        Okay. Under Sub section 4B there is

11             provision about an informational public

12             brochure that the Letcher County Sheriff's

13             Department is developed to inform members

14             of the public had to provide the department

15             with accommodations, suggestions,

16             dissatisfaction or complaints; do you see

17             that?

18    A        B?

19    Q        Yeah.

20    A        I don't see it here.

21    Q        I am on the second page.

22    A        On the second page.

23    Q        Subsection 4 procedure under B. So that is

24             A.

25    A        Right here?

```
 1    Q         Yeah, that I am reading that I am looking. It

 2              talks about an informational public

 3              brochure.  Do you see that?

 4    A         Yes.

 5    Q         Okay. Does Letcher County have any kind of

 6              informational public brochure to notify the

 7              community of how to provide the sheriff's

 8              department with a complaint alleging

 9              employee misconduct?

10    A         Not that I recall.

11    Q         Says that these brochures will be

12              maintained in all police, sheriff facility

13              lobbies, sheriff's informational desks,

14              ect. Does that refresh your recollection.

15              Is there any such brochure?

16    A         Not that I recall.

17    Q         Okay.

18        MR. SHAW: Are you asking about websites also?

19    Q         I am just reading the policy and it talks

20              about a brochure, so. Okay. Did I

21              understand you to say that aside from Ben

22              Fields you have never kind of complaint

23              alleging employee misconduct; is that

24              correct?

25    A         Not in writing.
```

| | | |
|---|---|---|
| 1 | Q | Well, this policy doesn't require it to be |
| 2 | | in writing, so. Have you received any kind |
| 3 | | of complaint consistent with this policy it |
| 4 | | would be in-person, by telephone, or by |
| 5 | | e-mail; do you see that? |
| 6 | A | Yes. |
| 7 | Q | So have you ever received any of those type |
| 8 | | of complaints? |
| 9 | A | Yes. |
| 10 | Q | How many would you say that you have |
| 11 | | received? |
| 12 | A | I don't recall. |
| 13 | Q | So what did you do when you received those |
| 14 | | complaints? |
| 15 | A | The person that comes in and tells me that |
| 16 | | I tell them to put it in writing, and see |
| 17 | | if they want to file a formal complaint. If |
| 18 | | they do, we go through that process. I have |
| 19 | | never received one in writing. If they say |
| 20 | | no, I get their side of the story verbally, |
| 21 | | and I will tell them that I will talk to |
| 22 | | the deputy. |
| 23 | Q | Okay. When you are references those |
| 24 | | complaints, have any of those complaints |
| 25 | | alleged sexual misconduct? |

1    A        Not that I recall.

2    Q        Do you have like a file somewhere in your

3             office where you keep documentation of

4             those complaints?

5    A        No, no, if it is not in writing, no.

6    Q        You don't document complaints yourself?

7    A        No, uh-uh.

8    Q        I guess within the sheriff's department, I

9             know you are the sheriff?

10   A        Yes.

11   Q        You have got a number of deputies?

12   A        Yes.

13   Q        Is there any sort of supervisor deputy or

14            are they on the same level so to speak?

15   A        On the same level.

16   Q        So if there is any reference in this policy

17            to like a supervisor - -

18   A        That is me.

19   Q        That is you. Okay. I got it. Have you ever

20            investigated any citizen complaint made

21            pursuant to this policy? I think that you

22            just said that any time that you asked

23            someone to write it down, they refused, so

24            maybe you haven't. But has there ever been

25            a time that there was a complaint, and you

```
 1              investigate, yes.

 2     A        If you call an investigation listening to

 3              the person, take the information, and then,

 4              talking to the deputy and seeing what

 5              happened, yes.

 6     Q        Okay. Did you work up any kind of report as

 7              a result of that?

 8     A        No.

 9     Q        Okay.

10     A        Also inform the people that complain if

11              they want to attempt to file criminal

12              charges they can see the county attorney or

13              we will get an outside agency in and most

14              of them decline that.  Most of them will

15              say I want you to talk to the deputy.

16     Q        Okay. Let's talk about Ben Fields

17              specifically.

18     A        Okay.

19     Q        Was there any kind of investigation

20              conducted by your office related to the

21              allegations against him from late January

22              early February of 2022?

23     A        No, I just took the initial information.

24     Q        There was no administrative investigation?

25     A        Just what information that I got I reviewed
```

1          everything with the county attorney and he

2          give me advice on what that I needed to do.

3          The documentation of it is just this.

4     Q    And what information did you have aside

5          from I guess a phone call from a reporter?

6     A    I got a phone call from a reporter.  You

7          have got me bouncing back and forth. I am

8          trying to remember. I got a phone call from

9          a reporter was the first thing. I believe

10         that I called Mr. Fields and told him what

11         was alleged, and then, after that happened,

12         Judge Craft and Robbie Kinzer come to my

13         office and gave some information. I am not

14         sure on the details. After that, I

15         consulted with the county attorney. I

16         believe that he actually came over to the

17         office and Lashauna Frazier was with me,

18         the office manager.

19    Q    Okay. Was this all on the same day?

20    A    Yes, the evening. That is when that was

21         produced.

22    Q    So that was the day that all of the

23         occurred that would have been January 31,

24         2022; is that correct?

25    A    Yes.

1      **MR. SHAW:** For the record you are discussing

2      Fields' Exhibit 20?

3      **MS. BAXTER:** Yeah. And we can make this an

4      Exhibit I think we will make this Exhibit 8.

5      **(The document was marked as Exhibit 8)**

6   A      I also talked to the Commonwealth Attorney

7          at the time.

8   Q      Is that Edison Banks?

9   A      At the time, yes.

10  Q      Okay. And I want to talk more about that

11         later, but since we are on that right now.

12         Anybody else that you have talked to or any

13         information that you have gathered as part

14         of that investigation to Ben Fields?

15  A      That day?

16  Q      That day, we will start there?

17     **MR. SHAW:** Or any other outside agencies

18     contacted?

19  Q      My question is anything that you did that

20         day?

21  A      Once that I talked to Mr. Hatton, we done

22         this, Brianna Cornett came in.

23  Q      So Brianna Cornett actually came to your

24         office?

25  A      Yes.

1    Q        After that I spoke with Jamie and Edison

2             and they said get the name and number. Do

3             not take any information from them. We are

4             going to talk to KSP and see if they will

5             investigate it. KSP said no we are not

6             going to investigate it. We work too close

7             with you. I don't want an investigation of

8             this magnitude done internally.  So Mr.

9             Banks said that I am going to get ahold of

10            the AG's office.  Mr. Banks told me the

11            AG's office would take the investigation. I

12            am trying to remember the next step.

13            Brianna come in and I got her name and

14            number. She left.

15   Q        Did she tell you - - give  you anything

16            more than her name and number, did she tell

17            you anything?

18   A        I don't recall.

19   Q        You don't recall anything more than a name

20            and number?

21   A        No.

22   Q        Did you take any notes when you talked to

23            her?

24   A        No, I did not, because I wasn't going to do

25            the investigation internally.

1    Q        Do you know Page ID#: 1359 Christy Fultz?

2    A        Yes.

3    Q        Have you known her for a long time?

4    A        Yes, I have known her well.

5    Q        Why do you say that you know her well?

6    A        Small community.

7    Q        Did you grow up and go to high school with

8             her?

9    A        She would be offended, but she is older

10            than me. I might look a lot older.

11   Q        And you knew Brianna Cornett was her

12            daughter?

13   A        Yes, Brianna has been in the criminal

14            system for years.

15   Q        Okay. Thank you for that, and we will come

16            back to some of that I believe. I have

17            another policy.

18        **MR. SHAW:** That will be 9.

19        **(The document was marked Exhibit 9)**

20   Q        Do you recognize this policy?

21   A        Yes.

22   Q        This policy is called Training Directive.

23            Was it in effect between 2019 and 2022?

24   A        Yes.

25   Q        Okay. And this policy identifies and number

1        of high risk critical tasks. Do you see

2        that?

3   A    Yes.

4   Q    And it provides that each member of an

5        agency will receive an annual block of

6        training on each of the high risk critical

7        tasks identified. Do you see that?

8   A    Yes.

9   Q    So did the Letcher County Sheriff's

10       Department itself provide any block of

11       training on these high risk critical tasks?

12  A    Not that I recall.

13  Q    Who would have provided annual training on

14       these high risks critical tasks?

15  A    They all received the training by the

16       state.

17  Q    And that is on an annual basis?

18  A    Some is on an annual, and some on ever two

19       years, that is the minimum of the state.

20  Q    Do you see on the second page under H,

21       sexual harassment/external sexual

22       misconduct by officers is identified there

23       as one of the high risk critical tasks?

24  A    Yes, I see that.

25  Q    So did the Letcher County Sheriff's

1            Department provide annual block training on

2            sexual harassment and external sexual

3            misconduct by officers?

4   A       Not that I recall.

5   Q       Do you know whether or not any of the state

6            training included an annual block of

7            training on sexual harassment and external

8            sexual conduct by officers?

9   A       Not that I recall.

10  Q       This says that all training shall be

11           documented and it references that each

12           officer shall have a training file. I am

13           looking under documentation.

14  A       Yes.

15  Q       So does each officer have a training file?

16  A       Yes, all of the training that they receive

17           from the state is a file. They get a

18           certificate from the state they will have

19           that.

20  Q       Okay. Was that training file amongst the

21           documents that you produced in Discovery in

22           this case?

23  A       I would have to see the documents to answer

24           that.

25  Q       Okay. I am just going to do a follow

1      request. If there is an additional training

2      files that have not been - -

3           **MR. SHAW:** A lot of times transcripts housed with

4      the state. The state is who documents and keeps

5      up with each officer, because we have so much

6      turnover with officers going to each agencies.

7      I don't know that we have got it, but we request

8      the transcript if we don't have it.

9      Q      Okay. Well, I am looking at Sub Section B

10            of documentation here.  It talks about

11            agency files will contain a lesson plan, an

12            outline of each in-house training session.

13            Do you see that?

14     A      Yes.

15     Q      Do you have any lesson plans or outlines

16            for in-house training sessions?

17     A      Not that I recall.

18     Q      Is that because there have not been any in-

19            house training sessions on sexual

20            misconduct since you have been sheriff?

21          **MR. SHAW:** Object to form.

22     A      Not that I recall.

23     Q      Okay. We can move this policy aside.

24          **MS. BAXTER:** This might be a good time to take a

25      break if anyone wants a lunch break. I still

1        think we are doing pretty on time. Do you want

2        to keep going?

3           **MR. SHAW:** We can keep going if you all want to?

4    A       I am ready.

5    Q       One quick thing. I saw this in what you

6            produced.  Looks like a sexual assault

7            investigation policy that got enacted in

8            October of 2023?  I don't' want to make it

9            as an Exhibit. I am just curious if you

10           recall that and what prompted you to enact

11           that new policy in 2023?

12   A       We model our polices by KACO.

13   Q       By KACO?

14   A       Yes.

15   Q       Speaking of KACO, are you being represented

16           under a reservation of rights to your

17           knowledge?

18   A       Can you explain that a little more?

19   Q       I don't know if I can.  But have you been

20           given any information by KACO about the

21           limits or conditions of their

22           representation of you in this case?

23   A       I can't recall.

24   Q       Let's look at some of these facebook

25           exhibits that you have had a chance to look

1           over.

2    A       Mine is all mixed up.

3    Q       Yeah, I have them in kinda specific order,

4            but I will try to identify them well for

5            you, and I can give you a new copy really.

6    A       Are you going to give me a new copy?

7    Q       Yes, I have more copies.

8    **MR. SHAW:** I have a copy and we can make copies

9    out there, so we don't have to worry about it.

10   Q       Since so many people are not here in

11           person, I have got some extra. I think this

12           will be good to keep them in order, so this

13           will be Exhibit 10.

14   **(The document was marked Exhibit 10)**

15   **MR. SHAW:** And you do or do not have an extra

16   copy of that one?

17   **MS. BAXTER:** I do.

18   Q       Do you recognize this communication chain?

19   A       Yes.

20   Q       And is this a facebook communication chain

21           between yourself, Ben Fields, and Jason

22           Eckels?

23   A       Yes.

24   Q       Is this a facebook communication chain from

25           June 14, 2021 thru June 15, 2021?

Exacta Court Reporting, Inc.
(606) 789-3034                    117

```
 1    A        I don't know, maybe the 15th, I see the

 2             14th.

 3    Q        I think if you keep going.

 4             MR. DOTSON: Are you talking about the one on top

 5             the 23rd.

 6    A        Are you talking about in the messages?

 7    Q        Yeah, I am trying to get the full time

 8             frame that we are talking about?

 9    A        Yeah, that is what it looks like.

10    Q        Okay. Did you use facebook messenger to

11             communicate with deputy sheriffs about work

12             related matters?

13    A        Some, yes.

14    Q        I think this was a group that was specific

15             to yourself, Ben Fields and Jason Eckels;

16             correct?

17    A        Yes.

18    Q        Were there other chains that included other

19             sheriff department employees? This one is

20             just yourself, Fields and Eckles. Based on

21             our recollection, were there other

22             messenger groups that included more of the

23             office generally?

24    A        You had one that you give me that had

25             Christine in it.
```

1    Q        So does that refresh your recollection?

2    A        Yes.

3    Q        I think that you entitled this group fat

4             boys. Do you see that at the top?

5    A        Yes, ma'am.

6    Q        Okay. Why did you call it that?

7    A        Look at me.

8    Q        Was there another group called office, if

9             you can recall?

10   A        I can't recall. I have got to use the

11            bathroom.

12   Q        Sure we can take a break.

13            **(A break was taken)**

14   Q        Do you see towards the bottom of the first

15            page, I am going to use the markings at the

16            top for reference, so this is page 1187.

17            Jason says I misread it at first and

18            thought it said Mickey's Boys. Do you see

19            that?

20            **MR. DOTSON:** Third paragraph from the bottom.

21   A         Yes.

22   Q        Great. Did you consider Eckels and Fields

23            your boys or Mickey's boys?

24   A        No, they are my employees.

25   Q        Okay. Did you have any sort of special

```
1              relationship with them that was more close

2              than other deputies?

3    A         No, they are all my friends.  They are all

4              my work family, you know.  We have cookouts

5              together as an office.  We try - - This is

6              very childish, but it is a way for us to

7              make fun of each other and just release

8              some stress.  You know, when I consulted

9              with my attorney after I seen the exhibits

10             in Mr. Fields' case. And I have eliminated

11             all of that, and I have talked to everybody

12             verbally and did a verbal reprimand, and it

13             will never happen again.

14   Q         So you have done that since this past

15             weekend when we took Mr. Field's

16             deposition?

17   A         Yes.

18   Q         In June of 2021, Eckels and Fields were

19             both working as deputy sheriffs; correct?

20   A         Yes.

21   Q         And they were the only two deputy sheriffs

22             who were invited to be a part of this

23             specific group; correct?

24   A         See, I can't answer that.

25   Q         Okay. You don't remember.
```

1    A        If I put someone in the group, and they

2             leave, I don't have documentation of that.

3             You know, people add me to groups all of

4             the time on facebook for yardsales and

5             stuff and I leave, so.

6    Q        Let's look at - - Do you dispute that these

7             were conversations that you had with Jason

8             Eckels and Ben Fields back in June of 2021?

9    A        No, I don't dispute it.

10   Q        Okay. I am looking now to the page marked

11            at the top 1190. It looks like you guys are

12            discussing some sheriff's deputy duties

13            related to serving an EPO and a DEO on

14            Stevie Wynn; do you see that?

15   A        Yeah.

16   Q        Okay. What you are discussing there that

17            would be part of Mr. Eckels' and Ben

18            Fields' duties as deputy sheriffs; correct?

19   A        Who sent that?

20   Q        If you look at the page before, it looks

21            like Jason Eckels is referencing - -

22   A        Yes, that would be their duties serving

23            EPO.

24   Q        Jason Eckels says on this page I busted the

25            window out and left a note that said " Mr.

1       Stines appreciate your business," and

2       left.  Do you see that?

3   A   Yes.

4   Q   Was that a joke or do you think that he

5       actually did that?

6   A   No, that was joke.

7   Q   Do you think that was funny?

8   A   If he had really done that, no. Knowing Mr.

9       Eckels, it was a joke. He is childish.

10  Q   Did you ever discipline him or reprimand

11      him for being childish in any of the

12      communications that are in these messages?

13  A   I have talked to him, yes.

14  Q   When did you talk to him?

15  A   I have talked to him during this, too, when

16      he makes crazy memes and stuff. You know,

17      we go overboard and I tell them that they

18      have got to relax.  Quit being childish

19      let's be more professional.

20  Q   Is there any sort of documentation of you

21      telling them that?

22  A   No, it is verbal.

23  Q   Did they stop after you told them that they

24      were being childish and they had gone too

25      far? Did you answer that question?

```
 1    A         They have stopped.

 2    Q         Okay. When is now?

 3    A         Right now.

 4    Q         As in since last week?

 5    A         Yeah.

 6    Q         Ben Fields was terminated back in 2022;

 7              right?

 8    A         Yes.

 9    Q         And I guess Jason Eckels still works there?

10    A         Yes.

11    Q         Has he continued with this kind of joking

12              childish behavior up through last week when

13              you told him it was time to stop?

14    A         Yes.

15    Q         Was a lot of that done through facebook

16              messenger communications?

17    A         I don't recall.

18    Q         I am looking at page marked 1191 it looks

19              like a naked policeman. It looks to be an

20              image that Jason Eckels sent to you and Ben

21              Fields on June 14th; is that correct?

22    A         Yes.

23    Q         Okay. And was your response to him sending

24              that image good morning boys LOL?

25    A         Yes.
```

1    Q        So you thought that funny?

2    A        Yes.

3    Q        Okay. Did you give him any kind of response

4             to that image asides from LOL?

5    A        Not that I recall. I think that I asked him

6             if that he had court.

7    Q        So you guys go on about discussing deputy

8             sheriff related duties there?

9    A        Let me see.  I am just looking at the next

10            one to make sure it is the right page. What

11            was your question?

12   Q        I asked if you have him any sort of

13            response other than LOL, and I think you

14            said, no, and then I asked - - you

15            referenced that you talked about going to

16            court?

17   A        No, just if he has court.

18   Q        Okay.

19   A        I mean schedule.

20   Q        Okay. So you just went on talking about

21            work related - -

22   A        Yeah, trying to get away from the childish

23            behavior.

24            **MR. SHAW:** Note on Exhibit 10, I will object to

25            the relevance. I don't know what this has to do

Exacta Court Reporting, Inc.
(606) 789-3034                                           124

1    with this case.

2         **MS. BAXTER:** That is fine. I think it is

3         relevant.

4         **MR. SHAW:** I think it is intended to annoy,

5         embarrass or harass this witness by using

6         private messages and trying to get it into a

7         public record, but we can take that up later if

8         that we need to.

9    Q    Okay. The next one that I have got is the

10        one marked 1218 a the top, and I will pass

11        you a clean copy. I have got one extra

12        copy.

13        **MR. SHAW:** Is that number 11?

14        **MS. BAXTER:** Correct.

15        **(The document was marked Exhibit 11)**

16   Q    So does this also to be some messages

17        between yourself and Fields and Jason

18        Eckels dated, I guess, June 18th of 2021?

19   A    Yes.

20   Q    Okay. And it looks likes, by my read,

21        Deputy Eckels and Deputy Fields are

22        discussing some transports to Hazard?

23   A    Yes.

24   Q    Okay. And Ben Fields writes, I think they

25        both like the same sex, though.  Jason

1              Eckels writes, you like freaky sex,

2              and Jason Eckels responds, hardcore?  Were

3              they discussing the sexual orientation or

4              sexual proclivities of these persons who

5              they are about to transport?

6    A        I can't answer that. I don't know.

7    Q        Well, you received the messages back in

8              June of 2021. I don't know who they would

9              be talking about, if not, the persons who

10             they are about to transport, but I am

11             wondering what your interpretation is - -

12             was when you read it?

13   A        To be honest with you, I don't read a lot

14             of these, because they are so childish. If

15             you will look mine - - I don't read a lot

16             of them. I get a lot of messages that I

17             don't even pay attention to.

18        **MR. SHAW:** I object to the characterization. I

19        mean it is plain if they need to take two

20        transport vehicles.

21        **MS. BAXTER:** Well, the record will speak for

22        itself.

23   Q        You chime in and you say you can take them

24             both at the same time or take two different

25             vehicles.  You were referencing that same

```
 1                 transport;
 2    A     Yes.
 3    Q     Is it a appropriate for a deputy sheriff to
 4          discuss the sexual orientation or sexual
 5          proclivities of persons who they are
 6          transporting?
 7    A     Absolutely not.
 8    Q     Did Ben Fields or Jason Eckels ever get
 9          disciplined or reprimanded for having this
10          conversation?
11    A     This certain one, I can't recall.
12    Q     And then, there is some reference at the
13          bottom and Jason says, are we playing
14          Sunday, and you wrote don't know yet. Are
15          you talking about playing poker?
16    A     Yes.
17    Q     Did you serve alcohol at those poker get
18          togethers?
19    A     Very rarely, but there is alcohol there
20          from time to time. I don't drink a lot,
21          because I get called out where I am the
22          sheriff.  But now, if I am out of town,
23          yes, I will have an alcoholic beverage.
24    Q     Sure. Okay. We will put that one down. And
25          this is the one marked 1343. I guess it
```

1 | will be Exhibit 12 —

2 | **(The document was marked Exhibit 12)**

3 Q | And this ones looks to be some messages

4 | between yourself, Deputy Eckels, Deputy

5 | Norris, and someone with the last name of

6 | Bolling, Christine Bolling. Who is

7 | Christine Bolling?

8 A | She is an employee of the office.

9 Q | Okay. What is her title?

10 A | She is a administrative assistant to

11 | Lashauna.

12 Q | Okay. All of those folks who are a party to

13 | this communication are also working under

14 | your supervision as the Letcher County

15 | sheriff's department; correct?

16 A | Yes.

17 Q | Okay. This was June 23rd thru June 25th of

18 | 2021; correct?

19 A | Yes.

20 Q | Okay. So it looks like Deputy Norris shares

21 | a screen shot that sort of by my read

22 | making a joke about sexual arousal and

23 | Crown Victoria vehicles; is that fair?

24 A | That he had sent to his wife, yes.

25 Q | And then, he shared it with you and his co-

1              workers; right?

2    A    Yes.

3    Q    Did you think that was an appropriate thing

4         for him to do?

5    A    I don't understand your question.

6    Q    Was it appropriate for a deputy sheriff to

7         be sharing a message like this with

8         yourself and his co-workers?

9    A    To blow off some steam and make fun of each

10        other, you know, so.

11   Q    So does that mean yes, it was appropriate?

12   A    No, it was not appropriate.

13   Q    Did Deputy Norris receive any kind

14        discipline or reprimand as a result of this

15        communication?

16   A    I can't recall if it was on this one.

17   Q    Has he ever been disciplined or gotten a

18        reprimand?

19   A    Verbal, yes, often.

20   Q    So are you saying they have been

21        reprimanded for this communication?

22   A    I can't recall.

23   Q    Okay. Let's look at the next one. This is

24        the one marked 13.

25        **(The document was marked Exhibit 13)**

| | | |
|---|---|---|
| 1 | Q | This is the — it was id 1649. Do you recall |
| 2 | | ever sent or received any of these |
| 3 | | communications that we have looked at thus |
| 4 | | far during work hours? |
| 5 | A | I can't recall. I mean I work all of the |
| 6 | | time. |
| 7 | Q | Okay. Well, at least based on these couple |
| 8 | | of pages it looks like it is yourself and |
| 9 | | someone named Seth Whitaker.  Is he a |
| 10 | | deputy sheriff? |
| 11 | A | Not any more. |
| 12 | Q | Okay. Was he back on August 11th of 2021? |
| 13 | A | Yes. |
| 14 | Q | Why is he no longer with the sheriff's |
| 15 | | department? |
| 16 | A | Found better employment. |
| 17 | Q | It looks like you sent him a photo, it is |
| 18 | | on the second page, showing a building with |
| 19 | | a big sign that says Mouse's Ear? |
| 20 | A | Yes. |
| 21 | Q | What is a Mouse's Ear? |
| 22 | A | A strip club. |
| 23 | Q | Yeah, I googled it and it says that it is |
| 24 | | strip club in Johnson City; does that sound |
| 25 | | correct? |

1    A        Yes.

2    Q        Have you ever been there?

3    A        Years ago, yes.

4    Q        Have you ever been there with anybody else

5             that works with the sheriff's department?

6    A        Absolutely not.

7    Q        Did you send that to your deputy sheriff

8             because you thought it was funny?

9    A        Yes.

10   Q        This one is marked 8906 at the top.

11        **MR. DOTSON:** Did you say 8906?

12        **MS. BAXTER:** Correct.

13        **(The document has been marked Exhibit 14)**

14   Q        Okay. This to me looks to be a conversation

15            Between yourself, Fields - - Deputy Fields,

16            and Deputy Eckels; is that correct?

17   A        Yes.

18   Q        Okay. And it looks like Jason Eckels sends

19            an image with a joke referencing penis

20            size; is that accurate? Looking at the

21            second page.

22   A        Yes.

23   Q        Okay. And then, he writes, I figured this

24            would be better here LOL. Do you know what

25            he meant when he said this would be better

1                           here?

2       A       No, not that I recall.

3       Q       Okay. And then, you wrote to him that was

4               funny. Do you see that on the third page?

5       A       Is that coming from me?

6       Q       On the third page, yeah.  It has got your

7               name at the bottom of 8907 and at the top

8               of 8908 it says that was funny. I think

9               that statement is attributed to you; but

10              would you agree?

11      A       That is funny or that statement is

12              attributed to me?

13      Q       Did you say in this chain that that was

14              funny?

15      A       Yes.

16      Q       Okay. And you were talking about the penis

17              size joke that Deputy Eckels sent; is that

18              correct?

19      A       That is what it says here.

20      Q       And then, you also have a reference that

21              you say and that picture that Ben done was

22              great. Do you see that?

23      A       Yes.

24      Q       Do you know what picture that you were

25              referring to?

1    A        No, not that I know of.

2    Q        Okay. So this was from August 19th of 2021.

3    A        Yes.

4    Q        Let's look at this next exhibit. So this is

5             the one marked 1697.

6         **(The document was marked Exhibit 15)**

7         **MR. SHAW:** This will be number 15.

8    Q        Okay. This was also dated August 19, 2021;

9             correct?

10   A        Yes.

11   Q        Okay. And this looks to be some

12            communications between yourself, Deputy

13            Eckels, and Deputy Norris from my read?

14   A        Yes.

15   Q        So it looks like first the way that I read

16            this you sent a photo of like maybe a Greek

17            statue, some sort of stone statue that is

18            on the page marked 1698?

19   A        Yes.

20   Q        And then, later, you sent another image

21            where it looks to be the same statue, but

22            it has got your face, Deputy Eckels' face

23            and I believe maybe Deputy Norris' face; is

24            that correct?

25   A        Yes.

1    Q      Do you remember who created that image?

2    A      Not that I recall.

3    Q      Do you know why that you sent that image to

4           your deputies?

5    A      For blowing off a little steam picking on

6           each other.

7    Q      How are you picking on them in this

8           picture?

9          **MR. SHAW:** Continuing objection to relevance. Go

10         ahead.

11   A      We are just aggravating each other. I mean

12         - -

13   Q      And then, on the next page marked 1700 you

14          wrote this is great at Ben Fields. Is that

15          because Ben Fields photoshopped the faces

16          on that statue for you?

17   A      I can't recall. I think he is in the group

18          with us, so it will mark at Ben Fields, you

19          know, the next one if you will follow down

20          what I am telling you about it says, what

21          you mad about at James Norris.

22   Q      So you are asking James Norris what he is

23          mad about?

24   A      No, no. James Eckels above it said I am

25          getting real sick and tired of this - - Do

1          you want me to say it?

2    Q     Sure.

3    A     Shit. I got feelings, too, you know.

4    Q     I said, what are you mad about? James

5          Norris should be the one mad.  Look where

6          James' position on the statue.

7    Q     And that is what I was going to ask. Are

8          you saying that James should be the mad one

9          because he is the one that's face is over

10         the penis on this statue?

11   A     Yes, ma'am.

12   Q     We can put this one aside. This is marked

13         2039 at the top. So is this a communication

14         between yourself and other person who

15         worked in the Letcher County sheriff's

16         department dated October 11, 2021?

17   A     Yes.

18   Q     Okay. And then, on the second page there is

19         an image.  Is that an image that you sent

20         to these persons who you supervise in the

21         Letcher County sheriff's department?

22   A     Yeah, that is what it looks like.

23   Q     Okay. Whose face is that up there?

24   A     Jason Eckels.

25   Q     And just to clarify, was he the person who

1          also pictured one of the turtle's head on the

2          last exhibit that we just looked at?

3     A    Yes.

4     Q    Why did you send this to these person who

5          you supervise?

6     A    I thought it was funny.

7     Q    And you wrote, and I am looking at 2040.

8          You wrote I was trying to be respectful,

9          but that is funny. Was you referencing the

10         image that you sent?

11    A    Yes.

12         **(The document was marked Exhibit 16)**

13    Q    What kind of example do you think that you

14         were setting for the folks working under

15         you by engaging in this kind of

16         conversation with your sheriff's deputies?

17    A    Horrible.

18    Q    Did those communications that we just

19         looked through did those violate any of the

20         Letcher County sheriff's department's

21         policies that we reviewed earlier?

22    A    Yes.

23    Q    Which ones?

24    A    Conduct.

25    Q    Conduct unbecoming?

1    A         Acting professionally.

2    Q         At least after those communications we

3              looked through, do you recall there being

4              any discipline or reprimand resulting from

5              any of those communications?

6    A         No documentation.

7    Q         Nothing documented you are saying?

8    A         That is right.

9         **MS. BAXTER:** Actually, this might be a good time

10             to take a little break.

11        **(A break was taken)**

12   Q         We just listened to about four or five

13             minutes of an audio recording that we got

14             through open records from the attorney

15             general's office.  Did you recognize the

16             voice on that recording?

17   A         Yes.

18   Q         Was that Brianna Cornett?

19   A         Yes.

20   Q         Okay. And did you hear her twice reference

21             her mother speaking to you about her issues

22             with Ben Fields?

23   A         Yes.

24   Q         Okay. Is her mother named Christy Fultz?

25   A         Yeah, I believe so.

1    Q        So do you recall when Christy Fultz came to

2             you and talked to you about Brianna

3             Cornett's issue with Ben Fields?

4    A        No, she has never came to me and talked to

5             me about issues with Brianna.

6    Q        So it is your testimony that Christy Fultz

7             never made that report to you?

8    A        Of the sexual allegations?

9    Q        I think that was I heard on the recording

10            was that Christy Fultz went to you and said

11            I have to live in this town, but I know why

12            he won't give it to her, talking about

13            putting Brianna Cornett back on home

14            incarceration?

15   A        I don't recall that conversation with Ms.

16            Fultz.

17   Q        I think that you said earlier that Brianna

18            Cornett did have a lot of run ins with the

19            law over the years.  Were most of those

20            drug related to the best of your knowledge?

21   A        Yes.

22   Q        Was she ever on home incarceration when you

23            were the home incarceration officer?

24   A        I don't recall.

25   Q        Okay. Talk about another document here.

```
 1              It is going to be Exhibit 17.

 2         (The document was marked Exhibit 17)

 3    Q      I will give you a chance to review it if

 4           you have not seen it before.

 5    A      Okay.

 6    Q      I want to ask you specifically about

 7           paragraphs five and six. But first, have

 8           you ever seen this affidavit before?

 9    A      I can't recall.

10    Q      Do you know Chris Triplett?

11    A      Yes.

12    Q      How do you know him?

13    A      Criminal record.

14    Q      Okay. What do you know about his criminal

15           record?

16    A      It is long, it is lengthy.

17    Q      Can you be more specific?

18    A      He has been in the court system a lot.

19    Q      Okay. So in paragraph five of this

20           affidavit he states that on or about

21           December 15$^{th}$ of 2021, he reported the

22           sexual abuse of Jennifer Hill by Deputy

23           Fields to the Letcher County sheriff's

24           department by telephone, and in person at

25           your headquarters downtown. Do you see
```

```
1              that?

2    A         Yes.

3    Q         So what did the Letcher County sheriff's

4              department do in response to this report?

5    A         We didn't receive no report from Mr.

6              Triplett.

7    Q         Have you asked your staff about whether or

8              not that any such report was made back in

9              December of 2021?

10   A         Yes.

11   Q         What response did you get?

12   A         No one received any reports to that.

13   Q         When did you ask your staff about that?

14   A         I don't recall.

15   Q         Was it after this lawsuit was filed or

16             before?

17   A         It would have been after.

18   Q         Are you aware on or about December 15th of

19             2021 Chris Triplett was pulled over by

20             Deputy Norris for having a tinted license

21             plate cover? Were you aware of that?

22   A         I don't recall.

23   Q         Is Deputy Norris a road officer?

24   A         Yes, ma'am.

25   Q         Okay. So when did you as Letcher County
```

| | | |
|---|---|---|
| 1 | | sheriff first become aware of these |
| 2 | | allegations against Ben Fields related to |
| 3 | | Jennifer Hill? |
| 4 | A | I don't recall. |
| 5 | Q | Okay. If there was a woman who would have |
| 6 | | picked up the phone at the sheriff's |
| 7 | | department, do you know who that woman |
| 8 | | would have been back in December of 2021? |
| 9 | A | Christine Bolling or Lashauna Frazier. |
| 10 | Q | Okay. And are they sort of office support |
| 11 | | staff or administrative staff? |
| 12 | A | Yes.  Can we step out a minute?  I need to |
| 13 | | ask you a question. |
| 14 | | **MR. SHAW:** Okay. |
| 15 | | **(A break was taken)** |
| 16 | Q | Do you recall specifically and we are still |
| 17 | | discussing the Chris Triplett report that |
| 18 | | he describes in his Affidavit to the |
| 19 | | sheriff's department. Do you recall whether |
| 20 | | you talked specifically to Deputy Whitaker |
| 21 | | about whether he ever received a report |
| 22 | | about sexual misconduct related to Jennifer |
| 23 | | Hill and Ben Fields? |
| 24 | A | I can't recall. |
| 25 | Q | Is Whitaker still working for the sheriff's |

1  department?

2  A    No.

3  Q    Okay. When did he leave?

4  A    I don't recall the date.

5  Q    Okay. What about a female - - If a female

6       was in uniform at the sheriff's department,

7       does that mean she would have been a

8       deputy, or do your administrative support

9       staff wear uniforms also?

10 A    You would have to be able to tell me what

11      uniform

12 Q    Like a deputy?

13 A    There are different types.

14 Q    How many different types of uniforms?

15 A    Standard, there is a class A with all of

16      the dress and everything, there is a class

17      B with BDU bottoms and BDU top, there a

18      polo like a BDU bottom.

19 Q    What is BDU?

20 A    It is like military style pants with a lot

21      of pockets.

22 Q    I guess in December of 2021, what females

23      were working for Letcher County Sheriff's

24      Department who would have worn any kind of

25      those uniforms that you just described? We

1        have talked about Dowling and Frazier;

2        right?

3    A   Yes.

4    Q   Would either of them have been in any kind

5        of uniform?

6    A   No.

7    Q   So beyond that, I have seen the names,

8        Alexis Stambaugh?

9    A   Yes.

10   Q   She would have been someone who would have

11       worn an uniform.  Have seen the name

12       Destiny Hall?

13   A   Yes.

14   Q   She would have been an uniformed person?

15   A   Yes.

16   Q   I think those are the only females names

17       that I have seen.  Cory Harris, is that a

18       female?

19   A   No.

20   Q   So I guess as far as woman in uniform, can

21       you think of anyone else aside from Destiny

22       Hall or Alexis Stambaugh?

23   A   Lexie worked for me twice.

24   Q   Okay.

25   A   So they might not have included her on the

1              time.

2    Q    Do either of them still work for you Lexie

3         or Destiny?

4    A    No.

5    Q    Are they still in Letcher County as best

6         you can tell?

7    A    Yes.

8    Q    Set that one aside.  And get this one.

9         Let me know when you are finished reviewing

10        that.

11        **MR. SHAW:** This will be Exhibit 18.

12        **(The document was marked Exhibit 18)**

13   Q    Have you ever seen this Declaration of

14        Stacy Yates before?

15   A    Not that I recall.

16   Q    Do you know who Stacy Yates is?

17   A    Yes, I am familiar with him.

18   Q    How are you familiar with him?

19   A    He has been in court and stuff on and off,

20        too.

21   Q    In January of 2022, were you aware that he

22        filed this petition for an emergency

23        protective order?  Would that be something

24        that you were aware of as sheriff?

25   A    Not always.  They come over a computer

Exacta Court Reporting, Inc.
(606) 789-3034                                    144

| 1  |   | system. I don't want to see them all. |
|----|---|---|
| 2  | Q | Do you see there is some names in paragraph |
| 3  |   | six? Robbie Kincer, do you know who Robbie |
| 4  |   | Kincer is? |
| 5  | A | Yes. |
| 6  | Q | Who is Robbie Kincer? |
| 7  | A | He is the Drug Court coordinator for |
| 8  |   | Letcher County. |
| 9  | Q | Would you interact with him on any kind of |
| 10 |   | regular basis in your capacity as sheriff? |
| 11 | A | Not regular basis. |
| 12 | Q | Well, how often a week would you see him? |
| 13 | A | It is not weekly. |
| 14 | Q | Okay. Once a month? |
| 15 | A | If that. |
| 16 | Q | Do you have any deputies that would have |
| 17 |   | worked more closely than you would with |
| 18 |   | him? |
| 19 | A | Yes. |
| 20 | Q | Who would that be? |
| 21 | A | It would be Circuit Court bailiff. |
| 22 | Q | And that would be Jason Eckels or that |
| 23 |   | would have been Jason Eckels at least back |
| 24 |   | in 2021 and in January of 2022;' correct? |
| 25 | A | I can't recall.  Mike Enfusse has worked |

1              for like three times, so Mike Enfusse has

2              been up there, too.  Keith Smith has been

3              up there also, so there have been several.

4    Q        So it could have been either Eckels, Smith

5              or - - What was the other guy's name?

6    A        Enfusse.

7    Q        Do you know who Holly Boggs is?

8    A        That is a drug court worker also with the

9              state, I believe.

10   Q        And she is also Ben Fields' sister;

11             correct?

12   A        Yes.

13   Q        Okay. What about Elena Blackford?

14   A        I am not familiar with that name.

15   Q        Okay. What about Chad Clemens, do you know

16             who that is?

17   A        A worker with drug court is all that I

18             know.

19   Q        Would it make sense for Ben Fields to be in

20             a hearing about - - in a drug court

21             session?

22   A        Where does it - -

23   Q        I am looking at paragraph seven.  It says,

24             during this drug court session there was

25             some discussion between Judge Craft and Ben

```
 1              Fields regarding the EPO location and

 2              residence of Sabrina Adkins; do you see

 3              that?

 4    A         Yes.

 5    Q         I guess that Ben Fields as I understood was

 6              the district court bailiff?

 7    A         Yes.

 8    Q         But I guess would it make sense for him to

 9              be discussing with Judge Craft the location

10              and residence of someone on home

11              incarceration?

12    A         Yes.

13    Q         And Sabrina Adkins, do you see her name

14              there?

15    A         Where?

16    Q         Yeah, it is in this declaration a few

17              different times?

18    A         Yes.

19    Q         When was the first time that you heard her

20              name or met Sabrina Adkins?

21    A         I don't recall.

22    Q         Have you met her?

23    A         I don't recall.

24    Q         Do you see - -

25    A         When Judge Craft and Robbie reported that
```

```
1              to me in my report that day after the
2              reporter, they also apologized to me,
3              because they did not come to me and tell me
4              all of this earlier.
5    Q    So they let you know that they had had this
6              information for some period of time, but
7              did not divulge it to you?
8    A    Yes.
9         MR. SHAW: Object to the characterization.
10   Q    Why did they wait?  Did they tell you why?
11   A    (No verbal answer given)
12   Q    Are you pointing something out on the
13             affidavit?
14   A    Yes.
15   Q    Did something catch your eye?
16   A    Yes.
17   Q    What caught your eye?
18   A    It is some handwriting.
19   Q    Yeah. I will say that is Stacy Yates adding
20             some additional details to this.
21        MR. SHAW: I was going to ask whose handwriting
22   that is.
23        MS. BAXTER: It is my understanding that it is
24   Stacy Yates.
25   Q    So I am looking at paragraph 13, and it
```

1          says that Ronald Kinser called Stacy Yates

2          and asked him to park across the street

3          behind the apartments so no one would see

4          his car looking at the top of page 2,

5          paragraph 13?

6     A    Yes.

7     Q    Do you know where that location would be

8          across the street behind the apartments?

9          Is there some apartments across the street

10         from the court house?

11    A    There is a bunch of apartments around the

12         courthouse.  I don't know which one that he

13         is talking about.

14    Q    Okay. So you don't know where that location

15         is?

16    A    No.

17    **MR. SHAW:** Object to the extent that you are

18    wanting this witness to identify anything about

19    the veracity of this document.  He is not

20    mentioned in it.  There is no indication. There

21    is handwritten notes at the bottom that no one

22    ever told him anything. The document speaks for

23    itself.

24    Q    Okay. Where is the Letcher County Drug

25         Court Office?

1    A        It has been at different locations at

2             different times.

3    Q        Good point.  Where was it in January of

4             2022?

5    A        I don't recall.

6    Q        Based on what you said earlier, at some

7             point, you became aware that Robbie Kincer

8             and Judge Craft had some knowledge about

9             Ben Fields; is that correct?

10   A        Yes.

11   Q        Okay. And do you know whether the

12            information that Robbie Kincer and Judge

13            Craft had had come from Stacy Yates?

14   A        That is what they told me.

15   Q        Okay. What else did they tell you?

16   A        That he had reported some sexual

17            interactions with Mr. Fields and Sabrina

18            Adkins.  That - - something about some

19            messages.

20   Q        Okay.

21   A        That they were sorry that they didn't come

22            to me sooner.

23   Q        Did they mention Brianna Cornett at that

24            time?

25   A        Not at that time.

1   Q        Okay. Did they mention her later?

2   A        No, they did mention her at that time.

3   Q        Okay.

4   A        Yeah, they did mention her at that time.

5   Q        And did they give you any of these messages

6            or did have any physical documents to

7            share?

8   A        I didn't take any of it where I was getting

9            - - investigation.

10  Q        Did they tell you that they had reported it

11           to anyone before reporting it to you?

12  A        Not that I recall.

13  Q        Did they tell you how long that they had

14           that information before sharing it with

15           you?

16  A        Not that I recall.

17  Q        There is some reference to someone trying

18           to get Stacy Yates terminated from drug

19           court.  Do you know who that could have

20           been?

21  A        No idea.  I don't work close with drug

22           court. I am not on the drug court team.

23  Q        Are there any sheriff's deputies that are

24           on the drug court team?

25  A        No, there is the bailiffs that are

1                  upstairs.

2    Q      And that would be the same folks that you

3           just referenced?

4    A      My understanding, yes, at that time frame.

5    Q      Okay. Where were you when you had this

6           conversation with Robbie Kincer and Judge

7           Craft?

8    A      In my office.

9    Q      So they walked over to your office from the

10          courthouse?

11    A      Yes.

12    Q      Was anybody else present for that

13          conversation?

14    A      Not in my office, no.

15    Q      Okay. Did Robbie Kincer ever tell you that

16          she spoke directly to Robbie Kincer?

17    A      I don't recall.  Who is she?

18    Q      Yeah.  Did Robbie Kincer ever tell you that

19          he spoke directly to Brianna Cornett?

20    A      I don't recall.

21    Q      How long did that meeting between yourself

22          and Judge Craft and Robbie Kincer last?

23    A      I don't recall.

24    Q      Well, I have got - - Well, I guess this one

25          did come from AG production, too.

1     **MR. SHAW:** What number is this one?

2     **MR. DOTSON:** 19.

3     **(The document was marked Exhibit 19)**

4     Q     So this looks like this is a criminal

5           complaint that Ben Fields swore out. Is

6           that the correct terminology?

7     A     Yes.

8     Q     I guess would a sheriff's deputy need to

9           come to you first before they swore out a

10          complaint like this?

11    A     I don't understand your question.

12    Q     I was just wondering like is there some

13          sort of process, if I am a deputy sheriff

14          and I am going to go get a criminal

15          complaint, do I have to notify the sheriff

16          before that I do that or was there any sort

17          of - -

18    A     No.

19    Q     Deputies have full discretion to go and get

20          criminal complaints without approval from

21          the sheriff; is that correct?

22    **MR. SHAW:** Object to form. Approval comes from

23    the county attorney.

24    **MS. BAXTER:** Okay. I was just wondering if he was

25    involved in that process at all.

1    **MR. SHAW:** When have you actively on the case?

2    **MS. BAXTER:** I guess in any circumstance.

3    Q    If a deputy sheriff wants to go and get a

4         criminal complaint, would the sheriff be

5         aware of that?

6    A    Not at all times.

7    Q    Okay. What would the circumstances be when

8         you would be aware of that?

9    A    If I am on the case.

10   Q    What does it mean to be on the case?

11   A    If I am working the case, if it is my case.

12   Q    Well, if it was your case, wouldn't you be

13        the person to get the complaint?

14   A    Yes.

15   Q    Okay. So if it is your case, would there

16        ever be a situation where instead of

17        yourself a deputy would go to swear out the

18        complaint?

19   A    If he was a witness to it, he could go

20        down.

21   Q    Okay. Thank you. I don't practice criminal

22        law, so I am not trying to ask dumb

23        questions, I am just trying understand how

24        the process works.

25   A    Just trying to understand.

```
1    Q          And likewise I am not trying to belabor

2               it. So this says that the offender on home

3               incarceration failed to report to the

4               Letcher County sheriff's office; do you see

5               that?

6    A          Yes.

7    Q          And Ben Fields signs this as - - it says

8               Ben Fields, LCSO. Do you see that?

9    A          Yes.

10   Q          Is that the designation for Letcher County

11              sheriff's office?

12   A          Yes.

13   Q          So you are saying that he would have gone

14              to speak to the county attorney about this

15              complaint, and he would have worked with

16              the county attorney to fill this out. Is

17              that your understanding?

18   A          He spoke with the county attorney's

19              assistant.

20   Q          So Angela Trent's signature down there at

21              the bottom?

22   A          Yes.

23   Q          And that is one of my questions.  Who is

24              Angela Trent?

25   A          She is a secretary for the county attorney.
```

```
 1    Q        Okay. So as far as you can tell, Ben Fields

 2             worked with Angela Trent and swore out this

 3             complaint; correct?

 4    A        Yes.

 5    Q        And looks like this got printed on January

 6             14th, and then, if you look at the next

 7             page, it looks like this complaint warrant

 8             was generated on the 15th. Do you see that?

 9    A        Yes.

10    Q        So would you have been aware of the fact

11             that complaint warrant had been generated?

12    A        No, it wasn't generated on the 15th.  You

13             looked at that wrong.

14    Q        Okay. Help me.

15    A        The Judge signed it on the 14th.

16    Q        Oh, I see.

17    A        It says date that it was printed, the copy.

18    Q        And I was looking at the top right corner

19             where it just says generated.

20        MR. DOTSON: Where is?

21        MR. SHAW: Number 14.

22    A        It was actually the judge signed it on the

23             14th, so it is actually should have been

24             generated then in the computer system.

25    Q        But in this case, it looks like it was not
```

1          generated up the next morning?

2          Regardless, would the sheriff's department

3          get a copy of this after the warrant is

4          generated?

5    A     No, ma'am.

6    Q     So what, if any, involvement with the

7          sheriff's office have with this complaint

8          warrant?

9    A     It would go into a computer system.

10   Q     Okay. And I guess is the sheriff's

11         department responsible for arresting people

12         and serving warrants?

13   A     Yes.

14   Q     So would you have been responsible for this

15         warrant?

16   A     We looked at them daily. I don't know if we

17         are responsible for that one.

18   Q     Okay. So the sheriff's department would

19         have looked at this complaint warrant in

20         the computer system?

21   A     We look at complaint warrants in a computer

22         system once the OA - - The AOC and the E-

23         warrant system.

24   Q     Okay. Is there one person at the sheriff's

25         department who is responsible for reviewing

1          all of that?

2     A    No.

3     Q    Okay. So everybody has got access to it?

4     A    Everybody has access to E-warrants.

5     Q    Okay. Are there only certain deputies

6          within the Letcher County sheriff's

7          department who have the authority to arrest

8          people?

9     A    Depends on the location.

10    Q    Okay. Help me understand what you mean by

11         that?

12    A    Road deputies can arrest on the road, and

13         you know, court and everything, court

14         security is suppose to be court on

15         courthouse grounds.

16    Q    Okay. So Ben Fields only had the authority

17         to arrest people in court and on courthouse

18         grounds; is that correct?

19    A    Yes.

20    Q    So is it fair or is it accurate to say that

21         at least as of the morning of January 15th

22         everyone within the Letcher County's

23         sheriff's office would at least have access

24         to be able to see this complaint warrant;

25         correct?

1    A        It depends on when day it is.

2    Q        Oh, I see. That is a Saturday.

3    A        Yeah. Nobody is at the office. I don't even

4             have a deputy out on Saturday mornings.

5    Q        Did you ever take issue - - Do you ever

6             recall reviewing this criminal complaint or

7             complaint warrant?

8    A        Not to my knowledge.

9    Q        Okay. That is all that I have got for that

10            one.

11            **(The document was marked Exhibit 20)**

12   Q        These are some notes that I got through the

13            attorney general's office. I think that I

14            never got an unredacted copy from you, but

15            I believe these to be your notes?

16   A        Yes.

17   Q        So do you still have a copy of this? I have

18            asked your attorney for it, but I have - -

19            and correct me if I am wrong Jonathan, but

20            I don't think that I have ever gotten a

21            clean copy of this.

22            **MR. SHAW:** I am not sure if you asked for it or

23            not, but I will check and see if we do have it.

24            **MS. BAXTER:** I have e-mailed you about this.

25   A        I believe that we do have it.

1    Q        Would be acceptable to you right now,

2             because I would love to know whose names

3             are redacted from this copy that I have

4             got.

5    A        I don't have it with me, no.

6        MR. SHAW: If we have got it, we will get it to

7        you.

8        MS. BAXTER: Okay. I have definitely asked for it

9        several times over e-mail.

10   Q        Are these your notes that you took on

11            January 31st of 2022?

12   A        Those are handwrote by Lashauna Frazier,

13            because she was at the office with me that

14            I made a timeline.

15       MR. SHAW: So that is not your handwriting?

16   A        No, that is not my handwriting.

17   Q        So she made these notes for you?

18   A        Yes.

19   Q        Did you make notes that she then used to

20            make these notes?

21   A        No, I sat down with her.

22   Q        Did you dictate this to her?

23   A        Yes.

24   Q        So it is dated January 21st of 2022. Did you

25            dictate this to her on that date?

1    A        I can't recall.

2    Q        So it looks like you noted that a reporter

3             called you and notified you of the lawsuit;

4             do you see that?

5    A        Yes.

6    Q        Do you remember who that reporter was?

7    A        No, I do not.

8    Q        It looks like the next thing you did

9             happened 15 minutes later. So were you on

10            the phone with that reporter for 15

11            minutes?

12   A        No.

13   Q        Did the reporter send you any documents?

14   A        No.

15   Q        After you got off the phone, did you access

16            any documents before speaking to Ben?

17   A        I can't recall.

18   Q        So it looks like at 4:15 you spoke with Ben

19            regarding reporter info; do you see that?

20   A        Yes.

21   Q        So did you speak with him in person or on

22            the phone?

23   A        I believe it was on the phone.

24   Q        Do you remember where he was when you

25            called him?

1    A       No, I don't recall.

2    Q       What did you say?

3    A       I can't recall the exact details of the
4            conversation.

5    Q       I would like for you to try the best that
6            you can, because this is my only chance to
7            ask you about it?

8    A       That a reporter had called and that
9            somebody had filed a lawsuit against him.

10    Q       Okay. And what did he tell you?

11    A       I can't recall.

12    Q       Did he admit?

13    A       I can't recall.

14    Q       Did he deny any wrong doing?

15    A       I can't recall the exact conversation.

16    Q       How long did you speak to him?

17    A       It was just very brief.

18    Q       Was there any sort of intent to follow up
19            or next steps discussed?

20    A       I can't recall.

21    Q       Did you tell him there was going to be an
22            investigation by the sheriff's department
23            into these allegations?

24    A       No, no, I don't recall telling him that at
25            that time.

1    Q        Then, it looks like the next thing on your

2             timeline is from 4:00 pm, so did you leave

3             the office between 2:15 when you talked to

4             Ben Fields and 4:00 pm when you talked to

5             Craft and Kincer?

6    A        No.

7    Q        You stayed in the office. Did you talk to

8             anybody else during that time period?

9    A        Yeah, I talked to Lashauna Frazier and

10            Christine.

11   Q        What did you all talk about?

12   A        I told them that I had got a call from a

13            reporter and a lawsuit had been filed

14            against Ben.

15   Q        What did they say?

16   A        They were shocked.

17   Q        Did you look up Sabrina Adkins?  Did the

18            reporter give you her name?

19   A        I don't recall.

20   Q        Did you access any court records in that

21            time period?

22   A        I don't recall.

23   Q        Okay. Did you know Judge Craft and Robbie

24            Kincer were coming down to talk to you

25            before they showed up?

1    A         No, they just showed up.

2    Q         Okay. So on your timeline, you say Judge

3              Craft and Robbie with drug court regarding

4              Brianna and Sabrina. So did you already

5              know the names Brianna and Sabrina before

6              they showed up?

7    A         No.

8    Q         What do you recall them telling you?

9    A         I am trying to remember. They came into the

10             office and told me that Ben had been

11             fooling around with a drug court

12             participant.

13   Q         Okay.

14   A         Brianna Cornett. And that Stacy Yates had

15             reported that he had been fooling with

16             Sabrina Adkins, and that is when they

17             mentioned something about messages.

18   Q         Was that their term of art fooling, did

19             they use that phrase?

20   A         I can't recall.

21   Q         So they told you that Ben had been fooling

22             around with Brianna Cornett and told you

23             that Stacy Yates had reported that there

24             had been some sort of fooling around

25             between Ben Fields and Sabrina Adkins; did

| 1  |   | I understand correctly?                          |
|----|---|-------------------------------------------------|
| 2  | A | Yes.                                            |
| 3  | Q | And that there are some messages?               |
| 4  | A | Yes.                                            |
| 5  | Q | Did they tell you that they had these           |
| 6  |   | messages?                                       |
| 7  | A | I can't recall.                                 |
| 8  | Q | Did they give you copies of any messages?       |
| 9  | A | I can't recall.                                 |
| 10 | Q | Did they tell you whether they reported it      |
| 11 |   | to anybody before reporting it to you?          |
| 12 | A | They advised me that they had not reported      |
| 13 |   | it to any law enforcement or anybody else.      |
| 14 | Q | Okay. What about Judge Mullins; do you          |
| 15 |   | think that he was aware? Did they tell you?     |
| 16 | A | No, they didn't tell me.                        |
| 17 | Q | Okay. Did you say earlier that they were        |
| 18 |   | apologizing to you?                             |
| 19 | A | Yes.                                            |
| 20 | Q | Explain to me how they apologized to you?       |
| 21 | A | They just said that they were sorry that        |
| 22 |   | they didn't come and tell me when they          |
| 23 |   | first found out about it.                       |
| 24 | Q | Okay. What did you say to them?                 |
| 25 | A | Yeah, yeah, you should have come and told       |

1              me. I am the one that let you know that I am

2              going to want to know that.

3    Q    Okay. After that, can you think of anything

4         else that was discussed in that meeting?

5         Any next steps discussed?

6    A    Not that I can recall.

7    Q    Okay. It looks like the next thing that you

8         did was - - Tell me this was Frazier and

9         Bolling a part of that meeting with Craft

10        and Kincer?

11   A    No.

12   Q    It was just the three of you?

13   A    Yes.

14   Q    Okay. After Judge Craft and Robbie Kincer

15        left, did you tell Frazier and Bolling you

16        talked to them again as you had after you

17        spoke to Ben?

18   A    Not that I recall.

19   Q    And then, it looks like at 4:30 sent a text

20        and spoke to somebody Sturgill with KSP?

21   A    Derrick Sturgill.

22   Q    Who is that?

23   A    He is a supervisor with KSP Post 13.

24   Q    That is Hazard; right?

25   A    Yes.

1    Q       Okay. What did he tell you?

2    A       I can't recall the conversation.

3    Q       Well, I guess did you tell him about the

4            report about Ben Fields?

5    A       Yes.

6    Q       Okay. I guess did you tell him what you had

7            been told by Judge Craft and Robbie Kincer?

8    A       I don't know if I told him that or I had an

9            employee that had some allegations made

10           against him. I need an investigation.

11   Q       Okay. So you requested an investigation and

12           what was his response?

13   A       I can't recall.  The text, I can't recall

14           what the text said.

15   Q       Do you have the text still?

16   A       I can check.

17   Q       Okay. I would like for you to check on

18           that. Okay. Then, I am sorry if I missed

19           this, but did you actually get ahold of any

20           messages between Ben Fields and either of

21           these woman from Judge Craft and Robbie

22           Kincer that day?

23   A       I can't recall if they gave me messages or

24           not.

25   Q       So the next thing that I see on your time

| | | |
|---|---|---|
| 1 | | line is at the county attorney came |
| 2 | | to your office? |
| 3 | A | Yes. |
| 4 | Q | Who is that? |
| 5 | A | Jamie Hatton. |
| 6 | Q | Okay. And did he come to your office |
| 7 | | because you asked him to come to your |
| 8 | | office? |
| 9 | A | Yes. |
| 10 | Q | Okay. And did you call him to tell him? |
| 11 | A | Yes. |
| 12 | Q | And what did you guys discuss? |
| 13 | A | Just what some of the allegations were. |
| 14 | Q | Okay. And what was his advice to you? |
| 15 | A | The letter suspending without pay. |
| 16 | Q | I have a copy of that here. I have a ton of |
| 17 | | copies, because it was the from Mr. Fields' |
| 18 | | deposition. |
| 19 | | **(The document was marked Exhibit 21)** |
| 20 | Q | Is this the document that you created after |
| 21 | | having that conversation with Jamie Hatton |
| 22 | | on January 31st? |
| 23 | A | Yes. |
| 24 | Q | There is not a lot of detail in there; do |
| 25 | | you see that? |

1    A       Yes.

2    Q       Why were you putting Ben Fields on

3            suspension without pay?

4    A       Because he has been messing around

5            allegedly with drug court participant,

6            another female.

7    Q       Aside from the folks that you have

8            mentioned as we have been reviewing this

9            Exhibit marked number 20, was there anybody

10           else that you consulted with about this

11           decision to suspend Ben Fields without pay

12           aside from the folks you mentioned already?

13   A       Not that I am aware.

14   Q       Did you ever instruct Ben Fields to delete

15           any of his facebook groups or messages?

16   A       No.

17   Q       Did you delete any of your messages with

18           Ben Fields after these allegations came to

19           light?

20   A       Not that I am aware of.

21   Q       So you said met with Ben Fields. Did he

22           actually come to your office that night?

23   A       Yes.

24   Q       Okay. And so who else was present aside

25           from yourself and Mr. Fields?

| | | |
|---|---|---|
| 1 | A | I took him back to my office and shut the |
| 2 | | door. |
| 3 | Q | So there was no witness to this? |
| 4 | A | Uh-uh. |
| 5 | Q | Okay. What did you say to Ben Fields? |
| 6 | A | That the reporter had made some |
| 7 | | allegations, and a lawsuit had been filed |
| 8 | | against him for sexual abuse. |
| 9 | Q | Okay. Did he respond to that? |
| 10 | A | I can't recall what he said. |
| 11 | Q | Did he deny it? Did he admit anything? |
| 12 | A | I can't recall at that time. |
| 13 | Q | Okay. Before we get to the Ben Field aspect |
| 14 | | of this.  At 1816, so I guess that is 6:26 |
| 15 | | someone, whose name is blacked out, came to |
| 16 | | your office. Do you remember who that was? |
| 17 | A | Yeah. |
| 18 | Q | Who was that? |
| 19 | A | That was Brianna. |
| 20 | Q | Was she in jail at that time? Did they |
| 21 | | bring her up from the jail? |
| 22 | A | I can't recall. |
| 23 | Q | Did you call her up on the phone and ask |
| 24 | | her to come to your office or how did she |
| 25 | | end up knowing to go there? |

1    A         I don't recall.

2    Q         Did anybody bring her there?

3    A         I can't recall.

4    Q         Did she come to your office at your

5              request?

6    A         I can't recall.

7    Q         So she appeared at your office and what was

8              the conversation?

9    A         She came into the office and sat down at

10             the desk and Lashauna was there and she

11             came in and said Ben Fields he had kissed

12             her, I believe in his car.

13   Q         Okay. Did you make any notes or any kind of

14             recorded statement of what she was telling

15             you?

16   A         No, I told her to give me her name and

17             number, and I would have somebody to

18             contact her.

19   Q         Okay. You already knew her name though?

20   A         Yes, I had her write it down. I will try to

21             find that.

22   Q         Okay. You think that you wrote that down,

23             you say that you wrote down her name and

24             number, but you don't recall making any

25             notes about the substance about what she

1    told you?

2    A    No.

3    Q    And no one else was present for that

4         conversation?

5    A    Yes, Lashauna Frazier was there.

6    Q    Lashauna. Okay. Did that take place in your

7         office or in the - -

8    A    In Lashauna's area, out front not in my

9         office.

10   Q    Anybody else present in the office at that

11        time?

12   A    By that time, dispatch is gone.

13   Q    Okay. How long did that conversation last?

14   A    A few minutes.

15   Q    Did you believe that Brianna Cornett was

16        being truthful with you, is that your

17        impression?

18   A    I didn't see why that she had any reason to

19        lie.

20   Q    Okay. And the next person that you spoke to

21        was  - - Did you call the county attorney

22        back and update him what you learned from

23        Ms. Cornett?

24   A    I believe, I did.

25   Q    Okay.

```
 1    A        I talked to the county attorney multiple

 2             times even when he wasn't at the office I

 3             called him.

 4    Q        Do you think this suspension without pay

 5             memorandum was created after that you spoke

 6             to Brianna Cornett or before?

 7    A        I think it was after. I gathered all of

 8             this information here.  Jamie came over

 9             before Brianna came and told him kinda what

10             we had, what Jimmy Craft and drug court,

11             you know, the messing around stuff, and

12             Brianna comes and I called him and told him

13             about Brianna saying that Ben kissed her,

14             and then, I think that is when he said you

15             have to suspend him without pay.

16    Q        And it was your understanding that Ben

17             Fields had kissed Brianna Cornett while she

18             was on home incarceration?

19    A        Yes.

20    Q        So you met with Ben Fields and advised him

21             of the suspension and gave him this

22             memorandum on the 31$^{st}$ of January; correct?

23    A        Yes.

24    Q        And what did he say - - How long did that

25             conversation last?
```

1    A         It wasn't long.

2    Q         Did he apologize to you?

3    A         Yeah, I think that he did.

4    Q         We will mark this memorandum 21.

5         **(The document was marked Exhibit 21)**

6    Q         Anything else networthy about what he told

7              you?

8    A         Me and him was meeting in the office, and I

9              told him about the allegations that was

10             made with Sabrina.

11   Q         Right.

12   A         I think that he just sat there.

13   Q         Just so we are clear, you are describing

14             the conversation that happened on January

15             31st at 1845?

16   A         Yes, I am pretty sure, and then, I get up

17             and say I got to have your gun and badge,

18             and I said, there are others, and he said,

19             who? And I said, I said, Brianna, and then,

20             he leaves.

21   Q         Did he respond at all when you said

22             Brianna?

23   A         Not that I recall.

24   Q         You don't recall him denying having that -

25             that there was an issue with Brianna?

| | | |
|---|---|---|
| 1 | A | What do you mean? |
| 2 | Q | Well, if you said there are others, |
| 3 | | Brianna, did he respond at all? The way |
| 4 | | that you said it, it sounded like he did |
| 5 | | not, but I was just trying to clarify. |
| 6 | A | Yeah, He said, what others?  And I said, |
| 7 | | Brianna. I am trying to remember. |
| 8 | Q | I appreciate it.  Did he say anything after |
| 9 | | that? |
| 10 | A | I can't recall. |
| 11 | Q | Did you speak to Patty Stockham at any |
| 12 | | point on January 31st? |
| 13 | A | Yes. |
| 14 | Q | Okay. Tell me about that communication? |
| 15 | A | I had called her after I suspended Ben and |
| 16 | | told her that I had got some allegations |
| 17 | | that he had been having a relationship with |
| 18 | | some people on house arrest and I had to |
| 19 | | suspend him without pay. |
| 20 | Q | You told Patty Stockham that after your |
| 21 | | meeting with Ben at 1845? |
| 22 | A | Yes. |
| 23 | Q | Okay. And what did Patty Stockham say? |
| 24 | A | I can't really recall all of the details. |
| 25 | Q | Did you give her names of these women on |

1          home incarceration?

2     A    I can't recall.

3     Q    Do you recall her asking for names?

4     A    I don't recall.

5     Q    Do you recall anything that she said?

6     A    No, not really.

7     Q    Okay. Do you remember what her response

8          was? Could you tell whether she was

9          surprised or upset or anything?

10    A    Yeah, she was shocked. I told her, you

11         know, that I was sorry.

12    Q    So you apologized to her?

13    A    Yes.

14    Q    Is that because you had recommended Ben

15         Fields to work for her?

16    A    Yeah.

17    Q    Okay. So the next thing that I see here

18         that nothing happened on February 1st

19         according to your timeline. Do you recall

20         talking to anybody about February 1st about

21         any of this?

22    A    I don't recall.

23    Q    Okay. And then, the next person that you

24         talked to was Bert Slone who requested that

25         the investigator to come to the jail about

1    an inmate appeal, it's blanked out. Do you

2    know what that name would be?

3  A    No, I need the original copy to be able to

4    see it.

5  Q    Where is the original copy as we sit here

6    right now?

7  A    At my office.

8  Q    Is someone working, could we get them to

9    send it over real quick would that be easy

10    enough?

11  A    Yeah, we can.

12  Q    It would be nice to be able to deal with

13    this today. Let's take a break.  I don't

14    have a whole lot more after this.

15    **(A break was taken)**

16    **MS. BAXTER:** Can we just change that to the new

17    20 without redactions.

18    **MR. SHAW:** Or we can do 22, if you want to.

19    **MR. DOTSON:** I say we add it. I don't say that we

20    take anything out.

21    **MS. BAXTER:** Okay Make it 22.

22    **(The document has been marked Exhibit 22)**

23  Q    Okay. This is an unredacted copy. I see

24    Brianna Cornett's name up from your 1824

25    meeting on January 31st as you recalled?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Then, we are on February 2nd now. And it |
| 3 | | looks like Bert Slone wanted someone to |
| 4 | | come to the jail regarding inmate - - I is |
| 5 | | that an and sign, Brianna Cornett? |
| 6 | A | Yes. |
| 7 | Q | Do you know who the unidentified inmate is? |
| 8 | A | No. |
| 9 | Q | Says also advised that Ben wife's has |
| 10 | | spoken to Lena Hensley about Sabrina Adkins |
| 11 | | incident. Do you see that? |
| 12 | A | Yes. |
| 13 | Q | So let's start here.  Who is Lena Hensley? |
| 14 | A | She is an employee at the jail. |
| 15 | Q | And Ben's wife, she is also an employee of |
| 16 | | the jail; right? |
| 17 | A | Yes. |
| 18 | Q | Okay. So I guess Bert Slone is calling you |
| 19 | | and relayed that information to you? |
| 20 | A | No, no, he came over to the office. |
| 21 | Q | Okay. So what did he say when he showed up |
| 22 | | to the office? |
| 23 | A | That whoever investigated it needed to come |
| 24 | | over and talk to Ben's wife. |
| 25 | Q | Did you ask him - - Do you know anything |

|   |   |   |
|---|---|---|
| 1 |   | more about what Ben's wife told Lena |
| 2 |   | Hensley beyond what is in here? |
| 3 | A | I can't recall if he said. |
| 4 | Q | Do you know if anybody ever did go over to |
| 5 |   | the jail to speak with Lena Hensley or |
| 6 |   | Ben's wife? |
| 7 | A | I don't know. |
| 8 | Q | Have you ever spoken to Lena Hensley about |
| 9 |   | these allegations about - - this issue with |
| 10 |   | Ben Fields? |
| 11 | A | No. |
| 12 | Q | Have you ever spoken with Ben's wife about |
| 13 |   | this issue with Ben Fields? |
| 14 | A | No. |
| 15 | Q | Did you pass this request on to anyone? |
| 16 | A | So at the time that all of this started |
| 17 |   | happening, I was tore up and was having a |
| 18 |   | bad episode, you know, so my memory is |
| 19 |   | fogged. I made this later just to kinda |
| 20 |   | have some guidelines to go back. |
| 21 | Q | Okay. So you did make this sometime after |
| 22 |   | February 11th, do you think? |
| 23 | A | Yeah, I think so. I don't know the exact |
| 24 |   | date. We didn't put it on it. |
| 25 | Q | Uh-huh. Would Ms. - - Was her last name |

1          Frazier - the woman that recorded

2          this for you?

3     A    Yeah, Lashauna Frazier.

4     Q    Do you think that she would remember when

5          this was created?

6     A    I don't know.

7     Q    We are going to come back to this.  I want

8          to look at another document, too while we

9          are doing this.  Mark this 23.

10         **(The document was marked Exhibit 23)**

11    Q    Do you recognize this form?

12    A    Yes.

13    Q    What is this form?

14    A    It is - - We sent in to Kentucky Law

15         Enforcement Counsel that.  Just making sure

16         that I am telling you right; okay?

17    Q    Yeah, sure, sure.

18    A    There is a criminal investigation and

19         suspended without pay.

20    Q    Okay. So is this a form that you have to

21         submit to the Kentucky Law Enforcement

22         Counsel when you put someone on suspension?

23    A    Yes.

24    Q    Okay. Do you see underaction you have

25         checked both boxes under criminal

1    investigation after administrative

2    investigation; do you see that?

3  A    Yes.

4  Q    Okay. Was there any administrative

5    investigation here?

6  A    Just taking the information that I took

7    here, speaking with the county attorney,

8    and the commonwealth attorney. I have left

9    the commonwealth attorney off my timeline,

10    and KSP refused, and that he would get up

11    with the AG's office, and they told me that

12    they would investigate it.  I can't

13    remember. My timeline here is bad, because

14    I had such a bad episode.  I can't remember

15    the details.

16  Q    Okay. I guess if anyone performed an

17    administrative investigation aside from

18    yourself, who would that have been?

19  A    It would have just been me.

20  Q    And as far as the administrative

21    investigation that you conducted, is it

22    documented on this piece of paper marked

23    exhibit 22?

24  A    Yeah, mostly, yes.

25  Q    Okay. What other documents might exist that

| | | |
|---|---|---|
| 1 | | document your investigation? |
| 2 | A | I don't have any other documents. |
| 3 | Q | Okay. It looks like you signed this on |
| 4 | | February 1st of 2022; do you see that at the |
| 5 | | bottom? |
| 6 | A | Yes. |
| 7 | Q | And then, it was the next day on February |
| 8 | | 22nd that you decided to terminated Fields; |
| 9 | | is that correct? I have got a document here |
| 10 | | and this is what was produced in discovery, |
| 11 | | and mark it 24. |
| 12 | | **(The document was marked Exhibit 24)** |
| 13 | Q | But that is not quite descriptive as the |
| 14 | | other version that you came with today; |
| 15 | | correct? |
| 16 | A | Yes. |
| 17 | Q | Okay. So which version did Ben Fields get? |
| 18 | A | The other one. |
| 19 | Q | Oh, he did. Okay. Did anybody get this |
| 20 | | version that has been marked 24? |
| 21 | | **MR. SHAW:** Do you have an extra copy of that? |
| 22 | | **MS. BAXTER:** I don't. It was in Fields' exhibits. |
| 23 | A | I can't recall. |
| 24 | Q | Let's look back at the one that had a |
| 25 | | little more detail, if we have got it in |

1        the pile.

2        **MR. DOTSON:** Are you talking about the short one?

3        **MS. BAXTER:** They are all pretty short. It is

4        longer than Exhibit 24.

5        **MR. SHAW:** What was the number, do you remember

6        putting it in?

7        **MS. BAXTER:** I don't know. I thought we made it a

8        number.

9        **MR. SHAW:** We did.

10        **MR. DOTSON:** What are you looking for counselor?

11        **MR. SHAW:** Number six.

12   Q        There you go Mr. Stines. Okay. So you gave

13            this letter to Ben Fields on February 2nd;

14            is that correct?

15   A        Yes, that is what the date shows on the

16            page.

17   Q        Yeah, so did you do that before or after

18            you spoke with Bert Slone?

19   A        It was after.

20   Q        Did you consult with the commonwealth

21            attorney and county attorney in deciding to

22            terminate Ben Fields?

23   A        So what I left off was February the 1st.

24   Q        So what happened on February the 1st?

25   A        I remember that I spoke with county,

1      commonwealth attorney.

2      Q      Okay. Anybody else?

3      A      I think Judge Mullins and Bert Slone at the

4             courthouse.

5      Q      Let's take it one by one. What did the

6             county attorney tell you on February the

7             1st?

8      A      That I was going to have to terminate him,

9             and use this, because we done this one

10            first.

11     Q      So what changed January 31st when your

12            decision was to suspend him without pay and

13            February 1st, if that is when you made the

14            decision to terminate him?

15     A      I am not sure. I can't recall.

16     Q      Okay.

17     MR. SHAW: I remember the answer. I don't know if

18     you want me to tell you.

19     Q      What about conversations that you had with

20            the commonwealth attorney on February 1st?

21     A      When I talked to the commonwealth attorney,

22            we talked about the AG's office

23            investigating it and he would get them to

24            come in and investigate it.

25     Q      Okay.

| | | |
|---|---|---|
| 1 | A | I can't remember that dates, because I was |
| 2 | | in such just a - - |
| 3 | Q | Okay. Anything else you remember talking to |
| 4 | | the commonwealth attorney about? |
| 5 | A | No, I don't. |
| 6 | Q | And at that time, it would have been Edison |
| 7 | | Banks? |
| 8 | A | I believe so. |
| 9 | Q | And then, you said that you talked to Judge |
| 10 | | Mullins. What did you and Judge Mullins |
| 11 | | talk about? |
| 12 | A | I told him that a lawsuit and stuff had |
| 13 | | been filed. |
| 14 | Q | Did he not already know that? |
| 15 | A | I don't know. |
| 16 | Q | Okay. Well, was it your impression when you |
| 17 | | spoke to him that he was aware of that or |
| 18 | | was not aware of that prior to your |
| 19 | | conversation? |
| 20 | A | I can't recall. |
| 21 | Q | Okay. So what all did you tell him? |
| 22 | A | I can't recall our conversation. |
| 23 | Q | What did he tell you? |
| 24 | A | I believe that I went over and told him |
| 25 | | that Ben wouldn't be there, because I had |

1          to suspend because of the lawsuit. I

2          can't remember a lot of details, because I

3          was sick.

4      Q   So the conversation that you had to the

5          best of your recollection, you had at the

6          courthouse, not in your office?

7      A   I can't remember seeing him at my office.

8      Q   Okay. Do you remember how long that you

9          spoke to Judge Mullins?

10     A   No, I can't remember.

11     Q   Aside from that conversation that you had

12         with Judge Mullins on February 1st of 2022,

13         have you had any other conversations with

14         Judge Mullins about Ben Fields and these

15         allegations about of sexual misconduct?

16     A   I can't recall.

17     Q   Okay. Do you have any documents that would

18         help refresh you recollection?  Do you and

19         Judge Mullins or any of these other

20         persons, do you guys text?

21     A   Yeah, I can check, yeah.

22     Q   Okay. I will ask you to do that. In the

23         latest specifics, I will follow up in

24         writing.

25         **MR. SHAW:** Okay.

1    **MS. BAXTER:** We would like that specific to this

2         time period.

3    Q    Okay. Anybody else that you recall speaking

4         to your on February 1st of 2022 aside from

5         the commonwealth attorney, county attorney,

6         and Judge Mullins?

7    A    I think maybe Bert Slone was up there.

8    Q    Okay. You mentioned him. And you have got

9         some notes about what Bert Slone told you

10        on the 2nd.  What do you recall about what

11        he told you or what you told him on the 1st?

12   A    I don't recall.

13   Q    Okay. And then, at some point on February

14        2nd, you handed Ben Fields his termination

15        notice which is the one marked Exhibit 6?

16   A    Yes.

17   Q    Not the one marked Exhibit 24; correct?

18   A    Yes.

19   Q    Okay. And so where did that exchange occur?

20   A    It was outside the courthouse in the

21        parking lot of the funeral home beside the

22        courthouse.

23   Q    And how did yo know that he was going to be

24        there?

25   A    I just seen his truck.

Exacta Court Reporting, Inc.
(606) 789-3034                                    187

1    Q        Okay. If you had bumped into him that

2             day, would you have put it in the mail or

3             how would have gotten it to him?

4    A        I would have called him and asked him to

5             come in.

6    Q        Okay. So you saw his truck out there and

7             you took this letter out to him and what

8             did you say to him?

9    A        It was in an envelope. I handed it to him

10            and said, this is your termination letter.

11   Q        Okay. And did you say anything beyond that

12            to him?

13   A        Uh-uh, no, that was all that I said.

14   Q        Did he say anything to you?

15   A        Not that I recall.

16   Q        Okay. Was that the first time that you have

17            terminated someone from the Letcher County

18            Sheriff's office?

19   A        Yes.

20   Q        Okay. So the next thing on your timeline

21            notes jumps to February 10. So is there

22            anything missing that is relevant to Ben

23            Fields and these allegations that occurred

24            between February 3rd and February 10th when

25            you have your notes here?

1    A    I can't recall.

2    Q    So the next thing that you have on your

3         timeline at least is on February 10th at

4         11:00 am Judge Craft contacted you and said

5         Brianna had informed more information

6         regarding Ben Fields. Do you see that?

7    A    Yeah.

8    Q    What was the more information?

9    A    I can't recall. He called me.

10   Q    Did he call you at the office?

11   A    I think he called my cell phone, I believe.

12   Q    Do you think that you would have any text

13        messages or audio recordings or anything

14        that would help remind you of any of these

15        conversations from your timeline?

16   A    I can check.

17   Q    Okay. Then, there is a note about Teresa

18        Quillen. Do you know who that is?

19   A    She is lady that lives in Jenkins. She just

20        called the office.

21   Q    Did you ever figure out who this girl in

22        Wal-Mart was?

23   A    No.

24   Q    Okay. Aside with that one conversation that

25        you had with Patty on January 31st, did call

1               her again and did not know that you were

2               terminating Ben or did she tell you that

3               she was going to terminate him?

4      A    The night that I talked to her, she said

5               that she was going to let him go.

6      Q    Even though, you had only made the decision

7               at that point to suspend without pay; is

8               that correct?

9      A    Yes, I don't know the exact terms yet.

10     Q    So since that conversation that you had

11              with Ben Fields on February 2nd of 2022,

12              have you talked to him at any point after

13              that date?

14     A    No.

15     **MS. BAXTER:** I may be finished. Give me like one

16     second to collect my thoughts.

17     **(A break was taken)**

18     **MS. BAXTER:** I am back on the record for the

19     record's sake. I don't have any more questions

20     today. I appreciate your time.

21     A    Thank you.

22     **MR. JONES:** I don't have any questions.

23     **MR. WILLIAMS:** I do have one or maybe a couple

24     of questions. Can you hear me okay. This is

25     Jason Williams. I represent Ben Fields in the

1      litagation.

2          **MR. SHAW:** Yes.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                          CROSS EXAMINATION

2        MR. WILLIAMS:

3        Q        Sheriff, I tried to listen carefully today

4                 while that you testified about various

5                 meetings and discussions that you have had,

6                 so I want to just limit my questions to

7                 those conversations that you had with Ben

8                 Fields after that you learned of the

9                 allegations; okay?

10       A        Okay.

11       Q        So I understand that it sounds like at

12                least on a couple of occasions that Ben

13                came to your office and you had some

14                conversation with him and the last one

15                being, I guess, where he was handed a

16                termination letter?

17       A        Yes.

18       Q        And as I understood your testimony, it

19                sounded like you had great difficulty

20                recalling anything that Mr. Fields said in

21                particular in any of those meetings?

22       A        Yes.

23       Q        You made reference to at one point he might

24                have said something to the effect what

25                others; do you recall that testimony?

```
1    A        Yes.

2    Q        Are you even sure that he said that?

3    A        At the time, I mean I  was really sick and

4             everything going on, I am pretty sure that

5             is what he said to me.

6    Q        Okay. As I heard you testify about it, that

7             as the only words from him that you could

8             recall at any time saying?

9    A        Yes.

10        MR. WILLIAMS: Thank you. I have no further

11   questions.

12        MR. SHAW: I have one and it is not really even a

13   question. It is more housekeeping. This is some

14   of the things in the personnel file.

15

16

17

18

19

20

21

22

23

24

25
```

CROSS EXAMINATION

MR. SHAW:

Q        Sheriff, I am going to feed you a couple of
         documents. One is the Ben Fields Oath.  Is
         that in his personnel file?

A        Yes.

Q        Are all deputies are they sworn in? Do they
         have a written oath as part of their
         personnel file?

A        Yes.

**MR. SHAW:** I would like to mark that as Defense
1.

Q        I have various documents from the Kentucky
         Law Enforcement Cabinet. It looks like it
         was signed by Sheriff Danny Webb at four
         pages when Mr. Fields was first hired, and
         I ask that we redact out the date of birth
         and social security number from these
         records. Does that look accurate?

A        Yes.

**MR. SHAW:** I would like to attach that as defense
2.

**MS. BAXTER:** How many pages is that just so I am
clear?

**MR. SHAW:** Four pages. Did we already get this

Exacta Court Reporting, Inc.<br>(606) 789-3034

194

1           in?  We did; did I do?

2           **MS. BAXTER:** Uh-huh.

3           **MR. SHAW:** I am not going to worry about that

4           one. I have got one dated December 11, 2018,

5           addressed to Danny Webb concerning Mr. Fields'

6           application.  Mark that as Defense 3. I think

7           everything else we have gotten in.

8           **MS. BAXTER:** Just for clarification, Defense 2

9           was the pages marked 23 and 24?

10          **MR. SHAW:** No, there were four pages that should

11          be 23, 24.

12          **MS. BAXTER:** I have got them.

13          **MR. SHAW:** Yeah, you have got them all. Keep

14          going past - - go past that. And then, there

15          should be one more the Code of Ethics.

16          **MS. BAXTER:** Mine were in a funky order. So these

17          four are all Defendant 2.

18          **MR. SHAW:** No questions.

19          **MS. BAXTER:** I have no more questions.

20          **MR. DOTSON:** I have nothing.

21          **MR. SHAW:** Jason, Don?

22          **MR. JONES:** Yes, I have no questions.

23          **MR. WILLIAMS:** Nothing further. Thank you.

24

25

REPORTER'S CERTIFICATE

STATE OF KENTUCKY

COUNTY OF JOHNSON

       I, Joey VanHoose, Stenographer and Notary Public, and for the State of Kentucky at Large, do certify that the foregoing deposition of Mickey Stines was taken at the place, on the date and for the purposes stated in the Caption and that the appearances were as noted herein.

       FURTHER, I certify that that witness was duly sworn by me before testifying; that the testimony was reported by me in steno notes and electronically recorded; and thereafter, I constitute a true, correct and complete transcript of my said shorthand notes as could be heard and understood by me.

       GIVEN under my hand at Paintsville, Kentucky, this 23rd day of September, 2024.

    My Commission Expires August 1, 2026.

_____

Joey VanHoose

KYNP53570