UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE
CIVIL ACTION NO. 7:22-CV-00007-REW-EBA

SABRINA ADKINS and
JENNIFER HILL                                                                    PLAINTIFFS

-vs-

BEN FIELDS, Individually
And in his Official capacity
as a Deputy Sheriff with the
Letcher County Sheriff's Department;

UNKNOWN SUPERVISORS OF
BEN FIELDS;

and MICKEY STINES,
LETCHER COUNTY SHERIFF                                               DEFENDANTS

---

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Come now Defendants, MICKEY STINES, Letcher County Sheriff and BEN FIELDS, in his official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department, by and through counsel, and for their memorandum brief in support of motion for summary judgment state as follows:

## I. <u>INTRODUCTION</u>

Plaintiffs SABRINA ADKINS and JENNIFER HILL filed suit in this matter January 31, 2022, naming as the Defendants BEN FIELDS, Individually and in his Official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department; Unknown Supervisors of Ben Fields; and MICKEY STINES, Letcher County Sheriff. R-1, Complaint. Plaintiff then filed an

1

amended complaint on March 16, 2022. R-17 and 18, First Amended Complaint.  On September 28, 2022 Plaintiff filed a Second Amended Complaint naming Ben Field's employer EASTERN KENTUCKY CORRECTIONAL SERVICES, INC. (hereinafter "EKCS") R-57, Second Amended Complaint.

Per the Second Amended Complaint the lawsuit alleges Defendant Fields, in his individual and official capacities, violated the Plaintiffs' Fourth and Fourteenth Amendment rights to arbitrary action, unreasonable search and seizure and deprivation of liberty.  The Plaintiffs also allege that Defendant Fields is liable under state law for damages for false imprisonment, assault and battery, malicious prosecution, intentional infliction of emotional distress, negligence and gross negligence.  Plaintiffs further allege that EKCS and Defendant Letcher County Sheriff Stines are liable to Plaintiffs for deliberate indifference in failing to adequately train and supervise Defendant Fields.

Claims asserted include:

Count I:        4th Amendment claims against Fields

Count II:       14th Amendment claims against Fields

Count III:      Deliberate Indifference/ Failure to Supervise and Train Actionable Pursuant To 42 U.S.C. § 1983 against **Letcher County Sheriff** and EKCS

Count IV:       Negligence, Gross Negligence, Assault and Battery against Defendant Fields

Count V:        Grossly Negligent Infliction of Emotional Distress against Defendant Fields

Count VI:       Intentional Infliction Of Emotional Distress Against Defendant Fields

Count VII:      Negligent Retention, Training, Supervision Against Defendant EKCS

*See* R. 57, Second Amended Complaint.

Plaintiff seeks an award of compensatory damages for alleged federal constitutional violations, compensatory damages for alleged violations of state law, punitive damages, attorney fees and an award of any and all other relief to which Plaintiffs may appear entitled.

## II.     SUMMARY JUDGMENT STANDARD

Present federal summary judgment practice is a result of three decisions handed down by the United States Supreme Court in 1986.  See *Street v. J. C. Bradford & Co.*, 886 F. 2d 1472 (6th Cir. 1989).  *Street* appraised the impact of the three Supreme Court cases and concluded that the following principles for summary judgment practice had been established:

(1)     Complex cases are not necessarily inappropriate for summary judgment.

(2)     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

(3)     The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

(4)     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

(5)     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment.  The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law."

(6)     As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

(7)     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

(8)     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

(9) The trial court no longer has the duty to search the entire record to establish that it is benefit of a genuine issue of material fact.

(10) The trial court has more discretion than in the "old era" in evaluating the Respondent's evidence. The respondent must do more than simply show that there is some metaphysical doubt as to the material facts. Further, where the record taken as a whole could not lead a rational trier of fact to find for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is implausible.

*Street v. J. C. Bradford & Co.*, *supra*, at 1479-1480.

The United States Court of Appeals for the Sixth Circuit in *Street* held that the nonmoving party must produce enough evidence, after having had a reasonable opportunity to conduct discovery, so as to withstand a directed verdict motion. *Id.* at 1477. As the court stated, "the movant could challenge the opposing party to 'put up or shut up' on a critical issue...[and] if the respondent did not 'put up,' summary judgment [is] proper." *Id.* at 1478.

Applying the above-stated summary judgment principles to this case, it is apparent that as a matter of law, without the need for factual analysis outside of the allegations of fact as stated in the complaint, the moving defendants are entitled to dismissal / summary judgment. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989); *Street v. J. C. Bradford & Co.*, supra.

### III.    STATEMENT OF THE CASE

**Allegations of the Complaint:**

Plaintiffs SABRINA ADKINS and JENNIFER HILL filed suit in this matter January 31, 2022, naming as the Defendants BEN FIELDS, Individually and in his Official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department; Unknown Supervisors of Ben Fields; and MICKEY STINES, Letcher County Sheriff. R-1, Complaint. Plaintiff then filed an amended complaint on March 16, 2022. R-17 and 18, First Amended Complaint. On September

28, 2022 Plaintiff filed a Second Amended Complaint naming Ben Field's employer EASTERN KENTUCKY CORRECTIONAL SERVICES, INC. (hereinafter "EKCS") R-57, Second Amended Complaint.

Per the Second Amended Complaint the lawsuit alleges Defendant Fields, in his individual and official capacities, violated the Plaintiffs' Fourth and Fourteenth Amendment rights to arbitrary action, unreasonable search and seizure and deprivation of liberty. The Plaintiffs also allege that Defendant Fields is liable under state law for damages for false imprisonment, assault and battery, malicious prosecution, intentional infliction of emotional distress, negligence and gross negligence. Plaintiffs further allege that EKCS and Defendant Letcher County Sheriff Stines are liable to Plaintiffs for deliberate indifference in failing to adequately train and supervise Defendant Fields.

It is alleged in the complaint that Plaintiff Adkins was arrested in Letcher County in April of 2021. From April 2021 through June 2021 she was incarcerated at the Letcher County Jail. In early June 2021, Adkins was released from jail and placed on home incarceration, at which time Defendant Fields was assigned as her home incarceration officer. Plaintiff Adkins allegedly had trouble finding housing accommodations and did not have money to pay for her ankle monitoring bracelet. Adkins explained this to Fields and he made flirtatious comments about her looks and body and told her they could "work something out." Adkins believed these comments to mean that she would receive favorable treatment from Fields is she provided him with sexual favors.

In late June 2021, Fields asked Adkins to meet him at the Letcher County Courthouse in the evening after dark. Once there, Fields took Adkins into District Judge Mullins' chambers, explaining that he wanted to meet her there because there were no cameras. At that time Fields removed her ankle bracelet and told her she would not have to pay the associated fees any longer

but could remain on home incarceration.  Adkins claims that between June and December 2021 she met Fields at the courthouse in the evening or early morning approximately six times.  During these encounters she claims Fields' behavior escalated from flirtatious comments to forcible kissing, oral sex and intercourse between the two.  Adkins claims she did not consent to these sexual activities (in the Complaint she describes it as "sexual abuse").  She claims that these encounters would typically occur on the night before she had a court appearance and Field would put her ankle monitor back on so it would appear that she was compliant with her home incarceration.

Plaintiff Adkins asserts that meetings between she and Defendant Fields occurred in the evenings and after dark at the Letcher County Courthouse. R.-57, Second Amended Complaint, ¶ 7, 12, 16 and 19.  It is also alleged that in December 2021 certain unnamed persons at the Letcher County Courthouse were notified that Defendant Fields was having inappropriate communications and/or relations with Plaintiff Adkins. *Id.* at ¶ 20.  Plaintiffs allege that Defendant EKCS hired Defendant Fields in 2020 to oversee the home incarceration ankle monitoring program in Letcher County, Kentucky for Defendant EKCS. *Id.* at ¶ 87.

Per the Complaint, Plaintiff Hill was arrested in Letcher County in 2019 and incarcerated at the Letcher County Jail.  In August 2020, she was put on home incarceration to be supervised by Defendant Fields.  Upon learning about her release Hill was taken to a small room in the jail where Fields was to put on her ankle monitor.  While in the room Fields allegedly told Hill that if she could not afford to pay her home incarceration fees that they could "work something out."  When Hill asked for clarification Fields stated that if she would do him a "favor," he would do her a "favor."  Hill took this to mean that Fields was asking for sex in exchange for waiver of her

home incarceration fees. As demonstrated below, Defendant Fields denies any improper interaction with Hill.

**Facts of Record:**

Defendant Fields provided home incarceration services through another employer **Eastern Kentucky Corrections Services, Inc.**. This company is not related to the Letcher County Sheriff's Department nor Letcher County Fiscal Court. **Ben Fields** testified that in 2019 he went to work at the Letcher County Sheriff's Department as a court security officer and was restricted to the Courthouse. R. 133, Fields at p. 40. Fields completed the state-mandated training for court security officers in Richmond, KY. *Id.* at p. 48. He recalls being trained on the Letcher County Sheriff's Department policies. *Id.* at p. 49. Mr. Fields worked as the District Court bailiff for Judge Mullins. *Id.* at p. 50. Fields denied that his outside employment with East Kentucky Correctional Solutions was in furtherance of performance of law enforcement duties. *Id.* at p. 107. His outside employment was contract employment not related to law enforcement. By example Fields explained that "they had to be on house arrest. If an inmate condition was to go to rehab, is rehab a law enforcement agency?". *Id.*

Fields testified that the only person he had sexual contact with while they were on home incarceration was Plaintiff Adkins. *Id.* at p. 104. Fields denies that he had any sexual contact with Jennifer Hill. *Id.* Fields testified that he was aware that it was the policy of the sheriff's department to forbid a sheriff's deputy from engaging in sexual conduct with someone in the custody of law over whom such officer has supervisory or disciplinary authority. *Id.* at p. 102. Fields testified that as a court security officer he only had arrest authority inside of the courthouse. *Id.* at p. 103.

Fields testified that he understood that he had to behave consistent with the LCSO policy as a Letcher County Sheriff's employee and that he was supposed to abide by the policies. *Id* at 96. Fields also agreed that the policies applied to him both off duty and on duty. *Id.* Fields testified that his work as a court security officer at the courthouse would end usually at 4:00 pm or a little earlier. *Id.* at p. 212-213.

**Sabrina Adkins** testified that she is currently incarcerated for her Letcher County possession of meth offense from 2021. R. 134, Adkins, p. 43. She has previously been housed in Letcher County, Pike County, Warren County, Franklin County, and Leslie County. *Id.* Adkins was first placed on home incarceration in 2021. *Id.* at p. 44. Adkins testified that her drug addiction with meth started around 2016. *Id.* at p. 54. Adkins was arrested in Letcher in April of 2021 and was incarcerated from April until June in the Letcher County Jail. *Id.* at p. 58-59. In early June of 2021 Adkins was released from the Letcher County Jail and placed on home incarceration. *Id.* This was the first time she had ever been on home incarceration of any type.

Adkins did not know Mr. Fields prior to June of 2021. *Id.* The first time she met Fields, he came to the jail, introduced himself, she signed her bond and paid the fee, and he placed a monitoring device on her leg. *Id.* at 59. Fields wife was with him as a witness. *Id.* at p. 60. Fields explained to her that she had a certain amount of time to get to where she was living and to let him know she was there to activate her bracelet. *Id.* at p. 62. Adkins sister paid the down payment for the monitor. *Id.* at p. 68. While in jail Adkins had heard rumors that Ben Fields would exchange sexual favors for payment of their house arrest fees. *Id.* at p. 72 – 73.

When Adkins was placed on home incarceration, she understood that she would be monitored by going in once a week and report to him on Wednesdays at 4:00 p.m. and she had to

keep her bracelet charged and it tracked her, she was allowed 5,000 feet outside of her residence. Once a week she would have to go pay the fee and check in with Mr. Fields. *Id.* at p. 77. Adkins paid her fee at the Courthouse. Fields would come out of Judge Mullins Chambers, take her money in the hallway and give her a receipt. *Id.* at p. 78. At some point Adkins quit making payments. Id.

In late 2021 Fields requested that Adkins meet her at the Letcher County Courthouse in the evening after dark. Adkins met Fields in Judge Mullins private chambers. She was upset and crying when she got there and told Fields that she didn't know how she was going to pay for the bracelet and needed to go to rehab. *Id.* at p. 80. Adkins testified that Fields removed her bracelet and then put it back on the day before she went to Court – and then removed it again after court. *Id.* at p. 81. This occurred probably 4 to 6 times and would always be in Judge Mullins private chambers. *Id.* There was a point that the texting between her and Ben Fields became flirtatious. Adkins would send him photos of herself. She sent him a picture of herself a couple of times. She stated that she was intending to flirt with him because she believed that that was the only way she would be okay being on house arrest without paying. *Id.* at p. 84.

Adkins testified that she wanted to stay out of jail and tried to "go about it the right way and write motions" to let them know she could not afford the bracelet. When that didn't work she did what she thought she needed to do to stay out of jail. *Id.* at p. 97-98. Plaintiff identified photos and messages attached at Exhibit 6 that she had sent to Fields that were sexual in nature. *Id.* at p. 113 – 116; *See also* Exhibit 1, messaging. A couple of months after she started messaging Fields they had their first physical contact. *Id.* at p. 137. Adkins does not recall Fields making any threats of harm to her. *Id.* at p. 144. During Adkins relationship with Fields she had already retained her attorney. *Id.* at p. 126 and 129.

Adkins received notice that the Letcher County House Arrest did not have anything to do with the Letcher County Sheriff's Department and that she was to call Eastern Kentucky Correctional Services. *Id.* at p. 146 and Exhibit 11 attached thereto; *See also* Exhibits 2 and 3. Adkins testified that consistent with Exhibit 11 directions that she had called Ms. Stockham the day after she was placed on house arrest and that Ms. Stockham went over the rules with her of what she was and wasn't allowed to do. *Id.* at p. 138 – 139. She then talked with Ms. Stockham several times after that. Id.

When initially interviewed by KSP Detective Matt Easter Plaintiff Adkins stated that she had heard rumors about Fields and saw an opportunity not to have to pay for home incarceration. *See* Exhibit 7, KSP Attachment 2_1, Adkins Interview at 6:40 and 08:45. When asked if she was pressured Adkins stated that the pressure she felt was not from Fields, but that she did not want to go back to jail. *Id.* at 14:45 through 15:40. Adkins had tried to file motions in her criminal case first and then saw an opportunity with Fields. *Id.* at 17:40. When her boyfriend found out, his finding out is what brought all of this to a head. *Id.* at 19:45. During a second interview with KSP Detective Matt Easter Plaintiff Adkins confirmed that she would meet Fields at the courthouse at night. *See* Exhibit 7 and Exhibit 8, transcript of KSP Attachment 2_3, Adkins Interview, p. 4 and 5.

**Mickey Stines** testified that prior to his becoming sheriff he had outside employment with Easter Kentucky Correctional Service, Inc. R. 135, Deposition of Stines, p. 23. He was paid monthly. With EKCS it was his responsibility to make sure the persons incarcerated abided by the terms of the home incarceration. The court and the contract set the terms of the home incarceration. *Id.* at p. 25. Violations of the terms of home incarceration were reported to the judge. *Id.* at p. 26. Stines had outside employment with EKCS while working under Sheriff

Danny Webb as a court security officer. *Id.* at p. 27. Stines performed his work with EKCS after hours and would meet with individuals after his court security shift ended – usually meeting at 4:30. *Id.* at p. 27 - 29. Aside from obtaining permission from Sheriff Webb for outside employment, there was no relationship between EKCS and the sheriff's office. *Id.* at p. 30. He received verbal approval from Sherif Webb for his outside work with EKCS and as a security guard at the hospital. *Id.* at p. 39.

Stines knew Fields' father Jerry Fields, who was a long-time constable. He was well respected in the community, as well as his mother, Nell Fields. His sister Holly worked in the clerk's office. Stines believed that Fields was a nice guy, polite, professional and always at work. He had hired him because he was dependable. Fields had been recommended by former jailer Don McCall – who believed that he was a great guy and there were no issues in his employment at the jail. Fields had been initially hired into the sheriff's office by Stines predecessor Danny Webb. *Id.* at p. 47-50. Fields passed the DOCJT background check and Pre-POP's background checks which included a lie detector test. *Id.* at p. 50 and 52. Deputies were given copies of the agency policies and instructed to read them. All deputies and court security personnel take an oath of office. *Id.* at p. 77. Stines testified that in his opinion EKCS does not provide law enforcement duties as they are monitoring people on hose arrest and reporting back to the Court. *Id.* at p. 85. The Letcher County Sheriff's Office had polices allowing outside employment, prohibiting sexual misconduct, and *Id.* at p. 91-92. Ben Fields violated the sexual misconduct policy. *Id.* at 94. Fields was terminated for violating the ethics policy. *Id.* at p. 96 and 98. Stines consulted with the county attorney for guidance. *Id.*

Stines was unaware of Field's misconduct until receiving a call from a reporter. He next talked with Ben Fields about the allegations against him, spoke with Judge Craft and Robbie

Kincer and then consulted with the county attorney. Stines believed this all occurred on the same day. *Id.* a p. 109, 163-164. Fields was terminated afterwards. To Stines knowledge there were no reports received from Chris Triplett by his office in December 2021 of the alleged sexual abuse of Jennifer Hill. Chris Triplet has a lengthy criminal record. *Id.* at p. 140. Stines is familiar with Stacy Yates who filed an EPO in January 2022 against Sabriina Adkins. *Id.* at p. 144. Stines called Patty Stockham and advised her of the allegations that Ben Fields was having a relationship with someone on house arrest. *Id.* at p. 175.

At or prior to the time he was hired by former Sheriff Webb as a court security officer Fields received copies of and agreed to comply with the LCSO's Policy & Procedures Manual, the Kentucky Law Enforcement Council ("KLEC") Canon of Ethics, and the KLEC Code of Ethics. The LCSO's policies specifically and unambiguously prohibit sexual misconduct, including engaging "in sexual intercourse or deviate sexual intercourse with another person without the latter's consent," "[a]ny sexual activity while on-duty or stemming from official duty," and "sexual contact with another person who is in the custody of law enforcement."

Plaintiffs were provided notice that her home incarceration had nothing to do with the Letcher County Sheriff's Department and that she should call EKCS if she had any issues. Adkins, p. 146; *see also* Ex. 2. Plaintiff Adkins testified that within one day of being placed on home incarceration that she called the number and spoke with Patty Stockham. R. 133, Adkins, 138-139. Adkins spoke with Ms. Stockham several times. *Id.*

## IV. <u>ARGUMENT</u>

Defendants adopt any arguments raised by co-defendant in support of summary judgment that may be applicable to these moving Defendants.

**A.      DEFENDANT FIELDS ALLEGED ACTS WERE OUTSIDE OF THE SCOPE OF HIS OFFICIAL DUTIES AS A COURT SECURITY OFFICER.**

If a deputy sheriff in Kentucky commits illegal acts while engaged in outside employment, those acts are considered personal and outside the scope of their official duties, and the Office of Sheriff would not be liable for such acts.  Illegal acts committed by a deputy sheriff while engaged in outside employment generally do not expose the Office of Sheriff to liability.  Under KRS 70.040 the sheriff is liable for the acts or omissions of his deputies only when those acts are performed in their official capacity.  Under Kentucky law a sheriff is not liable for acts of deputies that are personal and not performed under the color of their office.  For the sheriff to be liable, the deputy's act must be done by virtue of his office as deputy, such as in the execution of a writ or process, or under a statute giving him the right to arrest without a warrant.  *See i.e. Lawson v. Burnett*, 471 S.W.2d 726, 729 (Ky 1970).  However, if the deputy's actions are personal and outside the scope of their official duties, the sheriff is not responsible. *See Lawson* at 729 and *Lewis v. Treadway*, 277 S.W. 309, 310 (Ky 1925).

KRS 61.310(4) allows police officers, while in office, and during hours other than regular or scheduled duty hours, to act in *any* private employment as guard or watchman or in any other similar or private employment.  *See i.e.* OAG 77-347 "*KRS 61.310 clearly authorizes a peace officer to obtain private employment provided such employment does not interfere with the performance of his duties*". *See also Clark County Attorney v. Thompson*, 617 S.W.3d 427,436-437 (Ky. 2021).  In fact, the Kentucky Supreme Court has held that regulations requiring police officers wishing to engage in outside employment to obtain prior approval from chief of police was invalid as granting an arbitrary power.  *See Puckett v. Miller*, 821 S.W.2d 791, 795 (Ky 1991).  Here, the actions of Fields while employed by EKCS were personal and outside the scope of his official duties as a court security officer and the office of sheriff is not responsible for these acts.  This argument alone is dispositive of all claims asserted against MICKEY STINES, Letcher County Sheriff and BEN FIELDS, in his official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department.

### B.     PLAINTIFFS FOURTH AMENDMENT OFFICIAL CAPACITY CLAIMS UNDER COUNT I FAIL AS A MATTER OF FACT AND LAW.

Plaintiffs allege that Defendant Fields actions constitute a violation of Plaintiffs' right to be free from unreasonable search and seizure, secured by United States Constitution Amendments IV, which is actionable pursuant to 42 U.S.C. § 1983.  "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments. *Id.* The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," *id.,* while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. *See Whitley v. Albers,* 475 U.S. 312, 318–322, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment. *See Lanman v. Hinson,* 529 F.3d 673, 680–81 (6th Cir.2008).

Here, Plaintiffs appear to have been pretrial detainees at the time of their home incarceration.  A pretrial detainee's Fourteenth Amendment rights, consists of an objective and subjective component.  In failure-to-protect cases, the plaintiff must demonstrate exposure "to a substantial risk of serious harm" in order to satisfy the objective element. *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 361 (6th Cir. 2013).  With respect to conditions of confinement, the plaintiff must show "that the alleged deprivation is 'sufficiently serious' and that the official's act or omission resulted in the denial of the 'minimal civilized measures of life's necessities.'" *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 359 (6th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  To satisfy the subjective prong, a plaintiff claiming a violation of her right to protection or humane conditions of confinement must prove that the defendant knew of and disregarded "an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *accord Amick*, 521 F.App'x at 361; *Ruiz-Bueno*, 639 F. App'x at 359. The same standard applies to analogous claims arising under the Eighth Amendment. *See Farmer*, 511 U.S. at 834.

The Sixth Circuit, as well as other courts, has held that uncoerced, voluntary, consensual sex cannot form the basis for an Eighth Amendment claim. *Hall v. Beavin*, 202 F.3d 268, at *1 (6th Cir. Nov. 8, 1999); *Freitas v. Ault*, 109 F.3d 1335, 1338-39 (8th Cir. 1997); *Fisher v. Goord*, 981 F. Supp. 140, 174-175 (W.D. N.Y. 1997) ("consensual sexual interactions between a correction officer and an inmate, although unquestionably inappropriate," do not violate Eighth Amendment); *Baca v. Rodriguez*, 2013 WL 12147634, at *6-7 (D. N.M. Jan. 24, 2013); *McGregor v. Jarvis*, 2010 WL 3724133, at *11 (N.D. N.Y. Aug. 20, 2010); *Edge v. Ferrell*, 2008 WL 942038, at *6-7 (S.D. Ala. Apr. 7, 2008); *Stubbs v. DeRose*, 2007 WL 776789, at *5-7 (M.D. Pa. Mar. 12, 2007) (consensual sex did not cause "an objectively serious injury to the plaintiff"); *Phillips v. Bird*, 2003 WL 22953175, at *6 (D. Del. Dec. 1, 2003) ("Consensual sex between two adults does not constitute cruel and unusual punishment simply because it occurs within the walls of a prison."). Moreover, the fact that a prisoner may lack legal capacity to consent in the context of criminal liability "does not mean that an inmate can avoid the consequences of consent in a civil suit." *Phillips*, 2003 WL 22953175, at *6; *McGregor*, 2010 WL 3724133, at *10-11 (rejecting argument "that just because for criminal prosecution purposes an inmate is considered incapable of providing consent," consensual sexual relationship violated inmate's constitutional rights); *Doe v. Cunningham*, 2007 WL 990141, at *2 (W.D. Va. Mar. 29, 2007) ("welcome, voluntary attentions are not violations of a prisoner's rights, even when they are prohibited by state law"). Accordingly, because it is undisputed that Adkins consented to

each sexual encounter with Fields, she cannot satisfy the objective element of her failure-to-protect and conditions-of confinement claims and these claims should properly fail.

### C. PLAINTIFFS FOURTEENTH AMENDMENT CLAIMS FAIL AS A MATTER OF FACT AND LAW.

Whether a plaintiffs Fourteenth Amendment's substantive due process right to bodily integrity has been violated is evaluated under a "shocks the conscience" test. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996). While "[n]onconsensual or coerced sexual contact easily satisfies this standard, …. [i]t follows that consensual sexual conduct, even if highly inappropriate, does not shock the conscience." *Hassan v. City of Shreveport*, 2018 WL 3028951, at *3 (W.D. La. June 18, 2018); *see also Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998) (substantive due process prohibits "nonconsensual violation of inmate bodily integrity"); *Gowan v. Carney*, 1996 WL 735567, at *5-6 (N.D. Ga. Oct. 10, 1996) (granting summary judgment on bodily integrity claim where sexual acts were consensual). Accordingly, because the record is clear that Adkins and Fields's sexual relationship was at all times consensual, she cannot establish a violation of her right to bodily integrity.

Even if Adkins or Hill could prove that their right to bodily integrity was violated, they do not claim that Sheriff Stines sexually assaulted them. As set forth above, a § 1983 claim cannot be premised on *respondeat superior* but instead must be based on the defendant's own conduct. *Apsey*, 608 F. App'x at 339; *Colvin*, 605 F.3d at 292. Nor can Adkins support her claim against Letcher County or the Letcher County Sheriff's Office in the absence of evidence that an official custom or policy was the moving force behind the alleged violations of Adkins's rights. Sheriff Stines and Letcher County are therefore entitled to summary judgment on Adkins's substantive due process claim. *See i.e.* Exhibit 4, policies.

**D.   DELIBERATE INDIFFERENCE/ FAILURE TO SUPERVISE AND TRAIN ACTIONABLE PURSUANT TO 42 U.S.C. § 1983 AGAINST MICKEY STINES, LETCHER COUNTY SHERIFF AND EKCS**

Even if Adkins or Hill could satisfy the objective component of their claims, Sheriff Stines and Letcher County are nonetheless entitled to summary judgment because they cannot establish that they were deliberately indifferent to the alleged risk of harm to them.  "In a § 1983 action, each defendant's liability must be individually assessed to ensure that no defendant is improperly held liable for the conduct of another." *Apsey v. Chester Township*, 608 F. App'x 335, 339 (6th Cir. 2015). Moreover, "[a]llegations of *respondeat superior* do not sustain a § 1983 claim against [defendants] in their individual capacities, meaning that officials are personally liable for damages under that statute only for their own unconstitutional behavior." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (internal quotations omitted) (quoting *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir.1989)).  With respect to Sheriff Stines, there is no evidence that he knew, prior to the filing on the complaint in this matter and call from news media, any facts from which he could have inferred that either Adkins or Hill and Fields were in a sexual relationship. Nor is there any indication in the record that he actually drew that inference prior to the filing of the complaint in this matter.

And in any event, because the law does not clearly establish that consensual sex violates an inmate's constitutional rights, Sheriff Stines would be entitled to qualified immunity for any failure to prevent an off duty consensual sexual relationship. *See Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (identifying elements of qualified immunity analysis); *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (clearly established prong requires identification of "a case where an officer acting under similar circumstances … was held to have violated" the Constitution);  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("existing precedent must have

placed the statutory or constitutional question beyond debate"). Accordingly, Sheriff Stines is entitled to summary judgment based on both the merits of Plaintiffs claims against him and the doctrine of qualified immunity.

In order to hold the Letcher County Sheriff's Office liable, Plaintiffs "must eclipse a high bar" set by the Supreme Court in *Monell v. Department of Social Services*. *Hanson v. Madison County Det. Ctr.*, 736 F. App'x 521, 541 (6th Cir. 2018). Under *Monell*, a plaintiff seeking to hold a municipality liable for a deprivation of constitutional rights must prove that the deprivation occurred by reason of a governmental "custom" or "policy." 436 U.S. 658, 694-95 (1978). In addition, the plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). A municipality cannot be liable for a § 1983 claim under the theory of *respondeat superior*; the "touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution…. [A] municipality cannot be held liable *solely* because it employs a tortfeasor…." *Monell*, 436 U.S. at 690-91.

The Letcher County Sheriff's Office expressly and unambiguously prohibited its employees from having sexual contact with individuals in custody, engaging in sexual acts without the other party's consent, and engaging in sexual activity while on and off duty. Thus, in order to prevail against Letcher County Sheriff's office, Adkins must show either "the existence of a policy of inadequate training or supervision [or] the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th

Cir. 2014) (internal quotation omitted). To meet this threshold, the plaintiff ordinarily must demonstrate a pattern of constitutional violations. *Brown*, 520 U.S. at 409. Because no such pattern exists in this case, Plaintiffs can prevail only if she can demonstrate that it was obvious that the training or supervision of LCSO court security officers was inadequate and that the inadequacy was likely to result in constitutional violations. *Id.* She cannot do either. Here, the court security officers had all mandated state training and were certified by the state for the position held. Indeed, "[c]ourts addressing such claims have uniformly held that a single act of sexual misconduct by a police officer cannot form the basis of municipal liability under a failure to train theory." *Mize v. Tedford*, 2009 WL 1508373, at *12 (E.D. Mich. May 29, 2009).

Here, Fields actions were while acting as an employee of EKCS – not while acting in any capacity as a court security officer. Regardless, Court Security Officers receive training from the Department of Corrections. In addition, the LCSO Sexual Misconduct policy, which Fields received and reviewed, prohibits officers from having sexual contact while on duty, without consent, and with persons in their custody. And Sheriff Stines immediately investigated and suspended Fields when he learned of Adkins's allegations. Accordingly, Adkins cannot establish that court security officers with the LCSO were not adequately trained, supervised, and disciplined. *See*, *e.g.*, *Ford v. County of Oakland*, 35 F. App'x 393, 396-97 (6th Cir. 2002); *Mize*, 2009 WL 1508373, at *12; *Branum v. Loudon County, Tenn.*, 2014 WL 640634, at *7 (E.D. Tenn. Feb. 19, 2014).

Even if found to be acting in the "scope and course" of his employment with the Sheriff's Office, it is not obvious that an insufficiently trained or supervised CSO would commit sexual misconduct. "The proper course of conduct—refraining from sexual assault and rape—is patent and obvious; structured training programs are not required to instill it. Consequently, the

absence of such programs (even if such absence was proven) is not so likely to cause improper conduct so as to justify a finding of liability." *Oliver v. City of Berkley*, 261 F. Supp. 2d 870, 885 (E.D. Mich. 2003) (quoting *Williams v. Bd. of County Comm'rs of Unified Gov't of Wyandotte County/Kansas City*, 2000 WL 1375267 (D. Kan. Aug. 30, 2000)); *accord Mize*, 2009 WL 1508373, at *13 ("Refraining from raping women in police custody is so obvious that even if [the city] were silent about such conduct, it would not give rise to a violation."); *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996) ("In light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women."); *Barney v. Pulsipher*, 143 F.3d 122, 1308 (10th Cir. 1998) ("we are not persuaded that a plainly obvious consequence of deficient training would be the sexual assault of inmates. Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."); *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 772-774 (E.D. Tenn. 2010) ("Refraining from raping women in police custody is so obvious that even if Anderson County were silent about such conduct, it would not give rise to a constitutional violation.  The court finds that Anderson County's training procedures were sufficient as a matter of law, and that no specific training was necessary to inform officers not to rape or sexually assault women in their custody."); *Nosoud Alemarah v. Gen. Motors*, 2019 WL 3003637, at *10 (E.D. Mich. July 10, 2019) (slip copy) (that prison nurse "would sexually mistreat an inmate was not an obvious consequence of any failure of the County to train and supervise"); *Allen v. City of Benton Harbor*, 2013 WL 6512950, at *9 (W.D. Mich. Dec. 12, 2013) ("Where, as here, the unconstitutional conduct (i.e., sexual assault by a police officer) is so egregious as to be obviously wrong, it cannot fairly be said that the municipality is liable for failing to train officers not to engage in such behavior."); *Ice v. Dixon*,

2005 WL 1593899, at *6-7 (N.D. Ohio July 6, 2005); *Breland v. City of Centerville, Ga.*, 2008 WL 2233595, at *3 (M.D. Ga. May 28, 2008) ("No training is required to teach police officers not to commit sexual assaults. Sexual assault is illegal, and police officers can reasonably be expected to know, without training, that they are not allowed to take sexual advantage of their prisoners."); *cf. Alemarah*, 2019 WL 3003637, at *8 (absence of policies ensuring proper monitoring of inmates and preventing male nurses from being alone with female inmates did not create unreasonably high risk of sexual abuse). Nor is it "plainly obvious" that an unsupervised officer will commit sexual assault, and the fact that a lack of supervision may create an *opportunity* for such conduct does not make the lack of supervision a *moving force* behind the violation. *Campbell*, 695 F. Supp. 2d at 775; *Mize*, 2009 WL 1508373, at *14-15; *Branum*, 2014 WL 640634, at *9; *Alemarah*, 2019 WL 3003637, at *10. Accordingly, because the LCSO adequately trained and supervised its court security officers and any alleged inadequacy cannot be said to have been the moving force behind Fields's sexual relationship with Adkins or Hill, Letcher County is entitled to summary judgment as a matter of law. *See i.e.* Exhibit 4, policies; Exhibit 5, signed acknowledgment; Exhibit 6, KLEC file information.

### E. ADKINS AND HILL HAVE NOT ESTABLISHED A VIOLATION OF THEIR CONSTITUTIONAL RIGHTS AS REQUIRED TO MAINTAIN A CLAIM FOR EITHER SUPERVISORY OR *MONELL* LIABILITY.

Adkins asserts claims against Sheriff Stines and Letcher County on the theories of supervisory liability. But in order to establish § 1983 liability under either theory, the plaintiff must first prove that her rights were violated. "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Khaled v. Dearborn Heights Police Dep't*, 711 F. App'x 766, 772

(6th Cir. Oct. 4, 2017); *Moore v. City of Memphis*, 853 F.3d 866, 872 (6th Cir. 2017); *Sampson v. Gee-Cram*, 655 F. App'x 383, 391 (6th Cir. 2016); *Estate of Hickman v. Moore*, 502 F. App'x 459, 468 (6th Cir. 2012); *Simon v. Cook*, 261 F. App'x 873, 881-82 (6th Cir. 2008); *Cooper v. County of Washtenaw*, 222 F. App'x 459, 473 (6th Cir. 2007); *Summerland v. County of Livingston*, 240 F. App'x 70, 79 (6th Cir. 2007); *Crocker ex rel. Estate of Tarzwell v. County of Macomb*, 119 F. App'x 718, 724 (6th Cir. 2005). Likewise, "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen v. Beecher Comm. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006). Here, Fields was working for an outside employer at the time of consensual sexual encounters with Adkins and alleged encounters with Hill. As set forth above, Plaitniffs cannot establish that her constitutional rights were violated by Fields or any other named defendant, and her claims for supervisory and municipal liability should therefore be dismissed. Fields denies claims asserted by Plaintiff Hill.

F. **SHERIFF STINES CANNOT BE HELD LIABLE AS A SUPERVISOR BECAUSE HE DID NOT TAKE ANY ACTION THAT CONTRIBUTED TO THE ALLEGED DEPRIVATIONS OF ADKINS'S CONSTITUTIONAL RIGHTS.**

Here, Sheriff Stines was not named in his individual capacity. Even if Adkins or Hill could establish a predicate constitutional violation, they cannot prevail on her claim against Sheriff Stines in his supervisory capacity. The threshold for establishing the level of personal involvement required to impose individual-capacity supervisory liability is "much higher" than the standard for municipal liability claims. *Essex v. County of Livingston*, 518 F. App'x 351, 356 (6th Cir. 2013). Supervisory liability under § 1983 "must be premised on more than mere respondeat superior, the right to control one's employees." *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Instead, "[a]t a minimum, a plaintiff must show that the official at least

implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Where, as here, the plaintiff's claim arises from a supposed failure to follow institutional policies, a supervisor can be liable only if he knew "of a breakdown in the proper workings of the department" and nonetheless abdicated his responsibilities. *Winkler v. Madison County*, 893 F.3d 377, 898-99 (6th Cir. 2018) (quoting *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995)). Although Sheriff Stines was not named in his individual capacity, in order to defeat qualified immunity in the context of a supervisory liability claim, the plaintiff "must point to a specific action of each individual supervisor." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543-44 (6th Cir. 2008).

The Sixth Circuit's decision in *Essex* is dispositive of Adkins's supervisory liability claim against Sheriff Stines. In that case, a deputy sheriff, Randy Boos, sexually assaulted five women on different occasions while transporting them from the jail to the courthouse. 518 F. App'x at 352. When the county found out about the allegations, it suspended Boos, conducted an internal investigation, and notified the state police. *Id.* Boos claimed that he thought the sexual acts were consensual and therefore did not know they were criminal. *Id.* He also said he did not know that inmates could not validly consent to sex with a police officer and that he had never been trained on sexual assault or proper transport procedures. *Id.* The Sheriff conceded that deputies were not specifically trained not to have sex with inmates because he thought it was common sense. *Id.* at 353. The inmates with whom Boos had had sex sued the Sheriff, among others, for violations of their Fourth, Eighth, and Fourteenth Amendment rights based on failure to train deputies and supervise Boos. *Id.* The Sixth Circuit held that, although nonconsensual sexual acts do violate a victim's constitutional rights, the Sheriff was nonetheless entitled to summary judgment because

there was no evidence that his "personal actions violated those rights." *Id.* at 357. The Court explained:

> For [the Sheriff] to be individually liable for failing to train or supervise, Plaintiffs needed to demonstrate that he took deliberate action or was otherwise involved in Boos' illegal acts. Plaintiffs allege only that [the Sheriff] inadequately trained road patrol deputies and failed to supervise Boos despite knowing that sexual assaults on inmates were occurring in other jurisdictions. This hardly counts as encouragement of the specific incident or knowing acquiescence in Boos' conduct. Indeed, it is an allegation only of a failure to act, which alone is insufficient to support a supervisory-liability claim. Plaintiffs were required to point to some actual conduct by [the Sheriff] that directly contributed to their injury; we have no such showing here.

*Id.* (internal citations omitted).

Like in *Essex*, there is no evidence that Sheriff Stines took any action that contributed to the alleged deprivations of Adkins's constitutional rights. To the contrary, court security officers in Letcher County *were* educated with respect to the prohibition against sexual assault, and like in *Essex*, Sheriff Stines immediately investigated the allegations, suspended Fields, and notified the state police. Moreover, even if Adkins had established the necessary personal involvement to hold Sheriff Stines liable in his supervisory capacity, Sheriff Stines would still be entitled to qualified immunity because it is not clearly established that any specific training or supervision of law enforcement officers is required to prevent sexual assaults.

## G.  PLAINTIFF'S CLAIMS DO NOT AMOUNT TO A CONSTITUTIONAL VIOLATION.

Plaintiffs do not allege that Field's conduct was undertaken pursuant to an established policy or custom of the Letcher County Sheriff's Department nor EKCS.  A governmental entity (or a private company operating under contract with one) is only liable under § 1983 when its employees cause injury by carrying out their employer's formal policies or practices. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). As a result, to proceed with such a claim, a plaintiff must specify the policy

or custom which she alleges caused his injury. *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). Here, the record is devoid of any such policy. Therefore, the Complaint is subject to dismissal for failure to state a claim upon which relief may be granted. *Bright v. Gallia County, Ohio*, 753 F. 3d 639, 660 (6th Cir. 2014); *Brown v. Cuyahoga County, Ohio*, 517 F. App'x 431, 436 (6th Cir. 2013).

### H. CLAIMS AGAINST FIELDS IN HIS OFFICIAL CAPACITY ARE REDUNDANT AND SHOULD BE DISMISSED.

An official-capacity claim against a county official is treated as a claim against the county / governmental entity. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Claims against Defendant Ben Fields in his official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department represent claims against Letcher County Sheriff's Department. *See C.K. v. Bell County Bd. of Educ.*, 839 F.Supp.2d 881, 885 (E.D.Ky. 2012) citing *C.A. ex rel. G.A. v. Morgan County Board of Educ.* 577 F.Supp.2d 886, 890 (E.D.Ky.,2008); *See also Shepherd v. Floyd County, et al,* 128 F.Supp.3d 976, 978 (E.D.Ky., 2015); *Noble v. Three Forks Reg'l Jail Auth.*, 995 F. Supp. 2d 736, 740 (E.D. Ky. 2014); *Stevens v. Gooch*, 48 F. Supp. 3d 992, 1003 (E.D. Ky. 2014), aff'd, 615 F. App'x 355 (6th Cir. 2015); and *Curtis v. Breathitt Cnty. Fiscal Ct.*, 288 F. Supp. 3d 789, 799 (E.D. Ky.), aff'd, 756 F. App'x 519 (6th Cir. 2018) and *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." (citations omitted)); *Claybrook v. Birchwell,* 199 F.3d 350, 356 n. 4 (6th Cir.2000) ("An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."). In light of the

holding in *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which permits local governments to be sued directly for damages and injunctive or declaratory relief, "[t]here is no longer a need to bring official-capacity actions against local government officials." *Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. 3099. Therefore, these claims are redundant and should properly be dismissed. *See C.A. ex rel. G.A. v. Morgan County Board of Educ.* 577 F.Supp.2d 886, 890 (E.D.Ky.,2008) *citing Artis v. Francis Howell N. Band Booster Ass'n,* 161 F.3d 1178, 1182 (8th Cir.1998) (dismissing § 1983 claim against teacher in his official capacity as redundant to the claim against the school district); *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 509 (6th Cir.1996) (dismissing § 1983 claim against superintendent, principal, and school board member in their official capacities as redundant to the claim against the school board) *See also C.K. v. Bell County Bd. of Educ., 839 F.Supp.2d 881, 885 (E.D.Ky. 2012)*. The official capacity claim should properly be dismissed. *See also Shepherd v. Floyd County, et al,* 128 F.Supp.3d 976, 978 (E.D.Ky., 2015); *Noble v. Three Forks Reg'l Jail Auth.,* 995 F. Supp. 2d 736, 740 (E.D. Ky. 2014); *Stevens v. Gooch*, 48 F. Supp. 3d 992, 1003 (E.D. Ky. 2014), aff'd, 615 F. App'x 355 (6th Cir. 2015); and *Curtis v. Breathitt Cnty. Fiscal Ct.,* 288 F. Supp. 3d 789, 799 (E.D. Ky.), aff'd, 756 F. App'x 519 (6th Cir. 2018). Under Kentucky law, the sheriff is recognized as the chief law enforcement officer of the county. *Shipp v. Rodes,* 196 Ky. 523, 245 S.W. 157 (1922). Absent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity. *See Yanero,* 65 S.W.3d at 517.

I. **STATE LAW CLAIMS AGAINST STINES AND FIELDS IN THEIR OFFICIAL CAPACITY ARE BARRED BY THE DOCTRINE OF OFFICIAL IMMUNITY.**

"Official immunity" is immunity from tort liability afforded to public officers and

employees for acts performed in the exercise of their discretionary functions. It rests not on the status or title of the officer or employee, but on the function performed. *See Yanero v. Davis*, 65 SW3d 510, 524 (2002), citing *Salyer v. Patrick,* 874 F.2d 374 (6th Cir.1989). Official immunity can be absolute, as when an officer or employee of the state is sued in his/her representative capacity, in which event his/her actions are included under the umbrella of sovereign immunity. *Id.* In suits brought against county jails, Kentucky's courts have upheld sovereign immunity for counties, and by extension, their jailers. *See Rowan County v. Sloas,* 201 S.W.3d 469 (Ky. Sept. 21, 2006) (upholding summary judgment for Rowan County and its jailer in his official capacity based on sovereign immunity); *Commonwealth v. Harris,* 59 S.W.3d 896, 899 (Ky.2001) (noting that in a suit for negligent operation of jail, the jailer is cloaked with the county's sovereign immunity).

The official capacity claims are in essence claims against the Letcher County Sheriff's Office and are, therefore, claims against the county. *See Id. citing e.g., Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985). (Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (Internal citations and quotation marks omitted). This cloaks the Defendant, in his official capacity, with the County's sovereign immunity since the county is entitled to sovereign immunity (as to pending state law claims), *Cullinan v. Jefferson County,* Ky., 418 S.W.2d 407, 408 (1967). "Absent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity." *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008).

**J. STATE LAW CLAIMS AGAINST THE DEFENDANT MICKEY STINES, LETCHER COUNTY SHERIFF ARE BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY.**

"[A]bsent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity." *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). Kentucky's law of sovereign immunity bars state-law actions against county governments. e.g., *Schwindel v. Meade County,* 113 S.W.3d 159, 163 (Ky.2003). Kentucky subdivisions are not liable for the tortious performance of governmental functions, nor vicariously liable for the negligence of their employees. *See Howard ex rel. Estate of Howard v. Bayes*, 457 F.3d 568, 577 (6th Cir August 09, 2006) citing *Grayson County Bd. of Educ. v. Casey,* 157 S.W.3d 201, 202-03 (Ky.2005); *Franklin County, Ky. v. Malone,* 957 S.W.2d 195, 201 (Ky.1997), *overruled in part on other grounds by Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001).

As a result, all of Plaintiffs state law claims asserted against the MICKEY STINES, Letcher County Sheriff should properly be dismissed.

**CONCLUSION**

In the case at bar, this Court should grant summary judgment and dismiss Plaintiffs' claims against Defendants MICKEY STINES, Letcher County Sheriff and BEN FIELDS, in his official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department as a matter of fact and law.

PORTER, BANKS, BALDWIN & SHAW, PLLC
327 Main Street, P.O. Drawer 1767
Paintsville, Kentucky  41240-1767
Telephone:     (606) 789-3747
Facsimile:     (606) 789-9862

*/s/ Jonathan C. Shaw*
JONATHAN C. SHAW
jshaw@psbb-law.com
*Counsel for Defendants Ben Fields in his official capacity as Deputy Sheriff with the Letcher County Sheriff's Department and Mickey Stines, Letcher County Sheriff*

CERTIFICATE OF SERVICE:

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and I further certify that I mailed a true and correct copy of the foregoing to:

Ned B. Pillersdorf, Esq.
Pillersdorf, DeRossett & Lane
124 West Court Street
Prestonsburg, Kentucky 41653
pillersn@gmail.com

Bethany N. Baxter, Esq.
Childers & Baxter, PLLC
201 West Short Street Suite 300
Lexington, Kentucky 40507
bethany@jchilderslaw.com

Jason E. Williams, Esq.
Williams and Towe Law Group
303 S. Main Street
London, KY 40743
jason@wftlaw.com

Patty Stockham
Eastern Kentucky Corrections Services, Inc.
1319 Siloam Street
South Shore, KY 41175
pd.stockham@gmail.com

*/s/ Jonathan C. Shaw*
JONATHAN C. SHAW