**Indiscernible to 0:00:17.8**

Q                So, you've brought an ankle monitor and this is -- he gave this to you?

A                Yeah, um hmm; that's what I went to jail with.

Q                That's what you had on when you went to jail.

A                Um hmm, and I didn't know what to do with it.

Q                But that's not been on as far as you know?

A                No, it's never been on; no.

Q                And when you said like when you started this -- the flirtation, I guess, you had your bracelet on.

A                Yes.

Q                So when you got out of jail, you met him?

A                He met up the jail the first time.

Q                And that's Ben.

A                Um hmm.

Q                Right?

A                Right at the jail.

Q                Right at the jail, soon as you got out.

A                Yes.

Q                He put your bracelet on.

A                Yes.

Q                So you kept your bracelet on for a while.

Exhibit 8

A                                Yes.

Q                                Then the relationship developed.

A                                Um hmm.

Q                                How long after the relationship developed -- like from the time you got outta jail till the time that he first took your bracelet off.

A                                I'd say six weeks, 'cause I'd -- I'd went to -- I told the Court I wanted to go to rehab.  I couldn't afford the, you know, the bracelet and I pay him motion after motion; and finally, they said I could go to rehab but still had to pay for it; and that was the original reason.  I think anyway in my head, or I wanna believe that he took it off, is I was going go to rehab.

Q                                So, the Court system allowed you to go to rehab.

A                                Yes, they think I had my bracelet.  Court ever knew my bracelet was off -- was off ever, what I'm told to Judge.  He would meet me the day before, and actually the second time, I got arrested for driving in Pike County, I had Court that day and I was late and he lied to the Judge and told him I had to pull a sanction for something, you know, before; and they had a special hearing for me at two o'clock that day.

Q                                So you're out.  He -- he -- about six weeks after you get out, you meet him?

Exhibit 8

A                      Um hmm.

Q                      Is that one of the first encoun' -- you know, you told me --

A                      First --

Q                      -- last time you had three encounters with him of a sexual relationship.  When -- the first one, is that when he took the bracelet off?

A                      Yeah, yeah.

Q                      So from the time you got outta jail, approximately six weeks after that is when the --

A                      Yeah.

Q                      -- the first sexual encounter took place --

A                      Yeah.

Q                      -- and he removed the bracelet.

A                      Um hmm.

Q                      Alright, what did he do with that bracelet?  Did he give it to you to say hold onto or he just keep it?

A                      He kept it.  He usually kept it every time when I had told him that -- telling on him.  I said, "You better give me a bracelet," and that's when he gave me this one.

Q                      So now, after the six weeks, you -- you've met him; he's took your bracelet off.  Does he ever put it back on?

Exhibit 8

A                     The day before Court.  I'd usually meet him the night before Court [indiscernible] Court.

Q                     So if you had like just a Court date on your regular charge, you would --

A                     Um hmm.

Q                     -- did you call and say, "Hey, I've got a Court date?"

A                     Yeah, or -- and he called me too.  I mean because I'd rather to -- I'm real big on keeping my Court dates.  He said he'd met at -- you know, eight o'clock at the Courthouse or, you know, whatever.  "Well, I'll leave the Courthouse unlocked and I'll be there shortly."  It was always the night before my Court hearings.

Q                     How many Court days do you remember having to do that?

A                     Least -- well, probably, four or five because I've made three different motions myself, so's my record.

Q                     Now, every Court date, was there a sexual relationship that occurred --

A                     No.

Q                     -- by --

A                     No.

Q                     So you may have Court tomorrow and you just may meet him real quick somewhere and he'd throw it back on.

**4**

<u>Exhibit 8</u>

A                                    Yeah, but we always met at the Courthouse, always.

Q                                    Always at the Courthouse.

A                                    Yeah, in the Judge's chambers always.

Q                                    Even to put it on.

A                                    Yes, um hmm, and take it off; always there.

Q                                    So now, we're going to Court, he has met you at the Courthouse the night before?

A                                    Um hmm.

Q                                    Is that typically how it went?

A                                    Yeah, um hmm.

Q                                    Puts the bracelet back on, you go to Court. Then what happens?

A                                    I'd call him when I get out of Court. "Where do you want me to meet you to get this bracelet?" Once, he actually let me cut it off 'cause he couldn't meet me.

Q                                    So you'd meet him back at the Courthouse some -- the day after Court, or that day --

A                                    Yeah.

Q                                    -- or something?

A                                    Yeah.

Q                                    And then he would take the bracelet back off.

A                                    Um hmm, and keep it.

**5**

<u>Exhibit 8</u>

Q                    And he would keep it.

A                    Um hmm.

Q                    Now far as you know -- how do you know the bracelets are on or off?

A                    There's usually a light and you have a charger, you have to charge them.

Q                    So when you get out, he puts that first bracelet on.  That's six --

A                    Um hmm.

Q                    -- weeks that it's -- that it's on you.  Are you paying that fee?

A                    Um hmm.

Q                    So you paid it for six weeks.

A                    Yeah, um hmm.

Q                    So then you meet him, you had a sexual relationship, he takes the bracelet off.  When he puts it back on, do you have to charge that?  Do you think the bracelet was on?

A                    No.

Q                    You think he's turned it off.

A                    Yeah.

Q                    So the rest of the time, it's turned off.

A                    Yeah.  Usually Patty calls you, "You need to charge your bracelet," or, you know --

Exhibit 8

(Talk over)

Q                    The bracelet that you had there --

A                    Um hmm.

Q                    -- that was one of those last times that you've met him; you've had Court, he's gave you that bracelet --

A                    No, not for Court.  I call him, told him, I thought it's gonna tell and I said, "You better give me a bracelet."  You know, something -- I was scared to death; I didn't know that to do and so I met him and he give me the bracelet for that reason.

Q                    So once -- like you said there yesterday or the day before yesterday, you said that found out, your boyfriend --

A                    Um hmm.

Q                    -- and all that.

A                    Um hmm.

Q                    You let Ben know and that's when ever thing -- so then you said, "Hey, ever body knows about us and our -- our relationship."

A                    Right.

Q                    You told him that, right?

A                    Right, um hmm.

Q                    And then you tell Ben, "I need a bracelet."

A                    Yeah, yeah.

<u>Exhibit 8</u>

Q     What did he tell you about that?  Did he say anything, "Hey, you need a bracelet, I'll get this to you," or did he just -- what -- what?

A     No, I told him that and he said, "Where you gonna be at this evening?" and I went met him, give me bracelet.  He -- he really didn't say a whole lot about, you know, telling or, you know, gonna tell.  He didn't give any kind of opinion on it at all.  He'd always tell me to stay away from [indiscernible], you know.

Q     Did -- was that bracelet active?

A     No.  I mean without a charger, there's no way it could be.  You know, it's on the [indiscernible].

Q     Now, the other day you said that the reason that you started the relationship with Ben is because you had heard rumors that if you had relationships with him or -- that you could -- you know, wouldn't have to pay your fees --

A     Right.

Q     -- and you wouldn't have to wear the bracelet and you could do what you want.  And you gave me a name but you don't know her personally, do you?

A     No.

Q     Do you know anybody personally, like that you know that this has happened to, or is this just rumors you heard in the jail?

Exhibit 8

A                     Just rumors and I know that Chad Brown, he wasn't on house arrest but he does have some videotapes of some stuff in the Judge's chambers.

Q                     What kind of stuff?

A                     Just with girls, sexual and stuff.

Q                     Describe -- have you seen the videos?

A                     I've seen one partly and I -- you know, just him having sex with girls to -- for to be able to get out of jail.

Q                     Who was having sex?

A                     Ben and just some higherups up there.

Q                     Who?

A                     Judge and --

Q                     Now, you saw the video.

A                     Um, yeah.

Q                     What did you see on the video?

A                     I've seen Judge Mullins having sex with a girl.

Q                     Who is the girl?

A                     I don't know, 'cause I don't know a lot of people from over there.

Q                     Where was it at?

A                     In his offi' -- in the Judge's chambers.

Q                     Is that the same that you -- that you were meeting Ben?

<u>Exhibit 8</u>

A          Yes.

Q          Is that how you know it was the Judge's chambers?

A          Yeah.

Q          And this was Judge, who?

A          Mullins.

Q          But you don't know who the girl was?

A          Hmm um.

Q          How does -- what was this guy's name, again?

A          Chad Brown.

Q          Do you know Chad Brown?

A          Yeah, I do.  He's on the run, he's hiding.  They shoot -- they've shot at him and ever thing.

Q          Who has?

A          Letcher County Sheriff's Department trying to catch him.

Q          What's he on the run for?

A          I don't know.  Related to that, I don't know.

Q          Why would he have a video of the Judge having sex with somebody?

A          He's got several.  I don't know how he got them, I didn't ask. 'Cause listen, I know too much over there and that is a dirty place.  I try not to know.  I don't know he got them but he does have

**10**

Exhibit 8

some and he's got an attorney -- I can't remember -- maybe in Somerset that knows about it, too.

Q                            But you saw the video of --

A                            I saw them on video.

Q                            -- of the Judge.

A                            Yes.

Q                            Any other video that you actually saw?

A                            No, hmm um.  They say that the Sheriff, Mickey Stines, is involved.  I don't know.

Q                            Who said that?

A                            Chad.  He said he had videos with Mickey; that Mickey used to do the same thing when he was over house arrest.

Q                            And then Chad -- so, you've not seen any videos of Ben.

A                            No, hmm um.

Q                            But you saw the Judge.

A                            Right.

Q                            Do you know for sure that was a Judge?

A                            Yes.

Q                            How do you know that's the Judge?

A                            I've been in front of him.  His face is pretty clear on there.

Q                            But you don't know who the female was.

<u>Exhibit 8</u>

A                     No.

Q                     Would Chad be willing to  -- to meet me?
Could you get ahold of him and -- and maybe even let him call me or could
you get him to send you those?  Is it on his  phone or --

A                     No, they're cassette tapes.

Q                     They're cassette tapes.

A                     Yeah.

Q                     Like a cassette that you --

A                     VHS.

Q                     Like a VHS, like a big one?

A                     Yeah, big one.  He has [indiscernible] a long
time.  I don't know.  He's -- he's got videotapes here for 15, last 15 years.
I don't know.  I've seen one for sure.

Q                     And when did you see it, how long's that been?

A                     Couple months ago.

Q                     Do you think that you could get that video?

A                     Maybe; maybe.  I gotta over that [indiscernible]
doctor.  I'm scared to death but I'll try 'cause I wanna see Chad, or at least
maybe try to talk to him; I'm gonna tell him call me, you know, something.
I was gonna have him call my attorney, 'cause they need -- wanna talk to
him.  And he's real, you know, skiddish and stuff and hides ever where but
I don't blame him, you know.

<u>Exhibit 8</u>

Q                              Yeah, obviously.  You know, but if you could get that video --

A                              I'll try.

Q                              -- or videos of -- of anything that per' -- you know, that you think is necessary.

A                              But that won't -- nobody even won't say that I got it right.  I mean that place is dirty over there and, you know, it kinda scares me.

Q                              I understand.  Which I mean -- you know, I mean we're -- we're not saying the Judge has done anything wrong.

A                              Right, exactly.

Q                              You know, I just --

A                              I'm getting you a video and then, it's your call of what happened.  It mighta been his girlfriend, I don't know.  Like I say, my only goal is to make sure this don't happen to somebody else.  I struggle with it real bad.

Q                              And that's what we're trying to figure out is -- you know -- the rumors, who -- who I could go talk to -- else, other than you.

A                              Okay.

Q                              That's why I'm asking.

Exhibit 8

A                     There is a -- what is that girl's name I was in jail with.  Let me try on my phone 'cause she messaged me that Ben had made sexual advances to her.

Q                     Once you leave here today --

A                     Um hmm.

Q                     -- what is gonna be the best number to get up with you?

A                     I had another phone and it was messed up.  I had the awfullest time with telephones.

Q                     And there was somebody called me and said that your were gonna be late.  I forgot --

A                     Landlord.

Q                     Your landlord, okay.

A                     Yeah.

Q                     That's in the [indiscernible].

A                     Yeah.

Q                     And to clarify, when -- when Ben's uncle started calling you --

A                     Um hmm.

Q                     -- and -- what did Ben tell you when you confronted Ben, said, "Hey, your uncle's calling me," what'd he say?

A                     Really not much.  He said, "Well, he's made it --" 'cause I was worried to death about my charges over there, you know,

Exhibit 8

being on this house arrest.  He said, "No, he can help with these charges," and that was --

Q                            That's all he said.

A                            Yeah; or I'd say, you know, "Your uncle's pervert."  He'd say, "Yeah," he kinda laughed.  That was -- that was usually it.

Q                            But he never told you to do any kind of sexual favors --

A                            Did not.

Q                            -- with him for --.  The -- is there any -- did Ben ever send you any pictures or anything of him?

A                            Hmm um, no.

Q                            Is there any of the messages -- 'cause see, there's a bunch, I've not had a chance to go through them -- that Ben talks about having a sexual relationship with you or anything that I need to really --?  Like when I go through the messages --

A                            Right.

Q                            -- and I don't -- if I don't see something, I don't wanna make sure -- I don't wanna miss anything.  So I'm trying to -- is there anything in there that he always said, you know, anything sexual [indiscernible] towards you that he sent to you?

A                            No, not really 'cause he'd usually call.  Because one thing -- and that was probably a couple weeks ago, he told

Exhibit 8

me that Mickey Stines always had [indiscernible] do like the physical part of like the drugs and ever thing, and he said, "He has me on telephones. So never put nothing on a phone you don't want nobody to see." So he would always -- most time, he'd call. Mostly texting was at the beginning and then he got to where he called.

Q                              So he told you never put anything on the phone?

A                              Yes. That's when that Justin Lucas had got arrested and he come told me, "Hey, he's -- [indiscernible]; you know, say much."

Q                              Now, as part of your bond conditions, I guess, is wearing that bracelet.

A                              Um hmm.

Q                              Were you allowed to go anywhere in the State or were you supposed to stay in Letcher? Could you go to Pikeville? What -- do you remember?

A                              I could go in Kentucky but I always had to get permission for anything. If you walked outside that door, you get permission. I would not, first, catch any more charges. I caught three charges, which was driving but I say that 'cause I've been fighting for my license forever.

Exhibit 8

Q                                   So, you got three -- while he was supposed to be monitoring you, taking your bracelet on and off, you got three more charges.

A                                   Yeah, three driving charges.

Q                                   And you remember what the charges were?

A                                   Driving; driving on with no -- no license or something like that; and then one time, I had five Neurontins on me, I think, and they caught me with -- you know -- possession.

Q                                   Possession.

A                                   Um hmm.

Q                                   And that was in Letcher or was it --

A                                   No, that was in Pike.

Q                                   So, Pikeville.

A                                   Yeah; at which time I took it, they hollered down in the -- would call and ask me where my bracelet was and I told them it was home on the couch.  You know, it was like a dud.  I swear sometimes I -- I listen to it and I'm like, "This can't be real."

(Note:

                                    Pause here.  Continuing thereafter,

                                    as follows:)

A                                   And but, I don't know if they had a sexual relationship or whatever, but there was, you know, something; and then

<u>Exhibit 8</u>

she went to jail right after that.  Ben's wife, you know, was sergeant.

Ben's wife beat the crap out of her and she had to pull 90 days over it.

Q                              Do you know this person?

A                              I met her at the jail.

Q                              But you don't know her --

A                              No.

Q                              -- enough to say, "You can call me," or --

A                              Yeah; I know her enough to say that, yeah.  I

got her phone number the day --.  She got out, she ain't been out long.

She'd message me on Facebook.

Q                              Do you think you could get her to call me?  If

she has something she wants to say, she --

A                              Yeah.

Q                              -- you know, we're willing to listen to anybody.

A                              Well, she was wanting to.  She said, "You

know, give her my name."  Said, "You know, this place is dirty," and it is.

You know, it's -- and what's really funny, like City Police in Pikeville, "Ever

body knows up there like it's a dirty county."  And I'm like, "Well, why ain't

somebody done something about it before now."

Q                              Well, if you could get up with her --

A                              Okay.

Q                              -- you know, attach my number.  You still got

my card, right?

<u>Exhibit 8</u>

A                              I do.  Well, I left it with him.  May I have

another one?  I'm blessed with a wonderful [indiscernible], really have faith

in me.  He gave me a second chance, 'cause I don't have family and he

sees how hard I struggle, you know; and he seen all that was going on.

It's like nobody will believe you and we had -- the Judge called him other

day and said, "You know, I'm really sorry." Said, "I hate she's went through

all this."

Q                              What Judge?

A                              Judge Hall, Keith Hall.

Q                              But you don't know anything about why the

Judge -- his name has got brought up in this, do you?

A                              Hmm um.

Q                              You don't know anything.

A                              No, no.

Q                              You're just hearing rumors.

A                              Hear rumors, yeah.

Q                              How much longer -- when you got caught for

the Pikeville charges, did the escape charge come out?

A                              Let's see, I got arrested, I think in last August

and again in October, and then the first time.  So, a while.

Q                              So the last time that you got arrested while you

were out on bond --

A                              Um hmm.

Exhibit 8

Q                         -- was in October?

A                         Yes.

Q                         And then when did -- when did you -- the escape charge come?

A                         January.  You know I was called, faxed over paperwork.  Judge Keith Hall called and I had -- was in Court, you know.  Never was I trying to escape.  Talk to the clerk's office.

Q                         Did Ben ever have to fill out any paperwork for you or anything?

A                         As a [indiscernible], yeah.

Q                         Right when you got out of jail?

A                         Yeah; and the first time -- like you have to meet him ever Wednesday; I think at four o'clock you're supposed to, the first Wednesday, you know, he filled out paperwork.

Q                         But do you know any other paperwork after that?

A                         No.

Q                         Do you know what the name of that company that does that is?

A                         No, I really don't.

Q                         You were just told to meet Ben.

A                         Yeah, I was just told to meet Ben and then paid for the -- I know there's a lady named Patty that works with him; and, you

Exhibit 8

know, she had told me I wasn't allowed to talk to Ben no more and then just disappeared.  He said, "Don't -- you don't have to worry about calling me."  I's like, "Okay."  I's like, "How do you cover that?  How do I just disappear?"

Q                                    What'd he say?

A                                    He said, "Ah, don't worry about it."

EASTER:

                                     I will probably giving you a phone call from time to time as I look into this further.

INTERVIEWEE:

                                     Um hmm.

EASTER:

                                     'Cause I'm sure I'm gonna have more questions, more information, and then -- so if you see my phone number pop up, I'll give you the phone call at 223-6747.

Q                                    Do you have voicemail?

A                                    I do, yeah.

EASTER:

                                     So, I can leave voicemail.

INTERVIEWEE:

                                     Yeah.

Exhibit 8

EASTER:

I got a good feeling that I'm gonna think of something --

INTERVIEWEE:

Right.

EASTER:

-- you know --

INTERVIEWEE:

If you're like me I forget things, so --

EASTER:

-- have follow-up questions.

INTERVIEWEE:

Can I have another card, please?  Thank you.

(Talk over)

EASTER:

You're gonna run me outta business cards.

INTERVIEWEE:

Yes.  Do you think I have any concern, like for my safety or anything?  I know Ben won't, you know, when it first started.  Which he was mad, but then there's a little boy that said something; and so, like my son and ex-

Exhibit 8

husband to [indiscernible].  "You know, she better be careful.  She's dealing with a dangerous thing.

EASTER:

You know, I don't know who -- you know, I never have anybody I've talked to.  I don't wanna say you're safe or you're not safe --

INTERVIEWEE:

Right.

EASTER:

-- because I can't be responsible for you.

INTERVIEWEE:

Right.

EASTER:

I can say that nobody -- the only person that I would know that probably knows that we have even -- were gonna discuss or talk with you is the Assistant County Attorney --

INTERVIEWEE:

Okay.

Exhibit 8

EASTER:

    in Letcher.

INTERVIEWEE:

    Okay.

EASTER:

    That's it.

INTERVIEWEE:

    Okay.

INVESTIGTOR:

    Justin, who's present here, he's a detective

    with us; and the guy that was with me the

    other day is a detective with us.

INTERVIEWEE:

    Right.

EASTER:

    Where we don't tell anybody --

INTERVIEWEE:

    Right.

EASTER:

    -- that you even have talked to us --

INTERVIEWEE:

    Somebody told them something.  You know,

    they're just freaked, 'cause I'm not the brave

Exhibit 8

person I was.

EASTER:

If you have told somebody, then it could got out.

INTERVIEWEE:

Right.

EASTER:

But I feel confident that the Assistant County Attorney is not gonna say anything and he doesn't --

INTERVIEWEE:

There's a little boy that messaged me from over there but I didn't say nothing to him. He was like, "I was offered $500 for information" from something like; and I was like, "About what," you know; and that's the only reason why I'm asking.

Q       So, what's the boy's name?

A       Justin Lucas, which is the boy that Ben warned me about.

Q       Said that he was -- he --

A                              I'll tell you exactly what he said and you can

write him.  You know, like I told my son, you know, I've run from things

long enough and it's time to -- you know, I stand up for myself.

Q                              Justin, what?

A                              Lucas.

Q                              Justin Lucas.

A                              Uh huh.

Q                              So, he said that somebody's offered him $500

for --

[Note:

                                        Interviewee shows message.]

A                              Right there.

Q                              This is what -- is this the start of the

conversation?

A                              Um hmm, yeah.

Q                              I don't guess I had this other day then on your

phone, did I? 'Course that's outta your phone.

A                              I'm certain you didn't have --

Q                              Anything else there?  That's probably it.  Let

me see here if I got this here, right here.  He says, "Hey, I just got offered

$500 for info' on --

A                              On [indiscernible].  Somebody -- apparently,

somebody in Angie's family, his wife, said it's -- Angie's real close to me.

Exhibit 8

[indiscernible] got married, you know, he knows I live in a big ole' house by myself and it's kinda secluded. So, I mean, since I got married.

Q      Let's just maybe go over this text here. So, it looks like he says, "Hey, I just got offered $500 for info I got." You're saying, "What info?" "Lord, I'm thinking about doing it, it's $500." "What are you talking about? By the way, I got married." "Married to who?" So, and then he goes on and says, "See, I had a whore down here I like and always pass out Xanaxes. Letting her use my phone." So, I don't understand what he's --

A      Me, I don't understand the information that -- 'cause I mean he knews, ever body knew it was common knowledge that, you know, Ben gave me [indiscernible]. You know, with me and several other people, it's common knowledge. So, I don't know what information he's talking about.

Q      But he's not saying he's gonna never -- ever who's wanting to pay him $500. He doesn't say, define, information on you.

A      Right.

Q      It really doesn't say what, does it? Do you --

A      Let me see.

Q      Says, "Guess seeing you on [indiscernible] -- it looks and see a lot about Ben.

Exhibit 8

A                                  I mean he didn't say me particular.

[Indiscernible] 500 made to who. [Indiscernible].  "What are you talking

about?"  Wanted me -- tell me to type in, you know, Ben's name and I

finally did but I didn't see nothing besides this right here.  I don't know

what he was talking about.

EASTER:

                                   I'm not for sure.

INTERVIEWEE:

                                   Me either.

A                                  At one point, he said he was affair with Ben's

wife.  So, I don't --.

EASTER:

                                   You know, like I said, I don't -- you know, I don't

                                   know these people --


INTERVIEWEE:

                                   Right.

EASTER:

                                   -- and I'm just now getting involved.  So, I have

                                   no information, you know, nobody's told me

                                   what -- people I've talked to says, "You know,

                                   you're in danger," or anything like that.

Exhibit 8

INTERVIEWEE:

Right.

EASTER:

I can't give you any --

INTERVIEWEE:

That's fine.  I told my son I would ask so he'd

feel better --

EASTER:

Well, like --

INTERVIEWEE:

-- you know.

EASTER:

-- like I said, I -- I can't answer that whether

you're safe or you're not safe, 'cause I -- I

can't be there to protect you.

INTERVIEWEE:

I know.

EASTER:

And I -- but I do not at this time have any

information to say otherwise.

INTERVIEWEE:

Okay.

Exhibit 8

EASTER:

And as far as you meeting over here, if you don't tell anybody --

INTERVIEWEE:

I won't tell anybody.

EASTER:

-- then like said, the only person that -- would be the Cou' -- he knows the County Attorney has actually gave us your name --

INTERVIEWEE:

Right.

EASTER:

-- as somebody that we would need to talk to. Other than that, so he knows that --

INTERVIEWEE:

Right.

EASTER:

-- a conversation's gonna take place --

INTERVIEWEE:

Right.

EASTER:

-- at some point, but I feel confident he's not

Exhibit 8

gonna say anything. The Commonwealth

Attorney is not even -- we have a prosecutor

--

INTERVIEWEE:

Um hmm.

EASTER:

 -- that's assigned to this case, and she's out

of Frankfort.  So, it's -- the prosecutor is not

even from around here either; and, you know,

everything else that's -- people that's been

with me has been inhouse that works for the

attorney general.  So -- so nobody else --

INTERVIEWEE:

Yeah, he just -- he wanted to ask, and I

wanted to double check 'cause I am

ashamed of this but, you know, I'm kind

not, kinda glad that it's out.

EASTER:

Well, I mean as -- as this gets out and we

start talking, obviously, you know, people's

gonna say stuff.  At some point, you know,

we'll probably have to talk to Ben.

INTERVIEWEE:

Yeah, it's all over Letcher County papers and stuff, you know. So, I've had phone calls and --

EASTER:

Yeah, I don't think -- I don't think the -- I think the secrets got out when your -- your civil attorney filed the civil lawsuit. That kindly -- that kindly put a damper on how we do things. It's not secretive all of a sudden.

INTERVIEWEE:

When I left here, my home, I seen a civil suit and I's like, "Oh my God!" you know, 'cause I hate all of it. I wish I could just change it all.

EASTER:

But like I said, I -- I don't know. If I hear anything that's -- you know, would be concerning about you, I -- I'll definitely tell you. I'll report it, you know.

INTERVIEWEE:

Right.

EASTER:

But I don't know anything. I can keep you

Exhibit 8

up -- you know -- aware of some stuff that we're doing.  You know, because -- but we do some stuff, we try to keep it just as low as we can because it helps us --

INTERVIEWEE:

Right.

EASTER:

-- get accomplished what we need.  So --

INTERVIEWEE:

And I'm trying to get back to live a normal life a little bit, you know --

EASTER:

Understand that.  Well, this process won't be a quick one.  I'm sure, you know, a criminal investigation is a long, drawed out, process, you know.

INTERVIEWEE:

So, what happens next?  You just -- you'll be investigating and if you have any questions, you'll --

EASTER:

I'll call you.

Exhibit 8

INTERVIEWEE:

Yes.

EASTER:

And then, we'll -- once I compile the investigation and we think we've done all we can do and talked to ever body we can talk to, then it'll go to a prosecutor. Although, a prosecutor will be onboard with me throughout this; and then, 'course it's ultimately up to her what she thinks she can see and what, you know, she'll make some decisions and -- and then, you know, like I told you before, if there's something there, then it will go to a grand jury; if not, you know, sometimes a case will go to a grand jury and they don't do anything; and sometimes, a case is not even worth going to a grand jury --

INTERVIEWEE:

Right.

EASTER:

-- you know; but that's -- a prosecutor will look at that and they're the ones that decide, you

**34**

Exhibit 8

know, those laws --

INTERVIEWEE:

Right.

EASTER:

-- and that's the -- and like I told you, the prosecutor is out of Frankfort office, so it's not a local prosecutor. You can have confidence in that whatever happens, it'll be as straight up as it possibly could be.

INTERVIEWEE:

Right.

EASTER:

There will not be any locals and politics --

[Talk over]

INTERVIEWEE:

He said -- the Judge called, actually was bragging on you; said you was a good guy, and I said, "He seemed to be." He's with the County Attorney in Pike County.

EASTER:

I've had a couple cases in Pike County with the Commonwealth Attorney up there, the old

Exhibit 8

Commonwealth Attorney.   He's not even there anymore.

INTERVIEWEE:

I don't know that --

EASTER:

Keith Bartley.

INTERVIEWEE:

Oh, okay.  I don't know he, when I mentioned the name and --

EASTER:

I may have met him.  I --

INTERVIEWEE:

Right.

EASTER:

-- don't know.

INTERVIEWEE:

And Mickey, you know, our kids went to school together, so that's -- and he was like --

EASTER:

I can't say that I've not met him, because I work a lot of counties; so, I may have.

INTERVIEWEE:

He said, "You're in good hands."

Exhibit 8

EASTER:

Huh?

INTERVIEWEE:

He said, "You're in good hands," 'cause, you know, he knows how nervous I was.

EASTER:

All this will do -- you know, like I told you yester' -- the other day, which it is what it is.

INTERVIEWEE:

Right.

EASTER:

That's the way that we look at it. It doesn't make any difference if you're the Pope you're a drug addict. What you have told me, you know, obviously I have to corroborate stuff. It doesn't matter if you's a drug dealer or the Pope telling me, I've still gotta do that. It's all the same.

INTERVIEWEE:

I appreciate that..

EASTER:

And what you've told me, I'm gonna do my best to corroborate and -- and work with it.

Exhibit 8

You know, once I get in this, like I said, may not find anything, may not find anybody else talk to; but we may -- we'll just have to kindly see what -- what develops. It's at the [indiscernible] now, so --

INTERVIEWEE:

Now, Bethany said something about four girls had went to the jail and said same thing was going on, and she said, "I'm getting a bunch of calls."

EASTER:

I will tell you we're hearing -- we're hearing the same stuff what you're saying is, you know, this person, this person, this person; but when we -- we're having a hard time getting ahold of those people.

INTERVIEWEE:

Listen, they run scared, I don't blame them.

EASTER:

Well, I mean --

INTERVIEWEE:

[Indiscernible] cross, go over in Letcher County. I've not been back and I have to --

Exhibit 8

EASTER:

> The thing about at this point, there's nothing to be really scared of, because if you come forward and tell me your story, they can't do anything to you.  You know, if -- if Ben calls you and says, "You know, if you talk --" or something --

INTERVIEWEE:

> Right.

EASTER:

> What you need to do is -- is -- if Ben starts call you or does something, you need to record the conversations.

INTERVIEWEE:

> Okay,

EASTER:

> You need to get your other phone and hit record, and put it on speakerphone where we can --

INTERVIEWEE:

> Right.

EASTER:

> -- hear what the conversation's about.

**39**

Exhibit 8

|                | And then after the conversation, next phone call you need to be. |
|----------------|------------------------------------------------------------------|
| INTERVIEWEE:   | Right.. |
| EASTER:        | And if anybody threatens you because you're -- you're trying to be a witness, there's charges that we can send out on him to do that. Nobody can intimidate a witness. That's -- that's against the law; and I can assure you if I call the prosecutor at any given time and say, "Hey, our witness is -- somebody's intimidating her," and there's evidence of that, she will -- she will seek warrants quickly. |
| INTERVIEWEE:   | Okay. |
| EASTER:        | It won't -- you know, we're not gonna let anybody -- |
| INTERVIEWEE:   | Right; my biggest fear's to end up back in that jail. |

Exhibit 8

EASTER:

But now, if you don't break the law --

INTERVIEWEE:

Right.

EASTER:

-- but now, if you get out -- you get out and get wild and start driving --

INTERVIEWEE:

Right.

EASTER:

-- you know, you're on your own.

INTERVIEWEE:

Right; but just like --

EASTER:

Nobody's gonna be able to trump charges up on you.  I mean there's -- this is, we're past that.

INTERVIEWEE:

Right.  It's like in that escape, you know, that's part of my mind.

EASTER:

'Course, the problem with escape is, we need to look at -- and I just don't know.  You

Exhibit 8

know, is it because of the -- the circumstances or is it -- you know, it's just -- we just have to kindly see.

INTERVIEWEE:

Right.

EASTER:

I think we're -- I don't think anybody's up to go get an escape warrant on you, fairly --

INTERVIEWEE:

Right.

EASTER:

-- certain that's not gonna happen.

INTERVIEWEE:

God, no! I hope not. 'Cause escape -- I went "Escape, what are you talking about?"

EASTER:

Let me -- let me take a picture of that bracelet.

INTERVIEWEE:

I said, "Here's my bracelet."

EASTER:

I don't want it.

Exhibit 8

INTERVIEWEE:

I don't either.  It's a good reminder but I'm not gonna give it to [indiscernible].  I don't know.  Hopefully, he'll take it 'cause I don't want it.

Q Is there lights that light upon it?

A Normally, yes.

Q Down on the bottom here when it's working?

A Yes.

Q And you can't turn it on and off.

A Yeah, I can only charge it.  He didn't get a charger with it.

Q Could you have turned it on and off yourself?

A Oh, no.

Q Once it's activated, it's active.

A It's active, yeah.

Q And the one time, you said you cut it off?

A Yeah.

Q How did you cut it off?

A He told me take scissors and cut it and I did.  He was busy doing something and I was going to Lexington to see my [indiscernible] or my nephews right after the other one died.  He couldn't meet me again.  He said, "Just take scissors and cut it."

Exhibit 8

Q                        And then, you ended up giving that one back to him and he gave you another one?

A                        Um hmm.

Q                        Is that on any kind of messages or is that a voice phone call, can you remember?

A                        I think it was a voice call. There might've been some text messages, but somebody had turned off my iCloud and some of my messages didn't get saved from the past.

EASTER:

Alrighty, any other questions from me?

INTERVIEWEE:

No, I don't think so.

Q                        You got both your phones?

A                        Both my phones and my bracelet.

INTERVIEWEE:

This seems crazy, don't it?

EASTER:

I've seen crazier.

INTERVIEWEE:

Have you, okay?

EASTER:

Yeah.

Exhibit 8

INTERVIEWEE:

Thank you, and I appreciate all you're doing.

EASTER:

You're very welcome; and like I said, you know, we'll -- like I told you other day, we'll do our very best to see what's going on.  I mean that's all we can do, but I can assure you that it will be done thorough and done right; and, you know, so you don't have to -- local, town, stuff, you know, then they done [indiscernible] so --

INTERVIEWEE:

Because try to tell people and I've heard just like that was normal and I'm like, "This is not normal.  I know it can't be."

EASTER:

No.

INTERVIEWEE:

Thank you, I appreciate it.

EASTER:

You're welcome.  I will -- like I said, if you have any questions, feel free to give me a call.  If I have questions, I'll probably be calling you.

Exhibit 8

INTERVIEWEE:

I will call and --

EASTER:

See if -- you know, if she wants to -- if she's got information, you can meet and give my phone number, and I'll call her, meet and talk to her, or talk to her on the phone, whatever we need do.

INTERVIEWEE:

I'm gonna try to get ahold of Chad while I'm over there.

EASTER:

Let me know.

INTERVIEWEE:

All right, thank you.

EASTER:

Thank you.

Today's date is February 10th, 2022. It's 10:52. Unable to prep the tape before she came in but present, when she came in, was Detective Justin Cooley and Matt Easter with Attorney General's Office, and it'll be the end of the recording.

<u>Exhibit 8</u>