*Electronically Filed*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**
**CIVIL ACTION NO.  7:22-cv-00007-REW-EBA**

| | |
|---|---|
| **SABRINA ADKINS** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **ESTATE OF JENNIFER HILL** | ) |
| | ) |
|     **PLAINTIFFS** | ) |
| **V.** | ) |
| | ) |
| **BEN FIELDS, Individually** | ) |
| **And in his Official capacity as** | ) |
| **a Deputy Sheriff with the** | ) |
| **Letcher County Sheriff's Department,** | ) |
| | ) |
| **EASTERN KENTUCKY CORRECTIONAL** | ) |
| **SERVICES INC.** | ) |
| | ) |
| **AND** | ) |
| | ) |
| **MICKEY STINES, LETCHER COUNTY** | ) |
| **SHERIFF** | ) |
| | ) |
|     **DEFENDANTS** | ) |

---

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS BEN FIELDS'**
**AND MICKEY STINES' MOTION FOR SUMMARY JUDGMENT**

---

Come the Plaintiffs, Sabrina Adkins ("Ms. Adkins") and the Estate of Jennifer Hill ("Ms. Hill") together ("Plaintiffs") by and through counsel and respectfully submit their Response to Defendants Ben Fields' ("Deputy Fields") and Mickey Stines' ("Mickey Stines" or "Sheriff Stines") Motion for Summary Judgment.

## **INTRODUCTION**

There are at least three women who were violated and sexually abused by Deputy Fields between 2019 and 2022, two of whom are plaintiffs in this lawsuit. Deputy Fields' sexual contact with these women was clearly coerced and nonconsensual - these vulnerable women were all participants in the Letcher County Home Incarceration Program ("HIC"), and were at the mercy of Deputy Fields, who controlled this program. After this lawsuit was filed and the matter was investigated by the Attorney General, Deputy Fields pled guilty to third degree rape and third-degree sodomy due to acting as a peace officer *serving in his official capacity* at the time he raped Plaintiff Sabrina Adkins. KRS 510.060(f); KRS 510.090(f).

Sheriff Stines, the elected official responsible for policymaking at the Letcher County Sheriff's Office ("LCSO"), was admittedly deliberately indifferent in training and supervising Deputy Fields and others within his office, as he freely testified in his deposition as noted *infra*. Sheriff Stines was well aware of the fact that Deputy Fields' actions violated LCSO policies and importantly, Sheriff Stines had actual knowledge of Deputy Fields' bad acts. However, instead of addressing complaints he ignored them. As Plaintiffs' expert Mr. Scott Hilden opined, Sheriff Stines' failures were appalling, and caused the constitutional harm suffered by Ms. Adkins and Ms. Hill.  The LCSO had actual notice of the sexual predatory conduct of Fields during the relevant time period, in December, 2021. During this timeframe Chris Triplett, the fiancé of the late Jennifer Hill, made direct reports to the sheriff office of the sexual extortion, which according to Triplett caused him to be immediately pulled over by LCSO deputies three times.  Because a reasonable juror could find that the LCSO was deliberately indifferent in training and supervising Deputy Fields in this case, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

2

## COUNTER-STATEMENT OF FACTS

### A.  Relevant Background Related To Mickey Stines Prior To Being Elected Sheriff

From 2002 to 2019 Shawn Mickey Stines worked for the Letcher County Sheriff's Office ("LCSO") as a deputy and Court Security Officer ("CSO") for Letcher District Court Judge Kevin Mullins. When first hired by the LCSO, and for a number of years after, Mickey Stines worked as both a road deputy and CSO, but he never attended the Kentucky Department of Criminal Justice Law Enforcement Basic Academy.[1] After some years his time was devoted solely to court security.[2] Beginning in 2004, Stines started working as the home incarceration ("HIC") officer, monitoring all persons on home incarceration in Letcher County for Defendant Eastern Kentucky Corrections Solutions, LLC ("EKCS").[3]

The role of HIC officer and CSO were blurred from the time Mickey Stines held these positions in Letcher County. Stines testified that in his role as HIC officer he was responsible for ensuring that persons abided by the terms of their home incarceration as dictated by the Letcher County Judges.[4] During court hearings, while Mickey Stines was working as a CSO, he would report to the Letcher County Judges regarding violations, and if instructed to do so, would take those persons to Letcher County Jail, located in the basement of the Letcher County Courthouse.[5] Mickey Stines also removed ankle monitors and collected home incarceration fees and issued receipts while court proceedings were ongoing and while he was actively working as a CSO.[6]

Despite knowing that it was the LCSO's policy that "you can't use department's stuff to do other jobs," Mickey Stines recalled using his LCSO vehicle to retrieve HIC equipment for

---

[1] Stines Deposition, D.E. No. 135, Page ID# 1260.
[2] *Id*.
[3] *Id*. at Page ID# 1270.
[4] *Id*. at Page ID# 1272-73.
[5] *Id*. at Page ID# 1273.
[6]  *Id*. at Page ID# 1274-76.

EKCS.[7] If a person on HIC was out of range and not in the permitted physical location, Patty Stockham with EKCS would call Mickey Stines and notify him of the issue.[8] Mickey Stines would then contact the person, identify what was going on, and make verbal reports to the Judge whether there had been a violation to determine if the Judge wanted to give that person a break or revoke her HIC.[9] At all times Patty Stockham has lived several hours away in Greenup County, Kentucky and relied entirely on Mickey Stines, and later Deputy Fields, to relay information back and forth from EKCS and the Letcher County Judges.[10] Patty Stockham, who is EKCS's sole member and sole employee, testified that she had *never once* checked any court records on Courtnet 2.0 (the Kentucky state electronic filing system), had never once communicated with the Kentucky Administrative Office of the Courts, and did not herself maintain copies of court orders detailing HIC terms.[11] Sheriff Stines knew that Deputy Fields would have immense – and unchecked - authority over women on HIC working for EKCS, especially because the role of HIC officer overlapped significantly with the role of CSO. Mickey Stines worked these same roles for approximately fourteen years before handing off both positions to Deputy Fields in 2019 after Stines was elected Letcher County Sheriff.[12]  By utilizing LCSO equipment, including uniforms, guns, and vehicles, Mickey Stines, and later Ben

---

[7] *Id*. at Page ID# 1283-85. Mickey Stines also testified that while he was working as a CSO he had outside employment as a security guard at the hospital, and used his LCSO gun, duty belt, and cruiser in this role as a hospital security guard which would also have violated the LCSO policies at that time. *Id*. at Page ID # 1285-86.
[8] See Deposition of Patty Stockham, attached hereto as **EXHIBIT A**, at pp. 22; 67-68.
[9] Stines Deposition, D.E. No. 135, at Page ID# 1277.
[10] Stockham Deposition, **EXHIBIT A**, at pp. 8, 37-38; 104-05; 112.
[11] Stockham Deposition, **EXHIBIT A**, at pp. 37-38, 44,
[12] Stines Deposition, D.E. No. 135, Page ID# 1294-95, (Stines recommended Fields for position with LCSO); 1309 (Stines recommended Fields for position with EKCS); see also Stockham Deposition, **EXHIBIT A**, at pp. 36, 38-40, wherein Ms. Stockham testified that Deputy Fields was given no documents or training materials by EKCS related to his HIC duties, and all of Deputy Fields' understanding about his duties and responsibilities were based on his training by Sheriff Stines.

Fields, wielded their authority as LCSO deputies in working as HIC officers, blurring the lines between the two roles.[13]

### B.  LCSO Hires Ben Fields

Prior to going to work for LCSO, Ben Fields worked as Assistant Chief Deputy Jailer for the Letcher County Jail, which is in the basement of the Letcher County Courthouse.[14] In the course of being vetted for his position with the LCSO, Deputy Fields admitted that he had sexual contact several times in the Letcher County Courthouse with a female coworker while at work.[15] Admissions from Deputy Fields about having sex in the Letcher County Courthouse while at work were included in the LCSO's personnel file for Deputy Fields produced in discovery in this case. The LCSO made no effort to inquire about Deputy Fields' admissions, which Sheriff Stines agreed was a 'red flag.'[16]

### C.  Sheriff Stines Failed To Train And Supervise Deputy Fields And Acquiesced To Deputy Fields' Misconduct

#### 1.    LCSO Deficient Training And Policies

Sheriff Stines trained Deputy Fields to do HIC for EKCS by showing how the equipment worked, going over all the paperwork, and letting Deputy Fields shadow him while Sheriff Stines was still working as HIC officer.[17] Sheriff Stines was also responsible for training Deputy Fields regarding LCSO policies and procedures. The only evidence of anything akin to training on the LCSO's policies is a form signed by Deputy Fields five (5) months after he was hired, confirming that he had received a copy of the LCSO policy manual.[18] Deputy Fields was never

---

[13] EKCS acknowledged the benefits of having LCSO deputies act as HIC officers. In discussing a person on HIC who had not paid his fees, with Deputy Fields, Ms. Stockham stated, "but you are threatening them with jail. I couldn't do that. Lol." See text exchange attached hereto as **EXHIBIT B**.

[14] Fields' Deposition, D.E. No. 133, Page ID# 793-95.

[15] *Id*. Page ID# 786-87.

[16] Stines Deposition, D.E. No. 135, Page ID# 1299 -1300.

[17] *Id*. at Page ID# 1310.

[18] See Form at D.E. No. 136-6, Page ID# 1498.

5

required to affirm that he actually *read* or *understood* such policies, and he never received any training whatsoever on LCSO's policies.[19] No training was provided despite being explicitly required by the policies. Sheriff Stines offered no explanation for these deficiencies.

The LCSO policies relevant to this case are as follows:

**LCSO Sexual Misconduct Policy**[20]

This policy defines "criminal sexual misconduct" as the

"abuse of authority by a law enforcement officer for sexual purposes that violates the law.[21] A police officer/sheriff's deputy shall not engage in sexual contact with another person who is in the custody of law and such officer has supervisory or disciplinary authority over such person."[22]

The policy has a mandatory reporting requirement, mandating initiation of an investigation upon receipt of a report of sexual misconduct.[23] Finally, the policy provides that, "[a]ll sworn officers of this department including supervisors will receive specific training about the elements of sexual misconduct involving law enforcement officers. The training will also include all elements of this policy."[24]

Sheriff Stines never provided any training on the LCSO Sexual Misconduct policy whatsoever,[25] and as detailed *infra*, despite receiving complaints about Deputy Fields' sexual misconduct, Sheriff Stines and the LCSO failed to timely investigate or otherwise address this sexual misconduct.

---

[19] Stines Deposition, D.E. No. 135, Page ID# 1330.
[20] See LCSO Sexual Misconduct Policy, attached hereto as **EXHIBIT C**.
[21] *Id*. at Section III(A).
[22] *Id*. at Section IV(D).
[23] *Id*. at Section IV(F).
[24] *Id*. at Section IV(E).
[25] See Stines Deposition, D.E. No. 135, Page ID# 1340-41.

### LCSO Secondary Employment Policy[26]

LCSO's Secondary Employment Policy includes a definition for "extra duty details," whereby a deputy performs "law enforcement duties" "within the scope of his job classification," and in such circumstance the secondary employer must apply to the LCSO for approval of a permit to secure the services of the deputy.[27] Alternatively, "outside employment" is permitted where the position "does not conflict with their official duties," and is "[e]mployment of a non-police nature" that "provides no real *or implied* law enforcement service to the employer and is not performed during assigned hours of duty."[28] Extra duty details require a permit be obtained by the outside employer, and compensation paid to the LCSO pursuant to a contract.[29] For "outside employment," deputies were required to obtain a permission form from the LCSO detailing the outside employment and stating that, "no aspect of the employment could be considered questionable in nature such as placement in compromising situations, use of police powers, or have the potential to discredit the Department."[30] Deputies are also required to affirm that "the services rendered will not be connected with security work, investigations, or collection or repossession of property and will not involve any law enforcement duties."[31] Deputies must obtain written approval annually for this secondary employment.

Sheriff Stines could not recall a *single time* that any deputy ever sought approval for outside employment consistent with the policy.[32] This is confounding, because Sheriff Stines obviously knew that Deputy Fields had outside employment as an HIC officer for EKCS - *Sheriff*

---

[26] See LCSO Secondary Employment Policy attached hereto as **EXHIBIT D**.
[27] *Id*. at Section II, III(A).
[28] *Id*. at Section II, III(B), emphasis added.
[29] *Id* at Section IV(A)
[30] *Id*. at Section IV(B)(a)(d).
[31] *Id*. at Section IV(B)(e).
[32] Stines Depo., D.E. No. 135, Page ID# 1331-32.

*Stines himself trained Deputy Fields for this secondary employment*, which clearly conflicted with his official duties and qualified as an implied, if not actual, law enforcement service.

When he was a deputy CSO and home incarceration officer, Mickey Stines had persons on home incarceration meet him in the Letcher County Courthouse every Wednesday to confirm that ankle monitors were working properly and to collect weekly HIC fees.[33] Sheriff Stines trained Deputy Fields to do the same.[34] Both Sheriff Stines and Deputy Fields admitted that they performed home incarceration services while in their LCSO uniforms, while driving their LCSO vehicles, and while working in the courthouse as CSO.[35] All of Ben Fields' victims confirmed that every time they saw him he was wearing his LCSO uniform, and driving his LCSO official vehicle. This dangerous practice blurred the lines between Fields' law enforcement duties as deputy and CSO, and his law enforcement duty as HIC officer.

LCSO's Training Directive policy identifies "sexual harassment/external sexual misconduct by officers" as a "high-risk critical task in law enforcement" requiring annual training, along with "off duty conduct of officers/Off-duty paid details," and "complaints and internal affairs investigations."[36] No documentation of this requisite training was maintained in the LCSO's files. The LCSO was not accredited, and these policies (all dated 2007) were never updated or revised during Sheriff Stines's tenure.[37]

The LCSO's Internal Affairs/Citizen Complaints Policy further requires that all complaints be accepted, documented, processed and investigated.[38] This policy was not

---

[33] *Id.*, at Page ID# 1310.
[34] *Id.*
[35] Stines Deposition, D.E. 135, Page ID# 1314-16; Fields Deposition, D.E. 133, Page ID# 827-28 (testifying that he performed services for EKCS while wearing his uniform, badge, and while carrying a gun issued by LCSO and he was aware of no policy forbidding him to do so); Ms. Adkins Deposition, D.E. No. 134, Page ID# 1088-89).
[36] See LCSO Training Directive Policy, attached hereto as **EXHIBIT E**, Section IV.
[37] Stines Deposition, D.E. No. 135, Page ID# 1293-94, 1328.
[38] See LCSO Internal Affairs/ Citizen Complaints Policy, attached hereto as **EXHIBIT F**.

followed.[39] Instead it was Sheriff Stines' practice that anybody who wanted to complain had to do so in person, and to him directly.[40]

### 2.    LCSO Deficient Management And Supervision

Sheriff Stines conceded that he set a "horrible" example for the deputies working under his supervision and management.[41] He created a culture within the LCSO that enabled and encouraged Deputy Fields' misconduct at issue in this litigation.

Sheriff Stines often hosted parties at his house and invited his male deputies working as CSOs to play poker.[42] Female employees of the LCSO were not extended invitations. Deputy Fields and another CSO, Deputy Eckels, attended parties throughout 2021.[43] LCSO Deputies regularly exchanged crude and sexual materials throughout the workday.[44] Sheriff Stines also participated in and encouraged the exchange of crude and sexist jokes throughout the workday and into the evenings.[45] This included jokes about detainees' sexual preferences.[46] Deputy Eckels, who worked alongside Deputy Fields as a CSO in the Letcher County Courthouse testified that he and Sheriff Stines, along with Judge Mullins and others in the courthouse, referred to ankle monitors as "Ben bands," referring to it a "fashionable part of any wardrobe."[47]

### 3.    LCSO Ignores Reports Of Deputy Fields' Sexual Misconduct

LCSO and Sheriff Stines were aware of Ben Fields' actions and intentionally ignored complaints. While Ms. Adkins and Ms. Hill are the only Plaintiffs named in this action, they are

---

[39] Stines Deposition, D.E. No. 135, Page ID# 1350.
[40] *Id*. at Page ID# 1348 ("I am the boss. If anybody comes in to complain, I want to talk to them.").
[41] *Id*. at Page ID# 1383.
[42] Stines Deposition, D.E. No. 135, Page ID# 1295-97.
[43] Fields Deposition, D.E. NO. 133, Page ID# 833-85; see Deposition of Jason Eckels, attached hereto as **EXHIBIT G**, at pp. 11-12.
[44] See **EXHIBIT H**, attached to Ben Fields' Deposition as Exhibits 9-11.
[45] See **EXHIBIT I**, attached to Sheriff Stines' deposition as Exhibits 10 -16.
[46] *Id*. at p. 10.
[47] Eckels deposition, **EXHIBIT G**, at pp. 51-52.

not the only victims of Deputy Fields. Before Ms. Adkins or Ms. Hill were put on home incarceration and subjected to abuse by Deputy Fields, another woman, identified here as B.C., was victimized.[48] In the course of the Kentucky Attorney General's investigation that ultimately led to criminal charges against Deputy Fields, B.C. confirmed that her mother had talked to Sheriff Stines about Ben Fields' unlawful actions, to no avail.[49] Furthermore, in December 2021 Chris Triplett became aware of Deputy Fields' abuse of Ms. Hill, attesting that:

> Deputy Fields parked his cruiser behind the home of [Mr. Triplett] and Ms. Hill, told her "if you don't do what I say, I will put you back in jail," and commanded her to perform oral sex on him in his cruiser, which she did. [Mr. Triplett] further states that Deputy Fields returned several days later and commanded Ms. Hill to submit to sexual intercourse with him under his threat.[50]

Thereafter Mr. Triplett called the LCSO and reported Ben Fields' abuse of Ms. Hill and after his initial complaint was ignored, he went to the LCSO to complain about Deputy Fields in person.[51] He was not only ignored but retaliated against for making his complaint.[52]

> This harassment included pulling over [Mr. Triplett's] car three separate times for no legitimate reason within an approximately 12-hour period immediately following [Mr. Triplett] reporting the misconduct of Deputy Fields. On one of these pullovers [Mr. Triplett] states that a deputy followed his car into an extremely remote area at dusk, made him get out of the car and strip down to his underwear, performed a warrantless search of the car without [Mr. Triplett's] consent, and made [Mr. Triplett] fear for his life. [Mr. Triplett] believes these tactics by the deputies were meant to humiliate and harass him in retaliation for reporting Deputy Fields' misconduct.[53]

---

[48] Out of respect for this individual we are using only her initials.
[49] See **EXHIBIT J**, recording of interview with B.C., conventionally filed, at 15:00 to 15:30, 18:30 - 21:14.. B.C. described how Deputy Fields grew more friendly over time after she started on HIC, messaging her on Facebook messenger and snapchat and making comments about her looks and things he wanted to do to her sexually. In June 2020 Deputy Fields kissed and touched B.C. without her consent in the Letcher County courthouse, while she was on HIC. On or about August 5, 2021, B.C.'s mother spoke to Sheriff Stines and complained that Deputy Fields refused to let B.C. remain on HIC after Deputy Fields kissed B.C. while in custody and she refused his sexual advances. Sheriff Stines took no action to address or otherwise inquire about this complaint.
[50] See Chris Triplett Affidavit, attached hereto as **EXHIBIT K**, at paragraph 4.
[51] Id. at paragraphs 4-5.
[52] Id. at paragraphs 6-8.
[53] Id.

Mr. Triplett's account is corroborated, as on December 15, 2021, at 3:41 p.m. he was pulled over in Whitesburg by LCSO Deputy Norris for having a tinted license plate cover, a charge that was later dismissed.[54] Mr. Triplett was pulled over a total of three times that day, and it was evident this was retaliation for reporting Deputy Fields' misconduct.[55] Mr. Triplett attested that the LCSO refused to file a report documenting his complaint.[56] In deposition testimony it was confirmed that the LCSO refused to accept sexual misconduct complaints, instead insisting that complaints of any kind be made verbally and directly to Sheriff Stines (who, at least when Mr. Triplett made his complaints, was not available or made available).[57] This practice is inconsistent with the LCSO's own policies, which mandate that "[a]ny employee of this Department, who is made aware of any violation of this policy, is required to report the violation to their supervisor," who then must report same to the command level personnel having Internal Affairs responsibility."[58] This never occurred.  Letcher County courthouse personnel were also notified of Deputy Fields' sexual misconduct related to B.C. and Ms. Adkins and were provided text messages evidencing same. According to Sheriff Stines' testimony, these officials did not share this complaint and evidence with Sheriff Stines until after Ms. Adkins filed her federal civil rights complaint on January 31, 2022.[59]

### 4. Ms. Adkins And Ms. Hill Are Victimized By Deputy Fields

Both Ms. Adkins and Ms. Hill were arrested in Letcher County, Kentucky and spent time in the Letcher County Jail on drug related charges. Despite having this in common, the two women did not know each other until after this lawsuit was filed in early 2022.

---

[54] Triplett Citation, attached hereto as **EXHIBIT L**.
[55] **EXHIBIT K** at Paragraph 7.
[56] *Id*. at Paragraph 6.
[57] Stines depo, D.E. No. 135, Page ID# 1348.
[58] **EXHIBIT C**, at Section IV(F).
[59] Stines' Deposition, D.E. No. 135, Page ID# 1394-95.

Sabrina Adkins was arrested in Letcher County in April 2021 and was released on home incarceration in early June 2021.[60] Ms. Adkins did not know Deputy Fields prior to June 2021, but she had heard about him while in the Letcher County Jail.[61]  On June 18, 2021, Ben Fields came to the Letcher County Jail and put an ankle monitor on Ms. Adkins, and told her to go to her residence, which at that time was her boyfriend Stacy Yates' home in the community of Jeremiah.[62] Later that afternoon Ben Fields returned to see Ms. Adkins, driving a LCSO patrol car and accompanied by LCSO deputy Jason Eckels, both in uniform.[63] Deputy Fields brought Ms. Adkins cigarettes and flirted with her.[64] Ms. Adkins was upset because she was not sure how she was going to be able to afford the ankle monitor going forward and had been kicked out of the house by Mr. Yates.[65] Deputy Fields told Ms. Adkins that he could help her and could work something out with her to make sure she didn't have to go back to jail.[66] Ms. Adkins had heard at the Letcher Co. Jail that Deputy Fields traded sexual favors in exchange for waiving house arrest fees, and understood him to be asking for sexual favors.[67]

On approximately August 2, 2021, Deputy Fields asked Ms. Adkins to meet him at the Letcher County Courthouse after hours and took her to Judge Mullins private chambers.[68] Ms. Adkins was upset and crying because she had relapsed on drugs and could not afford the home incarceration fees. Deputy Fields took her ankle monitor off and told her she didn't have to wear it anymore.[69] From that day forward Deputy Fields had Ms. Adkins meet him at the Letcher

---

[60] Adkins Deposition, D.E. No. 134, Page ID#1037.
[61] *Id.,* at Page ID# 1051.
[62] Adkins Depo, D.E. No. 134, Page ID# 1041-42; see also **EXHIBIT M**, Adkins ankle monitor report.
[63] Adkins Deposition, D.E. No. 134, Page ID# 1042-43; Eckels Deposition, **EXHIBIT G**, at page 44-45.
[64] Adkins Deposition, D.E. No. 134, Page ID# 1048-49.
[65] *Id*. at Page ID# 1048-49.
[66] *Id* at Page ID# 1050-51.
[67] *Id*. at Page ID # 1051-54.
[68] *Id*. at Page ID# 1059.
[69] See **EXHIBIT M**, ECKS records which show that Ms. Adkins was on HIC June 18, 2021, through August 2, 2021, despite Letcher County court records showing that she remained on HIC through January 2022.

County Courthouse in the evenings before her court dates to put a "dummy bracelet" back on her ankle to maintain appearances.[70] Afterward, when she would be instructed to meet Deputy Fields at the courthouse, his demands escalated from comments to forcible kissing to oral sex, and finally to rape.[71] Ms. Adkins described herself as "scared" during these exchanges, which included "forceful kissing" which was not consensual.[72] This occurred approximately four times, between August and December, 2021.[73] Ms. Adkins understood that if she did not engage with Deputy Fields sexually she would have to go back to jail and could be charged by Deputy Fields with escape - which is exactly what eventually happened.

Records obtained from EKCS make clear that when Deputy Fields decided to give Ms. Adkins a "dummy bracelet" he simply told EKCS that Ms. Adkins had been taken off HIC in Letcher County.[74] As Deputy Fields and Sheriff Stines well knew, EKCS never bothered to check court records or otherwise follow up with the Letcher County Judges and court system. This was the same tactic Deputy Fields used with B.C. in 2020, without consequence. In January 2022 Judge Craft, the Circuit Judge, inquired about Ms. Adkins' location on HIC. This was problematic for Deputy Fields, who then swore out a false complaint alleging that Ms. Adkins had escaped from HIC, which resulted in a charge and arrest warrant.[75] Ms. Adkins was arrested on January 26, 2022, in Pike County, Kentucky for escape. This charge was later dismissed after this federal civil rights complaint was filed and after Deputy Fields pleaded guilty to criminal charges related to wrongful arrest.

---

[70] Adkins Deposition, D.E. No. 134, Page ID# 1059-61.
[71] *Id*. at Page ID# 1061.
[72] *Id*. at Page ID# 1062, 1064, 1074, 1123,
[73] *Id.* at Page ID# 1064-68.
[74] See **EXHIBIT M**, Ben Fields Guilty Plea, attached hereto as **EXHIBIT N**.
[75] **EXHIBIT O**, Criminal Complaint for escape against Sabrina Adkins, signed by Deputy Fields in his capacity as a LCSO Deputy.

As to Ms. Hill, Deputy Fields' approach was different. In 2020 Ms. Hill was on HIC and Deputy Fields made statements to her about exchanging sexual favors for leniency on HIC, but Ms. Hill refused and was arrested soon thereafter.[76] Ms. Hill was again on HIC from September 2, 2021 to October 20, 2021.[77] During this time period Deputy Fields started harassing Ms. Hill about where she was living; at one point showing up at her home with Sheriff Stines.[78] Deputy Fields later started showing up at her house demanding sexual favors and threatening to arrest Ms. Hill if she did not comply with his demands.[79] Ms. Hill took the threat seriously based on her past arrests and dealings with Deputy Fields. Ms. Hill was coerced into performing sexual intercourse with Deputy Fields approximately three times, until she was taken back to jail for allegedly violating the terms of her HIC in late October 2021.[80] Ms. Hill was in jail from late October 2021 until mid-December 2021 when she was released. It was around this time that Chris Triplett reported Deputy Fields' harassment of Ms. Hill to the LCSO.

After this federal civil rights case was filed, the Kentucky Attorney General's office investigated Ben Fields, and this investigation ultimately led to charges and an indictment. Deputy Fields was indicted for:

Charge 1: Rape, 3rd Degree KRS 510.060 *(related to Ms. Adkins)*
Charge 2: Rape, 3rd Degree KRS 510.060 *(related to Ms. Hill)*
Charge 3: Sodomy, 3rd Degree KRS 510.090 *(related to Ms. Adkins)*
Charge 4: Sodomy 3rd Degree KRS 510.090 *(related to Ms. Hill)*
Charge 5: Tampering with Prisoner Monitoring Device, KRS 519.070 *(related to Ms. Adkins)*
Charge 6: Tampering with Prisoner Monitoring Device, KRS 519.070 *(related to Ms. Hill)*
Charge 7: Tampering with Prisoner Monitoring Device, KRS 519.070 *(related to B.C.)*

---

[76] Attorney General Interview Recording of Jennifer Hill, attached hereto as **EXHIBIT P**, conventionally filed, at 5:00 – 5:52.
[77] *Id*. at 6:05 – 8:12; see also records showing Hill's completion of house arrest in 2021, attached hereto as **EXHIBIT Q**.
[78] *Id*. at 13:05 - 13:36.
[79] *Id.* at 13:36 – 15:05.
[80] See Hill Recording; Triplett Affidavit, **EXHIBIT K**, at Paragraph 3-4.

Charge 8: Perjury, 2nd Degree, KRS 523.030 *(related to Ms. Adkins)*[81]

Jennifer Hill died of a drug overdose on January 19, 2023, and Charges 2, 4, and 6 related to Ms. Hill's complaints were ultimately dismissed. Deputy Fields signed a plea agreement on September 28, 2023,[82] pleading guilty to all of the charges related to Ms. Adkins and B.C. He was sentenced on January 4, 2024, and served six (6) months in the Letcher County Jail where he was given special privileges as a "trustee," and was supervised by some of the same deputy jailers who he had previously supervised when he was working there as Chief Deputy Jailer.[83]

In 2024 this case proceeded through discovery, and in September 2024 Deputy Fields and Sheriff Stines were deposed. Three days after Sheriff Stines was deposed in this case, he was arrested for the murder of Letcher District Court Judge Kevin Mullins, who was reportedly shot eight times in his chambers. While failing to elaborate, Sheriff Stines' attorneys in his criminal murder case have made public statements claiming that this federal civil rights case is related to the shooting.

### 5. Scott J. Hilden Expert Report

On February 3, 2025, Plaintiffs filed the expert report of Scott Hilden, a veteran law enforcement professional with thirty two (32) years of experience in leadership.[84]  After reviewing all of the deposition testimony, and important documents, Mr. Hilden concluded that Sheriff Stines and the LCSO systematically failed to train deputies on key issues including sexual misconduct, ethical behavior, complaint handing and professional standards, which "created a permissive environment where deputies operated without clear boundaries or

---

[81] Deputy Fields' Indictment, attached hereto as **EXHIBIT R**.
[82] See Plea Agreement attached hereto as **EXHIBIT N**.
[83] Fields Deposition, D.E. No. 133, Page ID# 796-800.
[84] See Hilden Expert Report, at D.E. No. 131-1, Page ID# 666-67.

accountability," and which was a significant factor in enabling Deputy Fields' misconduct.[85] Sheriff Stines and the LCSO allowed Deputy Fields to misuse department resources, engage in unauthorized secondary employment, and failed to hold him accountable even despite complaints made about Deputy Fields' conduct.[86]  As to the LCSO's responsibility and failings, Mr. Hilden concluded:

> Deputy Fields' misconduct was directly facilitated by the overlap between his role as a deputy sheriff and his duties with the Eastern Kentucky Corrections Services. He wore his department-issued uniform, used his police vehicle, and leveraged his law enforcement authority to coerce individuals under his supervision. This misuse of departmental resources and authority highlights a lack of oversight and accountability by the sheriff's office, contributing to the misconduct. This lack of oversight, enforcement of ethical guidelines, and accountability mechanisms allowed this overlap to persist, enabling Deputy Fields to exploit his position.[87]

This "culture of indifference," which normalized and even encouraged inappropriate behavior, created an environment where Deputy Fields' abusive behavior flourished.[88]

## STANDARD OF REVIEW

The moving party bears the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. C*hao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating that there is a genuine issue in dispute. *Chao*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).  The Court then must determine "whether the evidence presents a

---

[85] *Id*. at Page ID# 693.
[86] *Id*.
[87] *Id*. at Page ID# 694.
[88] *Id*.

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

## ARGUMENT

### I.    DEPUTY FIELDS' ACTS AND OMISSIONS WERE WITHIN THE SCOPE OF HIS OFFICIAL DUTIES

Defendants assert that Deputy Fields' acts were outside the scope of his official duties, and as such the LCSO cannot be liable for such acts under KRS 70.040.[89]

KRS 70.040 plainly provides that, "[t]he sheriff shall be liable for the acts or omissions of his deputies except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section." The Kentucky Supreme Court has made clear that, "[w]e opine that the sheriff in his official capacity (the office of sheriff) has official immunity for tortious acts committed by his deputies, **but that KRS 70.040 waives said immunity for that office**." *Jones v. Cross*, 260 S.W.3d 343, 344 (Ky. 2008) (emphasis added).

Deputy Fields clearly acted within the scope of his official duties and in his official capacity. He pled guilty to violating KRS 510.060 (rape 3rd Degree) and KRS 510.090 (Sodomy 3rd Degree). He testified that he pled guilty to these charges because he was guilty of these charges.[90] KRS 510.060(a)-(c) and KRS 510.090(a)-(c) are all irrelevant to this case because they concern sexual intercourse with victims who are eighteen (18) years old or younger. KRS 510.060(d) and KRS 510.090(d) are likewise irrelevant because Deputy Fields was never acting as a "an employee, contractor, vendor, or volunteer of the Department of Corrections,

---

[89] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, D.E. No. 136-1, Page ID# 1458-59.
[90] Ben Fields Deposition, D.E. No. 133, page ID# 971-72.

17

Department of Juvenile Justice, or a detention facility as defined in KRS 520.010," nor was he working for an entity "under contract with" any such department or facility. Deputy Fields pled guilty and testified that he was guilty of violating KRS 510.060(f) and KRS 510.090(f) because he was a "peace officer" who "*while serving in his official capacity*," subjected Ms. Adkins to sexual intercourse despite knowing that she was "under arrest, held in custody, or being investigated for commission of a traffic or criminal offense." (emphasis added). KRS 510.060(f), KRS 510.090(f).  Deputy Fields always interacted with Ms. Adkins, Ms. Hill, and B.C. wearing his LCSO deputy uniform and while driving his official LCSO vehicle. In seeking escape charges against Ms. Adkins, he falsely claimed that she, "escaped from custody when the Offender failed to report to the Letcher County Sheriff's Office as directed while placed on the home incarceration program," signing the complaint "Ben Fields, LCSO."[91] Deputy Fields was clearly acting on behalf of the LCSO and "in his official capacity" at the times he deprived Ms. Adkins of her Constitutional rights protected by the Fourth and Fourteenth Amendments.

Defendants' cite to KRS 61.310(4), and the fact that police officers are allowed to seek private employment, miss the mark. While peace officers may seek outside employment this right is not unqualified. As the Defendants recognize such private employment cannot interfere with the performance of LCSO duties, and "[i]t is widely recognized that the rights of public employees may be abridged in the interest of preventing conflicts with official duties or promoting some legitimate interest of the governmental employer." *Puckett v. Miller*, 821 S.W.2d 791, 793 (Ky. 1991). As noted above, LCSO's own policies provide that secondary employment is permissible so long as it follows consistent processes and guidelines designed to safeguard both the department and the public. Sheriff Stines and the LCSO wholly failed to

---

[91] See **EXHIBIT O**.

enforce this policy, which directly contributed to the harm caused to Plaintiffs in this case. If anything, these statutes and policies reinforce liability against the Defendants, and in no way absolve Deputy Fields or the LCSO.

## II.    MS. ADKINS AND MS. HILL DID NOT CONSENT TO DEPUTY FIELDS' SEXUAL CONTACT

Defendants devote significant time to arguing that Ms. Adkins and Ms. Hill have no Fourth or Fourteenth Amendment claims against Defendants because their interactions with Deputy Fields were uncoerced, voluntary, and consensual.[92] This position is absurd and offensive, as the Sixth Circuit made clear in *Hale v. Boyle Cnty.,* 18 F.4th 845 (6th Cir. 2021). Citation to this controlling decision is glaringly absent from the Defendants' memorandum.

Recognizing the power disparity between detained persons and law enforcement, the Sixth Circuit applies a rebuttable-presumption framework in cases involving sexual conduct between law enforcement and incarcerated persons. Under this framework, a court presumes that "the conduct was not consensual." *See Hale*, 18 F.4th at 854 (quoting *Wood v. Beauclair*, 692 F.3d 1041, 1047 (9th Cir. 2012)). Because the court presumes non-consent, "the defendant must affirmatively show that the incarcerated person consented." *Id.* A defendant shows that the incarcerated person consented by establishing that the conduct "involved no coercive factors." *Id.*

In *Hale*, a female pretrial detainee was transported from the detention center where she was housed to court for hearings by CSO Pennington. *Id.* at 848. During these transports Ms. Hale and CSO Pennington had oral sex and sexual intercourse on a number of occasions. *Id.*, at 849-51. CSO Pennington purchased cigarettes and snacks for Ms. Hale and told her he would try

---

[92] See Defendants' Memorandum of Law in Support of Motion for Summary Judgment, D.E. No. 136-1, Page ID# 1459-61.

to help her with her criminal case. *Id.* Ms. Hale, who ultimately gave birth to CSO Pennington's child, even testified that she believed Mr. Pennington was her boyfriend and that she enjoyed their sexual contact. The Sixth Circuit found that Hale presented genuine issues of material fact about whether her encounters with Mr. Pennington were consensual. Specifically, the Court found that the gifts, privileges, and statements made by CSO Pennington regarding assisting Ms. Hale with her criminal case were sufficient evidence of coercion to create genuine issues of material fact. *Id.*, at 854. There is ample evidence that Deputy Fields coerced Ms. Adkins and Ms. Hill in this instance, and Deputy Fields cannot overcome the rebuttable presumption as established in *Hale*. Plaintiffs did not consent to Deputy Fields' actions, and Defendants are not entitled to summary judgment as to Counts I and II as asserted.

## III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS' COUNT III: DELIBERATE INDIFFERENCE/ FAILURE TO SUPERVISE AND TRAIN

Plaintiffs have developed facts upon which a reasonable jury could find that Sheriff Stines and the LCSO wronged Ms. Adkins and Ms. Hill.[93] Defendants put forth a cascade of arguments in support of their motion for summary judgment as to Count III, many of which baldly ignore genuine issues of material fact and controlling case law. Defendants would have this Court believe that Deputy Fields' sexual encounters and interactions were uncoerced and entirely consensual; that Deputy Fields' actions were wholly divorced from his work as a LCSO deputy; that Sheriff Stines doggedly trained deputies on the LCSO's robust policies; and that Sheriff Stines had no actual or implied knowledge of what Deputy Fields was up to until after

---

[93] Defendants make arguments related to qualified immunity. Plaintiffs' Count III asserts a claim against the LCSO and Sheriff Stines in his official capacity as the sole policymaker for the LCSO. Qualified immunity does not apply to *Monell* claims. As such Plaintiffs disregard such arguments advanced by Defendants.

this lawsuit was filed. The evidence bears out a much different story, as noted *supra*, creating genuine issues of material fact which foreclose summary judgment in Defendants' favor.

"To succeed on [a failure to train and supervise] claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)); see also *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To prove a policy or custom of acquiescence, a party must show:

> (1) the existence of a clear and persistent pattern of [wrongdoing];
>
> (2) notice or constructive notice on the part of the [municipal body];
>
> (3) the [municipal body]'s tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the [municipal body]'s custom was the "moving force" or direct causal link in the constitutional deprivation.

*Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 508 (6th Cir. 1996). Notably, although the two theories (inadequate training and acquiescence) differ in some ways, they both require deliberate indifference and causation. Moreover, there are generally two situations which can justify a finding of deliberate indifference or failure to train or supervise: (1) where training and supervision is deficient in light of foreseeable consequences that could result from a lack of instruction or supervision; and (2) where the municipality fails to act in response to complaints of constitutional violations by its officers. *Ellis ex rel. Pendergrass v.*

*Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006). Examples of deliberate indifference include "fail[ing] to provide adequate training in light of foreseeable consequences that could result from a lack of instruction" or failing to respond to "complaints of constitutional violations." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

*Russo v. City of Cincinnati,* 953. F.2d 1036 (6th Cir. 1992), is instructive. In *Russo* the plaintiffs alleged that the City of Cincinnati failed to adequately train its officers, which led to the use of excessive force and plaintiff's decedent's death. The Sixth Circuit reversed the lower court's grant of summary judgment as to the plaintiff's municipal liability claim, noting that in-service training was virtually non-existent, procedures were deficient, and expert testimony concluded that the this training was constitutionally inadequate, the result of deliberate indifference, and that this inadequacy may have caused the harm at issue in that case. *Id.*, at 1047. In the instant case, the supervision and training at issue was not merely deficient, it was non-existent. Sheriff Stines knew that Deputy Fields was working as a HIC officer in the courthouse, using his LCSO uniform and official vehicle – *because Sheriff Stines trained him to do this, and did it himself when he was in the same role*. Such actions violated the LCSO's policies – *but were wholly disregarded by Sheriff Stines himself as well as by his deputies*. Having served in the same role as HIC officer himself, Sheriff Stines knew full well that Deputy Fields had complete discretion and zero oversight from EKCS as HIC officer. Sheriff Stines created a toxic work environment where he permitted – *and even encoura*ged – sexist and crude behavior that Sheriff Stines himself admitted were "horrible" and in violation of the LCSO's own policies. Sheriff Stines received at least two reports that Deputy Fields was having improper relations with women on HIC and *chose to ignore such reports* and instead retaliate against one complainant, Mr. Triplett. The LCSO had a wholly deficient procedure for reporting sexual

22

misconduct, refusing to take written complaints and requiring that any complaints be made verbally to Sheriff Stines personally. This evidence, along with the expert opinion of Mr. Scott J. Hilden, is sufficient to raise genuine issues of material fact which foreclose summary judgment.

Cases cited by Defendants are distinct and inapposite. In *Campbell v. Anderson County*, 695 F. Supp. 2d 764 (E.D. Tenn. 2010) the plaintiff did not allege that the county had a custom of allowing sexual assaults by its officers, or that the county lacked adequate policy prohibiting criminal behaviors by its officers. *Id*. at 772.[94] Instead, the plaintiff took issue with the county's practice of using reserve officers to transport females without supervision. Summary judgment was granted based on a finding that the plaintiff had no evidence that the county knew of a pattern of violations related to this practice. *Id. Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir.1998), also cited by Defendants, similarly dismissed municipal liability claims where there was no evidence of notice to the municipality of violations of policies and inadequate training. While it may be generally true that refraining from raping women in custody should be obvious to law enforcement officials, in light of the circumstances and information available to the LCSO in this case, the LCSO was sufficiently on notice that additional training was necessary to prevent constitutional violations; yet LCSO was deliberately indifferent to this obvious need for training and supervision.

In the case *sub judice* it was obvious to Sheriff Stines that Deputy Fields was committing sexual misconduct because he had been specifically advised of such, and despite such knowledge he failed to investigate, train, or supervise Deputy Fields. The consequences of Sheriff Stines' acquiescence and failure to train were foreseeable, and these actions and inactions support a finding of deliberate indifference and municipal liability in this case.

---

[94] Cited at Defendants Memorandum, D.E. No. 136-1, Page ID# 1465.

## IV.    PLAINTIFFS STATE LAW CLAIMS AGAINST DEFENDANT FIELDS

Defendants moved for summary judgment as to Counts IV, V, and VI of the Second

Amended Complaint to the extent these claims are alleged against Defendant Fields in his

official capacity. Defendants ignore the fact that KRS 70.040 imposes liability against the LCSO

for Deputy Fields' state law tort claims as discussed in greater detail *supra*. The General

Assembly has waived governmental immunity for sheriffs' offices based on the underlying

conduct of a deputy. KRS 70.040; *Jones v. Cross*, 260 S.W.3d 343, 346 (Ky. 2008). While the

Defendants' brief does not allege that Deputy Fields enjoyed qualified official immunity for his

sexual misconduct and wrongful arrest of Ms. Adkins in this case, such immunity cannot attach

where his actions were clearly not performed within the scope of his discretionary authority and

were not taken in good faith. *See Sheehy v. Volentine*, No. 2023-SC-0129-DG, 2024 WL

5180785, at *10 (Ky. Dec. 19, 2024). Therefore, summary judgment is not appropriate where

governmental immunity has been waived as to these tort claims by KRS 70.040.

## CONCLUSION

Plaintiffs are entitled to their day in court. As demonstrated herein, summary judgment is

not warranted because genuine issues of material fact exist regarding the LCSO's actions and

inaction, by and through its policymaker Sheriff Stines, which amount to deliberate indifference.

Respectfully submitted,

/s/ Bethany N. Baxter
JOE F. CHILDERS
BETHANY N. BAXTER

CHILDERS & BAXTER, PLLC
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
Telephone: (859) 253-9824

24

Facsimile: (859) 259-1909
joe@jchilderslaw.com
bethany@jchilderslaw.com

COUNSEL FOR SABRINA ADKINS AND
THE ESTATE OF JENNIFER HILL
NED PILLERSDORF
PILLSERDORF LAW OFFICES
124 West Court Street
Prestonsburg, Kentucky 41653


### CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, a copy of the foregoing was served

electronically in accordance with the method established under this Court's CM/ECF

Administrative Procedures and Standing Order upon all parties in the electronic filing system in

this case.


/s/ Bethany N. Baxter
COUNSEL FOR PLAINTIFF