UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION
CIVIL ACTION NO. 7:22-CV-00007-REW-EBA


SABRINA ADKINS AND
THE ESTATE OF JENNIFER HILL                PLAINTIFFS


VS:       DEPOSITION OF LASHAUNA FRAZIER

BEN FIELDS, individually
And in his Official capacity as
a Deputy Sheriff with the
Letcher County Sheriff's Department

EASTERN KENTUCKY CORRECTIONAL
SERVICES, INC.

AND

MICKEY STINES, LETCHER COUNTY
SHERIFF                                    DEFENDANTS


* * * * * * * * * * *

The Deposition of LASHUNA FRAZIER was taken

on behalf of Plaintiff on January 15, 2025 via Zoom.

Said deposition was taken pursuant to

notice, previously filed, and is to be used for

purposes of discovery and all other purposes

permitted by the Rules of Civil Procedure.

APPEARANCES


ON BEHALF OF PLAINTIFF:

                    HON. BETHANY BAXTER
                    HON. JOE CHILDERS
                    301 WEST SHORT STREET, STE 300
                    LEXINGTON, KY 40507
                    bethanybaxter@jchilderslaw.com


on BEHALF DEFENDANTS:

                    HON. JONATHAN SHAW
                    P.O. DRAWER 1767
                    PAINTSVILLE, KY 41240
                    jshaw@psbb-law.com


                    HON. JASON WILLIAMS
                    303 SOUTH MAIN STREET
                    LONDON, KY 41743
                    jason@wftlaw.com

ALSO PRESENT:     SABRINA ADKINS

                  INDEX

CAPTION PAGE . . . . . . . . . . . . . 1

APPEARANCES AND INDEX. . . . . . . . 2

DIRECT EXAMINATION BY:

     HON. BETHANY BAXTER . . . . . . . 3-44


REPORTER'S CERTIFICATE . . . . . . . . 45

Exhibits 1

1    WHEREUPON, LASHAUNDA FRAZIER, THE WITNESS, HAVING

2    BEEN DULY SWORN BY THE COURT REPORTER, WAS EXAMINED

3    AND TESTIFIED AS FOLLOWS:

4                        **DIRECT EXAMINATION**

5    **MS. BAXTER:**

6    Q        Good afternoon, Ms. Frazier.  My name is

7             Bethany Baxter, as I said, I am the

8             attorney who represents Sabrina Adkins and

9             the Estate of Jennifer Hill in this Federal

10            Civil Case.  I will start out with a couple

11            of basic questions.  Have you ever given a

12            deposition before?

13   A        No, ma'am.

14   Q        Well, it is a fairly informal process, but

15            I will explain to you how it is going to

16            work. You are under oath, so your job is to

17            tell the truth and answer questions

18            honestly and completely. I am going to be

19            asking the questions today. If you don't

20            understand something that I say of if the

21            internet bugs out a little bit and you

22            don't hear everything or if I ask a bad

23            question, just let me know that you didn't

24            hear it or didn't understand it, and I am

25            happy to repeat what I said or rephrase it.

1                But if you don't ask me to do that, I am

2                going to assume that you understood my

3                question and that your answer is responsive

4                to my question; is that fair?

5    A       Yes, ma'am.

6    Q       If you need to take a break at some point,

7                we can easily do that; however, if I have

8                asked you a question, I ask that you

9                respond to my question before we take the

10               break. Is there any reason that you don't

11               think that you would be able to give

12               truthful testimony here today?

13    A      No, ma'am.

14    Q      Will you go ahead and state your full name

15               for the record?

16    A      Lashauna Faye Frazier.

17    Q      Mr. Frazier what did you do to prepare for

18               your deposition today?

19    A      I met with Mr. Shaw yesterday by Zoom.

20    Q      Okay. Did you review any documents prior to

21               us getting started here today?

22    A      Just this morning.

23    Q      Okay. What were those documents?

24    A      What you submitted for exhibits.

25    Q      Okay. Anything else in addition to that?

| | | |
|---|---|---|
| 1 | A | No, ma'am. |
| 2 | Q | Who did you speak to about your deposition |
| 3 | | besides from your attorney? |
| 4 | A | Just my family members that I was doing a |
| 5 | | deposition. |
| 6 | Q | Okay. When was the last time that you spoke |
| 7 | | with Mickey Stines? |
| 8 | A | The incident of the shooting. |
| 9 | Q | And that was September 19th? |
| 10 | A | Yeah. |
| 11 | Q | And what about the last time you spoke with |
| 12 | | Ben Fields? |
| 13 | A | I can't even tell you. |
| 14 | Q | Has it been over a year? |
| 15 | A | Probably. |
| 16 | Q | Have you spoken to him since he left |
| 17 | | employment with the sheriff's office? |
| 18 | A | Yes. |
| 19 | Q | What was the nature of your conversations |
| 20 | | with Ben Fields after he left the sheriff's |
| 21 | | office? |
| 22 | A | I said hello. |
| 23 | Q | Okay. Anything more substantive than that? |
| 24 | A | No, ma'am. |
| 25 | Q | Okay. Were you born and raised there in |

```
 1              Letcher County.
 2    A         Yes.
 3    Q         What part of the county were you born in?
 4    A         I am from Crafts Colley. I currently live
 5              on 3401.
 6    Q         Okay. 3401, can you be a little more
 7              specific about where that is?
 8    A         Yes, it is right past the Parkway Motel.
 9    Q         Okay. And you lived in Letcher County your
10              whole life?
11    A         Yes.
12    Q         What is your maiden name?
13    A         Holbrook.
14    Q         Okay. When did you first start working for
15              the Letcher County Sheriff's Department?
16    A         I started in March of 2003.
17    Q         So are you the most senior, and my that, I
18              mean the longest serving employee of the
19              Letcher County Sheriff's Office to date?
20    A         Yes, ma'am
21    Q         Would that have also been true back in
22              20021 to 2022?
23    A         Other than Mickey.
24    Q         If you can recall, when did Mickey Stines
25              start working for the Letcher County
```

1    Sheriff's Department?

2    A    He was here before I.

3    Q    Okay. And as I recall, he started as a

4         deputy and he was working as a CSO?

5    A    When I started, yes, he was a CSO.

6    Q    And also, doing home incarceration during

7         that time period?

8    A    Yes.

9    Q    Sort of walk me through from 2003 to

10        present sort of what your job titles have

11        been?  I have seen your name with a few

12        different designations.

13   A    I am the financial officer. I take care of

14        our office.  I am also a court security

15        officer, and those are pretty much the hats

16        that I wear the entire time.

17   Q    When did you become court security officer?

18   A    When I started.

19   Q    And are you still court security officer

20        today?

21   A    Yes, ma'am.

22   Q    Okay. And saw that you are a Lieutenant?

23   A    Yes, I was a Lieutenant, and I retired, and

24        then, I just came back, and we just didn't

25        carry the title, so - -

```
1    Q        Okay.  I also saw somewhere that you were an

2             equine investigator?

3    A        Yes, ma'am.

4    Q        What does that mean?

5    A        The sheriff sent me for training for

6             investigation for, like, horse cruelty, and

7             livestock cruelty.

8    Q        Okay.  I have also seen you listed as office

9             manager?

10   A        Uh-huh.

11   Q        Is that an accurate designation?

12   A        Yeah.

13   Q        Have you been financial officer and office

14            manager during Sheriff Stines' tenure as

15            sheriff?

16   A        Yes, ma'am.

17   Q        So in 2022 at least, I will say 2021 and

18            2022, would have been working in uniform or

19            in plain clothes?

20   A        I would have been working in jeans and a

21            sweatshirt.

22   Q        Okay.  Explain to me sort of what your job

23            duties are and I will be specific to 2020

24            to 2022, what were your, sort of, just

25            general jobs duties with the sheriff's
```

1    department?

2    A    I run our office, and make that everybody's

3    payroll get done, out month reports are

4    done, any kind of paperwork, but I also

5    file report court securities, so where they

6    transport females that needed to do, I

7    would do transport. If someone needed to

8    turn them self in, they would turn them

9    self in at the office, I have serve papers.

10   Q    Okay. Did you have any responsibilities as

11   far as onboarding or training new deputies?

12   A    No, ma'am.

13   Q    What about hiring and firing deputies?

14   A    Other than doing their paperwork, other

15   than decision wise, no, ma'am.

16   Q    Is that because hiring and firing would be

17   the responsibility of the sheriff?

18   A    Yes, ma'am.

19   Q    And what about onboarding and training

20   deputies, is that the sheriff's

21   responsibility or whose responsibility is

22   that?

23   A    Whoever the sheriff assigns.

24   Q    Do you know who would have been responsible

25   for onboarding and training deputies back

1           in 2018-2019?

2   A     Like - - Be more specific?  Are you asking

3           person wise or are you asking like the

4           Department of Criminal Justice like?

5   Q     I guess person wise, if you know?

6   A     Okay. They ride with someone until they are

7           adequately trained to where the sheriff

8           felt like they were, you know, could be on

9           their own.

10   Q     Okay. So the sheriff would make a decision

11          about who a new deputy would ride with and

12          when they satisfied him enough that they

13          were ready to ride on their own?

14   A     Yes.

15   Q     Thank you.  Christine Bowling, I have seen

16          her name. Is she also an administrator or

17          was she also an office type person as well

18          during this 2020 to 2022 time period?

19   A     Yes, she is a clerk.

20   Q     Tell me how her job duties or similar or

21          different from yours?

22   A     She handles, like, the dispatch, and

23          entering civil papers and logging on, and

24          keeping up with the paperwork, take taxes,

25          assists me when I need assistance.

| | | |
|---|---|---|
| 1 | Q | Eastern Kentucky Correction Solutions, are |
| 2 | | you familiar with that company? |
| 3 | A | Is that who does house arrest? I don't know |
| 4 | | the name. |
| 5 | Q | Okay. That was the company who did home |
| 6 | | incarceration house arrest back in 2020 |
| 7 | | into 2022. |
| 8 | A | Okay. |
| 9 | Q | Have you had any interaction with a woman |
| 10 | | named Patty Stockham? |
| 11 | A | No, ma'am. |
| 12 | Q | I think that you said earlier that you did |
| 13 | | remember Mickey Stines working as a home |
| 14 | | incarceration officer; correct? |
| 15 | A | Yes, ma'am. |
| 16 | Q | Back during that time period before he |
| 17 | | became sheriff, do you recall about there |
| 18 | | being any complaints about Mickey and how |
| 19 | | that he did home incarcerations? |
| 20 | A | No, ma'am. |
| 21 | Q | Any complaints about him related to his |
| 22 | | other work related to the Letcher County |
| 23 | | Sheriff's Department? |
| 24 | A | No, ma'am. |
| 25 | Q | What were thee sheriff's, would that have |

1       been Sheriff Webb that he worked under?

2   A   Yes, Danny Webb.

3   Q   Okay. And I guess, were you working with

4       the sheriff's department prior to Danny

5       Webb becoming sheriff?

6   A   No, ma'am.

7   Q   So you got hired under Danny Webb; correct?

8   A   Yes.

9   Q   Do you recall when Ben Fields was hired as

10      a deputy?

11  A   He was hired for court security.

12  Q   But he was hired by the Letcher County

13      Sheriff's Department to work as a CSO?

14  A   Yes, ma'am.

15  Q   Were you involved in training Ben Fields at

16      all?

17  A   No, ma'am.

18  Q   Were you involved in terminating Ben

19      Fields?

20  A   Other than doing his paperwork, that is it.

21  Q   I saw when I was just looking through some

22      documents, and there should be some there

23      on your desk there that looks like you were

24      a Notary?

25  A   Yes, ma'am.

| | | |
|---|---|---|
| 1 | Q | It looks like you notarized that Ben Fields |
| 2 | | received a copy of the Policy Manual. |
| 3 | | Beyond being Notary, did you have any |
| 4 | | involvement in distributing the Letcher |
| 5 | | County Sheriff's Department policies? |
| 6 | A | As far as maybe printing the books, and |
| 7 | | creating the books.  Sure, I put the |
| 8 | | binders together. |
| 9 | Q | Anything beyond what you just described? |
| 10 | A | No, ma'am. |
| 11 | Q | When you were working under Sheriff Webb, |
| 12 | | did you also have responsibilities over |
| 13 | | office administration and paperwork? |
| 14 | A | Yes, ma'am. |
| 15 | Q | Do you recall there being a policy back |
| 16 | | when Danny Webb was Sheriff related to |
| 17 | | outside employment with the sheriff's |
| 18 | | department? |
| 19 | A | Yes, ma'am. |
| 20 | Q | Okay. Do you recall there being any |
| 21 | | applications or any other documentations |
| 22 | | submitted by Eastern Kentucky Corrections |
| 23 | | Solutions related to home incarceration? |
| 24 | A | No, ma'am. |
| 25 | Q | And I assume Sheriff Webb also knew that |

1      Mickey Stines was working as a home

2      incarceration officer for Eastern Kentucky

3      Corrections Solutions; correct?

4   A   Yes.

5   Q   Okay. But you don't recall there being any

6      paperwork related to that employment of any

7      approvals by the sheriff's department from

8      then Deputy Stines to do home

9      incarceration?

10  A   He would have had to talk to Sheriff Webb

11     and Sheriff Webb would have had to agree,

12     yes, as far as paperwork done.

13  Q   Do you recall witnessing any of those

14     conversations between Sheriff Webb and

15     Mickey Stines about approving his home

16     incarceration work?

17  A   No, ma'am.

18  Q   Do you recall how Ben Fields became home

19     incarceration officer after Mickey Stines?

20  A   Like, I mean he was the District Bailiff,

21     the same as Mickey, so I guess, Mickey just

22     gave it over to him.  I wasn't privy to any

23     of that.

24  Q   Okay. That is what I am wanting to know if

25     you ever talked to Mickey Stines about Ben

1       Fields and his home incarceration work?

2   A   No, ma'am.

3   Q   Okay.

4   A   Do you recall there being any paperwork at

5       the sheriff's department related to ben

6       Fields work as a home incarceration officer

7       with the Eastern Kentucky Corrections

8       Services?

9   A   No, ma'am.

10  Q   Do you recall there being any complaints

11      made to the sheriff's department about Ben

12      Fields and his actions as a home

13      incarceration officer?

14  A   No, ma'am.

15  Q   While you were aware of this complaint,

16      this civil case eventually; correct?

17  A   Yes.

18  Q   And Ben Fields was ultimately terminated

19      because of his actions that are an issue

20      here in this civil case; correct?

21  A   Correct.

22  Q   So aside from that issue related to

23      Jennifer Hill and Sabrina Adkins, were you

24      aware of any other persons on home

25      incarcerations who complained about Ben

1              Fields?

2       A      No, ma'am.

3       Q      Okay. Are you on facebook?

4       A      No, ma'am.

5       Q      I noticed that and I think that you must be

6              the only person in Letcher County who is

7              not on facebook. Have you ever met Sabrina

8              Adkins?

9       A      No, not to my knowledge, no.

10      Q      What about Jennifer Hill, do you recall a

11             woman named Jennifer Hill?

12      A      Other than the name, I wouldn't know.

13      Q      What about someone named Chris Triplett?

14             Have you ever met Chris Triplett?

15      A      Other than his name.

16      Q      Okay. In 2021, if someone was to come to

17             the Letcher County Sheriff's Office and

18             spoken to a woman in plain clothes, would

19             that have had to have been you or Christine

20             Bowling?

21      A      Yes, it would.

22      Q      Because you were the only two women working

23             in the Letcher County Sheriff's Office in

24             2021 who would have been in the office and

25             in plain clothes; is that correct?

1    A         Yes.

2         **MS. BAXTER:** I missed that.

3         **MR. SHAW:** I object to form. If you want to

4         clarify working, there are other people in plain

5         clothes at the Sheriff's office. Sorry.

6    Q         Specifically about working in the Letcher

7              County Sheriff's Office and that would have

8              been either yourself or Christine Bowling;

9              correct?

10   A         That would be correct, yes.

11   Q         And if someone were to complain about a

12             deputy sheriff back in 2021, and makes some

13             allegation about some improper conduct,

14             what would be the sheriff's offices process

15             from documenting such a complaint and

16             investigating such a complaint?

17   A         If someone came in the office, and made

18             that kind of complaint, we would them wait

19             and speak to the sheriff and the sheriff

20             and that person would meet.

21   Q         Okay. There would be no documentation

22             related to that complaint?

23   A         The sheriff would investigate and determine

24             whether or not it would go from there.

25   Q         Can you recall a time during the time

```
 1              period when Mike Constines was sheriff when

 2              that occurred when someone came to make a

 3              complaint and you directed them to speak to

 4              the sheriff?

 5     A        That is a broad question.

 6     Q        But I was wondering did it ever happen?

 7     A        I am sure it has happened.  We have had

 8              people come and complaint and we ask them to

 9              wait and talk to the sheriff, so that is a

10              broad question to answer.

11     Q        Okay. I understand. So you are saying that

12              has happened. Has anyone ever complained

13              about Ben Fields that you can recall?

14     A        No, ma'am.

15     Q        What about James Norse, has anyone ever

16              complained about James Norse that you can

17              recall?

18     A        As far as giving you a specific, no. People

19              don't like when an officer does something

20              and they complain, so again, that is a

21              broad spectrum to answer.

22     Q        I was just wondering if you can recall, and

23              I am not asking for details, but if you can

24              recall if there has ever been a complaint

25              about James Norse?
```

| | | |
|---|---|---|
| 1 | A | Sure. |
| 2 | Q | But you can not recall any complaints about |
| 3 | | Ben Fields; is that what I understood? |
| 4 | A | Correct. |
| 5 | Q | Do you recall anything specific about any |
| 6 | | of those complaints about James Norse? |
| 7 | A | I mean James has responded to a complaint |
| 8 | | and they didn't like the way the complaint |
| 9 | | went, and they come and complain.  I mean, |
| 10 | | that is a common occurrence as far as |
| 11 | | someone not liking the way that an officer |
| 12 | | responds. |
| 13 | Q | In those circumstances, you would refer |
| 14 | | those persons to speak to the sheriff? |
| 15 | A | We would ask them to sit and wait for the |
| 16 | | sheriff.  If they don't want to sit, then, |
| 17 | | we would take their name and number and |
| 18 | | have the sheriff call them. |
| 19 | Q | And it is your testimony that you don't |
| 20 | | recall any complaints being made by someone |
| 21 | | Chris Triplett? |
| 22 | A | No, ma'am. |
| 23 | Q | Back in 2020 and 2021, do you recall |
| 24 | | hearing any rumors about Ben Fields messing |
| 25 | | around with any women on home |

1              incarceration.

2    A        I was not aware of any information

3             regarding that until that we received the

4             phone call from the journalist.

5    Q        Okay. And I will get to that in a minute.

6             Similar question, back in 2020 and 2021, do

7             you ever hear any rumors about Judge

8             Mullins having sexual relations with women

9             in the court system?

10   A        No, ma'am.

11   Q        You never heard any rumors like that?

12   A        No, ma'am.

13   Q        You never heard any rumors like that?

14   A        No, ma'am.

15   Q        Did you ever hear any rumors about Sheriff

16            Stines having sexual relations with women

17            on home incarceration back when he was

18            serving as the home incarceration officer?

19   A        No, ma'am.

20   Q        Okay. Let's talk about and I believe it was

21            on January 31st and this next page in that

22            stack there, do you recognize that?

23   A        Uh-huh.

24   Q        Is that your handwriting?

25   A        Yes, ma'am.

| | | |
|---|---|---|
| 1 | Q | Explain to me when you made this, I will |
| 2 | | call it a timeline as documented on this |
| 3 | | page? |
| 4 | A | The sheriff asked me to.  He sat in front |
| 5 | | of me and I dictated for him. |
| 6 | Q | So this document span from January 31, 2022 |
| 7 | | all of the way up until February 11? |
| 8 | A | Yes, ma'am. |
| 9 | Q | So did you write ever word on this page on |
| 10 | | the same date? |
| 11 | A | I do not recall. |
| 12 | Q | So you might have worked on it cumulatively |
| 13 | | over a number of days? |
| 14 | A | Correct. |
| 15 | Q | Do you recall being in the sheriff's |
| 16 | | department in the Letcher County Sheriff's |
| 17 | | Office on January 21, 2022 I guess, when a |
| 18 | | journalist called? |
| 19 | A | Yes, ma'am. |
| 20 | Q | When I received the phone call, it was a |
| 21 | | journalist out of Lexington advised that |
| 22 | | they wanted to know the allegations against |
| 23 | | Ben Fields. I told him that I would take |
| 24 | | the message and have the sheriff call as |
| 25 | | soon as he got back, and that is exactly |

1         what he done.

2    Q    Okay. At that time, did you have a cop yo f

3         the complaint or did you know anything

4         beyond what the journalist had said on the

5         phone?

6    A    Nothing beyond what the journalist had

7         said.

8    Q    Describe for me your exchange with Sheriff

9         Stines when that he came back to the

10        office?

11   A    I give him the message and told him what

12        the journalist said, and that is the jest

13        of it.

14   Q    Okay. What did he do from there?

15   A    He went back and talked to the journalist.

16   Q    So he called the journalist back?

17   A    Yes.

18   Q    Were you in the room for that phone call?

19   A    No, ma'am, he went into his office.

20   Q    Okay. After that he got off the phone, did

21        he come and speak to you?

22   A    He came back in, the dispatch then advised

23        us what the allegations was and that was

24        it.

25   Q    Who is us?

1    A    Me and Christine.

2    Q    Anybody else at the office?

3    A    Not that I can recall.

4    Q    Okay. I guess, what did he tell you to the

5         best of your recollection?

6    A    That someone had made allegations against

7         Ben.

8    Q    What did you all guys do?

9    A    We didn't believe it.

10   Q    Describe to me your conversation between

11        the three of you?

12   A    Just that we were all completely surprised

13        and just didn't believe it.

14   Q    So what happened next?

15   A    At the end of the say or at home I got a

16        phone call to come back to the office to

17        meet with the county attorney.

18   Q    Okay. Let's look back at your timeline that

19        you wrote up here. So this looks like at

20        2:00 pm this reporter called and notified

21        of lawsuit. Would that have been the

22        original call to you or would that have

23        been the call that Sheriff Stines made back

24        to the reporter?

25   A    That would have been the call that Mickey

1                 made back to the reporter.

2    Q      And then, it says 15 minutes, it looks like

3           Sheriff Stines spoke to Ben regarding

4           reporter info. Do you see that?

5    A      Yeah.

6    Q      Did Ben show up at the office or how did

7           that go?

8    A      No, Ben didn't show up at the office.

9    Q      Okay. What do you know about Sheriff Stines

10          speaking to Ben Fields about this

11          reporter's information?

12   A      Other than he spoke to him that is it.

13   Q      Would you have been in the office at 2:15?

14   A      At 2:15, yes.

15   Q      Okay. And then, it looks like 4:00 o'clock

16          Judge Craft and Robbie Kinzer with drug

17          court regarding Brianna and Sabrina; do you

18          see that?

19   A      Yes, ma'am.

20   Q      Were you at the office at 4:00 o'clock when

21          Judge Craft and Robbie Kinzer came?

22   A      No.

23   Q      What time do you normally leave work?

24   A      We leave at 4:00 o'clock.

25   Q      Did Sheriff Stines tell you anything about

1          Judge Craft and Robbie Kinzer coming and

2          talking to him?

3     A    No. Like I said, I made it home, and then,

4          I got a phone call to come back because we

5          had to speak with the county attorney.

6     Q    It looks like at 4:30, Sheriff Stines sent

7          a text and spoke to it looks like Derrick

8          Sturgill with KSP. Do you know Derrick

9          Sturgill?

10    A    I know his name, yes.

11    Q    Were you present when Sheriff Stines texted

12         Mr. Sturgill?

13    A    No.

14    Q    Then, it says like at 5:45 the county

15         attorney came to the office?

16    A    Yes.

17    Q    Were you there when the county attorney

18         showed up?

19    A    Yes, ma'am.

20    Q    So you got back to the office before 5:45;

21         correct?

22    A    Yes, ma'am.

23    Q    I don't know if I asked, but what - - I

24         know that you said that you grew up at

25         Crafts Colley and now you live at - -

1    A    On 3401.

2    Q    Right. What do you recall about the county

3         attorney coming to the office and that

4         conversation?

5    A    The county attorney came. Mickey asked how

6         we were to proceed. County attorney advised

7         us to do the memorandum, which I think is

8         actually in your paperwork, about saying

9         that he is hereby suspended without pay.

10   Q    Okay. Did Sheriff Stines tell you or the

11        county attorney about what Ben Fields had

12        told him or what his response had been?

13   A    No, ma'am, not in my presence anyway.

14   Q    Okay. Well, what else do you recall having

15        occurred in your presence?

16   A    The county attorney advised what to do. I

17        went and typed up the paperwork and brought

18        the paperwork to them, so - -

19   Q    Do you see there 6:25 Brianna Cornett came

20        to the office?

21   A    Yes.

22   Q    Do you know Brianna Cornett?

23   A    I know the name.

24   Q    Were you there when she came to the office?

25   A    I was here, yes.

1    Q        Okay. How did she get to the office or how

2             did she know to come to the office?

3    A        I don't know.

4    Q        Did she come with anyone else?

5    A        Not that I can recall.

6    Q        So was the county attorney still there when

7             Brianna showed up?

8    A        Not that I can recall.

9    Q        So it was yourself, Sheriff Stines and

10            Brianna Cornet who were there that evening?

11   A        To the best of my recollection, yes.

12   Q        What did Brianna tell you or what was that

13            meeting like?

14   A        She didn't tell me anything.

15   Q        Did you hear her tell Sheriff Stines

16            something in your presence?

17   A        No ma'am. In my office, they sat at my

18            desk, but my desk is open to dispatch, they

19            did stay in my vision so that he was not

20            left alone with her, but as far as privy to

21            the conversation, I was not privy to the

22            conversation.

23   Q        You saw her mouth move, but you didn't hear

24            anything come out of her mouth?

25   A        Correct.

| | | |
|---|---|---|
| 1 | Q | Did Sheriff Stines share with you any of |
| 2 | | the messages or documents that he received |
| 3 | | from Judge Craft and Robbie Kinzer? |
| 4 | A | No, ma'am. |
| 5 | Q | You observed Brianna Cornet at least, what |
| 6 | | was her - - how would you describe her - - |
| 7 | | How did she seem emotion wise during her |
| 8 | | conversation with Sheriff Stines? |
| 9 | A | I mean she seemed okay. |
| 10 | Q | Why do you say that? |
| 11 | A | I mean she wasn't distraught or anything. |
| 12 | | They just had a general conversation, I |
| 13 | | assume. |
| 14 | Q | How long did that conversation last? |
| 15 | A | I don't know, sorry. |
| 16 | Q | Was Brianna Cornett still there at 6:45 |
| 17 | | when Sheriff Stines met with Ben Fields? |
| 18 | A | No, I was actually gone when he met with |
| 19 | | Ben Fields also. |
| 20 | Q | Okay. And I guess, as you were dictating |
| 21 | | this timeline, did that happen on January |
| 22 | | 31, of 2022? |
| 23 | A | According to this timeline, yes. |
| 24 | Q | I mean did you actually write these words |
| 25 | | on the pager on January 31st? |

```
 1    A         No.

 2    Q         Do you recall when you made this list and

 3              timeline of what occurred on January 31st?

 4    A         Do I recall, no. Do I think it would be the

 5              next day, yes.

 6    Q         Okay. These are pretty precise times, so I

 7              am just worrying did somebody document when

 8              Brianna came to the office or do you have

 9              some way of knowing the minute that she

10              walked through the door what other

11              resources would you have used to try to

12              create this timeline?

13    A         I just wrote down what the sheriff told me

14              to write down.

15    Q         Did he have his phone out, was he looking

16              about when he called Ben Fields? Was he

17              using anything else when he was trying to

18              figure out when these events occurred?

19    A         Not that I can recall.

20    Q         It looks like the next day, I am sorry, a

21              couple of days later rather on February 2nd

22              it looks like Burt Slone made a report; do

23              you see that?

24    A         Yeah.

25    Q         Were you there when Burt Slone came and
```

| | | |
|---|---|---|
| 1 | | requested an investigation or I guess |
| 2 | | requested the investigator come to the |
| 3 | | jail? |
| 4 | A | I don't recall him coming over here or if |
| 5 | | called, I don't know. |
| 6 | Q | It says requests whoever investigates to |
| 7 | | send to the jail regarding inmate and |
| 8 | | Brianna Cornett; do you see that? |
| 9 | A | Yes. |
| 10 | Q | Okay. Do you know who was investigating |
| 11 | | this issue on February 2nd? |
| 12 | A | I don't, I am sorry, I assume it would be |
| 13 | | the sheriff. |
| 14 | Q | Okay. Do you know if the sheriff ever went |
| 15 | | over and investigated or I guess ever went |
| 16 | | over to the jail and got some more |
| 17 | | information about this unnamed inmate and |
| 18 | | Brianna Cornett? |
| 19 | A | No, ma'am. |
| 20 | Q | Is Burt Slone still the jailer in Letcher |
| 21 | | County? |
| 22 | A | No, he is retired. |
| 23 | Q | When did he retire? |
| 24 | A | He just retired. August, maybe. |
| 25 | Q | Okay. |

| | | |
|---|---|---|
| 1 | A | Don't hold me on that, but he just retired. |
| 2 | Q | I understand.  Do you know why he retired? |
| 3 | A | He had his time in. |
| 4 | Q | Lena Hensley, I see her name here.  Do you |
| 5 | | know Lena Hensley? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Do you know any thing about Ben's wife |
| 8 | | having spoken to Lena Hensley about Sabrina |
| 9 | | Adkins? |
| 10 | A | No, ma'am. |
| 11 | Q | I guess you documented this February 2nd |
| 12 | | event because I guess based on what Mickey |
| 13 | | Stines told you to write? |
| 14 | A | Yes, ma'am. |
| 15 | Q | Who was he preparing this timeline for? |
| 16 | A | I don't think he was necessarily prepared |
| 17 | | it for anybody other than himself. |
| 18 | Q | Well, in Sheriff Stines' deposition, he |
| 19 | | referenced having an episode around this |
| 20 | | time period.  Do you recall him ever |
| 21 | | telling you about episodes? |
| 22 | A | He had a flea bite.  Not a flea bite, |
| 23 | | sorry, but a tick bite that cause him to |
| 24 | | have what he would call episodes, yes. |
| 25 | Q | Was this the first time that he had one of |

1    those episodes and he had episodes prior

2    to this January 2022 time period?

3  A    No, he had had episodes before.

4  Q    How often did he have those episodes?

5  A    I mean they were just random.

6  Q    Like once a month, once a week?

7  A    I mean until her would tell us we wouldn't

8    know that he is having one, so - - It all

9    depended on how that he felt.

10 Q    Do you have any sense of what would bring

11    on these episodes?

12 A    No, ma'am.

13 Q    He didn't tell you that they were caused by

14    stress?

15 A    I am sure that stress didn't help, but no.

16 Q    Do you remember him having an episode on

17    January 31st and around this time period?

18 A    No, ma'am.

19 Q    When he would have these episodes, based on

20    your observations, what was going on?

21 A    He would get dizzy, he would get sweaty

22    palms, his head would hurt.

23 Q    Sounds like you were aware of these

24    episodes, but were other people, other co-

25    workers at the sheriff's office were they

1            also aware that he was having this issue

2            and having episodes?

3    A       Yes, ma'am.

4    Q       So was there a common knowledge amongst the

5            sheriff's department?

6    A       Yes, ma'am.

7    Q       Okay. Was it understanding that these

8            episodes would also cause memory issues for

9            him?

10   A       Sure.

11   Q       So he told you when he had these episodes

12           he had more difficulty with memory and

13           remembering things?

14   A       Do I remember him saying those words, no. I

15           mean he wouldn't always remember things,

16           no.

17   Q       Was that why that he was having you make

18           this list because of those memory issues

19           related to episodes or not?

20   A       No.  That way he would be able to put it in

21           a file if he needed to go back and review

22           it.

23   Q       Do you remember anything else happening

24           between February 2nd and February 10th?

25   A       Exactly like what?  I am sorry.

1    Q       There is nothing on the timeline, I am just

2             wondering if there was any other events

3             that might have happened as you recall

4             between February 2nd and February 10th that

5             are not on this list?

6    A       I know that he reached out to the AG's

7             Office for them to investigate, but other

8             than that.

9    Q       Did you ever talk to anybody at the AG's

10           Office about their investigation of Ben

11           Fields?

12    A       No, ma'am.

13    Q       In his deposition, Sheriff Stines testified

14           that he also talked to Edison banks back on

15           February 1st of 2022 that was his

16           recollection. Do you have any memory of

17           Sheriff Stines speaking to Mr. Banks about

18           this Ben Fields issue?

19    A       No, ma'am.

20    Q       Did you, yourself, ever talk to Mr. Banks

21           about Ben Fields and this issue?

22    A       No.

23    Q       Did you, yourself, ever speak to Burt Slone

24           about these issue with Sabrina Adkins and

25           Brianna Cornett?

1    A      Not that I recall, no.

2    Q      Sheriff Stines also testified that he spoke

3           with Judge Mullins on February 1st of 2022

4           about Ben Fields and these allegations.

5           Were you aware of that?

6    A      Come again?

7    Q      Were you present for any conversations

8           between Sheriff Stines and Judge Mullins

9           about Ben Fields?

10   A      No, ma'am.

11   Q      Have you ever spoken to Judge Mullins about

12          these allegations about Ben Fields?

13   A      No, ma'am.

14   Q      Going back to this episode issue, these

15          episodes that Sheriff Stines was having,

16          did the frequency or severity of these

17          episodes change over time to your knowledge

18          between 2022 and 2024?

19   A      They were random. There was not like a

20          consecutive order or - -

21   Q      You didn't notice them getting any worse

22          over the years?

23   A      No, ma'am.

24   Q      And you didn't notice them getting any

25          better either over that period of time?

| | | |
|---|---|---|
| 1 | A | No, ma'am. |
| 2 | Q | I believe there is also a department wide |
| 3 | | so all of the Letcher County Sheriff's |
| 4 | | Department folks, a meeting of those |
| 5 | | persons on February 2nd of 2022. Would you |
| 6 | | have been a part of that meeting? |
| 7 | A | If it was the entire office, then, yes. |
| 8 | Q | Do you remember a meeting where that |
| 9 | | Sheriff Stines called after these |
| 10 | | allegations were made against Ben Fields? |
| 11 | A | I don't recall one, no. |
| 12 | Q | Sheriff Stines gave a deposition in this |
| 13 | | case on September of last year. Did you |
| 14 | | talk to Sheriff Stines about his deposition |
| 15 | | before he gave that deposition? |
| 16 | A | I did know that he was having a deposition. |
| 17 | | He asked us to pull the case file.  I |
| 18 | | pulled the case file and gave it to him and |
| 19 | | that is the jest of it. |
| 20 | Q | What do you mean by case file? |
| 21 | A | Like, Ben's personnel file, like his |
| 22 | | information, like everything bundled |
| 23 | | together. |
| 24 | Q | Okay. Did you pull that for him? |
| 25 | A | Yes, ma'am. |

1    Q        And did he return it to your knowledge?

2    A        He took it with him.

3    Q        Any other conversation or information that

4             you had with Sheriff Stines before he went

5             for that deposition?

6    A        No, ma'am.

7    Q        Do you recall talking to Sheriff Stines

8             about Ben Fields deposition that is

9             occurred the week prior?

10   A        I did know that Ben had his deposition,

11            yes.

12   Q        Did Sheriff Stines tell you anything about

13            it?

14   A        No, ma'am.

15   Q        Did you know that Sheriff Stines

16            participated via Zoom in that deposition?

17   A        I did not know that he participated, no.

18   Q        And he was at some sort of sheriff's

19            conference that week; correct?

20   A        Yes.

21   Q        So it is your testimony that you never

22            spoke with Sheriff Stines about Ben Fields'

23            deposition?

24   A        Correct.

25   Q        Was Sheriff Stines behavior different in

1          any way based on your observations after

2          that he came back from that sheriff's

3          conference?

4     A    That is a really bad time, so I don't

5          really know how to answer that question.

6     Q    What do you mean it was a really bad time?

7     A    Well, that was right before everything

8          happened, so - -

9     Q    Well, I would like to hear if he was

10         behaving in any way that was noticeably

11         different for between the time that he came

12         back from that conference and the time that

13         he gave that deposition?

14    A    I would say that his anxieties were really

15         high, I guess.

16    Q    Did you talk to him about his anxiety?

17    A    Yes, I did.

18    Q    Did he tell you why that he was anxious?

19    A    I know that he hadn't slept.

20    Q    Okay. Did he tell you why that he hadn't

21         slept?

22    A    He was just really anxious.

23    Q    Did he tell you or do you have any reason

24         to know that he was so anxious?

25    A    Do what? I am sorry. You glitched.

```
 1    Q       Did you have any reason or any information

 2            about why he was so anxious?

 3    A       I mean I don't have any information on

 4            that, no.

 5    Q       Do you have any reason to believe why he

 6            was so anxious?

 7    A       When he goes - - When he would go to the

 8            conferences, they go over policies, they go

 9            over manual, everything like that, so he is

10            always - - When he comes back, he is always

11            stressed, like trying to implement the new

12            rules, new regulations only it is a very

13            stressful time for him, so we just assume

14            that was all related to his conference

15            added the stress on top of this deposition.

16            It was just a very stressful time. He

17            advised us that he hadn't slept and he

18            hadn't ate.

19    Q       When you say us, is that yourself and Ms.

20            Bowling?

21    A       Yes, ma'am.

22    Q       Anybody else?

23    A       No ma'am.

24    Q       Did you speak to Sheriff Stines after his

25            deposition on September 16$^{th}$?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What did he tell you about his deposition? |
| 3 | A | He didn't tell me anything.  He just told |
| 4 | | us that he was done and that he was headed |
| 5 | | back. |
| 6 | Q | What do you mean by headed back? |
| 7 | A | Headed back tot he office. |
| 8 | Q | So he touched base with you that evening |
| 9 | | right after the deposition? |
| 10 | A | Yes. |
| 11 | Q | What about on Tuesday or Wednesday, did you |
| 12 | | speak with Sheriff Stines the days |
| 13 | | following the deposition? |
| 14 | A | Yes, ma'am. |
| 15 | Q | Did he tell you anything about the |
| 16 | | deposition? |
| 17 | A | No, ma'am. |
| 18 | Q | Did he say anything about having had an |
| 19 | | episode on Monday? |
| 20 | A | No, ma'am. |
| 21 | Q | Any behavior from Sheriff Stines that |
| 22 | | unusual that Tuesday or Wednesday after he |
| 23 | | returned from the deposition? |
| 24 | A | Yes, he was very paranoid and very, again, |
| 25 | | stressed. |

| | | |
|---|---|---|
| 1 | Q | Did you have any reason to attribute that |
| 2 | | paranoia and stress to the deposition and |
| 3 | | this lawsuit? |
| 4 | | **MR. SHAW:** I am going to object to form. I don't |
| 5 | | know that she is qualified to make that |
| 6 | | relationship, but she can answer, if she wants |
| 7 | | to. |
| 8 | | **MS. BAXTER:** Yeah, based on her observations and |
| 9 | | anything that was said. |
| 10 | A | I think it was related to all stress. |
| 11 | Q | Were you aware of any other stressors in |
| 12 | | Sheriff Stines' life beyond the ones that |
| 13 | | you have already testified to? |
| 14 | A | Him and his wife had discussed divorce. |
| 15 | Q | Okay. Anything beyond that? |
| 16 | A | No. |
| 17 | Q | Were those discussions that he and his wife |
| 18 | | have had, were those in any way related to |
| 19 | | this lawsuit and his deposition on Monday |
| 20 | | to your knowledge? |
| 21 | A | Not to my knowledge. |
| 22 | | **MR. SHAW:** Object to form. Go ahead. |
| 23 | Q | Did you have any involvement whatsoever in |
| 24 | | the criminal investigation related to Ben |
| 25 | | Fields? I know that you said that you never |

1           spoke to the attorney general, but any

2           other involvement in that prosecution and

3           in that investigation?

4    A      No, ma'am.

5    Q      Did you see Sheriff Stines on Thursday of

6           that week the day of the shooting?

7    A      Yes.

8    Q      Were there any discussion between yourself

9           and Sheriff Stines on that day about this

10          lawsuit or his deposition?

11   A      No, ma'am.

12   Q      Did you turn a telephone over to

13          investigator who were investigating the

14          incident on Thursday?

15   A      No, ma'am.

16   Q      And do you have any reason to believe that

17          this shooting on September 19th of 2024 had

18          anything to do with this lawsuit or the

19          allegations made by clients in this

20          lawsuits?

21   A      No, ma'am.

22          **MS. BAXTER:** I think that is all that I have got.

23          Give me 5 minutes to collect my thoughts and

24          come back.

25          (A short break was taken)

1    Q        Back on the record, I want to include this

2             timeline that Ms. Frazier said that she

3             wrote out. I want to put that as Exhibit 1

4             to her deposition.  That is the only

5             exhibit that I am going to include for her,

6             and just to make sure that we got it all,

7             Ms. Frazier, is there any other

8             conversations that you recall having or

9             being aware that I will say being related

10            to Ben Fields that are not documented on

11            this timeline that would have occurred

12            during this time period.

13       **MR. SHAW:** Are you talking about involving this

14       case?

15       **MS. BAXTER:** I was trying to run that in.

16       **MR. SHAW:** Sorry.

17    Q        We will start here. There are certain

18             events documented on this page that you

19             wrote down at the request of Sheriff

20             Stines; correct?

21    A        Correct.

22    Q        Are you aware of any other relevant

23             conversations or events that are not listed

24             on this page, but which also took place

25             during this January 31, 2022 through I will

| | | |
|---|---|---|
| 1 | | say February 13, 2022 time period related |
| 2 | | to Mr. Fields? |
| 3 | A | Will you repeat that again one more time. |
| 4 | Q | We talked about the events that are on this |
| 5 | | page from January 31 through mid February |
| 6 | | of 2022; correct? |
| 7 | A | Yes. |
| 8 | Q | And I know you wrote this time down at |
| 9 | | Sheriff Stines' direction; correct? |
| 10 | A | Correct. |
| 11 | Q | Are you aware of any other events or |
| 12 | | happenings that occurred during this same |
| 13 | | time period that are not reflected on this |
| 14 | | Exhibit 1? |
| 15 | A | Not that I recall, no. |
| 16 | | **MS. BAXTER:** That is what I was trying to |
| 17 | | clarify. That is all that I have. |
| 18 | | **MR. WILLIAMS:** Ma'am, my name is Jason Williams, |
| 19 | | I represent Ben Fields and don't have any |
| 20 | | questions for you. Thank you. |
| 21 | | **MR. SHAW:** Of course, no questions here. Thank |
| 22 | | you. |
| 23 | | |
| 24 | | |
| 25 | | |

REPORTER'S CERTIFICATE

STATE OF KENTUCKY

COUNTY OF JOHNSON

       I, Joey VanHoose, Stenographer and Notary Public, and for the State of Kentucky at Large, do certify that the foregoing deposition of Lashauna Frazier was taken at the place, on the date and for the purposes stated in the Caption and that the appearances were as noted herein.

       FURTHER, I certify that that witness was duly sworn by me before testifying; that the testimony was reported by me in steno notes and electronically recorded; and thereafter, I constitute a true, correct and complete transcript of my said shorthand notes as could be heard and understood by me.

       GIVEN under my hand at Paintsville, Kentucky, this 19th day of January, 2025.

     My Commission Expires August 1, 2026.

                    _____

                    Joey VanHoose

                    KYNP53570