UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CASE NO: 7:22-CV-00007-REW

***THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED***

SABRINA ADKINS, and
JENNIFER HILL

                                                           PLAINTIFFS

V.

BEN FIELDS, Individually
And in his official Capacity as
A Deputy Sheriff with the
Letcher County Sheriff's Department,
MICKEY STINES, Letcher County Sheriff, and
EASTERN KENTUCKY CORRECTIONAL
SERVICES, INC.                                             DEFENDANTS

_____

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
_____

Comes the Defendant, Ben Fields, individually, by and through counsel, and for his memorandum brief in support of Motion for Summary Judgment states as follows:

## I.

## INTRODUCTION

On February 7, 2025, a Motion for Summary Judgment was filed on behalf of Defendant Stines and the Letcher County Sheriff's Department. [Doc # 136] In his supporting memorandum, the Sheriff's counsel maintains that the evidence presented during discovery does not support Plaintiff's constitutional claims. He specifically contends that Deputy Field's conduct does not rise to the level necessary to support Plaintiff's claims that he violated the Fourth and Fourteenth Amendments. [Doc # 136-1, pgs. 14-16] Defendant Fields now incorporates these well supported arguments within his own motion for summary judgment and memorandum.

On February 28, 2025, Plaintiff filed a "combined response" addressing not only the issues raised by Defendant Stines' motion for summary judgment but those that might be raised

by Defendant Fields. [Doc # 139] Apparently recognizing the strength of Defendant's arguments, Plaintiff's counsel provides a very exaggerated summary of her client's allegations that is not supported by the actual evidence revealed during discovery.

Counsel first claims, "There are at least three women who were violated and sexually abused by Deputy Fields between 2019 and 2022, two of whom are plaintiffs in this lawsuit."

Besides Ms. Adkins, counsel claim that Jennifer Hill was victimized by the Deputy. However, Ms. Hill died before her deposition was taken and the general allegations in her complaint have not been subject to cross examination. Her son Billy Dwayne Adams, serves as the Administrator of her Estate but was unaware of this suit or any allegations made prior to his mother's death. (**Exhibit 1,** Deposition of Billy Dwayne Adams pages 14, 28-29)

The Estate instead relies upon the affidavit of Plaintiff Hill's fiancé, Chris Tripplett. However, the allegations made in his affidavit are not based upon personal observation. Again no details are provided, nor has he been deposed.

Upon reading the affidavit. It is evident that his knowledge is not based on personal observation of sexual misconduct. He claims that he "became aware of such conduct" without revealing the source of the information. It is evident that the account given in the affidavit is hearsay upon which summary judgment cannot be maintained. [Doc # 139-9]

The "third" woman is referred to only by her initials, B.C. Plaintiff's counsel has submitted a recorded interview of this supposed claimant in which she alleges that she was propositioned by Deputy Fields and that he made advances. Notably, the recorded interview was not taken under oath. Nor was the witness subject to cross examination.

By contrast, Plaintiff Adkins has been deposed and subject to cross examination. During her deposition she confirmed statements made to the state police. She told investigators that she had agreed to a liaison with Deputy Fields and saw it as an opportunity to avoid payment for the home incarceration equipment. Any stress she felt was directed more toward staying out of jail rather than any coercion from Mr. Fields. [Doc #136-7, KSP statement]

As for the criminal charges, It should be noted that Mr. Fields' guilty plea was part of a negotiated settlement reached during mediation.

Also, Ms. Adkins consent was not an issue relevant to the third-degree rape charge under

KRS 510.060 (f) or the third degree sodomy charge under KRS 510.090 (f). Rather, by statute she was deemed to be incapable of consent when she was in Deputy Fields custody KRS 510.020 (f).

As set out below however, it is a factor in determining coercion sufficient to violation of constitutional rights both under the Fourth and Fourteenth Amendment analysis.

## II.

## STATEMENT OF CASE

On January 31, 2022, Plaintiffs Sabrina Adkins and Jennifer Hill filed a Complaint against Defendants Ben Fields, Individually and in his Official capacity as a Deputy Sheriff with the Letcher County Sheriff's Department; Unknown Supervisors of Ben Fields; and Mickey Stines, Letcher County Sheriff. (DE 1). This memorandum will address allegations brought specifically against Fields in his individual capacity. On March 16, 2022, Plaintiff then filed an Amended Complaint. (DE 17). On September 28, 2022, Plaintiff again filed a second amended complaint naming Ben Field's employer Eastern Kentucky Correctional Services, Inc. as a defendant. (hereinafter "EKCS"). (DE 57, Second Amended Complaint).

As it relates to Plaintiff Sabrina Adkins, she alleges the following in the Second Amended Complaint: Ms. Adkins alleges that in June 2021, she was released from the Letcher County Jail, and placed on home incarceration. At that point, Defendant Fields, alleged to be a Deputy Sheriff, was assigned to be her home incarceration officer. She claims that Fields visited her the night of her release, and consoled her with cigarettes. She claims she told Fields that she didn't have money to pay for her ankle bracelet, at which point Defendant Fields made flirtatious comments about her looks, and body, and told her he was confident that they "could work something out."

Ms. Adkins claims that she routinely communicated with Fields by text, and that he arranged to meet her at the courthouse during nighttime hours for sexual encounters. Plaintiff claims that she felt compelled to comply with Defendant Fields advances as she could not afford to pay for the ankle monitor, and did not want to return to the jail. She claims that she did not consent to the sexual abuse.

3

In December 2021, Plaintiff alleges that certain persons at the Letcher County Courthouse were notified that Defendant Fields was having inappropriate relations, and communications with Sabrina, and that Fields became aware of the allegations. At this point Defendant Fields stopped communicating with Sabrina by text or other messages. However, early in January 2021, she claims that Fields filed a Complaint against her asserting that she was not complying with her terms of home incarceration. Adkins claims that Fields took this action to punish Sabrina, and in attempt to save his own job and reputation.

Sabrina claims that she was thereafter arrested on January 26, 2022, and taken to the Pike County Detention Center. Adkins claims that she has suffered, and continues to suffer from emotional distress, and suffered mental anguish. (DE 1, pgs. 3-6).

As it relates to Plaintiff Ms. Hill, she alleged that she was arrested in Letcher County in 2019, and incarcerated at the Letcher County Detention Center. In August 2020, she was put on home incarceration, and was to be supervised by Defendant Fields. When Fields met with Jennifer to place her ankle monitor, he allegedly told her that if she could not afford to pay the home incarceration fees, that they could "work something out." He also allegedly told her that "if she did him a favor, he would do her a favor."

Thereafter, Jennifer claims that Defendant Fields began asking for sex in exchange of waiver of the incarceration fees, and she declined his advances. She claims that after she declined his advances, that he created home incarceration conditions violations which resulted in her arrest.

On August 17, 2021, Jennifer was arrested, and soon there after she was bonded out of jail on the conditions, that she would comply with home incarceration. Within a few days, she claims that Fields showed up at her home with Sheriff Micky Stein, claiming that she had an overdose. Jennifer claims that EMS personnel thereafter arrived at her home and threatened to give her a drug screen, and that after other emergency workers had left, that Fields again told her that she needed to succumb to his sexual advances. She claims she involuntarily complied with Fields instruction, and engaged in sexual acts with the Defendant.

The unwanted sexual abuse continued through October 2021, at which point Jennifer was incarcerated for traveling to London, Kentucky to visit her newborn granddaughter. She claims in the presence of Deputy Sheriff Whitaker, that Defendant Fields told her, "Remember what I

4

told you and keep your mouth shut." She claims that when she was arrested in October 2021, that her cell phone was confiscated, and never returned to her because it had incriminating communication between herself and Defendant Fields.

According to the Complaint she was arrested in February 2022, on an arrest warrant from another county, and remains housed at the Perry County Detention Center. Like Adkins she claims to suffer emotional distress, and mental anguish. Hill subsequently died and her estate was substituted as party plaintiff.

The lawsuit alleges that Defendant Fields, in his individual and official capacities, violated the Plaintiffs' Fourth and Fourteenth Amendment rights to be free from arbitrary action, unreasonable searches and seizure and deprivation of liberty. The Plaintiffs also allege that Defendant Fields is liable under state law for damages for false imprisonment, assault and battery, malicious prosecution, intentional infliction of emotional distress, negligence, and gross negligence. Plaintiffs further allege that EKCS and Defendant former Letcher County Sheriff Stines are liable to Plaintiffs for deliberate indifference in failing to adequately train and supervise Defendant Fields. (See, DE 57 Second Amended Complaint).

The Second Amended Complaint alleges the following Counts:

Count I: That Defendant Fields violated the Plaintiff's rights secured by the United States Constitution, Amendment IV.

Count II: that Defendant Fields violated the Plaintiff's rights secured by the United States Constitution, Amendment XIV.

Count III: Deliberate indifference to supervise, and train pursuant to 42 U.S.C. § 1983, against Letcher County Sheriff, and unknown supervisors of Defendant Fields.

Count IV: Negligence, gross negligence, assault and battery, against Defendant Fields.

Count V: Grossly negligent intentional infliction of emotional distress.

Count VI: Intentional infliction of emotional distress.

Count VII: Negligent Retention, Training, Supervision Against Defendant EKCS

The Complaint contains a claim for punitive damages on the basis that Defendant Fields actions were malicious, and intentional conduct. No specific amounts for damages are listed. The Complaint also makes a claim for attorney's fees.

Discovery is now completed and below is a summary of depositions taken. On or about January 19, 2023, Plaintiff Jennifer Hill died. By Order entered August 9, 2023, in Magoffin District Court, Jennifer Hill's son Billy Adams was appointed Administrator of the Estate of Jennifer Hill. (*See Estate of Jennifer Hill, 23-P-00078*). On August 18, 2023, Plaintiffs filed a motion to substitute the estate of Jennifer Hill as a party and Court subsequently granted that motion. (See DN 84-85).

## III.

## FACTS

### PLAINTIFF SABRINA ADKINS

At the time of her deposition, Sabrina Adkins was an inmate at the Lesile County Detention Center. Her first instance of trouble with law enforcement was in 2016 in Pike County for a DUI. Most of her charges were in Letcher County or Pike County. She was also charged with a second DUI that same year. She would later be charged with a third DUI for two Norco 10s and possession in 2017. Adkins begin developing an addiction to pain pills sometime around 2012 as Dr. Fannin prescribed them for her back. (Sabrina Adkins, Deposition Pages 14, 39-42).

In 2021, she would be charged with possession of Meth in Letcher County, and was incarcerated on this charge. She was placed on house arrest and then probation. She violated her probation by using drugs. She has been housed in jails at Letcher, Pike, Warren, Franklin, and Leslie County. In total she has been convicted of three (3) felonies. (Sabrina Adkins, Deposition Pages 42-45, 111-112).

She agreed that her allegations raised in the complaint relating to Fields begin after June 2021. At the time she was taking the following medications Polytrim, Robaxin, Lyrica, and Ibuprofen. She also agreed that she was actively treating for anxiety, insomnia, and bipolar disorder before April 2021 and started using meth at the approximate age of forty (40) years. She was incarcerated from April to June 2021 in Letcher County. She was then released in June 2021

and placed on home incarceration. She did not know Fields prior to June of 2021. (Sabrina Adkins, Deposition Pages 48-49, 52, 54-60).

She first met Fields at the jail she had been placed on house arrest, and he put the monitoring device on her leg. Fields wife, who was a guard at the jail, and some other guards witnessed this take place. She did not know who the other guards were. After the monitoring device was placed on her, she then notified Fields once she arrived at her house. She told Fields that she was living with her boyfriend Stacy who had also been arrested, and was in rehab for inpatient treatment. However, Stacy called the police, as he did not want Adkins to stay at his house. (Sabrina Adkins, Deposition Pages 59-63).

At this point Fields helped Adkins move to 164 Perkins Branch, with Dale Martin where she stayed. She also stayed in Pike County for a brief period while on home incarceration. She arrived at Dale's around 1pm that day upon release. Fields had consoled her because Stacy did not want her to stay at his house, because she was on house arrest. According to the judge's order, she was not to leave Letcher County, but Fields allegedly did not report this. Fields would visit her in the evenings to bring her cigarettes and console her. (Sabrina Adkins, Deposition Pages 64-67).

Adkins proceeded to tell Fields that she did not have the money for her ankle bracelet. Before her bracelet was placed on her, she had to pay a monitoring fee that her sister Melissa Polly. Adkins was terrified of the Letcher County jail because the conditions of the jail were very poor. While in jail she made written complaints regarding her treatment, as she developed a severe yeast infection and was not allowed to take a shower. She was under home incarceration supervision from June 2021 to January 2022. (Sabrina Adkins, Deposition Pages 64-70).

Fields would make flirtatious comments about her looks and body and told her he was confident they could work something out.  In particular he allegedly told Adkins she was pretty, and she had pretty legs. She did not make any flirtatious comments towards Fields prior to his advances. After speaking with Fields, she filed motions with the Court in an attempt to lower her device fee, but they all were denied. Before Fields told her they could "work something out" in return for sexual favors, she had heard allegations that women had given him sexual favors in exchange for not having to pay for their house arrest fees. She had heard these allegations from

Crystal Dishman and Amanda Stills prior to her release from jail. (Sabrina Adkins, Deposition Pages 70-76).

Fields would regularly communicate with Adkins via text. She texted with Fields daily for a period of seven (7) months while she was on home incarceration. While she was on home incarceration, she was to go in once a week and report to Fields at the courthouse to pay her fees. A month after being released, she stopped making payments to Fields. (Sabrina Adkins, Deposition Pages 76-79).

Upon being shown a series of Facebook messages, she agreed that she begin exchanging Facebook messages with Fields in June 2021. She agreed that some of the messages she sent to Fields were sexual. (Sabrina Adkins, Deposition Pages 112-114).

In late 2021 she alleged that Fields had asked her to meet her at the Letcher County courthouse after dark. Upon meeting with Fields that day in Judge Mullins chambers, she was upset, and told Fields she did not know how she was going to pay for her bracelet. She also told him that she had relapsed and needed to go to rehab. Fields proceeded to remove her bracelet. Fields would then later put the bracelet back on before she went to Court, and then proceed to take the bracelet off after Court.  This occurred a total of four (4) to six (6) times. No one witnessed this occurrence, as the courthouse was always closed. She believed that Dale might know about these instances as he would wait in the car while her bracelet was taken off. (Sabrina Adkins, Deposition Pages 80-82).

From June 2021 to December 2021 as their relationship became flirtatious, she could not recall what she told Fields about his advances as she was scared at the time. She also agreed that she made flirtatious comments towards Fields during this time period. She would send pictures of herself to Fields in hopes of not having to pay her ankle bracelet fees and to flirt with Fields. After the second or third meeting at the courthouse, she alleged that Fields behavior escalated to forceful kissing. She could not recall the date. She also alleged that while shopping at Wal-Mart he had told her leg was too pretty to be swollen and would visit Dale's apartment to change her bracelet. (Sabrina Adkins, Deposition Pages 82-88).

The first time Fields kissed her was in Judge Mullins chambers as he grabbed her and kissed her on the mouth. She did not recall whether she told him to stop or if she kissed him back. The sexual behavior escalated to oral sex in December 2021 at the courthouse in Judge

Mullins chambers. She performed oral sex on Fields on two occasions and engaged in sexual intercourse one time. She did not believe there were any witnesses. She also agreed that she engaged in these behaviors voluntarily, and was not held down or anything of the sort. During her meeting with Fields, he was always in his Sheriff's uniform and drove a Letcher County Sheriff Department vehicle. (Sabrina Adkins, Deposition Pages 87-91, 110-111).

Fields believed that she had to engage in these behaviors, or she would go back to jail for not paying her fees. She had asked family including her son, ex-husband Greg, and her current landlords Greg, and Gay Edmonds to help pay her fees. During this time Adkins would relapse and started using meth, about a month after her release from jail. She was using about $50 a day for meth, and her ankle bracelet fees were $85 a week. In December 2021 Stacy Yates would begin making complaints about Fields at the courthouse to his drug court case workers Robbie Kincer and Holly Boggs. (Sabrina Adkins, Deposition Pages 90-94).

Yates had made this complaint about Fields as he had gotten into an argument with her. Adkins was dating Yates at the time of the incident. Adkins did not make a complaint about Fields as she was scared to go back to Letcher County jail. Adkins did not suffer any physical injuries from her sexual interaction with Fields, such as bruising, broken bones, etc. because of Fields alleged conduct. She agreed that her allegations relate to mental and emotional type damages. She stated that since the incident, she has been having nightmares. As a result of her damages, she has sought treatment at Mountain Comp, with Rich Godman at ARC facility, and King's Daughter's. She was last treated with these facilities in January 2023 and last December. She mostly recently sought counseling in February 2024 at ARC. (Sabrina Adkins, Deposition Pages 96-102).

She is also not familiar with the allegations raised by Jennifer Hill against Fields. She last spoke to Fields around January 2022 when he told her that she had a warrant for escape for failing to wear her bracelet. Fields did not make any physical threats to her, but Patty Stockham who worked for East Kentucky Correctional, the company in charge of her bracelets, told her not to speak to Fields again. She did not view this as a threat. (Sabrina Adkins, Deposition Pages 106-108).

**BILLY ADAMS (JENNIFER HILL'S SON AND ADMINISTRATOR**

Adams offered little to no information regarding allegations raised by his mother Jennifer Hill in her complaint. He confirmed that he is the Administrator of his mother's estate. He testified that he did not have much of a relationship with his mother. In fact, he last saw her in 2020. He testified that he last saw her in 2020, because he did not want her lifestyle of drugs around his children. He suspected that she died of an overdose. (Billy Adams, Deposition Pages 3, 13-14, 31).

Billy had no knowledge as to Hill's medical or counseling history. He also had no knowledge about the facts of the case or any knowledge about her incarceration. He also had no knowledge about her suspected criminal history. He would only learn about the case after Jennifer's attorney had reached out to him in the past year. He confirmed that Jennifer lost custody of him and his siblings in 2014. She would never regain custody of the children as they would live with Ryan. He has not spoken to his siblings about the case, and did not know most of the individuals Johnny Potter, Betty Jo Mckenzie, Ethan McKenzie, Devon McKenzie, Paula Cambell, Anthony Potter, Bert Slone, Angie Fields, Holly Boggs, and Chris Triplett  that Jennifer disclosed a possible witnesses about the allegations raised in the complaint including Fields. Billy Adams, Deposition Pages 13-17, 19, 22-26,).

Billy testified that he had "no idea" about the amount damages being sought in this case. (Billy Adams, Deposition Page 28).

**DEFENDANT SHAWN MICKEY STINES**

Former Sheriff Stines went to the Letcher County Sheriff's Office to work when Steve Banks was the Sheriff around 2002. He worked as a Court Security officer. Which in that position, Judge James T. Wood and County Attorney Harold Bolling approached Stines about a job for East Kentucky Correctional Solutions (EKCS). Once employed, he worked with Patty Stockham to be trained. He said he worked for EKCS for 14-16 years, starting in around 2004. (Mickey Stines, Deposition Pages 9,12-16).

Former Sheriff Stines testified that Ben Fields was hired by Sheriff Webb but he recommended him to Webb. Stines took state training at the Sheriff's Conference. He attended every year but the year of Covid. When Stines became Sheriff, he left EKCS and recommended

Ben Fields to Patty Stockham to be her new employee over home incarceration. (Mickey Stines, Deposition Pages 41-45, 50-53, 62).

He was asked about policy and procedure with regard to outside employment of Ben Fields, and he said they just had a verbal agreement. He was asked if Ben Fields was violating policy if he was wearing his deputy sheriff uniform, while working for EKCS, and he stated that it was okay, if he was in the courthouse. He was asked about using the deputy cruiser in his role as EKCS representative, and he said it was ok if he was stopping on his way home to get a monitor out of the creek or something. He was asked if he terminated Ben Fields because of his violation of the ethics policy or "conduct unbecoming" of a police officer, and he reviewed Field's Termination Letter which confirmed he had. (Mickey Stines Deposition Pages, 54, 60-75).

He denied that Chris Triplett had filed a complaint with the sheriff's office of sexual misconduct on behalf of Ben Fields. He stated he first found out about Ben Fields' sexual misconduct by a reporter who called the Sheriff's office but was unaware of the date. After he found out about the alleged misconduct from the reporter, Brianna Cornett came in to talk with him. He talked with the Commonwealth Attorney, Edison Banks, who advised him to open an investigation. KSP would not take the investigation, but the Attorney General's Office did. (Mickey Stines Deposition Pages, 100, 109-111).

A recording was played from Brianna Cornett where Cornett stated that her mother came twice and talked to Stines about Fields' behavior, but Stines denied ever speaking with Cornett's mother. (Mickey Stines Deposition Pages, 137-138).

According to Stines, Judge Craft and Robbie Kincer from Drug Court both knew about Ben Fields' alleged misconduct, but did not tell him until after he had already learned about it on January 31st, 2022. He later met with Brianna Cornett the same day. She told him what had happened between her and Ben Fields. Lashauna Frazier was present at the time of this meeting. He did not record a statement or anything. He wrote down her name and number and told her he would have somebody contact her. He then created a letter of suspension for Fields. He then met with Fields the same day, gave him the suspension letter, and told him what he had learned from the reporter and Judge Craft and Kincer. Stines did not recall much from the meeting with Fields. (Mickey Stines Deposition Pages, 146-148, 150-152,172, 188-189).

11

He called Patty Stockham on January 31st to tell her what he had learned. Stines said he apologized to her for recommending Fields. On February 2nd he talked with Bert Slone who told him that whoever investigated it needed to talk to Ben's wife, who worked at the jail. He later sent in a form to the Kentucky Law Enforcement Council to notify them of Fields' suspension. He gave a termination letter to Fields on February 2nd. On February 10th Judge Craft contacted him and said that Brianna Cornett had informed him of more information about Fields. (Mickey Stines Deposition Pages, 175-178, 188,).

## DEFENDANT BENJAMIN CHARLES FIELDS

Ben met Mickey Stines when Stines was a bailiff and Ben worked at the jail. They developed a friendship, and Ben would often go to Stines' house for poker parties. Stines later approached Ben about a job if he won the election for Sheriff. When he did win, Ben went to work for him in 2019. Stines later got him the job at East Kentucky Correction Solutions (EKCS). In 2019 he shadowed Stines to learn how to do that job. He knew both Judge Mullins and Judge Craft in their capacity as Judge, but not outside the courtroom. (Benjamin Fields Deposition Pages, 42-47, 50).

Ben Fields only worked with Patty Stockham at EKCS. She trained him on how to do the ankle monitoring. He interacted with pretrial sentences in his capacity as EKCS.   Part of his job with the Sheriff's Office was to transport prisoners. He had a Sheriff's uniform, a badge and a gun. (Benjamin Fields Deposition Pages, 53-54, 56-57, 61, 63).

He was working for EKCS while he was a bailiff, and he said he sometimes hooked inmates up on home incarceration on his lunch or on days there was no court. He was paid half of the hookup fee for anybody he hooked up and 2.00 per day per person monitored. (Benjamin Fields Deposition Pages, 63, 73, 76-79).

It was noted in this deposition by text references that Patty Stockham looked to Ben to help with decisions about bond conditions. He stated this was because he knew their bond conditions better, and had access to the judge to ask if an inmate would be allowed to do something. If he wasn't present with the judge, he would text him and ask permission. The judge told him he had authority to make decisions on behalf of some people. Sometimes he would get warrants on those who had violated home incarceration. (Benjamin Fields Deposition Pages, 83-85-86, 89).

He stated that sometimes those on house arrest would leave their home incarceration fees with the deputy jailers. He was asked about policies with the sheriff's office about conduct on and off duty, being beyond reproach and using their departmental position for gains and if he violated those policies, to which he stated he was not sure. He was asked if he was terminated, but he stated again he was not sure if it was for violating those policies. There were numerous questions about sexual misconduct and he answered that he wasn't sure or didn't remember to a lot of them. He testified that he had never had sexual contact with anyone that he arrested as a deputy, and that arrest powers his was only inside the courthouse. He admitted to having sexual contact with Sabrina Adkins, but he denied having any sexual contact with Brianna Cornett or Jennifer Hill. (Benjamin Fields Deposition Pages, 94-98, 101, 103-104).

He was asked about secondary employment and the policy with the sheriff's office, and if home incarceration was a type of law enforcement work. He didn't agree that it was. Opposing counsel made a reference to ankle monitors being called "Ben Bands" but he stated he never referred to them as that. He was asked if he had sexual conduct with a number of women specifically by name, and he stated that he did not, to all of them. He did admit to having flirtatious conversations with Brianna Cornett but denied kissing her in his cruiser, although he also admitted to picking her up at her mother's and taking her to jail because she had violated her home incarceration. (Benjamin Fields Deposition Pages, 106-108, 113-115, 128-137).

He admitted to going to Jennifer Hill's residence when there was a call that she was laying in the road overdosed, but he was in his truck not his police cruiser. He denied having any sexual conduct with Jennifer Hill and denied going to her house again and making her get inside the vehicle. When about her release from jail and whether her cell phone was returned to her, he had no knowledge. (Benjamin Fields Deposition Pages, 149-154).

He spoke of the time when he first met Sabrina Adkins, and when he hooked her up on home incarceration. Her boyfriend Stacy Yates called and told him she wasn't allowed to stay at that residence, so he and another deputy, Jason Eckels, went to the residence and gave her a ride to another residence. He felt sorry for her at one point, and unhooked her ankle bracelet he said so she could go to rehab. He lied to Patty Stockham, and told her that Sabrina was taken off house arrest. He stated he only told Patty Stockham twice that people were off home

13

incarceration when they weren't, Sabrina Adkins and Brianna Cornett. (Benjamin Fields Deposition Pages, 156-160, 162-163, 166-167).

He admitted to having sexual contact with Sabrina in the bathroom by the Judge's secretary's office. Not in the judge's chambers. He stated he was in the bathroom once with her. He stated he hugged her another time and that they were in the courthouse after hours several times. He stated that he didn't recall telling her that he could help her with her fees. He also didn't recall telling her that his uncle could help her with criminal charges. (Benjamin Fields Deposition Pages, 168-171).

Opposing counsel brought up that Stacy Yates had gotten an EPO against Sabrina Adkins and Judge Craft had asked Ben to look and see if she had left her house, and if so, to get a warrant for escape. But he couldn't, because he had let her off house arrest. He stated he thought he told that judge that her GPS was messed up and he couldn't get any information on it. He stated that he did not know that Stacy Yates had a relationship with Brianna Cornett. He was also unaware that Stacy Yates had reported his relationship with Sabrina to Robbie Kinzer in drug court. He stated he finally did swear out a warrant because Sabrina was supposed to come in. She was later arrested on escape for the Warrant he swore out. (Benjamin Fields Deposition Pages, 183-186-192-195).

Mickey Stines was the first person to contact him and tell him of a lawsuit and that it was in the news. He stated he and Stines had a talk in Stines' office on January 31st, 2022, and that Stines asked Ben if it was true and Ben told him no. During that meeting Ben turned in his badge and gun. Stines later gave him a letter on February 2 terminating his employment. He called Patty Stockham at some point between January 31 and February 2 and told her what was going on. She terminated his employment as well. (Benjamin Fields Deposition Pages, 196-202-204-206).

He pled guilty to 3rd Degree Rape, 3rd Degree Sodomy, Tampering with Prisoner Monitoring Devices, and Perjury 2nd Degree. He stated that he has not spoken to Mickey Stines about the case. (Benjamin Fields Deposition Pages, 206-209).

**<u>PATTY STOCKHAM</u>**

When her husband was diagnosed with Leukemia, Patty became President of EKCS. At the time she became President, Mickey Stines was an independent contractor of EKCS. He worked in Letcher County for EKCS for around 20 years. Mickey Stines was recommended to Patty by Judge Woods. He worked at the jail at the same time he worked for EKCS. He left EKCS when he ran for Sheriff at the end of 2018. (Patty Stockham Deposition Pages, 15-16, 23)

Oddly enough, EKCS is not insured, and has never been. It does not own any real property. Their workers are all independent contractors who file LLC paperwork, and their checks are made out to the LLC. Ben Fields was an independent contractor who was recommended by Mickey Stines, who also worked at the jail with Mr. Stines. Patty Stockham Deposition Pages, 29, 33-34)

Mrs. Stockham did not seem concerned with paperwork. She did not give any directions to her workers on how to keep files or what they did with them. EKCS did not provide training on sexual harassment or sexual assault. There were no policies when supervising family members or close family friends. There were no uniforms for EKCS workers to wear. There was no paid mileage for travel. Mrs. Stockham did the training for workers herself. The software she used, had online training which she would watch. Others did not have access to the program. Independent contractors received $25 per hookup and $3 per day that person was on home incarceration. Patty Stockham Deposition Pages, 35-40, 42-43, 45-47, 50)

Workers had receipt books and gave written receipts to those who paid their home incarceration fees. Mrs. Stockham said folks usually always paid. But if they didn't, they would usually let them wait until the next week. Patty Stockham Deposition Pages, 50-51)

Plaintiff's Counsel had a copy of the contract signed by inmates when they went on home incarceration. He went over that with Mrs. Stockham. She advised that they agreed to follow the court order which controlled. According to Mrs. Stockham, if a supervisee just got out of range it wasn't a violation. She said they rarely had an escape violation, maybe twice a year in Letcher County. When they did, she would send to her representative and they would go to the Judge and get a warrant for that escape. Any violations according to Mrs. Stockham were reported to her representative, and they would notify the judge. She never got confirmations that any of that was provided to the Court, she trusted her representatives. If clients did not charge the unit and it went dead, that could lead to a violation. Patty Stockham Deposition Pages, 59-61, 65-69, 71-73)

If supervisees had a problem and needed to leave the home, in which they were living, they were to call Mrs. Stockham. She stated she assumed if there was a problem with her contractors that the inmates would have spoken with her. When pressed with records for Sabrina Adkins, Mrs. Stockham stated that Ben would tell her the Judge gave her permission to do things and she would make a note of it. Patty Stockham Deposition Pages, 83-86).

If there was a violation, sometimes Mrs. Stockham would call the supervisee first to see what was going on, then check with Ben to see if they had permission. If they didn't, then she would give him the printout to give to the Court for a warrant. According to Mrs. Stockham, Ben had told her that Ms. Adkins had permission to go stay in Pike County with her ex-husband and son from time to time to care for her ex-husband who was ill. She said she followed up with the Judge and he had given her permission to go. Patty Stockham Deposition Pages,95-100).

Mrs. Stockham learned later that Sabrina Adkins was not taken off of home incarceration like she thought on August 2, 2021. She found that out after she fired Ben and talked to the investigator. She did not know about the charges against Ben until Mickey Stines called her, after which she called Ben and fired him. Patty Stockham Deposition Pages, 105-110).

When asked about Jennifer Hill's violations, she said the same thing she about Ms. Adkins violations, that some of them were not truly violations. However, on one occasion, according to Mrs. Stockham, Ms. Hill had cut her strap on her ankle bracelet. Patty Stockham Deposition Pages, 128-129).

## IV.
## ARGUMENT
### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.,* 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); _Lindsay_, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is  no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. _Celotex Corp._, 106. S. Ct. at 2253; _Bass v. Robinson,_ 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." _Celotex Corp._, 106 S. Ct. at 2552; see also id. at 2557 (Brennan, J., dissenting).

A fact is "material" if the underlying substantive law identifies the fact as critical. _Anderson_, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." _Id._ A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 2511; _Matsushita Elec._, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. _Salt Lick Bancorp v. FDIC_, 187 F. App'x 428, 444–45 (6th Cir. 2006).

## B.

## PLAINTIFFS FOURTH AMENDMENT INDIVIDUAL CAPACITY CLAIMS AGAINST FIELDS UNDER COUNT I MUST FAIL

In Count One, Plaintiffs allege that Fields' knowing and reckless sexual abuse of the Plaintiffs constituted a violation of Plaintiffs' right to be free from unreasonable search and seizure, secured by the United States Constitution Amendment IV, which is actionable pursuant to 42 U.S.C.§ 1983.

"[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments. Id. The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," id., while the Eighth

Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. See *Whitley v. Albers, 475 U.S. 312, 318–322, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)*. When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment. *See Lanman v. Hinson, 529 F.3d 673, 680–81 (6th Cir.2008).*

Here, Plaintiffs appear to have been pretrial detainees at the time of their home incarceration. A pretrial detainee's Fourteenth Amendment rights, consists of an objective and subjective component. In failure-to-protect cases, the plaintiff must demonstrate exposure "to a substantial risk of serious harm" in order to satisfy the objective element. *Amick v. Ohio Dep't of Rehab. & Corr., 521 F. App'x 354, 361 (6th Cir. 2013).* With respect to conditions of confinement, the plaintiff must show "that the alleged deprivation is 'sufficiently serious and that the official's act or omission resulted in the denial of the 'minimal civilized measures of life's necessities.'" *Ruiz-Bueno v. Scott, 639 F. App'x 354, 359 (6th Cir. 2016) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).* To satisfy the subjective prong, a plaintiff claiming a violation of her right to protection or humane conditions of confinement must prove that the defendant knew of and disregarded "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837*; *accord Amick, 521 F.App'x at 361; Ruiz-Bueno, 639 F. App'x at 359. T*he same standard applies to analogous claims arising under the Eighth Amendment. See Farmer, 511 U.S. at 834.

The Sixth Circuit, as well as other courts, has held that uncoerced, voluntary, consensual sex cannot form the basis for an Eighth Amendment claim. *Hall v. Beavin, 202 F.3d 268, at *1 (6th Cir. Nov. 8, 1999); Freitas v. Ault, 109 F.3d 1335, 1338-39 (8th Cir. 1997); Fisher v. Goord, 981 F. Supp. 140, 174-175 (W.D. N.Y. 1997)* ("consensual sexual interactions between a correction officer and an inmate, although unquestionably inappropriate," do not violate Eighth Amendment); *Baca v. Rodriguez, 2013 WL 12147634, at *6-7 (D. N.M. Jan. 24, 2013); McGregor v. Jarvis, 2010 WL 3724133, at *11 (N.D. N.Y. Aug. 20, 2010); Edge v. Ferrell, 2008 WL 942038, at *6-7 (S.D. Ala. Apr. 7, 2008); Stubbs v. DeRose, 2007 WL 776789, at *5-7 (M.D. Pa. Mar. 12, 2007)* (consensual sex did not cause "an objectively serious injury to the plaintiff"); *Phillips v. Bird, 2003 WL 22953175, at *6 (D. Del. Dec. 1, 2003)* ("Consensual sex between two

adults does not constitute cruel and unusual punishment simply because it occurs within the walls of a prison.").

Moreover, the fact that a prisoner may lack legal capacity to consent in the context of criminal liability "does not mean that an inmate can avoid the consequences of consent in a civil suit." _Phillips, 2003 WL 22953175, at *6; McGregor, 2010 WL 3724133, at *10-11_ (rejecting argument "that just because for criminal prosecution purposes an inmate is considered incapable of providing consent," consensual sexual relationship violated inmate's constitutional rights); _Doe v. Cunningham, 2007 WL 990141, at *2 (W.D. Va. Mar. 29, 2007)_ ("welcome, voluntary attentions are not violations of a prisoner's rights, even when they are prohibited by state law").

Moreover, the Sixth Circuit has held that "isolated, brief, and not severe" instances of sexual harassment, without more, do not give rise to Eighth Amendment violations. _Jackson v. Madery, 158 F. App'x 656, 662 (6th Cir. 2005)_ (finding that harassing comments, even coupled with one minor instance of sexualized touching during a search, fall short of an Eighth/Fourteenth Amendment violation), abrogated in other part by _Maben v. Thelen, 887 F.3d 252 (6th Cir. 2018); Violett, 76 F. App'x at 27_ (an offer of sexual favors is not sufficient to state Eighth Amendment claim); _Johnson v. Ward, No. 99-1596, 2000 U.S. App. LEXIS 11463, 2000 WL 659354, at *1 (6th Cir. May 11, 2000)_

Here, Plaintiffs have failed to show a substantial risk of serious harm" in order to satisfy the objective element of their Count One Claim. It is not credibly disputed that Adkins consented to the sexual encounter with Fields, and admitted that her text messages in exchange with Fields were flirtatious in nature, and sent him flirtatious photographs. _(See **Exhibit 2**, Text Messages and Photographs)._ (Sabrina Adkins, Deposition Pages 82-86). Adkins testified that she heard through other inmates at the jail that Fields would exchange sexual favors in return to letting females get out on home release and off their ankle bracelet eventually prompting her sexual filtrations with him. It has also been established by Adkins that she started using meth around forty (40) years old and Adkins herself testified that she was using around $50 a day on meth while her ankle bracelet fees were $85 a week. Despite Adkins testimony, she was scared to go back to the jail if she did not condone the sexual behavior as she could not have paid her fees. The $350 a week she was spending on meth would have easily covered the monitoring fee.

Furthermore, the sexual encounters by the parties involved were brief and isolated taken occurring over a span of months and not severe in nature as Adkins testified that she was not held down against her will and participated in the actions. As for Hill, Fields has denied any wrongdoing let alone sexual encounters with her. Thus, the objective element has not been met by the Plaintiffs and Count One claims against Fields in his individual capacity must fail. As referred to below later in this memorandum by Chris Tripplet's statement regarding Hill's knowledge these claims are time barred. *(See Pgs. 22-23)*.

<u>C</u>.

## PLAINTIFFS FOURTEENTH AMENDMENT CLAIMS IN COUNT II AGAINST FIELDS IN HIS INDIVIDUAL CAPACITY MUST FAIL AS A MATTER OF FACT AND LAW

In Count Two of the amended complaint Plaintiffs allege they had a fundamental liberty right to personal security and bodily integrity extending specifically the right to be free from sexual abuse. That the actions of Defendant Fields constitute a violation of Plaintiffs' substantive due process rights, secured by the United States Constitution Amendment XIV, which is actionable pursuant to 42 U.S.C. § 1983.

To allege a plausible claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) she was "deprived of a right secured by the Constitution", and (2) "such deprivation occurred under color of state law." *Doe v. Claiborne Cnty., ex rel. Claiborne Cnty. Bd. of Educ., 103 F.3d 495, 511 (6th Cir. 1996).* Substantive due process protects "a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" Id. (quoting *Bell v. Ohio State Univ., 351 F.3d 240, 249-50 (6th Cir. 2003)).*

"[T]he list of fundamental interests is short and includes: the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment." *Langston v. Charter Twp. of Redford, 623 F. App'x 749, 759 (6th Cir. 2015) (citing Washington v. Glucksberg, 521 U.S. 702, 720, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)).*

20

Even absent the deprivation of a fundamental right, substantive due process is violated by government action that "shocks the conscience*." Range, 763 F.3d at 588*. This is a demanding standard. "When the conduct in question has been taken by an executive officer, the action violates substantive due process only if it can be characterized as 'arbitrary, or conscience shocking, in a constitutional sense.'*" Handy-Clay v. City of Memphis, 695 F.3d 531, 547 (6th Cir. 2012) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998))* (citation and internal quotation marks omitted). "[T]his characterization applies to only the most egregious official conduct, conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency." *Id. at 547-48* (internal citations and quotations omitted). Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas, 763 F.3d 573, 589 (6th Cir. 2014) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846-47, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).*

Whether state action shocks the conscience is context-dependent. *Range, 763 F.3d at 590.* The Sixth Circuit has explained that courts should apply a sliding-scale approach to such claims based on the *mens rea* of the government officials involved, where merely negligent action by government officials leading to harm will almost never shock the conscience, deliberately harmful action will be the most likely to shock the conscience, and mental states in the middle will depend on circumstances. Id. After determining the appropriate *mens rea*, the Sixth Circuit has instructed courts to look to three factors: (1) the nature of the relationship between the government actor and the plaintiff, (2) the time government officials had to deliberate in making their decision, and (3) the countervailing government interest involved, if any. Id.; *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ., 542 F.3d 529, 536 (6th Cir. 2008).*

*I*n evaluating the first factor, evidence that the plaintiff did not voluntarily engage with the government actor would weigh in favor of a finding that government action shocks the conscience. *Hunt, 542 F.3d at 536-37*. Here no rational juror could conclude that Adkins did not voluntarily engage in sexual conduct with Fields. In evaluating the second factor, evidence that government officials had a great deal of time to deliberate would weigh in favor of a finding that government action shocks the conscience. *Range, 763 F.3d at 590*. And in evaluating the third factor, the existence and importance of a countervailing government interest always weighs against a finding that government action shocks the conscience. *Hunt, 542 F.3d at 540-43; Schroder v. City of Fort Thomas, 412 F.3d 724, 729 (6th Cir. 2005).*

21

Here, even if Adkins or Hill could prove that their right to bodily integrity was violated, the action does not meet the challenging "shock the conscience" test. Fields had no intention of harming the Plaintiffs as any sexual interaction with Adkins was consensual. He has denied any sexual encounters with Hill. The same can be said under the mens rea analysis as well. Thus, as Fields in his individual capacity had no intention of harming any of the parties, the shock the conscience standard has not been met.

Lastly, as referenced in more detail above Adkins sent flirtatious and explicit sexual messages along with photographs consenting to the encounters. Her argument that she acquiesced to the behavior because she was afraid to go back to jail for not paying her bracelet fees is spacious due to the amount of money she was spending weekly to support her meth addiction. Fields has denied any wrongdoing on behalf of Hill and those criminal charges relating to her (Benjamin Fields, Deposition Pages 150-153, 207) were later dismissed.

### D.

### PLAINTIFFS 42 U.S.C. 1983 CLAIMS AGAINST DEFENDANT FIELDS IN HIS INDIVIDUAL CAPACITY FAIL UNDER AS A MATTER OF LAW UNDER QUALIFIED IMMUNITY

Defendant Fields is also protected by qualified immunity under federal law. Individual

"Qualified immunity, in its simplest terms, is given to an officer who may have violated a constitutional right of a person, *if the officer's actions are such that a reasonable officer could have believed that the actions were lawful, in light of clearly established law and the information the officer possessed*." *Martin v. Eastlake,* 686 F. Supp. 620, 625 (N.D. Ohio 1988) (emphasis added). When Defendants are entitled to qualified immunity in a case brought under § 1983, such case should be terminated as early in the litigation process as possible, typically by summary judgment. *Anderson v. Creighton*, 483 U.S. 635, 637 (1987); *Harlow*, *supra,* at 817. Here, any action taken by Fields in his individual capacity was consensual in nature and thus Fields was not on notice that his his actions may be unlawful as sex between two consenting adults is protected

22

under qualified immunity. Patty Stockham has testified that she had no written policies of any kind. (Patty Stockham Deposition Page 40).

Furthermore, he has denied any sexual encounters with Hill. A number of cases support invocation of qualified immunity here, as set out in <u>Argument B</u> found at pages 17-19, *supra*. These numerous cases relating to consent, would have only put Defendant on notice that his conduct did not rise to a constitutional violation.

## E.

## COUNT III

Count III in the amended complaint is not applicable against Fields in his individual capacity as Plaintiffs allege Deliberate Indifference/Failure to Supervise and Train pursuant to 42 U.S.C. § 1983 against Defendants Letcher County Sheriff and KKCS.

## F.

## PLAINTIFF HILL'S 1983 AND STATE LAW CLAIMS ARE TIME-BARRED

Plaintiffs in their Response to Stines and Fields Official Capacity Motion for Summary Judgment memorandum (DN, 133) cite the affidavit of Chris Triplett wherein he testifies that on or around December 2019 he became aware of Ben Fields' alleged sexual abuse of Jennifer Hill. See R. 139-9, Triplett, 3 (Page ID# 1875).

Section 1983 claims do not contain their own statute-of limitations period.  Constitutional claims asserted under § 1983 are governed by the state personal injury statute of limitations. *Fox v. DeSoto, 489 F.3d 227, 233 (6th Cir. 2007) (citing Wilson v. Garcia, 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985))*. Personal injury actions in Kentucky "shall be commenced within one (1) year after the cause of action accrued." *Ky. Rev. Stat. § 413.140(1); Collard v. Ky. Bd. of Nursing, 896 F.2d 179, 182 (6th Cir. 1990).* Thus, Hill's Complaint here was filed over two years after Hill's reports that  alleged conduct began in 2019. The Complaint in this matter was filed on January 31, 2022. Accordingly, Hill's claims are time barred and should be dismissed.

KRS 413.120(6) sets forth a five-year statute of limitations for injuries arising out of miscellaneous claims of a non-specific, non-contractual nature. Claims for the Intentional Infliction of Emotional Distress have been held to fall into this category. However, a claim for a

more traditional tort, such as defamation, cannot be saved from the application of the one-year statute of limitations by the addition of a claim for intentional infliction of emotional distress, where that claim is based upon the same facts. *See Mock v. Panera Bread Co., No. 2021-CA-1393-MR, 2022 Ky. App. Unpub. LEXIS 560, 2022 WL 4587812, at *2 (Ky. Ct. App. Sept. 30, 2022).*  Also see *Shaw v. Handy, 588 S.W.3d 459, 461-62 (Ky. App. 2019) (citing Childers v. Geile, 367 S.W.3d 576, 582-83 (Ky. 2012)). Taylor v. Wilson, 2025 Ky. App. Unpub. LEXIS 64, 2025 LX 72120, 2025 WL 422998* (holding that ("A complaint cannot be saved from limitations by pleading intentional infliction of emotional distress to reach the longer statute when the facts support a claim for a more traditional personal injury tort with mental pain and suffering as part of the damages rather than severe emotional distress caused by outrageous conduct.").

Hill's state law claims are also barred pursuant to KRS 413.140.  KRS 413.140(1) provides that personal injury claims among others "shall be commenced within one (1) year after the cause of action accrued." Thus, Plaintiff Hills claims of Assault and Batter, Negligence, Gross Negligence, Neglect, and Intentional Infliction of Emotional Distress are trial barred.

## G.

## PLAINTIFFS CLAIMS OF NEGLIGENCE, GROSS NEGLIGENCE, ASSAULT, AND BATTERY AGAINST FIELDS IN HIS INDIVIDUAL CAPACITY MUST FAIL

### I. Claims of Negligence and Gross Negligence Must Fail

In Count IV of Plaintiffs allege that the actions of Fields were negligent, grossly negligent, and constitute assault and battery. Under Kentucky law, a negligence claim requires proof that "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) [a] consequent injury [occurred]." *Pathways, Inc. v. Hammons, 113 S.W.3d 85, 88 (Ky. 2003).* "'Consequent injury' involves 'actual injury or harm to the plaintiff and legal causation between the defendant's breach and the plaintiff's injury.'" *L. C., 83 F.4th at 550 (quoting Hammons, 113 S.W.3d at 88-89).*

Even after showing that there is a genuine issue of material fact on the elements of duty of care and breach, Plaintiffs must still establish causation. Under Kentucky law, a plaintiff may show legal causation by demonstrating that the defendant's conduct was "a substantial factor in

24

bringing about the harm." *Pathways, Inc. v. Hammons, 113 S.W.3d 85, 92 (Ky. 2003).* The term "substantial" is "used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense ... rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Id.* The Court has a "duty to determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Id.*

Here, even if Plaintiffs can show that Fields had a duty and breached that duty his conduct was not a substantial factor in bringing about any harm. Adkins consented to any such sexual behavior and sent sexual messages and photographs to initiate the encounters. Furthermore, Adams, the administrator of Hill's estate, had no knowledge of the allegations raised in the lawsuit by his mother. Thus, any action taken by Fields was not a substantial factor in bringing about the harm to the Plaintiffs. Specifically, Fields has denied any wrongdoing with Hill stating that no sexual encounter occurred.

Plaintiffs also make a claim of gross negligence and all other state law claims due to the actions of Fields entitling them to punitive damages.

> KRS 411.184(2) provides "A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." In order to justify punitive damages, there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others. See <u>Gibson v. Fuel Transport, Inc.,</u> 410 S.W.3d 56, 59 (Ky. 2013). *See also <u>Phelps v. Louisville Water Co.,</u> 103 S.W.3d 46, 52 (Ky. 2003)* (defining gross negligence as "a wanton or reckless disregard for the lives, safety, or property of others.").

> KRS 4.11.184(c) defines Malice as "either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm."

Here, the Plaintiffs have provided no evidence, establishing the Defendant Fields acted with malice, let alone a flagrant indifference to the rights of the Plaintiff. Simply put, there is no evidence that any alleged negligence from the Defendants was accompanied by wanton or

reckless disregard for the lives, safety, or property of others that would justify a finding that their conduct rises to the level of gross negligence. Adkins consented to any sexual encounters, and she was not held down against her will or coerced into such actions. She agreed that the photographs and text messages were sexual and flirtatious in nature. As evidenced by the graphic messages Adkins texts Fields several sexual messages including that "u show up to arrest (See **Exhibit 2,** Photographs & Text Messages of Adkins Deposition, Pages 234-235, 240-241) I promise I will have a rape charge" and "damn see I need sex I will go to jail for rape next lmao." It is clear that his conduct was not reckless or an indifference to her rights.

Adams, as the administrator of Hill's estate, has no knowledge of the lawsuit or the allegations raised by her and Fields has denied any sexual relations with Hill. Thus, Fields' conduct was not negligent or outrageous towards Adkins or Hill and did not raise to the level of gross negligence. For the same reasons Plaintiffs are not entitled to any punitive damages on the state law claims. Furthermore, Hill's claims are also barred under KRS 413.140. Its noted below in Section II, because Plaintiffs chose to assert claims of intentional conduct of assault and battery, these claims of Negligence and Gross Negligence must fail. See _Ten Broeck Dupont, Inc., v Brooks_ Infra. at p.733.

**II**. **Claims of Assault and Battery must also fail**

Kentucky law defines battery as 'any unlawful touching of the person of another" and requires only single intent: that is, the actor need only intend to make contact, not that the contact be harmful. _Vitale v Hanchey_, _24 S.W. 3d 651, 657-58 (Ky. 2000)_. Assault and battery are distinct claims: "one is liable for assault if 'he acts intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact, and the other is put in such imminent apprehension.'" _Humphress v. United Parcel Service, Inc., 31 F. Supp. 2d 1004, 1014 (W.D. Ky. 1997) aff'd, 172 F.3d 48 (6th Cir. 1998) (quoting Restatement (Second) of Torts § 21)._

In _Ten Broeck Dupont, Inc. v. Brooks,_ 283 S. W.3d 705 (KY. 2009), Kentucky's Supreme Court held that an assault and battery is not negligence, that the former or was intentional and the latter is unintentional. Therefore, negligence and assault and battery claims are mutually exclusive. _Id._ at 733. "[A] plaintiff cannot seek to recover by 'dressing up the substance' of one claim, here assault, in the 'garments of another,' here negligence." _Id._ at 708. Here, thus Plaintiffs

cannot recover under the umbrella of all tort claims-assault, battery, and negligence by dressing up their claims under one theory to support another claim to recovery under a tort action.

In _Banks v. Fritsch_, 39 S. W.3d 474 (Ky. App. 2001), a Kentucky Court of Appeals identified the elements necessary to prove an assault and battery claim. The Court held that assault is a tort which requires merely the threat of unwanted touching of the victim, while battery requires an actual unwanted touching. The Court also holding that intent is an essential element of assault and battery. _Id._ at 480.

Here, Fields had no intent of causing Fields or Adkins any harmful or unwanted touching or contact under assault or battery and neither party was put in imminent apprehension for the purposes of battery. Evidence has already established that Adkins sent flirtatious messages and photographs to Fields, and thus any behavior was consensual among the parties as there was no intent to cause harm to Adkins, and especially Hill due to the lack of knowledge by the administrator of the claims alleged and Fields denial of any sexual encounters. Consensual Contact or the threat of it is not "unwanted."

It should also be noted that the criminal charges relating Fields alleged conduct with Hill were later dismissed. (See **Exhibits 3 & 4,** State Indictment & Civil Case Sheet Dismissing Claims). As referenced on pgs. 22-23 in the argument above, Hill's state law claims should be dismissed pursuant to KRS 413.140.

Furthermore, by Adkins engaging in this behavior sending Fields flirtatious and sexual text messages along with sexual suggestive photographs this negates any claimed negligence on the part of Fields and harm that Adkins alleges as a result of his behavior.

## H.

## PLAINTIFFS CLAIMS OF GROSSLY NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS MUST FAIL AGAINST FIELDS IN HIS INDIVIDUAL CAPACITY MUST FAIL

In Count Five of the complaint Plaintiffs allege that the conduct of Fields was grossly negligent, causing plaintiffs to suffer severe emotional distress. In Count of Six of the Complaint Plaintiffs also allege that the actions of Fields were intentional and offended the generally accepted standards of decency and morality, thus amounting to an intentional infliction of emotional distress, causing

plaintiffs to suffer damages.

To state a claim for negligent infliction of emotional distress, a plaintiff must establish the basic elements of negligence: "(1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Modern Holdings, LLC v. Corning Inc., No. 13-405-GFVT, 2015 U.S. Dist. LEXIS 41134, 2015 WL 1481457, at \*16 (E.D. Ky. 2015) (quoting Osborne v. Keeney, 399 S.W.3d 1, 17 (Ky. 2012))*. In addition, the plaintiff must also show that she has suffered a "'serious' or 'severe' emotional injury." *Osborne, 399 S.W.3d at 17*. A serious or severe emotional injury is one that a reasonable person, normally situated, would not be expected to endure. *Id.* "Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice." *Id.*

Here, plaintiffs cannot prove any serious or emotional injury, and Adams, the administrator of the estate, has no knowledge of the lawsuit itself or any of the claims and/or allegations raised in the complaint. Fields has denied any wrongdoing with Hill. As for Adkins, even if a duty was found to be breached by Fields, she did not suffer a serious injury due to her willingness to partake and consent to the sexual encounters as Fields did not coerce her.

To state a claim for intentional infliction of emotional distress under Kentucky law, Plaintiff must allege four elements. *Craft v. Rice, 671 S.W.2d 247, 249 (Ky. 1984) (citing Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145, 148 (Va. 1974))*. First, Plaintiff must demonstrate "the wrongdoer's conduct was intentional or reckless." *Id.* Plaintiff can demonstrate this when "the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result." *Id.* Second, the Plaintiff must demonstrate that "the conduct was outrageous and intolerable in that it offends against the generally accepted standard of decency and morality." *Id.* This element is "aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Id.* Third, Plaintiff must demonstrate that "there was a causal connection between the wrongdoer's conduct and the emotional distress." *Id.* And fourth, Plaintiff must demonstrate that the "emotional distress was severe." *Id.*

Under Kentucky law, when damages for emotional distress are available through a traditional state tort claim, and the conduct was not intended only to cause extreme emotional

distress, a claim for the tort of intentional infliction of emotional distress ("outrage") will not lie. _Rigazio v. Archdiocese of Louisville, 853 S.W.2d 295, 299 (Ky. App. 1993)_. Courts in Kentucky have continued to apply the distinction set forth in Rigazio. _See, e.g., Childers v. Geile, No. 2008-CA-002114-MR, 2009 Ky. App. LEXIS 226, 2009 WL 3672891, at *4 (Ky. App. Nov. 6, 2009)_ (trial court properly dismissed outrage claim where defendants' alleged conduct amounted to medical malpractice, even though plaintiffs had voluntarily dismissed that claim); _Chambers v. Haas, No. 2008-CA-001546-MR, 2009 Ky. App. Unpub. LEXIS 903, 2009 WL 3400641, at *3 (Ky. App. Oct. 23, 2009) (similar); Doe v. Suroor, No. 3:05CV-728-H, 2007 U.S. Dist. LEXIS 41343, 2007 WL 1651993, at *1 (W.D. Ky. June 6, 2007)_ (plaintiff cannot maintain claim for outrage where she alleges torts of sexual assault and assault and battery). This rule from _Rigazio_, bars Plaintiffs' Intentional and Negligent Inflection of Emotional Distress claims in this case.

In _Rigazio, 853 S.W.2d at 299_, the sexual assault was committed not with the sole intent to cause emotional distress but for the defendant's sexual gratification. Similarly, the court in _Doe v. Suroor, No. 3:05-CV-728-H, 2007 U.S. Dist. LEXIS 41343, 2007 WL 1651993, at *1 (W.D.Ky. June 6, 2007),_ interpreted Rigazio to bar a claim for IIED where the assault was not intended solely to inflict emotional distress but instead "sexual gratification or sexual dominance was the primary purpose at work here." The courts in both _Rigazio_ and _Doe_ held that the actions should be brought as traditional state law torts. Id.

"Kentucky considers the tort of outrage, or IIED, to be a 'gap filler.'" _Watts v. Lyon Cty. Ambulance Serv., 23 F. Supp. 3d 792, 813 (W.D. Ky. 2014) (citing Farmer v. Dollar Gen. Corp., 2012 U.S. Dist. LEXIS 136117, at *20 (W.D. Ky. Sept. 24, 2012))._ Therefore, "where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie." _Rigazio v. Archdiocese of Louisville, 853 S.W.2d 295, 299 (Ky. App. 1993)._ "This means that IIED is not ordinarily a valid cause of action if the alleged conduct also gives rise to a claim for another tort through which emotional distress damages are available." _Dahms v. Correct Care Sols., LLC, No. 3:18-CV-63, 2019 U.S. Dist. LEXIS 173305, at *29 (W.D. Ky. Oct. 7, 2019)._

Clearly these claims of Emotional Distress must be dismissed. The assertion of the Assault and Battery Claims preclude them. Further Plaintiffs cannot establish sever Emotional

Distress through expert proof or otherwise. Finally, as set out above, Hill's claims are time barred.

## I.

## PLAINTIFFS STATE LAW CLAIMS ARE ALSO BARRED UNDER QUALIFIED OFFICIAL IMMUNITY

Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[ ]; (2) in good faith; and (3) within the scope of the employee's authority. *Yanero v. Davis, 65 S.W.3d 510, 522 (Ky. 2001).*

Public officers sued in their individual capacities are protected by qualified immunity to the extent their decisions are "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis, 65 S.W.3d 510, 522 (Ky. 2001)*. To determine if qualified immunity applies, the Court must characterize Defendants' actions as discretionary or ministerial. *Haney v. Monskey, 311 S.W.3d 235, 240 (Ky. 2010)*. Officials have qualified immunity for discretionary acts, which are generally "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero, 65 S.W.3d at 522.* An act is discretionary "when the act may be performed in one or two or more ways . . . ." *Haney, 311 S.W.3d at 240 .* On the other hand, ministerial acts are those are those that require "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (internal quotation marks omitted) (quoting *Yanero, 65 S.W.3d at 522*).

Comparatively speaking, a discretionary act requires "policy-making decisions and significant judgment" while ministerial acts require little thought and are "merely routine" functions. *Stratton v. Kentucky, 182 S.W.3d 516, 519 (Ky. 2006).* Once an act has been determined to be discretionary "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero, 65 S.W.3d at 523*. "'Good faith,' however, is somewhat of a misnomer, as the proof required is really [that] of 'bad faith.' In fact, in most cases, 'good faith' is just a presumption that exists absent evidence of 'bad faith.'" *Sloas, 201 S.W.3d at 475.*

Here, the acts of Fields are protected under qualified official immunity as there was no ill will or bad motive behind his actions. He has denied any wrongdoing or sexual encounters with Hill, and Adkins consented to any such encounters.

## J.

## COUNT VII

Lastly, Count Seven of the Plaintiffs' complaint is not applicable to Fields as Adkins and Hill allege Negligent Retention, Training, Supervision Against Defendant EKCS.

## V.

## CONCLUSION

In the case at bar, this Court should grant summary judgment and dismiss Plaintiffs' claims against Defendant Fields in his individual capacity as a matter of fact and law.

For the reasons stated herein, Plaintiff's 42 U.S.C. § 1983 claims do not rise to the level of a Constitutional Violation. Plaintiff Adkins' consensual actions negate her claims as does the doctrine of mutual exclusivity of cause of action.

Hill's claims, while otherwise also are untimely thus requiring dismissal.

Respectfully submitted,

Jason E. Williams, Esq.
Williams and Towe Law Group
303 S. Main Street
London, KY 40743
Telephone (606) 877-5291
jason@wftlaw.com
brandy@wftlaw.com

By:    /s/Jason E. Williams
JASON E. WILLIAMS, Esq.
*Counsel for Defendant, Ben Fields, individually.*

/s/Jason E. Williams

## **CERTIFICATE OF SERVICE:**

I hereby certify that on May 12, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system and I further certify that I mailed a true and correct copy of the foregoing to:

Jonathan Shaw
PORTER, BANKS, BALDWIN & SHAW, PLLC
327 Main Street, P.O. Drawer 1767
Paintsville, Kentucky 41240-1767
jshaw@psbb-law.com

Ned B. Pillersdorf, Esq.
Pillersdorf, DeRossett & Lane
124 West Court Street
Prestonsburg, Kentucky 41653
pillersn@gmail.com

Bethany N. Baxter, Esq.
Childers & Baxter, PLLC
201 West Short Street Suite 300
Lexington, Kentucky 40507
bethany@jchilderslaw.com

Patty Stockham
Eastern Kentucky Corrections Services, Inc.
1319 Siloam Street
South Shore, KY 41175
pd.stockham@gmail.com

/s/Jason E. Williams
Jason E. Williams