UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

SABRINA ADKINS, *et al.*　　　　　)
　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　)　　　No. 7:22-CV-7-REW
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　OPINION & ORDER
BEN FIELDS, *individually and in his official*　)
*capacity*, *et al.*,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　)

*** *** *** ***

## I.    Background

Plaintiffs Sabrina Adkins and the Estate of Jennifer Hill[1] bring this action against Defendants Ben Fields in his individual and official capacities, Billy Jones in his official capacity, and Eastern Kentucky Correctional Services Inc. (EKCS).[2]  *See* DE 57 (Second Am. Compl.). Fields is a former court security officer (CSO) for the Letcher County Sheriff's Office (LCSO), and Jones[3] is the Letcher County Sheriff.  *See* DE 133 (Fields Depo.) at 40:1–7.  EKCS provides ankle monitoring services for Letcher County.  *See* DE 57 ¶ 5.  EKCS hired Fields to oversee the ankle monitoring program for home incarceration in Letcher County while he was also a CSO. *See id* ¶¶ 86–87.  This case involves Fields's alleged sexual coercion of two women he supervised during their periods of home incarceration.

---

[1] Though the Estate is the party-in-interest, the Court will refer to the Estate as "Hill" for ease of reference.
[2] EKCS represents its name to be "Eastern Kentucky Corrections Services, Inc." rather than "Eastern Kentucky Correctional Services, Inc." *See* DE 155.  However, until formal amendment, this Court will continue to refer to this Defendant by its name as forth in the pleadings. *See* DE 57.
[3] The Second Amended Complaint originally brought claims against Mickey Stines in his official capacity as the Letcher County Sheriff.  Because Stines is no longer Sheriff, the Court earlier substituted Jones as a defendant.  *See* DE 147 (Order of Substitution).

### A.    Fields's Supervision of Adkins

As alleged in the Second Amended Complaint, Adkins's version of events is this: she was incarcerated in the Letcher County Jail from April 2021 through June 2021.  *See* DE 57 at 3 ¶ 2. Upon her release, she was placed on home incarceration.  *See id.* ¶ 3.  Fields was assigned as Adkins's home incarceration officer.  *See id.* ¶ 4.  When she expressed concern to Fields about her ability to pay for an ankle monitor, Adkins claims that Fields made "flirtatious comments" about her appearance and told her that they "could work something out."  *See id.* ¶ 9.  Adkins understood Fields's comments to imply that she would receive preferential treatment from Fields in exchange for sexual favors.  *See id* ¶ 10.  Adkins and Fields began communicating regularly via text message. *See id.* ¶ 11.  In late June 2021, Fields asked Adkins to meet him "after dark" at the Letcher County Courthouse in District Judge Kevin Mullins's chambers.  *See id.* ¶¶ 12–13.  In that first meeting, Fields removed Adkins's ankle monitor, advising her that she would not have to pay the associated fees and could remain on home incarceration.  *See id.* ¶ 14.  Between late June 2021 and December 2021, Adkins alleges that she met Fields in Judge Mullins's chambers several times, with their interactions escalating from "forcible kissing" to oral sex and intercourse.  *See id.* ¶¶ 15–16. According to Adkins, she "was coerced and compelled to comply" due to Fields's "position of power" and because she could not afford her ankle monitor.  *See id.* ¶ 17.  She feared that if she did not comply, she would have to return to the Letcher County Jail.  *See id.*  In December 2021, employees at the Letcher County Courthouse received notice of the relationship between Adkins and Fields.  *See id.* ¶ 20.  Fields filed a criminal complaint against Adkins in early January 2022 on the basis of non-compliance with the terms of home incarceration.  *See id.* ¶ 23.  She was then arrested.  *See id.* ¶ 25.  Adkins claims Fields filed the complaint to punish her and save his own

job and reputation. *See id.* ¶ 24.

Evidence produced in discovery regarding Fields's supervision of Adkins is as follows: in her deposition, Adkins testified that she was arrested in April 2021 and booked in the Letcher County Jail. *See* DE 134 (Sabrina Adkins Depo.) 59:14–60:2. While incarcerated, she heard from fellow inmates that women would give Fields sexual favors so that they would not have to pay for their home incarceration fees. *See id.* at 73:4–14. She was released in June 2021 and placed on home incarceration. *See id*. at 59:23–60:2. Fields was assigned as her supervising officer. *See id.* at 60:8–11. The period of home incarceration extended from June 2021 through January 2022. *See id.* at 77:11–15.

The night of her release, Fields bought Adkins cigarettes to "console" her after she experienced issues with securing housing. *See id.* at 63:13–64:24, 65:24–66:13. He also told her that she was "pretty" and had "pretty legs." *Id.* at 84:2–7. During the interaction, she told Fields that she could not afford to pay for her ankle monitor. *Id.* at 67:22–67:10. She testified that at the time, she was "terrified" to return to the Letcher County Jail due to its "very poor" conditions. *See id.* at 69:9–14. Fields told her that "he could help [her] out, work out something." *Id.* at 72:21–73:1.

Following this interaction, Adkins texted and messaged with Fields on a daily basis for about seven months. *See id.* at 76:17–78:24. This included messages and photographs that were admittedly "sexual in nature." *See id.* at 115:4–116:1. She testified that the messages and photographs were "flirtatious." *See id.* at 84:19–21, 85:8–20. However, Adkins stated that she flirted with Fields because it "was the only way that [she] thought that [she] would be okay on house arrest without paying." *Id.* at 85:8–20.

Sometime in 2021, at Fields's request, Adkins met with him after hours at the Letcher

County Courthouse in Judge Mullins's private chambers. *See id.* at 81:7–16. During that meeting, she cried to him that she did not know how she would pay for her ankle monitor, and Fields removed her monitor. *See id.* at 81:14–21. This initiated a cycle where Fields would meet with Adkins in Judge Mullins's chambers, take her monitor off, put it back on the day she had to appear in court, and then remove it again after court. *See id.* at 81:24–82:7. Fields and Adkins met in this manner between four and six times. *See id.* Upon their second or third meeting, physical contact between Adkins and Fields first occurred. *See id.* at 86:18–87:3. Adkins described the initial contact as involving "forcible kissing" since Fields "grabbed [her] and kissed [her] on the mouth." *See id.* at 88:18–89:2. The first instance of sexual contact occurred between late November and early December of 2021, escalating to oral sex and sexual intercourse in subsequent meetings. *See id.* at 83:9–16, 89:11–90:3. To her memory, Fields made no physical threats against her. *See id.* at 146:12–15. In January 2022, Fields obtained a warrant against Adkins for failure to report to LCSO while on home incarceration. *See id.* at 144:6–9; DE 139-13 (Criminal Complaint).

Adkins testified that she believed that engaging in sexual activity with Fields was her "only option at that time." DE 134 at 91:1–10. She did "what [she] thought that [she] needed and had to do to stay out of jail." *Id.* at 99:16–22. She felt "scared" and "terrified" because of the situation. *See id.* at 84:16–18, 145:23–146:3.

In connection with his interactions with Adkins and another female inmate (B.C., a non-party to the current suit), Fields was criminally charged and ultimately pleaded guilty to third-degree rape, third-degree sodomy, tampering with a prison monitoring device, and second degree-perjury. *See* DE 139-12 (Fields Guilty Plea) at 1–2. The B.C. conviction involved only the tampering. Specifically, he admitted to "advis[ing] [Adkins] he would not require her to pay [the weekly home incarceration] fee, and would allow her to go without the ankle monitor in exchange

for sexual favors." *Id.* at 2.  Consistent with Adkins's deposition testimony, Fields further admitted that he would meet with her "the night before a court appearance to put the ankle monitor on" and then he "would remove it after court."  *Id.*  After he was unable to provide a requesting judge with Adkins's location coordinates, Fields admitted that he "obtained a sworn false criminal complaint" against her for escape "to cover up the fact he allowed her to not wear the ankle monitor."  *Id.*

### B.    Fields's Supervision of Hill

Hill alleges a similar scenario in the Second Amended Complaint: she was incarcerated at the Letcher County Jail in 2019, placed on home incarceration in August 2020, and supervised by Fields.  *See* DE 57 ¶¶ 29–31.  Fields also told Hill that if she could not pay the ankle monitor fees, they "could work something out," meaning that if she "would do him a favor, he would do her a favor."  *See id.* ¶¶ 33–34.  Like Adkins, Hill understood Fields's comments to imply that he would waive her fees in exchange for sexual favors.  *See id.* ¶ 35.  After Hill rebuffed Fields, he arrested her a few days later, claiming that her home did not comply with the home incarceration requirements.  *See id.* ¶ 36.  After her release for that arrest, Hill was arrested again several months later, and again, she was placed on home incarceration under Fields's supervision.  *See id.* ¶¶ 40–42.  Upon her release, Fields visited Hill at her house, warning her that he would arrest her if she did not follow his instructions.  *See id.* ¶¶ 47–50.  Hill states that Fields commanded her to get into the front seat of his vehicle and perform oral sex on him.  *See id.* ¶¶ 51–52.  She "involuntarily complied." *Id.* ¶ 53.  Multiple further instances of sexual contact between Fields and Hill occurred in a similar manner.  *See id.* ¶¶ 58–61.  He consistently reminded her that she "needed to keep him happy" or else she could be arrested again.  *See id.* ¶ 65.  According to Hill, she "was coerced and compelled to comply" with Fields's instructions, given his "position of power over her."  *See id.* ¶ 66.  In approximately October 2021, Fields demanded sex from Hill at her home, but she refused.

*See id.* ¶ 68.  During the same visit, Fields agreed that Hill could visit her newborn granddaughter in London, Kentucky, and removed her ankle monitor.  *See id.* ¶ 69.  Thereafter, Fields reported Hill for a violation of her bond conditions, and she was again arrested.  *See id.* ¶ 70.

Documentation in the record shows that Hill completed one period of home incarceration from September 2, 2021, through October 13, 2021.  *See* DE 139-15 (Hill Incarceration Completion Form).  Hill's fiancé (Chris Triplett) states in an affidavit that that "sometime during [her] period of home incarceration," he "became aware" that Fields commanded Hill to perform oral sex and "submit to sexual intercourse."  DE 139-9 (Triplett Aff.) ¶ 4.  However, he sets the timeframe when he first became aware that Fields "was forcing" Hill "to provide sexual favors" as December 2019.  *See id.* ¶ 3.  There is no affidavit or sworn testimony in the record from Hill, who passed away in 2023.

### C.    Oversight of Fields

#### 1.    Training and Supervision on Sexual Misconduct

LCSO maintains a policy manual with a sexual misconduct policy.  *See* DE 139-3 (Sexual Misconduct Policy).  Fields signed an acknowledgement that he received the policy manual.  *See* DE 136-6 (Signed Acknowledgment).  LCSO also had in force a policy regulating deputy ethics and requiring adherence to proper standards.  DE 136-5. While Former Letcher County Sheriff Mickey Stines testified that he "[didn't] recall" whether LCSO conducted any annual trainings on its policies, *see* DE 135 (Stines Depo.) at 82:24–83:17, Fields confirmed that he reviewed LCSO's policies, *see* DE 133 at 49:11–21.  He recognized his obligation to abide by LCSO policies.  *See id.* at 96.  Stines also separately verified that Fields was "trained" and completed "biannual updated training" to maintain his CSO certification, and "was required to be familiar with and follow department policies and procedures" that "address excessive force, abuse of power, sexual contact,

sexual abuse and sexual harassment." *See* DE 143-16 (Interrogatory Responses) at 2.  Per Stines, he had an obligation to enforce policies, and he ensured that deputies received the policies.  *See* DE 135 at 35.

Though LCSO had its own formal and detailed policies for handling complaints against deputies, *see* DE 140-1, Stines testified that he would generally speak to any individual that raised complaints about a deputy.  *See* DE 135 at 101:8–18; 106:15–22.  Stines advised complainants to put any formal complaint in writing.  *See id.*  In his tenure, he only received verbal complaints. *See id.*  Upon receipt of a verbal complaint, he would speak to the respective deputy.  *See id.*

Evidence shows that, over the course of time, Stines, Fields, and other LCSO employees regularly sent each other graphics of sexual imagery and made sex-related and crude comments via Facebook.  *See* DE 139-6 (Message Thread); DE 139-7 (Message Thread).  Stines later testified and conceded that this set a "horrible" example as far as "[a]cting unprofessional."  *See* DE 135 at 136:13–137:1.

As for any pre-existing complaints about Fields, B.C. stated in an interview that "[her] mom, she told [Stines], she said, 'I have to live in this town but you – but I know why he won't give it to her'" regarding why Fields would not allow B.C. home incarceration.  *See* DE 143-19 (Interview Transcript).  Stines denies that B.C.'s mother made a report to him about Fields.  *See* DE 135 at 138:1–16.  Around December 15, 2021, Triplett claims that he also reported Fields for his sexual abuse of Hill via telephone to LCSO and in person to an "unknown employee" of LCSO. DE 139-9 ¶¶ 5–6.  The employee allegedly "refused" the report and "laughed at" him.  *Id.*

## 2.    Training and Supervision on Secondary Employment Policy

LCSO also has a "secondary employment policy," which provides that in cases where an LCSO employee seeks to perform "law enforcement duties" for another employer, the secondary

employer must secure a permit of approval from LCSO.  *See* DE 139-4 (Secondary Employment Policy) at 1.  The employee must also obtain separate written approval for any "outside employment" ("[e]mployment of a non-police nature in which vested police powers are not a condition of employment") on an annual basis through the chain of command. *See id.* at 3.  Stines testified that he did not "recall" any instances of a secondary employer receiving a permit from LCSO, or an employee seeking approval for outside employment, although in rare instances he gave verbal approval.  DE 135 at 84:3–92:4.  Stines certainly knew that Fields worked for EKCS—indeed, Stines held the job previously, and he recommended Fields and trained him for that work. *See id.* at 62-63.

### D.    Procedural History

Plaintiffs bring the following claims: 42 U.S.C. § 1983 claims against Fields under the Fourth Amendment for unreasonable search and seizure (Count I) and the Fourteenth Amendment for violation of substantive due process rights, specifically the right to be free from sexual abuse (Count II); § 1983 claims against EKCS and Jones for failure to supervise and train (Count III); state law claims against Fields for negligence, gross negligence, assault and battery, grossly negligent infliction of emotional distress, and intentional infliction of emotion distress (Counts IV, V, and VI); and a state law claim against EKCS for negligent retention, training, and supervision (Count VII).  *See* DE 57 ¶¶ 123–169.  Plaintiffs seek an award of compensatory and punitive damages. *See id.* at 23.

Defendants Fields and Jones move for summary judgment.  *See* DE 136 (Motion for Official Capacity Claims); DE 152 (Motion for Individual Capacity Claims).  Plaintiffs have responded, and Defendants have filed their respective replies.  *See* DE 139 (Response); DE 159 (Response); DE 143 (Reply); DE 161 (Reply).  Defendant EKCS, though making no independent

arguments, also moves to join its co-defendants' motions for summary judgment. *See* DE 155 (Motion to Join). Plaintiffs separately file a motion to reopen discovery and hold consideration of the pending summary judgment motions in abeyance. *See* DE 153 (Motion); DE 157 (Response); DE 158 (Response); DE 162 (Notice of Filing). All motions are fully briefed and ready for review.

## II.    Standard

Pursuant to Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* (quotation marks omitted) (quoting FED. R. CIV. P. 56(e)). "A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020) (citation and quotation marks omitted). In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).

Rule 56 does not require that the evidence considered, at the summary judgment stage, then be admissible. Obviously, Rule 56(c)(1)(A) references a host of materials, "in the record," that may form the decisional basis. For this reason, many such items might present proof that would not, in the instant form, make it into the trial record. Thus, an affidavit must be "made on personal knowledge [and] set out facts that would be admissible in evidence[.]" *See id.* at (c)(4). "[T]he party opposing summary judgment must show that she *can* make good on the promise of the

pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir. 1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Id.* Further, courts, "in determining whether to consider hearsay evidence, may inquire as to whether the party opposing summary judgment is capable of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, *i.e.*, via substituted oral testimony by the third-party declarant." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 424 (6th Cir. 2021).

## III.    Analysis

### A.    Motion to Reopen Discovery

Plaintiffs move to reopen discovery for a period of 180 days and hold the Court's resolution of the summary judgment motions in abeyance. *See* DE 153. Their request arises out of public statements allegedly made by a lawyer representing Stines in his pending criminal case regarding the death of Judge Mullins. *See id.* Stines is accused of shooting and killing Judge Mullins in his chambers on September 19, 2024, three days after he was deposed in this matter. *See id.* at 1–2. The lawyer's statements, as reported in an online news article, are as follows:[4]

> I think one of the big things is that my client felt there had been pressure placed on him not to say too much during the deposition, and not to talk about things that happened within the courthouse, particularly in the judge's chambers. . . . On the day that this [shooting] happened, my client had attempted multiple times to contact his wife and daughter, and he firmly believed that they were in danger. . . .
>
> He believed that they were in danger because of what he knew to have happened within the courthouse. And there was pressure, and there were threats made to him

---

[4] While the Court attempted to access the online article, the article is apparently no longer available.

10

to sort of keep him in line, to keep them from saying more than these folks wanted him to say.

*Id.* at 2.  The lawyer also indicated that "Stines was under pressure by his peers not to say too much during the proceedings in the civil lawsuit."  *Id.*  Plaintiffs argue that it is necessary to re-depose Stines "because he was not truthful in his prior deposition in this action."  *Id.* at 2.

The Court is unwilling to shift course, reopen discovery, and stay the summary judgment motions based on what amounts to unsworn hearsay statements reproduced as online fodder. Moreover, contrary to Plaintiffs' characterization, the lawyer never actually stated that Stines was untruthful in his deposition.  While Stines's deposition is certainly relevant to the claims at issue, Plaintiffs did not sue Stines individually, and his only status was as an official defendant.  Because he is no longer the Letcher County Sheriff, Stines is not even an extant party to this lawsuit.  *See* DE 147.  Discovery closed long ago, *see* DE 121, and summary judgment motions are fully briefed. The case was originally filed over three years ago, and the underlying events took place four years ago.  At this point, delaying resolution by an additional six months is untenable; frankly, even that prediction seems doubtful given the circumstances Stines faces.  A well-developed and plenary record, including Stines's sworn testimony, subject to cross-examination, exists.  The Court denies Plaintiffs' request.

### B.    Hill's Claims

When a federal statute does not specify a statute of limitations period, courts borrow "the most analogous state limitations period."  *McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012).  42 U.S.C. § 1983 does not contain a limitations period; thus, the Sixth Circuit looks to the relevant state's statute of limitations for personal injury claims.  *Wright v. Louisville Metro Gov't*, 144 F.4th 817, 824 (6th Cir. 2025).  In Kentucky, the statute of limitations for such claims is one year.  *See id.* (citing KRS § 413.140(1)(a)).  The same one-year statute of limitations applies to

negligence, assault, and battery claims.  *See* KRS § 413.140(1)(a) (stating that a plaintiff must file "[a]n action for an injury to the person of the plaintiff" within one year after the claim accrues).

In cases where the court borrows the limitations period from state law, the claims still "accrue and the statutory period begins to run according to federal law."  *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010); *see also Hall v. Knott Cnty. Bd. of Educ.*, 941 F.2d 402, 408 (6th Cir. 1991) ("The date on which the plaintiff's claims accrued is a matter governed by federal law.").  Under federal law, "[t]he statute of limitations begins to run when a plaintiff knows or has reason to know of the injury which is the basis of his action."  *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (citation and quotation marks omitted).  Under Kentucky law, the statute of limitations begins to run when the challenged conduct "causes injury that produces loss or damage."  *Abel v. Austin*, 411 S.W.3d 728, 736 (Ky. 2013) (citation and quotation marks omitted).

The impetus for Hill's allegations and thus, her claims, is the allegedly coerced sexual contact between her and Fields.  *See generally* DE 57.  Therefore, Hill knew of the contact (the injury-producing conduct) when it first occurred, triggering the statute of limitations.  While the operative complaint sets the timeline for Fields's conduct vis-à-vis Hill as occurring between August 2020 through October 2021, *see* DE 57 ¶¶ 31, 68, her fiancé (Chris Triplett) states that he became aware that Fields "was forcing" Hill "to provide sexual favors" to him in December 2019.  *See* DE 139-9 ¶ 3.  Based on this affidavit, Hill had (at latest)[5] until December 2020 (one year later) to file her § 1983, negligence, assault, and battery claims.  Because, as Fields argues, Hill did not initiate the instant action until January 31, 2022, those claims are time-barred.

_____

[5] December 2019 is only when Triplett himself learned of the contact, meaning that the contact logically occurred earlier.  The record contains no other date from which the Court can calibrate the limitations analysis.

In response, Hill points to documentation showing that she completed a home incarceration period that ran from September 2, 2021, through October 13, 2021. *See* DE 139-15. The issue is that the completion form says nothing about when the contact between Hill and Fields occurred. Indeed, the form includes no information about who was supervising Hill[6] during this period. By Hill's own allegations, she served multiple periods of home incarceration. *See, e.g.*, DE 57 ¶¶ 31, 41. Hill also relies on Triplett's affidavit, which states that "sometime during [her] period of home incarceration," Triplett "became aware" that Fields commanded Hill to perform oral sex and "submit to sexual intercourse."[7] DE 139-9 ¶ 4. Again, this affidavit does not state *when* during Hill's home incarceration the sexual contact transpired. The only date tied to the alleged sexual misconduct is the December 2019 date listed within the same affidavit. *See* DE 139-9 ¶ 3. Absent affirmative evidence that sexual contact occurred at a later date, Hill fails to genuinely dispute that December 2019 serves as the reference point for claim accrual. Since she did not file suit until after the one-year limitations period expired, her § 1983, negligence, gross negligence, assault, and battery claims are time-barred. The Court accordingly grants summary judgment on these claims and dismisses them.

Importantly, there simply is not cognizable proof supporting Hill's claims about misconduct by Fields in 2021, which would spare claims as to timeliness. Hill is now deceased, and nothing captures her personal knowledge in a way that, under any colorable theory, would be

---

[6] A mostly illegible signature on the form could, construing evidence in Hill's favor, read as "B Fields." Still, he is not identified as her supervising officer during this period, and even if he was, she fails to submit any *evidence* that the sexual misconduct arose throughout the course of this particular instance of home incarceration.

[7] Although not raised by Hill, the Court rejects any "continuing violations" theory such that the Court could "consider as timely all relevant violations including those that would otherwise be time-barred." *Bruce v. Corr. Med. Servs., Inc.*, 389 F. App'x 462, 466 (6th Cir. 2010) (citation and quotation marks omitted). To the extent that theory is even cognizable based on the claims presented, Hill has not established, with specific evidence, that any sexual contact between her and Fields happened after December 2019.

admissible. There was no deposition, and there is no affidavit. Although Hill signed the complaint at DE 17, purporting to verify, that document is not notarized, and she does not sign under penalty of perjury as required by 28 U.S.C. § 1746. The recorded statement in the record is not verified and is not a deposition. This means there is no proof on the timeliness, and quite notably, there would be no admissible proof on the facts alleged by Hill against Fields. Fields denies any impropriety toward Hill. *See* DE 133 at 104. Given Hill's untimely passing, and the absence of any perpetuated testimony, Hill would not, in any event, be in a position to prove this case at trial.

As to timeliness, and alternatively, what of Hill's intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) claims? As a general matter, IIED and NIED claims are subject to a five-year limitations period. *See Craft v. Rice,* 671 S.W.2d 247, 251 (Ky. 1984) (citing the predecessor to KRS § 413.120(6)). However, "a complaint cannot be saved from limitations by pleading [emotional distress claims] to reach the longer statute when the facts support a claim for a more traditional personal injury tort with mental pain and suffering as part of the damages rather than severe emotional distress caused by outrageous conduct." *Childers v. Geile*, 367 S.W.3d 576, 582–83 (Ky. 2012). Here is where the statute of limitations for IIED and NIED claims begins to merge with the viability of these so-called "gap-filler" torts; IIED and NIED claims are "available only where a more traditional tort cannot provide redress for" emotional distress. *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011); *see also Downing v. Petry*, Civil Action No. 5:20-187-DCR, 2021 WL 707654, at *4 (E.D. Ky. Feb. 23, 2021). Since "[t]here can be only one recovery for emotional distress on the same acts," *Childers*, 367 S.W.3d at 582–83, an emotional distress claim is not viable if an "actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295,

298–99 (Ky. Ct. App. 1993). This rule is subject to one exception: IIED and NIED are "still [] permissible cause[s] of action, despite the availability of more traditional torts, as long as the defendant[] *solely* intended to cause extreme emotional distress." *Green*, 803 F. Supp. 2d at 655 (emphasis added).

Fields maintains that a one-year limitations period also governs the IIED and NIED claims due to the factual overlap between these claims and Hill's other tort claims. *See* DE 152-1 (Memorandum in Support) at 23–24. The Court agrees that the factual allegations underlying Hill's traditional tort claims (negligence, gross negligence, assault, and battery) duplicate those underlying her IIED and NIED claims. In pleading their NIED claim, Plaintiffs directly rely on the facts of their other tort claims, alleging that "*[a]s a direct and proximate result of the above-described grossly negligent conduct* of Defendant Fields, Plaintiffs suffered and continue to suffer severe emotional distress." DE 57 ¶ 156 (emphasis added). Similarly, in pleading their IIED claim, Plaintiffs also state that "*[t]he above-described actions* of Defendant Fields were intentional and are outrageous and offend generally accepted community standards of decency and morality." *Id.* ¶ 159 (emphasis added). Her traditional tort claims (the negligence and assault and battery claims) also allow for the recovery of emotional distress damages. *See Rigazio*, 853 S.W.2d at 298–99. Given the factual overlap and the availability of emotional distress damages, the IIED and NIED claims are substantively preempted. *Cf. Gibson v. Slone*, Civil No. 10-145-ART, 2011 WL 2009815, at *3 (E.D. Ky. May 23, 2011) (rejecting IIED claim because the plaintiff "could have recovered damages for emotional distress on his assault-and-battery claim," even though that claim was time-barred). Those claims would not, then, avoid the time bar. And again, Hill does not show the ability to offer first-hand proof on the merits of her claims.

The Court acknowledges one potential wrinkle: neither party addresses whether Fields's

*sole* intent in engaging in the alleged sexual contact was to cause Hill extreme emotional distress versus for some other reason (i.e., sexual gratification).  If Fields solely intended to cause Hill extreme emotional distress, then the NIED and IIED claims could exist as separate, standalone claims with a five-year limitations period.  *See Green*, 803 F. Supp. 2d at 655.  Intent typically is an inherently fact-based determination best left for the jury.  Perhaps, then, the Court should reserve for trial the limitations question on the emotional distress claims.

Even if the five-year limitations period applied and rendered the IIED and NIED claims timely, those claims fail for other reasons.  To establish an IIED claim, a plaintiff must prove: (1) "intentional or reckless conduct;" (2) "conduct that is outrageous and intolerable because it offends against generally accepted standards of decency and morality;" (3) "a causal connection between the conduct and emotional distress;" and (4) "emotional distress which is severe."  *Childers*, 367 S.W.3d at 579.  An NIED claim requires the plaintiff to prove: (1) "the defendant owed a duty of care to the plaintiff;" (2) "breach of that duty;" (3) "severe" or "serious" emotional injury such that "a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case;" and (4) "legal causation between the defendant's breach and the plaintiff's injury."  *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012).  For both NIED and IIED claims, the plaintiff "must present expert medical or scientific proof to support the claimed [emotional] injury or impairment."  *Id.* at 17–18; *cf. Ind. Ins. Co. v. Demetre*, 527 S.W.3d 12, 39 (Ky. 2017) ("*Osborne*'s requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress.").  According to Fields, Hill's emotional distress claims fail because she has not shown "severe emotional distress" (IIED), a "severe" or "serious" emotional injury (NIED), or expert proof of the claimed emotional distress.  *See* DE 152-1 at 27–30.  Hill does not produce any evidence in support of her emotional distress

16

claims to counter Fields's position and place those claims in dispute; the response briefing fails to address or try to preserve these claims. Because, alternatively, Hill has not submitted any evidence, buttressed by expert proof, of the requisite emotional injuries, her NIED and IIED claims do not survive summary judgment. The Court grants summary judgment on those claims.

Accordingly, Hill's claims are dismissed against all defendants in their entirety.

### C.  Adkins's Claims

#### 1.  Claims against Fields – Individual

##### a.  *Federal Claims*

Adkins brings two federal claims pursuant to § 1983 against Fields, alleging violations of her constitutional rights under the Fourth Amendment and the Fourteenth Amendment. Both relate to Fields's alleged sexual abuse of Adkins and the physical contact between them. *See* DE 57 ¶¶ 123–138. The analysis of Adkins's claims and the relevant constitutional provisions depends on her status while on home incarceration. *See Hale v. Boyle Cnty.*, 18 F.4th 845, 852 (6th Cir. 2021) ("Persons in the criminal justice system invoke different constitutional amendments in their 42 U.S.C. § 1983 suits depending on their status."). While not discussed at length by any party, the record indicates that because Adkins was on home incarceration while awaiting resolution of pending charges, she was initially a pretrial detainee. *See* DE 143-2 (Adkins Conditions of Release). Because she was in the context of a pretrial detainee, the Fourteenth Amendment governs her § 1983 claims. *See Hale*, 18 F.4th at 852.

*Hale v. Boyle County* provides the binding standard for claims involving sexual conduct between a law enforcement official and a pretrial detainee, construing such claims as Fourteenth Amendment excessive-force claims. *See id.* at 852–54. In *Hale*, the Sixth Circuit created a "rebuttable-presumption" framework. *Id.* at 854. A pretrial detainee is "entitled to a presumption

17

that the conduct was not consensual." *Id.* (citation and quotation marks omitted). The defendant-officer may "rebut this presumption" if he "affirmatively show[s]" that "the conduct involved no coercive factors." *Id.* Coercive factors include (but are not limited to) "explicit assertions or manifestations of non-consent," and "favors, privileges, or any type of exchange for sex." *Id.*

Defendants' lead position is one of consent. This difficult proposition—where an officer, with the power to control the liberty of a vulnerable female, committed a sex crime in the course of supervision of that female—is one for the jury. The Court finds that there is a genuine (if dubious) dispute of material fact as to whether Adkins consented to the sexual contact with Fields. Thus, her claim against Fields can proceed.

Based on the record, a reasonable jury could find that Adkins did not consent to the sexual contact with Fields based on the coercive factors present. First, the clearest example, the evidence of an exchange between Adkins and Fields: as admitted in his guilty plea, Fields did not require Adkins to wear her ankle monitor or pay her home incarceration fees in exchange for sexual favors. *See* DE 139-12 at 2. Upon her release to home incarceration, Adkins told Fields that she could not afford to pay for her ankle monitor. *See* DE 134 at 67:22–68:9. He responded that "he could help [her] out, work out something." *Id.* at 72:21–73:1. In that same conversation, Fields also commented that Adkins was "pretty" and had "pretty legs," which a reasonable jury could find set the tone for a physical relationship. *Id.* at 84:2–7. On multiple occasions, Adkins met with Fields in Judge Mullins's chambers, where Fields would attach her ankle monitor in advance of a court appearance and remove it after the appearance. *See id.* at 81:24–82: 7. These meetings and the consequential locale are also where the kissing, oral sex, and sexual intercourse occurred. *Id.* 88:23–90:3. The stakes were very high for Adkins: if she did not pay the requisite fee or wear her ankle monitor properly, she likely would have to return to the Letcher County Jail. *See id.* at 69:9–

14. She was "terrified" to return to the Letcher County Jail due to its "very poor" conditions. *Id.* Ultimately, Fields held the strings on whether Adkins would return to jail. Indeed, he eventually wielded his power against her, filing a "false" criminal complaint against Adkins to cover up their arrangement. *See id.* at 144:6–9; DE 139-12. That act put Adkins back in jail. Thus, Fields's promise to help Adkins and his later circumvention of her home incarceration requirements, in light of these stakes and in conjunction with sexual activity, are strongly indicative of coercion. Adkins was a victim of Fields's adjudicated crimes, so the argument in favor of consent is thin gruel.

A reasonable jury could also conclude that evidence of Adkins's subjective experience indicates a lack of consent. *See Hale*, 18 F.4th at 854 (explaining that "subjective intimidation" was "evidence that the encounters were not consensual"). Adkins testified that she engaged in sexual conduct with Fields because it "was the only way that [she] thought that [she] would be okay on house arrest without paying." *See* DE 134 at 85:8–20. She also testified that the sexual contact was her "only option at that time," and that she did "what [she] thought that [she] needed and had to do to stay out of jail." *See id.* at 91:1–10, 99:16–22. And she felt "scared" and "terrified" because of the situation. *See id.* at 84:16–18, 145:23–146:3.

Still other evidence also implies coercion. Where and when their interactions occurred suggest a coercive atmosphere—Adkins and Fields met after hours in a judge's private chambers in the courthouse. *See* DE 134 at 81:7–16. The county jail was in the basement. In the first instance of physical contact, Adkins testified that Fields "forcibl[y] kiss[ed]" her and "grabbed [her] and kissed [her] on the mouth." *See id.* at 88:18–89:2. Such physical contact is an unmistakable marker of non-consent. Fields also bestowed gifts on Adkins, such as the cigarettes he bought to "console" her. *See id.* at 63:13–64:24, 65:24–66:13. Fields was criminally charged

and pleaded guilty to third-degree rape and third-degree sodomy for his relationship with Fields, signifying non-consent and the role of his official power in the crimes. *See* DE 139-12 at 2. Taken together, a reasonable jury could easily conclude that the present coercive factors rendered the sexual contact between Adkins and Fields non-consensual.

To overcome the presumption of non-consent, Fields points to evidence that Adkins admitted to making "flirtatious comments" to Fields and exchanging Facebook messages and photographs with Fields that were "sexual in nature." *See* DE 134 at 84:19–21, 115:4–116; *see generally* DE 143-20 (Excerpts of Messages). And she texted with Fields on a daily basis for a period of about seven months. *See id.* at 76:17–78:24. Other evidence suggests Adkins initiated the arrangement: she stated that she heard from fellow inmates that women would give Fields sexual favors to get out of paying their home incarceration fees. *See id.* at 73:4-14. She also sent a message to Fields, stating, "Listen I [] have to work something out so I can enjoy my Life." DE 143-20 at 8. Finally, Adkins does not recall Fields making any physical threats against her. *See* DE 134 at 146:12–15. True enough, Adkins made certain expressions of mutuality to the person in control of her liberty. The jury can grapple with the power dynamics, Adkins's extremity, and Fields's behavior in resolving the question of consent—that is for the factfinder, not the Court.

Due to the conflicting evidence on the issue of consent, the Court denies summary judgment as to Adkins's Fourteenth Amendment claim against Fields.[8]

---

[8] Adkins was on bond, and the defense complains that she did not have pretrial detention status. She was on "house arrest," and thus in a margin between release and detention. The due process concept of bodily integrity also would apply, in this context, to the extent there are questions about home incarceration as an equivalent to pretrial detention. To quote the Circuit:

> This court has previously held that "no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause" and that a citizen has "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity[.]""

However, the Court grants summary judgment as to Adkins's Fourth Amendment claim. "[I]f a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision[.]" *United States v. Lanier*, 117 S. Ct. 1219, 1228 n.7 (1997). Since the Fourteenth Amendment covers Adkins's claim, the Fourth Amendment is superfluous and inapplicable. Regardless, "[t]he Fourth Amendment is meant to apply when evaluating the reasonableness of searches and seizures," and no evidence indicates that the sexual contact occurred during a search or seizure. *Carnes v. Hall*, 665 F. Supp. 3d 831, 843 (E.D. Ky. 2023). Thus, the Court dismisses the Fourth Amendment claim, which does not apply in concept and unnecessarily complicates the field.

Fields also raises a qualified immunity defense. *See* DE 152-1 at 22–23. Qualified immunity protects a public official from liability unless (1)"the official violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the challenged conduct." *Hodges v. City of Grand Rapids*, 139 F.4th 495, 504 (6th Cir. 2025). Because there is a genuine dispute of material fact as to whether Fields violated Adkins's Fourteenth Amendment rights, the Court cannot find, at this stage, that Fields is entitled to qualified immunity. Fields does not argue with any seriousness that coerced sex by a law enforcement officer, with a person under the officer's control, would not clearly fall out of bounds. The Court therefore denies summary judgment on this ground.

---

*Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 966–67 (6th Cir. 2006) (quoting *Doe v. Claiborne Cnty., Tenn.,* 103 F.3d 495, 507 (6th Cir. 1996)); *see also Sexton v. Cernuto*, 18 F.4th 177, 191 (6th Cir. 2021)(recognizing clearly established due process interest against sexual assault by state actor and applying concept to a probationer sexually assaulted during a probation work program). The Court sees no reason that the Fourteenth Amendment avenue would change the consent analysis.

**b.  *State Claims***

As with his constitutional claims, Fields contends that Adkins's negligence, gross negligence, assault, and battery fail because his sexual contact with Adkins was consensual.  *See* DE 152-1 at 24–27.  Since consent obviously is disputed, the Court denies summary judgment as to these claims for the same reasons as the Fourteenth Amendment claim.

To the extent Fields relies on the issue of consent to argue that punitive damages are not recoverable, the Court also denies summary judgment.  On this record, a jury could reasonably find that the evidence of non-consensual sexual contact establishes Fields's wanton and reckless disregard for Adkins's rights, thereby potentially justifying punitive damages.  *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013) ("In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others.") (citation and quotation marks omitted); KRS 411.184(1)(c)(defining "malice" for purposes of punitive damages statute).  Again, Fields committed a sex crime against Adkins, and a criminal act surely supports a cognizable theory on punitive damages.

Adkins's IIED and NIED claims fail for the same reasons as Hill's emotional distress claims.  The factual allegations underlying Adkins's traditional tort claims overlap with those underlying her IIED and NIED theories, and the traditional tort claims allow for emotional distress damages.  *See* DE 57 ¶¶ 156, 159.  Adkins points to no evidence showing that Fields's sole intent in engaging in the alleged sexual contact was to cause her extreme emotional distress.  Adkins also fails to produce any expert evidence in support of either claim.  Due to this dearth of evidence, the Court grants summary judgment for the defense on Adkins's emotional distress claims.

This leaves only the negligence, gross negligence, and assault and battery claims. As the defense notes, though, the theory against Fields is one of intentional wrongdoing, not negligence. In the context of this case, and given the primacy of intentional action in the narrative, the Court will dismiss the negligence-based theories against Fields. The Court here relies on the principles of *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 732–33 (Ky. 2009). *Ten Broeck* recognizes that negligence and assault and battery claims are "mutually exclusive" and that there is no such thing as negligent assault. *See id.* To avoid the doctrinally unsound notion of submitting negligence claims regarding Fields's intentional acts (acts already largely adjudicated, as to him), the Court will dismiss those theories as to Fields.

Finally, Fields also briefly raises a qualified official immunity defense for his state law claims. *See* DE 152-1 at 30–31. Under Kentucky law, a defendant is entitled to official immunity on a tort claim if his conduct was (1) a discretionary act or function; (2) taken "in good faith"; and (3) within the official scope of the defendant's authority. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Kentucky's immunity inquiry follows a burden-shifting scheme. *See id.* at 523. The defendant must first make a prima facie showing that "the act was performed within the scope of [his] discretionary authority." *Id.* Then, "the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith," i.e., *bad* faith. *Id.*; *see also Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) ("'Good faith,' however, is somewhat of a misnomer, as the proof is really of 'bad faith.' In fact, in most cases, 'good faith' is just a presumption that exists absent evidence of 'bad faith.'").

Here, in raising this defense, Fields only focuses on the "good faith" element, without attempting to meet his burden to provide evidence that his conduct was within the scope of his discretionary authority as a CSO. *See* DE 152-1 at 30–31. For his failure to meet his initial burden

alone, his defense fails also.  Similar to his other arguments, Fields states that because the sexual contact with Adkins was consensual, he acted in good faith.  *See* DE 152-1 at 31.  On her part, Adkins points to Fields's dishonesty and alleged sexual abuse of women within the purview of his supervision.  *See* DE 159 at 9.  The Court finds that the evidence of Adkins's lack of consent already discussed*,* Fields's filing of a false criminal complaint, and his guilty plea to perjury (and felony sex crimes) plainly is enough to vanquish good faith at the gate.  Therefore, the Court denies summary judgment as to Fields's qualified official immunity defense on the state claims.

### 2.    Official Capacity Claims against Fields and Jones

Adkins seeks relief against Jones only in his official capacity as the Letcher County Sheriff.  Through the official capacity claim, "the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent."  *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) (citation and quotation marks omitted).  Therefore, "[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.*  This principle applies to both federal and Kentucky law.  *See id.*; *Simpson v. Thompson*, No. 2011-CA-001726-MR, 2012 WL 2946217, at *5 (Ky. Ct. App. July 20, 2012).  Thus, the Court construes the § 1983 failure to train and supervise claim against Jones in his official capacity as one against LCSO.  The official capacity claims against Fields likewise are construed as against LCSO.

### a.  *Federal Claims*

Section 1983 does not hold municipal entities vicariously liable for the illegal actions of their employees.  *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 471 (6th Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 98 S. Ct. 2018 (1978)).  To plead a municipal entity liability claim under § 1983, a plaintiff "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom."  *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024)

(citation and quotation marks omitted). This requires the plaintiff to (1) identify an existing illegal policy or custom; (2) connect the policy or custom to the municipal entity; and (3) show that the claimed injury was caused by the execution of the policy or custom. *See id.* at 471. The Sixth Circuit has recognized four ways that a plaintiff may prove "the existence of a municipality's illegal policy or custom":

> (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Id.* at 470 (citation and quotation marks omitted). Plaintiff Adkins pursues the third avenue, claiming that LCSO maintained a policy of inadequate training and supervision.[9]

To establish a failure-to-train or -supervise claim, the plaintiff must demonstrate that (1) "the training or supervision was inadequate for the tasks performed;" (2) "the inadequacy was the result of the [municipal entity's] deliberate indifference;" and (3) the inadequate training or supervision "actually caused the plaintiff's injury." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024). A municipality acts with "deliberate indifference" if the "violation of a clearly established right was a known or obvious consequence" of the inadequate training or supervision. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (citation and quotation marks omitted). Typically, this requires proof that the municipality failed to act "in the face of repeated, known, rights violations," including a "pattern of similar constitutional violations separate from the conduct that harmed the plaintiff." *See id.*; *Mosier*, 90 F.4th at 549. In "a narrow range of circumstances," *see*

---

[9] In response to LCSO's motion for summary judgment, Adkins also relies on the acquiescence theory of *Monell* liability. This theory was never raised in her Second Amended Complaint, so the defendants did not have proper notice of the theory. Therefore, the Court only considers the failure-to-train and failure-to-supervise theory. *See West v. Wayne Cnty.*, 672 F. App'x 535, 541 (6th Cir. 2016) (disallowing First Amendment claim based on a political association theory when the complaint only alleged a free speech theory).

*Mosier*, 90 F.4th at 549, "evidence of a single violation of federal rights" is sufficient if "accompanied by a showing that the [entity] had failed to train [or supervise] its employees" on "hand[ling] recurring situations," creating "an obvious potential for such a violation." *Gillispie v. Miami Twp.*, No. 23-3999, 2025 WL 1276900, at *5 (6th Cir. May 2, 2025).

In addition, the plaintiff must also prove "but-for" causation and proximate causation. *See Gambrel*, 25 F.4th at 408. Thus, the plaintiff must establish that "proper training [or supervision] would have prevented the constitutional violation" (but-for causation). *Id.* at 409. The plaintiff must also show that the entity "could reasonably foresee that an employee's wrongful act would follow from the lack of training [or supervision]" (proximate causation). *Id.*

In support of her § 1983 failure-to-train and failure-to-supervise claim, Adkins points to the following alleged inadequacies: 1) officers received no formal training on LCSO policies; 2) LCSO's secondary employment policy was disregarded; 3) Stines created a "toxic work environment;" 4) complaints about Fields's misconduct went ignored; and 5) LCSO did not follow adequate procedures for the report of sexual misconduct complaints. *See* DE 139 at 5–11, 21–23. The Court will address each argument in turn.

First, Adkins alleges that LCSO never formally trained Fields on its policy manual, specifically, its sexual misconduct policy. *See* DE 139-3. She cites to evidence that Fields merely signed an acknowledgement that he received the policy, rather than read or understood the policies. *See* DE 139 at 5–6 (citing DE 136-6). She also states that LCSO did not, in any manner, train its officers on its policies. Stines claimed he circulated LCSO policies and "told them to read it and be familiar with it." DE 135 at 77. Essentially, as to annual training, Stines merely testified that he "[didn't] recall" whether LCSO conducted any annual trainings on its policies. *Id.* at 82:24–83:17. However, in an interrogatory response, Stines affirmed that Fields was "trained" and had

"biannual updated training" to maintain his CSO certification, and "was required to be familiar with and follow department policies and procedures" that address "excessive force, abuse of power, sexual contact, sexual abuse and sexual harassment."  DE 143-16 at 2.  Fields also confirmed that he reviewed LCSO's policies.  *See* DE 133 at 49:11–21.  As to the sexual misconduct policy, Stines confirmed he could recall "none" in that particular area.  DE 135 at 94.

Next, Adkins claims that LCSO failed to adhere to its secondary employment policy, which provides that in cases where an LCSO employee seeks to perform "law enforcement duties" for another employer, the secondary employer must secure a permit of approval from LCSO.  *See* DE 139-4 at 1.  The employee also must obtain separate written approval for any "outside employment" ("[e]mployment of a non-police nature in which vested police powers are not a condition of employment") on an annual basis through the chain of command.  *See id.* at 3.  Stines testified that he did not "recall" any instances of a secondary employer receiving a permit from LCSO, or an employee seeking approval for outside employment, although in rare instances he gave verbal approval.  *See* DE 135 at 84:3–91:25.  Adkins claims that this "dangerous practice" blurred the lines between Fields's law enforcement duties as CSO with his duties as a home incarceration officer.  DE 139 at 8.  Notably, "the failure to follow internal policies, without more," does not constitute a constitutional violation.  *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018).  Standing alone, the policy issue has only marginal causation value.  Adkins has not submitted any evidence to show that adherence to the secondary employment policy would itself have prevented Fields's alleged sexual misconduct.  Nor has she submitted evidence that LCSO could reasonably foresee that such misconduct would follow from the disregard of that specific policy.  Simply, a failure to obtain adequate approvals for secondary employment does not create

the "obvious potential" for sexual assault. Still, the secondary employment at issue is not something to be addressed in a vacuum, as the Court later notes.

Adkins also argues that Stines fostered a toxic environment at LCSO by exchanging "crude" and "sexist" materials with male deputies, Fields included, *see* DE 139 at 22, a practice that Stines testified set a "horrible" example as far as "[a]cting unprofessional," *see* DE 135 at 136:13–137:1. The materials include graphics of sexual imagery and other sex-related comments sent between various groupings of Stines, Fields, and another LCSO employee via Facebook. *See* DE 139-6; DE 139-7. Stines is not an individual Defendant, of course, and Adkins tends to discuss this argument and the related allegations as if there were a direct liability claim against Stines. However, Stines was only named in his official capacity, not his personal capacity. Further, though such imagery and comments are unsavory and unprofessional, crude and inappropriate joking between co-workers arguably does not, itself, produce the "obvious potential" that one of those co-workers will commit sexual assault. *See Magoffin Cnty. Fiscal Ct.*, 174 F. App'x at 970 ("The intentional, violent act that a custodian performed far outside the scope of his duties cannot be something that was 'obvious' to occur."). Again, although this is part of the record, it is not to be viewed in isolation under Rule 56.

Finally, Adkins's argument that LCSO ignored complaints regarding Fields presents significant issues for consideration. She relies on two prior reports against Fields: 1) evidence that around August 5, 2021, B.C.'s mother (B.C. being a non-party alleged victim) complained to Stines that Fields refused to let B.C. remain on home incarceration after she rebuffed his sexual advances, but Stines took no action to address the complaint; and 2) evidence that around December 15, 2021, Triplett reported Fields's sexual abuse of Hill to LCSO via telephone and in person to an

unknown employee, but the employee "refused" the report and "laughed at" him. *See* DE 139 at 10–11.

The description of the first report is, at least in the particulars, belied by record. B.C. stated that "[her] mom, she told [Stines], she said, 'I have to live in this town but you – but I know why he won't give it to her'" regarding why Fields would not allow B.C. home incarceration. *See* DE 143-19. The vague and cryptic statement of B.C.'s mother to Stines, presented here only in non-cognizable hearsay form, was not enough to put him on notice of Fields's potential sexual misconduct. The statement, if made, says nothing about any unwanted physical contact between B.C. and Fields. Stines also denies that B.C.'s mother ever made a report to him about Fields. *See* DE 135 at 138:1–16.

The Court has certain observations about the second report. One, some of the sexual contact between Adkins and Fields predated Triplett's report, as the contact first started in late November or early December of 2021. *See* DE 134 at 83:9–16, 89:14–19. Two, the report was made to an "unknown employee," meaning that there is no evidence that the statement was made to an employee with the requisite "final policymaking authority" as necessary to establish entity liability. *See Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) ("[A] plaintiff must demonstrate that a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question."). It is difficult to call notice to a nonspecific employee notice to Stines. At the same time, Stines employed a bespoke complaint process that ignored LCSO policy and essentially would negate notice to an employee from automatically filtering up to him, as Sheriff. And again, there was no training at LCSO, under Stines, on the handling of complaints.

29

Thus, contrary to the written policies at LCSO as described,[10] Stines testified that he would personally speak to any individual that had a complaint about a deputy. *See* DE 135 at 101:8–18; 106:15–22. While he would advise complainants to put any formal complaint in writing, he only ever received verbal complaints. *See id.* After receiving a verbal complaint, he would speak to the deputy. *See id.* Stines unequivocally stated, "I am the boss. If anybody comes in to complain, I want to talk to them." *Id.* at 101.

Although the call is close, upon consideration of the full record and making all reasonable inferences in Plaintiff's favor, the Court finds that the matter is triable as to the Sheriff's liability for Fields's conduct toward Adkins. Here is why:

First, as Sheriff, Stines was a constitutional officer and the chief law enforcement official for the county. *See* KY. CONST. § 99; *see also* KRS 70.060 (providing that any sheriff "may command and take with him the power of the county, or a part thereof, to aid him in the execution of the duties of his office"). As such, Stines carried individual decisional power with respect to operations within his administration. He had the authority to train, or not, to enforce written standards, or not, and to affect the de facto status of ostensible policies within his office. For example, LCSO policies required conduct beyond reproach, required specific and detailed annual trainings on various topics (like complaint processes and sexual misconduct), and thoroughly regulated and documented outside or secondary employment by deputies. Stines chose to ignore all of these policies—he performed no local annual or other training, beyond making policies available, and he seemingly took ad hoc approaches to the matters at issue in this case. His email chain conduct set the example, one he called "horrible," in terms of professionalism in the

---

[10] The policy is at DE 140-1.

department.  Giving subordinates a policy book is not training on the included subject matter.  A law student in receipt of a textbook on civil procedure is not thereby trained in civil procedure.

Second, Stines intimately knew the structure and operations of EKCS.  He had held the position Fields ultimately took for years.  Stines recommended Fields and arguably trained him for EKCS.  Thus, he well knew the potential blurred boundaries between the CSO position and home monitoring for EKCS.  He knew and arguably approved of Fields meeting supervisees in the courthouse after hours, wearing the deputy uniform and using deputy equipment in the work, and using his LCSO marked vehicle.  He further knew that CSO authority was at its apex within the courthouse itself, where Fields had arrest power and would encounter persons under his supervision for EKCS.  This, from any objective view, merged the positions and imbued Fields with particular sway and authority in managing the vulnerable supervised population.  This was especially true given the way EKCS operated, with little direct involvement or oversight by the geographically remote entity and evident wholesale deference given to the managing employee, Fields, in terms of home incarceration compliance or default.  It is notable that in Fields's false complaint resulting in Adkins's custody, he alleged that she "failed to report to the Letcher County Sheriff's Office" and he signed as "LCSo."  DE 139-13.

Third, Stines chose to eschew all specific local training, relevant to this case, for his deputies.  Despite policy recognition of the need for and primacy of regular and in-service training, Stines implemented no local requirements and merely depended, one charitably infers, on centralized training as part of state officer certification.  The Court is not convinced that the generic references to "ethics" or ethical conduct within the Kentucky Administrative Regulations (KAR) rubric fairly addresses the particular risks presented in the local policies or in this case.  *See* DE

143-5 (CSO training rubric, which would cover unspecified "ethical standards").[11]  The defense certainly has not proven this at the summary judgment stage.

Fourth, although notice to the Sheriff is subject to debate, there certainly was static about Fields that should, in one reasonable view, have prompted institutional inquiry.  The key is Triplett's involvement.  He alleges two efforts to alert Stines—one by phone to the department and one in person.  Certainly, the defense offers a series of institutional on personnel denials, but Triplett swears he made specific complaints, in December 2021, regarding "the sexual abuse of Ms. Hill by Deputy Fields to the Letcher County Sheriff's Department."  DE 139-9.  He also alleges retaliatory stops and harassment by deputies in the period immediately after the complaint.  His allegations—that he registered the conduct, that the employee he spoke to laughed at him and refused to file a report, and that deputies then targeted him—supports an inference that Stines's policy avoidant complaint approach thwarted effective reporting and allowed the continuation of problematic conduct.  In January, after Triplett's alleged report, Fields, as LCSO complaining witness, targeted Hill through a false criminal complaint designed to hide his malfeasance from the state court.  The jury should be allowed to consider Triplett's efforts to alert Stines's small department to the abuse.[12]

Fifth, and most problematically for the Sheriff under the § 1983 rubric, LCSO recognized a grave risk of sexual misconduct by officers and yet Stines intentionally withheld required training on LCSO's own resultant policies.  The recorded LCSO policies appear sound.  Thus, the Sexual Misconduct policy (DE 136-5) acknowledges the problem when "an officer abuses . . . authority for sexual purposes."  The policy warns against and forbids Sexual Misconduct including Criminal

---

[11] The Kentucky Law Enforcement Council (KLEC) Code of Ethics, at least as reflected in DE 143-6, does not directly address much of the conduct at issue.

[12] The Court will defer consideration of whether B.C.'s reporting theory has any admissible route at trial.

Sexual Misconduct, defined as the "abuse of authority by a law enforcement officer for sexual purposes that violate the law." *See id.* The policy states, "It is the policy of this Department to train all of their officers concerning the potential for criminal sexual misconduct within law enforcement. . . . " And what degree of risk did LCSO perceive, via its own policies? LCSO listed the risk as among the "High Risk Critical Tasks" that called for continuous and specific training. *See* DE 139-5 (Training Directive).

Under the Training Directive, several matters qualified as "High Risk Critical Tasks." One of these was "Sexual harassment/External Sexual Misconduct by Officers." The "Risk" aspect was "High" because, as the policy itself articulated, such areas are ones "*that the final policy maker of the agency knows to a moral certainty that officers will face* and . . . the wrong decision with respect to that task will lead to a physical or constitutional injury." *See id.* (emphasis added). It often is true in failure-to-train cases, when "rogue employees engage in blatant wrongdoing," that failure to train on obviously improper conduct either a) will not meet the deliberate indifference standard or b) will eliminate causation tied to absent training. *See Gambrel*, 25 F.4th at 410-11. Those principles would not square with this record. Stines did not revise the long-standing LCSO policies. Rather, he turned his back on them. The policies recognize, from the viewpoint of the final policy maker (here, the Sheriff), that the risk of sexual misconduct by officers is one that the policy maker "knows to a moral certainty that officers will face." The policy's responsible approach is continuous, targeted, rigorous, and documented training. *See* DE 139-5 at V. Stines's chosen unilateral approach as Sheriff? He could not recall any training pursuant to the dictates of the training directive. DE 135 at 112-15 (repeatedly answering "Not that I recall" on directive implementation). As to sexual misconduct training, in particular, again, he remembered "None." There is no proof in the record of specific training by LCSO on any of the pertinent subject matter.

Plaintiff is entitled to reasonable inferences and a view of the proof taken in her favor. She offers a supportive expert, who carefully parsed LCSO's policies and compliance history. That expert, *see* DE 131-1, noted Stines's individual unbecoming conduct, his utter failure to follow, train on, or enforce the written policies (to include ethics, sexual misconduct, and citizen complaint processing), and the institutional climate Stines fostered. Ultimately, expert Hilden opined that Stines's training failures facilitated Fields's conduct and contributed directly to the harms suffered. This, given LCSO recognition that a problem of this type is a moral certainty, is a plausible explication of the record that the jury is entitled to hear and consider in judging whether the Letcher County Sheriff has direct liability for Fields's constitutional torts.

Certainly, the idea of single-instance liability, under this rubric, is a challenge and rarity. However, as the Sixth Circuit recently explained:

> To state a claim under this theory, the complaint must allege that a "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Here, liability can be established "based on a single violation of federal rights" when the plaintiff also shows that the municipality's failure to train "present[ed] an obvious potential for a constitutional violation.". But the plaintiff has the burden of showing two layers of obviousness: "It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights."

*Martinez v. Wayne Cnty., Michigan*, 142 F.4th 828, 844 (6th Cir. 2025) (first citing *J.H. v. Williamson Cnty.*, 951 F.3d 709, 720-21 (6th Cir. 2020); then quoting *City of Canton v. Harris*, 109 S. Ct. 1197 (1989)). That high hurdle yields to a jury question here, because LCSO's own in-force policies plainly declared both layers of obvious risk—the incidence of sexual misconduct and the constitutional injury from the "wrong decision." *See* DE 139-5. The Training Directive tried to address the stated risk by, as its name proclaims, *training*. Sheriff Stines, cloaked with full policy power within his department, intentionally chose otherwise. A jury must assess that choice,

given the full and nuanced record presented. After all, this is not as stark, for example, as the rogue officer's forcible rape of an inmate. Rather, Fields plied Adkins with gifts, favors, leniency, and months of text communications, all against a backdrop of conditional liberty. All Defendants in this case *lead* with the argument of consent. As such, the situational power imbalance and dynamics of home incarceration figure into the factual context and strongly indicate that, just as LCSO's policy predicted, training may have prevented the misconduct of Fields. Stines facilitated Fields in getting the EKCS job, learning the job, and performing the job. Given all Stines knew about the EKCS structure, Fields's siloed power, the importance of the courthouse location, and the overlapping duties between the CSO and EKCS function, the Sheriff's deliberate failure to adhere to the foundational training policies may put the Office on the hook for obvious and materialized risks.

The Court denies summary judgment to the Sheriff's office.

### b. State Law Claims

This leaves Adkins's state law claims against LCSO. A sheriff's office is generally protected from tort liability via governmental immunity. *See Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). Thus, LCSO is immune from suit on Adkins's state law claims unless that immunity is waived. *See id.* KRS § 70.040 provides that "[t]he sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section." KRS § 70.040. Through this provision, a sheriff's office waives immunity for certain tortious acts or omissions of his deputies. *See Jones*, 260 S.W.3d at 346.

Adkins maintains that LCSO waived immunity from liability pursuant to § 70.040 because Fields "clearly acted within the scope of his official duties." DE 139 at 17, 24. LCSO disagrees, stating that Fields's conduct was outside the scope of his duties as a CSO, *see* DE 136-1 at 13, and

regardless, § 70.040 does not apply to CSOs, *see* DE 143 at 13.

*Bond v. Carter Cnty.*, Civil Action No. 14-140-DLB, 2015 WL 3619228 (E.D. Ky. June 9, 2015), a case from this Court, is instructive and persuasive, and the Court adopts its rationale fully here. *Bond* held that common law vicarious liability principles determine "[w]hat kinds of tortious acts will be imputed to the [sheriff's office]." *Id.* at *3. Thus, a sheriff's office is "only liable for acts of his [deputies] committed in the scope of the employment." *Id.* at *4. An act is within a deputy's scope of employment "where its purpose, however misguided, is wholly or in part to further" the interests of the sheriff's office. *Id.* But if the act is done for "purely personal motives" that are "in no way connected with" the interests of the sheriff's office, that act falls outside of the scope of the deputy's employment, and the sheriff's office is not liable. *Id.*

Adkins has not provided any evidence that Fields's alleged sexual misconduct in any way was done to further the interests of LCSO rather than his own personal sexual interests. "[C]ourts have held that [o]rdinarily, an employer is not vicariously liable for an intentional tort of an employee not actuated by a purpose to serve the employer but motivated, as here, solely by a desire to satisfy the employee's own sexual proclivities." *Id.* (citation and quotation marks omitted). Such is the case here. The purported arrangement between Adkins and Fields—no home incarceration fees or tracking in exchange for sexual favors—did not further the interests of LCSO, and Fields's conduct was thus outside the scope of his employment. Section 70.040 therefore does not apply, and LCSO is immune from liability on the state tort claims against it. Because the issue of scope is dispositive, the Court need not consider whether § 70.040 applies to conduct of CSOs.[13]

Accordingly, the Court dismisses the negligence, gross negligence, assault, and battery

---

[13] That the crime Fields committed involved misconduct performed in his "official capacity" does not introduce a conflict. That criminal element goes to the elements of the offense and the abuse of power; the Court does not see the element as implicating the separate scope of employment values that pertain to tort liability or immunity waiver in this context.

claims against LCSO.

### 3. Plaintiffs' Claims against EKCS

EKCS moves to join the summary judgment motions filed by Fields and LCSO.  *See* DE 155.  The Court grants the motion to join but finds that its rationale in resolving the motions of the co-defendants does not apply with equal force to EKCS.  EKCS is its own entity, separate from LCSO.  The claims against it will require analysis of separate (though, predictably, related) evidence.  The Court is not responsible for sifting through the record to breathe life into or erect EKCS's non-existent and functionally distinct arguments.  Therefore, the Court denies summary judgment as to Adkins's § 1983 failure-to-train/supervise claim against EKCS and her state negligent hiring/training/supervision claim against EKCS.  Given that Hills's claims are untimely, and not provable, the Court grants summary judgment for EKCS as to those claims and dismisses them.  Moreover, the Court also grants summary judgment as to Adkins's IIED and NIED claims due to the already described lack of evidence to support those claims.  All other claims against EKCS withstand summary judgment and will proceed to trial.

## IV.    Conclusion

The Court accordingly **ORDERS** as follows[14]:

1.    The Court **DENIES** DE 153;

2.    The Court **GRANTS** DE 155, as to joinder;

3.    The Court **GRANTS** in part and **DENIES** in part DE 136 and DE 152;

4.    The Claims by Adkins against Fields under § 1983 (Fourteenth Amendment), and assault and battery persist for trial;

---

[14] The Court has endeavored to identify and resolve every pertinent argument.  The parties littered the briefing with scores of distinct cases and theories; the decision here concludes all such arguments with a trial to result.

5. The Claims by Adkins against the Sheriff, officially, under § 1983 (Fourteenth Amendment) and failure to train or supervise persist for trial;

6. The Claims by Adkins against EKCS, under § 1983 (Fourteenth Amendment) and for negligence persist for trial;

7. The Court **DISMISSES** Plaintiff Adkins's remaining claims **with prejudice**;

8. The Court **DISMISSES** Plaintiff Hill's claims, in their entirety, **with prejudice;** and

9. By no later than **October 6, 2025,** the Court **ORDERS** the parties to file a joint status report setting forth the following: a) anticipated length of trial; b) dates of availability for trial in the first half of 2026; and c) whether the parties intend to engage in mediation and, relatedly, whether the parties would have interest in mediation by the Magistrate Judge.

This 19th day of September, 2025.

**Signed By:**

**_Robert E. Wier_**

**United States District Judge**